# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.: 16-10403

| | | |
|---|---|---|
| YURY RINSKY, PLAINTIFF | : | Volume: 1 |
| | : | Pages: 1 - 197 |
| VS. | : | Exhibits: 22 |
| CUSHMAN & WAKEFIELD, INC., DEFENDANT | : | |

DEPOSITION OF YURY RINSKY, a witness called on behalf of the Defendant, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Elizabeth O. Bailey, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Berluti McLaughlin & Kutchin, LLP, 44 School Street, Boston, Massachusetts, on Wednesday, March 1, 2017, commencing at 10:01 a.m.

FEDERAL COURT REPORTERS
617-543-5924 978-535-8333



APPEARANCES:

MARK D. SZAL, ESQ.
Szal Law Group, LLP
589 Tremont Street
Suite 4
Boston, Massachusetts, 02118
(617)830-2494
On behalf of the Plaintiff.

ROBERT R. BERLUTI, ESQ.
Berluti McLaughlin & Kutchin, LLP
44 School Street
9th Floor
Boston, Massachusetts, 02108
(617)557-3030
On behalf of the Defendant.

Also Present:

Raisa L. Rinksy

INDEX


| Witness: | Direct |
|---|---|
| Yury Rinsky | |
| (By Mr. Berluti) | 4 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Four-Page Unit Deed | 22 |
| 2 | Unit Deed | 23 |





| No. | Description | Page |
|---|---|---|
| 3 | Quitclaim Deed | 25 |
| 4 | Registry to Deeds Document | 32 |
| 5 | Declaration of Homestead | 37 |
| 6 | Purchse and Sale Agreement | 61 |
| 7 | E-Mail Thread | 64 |
| 8 | E-Mail Thread | 68 |
| 9 | E-Mail and Attachments | 74 |
| 10 | E-Mail and Attachment | 75 |
| 11 | E-Mail dated May 17, 2015 | 87 |
| 12 | E-Mail dated 5/13/2015 | 107 |
| 13 | E-Mail Thread | 115 |
| 14 | Deed | 118 |
| 15 | E-Mail Thread | 123 |
| 16 | E-Mail dated June 22, 2015 | 134 |
| 17 | E-Mail Thread | 142 |
| 18 | E-Mail Thread | 154 |
| 19 | E-Mail Thread | 155 |
| 20 | Letter dated July 14, 2015 | 165 |
| 21 | MCAD Complaint | 174 |
| 22 | Complaint | 181 |




PROCEEDINGS

MR. BERLUTI: This deposition will be taken pursuant to the federal stipulations as set forth in the Federal Rules of Civil Procedure, and you can swear the witness.

YURY RINSKY, first having been satisfactorily identified by the production of his Massachusetts driver's license and duly sworn, deposes and says as follows:

DIRECT EXAMINATION

BY MR. BERLUTI:
Q Please state your full name.
A Yury Rinsky.
Q Can you spell it, please?
A Y-U-R-Y. Last name is R-I-N, as in Nancy, S-K-Y.
Q Present in the room today, Mr. Rinsky, is your wife?
A Is my wife, Raisa, R-A-I-S-A. Same last name. R-I-N-S-K-Y.

MR. BERLUTI: I will note for the record that I was not aware that the witness' wife was going to attend the deposition. I don't believe she should be here, but I'm going to proceed so we can get the depositions completed.

MR. SZAL: I'll just say, for the record,

that Ms. Rinsky has been instructed not to say anything during the deposition or interrupt the deposition.

MR. BERLUTI: She's not a party but be that as it may.

Q Mr. Rinsky, how old are you?
A I'm 65.
Q What is your date of birth?
A August 30, 1951.
Q What is your home address?
A 7 Conant Road, Apartment 9, Winchester, Massachusetts, 01890.
Q How long has that been your principal residence?
A Since the end of May of 2015.
Q Since the end of May 2015?
A Yes.
Q Prior to that, sir, what was your principal residence?
A Address?
Q Yes.
A 36-24 Gardenview, one word, Terrace, Fair Lawn, two words, New Jersey, 07410. That was for 28 years.
Q You're married, obviously. We have already established that, correct?
A Yes.



Q Do you have any children?
A Yes.
Q How many?
A One.
Q How old is your child?
A 42.
Q What's her name?
A Karina.
Q Where does Karina reside?
A In Winchester.
Q Address?
A 79 Wendell Street.
Q How long has Karina resided in Massachusetts?
A Since she went to college in '94 or '93.
Q 1994 or 1993 when she went to college?
A Yes.
Q She went to Boston University?
A She went to Northeastern.
Q At some point, she became a student at Boston University?
A Yes. Later on. Yeah.
Q Do you have any grandchildren?
A Yes.
Q How many?



A Two.
Q How old are they?
A Eight and two.
Q Is Karina -- is she married?
A Yes.
Q Is she married to this day?
A Yes.
Q What's her husband's name?
A John Money.
Q M-O-N-E-Y?
A Yes.
Q What's your educational background?
A I have a degree, which is an equivalent to a master's degree, from the Civil Engineering University in Moscow. Soviet Union at the time. With minor in computer science.
Q Do you hold any other special licenses or certifications?
A No.
Q In 1988, you became employed at Cushman & Wakefield?
A Correct.
Q How long have you been in the United States, Mr. Rinsky?
A Since December of 1981.



Q What did you do for work prior to becoming employed at Cushman & Wakefield in 1998?
A I worked as a programmer analyst.
Q I'm sorry. Program analyst?
A Programmer analyst for Marsh & McLennan for a couple of years and then I worked for, like, another company under four years. A computer consulting company called CGS, Computer Generated Solutions, as a senior systems analyst/project leader.
Q Where were you employed at Marsh & McLennan? Where, geographically, were you employed?
A 100 Avenue of the Americas, New York City, across the street from Cushman & Wakefield.
Q Where, geographically, were you employed at Computer Solutions?
A 1250 Broadway, New York City.
Q From 1981 until the end of May 2015, you were employed at all times in New York City, correct?
A Yes.
Q You were first employed at Cushman & Wakefield as a senior systems analyst?
A Cushman & Wakefield? Cushman & Wakefield, I will start as a senior systems analyst. Yes.
Q You were then promoted to project manager?

A Yes, but that was later.
Q You became a software engineer II?
A Yes. In 2009. IT management at Cushman & Wakefield changed and changed the name of the positions according to the way they like. I was a project manager for, like, ten years or maybe longer, and they started to call me a software engineer. I looked at it as a demotion, but my salary stayed the same.
Q You never complained to anyone at Cushman & Wakefield that you viewed the name of your position or the title of your position change as a demotion, did you?
A I never complained. I told about it to my immediate manager. It's like a demotion. He told me that was the thing. You are a software engineer because, in their understanding, project manager is a person who communicate with the users who doesn't do hands-on job.
I did projects A to Z starting from user requirement that included programming, testing implementation, cost implementation, support, everything. That's why it was a little different from what they thought.
Q As I understand your testimony, there was a complete revamping of the information technology systems in



2009, and the titles were changed for other members of the information technology department, not just you?
A Yes.
Q Just you?
A No. Not just me. There were other changes. I looked at it like the other people had changed on the same level and I got a change. It's like a paralegal and attorney. That's what it was.
Q Mr. Reid explained to you the reason why your title was changed to software engineer II, yes?
A Yes. That was the management.
Q I understand. It was a management decision to do so?
A Yes.
Q Several people in the information technology department had their titles changed in 2009 as well, yes?
A Yes.
Q You did not file any claim --
A No.
Q -- of age discrimination in 2009?
A No.
Q That's a correct statement?
A Correct.
Q You didn't file any claim for disability



discrimination in 2009 by virtue of any health issue you had, correct?
A Correct.
Q At all times that you were employed at Cushman & Wakefield, you were assigned to the New York City office, correct?
A I wasn't assigned anywhere. I was doing the job, which was support of certain systems.
Q Your testimony, sir, is you were not assigned at any particular office at Cushman & Wakefield. Is that your testimony as you sit here?
A Yes.
Q Every day, sir, where did you go to work for 28 years?
MR. SZAL: Objection.
A Cushman & Wakefield headquarters.
Q That headquarters was in New York City, correct?
A Right.
Q You had an office or cubicle there?
A For several year, I had an office, and later on, I had a cubicle.
Q At all times you had a computer set up, computer station at the headquarters in New York City at Cushman & Wakefield, correct?
A Yes.



Q Your compensation level was determined by virtue of the fact that you reported to the New York City office every day, correct?
MR. SZAL: Objection.
A I don't know how to -- I don't know.
Q You don't know?
A I have no idea. My compensation schedule was tied to my category.
Q What was your position in 2015 at Cushman & Wakefield?
A Software engineer.
Q What were your job responsibilities?
A I was responsible for support of the financial systems. The main system was a commission system which handled the offices nationwide and Mexico.
In particular, I was responsible for design, implementation, post implementation of support of new projects, which I completed most of the time solo.
When it was a big project, then we had a couple of consultants to help me. I also was responsible for system support, and that applies mostly to after-hours support when there were, like, high-data-activity times like month's closing, broker payroll.
If a check has to be posted, then users at

headquarters and all over the country were posting. They were in a very limited time frame. So, it was asked for support. Specifically, my support. There was another programmer who was needed and sometimes --
Q That's Anna Kleynsteyn?
A Yes.
Q Anna Kleynsteyn reported every day to work at Cushman & Wakefield, correct?
MR. SZAL: Objection.
Q At the New York City headquarters?
MR. SZAL: Objection.
MR. BERLUTI: What's your objection?
MR. SZAL: The form of your question.
MR. BERLUTI: What about the form?
MR. SZAL: I put my objection on the record and he can answer.
MR. BERLUTI: I'm trying to obviate. That's the federal rules.
MR. SZAL: He can answer the question.
A She put the day she was coming to the office. She reported to the same headquarters office.
Q In New York City?
A In New York City.
Q When you applied for your job at Cushman & Wakefield,



where did you apply for?
A At the same address.
Q The person that you reported to was Colin Reid, correct?
A Correct.
Q How long did you report to Colin Reid?
A All the time I was employed by Cushman & Wakefield.
Q Except at all times prior to April 1, 2015, Colin Reid reported to work every day at Cushman & Wakefield at the New York City office, correct?
A None of us was reported every day because we worked remotely.
Q Except for working remotely. What I'm saying is when you reported to an office at Cushman & Wakefield, you reported to the New York City office, correct?
A Yes. No. No. That's not correct. It's not New York City office. I had nothing to do with New York City office. It was Cushman & Wakefield headquarters.
Q The headquarters was located in New York City?
A Yes. New York City office is a different --
Q Fine. The headquarters office in New York City. That's where you reported?
A Exactly.
Q That's where Colin Reid reported?



A Yes.
Q The people going up the line from Colin Reid was Leif Maorini --
A Correct. Andrew Hamilton.
Q Andrew Hamilton?
A And Leif.
Q Maorini?
A And their manager was the chief information officer.
Q In 2015, that chief information officer was Craig Cuyar, correct?
A Yes.
Q Craig Cuyar reported to the headquarters office in New York City?
A Craig Cuyar was not a regular chief information officer. He was specifically -- his position was global chief information officer. He was for Cushman & Wakefield globally.
Q His office was in the headquarters in New York City, correct?
A Yes.
Q Leif Maorini was at the headquarters office in New York City?
A Yes.
Q Andrew Hamilton's office was at Cushman & Wakefield



headquarters in New York City?
A Yes.
Q Colin Reid, at all times up until April 1, 2015, was at Cushman & Wakefield headquarters in New York City, correct?
A Yes.
Q Are you familiar with a computer system known as the AS400?
A Yes. That was the area of my expertise.
Q You just testified that, in 2015, you were responsible for the financial system including the commissions that were paid to brokers, correct?
A Right.
Q The personnel -- the financial department that would collect that information and would determine those commissions was located at Cushman headquarters in New York City?
A No. They were all over the country.
Q Where the financial information was brought to for determining the commissions was located in New York City, correct?
MR. SZAL: Objection.
A I don't understand the question.
Q Did you ever meet with financial people, people in the

accounting department --
A Yes.
Q You met with them?
A I --
Q Let me ask the question. You met with them in New York City for the purposes of determining brokers' commissions, correct?
A I met with them in New York City, and with a lot of them, I communicated with e-mails and phone to the people who were not in New York City. We were on the phone and constant e-mail traffic.
Q When compensation was cut out, it was cut out of New York City, correct? Checks?
A A couple of people were working in San Francisco.
Q I'm asking you about the commissions for the brokers. They were cut out of the headquarters office in New York City?
A I'm not...
Q You're not sure? You don't know?
A I'm not sure.
Q How long did you work on the AS400 system?
A For about 30 years.
Q Basically, your entire time at Cushman & Wakefield?
A Yes. There was another --



Q Hold on. Was there ever a time, sir, where you reported to work at Cushman & Wakefield headquarters in New York City five days a week?
A Yes.
Q For how long did you do that?
A All the time I worked there except the last, like, about three years.
Q The last three years, you were permitted to work remotely?
A Not permitted. I was told to work remotely.
Q You're saying the last three years that you were employed --
A About.
Q That's your estimate?
A Yes.
Q Do you have any records to show that you were working remotely for the past three years prior to leaving Cushman & Wakefield's employment?
A The records that confirm I work remotely?
Q Yes.
A No. What happened -- Cushman & Wakefield, about three years prior to the time they fired me, bought Salesforce software, and they acquired a lot of engineers to support just this particular software.



It was state-of-the-art, new software. IT run out of space. There were no space.
We were told to work half of the time, people on my level, not managers. The managers still had to be at the office every day but people on my level, the developers -- they call us the developers. We were told to come to the office, like, approximately half of the time. Three or four days to work from -- to work remotely.
MR. SZAL: Mr. Rinsky, make sure you listen to Mr. Berluti's question. His question was: Do you have any records regarding --
A I don't have any records.
Q When you worked remotely, sir -- for the three years prior to your separating from Cushman & Wakefield up until May 27, 2015, when you worked remotely, you worked in the greater New York area, correct?
A I work here from my home in north Jersey. Sometimes I work from Boston when I visited my daughter.
Q In 2015, sir, other than yourself, how many other AS400 programmers were there at Cushman & Wakefield under Colin Reid?
A There was Anna Kleynsteyn. You said at the time I left?



Q Yes.
A There was a consultant, Mr. Trevor Sini.
Q Trevor?
A Sini.
Q S-I-N-I?
A I think so.
Q He was a consultant?
A Yes.
Q He wasn't an employee?
A Yes. He was just temporary. I think Trevor Sini working for someone else. It was his company. He brought someone else. They were working on a similar project related to our system, and there was a consultant working out of Turkey, I think, who supported data warehouse.
Q I'm asking for Colin Reid. Under Colin Reid's report, it was Anna Kleynsteyn. There was yourself, and there was this consultant, Trevor Sini, correct?
A I can only tell you what I know and I know only about my group, but Colin was also responsible for a group in India. He was managing, from time to time, a group in India, but if you're asking about the office, the headquarters, there were only two of us full-time employee.

Q No desire to live in Massachusetts at that time?
A No.
Q None?
A We had plans, which we made probably a year before that. Once we retire, we move there because we were very attached to the family, and we were driving to Boston from New York for 20 plus years every two, three weeks and that what we wanted once we retire, but I wasn't planning to retire at that time.
I was planning to work until I'm 66, 67, around that time and then move to Boston.
Q Sir, have you signed up for Social Security benefits?
A Yes.
Q When did you sign up for Social Security benefits?
A In August of 2015.
Q In August of 2015, how old were you, sir?
A 64. After my birthday. Maybe September. August or September.
Q In August or September of 2015, you were 64 years old?
A Yes.
Q Mr. Rinsky, did you purchase some property in Massachusetts in November of 2014?
A In December of 2014.
Q Where did you buy that property?



A We finally were able to find something close to our daughter's. Close to 79 Wendell. We were looking for a condo, and we were looking for about a year before that and we couldn't find anything even close to what we want, what we like, and once we found this one, we bought it. Yeah.
Q For what purpose did you buy it?
A We bought it as a retirement house for the future. Before we retire, we were going to make it -- to rent it out to make it an investment property until we retire. For two, three years.
Q You closed on the property -- you purchased it in December of 2014?
A Yes.
Q It's your testimony that you intended to rent it out for two or three years before moving there?
A Yes.
Q Is that your testimony?
A Yes.
Q Did you ever list it with a broker?
A We didn't get to it.
Q You didn't get to it?
A It didn't get to listing it because -- until end of April or even beginning of May, we were fixing it up.



Q What did you do to Conant Road?
A Conant Road?
Q To fix it up.
A The construction?
Q Yes.
A We removed a partition. We removed a wall. We replaced all appliances -- 100 percent of appliances. We put hardwood.
Q Hardwood floors?
A Hardwood floors. We painted everything. Replaced the toilets, sinks. What else? That's it. Everything. We re-did the apartment.
Q You never listed it with a broker to try to find a tenant?
A No, because it was the winter --
Q If you could -- you never listed it with a broker?
A Never listed it with a broker.
Q You never rented it out?
A Never rented it out.
Q Are you familiar with the term called "Homestead"? Something in the law called the Homestead or Homestead Declaration?
A No.
Q You're not familiar with that?



A No.
MR. BERLUTI: Let's mark this as Exhibit 4, please.
(Middlesex South Registry of Deeds Electronically Recorded Document marked as Exhibit No. 4 for identification.)
Q Do you recognize Exhibit 4 particularly beginning with the second page? Do you recognize this document?
A I don't recognize it. I don't remember seeing it before.
Q Let me direct your attention to page 2 of Exhibit 4. You purchased unit 9 at 7 Conant Road, Winchester, from a Robin Silverstein as a representative of the estate of Faith Kaplan. Do you recall that?
A Yes.
Q You paid $400,000 to purchase unit 9 at 7 Conant Road, correct?
A Yes.
Q Title to the property stands in the name of Yury B. Rinsky and Raisa L. Rinsky as husband and wife, tenants by the entirety, and Karina Money, all as joint tenants with the right of survivorship. Do you see that?
A Yes.

Q That's how you owned unit 9, 7 Conant Road, Winchester, correct?
A Yes.
Q This property closed -- you purchased it on December 19, 2014, correct?
A Yes.
Q From December 19, 2014, until sometime in April of 2015, you did a renovation in the unit, correct?
A Definitely until the end of April. Maybe even May.
Q Maybe into May?
A The winter was a lot of snow. Everything was going very slow. It took us a long time.
Q How much did this renovation cost approximately?
A I would say, like, $30,000. Maybe a little bit more.
Q Who did the work? Did you hire contractors, or did you do it yourself?
A I hired different contractors.
Q Did you have to take out a home equity loan in order to do this renovation work at unit 9 at 7 Conant?
A Home equity from what loan?
Q From anywhere.
A We didn't take -- we took a home equity loan from our property in New Jersey.
Q What did you use that equity for?



A We used it to buy the property at 7 Conant Road and probably some of it for fixing it up, but yeah.
Q In 2014, did you have a mortgage on your property -- an outstanding balance on your mortgage on your New Jersey property?
A 2014?
Q Yes.
A I believe we paid off the mortgage in 2014.
Q Did you take out a mortgage to purchase 7 Conant Road?
A Yes.
Q So --
A Whatever was not enough from the sale of the property in New Jersey, we took a mortgage for, like, 70, 80,000 range --
Q Wait a minute. Since the time you purchased --
A -- at the time of closing.
Q At the time you purchased Conant Road, you also owned your New Jersey property, correct?
A Correct.
Q So, did you use any of the home equity from New Jersey to purchase Conant Road?
A Most of it, yeah.
Q In addition to that, you took out a mortgage to purchase Conant Road, correct?



A Yes.
Q So, you had to pay the mortgage on Conant Road, and you had to pay the home equity mortgage on the New Jersey property from December through May of 2015, correct?
A Yes.
Q In May of 2015, you sold your New Jersey property, correct?
A Yes.
Q You never hired a broker to find a tenant. Did you ever list a classified ad in the newspaper to try to find a tenant for Conant Road in Winchester?
A No. It was still under construction. It was being renovated.
Q I understand, but you knew the renovations would be completed sometime in the April time frame, correct?
A I just asked the broker how difficult it is, how long would it take. I was told there are plenty of people who want an apartment. That's all. I didn't worry about it.
Q So, in April, you never asked a broker to find a tenant, correct?
A No.
Q Did you ever speak to anybody that you just may have



come across on your own, when you were up here visiting your daughter or up here overseeing the renovations, about renting out Conant Road?
A In particular about how much I could rent it for or how difficult it is to rent.
Q Any prospective tenant?
A I asked the broker.
Q Other than speaking to the broker, did you speak to anyone else?
A I don't recall.
Q Were you represented by an attorney when you purchased Conant Road?
A Yes.
Q Was it an attorney up here in Massachusetts?
A Yes.
Q Who was that?
A An attorney in Woburn.
Q In where?
A Woburn.
Q Woburn?
A Woburn. A local attorney.
Q Was his name Robert Tedesco?
A Yes.
Q T-E-D-E-S-C-O?

A Yes.
Q Did Mr. Tedesco provide you with a form that you signed called a Declaration of Homestead?
A I don't recall. If you were looking at it, yes.
Q What did you understand a Declaration of Homestead to be?
A Can I look at the document?
Q I'm going to show it to you. I'm just going to ask you what your understanding -- it's only a couple of years ago you signed it. Actually, two years ago. You signed it in December of 2014, right?
A Uh-huh.
Q What did you think you were signing when you signed a Declaration of Homestead?
A I don't remember. I'd have to look at it.
MR. BERLUTI: Let's mark this as the next exhibit in line, please.
(Declaration of Homestead marked as Exhibit No. 5 for identification.)
Q Please take a look at Exhibit 5. First of all, Mr. Rinsky, please take a look at the second page. Is that your signature in the middle of the second page --
A Yes.



Q -- above your typewritten name? Is that your wife's signature above her typewritten name?
A Yes.
Q That was signed on December 18, 2014, correct?
A Yes.
Q Do you recognize Mr. Tedesco's signature at the bottom?
A Yes.
Q Where did you sign this document? At Mr. Tedesco's office?
A Yes.
Q That was in Woburn, Massachusetts, right?
A Yes.
Q Have you had a chance to look at this document?
A There were so many documents to sign. I didn't read the documents.
Q You just signed?
A I just signed.
Q You just signed?
A Yes.
Q I see. You have no understanding, as you sit here, what a Declaration of Homestead is, correct, what the significance of that is?
A I still don't.



Q Let's look at the check marks, sir, on the first page. It says, "We, Yury B. Rinsky and Raisa L. Rinsky, hereby declare homestead pursuant" to a particular Massachusetts statute. Do you see that?
A Yes.
Q You stated, "I/we own the home described below and occupy or intend to occupy the home as my/our primary residence."
You signed that in December of 2014, correct?
A Yes.
Q Now, do you know someone by the name of Michael Salman, S-A-L-M-A-N?
A Yes. That was the broker who sold our house in New Jersey.
Q When did you first meet Mr. Salman?
A A long time before that. He had a lot of advertisements in local newspapers, and we heard about him and knew people who used him.
Q He spoke Russian, correct?
A Yes.
Q Some of your friends had used him as a real estate broker?
A Yes.



Q Did you ever meet him?
A Yes. Briefly. Yes.
Q When did you first meet him? Approximately.
A A long time before that. He was selling a house on my block. People I knew.
Q So, you met him a long time --
A I --
(Discussion off the record.)
Q Just to pick up on that, Mr. Rinsky. I will try to wait and let you finish your answer, and you have to wait and let me complete my question so she can take both down.
You first met Mr. Salman many years prior to December of 2014, correct?
A Correct.
Q You asked Mr. Salman to sell your property in New Jersey, correct?
A Correct.
Q When did you first speak to Mr. Salman about selling your property in New Jersey?
A End -- I would say March 20th -- around the week of March 20th probably.
Q March 20th of 2015?
A Yes.

Q It's your testimony --
A What --
Q Go ahead.
A What happened the house next door went for sale and the broker stopped at our house and told for us to sell our house as well. A new season. There was a big inventory of houses in the town that weren't selling. People were waiting for year, two year to sell the house.
So, this broker says this season -- a new season start in April and it's very promising. Why don't you try to sell your house.
We discussed it with the other broker, and we said, Hey. Why don't we try?
We said, Instead of using a broker we don't know, we should use Michael.
We knew him and his reputation. We called him, and he said, I'll come and take a look at the house in a couple of days.
That was around March 20th and the next several days --
Q Did you sign any document to list the house with Mr. Salman?
A He brought us a handwritten form. It wasn't, like,



something, like, electronically generated. It was a simple form which you sign, and he said he's going to list it. Yeah.
Q So, you signed some document --
A I signed some document.
Q -- to list the property? When did you sign the document?
A I signed it sometime at the end of March. I would say March 27th. A couple of days before it was listed. Around this time.
Q Do you have a copy of this document?
A I didn't get a copy. He didn't offer me a copy.
Q Had you asked him to, as part of this litigation, provide you with a copy of that document?
A I did.
Q What did he say?
A He said it's in the basement of his office. He works for -- it's a small agency, part of RE/MAX. He told me that all the documents are being stored in the basement. I didn't speak. I e-mailed him. The documents are in the basement and he's not sure if he will be able to find it.
After a couple of day, I ask him again. Did you find it because I need it? My former employer



needs to verify when I moved out, and I need it very badly.
He still didn't find the document. He send me the listing itself.
Q I saw that, sir. You've never actually spoken to him live about this topic --
A I never spoke -- sorry. After I sold the house.
Q Did you ever look at renting any property in the New York area, New York, New Jersey area?
A Rent?
Q Yes.
A No.
Q Did you ever stipulate, as a part of your sale, that although you would sell your property in New Jersey that you wanted to remain there after the sale and rent it?
A I didn't think about it.
Q So, when you sold the New Jersey property, you intended to move to Massachusetts, correct?
A Everything depended on whether or not my employer would allow me to work out of the Boston office.
Q Sir, you listed the property for sale in March of 2015, correct?
A Yes.



Q You knew that if you listed the property, you could sell the property. That was a possibility, correct?
A Yes, but it --
Q Just stay with me, sir. In March of 2015, you didn't ask anybody at Cushman & Wakefield if you could move to another office, correct?
A I asked Colin. Colin Reid.
Q You asked Colin Reid in March of 2015?
A Yes. When I talked to the broker about the same time, end of March, I asked Colin. I told him that I'm putting the house on the market and I would like to, when it sold -- if it sold and when it sold, I would like to move to Boston and work out of the Boston office.
Q Sir, Mr. Reid himself was moving from the New York area. Isn't that right?
A Right.
Q He learned he was moving from the New York area at the end of February 2015. Isn't that right?
A That I don't know. I found out about it about two weeks before he told.
Q Two weeks before when?
A When he moved.
Q The first day he started in Miami was on April 8,

2015. Isn't that right?
A I'm not sure.
Q You learned about two weeks before he moved to Miami?
A Two weeks, yeah. It was the middle of March some time.
Q You have no document with respect to that, correct?
A With respect to what?
MR. SZAL: Objection.
Q This conversation that you had with Mr. Reid. No document?
A There was no conversation.
Q There was no conversation?
A I ask him. He said, The sale of your house will take at least six months, and we can talk about it later. I'm extremely busy right now.
And that was the whole thing.
Q That was everything he said to you at that time?
A Yes.
Q Notwithstanding that, you went ahead and listed your property for sale?
A I told him, I'm putting my house on the market.
Q You had already decided to put your house on the market?
A Right.



Q You decided to put your house on the market before you spoke to Mr. Reid? You were informing him that you were putting your house on the market, correct?
A Yes. I didn't ask him whether or not I can do it. I told him, I'm planning to sell the house. I'm putting it on the market to see what happened.
Q You've got no calendar entry or no e-mail to track when it was you first informed Mr. Reid that you were putting your house on the market and you were moving to Boston, correct?
A I couldn't tell him that I'm moving to Boston. I was asking him for his approval, for his permission. I didn't tell him I'm moving to Boston.
Q This conversation occurred in the headquarters in New York City, correct?
A When I ask him that I'm putting the market on the house -- the house on the market?
Q Yes.
A That occurred, I believe, in the office before he left. Days before he left.
Q How long did this conversation last? A couple of minutes?
A Yeah.
Q A minute?



A Yeah.
Q You've now told me everything you recall about your conversation with Mr. Reid when you first informed him you were putting your house on the market, correct?
A That I'm putting the house on the market. Yes. Everything.
Q Do you recall that Mr. Reid had to be back in New York at the end of April?
A I am not sure it was end of April, but he was back and forth many time. Yeah. He was back on his personal business, and he stopped in the office two weeks after he left.
Q On April 30th, he had to be back in the New York area because he had to attend a funeral. Isn't that right?
A Probably.
Q You knew that?
A I saw an e-mail. Yeah.
Q When he came up to attend that funeral, you had a conversation with him about moving -- about selling your home. Isn't that right?
A I had several conversation with him before that.
Q When was the next one, sir?
A The next one was when I received this beautiful offer for my house, which didn't have mortgage contingency



and an option to stay in the house after I sold it. I received unusually fast and I received a very unusual offer, which we liked a lot.
There were, like, 80 houses in the town for sale. People couldn't sell their houses, and we received an offer for the money we asked for, 340. It doesn't make sense to list it for more.
So, we put it for 340. We received an offer with no mortgage and an option to stay there, and I told Colin right away.
Q The offer you received on March 31, 2015, correct?
A The offer we received late -- a couple of days later.
Q Sir, what you actually received was a purchase and sale agreement, a signed purchase and sale agreement, from the person interested in buying the property, correct?
A Yes.
Q You received that on March 31, 2015?
A That was -- I received it via e-mail dated, like, April 4th or something like that, but the attachment was they put the 31st on there.
Q Did you sign that purchase and sale agreement, sir?
A Later.
Q You never produced a signed purchase and sale

agreement. Do you have a copy of the purchase and sale agreement?
A I think I did. Purchase and sale agreement.
Q I don't have a signed purchase and sale agreement. I've got a signed addendum to the purchase and sale agreement. I don't have a signed purchase and sale agreement.
You've testified about what you say is your first conversation with Mr. Reid that occurred in the Cushman & Wakefield headquarters in New York in which you informed him that you were going to sell your house in New Jersey. When do you say is the second conversation with Mr. Reid?
A The second conversation when I received this offer. A couple of days later, which makes it, like, end or first week of April. Around that day.
Q Did this conversation occur in the New York headquarters as well?
A I don't recall.
Q You don't recall where the --
A I don't.
Q -- second conversation took place?
A I remember our last conversation and the conversation --



Q Hold on. Stay with this one. You don't recall where the next conversation in April took place?
A No.
Q Did it occur in your house?
A Definitely not in my house.
Q Did it occur at Colin's house?
A No.. It could only be over the phone or in the office. If Colin was there, which I don't remember -- I remember he had problem with his baggage he sent to Florida. Something went wrong and he came back. I remember it could be a week or two week after he left.
He stopped in the office. It could be at that time or I called him, but I didn't want to wait. I told him, Colin, I received an excellent offer, a cash offer.
And he made a joke. Now you have a lot of cash.
Q You told Mr. Reid you received an excellent offer. His response was, Now you have a lot of cash?
A Right.
Q You don't recall if this conversation occurred over the telephone or in person?
A I don't.
Q What else do you recall about this conversation?



A Then I told him that I will go with it and I would like to -- I must ask the company if the company will allow me to work out of Boston once the house is sold.
Q So, you said, "I will go with it." Meaning I will accept this offer?
A Yes.
Q You asked him, Will the company allow me to work out of the Boston office?
Is that correct?
A Yes.
Q What did he say in response?
A He said, I'm okay with it.
He also said, Anyway, you work half of the time remotely, and we didn't have a problem with it.
He also said, It's not just me. I need to talk to my boss.
Q Who did you understand that to mean? I have to talk to my boss. Who did you understand that to mean?
A His boss is his manager.
Q Who is?
A Andrew Hamilton.
Q What else did he say?
A He also said, It's too fast. It's too fast.
Initially -- by the way, initially, he asked



me, What is it that you want to talk?
I told him that it's about my house. I mentioned it before.
He said, Okay. I was worried that you have some health issues again. That's better.
Then we started to talk about it. That was the beginning of the conversation.
Q At the beginning of the conversation, you told him you wanted to talk to him about your house -- about the house situation?
A Yes.
Q He said to you, Oh, I was worried it was about your health situation?
A No. I think I left him a message before. I couldn't get a hold of him. I left him a message that I need to talk to him about something important.
Q How did you leave that message?
A I think I left a voice mail.
Q On his work telephone?
A I'm not sure. Could be work. Probably it was his cell phone because if he wasn't in the office -- they hooked up his work phone in Miami later. It took a while. He was using his cell phone, I think, at the beginning.

Q So, you left him a voice mail saying, I have to talk to you about something important?
A Something important.
Q When you finally spoke to him, you said to him, I want to talk to you by my selling my house?
A Yes.
Q What did he say in response?
A He said, Oh, that's about the house. You already mentioned it.
I mentioned it to him before that I was going to put it on the market.
He said, I was worried something went wrong again -- again you have some health issues.
Q What else did he say about that?
A That's it.
Q He said, Oh, good?
A Oh, good. It's not your health issues.
Q He was happy for you that it wasn't your health?
A Exactly.
Q He didn't say or do anything negative about your health, correct?
MR. SZAL: Objection.
A Never. He was always nice about it.
Q Did you talk about any health issues any more in this



conversation that you're now telling me about?
A No.
Q So, what did you tell him about your house in New Jersey in this conversation, the second conversation?
A I told him that I received an attractive offer, an offer we like, for the house -- my house in New Jersey, and we were going to go with it. We like it. I just told you. You want me to repeat?
MR. SZAL: No.
Q Yes. I want to understand what it is he told you or what you said to him.
You said, We received an attractive offer, an offer we like, and we will go with it.
A Yes.
Q You informed him you were going to accept the offer?
A Yes.
Q Did you say anything else at this point?
A We are going to accept this offer, and I would like to ask if the company will allow me to work -- when the house is sold, if the company will allow me to work out of the Boston office.
Q What did he say in response?
MR. SZAL: Objection. He's already testified to this.



Q Go ahead.
A He said, It is okay with me. Anyway, you work at least half of the time remotely, and we never had a problem with it, but it's not just me. I need to talk to my boss.
Q You understand he was referring to Andrew Hamilton?
A That was his only boss. Yeah.
Q That was his only boss?
A Yes.
Q What did you say in response?
A I said, Okay. Let me know.
Q How long did the second conversation last?
A Five minutes.
Q Did you ever e-mail Mr. Reid about this conversation -- this second conversation?
A No.
Q Did Mr. Reid e-mail you about this second conversation?
A No.
Q You did accept the offer, correct, to purchase your New Jersey property. You did accept that offer, correct?
A Yes.
Q You got the property -- the property had to be



inspected, correct?
A Yes. The property has to be inspected, and I had to get certificate of occupancy for the town. Yeah.
Q You moved ahead doing all the things --
A I moved ahead. I started it. It took a while. It took, like, through May.
Q If you received this purchase and sale agreement on the first or second day of April, how long did it take you to sign? When did you sign the purchase and sale agreement?
A Sign the purchase and sale agreement? I don't remember when I signed it. I know the end or first week of April, we decided to go with the offer. It came in earlier but we waited. Maybe someone else will come. We didn't get any competitive offers, but by the end of the week, we decided to go with this offer.
MR. SZAL: Can we take a short break?
MR. BERLUTI: Yes. Yes. Short break.
(A recess was taken.)
MR. BERLUTI: Back on.
Q Mr. Rinsky, the first conversation that lasted about a minute with Mr. Reid, that occurred in the headquarters in New York City, correct?

A Yes.
Q The second conversation you're not sure if it happened over the telephone --
A I'm not sure.
Q -- or in the office in New York City -- in the headquarters in New York City, correct? One of those two places?
A Correct.
Q You were telling me about the second conversation, and you said at one point, Mr. Reid said, It is too fast.
Do you recall that?
A (Witness nods.)
Q You have to say yes or no.
A Yes.
Q What else did Mr. Reid say in connection with, It is too fast?
What was he referring to? Where in the conversation did he make that statement?
A He was referring probably that the house was sold very fast and that what happened.
Q You asked him if the company would allow you to work out of the Boston office, correct?
A Correct.
Q He said that it is happening too fast, correct?



A Correct.
Q That's what he said, right?
A That exactly what he said.
Q What else did he say after he said that it was happening too fast?
A Then, like I said, he told me, It's not just me. I need to talk to my boss.
Q Did he say anybody else at the company that had to agree or had to approve you working out of the Boston office in this conversation?
A That was his exact word. I need to talk to my boss.
Q Did he say -- did he have any conversation with you, any reference to you, about how long it took for his transfer to be approved?
A Yes. He made a joke.
Q What did he say?
A It took me almost ten years.
Q In this conversation, he also said, It took me almost ten years for me to get my transfer?
A Yes.
Q What else did he say in connection with how long it would take to get approval for your request to work out of the Boston office?
A He said he doesn't know. He didn't know.



Q He didn't know how long it would take?
A I ask him. He said, I don't know. I need to talk to my boss. I'll let you know.
Q Did he make any reference that his boss, Andrew Hamilton, would also have to talk to his --
A No.
Q -- boss, Andrew's boss?
A No.
Q Did he tell you that any decision had to be approved by Craig Cuyar?
A No.
Q Did you ask him about the process?
A No. I didn't know about any processes.
Q What else did he say when he said it took him almost ten years to get the approval from the company that he could move to another office?
A Nothing. I said, Because you were a managing director and I am a much lower position.
Q Is there anything else that was said in the second conversation, other than what you've testified to? Anything else?
A I don't recall anything else.
Q How was it left?
A Colin was nice. He said that -- he wasn't, like,



upset with it. He said, I'll talk to Andrew.
He ended it on a good term and that's it.
Q Okay. When was the next time you spoke to Mr. Reid?
A The next time in about two, three days, I called Colin. I don't remember I called just for that or was it something related to the business I needed to talk to him about.
I asked him, Did you talk to Andrew?
He said, No. Everyone is busy. Not yet.
He didn't like me asking. He said, You think that's only thing we have to do?
Q Again, put a time frame.
A In about two days after our conversation. Two, three days.
Q Where are we now in the chronology of things? Is this in May, or is this in April?
A This is middle of April. Middle of April.
Q Okay. Now, your testimony was you decided -- you and your wife decided to continue to take offers on the New Jersey property after you got the proposal-- the purchase and sale agreement in March -- dated March 31, 2015? Is that your testimony?
A Yes. The broker explained to us that once the house is listed, he has somehow to communicate to all the

brokers and they set up a day or two days when people from all the brokers come to, like, an open house to look at the house. That happens once it's listed.
We were waiting once the people, you know, looked at the house. The people who were seeing after the house went on the listing, we were waiting another two or three days. That was it.
Q Was there an open house that the person that bought your house attended?
A The person who bought -- it was one of the people sent by the brokers right when the house was listed.
Q Had there been any open houses at that point?
A It was, like, an open house.
Q It was an open house. Okay.
MR. BERLUTI: Let's mark this as the next exhibit in line.
(Contract for the Sale of Real Estate marked as Exhibit No. 6 for identification.)
Q Do you recognize Exhibit 6?
A Yes.
Q This is the purchase and sale agreement that the person that bought your house submitted on March 31, 2015, correct?
A This is an exhibit. I don't know when it's submitted.



Q It's dated on page 1.
A Right.
Q It says, "March 31, 2015," correct?
A Yes, but I received it later.
Q We will get to that, sir. Did you and your wife sign this document, Exhibit 6?
A I think we signed it later on. When we received it, it was only -- yes. That was the document sent to our broker from buyer's broker and then forwarded to us. It couldn't have our signature.
Q I understand. If you -- you don't recall when you signed this document?
A I don't recall.
Q Your testimony is you don't have a copy, correct, of your signature on the purchase and sale agreement, right?
A It may be similar. I looked. There are e-mails, but they are all similar.
Q Mr. Rinsky, did you hire an attorney to represent you in the sale your New Jersey home?
A Yes.
Q Who was that?
A I forget his name.
Q Was his name James Banks?



A Right.
Q You retained Mr. Banks because you wanted to accept this purchase and sale agreement, Exhibit 6, correct? You wanted to accept this offer?
A Yes.
Q So, you hired him right away, correct?
A Just for that. Yes.
Q When you hired him, you had made a determination, you and your wife, that you wanted to accept this offer. Is that right?
A Yes.
Q Your attorney was located in New Jersey, right?
A In the same town. Fair Lawn.
Q Now, you and Mr. Salman communicated sometimes by e-mail. Is that correct?
A Yes.
Q The e-mail address that he used for you was your Yahoo account, correct?
A Yes.
Q YRinsky@yahoo.com?
A Correct.
Q Do you have any other personal e-mails other than your Yahoo account?
A I don't.



Q Did Mr. Salman transmit Exhibit 6 to you by e-mail?
A I think so. Yes.
Q Whatever date it was that he transmitted to you was the date you received it, correct?
A It was an attachment to his e-mail. Yes. The e-mail had a date of, I believe, March 4th, I believe.
Q March 4?
A Yeah.
Q March 4th or April 4th?
A I'm sorry. April 4th.
Q Let's see if we can't refresh your memory.
MR. BERLUTI: Let's mark this as the next exhibit in line, please.
(E-Mail Thread marked as Exhibit No. 7 for identification.)
Q Do you recognize Exhibit 7 to be some e-mail correspondence, at the top, between you and Mr. Salman dated April 2, 2015?
A Okay. Yes. It was April. Not 4th, but it wasn't the date on --
Q It wasn't March 31st. I understand that.
A A couple days later.
Q Mr. Rinsky, it says, "Updated offer."
Do you see that?

A Right.
Q What does that mean?
A Updated offer.
Q Had you received an offer before that?
A My broker sent me an e-mail on April 2nd and then another one, again, like an hour later and the difference between those offers was, one, I need to remove an oil tank, which wasn't used, and the other one was I don't need to remove it. That was the difference.
Q The seller's broker was someone named Bruria, B-R-U-R-I-A, Laura, Bussi, B-U-S-S-I?
A Yes.
Q Look at Exhibit 7. This is Exhibit 7. At the bottom of the first page of Exhibit 7 -- actually, let's start on the second page. On the second page is an e-mail from Laura Bussi, it looks like, to herself. It's a forwarded message regarding updated offer.
Then if you go on to the first page in the middle, it appears that Ms. Bussi sent an e-mail to Michael Salman at 2:54 on April 2, 2015. Do you see that?
MR. SZAL: Objection. It says 2:04.
MR. BERLUTI: I stand corrected.



Q Ms. Bussi sent an e-mail to Mr. Salman on April 2nd at 2:04 p.m. Do you see that?
A Yes.
Q The subject is updated offer?
A Right.
Q Then Mr. Salman forwarded it to you, right?
A Right.
Q At 2:45 p.m. on April 2nd, correct?
A Okay.
Q I have no e-mails between you and Mr. Salman prior to this e-mail on Thursday, April 2nd, 2015. Did you inspect your Yahoo e-mail account for all correspondence with Mr. Salman?
A I have the other e-mail.
Q It wasn't produced. I'd like to see it.
A They look, to me, similar. The difference was about the oil tank. That's why I provided only one.
MR. SZAL: Are you sure it's not produced? Because I recall there are two e-mails that were produced at different times. I'll check it.
Q Did you inspect your Yahoo account for all e-mail correspondence between you and Mr. Salman?
A Yes.
Q Have you produced all the e-mails between you and



Mr. Salman?
A Not all. There were e-mails which I thought are insignificant, like, How is it going? Did you see the contractor?
Q I'd like to see all of them. I'll seek to get those. Did you provide them to your counsel?
A Not all of them.
Q How did you meet Mr. Banks?
A As an employee of Cushman & Wakefield, I participated in the legal plan. I looked him up from this legal plan. He was listed on this legal plan I could use, and I send a list of local attorneys on my plan to my broker, Michael Salman, and ask him, Can you recommend someone?
He said he worked once with this guy. He knows him. He is okay. So, I picked that person.
Q How long did it take from April 2nd when you received Exhibit 6 until the time you retained Mr. Banks? How long did that take?
A I retained Mr. Banks a couple of days after this offer. Like maybe three days after I started to work -- when we decided to go visit.
Q Did you inform or did Mr. Salman inform Ms. Bussi that you would be represented by Mr. Banks?



A I don't know.
Q Was the buyer represented by an attorney?
A Yes.
Q Was the buyer represented by an attorney named Chander, C-H-A-N-D-E-R, Singh, S-I-N-G-H?
A I think so. Yes.
MR. BERLUTI: Let's mark this as the next exhibit in line.
(E-Mail Thread marked as Exhibit No. 8 for identification.)
Q Before we get to this exhibit, Mr. Rinsky, Exhibit 7 has the e-mail string from Mr. Salman to you, and the attachment is the purchase and sale agreement dated March 31, 2015, that we marked as Exhibit 6, correct?
A There were two. I told you. There was an original and an updated.
Q Why don't you take a look and see if the one that we have marked as Exhibit 6 is different than the one that's marked as an attachment to Exhibit 7.
MR. SZAL: In the meantime, just for the record, there was e-mail produced beginning at YR109 dated April 2, 2015, at 3:12 p.m. The title is, "Gardenview," and it appears to be the initial offer notwithstanding the fact that it appears to be

forwarded after the e-mail we are looking at in Exhibit 7.
MR. BERLUTI: What's the page? 109?
MR. SZAL: 109.
A Yes. This is the same because the owner will remove oil tank. This is the same.
Q So, Exhibit 6 is the same as the attachment to Exhibit 7?
A Right.
Q I'll show you Exhibit 8. Exhibit 8 is -- are documents that are Bates stamped, in the lower right-hand corner, YR72 through YR100. These were produced by your attorney.
A My attorney?
Q Yes.
A Okay.
Q Now, I'd like to direct your attention to four pages into Exhibit 8 with a Bates stamp YR75. It's a letter from the law firm Cuan, C-U-A-N, and Singh, S-I-N-G-H, to James Banks. That's your attorney, correct?
A Yes.
Q It's dated April 3, 2015. Do you see that?
A Yes.
Q It's regarding Yaar and the property address of your



property in New Jersey, correct?
A Yes.
Q By April 3rd, you had retained Mr. Banks and the attorney, for the buyer is corresponding with your attorney on this transaction, correct?
A I'm confused because I didn't think I already made it on April 2nd. I think it was a couple of days, at least, later. What makes you think it's communication from my attorney, not from their attorney?
Q It is a communication from their attorney, but it's to Mr. Banks. So, you had retained Mr. Banks about this transaction by April 3rd of 2015?
A I didn't know whether or not they were communicating. As soon as I selected the attorney, maybe I gave the name to my broker. Maybe, but I doubt it was on April 2nd. My estimation was it was at least a couple of days later.
Q Let's look at the second page of Exhibit 8, Bates stamped YR73. It's an e-mail from the attorney for the buyer, whose name is Chander Singh, to JBanks@Banks-lawoffices.com. Do you see that?
A Yes.
Q It's an e-mail dated April 3, 2015, correct?
A That's what it says, yeah. Yeah.



Q It's your testimony that you didn't retain Mr. Banks until you knew you were going to accept this offer, correct?
A Yes.
Q Did you sign an engagement letter with Mr. Banks?
A I don't remember.
Q Is it your testimony that there were any other open houses after you received this offer from Yaar?
A After I received the offer from Yaar, I don't know if it was an open house, but this first batch of people, you know, that the brokers sent after the house was listed was not over after a day or two.
Q Yaar was a part of the first batch of people?
A She came the first day.
Q Now, was there a home inspection --
A Yes.
Q -- of your property by this buyer?
A Yes.
Q When did this home inspection occur?
A Like ten days, two weeks after. About ten days after. Maybe two weeks after.
Q After what?
A After we agreed. We decided to go with this. Her husband came to look at the house, and she said, We



are going to hire an inspector.
Q You wouldn't allow the inspection until after you had reached an agreement on the amount of money, correct, and on the other terms of the purchase and sale agreement. You wouldn't have allowed a home inspection. Is that correct?
A Yes.
Q So, you had reached agreement on the purchase and sale agreement, and then after that, there was the home inspection, correct?
A Yes.
Q Let's look at Exhibit 8 Bates stamped YR91. This document is the inspection agreement, correct?
A Yes.
Q It's for your property in Fair Lawn, New Jersey, correct?
A Yes.
Q Do you see at the top left-hand, the second line down, the date is April 14. Do you see that?
A Yes.
Q That's when the inspection took place, April 14, 2015?
A I'm not sure, but it sounds about right. Yeah.
Q Well, look at the signature and the date in the lower right-hand corner. That's also dated April 14, 2015,

and it's signed by the inspector, correct?
A Yes.
Q Now, as a result of the inspection, you had to agree to a reduction in the purchase price. Isn't that right?
A Yes.
Q You had to reduce the purchase price by $4,000, correct?
A Yes.
Q You had to sign an amended purchase and sale agreement or an addendum to the purchase and sale agreement reflecting that reduced purchase price, right?
A Right.
Q When did you sign that addendum?
A There was a dated document. I don't recall the exact date.
Q Do you recall, Mr. Rinsky, that at some point you e-mailed some documents to yourself from your Cushman & Wakefield e-mail address?
A That's possible. Yeah.
Q Do you recall when you did that?
A When I needed a copy of something maybe. I needed -- I didn't have a scanner at home. So, I use company scanner.



MR. BERLUTI: Let's mark this as Exhibit 9.
(E-Mail and Attachments marked as Exhibit No. 9 for identification.)
Q I'm showing you what's been marked as Exhibit No. 9. That's an e-mail from you at Cushman & Wakefield to yourself on May 22, 2015. Do you see that?
A Yes.
Q There are several attachments. Do you see where it says, "Attachments"? On the first page, it says, "Attachments."
A Yes.
Q One of the attachments is the contract addendum. Do you see that?
A Yes.
Q That's dated April 28, 2015?
A Okay.
Q That's your signature and your wife's signature, correct?
A Yes.
Q The application for certificate, from the Borough of Fair Lawn, for continued occupancy/resale is dated April 30, 2015. Do you see that?
A Right.
Q There's a construction permit notice --



A Yes.
Q -- dated May 11, 2015. Do you see that?
A Yes.
Q There is a smoke detector certificate on May 6, 2015. Do you see that?
A Yes.
Q The next page is a notice from the Borough of Fair Lawn Water Department, and that's dated May 5, 2015. Do you see that?
A Yes.
Q Now, you testified that Mr. Salman sent you an e-mail along with the listing agreement about the sale of your property, correct? Just recently, you sent an e-mail, right?
A Yes.
MR. BERLUTI: Let's mark this as the next exhibit in line, Exhibit 9.
(E-Mail and Attachment marked as Exhibit No. 10 for identification.)
Q I'm showing you what's been marked as Exhibit No. 10. I think I said 9. It's Exhibit 10, which is an e-mail dated February 16, 2017, from Michael Salman to you, correct?
A Yes.



Q It says here that your house was listed on March 29, 2015, with the MLS -- Multiple Listing Service, correct?
A Yes.
Q And that you closed on it -- it was sold May 22, 2015, correct?
A Yes.
Q Attached to that is the Multiple Listing Service agreement with the full report for your property?
A Yes.
Q Now, when was the next conversation with Mr. Reid after the second conversation that you've testified about?
A The next conversation was about a week later.
Q So, can you put a date on it?
A I didn't take notes when I talked to Colin. I can tell you approximately, and my memory is based on the events. After the conversation when I requested the approval to work out of the Boston office, like I said, about two days I called Colin or he called me, and I ask him whether or not he talk to Andrew.
He said, No. Not yet. We are busy. Everyone is busy.
Then I ask him, like, four days, maybe

later. He told me, Yes. He did talk to Andrew.
Q So, are we now in April or May?
A We are now close to the middle of April. April 15, April 18. About this time. I'm not sure about the exact date.
Q You're not sure of the exact date, but you're saying it's mid April?
A Mid April.
Q By this time, your house -- you had reached agreement with the seller. Your house had been inspected, and you had agreed to an adjustment on the purchase price of the house to reduce it by $4,000, correct?
A The adjustment may still be in the process.
Q But the house had been inspected by this time?
A Yes.
Q You knew that the buyer was still interested in going forward with this transaction after the inspection, correct?
A Yes.
Q So, you then had another conversation with Mr. Reid, you're saying?
A Yes.
Q This is now the fourth conversation? The first conversation lasted about a minute?



A The fourth?
Q The second conversation was about five minutes?
A Right.
Q The third conversation is when you asked Mr. Reid for a status. Do you think this is the only thing? We are busy.
This is now the fourth conversation, right?
A Correct.
Q Is this in person or over the telephone?
A I don't recall.
Q What did you say? What did he say?
A I was inquiring again about whether or not he discussed it with his boss, with Andrew.
Q What did he say?
A He said we discuss it, and Andrew is okay with it. Andrew specifically -- he says that I know you handle most of the work on the AS contract, and I have no problem for you to work out of Boston.
Q That's what Andrew said? That's what Colin told you Andrew said?
A I said, What did he say?
And Colin told me, He said he realized I handle most of the work on the AS400, and I have no problem for Yury to work out of the Boston office.



Q What else was said in this conversation?
A Then I asked what was the next step. What else should be done? When am I getting the office? Colin told me that Craig is traveling now. He's very busy with the merger.
Q The merge?
A The merger with the other company.
Q Okay.
A Once he has time, he will call the Boston office and arrange a space for you.
Q The Craig you're referring to is Craig Cuyar?
A Yes.
Q The global leader of information technology?
A Yes.
Q Mr. Reid told you that it was Craig who had to call the Boston office, correct?
A Yes.
Q What did he say Craig had to do in terms of approving whether you could work out of the Boston office?
A Nothing.
Q Why was it that Craig had to call the Boston office?
A That what Colin told me. I didn't know.
Q What did you say in response?
A Nothing. Nothing. I just ask when do you think it



will happen, and Colin told me that he's traveling. I believe Colin told me at the time he was in Europe. I don't know. I'm not sure. He was traveling. He told me he's traveling.
Q How long did this conversation last?
A Like five minutes maybe. Not more than that.
Q Not more than that. It may have been a little less, right?
A Yeah.
Q Anything else that you recall that you said or that Colin said in this fourth conversation?
A No. That's basically what I recall.
Q By this time, you had already committed to sell your house in New Jersey, correct?
MR. SZAL: Objection.
A Committed?
Q You had already reached agreement. The house had been inspected, and you had already made the decision that you were going to sell the house in New Jersey?
A Yes. I made the decision but I had...
MR. SZAL: Were you done with your answer?
THE WITNESS: No.
MR. SZAL: Finish it then.
A I didn't worry about it too much. Once I found out

trying to make sure I have a cubicle. I was trying to make sure that I have the right equipment; that I didn't want to work with a laptop. I wanted a bigger screen. I asked for a desktop.
Q Who were you asking about your cubicle?
A Colin. I asked him when -- I couldn't talk to Craig but I asked Colin.
Q Did you ever put this in writing?
A No.
Q Any of your requests sent by e-mail?
A No.
Q It's a pretty important thing, isn't it, your moving to Boston?
A It is.
Q There was never any e-mail correspondence between you and Mr. Reid about your request for a cubicle or when the cubicle would be set up?
A I didn't need to send e-mails. He was my manager for 27 years. I didn't have a reason not to trust him. Who could predict it's going to end like this?
Q You understand you were an employee at will, correct?
A Yes.
Q You understand that concept?
A Yes.



Q You understood that, at any time, you could tell Cushman & Wakefield that you were going to resign your position, right?
A Yes.
Q You also understood that, at any time, Cushman & Wakefield could say to you they were no longer going to employ you any longer?
A Yes.
Q There was no e-mail -- whether you had to or not, there was no e-mail communication between you and Mr. Reid that you know of in which you make mention to Mr. Reid about your cubicle in Boston?
A There was an e-mail about the equipment. The computer. I don't think it was the cubicle. No.
Q When was that e-mail?
A That e-mail wasn't sent by me. It was sent by the person in charge of replacing the hardware at Cushman & Wakefield, and he send me an e-mail when I was already working remotely from my apartment in Boston.
Q So, it was in June, right?
A Yes.
Q That person was a person named Sommer, right, S-O-M-M-E-R?
A Right.



Q We will get there. You made mention about an e-mail to Mr. Reid once you knew the closing date of your New Jersey property, right?
A Yes.
Q You thought it was May 18th?
A Yes.
MR. BERLUTI: Let's mark this as the next exhibit in line.
(E-Mail dated May 17, 2015, marked as Exhibit No. 11 for identification.)
Q Exhibit 11 is an e-mail dated Sunday, May 17, 2015, to Mr. Reid, and the subject is moving to Boston. That's from you, correct?
A Yes.
Q That's on your Cushman & Wakefield e-mail account, correct?
A Yes.
Q It says, "Colin, as discuss, I will be moving to Boston on May 27, 2015, for family reasons and need to take four personal days after Memorial Day (5/26 - 5/29)."
Had you ever told -- prior to this e-mail in Exhibit 11, prior to May 17, 2015, had you ever spoken with Mr. Reid about the date you were moving to



Boston?
A I did not. I didn't know what date it would be.
Q Did you ever tell Mr. Reid that you were going to be moving to Boston when you sold your property in New Jersey?
A Yes. In our second conversation.
Q What family reasons were you referring to in Exhibit 11?
A Family reasons. That we wanted to live close to our daughter, and they all knew about it.
Q I'm sorry. I didn't understand. Live close to your daughter and what else?
A That's it. They all knew about it that I was going to Boston for two decades.
Q What are the family reasons you were referring to in Exhibit 11?
A This is my family reasons. This is what I call family reason, to live close with my daughter.
Q It had nothing to do with your health, correct?
A No.
Q That's correct? It had nothing to do with your health?
A Nothing to do with my health.
Q Why did you send this e-mail to Mr. Reid on Sunday?

A On Sunday? Probably -- I'm not sure, but probably this is when I found out that the closing would be on this date. I'm not sure. Maybe I hired a mover. I found out who would be the mover.
I can check my e-mails. I thought that was because the mover. I found a mover who was available on this day, and it was good for me because it's close to a long weekend. That's why.
Q So, it's your testimony that you were simply informing Mr. Reid of the exact date that you were moving but everything else is really -- you had already discussed with him. Is that right?
A No. I was also going to sit down with him and discuss all the questions that he told me we will discuss later like the cubicles, the equipment. Also, how often I would have to come to Boston. He told me we would discuss it later.
Q How often you'd have to come to New York?
A To New York. I'm sorry. I said, Once a week will be enough.
He said, Maybe that will be not needed. Maybe we will call you when you have to come.
Also, I was asking -- when I was in the New York area, he was asking me to support the users which



was usually after hours. This day they specifically told me to work from home so I can spend time. Instead of commuting, I can work late, okay. Sometimes until ten o'clock in the evening.
So, I was going to discuss how would it work in Boston when I need to support them late. I should also stay home. I wasn't clear how many times the cubicle in Boston would be available.
Before I leave, I was going to find out who would be my contact in Boston, the administrator, you know, if I need something like a chair or something or a printer. Things like that.
Q When did you discuss all these questions with Mr. Reid?
A When? Over this time. He told me -- when we met or when we were on the phone. He told me with how it went with his move, and he describe like my move would be similar.
Q When did you have -- I've asked you about every conversation you had with Mr. Reid about your transfer, and you've never testified about any of this.
So, when was it you spoke with Mr. Reid about your cubicle, your equipment, how much you'd



have to travel back to New York, how often your cubicle in Boston would be available, who would be your administrative contact in the Boston office? When did you discuss all of those issues with Mr. Reid?
A It was briefly mentioned.
Q When?
A During our conversations when I asked him about the move, and we were talking about his move. We were constantly communicating with Colin.
Q These were all issues that had to be resolved?
A Colin assured me they will be resolved. I just was pushing it a little bit because I wanted to know.
Q Those are all issues that Colin was telling you that had to be resolved as part of the decision for you to transfer to the Boston office? These are all things that needed to be worked out?
MR. SZAL: Objection.
A I don't understand.
Q You don't understand?
A I don't understand.
Q You don't understand if these issues were raised, Mr. Reid was raising them as issues that had to be resolved as part of an agreement to be transferred to



the Boston office?
A These are no issues. I was supposed to get a cubicle. They told me I was getting a cubicle.
Q When did Mr. Reid tell you you were getting a cubicle?
A When I told him -- after Andrew approved my cubicle. When will I get a cubicle?
He told me Craig will do it, but I wanted to know when. When I went to Boston, they told me to work from home until I get the cubicle.
Q When did Mr. Reid tell you that?
A On this meeting.
Q On which meeting? The meeting -- you're pointing to Exhibit 11. That was not a meeting. That was an e-mail, correct?
A The meeting that was a result of this e-mail two days later. We met and had a discussion.
Q So, the discussion with Mr. Reid about your cubicle in Boston, what equipment you were going to have in Boston, how often you'd have to come back to New York, how many times or how often your cubicle in Boston would be available, and who your administrative person would be in Boston -- this was as a result of a conversation you had with Mr. Reid a few days after May 17, 2015?

A Not a few days later. Two days. We are talking two days here.
Q So, that's May 19th?
A Right.
Q So, it was after you sent him your May 17th e-mail?
A Right.
Q Where did your discussion with Mr. Reid take place two days after May 17th, 2015, in which you discussed all the things you just testified about? Where did that conversation take place?
A In Cushman & Wakefield headquarters.
Q In the headquarters?
A (Witness nods.)
Q That was a person-to-person meeting with Mr. Reid?
A Yes.
Q Did that take place in your cubicle? Where did it take place in the headquarters?
A I don't recall.
Q Before we leave, let's go to the second sentence here. The second sentence of Exhibit 11 says, "I am confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved."



If this had already been approved, what was the purpose of that second paragraph?
A This has nothing to do with approval. I told you what we were discussing. I just told you what we were discussing. The people -- I need a person in Boston, administrator, when I need something.
Q Mr. Rinsky, you have the equivalent of a master's degree, right?
A Yes.
Q You testified to that?
A Yes.
Q You've got a minor in computer science?
A Right.
Q You're a well-educated, intelligent man?
A Probably.
Q Probably. You would agree with that?
A It's for other people to decide.
Q You use the word -- how long have you been speaking English?
A Don't forget --
Q Hold on. How long have you been speaking English?
A I still don't speak it that well. English is my second language.
Q I understand.



A I look at examples, and I go to Google. It's not perfect.
Q Mr. Rinsky, the last sentence in Exhibit 11 said, "I look forward to sitting down with you and coming up with an arrangement."

What were you referring to as far as coming up with an arrangement?

MR. SZAL: Objection.
A I just explained myself. The arrangement how often I need to come to New York. This is an arrangement. How do I support the users I usually supported from New York? Who would be the administrative person in the Boston office? Should I stay and work from home or from the office? Would I need to support the users after hours?

This is what I call the arrangements because it had nothing to do with the approvals. That was a done deal. I didn't have any doubts it's okay.
Q Don't you think it would be pretty important to Cushman & Wakefield to understand how often they would need you to come to New York as a part of agreeing that you could transfer offices? Don't you think that would be a pretty important factor?
A Why was it important? They ask me to come. Why



wouldn't they call when they need me? If they need me on a regular basis, why wouldn't they do that?
Q If they told you you had to go to Cushman & Wakefield four times a week, would you do that?
A From Boston?
Q Yes.
A Absolutely not.
Q It's important to know the number of times a week?
A Yes.
Q Four times a week was too much?
A Right.
Q So, that would not be an acceptable arrangement?
A Correct, but one day a week --
Q Hold on. One day a week would be acceptable to you?
A Yes.
Q You didn't know whether one day a week would be acceptable to Cushman & Wakefield, correct?
A No. Colin said it will probably be once a week or when we need you.
Q You did not know what Cushman & Wakefield's position was as to how many times they would need you in New York, correct?

MR. SZAL: Objection. He just answered it.
A (Witness shakes head.)

Q An important component of your job was working with the finance people in New York, correct?
A Yes.
Q You would meet with those people person to person, right?
A Occasionally.
Q Monthly, right?
A Monthly?
Q Yes.
A Yes.
Q Sometimes weekly?
A Yes.
Q Sometimes several times a week?
A No.
Q Okay, but sometimes once a week you would meet them?
A When I was needed and usually for a relatively big project because day-to-day support was done through e-mails and communicate by phone.
Q The finance people you had to meet with in person, right?
A No.
Q The finance people you had to work with -- you had to speak to on a sometimes weekly basis, correct?
A Yes.



Q When you worked in New York City at the headquarters, you would meet with them in person on a weekly basis, correct?
A Yes. There is also those in New York or in San Francisco or Dallas.
Q No. Stay with me, Mr. Rinsky. You met with the finance people weekly in the New York headquarters while you worked at the headquarters?
A What do you mean by "weekly"?
Q Weekly.
A There wasn't a schedule --
Q I didn't say there was. You would meet with them weekly?
MR. SZAL: Let him finish an answer.
A If it was a relatively big issue or big issues, only then I would need to meet them.
Q The brokers at Cushman & Wakefield earned a lot of money, correct?
A Yes.
Q Making sure their commission amounts were accurate was something you had to do every month, right?
A Every day and much more than that.
Q As a result of that, you had to meet with the finance people weekly, right?



A I didn't need to meet with them.
Q Did you meet with them?
A I meet with them to discuss big issues and big projects. Maintenance and support didn't require meetings because I was an expert on the system. No one, even Colin, could explain to me what is rare and new.
I knew everything better than Colin. I was working with this system for 27 years. If Colin was a driver, I was a mechanic, okay. I didn't need guidance.
Q Part of your job was working with the finance people though, right? Part of it was the technical aspect?
A That was done via e-mail. They described the issues, the problem. That was enough for me to resolve it. I didn't want to talk to them. They didn't want to talk to me. When it was necessary and it was occasionally, like I said.
Q When you worked out of the headquarters in the New York office, you met with finance people every month, right, at least once a month?
A Yes.
Q Many times at least once a week, correct?
A No. When needed.



Q Sometimes when needed was weekly, right?
A Could be weekly. Could be once a month.
Q Could be, but it could be weekly?
A Yes.
Q It could be several times a week, too?
A Yeah. Maybe.
Q You said you then met with Mr. Reid on May 19th, right?
A Yes.
Q Two days after your e-mail of May 17th?
A Yes.
Q That meeting took place at the headquarters of Cushman & Wakefield, correct?
A Yes.
Q Who else was present?
A Just Colin and me.
Q Where, at the headquarters, did it take place?
A I don't recall.
Q How long did the meeting last?
A This one was much longer than the other ones because Colin was very nice. He told me a lot about his move to Miami, the issues he had. He specifically said his problem was it took him a long time to get Internet access in Miami from his home. So, he wasn't able to

log on to the AS400 for a while.
He told me that, as soon as you get there, even before that, have the people at Verizon or whatever to set up Internet for you. He told me to ask about the cubicle or issues I had discussed. He told me for him it took about three weeks. He went to the office in about three weeks. You'll probably get in in about three weeks. Things like that. Yeah.
Q Have you told me everything you can recall that you said and he said on May 19th, 2015?
A He said, It will work out fine. We will have meetings in New York probably, you and I.
He mentioned that, most likely, I would have to come to New York for month's close. That's one day or two days for month's end.
Q He said you would probably have to come back for the month's end close?
A How often I would need to come. I said, I can come once a week.
He said, Maybe once a week but I don't think so. You will definitely have to come for month's end or when there is a project -- a big project. We will have a meeting. I will come from Miami. You will come from Boston. We will get together.



Q Who was going to pay for your trip to go to New York?
A I have no idea.
Q It was something that wasn't discussed?
A It wasn't discussed.
Q You didn't know if Cushman & Wakefield was going to pay for your travel or if you were going to have to pay for your travel?
A I didn't know. My understanding --
Q Hold on. I'm not asking for your understanding. It's something you never discussed with Colin and --
A No.
Q Is that correct?
A Yes.
Q Why was it you would have to come in for every month's end? What was happening at the month's end?
A Month's closings --
Q Commissions. Is that right?
A Yes.
MR. SZAL: Can you let him answer?
A Commissions. Sending the information to the general ledger. All this information comes from the system I was responsible for, and that had to be done in a really small time frame and everyone was extremely busy, and they needed us with the system.



They were working late. All the reports have to be reconciled. The discrepancies, variances. I had to fix very quickly. That was part of the close.
Q At all times until you moved to Boston --
A And from Boston.
Q You never had a month's end when you moved to Boston. Through the time that you lived in New Jersey, at month's end, you would meet with people in New York to do the month's end closing, correct?
A No. No. My job was not to meet with people on a regular basis. My job was to resolve their problems. To monitor the systems so they don't have problems and to fix the problems.
Q Why would there be a requirement for you to come in to New York at month's end if it wasn't necessary for you to be there?
A Sometimes they ask me to work from home even at month's end because I was able to work longer after hours. The users stayed late working until ten o'clock. Sometimes until midnight. They insisted on support, and I was the one who provided it.
Q In order for you to provide support remotely, you would have to have an Internet connection, correct?



A Correct.
Q If you didn't have an Internet connection remotely, you wouldn't be effective. You wouldn't be able to do your job?
A It was impossible to do.
Q It was impossible. When you lived in New Jersey and there was a problem with the internet, you could go right into the office, correct?
A I never had a problem.
Q That wasn't my question. My question was: If you had a problem with connectivity through the Internet, you could physically go right into the office in New York. That was not an issue within the office?
A That was an option. I could also go somewhere close to my home to get the Internet connection.
Q If you could stay with me, Mr. Rinsky. The point is if you did not have an Internet connection and you were in striking distance to the headquarters, you could go into the headquarters to do your job, correct?
A Yes.
Q If you didn't have an Internet connection, it was impossible for you to do your job remotely, correct?
MR. SZAL: Objection.

A Some question I may be able to answer over the phone or I could instruct someone else how to do.
Q That would be a pretty limited basis, right? You would agree with that, wouldn't you?
A Yeah.
Q You remained an at-will employee in June of 2015, correct? There's nothing about this transfer, whatever Colin said to you about moving to Boston -- nothing had anything to do with whether or not you remained an at-will employee at Cushman & Wakefield, correct?
A Yes.
Q Now, you said you were permitted to work remotely in May of 2015, correct?
A May of 2015 was like any other month.
Q You were allowed to work remotely?
A Not allowed. They told me to work remote. Half of the time. Maybe a little bit more than half of the time.
Q It's true that, at this time frame, there was a lot of work to do in the IT department at Cushman & Wakefield?
A There was always a lot of things to do.
Q In particular, this was a busy time?



A Yeah.
Q They had just agreed to acquire Massey Knakal. You recognize that name, isn't that right? A brokerage firm in Brooklyn?
A No.
Q You don't recognize that?
A I know DTZ.
Q Hold on. I'm talking about Massey Knakal. M-A-S-S-E-Y K-N-A-C-K-L-E (sic), I believe. You don't recognize that?
A I don't recognize that.
Q You were putting in new systems called Workday?
A I participated. That was a big effort. It was important for the company.
Q It was a big effort, right?
A On my part. There was a lot of problems with this project. Right.
Q There was also a major merger going on between Cushman & Wakefield and DTZ?
A It wasn't going on yet.
Q It wasn't going on yet?
A Yes.
Q There was no aspect of the merger that affected your workday?



A No. Not at that time.
Q Okay. Do you recall that there were any issues with the Workday tasks that weren't getting done in an acceptable way in May of 2015?
A Yes. I pointed them out.
Q As a result of that, you were asked to report to the office every day in May?
A It wasn't the result of. It was the result of me maybe telling that I'm moving soon. That was my understanding.
Q Do you recall being asked, by Colin Reid -- not just you but Anna Kleynsteyn, K-L-E-Y-N-S-T-E-Y-N, that permission to work remotely was being revoked for both of you? Do you remember that in May of 2015?
A Yes.
Q Until the Workday tasks were completed and approved by management, your right to work remotely was being revoked?
A Yes.
Q You were informed of that by e-mail, correct?
A Yes.
MR. BERLUTI: Let's mark this as the next exhibit in line.
(E-Mail dated 5/13/2015 marked as



Exhibit No. 12 for identification.)
Q I'm showing you Exhibit 12. Do you recognize that?
A Yes.
Q That's an e-mail to you dated May 13, 2015, which was four days before you informed Mr. Reid about when you were going to move to Boston, correct?
A Yes.
Q Mr. Reid informed both you and Anna Kleynsteyn that working remotely was being revoked for both of you effective next week until Workday tasks are completed and approved by management, correct?
A Yes.
Q Did Mr. Reid ever inform you that the revocation for you to work remotely had changed; that that revocation was rescinded?
A I don't understand.
Q He's telling -- this e-mail, Exhibit 12, says you can no longer work remotely?
A Right.
Q Did he ever then tell you the Workday tasks are completed; now you can work remotely again?
A No. He didn't.
Q He didn't. Okay. No further questions. We can break for now. We can take a lunch break. It's 1 o'clock.

(A recess was taken.)
MR. BERLUTI: Back on.
Q When we ended, Mr. Rinsky, we were talking about Exhibit 12. That exhibit was the e-mail, I'll put it before you, in which Mr. Reid informed you and Anna that the option to work remotely was being revoked until further instruction based upon the Workday requirements, correct?
A Except it wasn't an option. It wasn't an option to work remotely.
Q Just stay with my question. That e-mail says, "Your opportunity to work remote has been revoked."
Correct.
A Yes.
Q Did you follow that directive?
A Yes.
Q You already testified that directive wasn't changed. Mr. Reid never sent another directive prior to May 27, 2015, correct?
A No.
Q That's correct? That's a correct statement, right?
A Yes.
Q You testified earlier about your discussion with Mr. Reid, you know, about the number of times you



would have to come from Boston to New York was something to be worked out, and I asked you about four times a week and you said that was unacceptable. Do you recall that testimony?
A We didn't discuss four times a week.
Q At some point, sir, you were given an option that you could live in Boston --
A No. That's what they said, but I don't recall it. I was never given an option --
Q Let's go one step at a time. My question is: Was you living in Boston and coming to New York four times a week an acceptable alternative?
A Absolutely not.
Q Absolutely not. Why?
A The commute would take half of my life. How can I take it four times a week?
Q Well, the commute could be -- let me ask you this: If you learned at an earlier time that Cushman & Wakefield would not agree to your transfer to Boston, what would you have done?
A I would never move to Boston. I would never jeopardize my job. I would stay where I am or close to where I am. In my house. I had an option to stay in my house, or I could stop the sale.



Q Not sure if you could stop the sale, but you had an option you could rent your house, correct?
A Yes.
Q That would cause you to have to pay rent, right?
A Yes.
Q Did you explore, at any time, renting a house in New York after you learned that Cushman & Wakefield would not agree to your transfer to Boston?
A I learned it after I moved to Boston.
Q I understand, but did you ever look for apartments or consider getting an apartment close to New York so you could keep your job at Cushman & Wakefield?
A I did not.
Q How would you characterize your working relationship with Colin Reid?
A It was good. Not perfect. It was good.
Q Did you find Mr. Reid to be truthful --
A Yes.
Q -- in your dealings with him? You understand that Mr. Reid says the first time you and he discussed your desire to move to Boston was on April 30, 2015?
A I saw that in the documents, but I don't think this is correct.
Q Okay.



A Want me to explain why?
Q No. Yes. Go ahead.
A It definitely occurred in the beginning of April -- first part of April. I looked at the document, and on -- I don't think I worked on this day. I wasn't in the office on this day because, on April 30th, I went to the town in New Jersey to apply for the inspection, to apply for the permits.
This date is in one of the documents, and I couldn't make it after that. I couldn't because the busses were going home at rush hour. If I stayed in New Jersey, that means I didn't go later, and I couldn't make it to New York this day.
Q You often speak with Mr. Reid by telephone, correct?
A When?
Q Whenever.
A On the 30th?
Q At any time. You frequently spoke with Mr. Reid by telephone?
A Yes.
Q You don't have any documents one way or the other to say whether or not you spoke to him on the 30th, correct?
A I don't.

I already explained this half an hour ago.
Q He made no comments to you about your age?
A About what?
Q Your age.
A No.
Q Do you have any understanding as to how old Mr. Reid is?
A A couple years younger than me.
Q Did he make any comments to you about your health?
A On this meeting?
Q Yes.
A No.
Q Did you tell him at any time that your desire to move to Boston had anything to do with your health?
A My health, no.
Q After May 19th, when was the next time you spoke to Mr. Reid about your transfer to Boston?
A I think before I was leaving. The last day or the day before.
Q So, each day from May 18th until your last day, you reported to the office at the headquarters at Cushman & Wakefield?
A I waited for some time to deal with contractors and inspectors. I may have taken a day or two to work



from home.
Q But other than that --
A Other than that, I reported to the office.
Q When did your closing actually take place in New Jersey?
A I think it was the 27th. May 27th, I think, or 26th. Either the 26th or 27th, I think.
MR. BERLUTI: Let's mark this as the next exhibit in line.
(Deed marked as Exhibit No. 14 for identification.)
Q Do you recognize Exhibit 14?
A I don't recognize it, but it looks like it belongs to...
Q Belongs to what?
A To the sale of my house. Yes.
Q In the lower right-hand corner, they are Bates stamped YR66 through YR70, I think it is. These were produced by your attorney. So, let's look YR69.
A Okay.
Q Those are your signatures -- your and your wife's signatures on the middle of the page?
A Correct.
Q The date that's it's certified and notarized by



Mr. Banks is May 25, 2015?
A Yes.
Q Was the closing on either May 25th or May 26th?
A The closing was on May 25th, and we moved on May 27th. That why I confused.
Q What was your last date in the Cushman & Wakefield office, if you recall?
A I need to look at the calendar but I worked until closing -- until we moved. It was a long weekend.
Q Go ahead.
A I didn't take any additional time off besides the one I stated in the e-mail.
Q So, you moved on May 27th. That means the day before, May 26th, was probably your last day in the Cushman & Wakefield office?
A Yes.
Q Then you never went back afterward because you then took some personal days after the move, correct?
A I never went back?
Q To the Cushman & Wakefield office.
A No. That was my last day.
Q Did you become aware that Cushman & Wakefield began -- decided to hire a consultant to work on the AS400 system?



A I found out about it when I moved to Boston.
Q To the best of your memory, when was it you learned that?
A Beginning of June. The consultant -- I knew him. He worked for me before.
Q What's his name?
A Edgardo Felix.
Q Edgardo Felix was a consultant that Cushman & Wakefield contracted with to work on the AS400 system, which was the system you had worked on?
A Correct.
Q Did you understand that Edgardo Felix was going to do some of the work you had been doing in New York for Cushman & Wakefield?
A He was doing or will be doing.
Q Would be doing. They contracted with him to do some of the work you were doing?
A I didn't know why they hired him.
Q You didn't know?
A I didn't know.
Q You didn't speak to Mr. Reid about it?
A No. I know that about a year before, maybe two years before that, Edgardo contacted me and Colin asking for a job. Colin said, I don't have anything now.

I tried to send him to people I know. I was trying to help Edgardo. I didn't know what was the end of it. He send another e-mail to Colin asking for a job sometime before New Year, I think, or around New Year.
Q December 2014 or early January 2015?
A Yes. He send an e-mail. Colin again told him, I don't have anything now.
Q So, the first time Cushman & Wakefield had something for him was after you left at the beginning of June 2015, correct?
A Yes.
Q You worked with Mr. Felix at an earlier time, correct?
A Yes.
Q Do you have an estimate of how old Mr. Felix is?
A About 15 years younger.
Q 15 years younger?
A Yes.
Q That's your estimate?
A Yes.
Q Did you ever talk to him about his birth date?
A No. Just the way he looked.
Q If you were 64 in 2015, he was approximately 50 years old?



A Yeah. I would say so. I didn't see him. The last time I saw him was --
Q -- two years prior?
A No. After Y2K, 2001, 2002, when he worked for us. That was the last time I saw him. All the communications were via e-mail.
Q The last time you saw Mr. Felix was in about 2001? On or about 2001?
A Yes.
Q Okay. Now, on June 2nd, you had some e-mail communication with a Scott Sommer, S-O-M-M-E-R?
A Yes.
Q Who did you understand Scott Sommer to be?
A He was in charge of replacing the laptops, desktops for all the employees at the headquarters.
Q Did you have a Cushman & Wakefield laptop?
A Yes.
Q On or about June 2nd, did you contact him, or did he contact you in the first instance?
A He contacted me because he didn't know what to do with my desktop. He wrote in the e-mails that your desktop is still there, and do you need it or what to do with it.
Can I continue?



MR. SZAL: Yes.
Q Sure.
A I had replied that I don't need my desktop in Boston in a couple of weeks when I get a cubicle there, and I kept a copy of this e-mail.
Q Okay. So, it's your testimony that the first initiator of this back and forth was by Mr. Sommer to you, correct?
A Yes.
Q Everything -- all of your communication with him was by e-mail format, correct?
A Yes.
Q You never had a telephone conversation with him?
A No.
Q Okay. What -- do you recall what Mr. Reid's response was?
A Mr. Reid's response was that yes. This is correct. Your -- no. He said Yury may need new equipment in Boston, and this one I was going to use for consultant who starts soon.
Q Okay.
MR. BERLUTI: Let's mark this as the next exhibit.
(E-Mail Thread marked as Exhibit No. 15 for identification.)



MR. BERLUTI: I'm just going to note that I believe there is some redundancy in this exhibit. It looks like the first page of Exhibit 15, CW1223, has all the communications on one page and the second two are spread over two pages, but I think they are the same.
MR. SZAL: Why not tear off the first page?
MR. BERLUTI: That's all right. It's been marked now.
Q So, Mr. Rinsky, do you recognize the e-mails contained in Exhibit 15?
A Yes.
Q When was the last time you saw this e-mail?
A The last time -- I briefly looked at the documents Cushman & Wakefield sent to my attorney. There were so many. I briefly looked at them. I hit this one.
Q You saw it in the last couple of days?
A Yes.
Q Did you see it yesterday?
A Not yesterday. Maybe two days ago. Over the weekend.
Q So, your response -- Mr. Sommer's communication to you was, "Good afternoon. Your desktop is still in New York. Do you need it?"

Your response is, "Scott, I will need my desktop in a couple of weeks when I get a cubicle in Boston office."

Mr. Sommer's e-mail to you is to himself and you, and Mr. Reid is not on that communication, correct? Start at the bottom of page 1. Start at the first one at the bottom. So, Mr. Sommer's communication was to you?
A To me and I replied.
Q Why did you copy Mr. Reid?
A Because he was my manager. I couldn't decide on what to do. It was his decision.
Q It was his decision. Okay. No one ever told you a time frame as to when you would have a cubicle in Boston, correct?
A Colin estimate it will be, like, in my case, in about three weeks and then I asked a couple. They told me soon, soon. Craig is busy. Craig is busy. A little later but soon.
Q You said, though, in a couple of weeks?
A Yes.
Q No one told you specifically it would be in a couple of weeks?
A A couple of weeks to me means flexible. It doesn't



mean 14 days.
Q Mr. Reid responds at the top, "Please wait until I am back in New York tomorrow. Yury might be getting new equipment for Boston since I have an AS400 consultant sitting there next week."

The AS consultant sitting there next week is Mr. Felix, right?

MR. SZAL: Objection.
A I'm not sure.
Q You don't know?
A I'm not sure.
Q Are you aware of any other AS400 consultant that Cushman & Wakefield retained after you left?
A Yes. I already told you. Mr. Trevor Sini and another consultant who worked for Mr. Trevor Sini.
Q But they were already working, right? They were already consultants?
A They were working because I had meetings with them. Yeah. No new consultants.
Q The only new one was Mr. Felix?
A Probably it was him. I don't know.
Q Did you ever have a conversation with Mr. Reid about this Sommer e-mail?
A No.



Q The only response was what you saw -- what we saw in Exhibit 15, correct?
A Didn't look suspicious to me. Colin --
Q I didn't ask you that. Other than the e-mail response, did you have any other communication with Mr. Reid about Mr. Sommer's e-mail to you?
A I didn't.
Q I did not, right? That's your answer?
A Yeah.
Q When was the next time you spoke with anyone at Cushman & Wakefield about your employment at Cushman & Wakefield?
A The next time after I moved to Boston?
Q Well, after June 2nd. After the June 2nd e-mail back and forth with Mr. Sommer, when was the next time you spoke about your employment with anybody else?
A The next time was the letter I got from June 22nd.
Q What happened on June 22nd?
A I received an invite with Colin and Andrew. The topic was supporting the system from Boston. I believe that was the topic. So, when they called -- you want me to continue to describe it?
Q Before we get there, let me ask you this: From June 2nd until June 22nd, were you performing any duties



for Cushman & Wakefield?
A I was working 14 hours every day because the requirements. It wasn't because someone at Cushman & Wakefield was slow. It was because the requirements of the project were constantly changing. It wasn't a big project for me. For me, it was a two-month project, but because the requirements were constantly changing, I had to redo and redo and redo again.
Q It's your testimony it took you 14 hours a day. That's how much demand was required for you to do your work for Cushman & Wakefield from June 2nd to June 22nd? You were working 14-hour days?
A I didn't want to hold someone up. So, I tried to accomplish my tests on time in order not to hold the other people up.
Q When you say "14 hours a day," you mean Monday through Friday?
A Every day Monday through Friday. Saturday, too.
Q You were paid no change in your compensation right through June 22nd?
A No. I was a full-time employee and the extra hours I put in, I thought that's why I'm getting paid my bonus so...
Q So, on June 22nd, you got an invite from Colin and

Andrew. What time were you to speak with them?
A It was like 10 in the morning, I think.
Q What happened?
A Colin started. I made a joke. I probably got a Boston accent. Sorry if I get a Boston accent.
Then Colin said, You want to find out about your cubicle in Boston? Here's Andrew. He will explain it to you.
Andrew did all the talking. Colin just made a little introduction.
Q What did Andrew say?
A Andrew said that we want you -- we need you in New York. We want you to come back to New York.
I understood that it was just once for a meeting. I said, Of course, I will come. When do you want me to come?
He said, You have to be in New York every day. We want you in New York. You have to be here.
I ask, When?
He said, Tomorrow morning and every day.
I said, How many days?
He said, Five days a week. All the time. We want you back to New York if you want to keep your job.



They were angry at me for something I didn't know. They were, like, angry at me. You have to come tomorrow morning. You have to work five days a week. You have to work here.
I said, But I just move. You let me move here. You let me work from Boston. I'm waiting for the cubicle. Why all of a sudden it got changed?
That's what we decided. We need you in New York.
Q That was Andrew that said all this?
A Huh?
Q That was Andrew that said all this?
A Yes.
Q When you said he seemed angry, you weren't referring to Colin?
A Not angry. He was, like, tense.
I said, How can I move to New York? I just move all my belongings. I have no place to live in New York. I can stay with my friends for one night but I cannot move to my friends' house or where would I live? My belongings are here. I just moved it and you all knew about it. What happened?
He said, If you don't do that, then we want you to resign. The best way for you to resign. We



already discussed with HR.
Andrew was pushing me to resign.
He said, It will be good for you. It will be -- it will not look like you were fired. You'll get another job, and if you don't want to come to New York, resign.
I said, I'm not going to resign. I didn't do anything wrong. I honestly work for Cushman & Wakefield for 27 years. I did the job for three people for 27 years. I exceeded all expectations.
They called me an expert. They let me go to Boston. Why would I resign? I got really upset. It was a shock for me.
Q It was a what?
A Shock.
Q Shock. Okay.
A I told them, I'm not resigning. That's it.
It will be better for you. It will be good for you. We will give you references. You'll get another job.
That was it.
Q How long was this conversation?
A It lasted for about 10, 15 minutes.
Q Have you told me everything that you can recall that



you said and that Mr. Hamilton and Mr. Reid said to you?
A Yes. I told them, Why are you doing this? It will be bad for the company. I know all the software in and out. I wrote it. It will be difficult for you to work. What are you doing? Are you trying to save money on me?
He said, No. We are not trying to save money, Andrew said.
I said, It's bad for you. It's bad for me. Why are you doing this?
We want you in New York.
Q Anything else?
A They either told me or send me an e-mail right after that HR is expecting, from you, a letter of resignation, and they send me a sample of this letter.
Q I'm asking about the conversation now. Stay with the conversation.
A That's it. Yeah.
Q There was no mention about your age at any time in this conversation?
A No.
Q There was no mention, at any time, about any medical condition that you had in this conversation at 10 a.m.

on June 22, 2015?
A No.
Q Do you have any information that Mr. Hamilton had any knowledge one way or the other about any medical condition you had?
A I am not sure. I know Colin did.
Q I'm asking about Mr. Hamilton.
A I'm not sure.
Q You never spoke to Mr. Hamilton about any medical condition?
A Never.
Q You never submitted any medical documentation to Cushman & Wakefield about your medical condition, correct?
A All my medical condition, I guess, went through HR. All the paperwork through the insurance -- Cushman & Wakefield's insurance.
Q I'm talking about your medical records, about any medical condition you have. I understand you had medical insurance, but I'm talking about a medical condition.
A I informed Colin about my medical condition.
Q Anybody else?
A No.



Q Mr. Reid didn't mention your medical condition in any way, shape, or form on June 22, 2015?
A No.
Q So, I take it from your testimony that, after the phone call at approximately at 10 a.m., you received an e-mail with some suggested language for your resignation. Is that correct?
A Right.
Q Who sent that to you?
A Ms. Hicks, an HR manager.
Q Could Mr. Reid have sent you that e-mail?
A Could have been Mr. Reid. Yeah. Probably Mr. Reid. Yeah. Yeah. Mr. Reid and he wrote, This is what HR expects from you.
MR. BERLUTI: Let's mark this as the next exhibit.
A And I think he also said -- all right. Wait for the question.
(E-Mail dated June 22, 2015, marked as Exhibit No. 16 for identification.)
Q Mr. Rinsky, Exhibit 16 is an e-mail from Mr. Reid to you with a copy to Mr. Reid and to Andrew Hamilton?
A Uh-huh.
Q Is that correct?



A Yes.
Q The time is 9:39 a.m. Do you see that?
A Yes.
Q This e-mail -- you received this e-mail after you had the conversation with Mr. Reid and Mr. Hamilton, correct?
A Absolutely. After.
Q So, you estimated that the call occurred at about 10 a.m. Is your memory now refreshed that it must have been earlier than that?
A A little bit. Yes.
Q The subject matter is your employment status with C & W, correct?
A Yes, but it -- Colin never mispronounced my name. In 27 years, he knew how to spell my name. That never happened.
Q Where are you pointing to that it's misspelled?
A Y-U-R-I. My name is Y-U-R-Y. Colin never did it. Never in 27 years, but it was sent by Colin. So, I don't know. It looks a little suspicious to me.
Q At the end of the e-mail, it says, "Any additional question will be answered by Katrina Hicks in HR. She can be reached at," and there's a telephone number.
Do you see that?



A Yes.
Q Did you contact Ms. Hicks?
A That meant to me I cannot call Colin Reid to discuss it. It's a done deal. You're firing will go through this person. Andrew doesn't want to talk to you. I tried, and they didn't pick up the phone. They pointed me to this person. From this point on, this is my contact. This is it.
Q So, you received Exhibit 16. Is it your testimony that you tried to call Mr. Reid -- telephone call Mr. Reid?
A Yes.
Q What happened?
A Right after the conversation, minutes after the conversation, instead of calling me back, he sent me a text message saying, I'm trying to find Ms. Hicks.
I still have it on my phone. The other text message on my phone was, like, ten minutes later. I think I left a message to Colin.
Colin, what happened? Why everything so different?
Instead of calling me back, his text message was, You can talk to Katrina -- Ms. Hicks and find out all the details.

you would get a cubicle in Boston, to change their mind?
A I don't know. This is a legal question.
Q You have no document that said you had any right to stay in Boston, correct?
A This is a legal question.
Q But you have no document. That's not a legal question. You have no document that says you have a right to stay in Boston, right?
A I don't have any documents. When I talked to my manager --
Q You have no documents --
A -- I didn't ask for a document or sign. I find it funny.
Q You have no documents --
A Nothing has changed.
Q Hold on. You said you sent a letter to the president of Cushman & Wakefield, correct?
A Yes.
Q That was sent on June 22nd?
A Yes.
Q The president was John Santora, S-A-N-T-O-R-A?
A Yes.
Q What did this letter say?



A I described what my view what happened, and I ask him for help with what happened. Nothing had changed and --
Q Hold on. You answered the question. By the time you wrote the letter to Mr. Santora, you were upset, correct?
A I was very upset.
Q You were very upset?
A Yes.
Q You were contemplating a lawsuit at that point. Is that right?
A I started to think about it. Yes.
Q Did you speak to counsel?
A No.
Q Did you speak to an attorney?
A No.
Q You were beginning to take steps to do what you had to do to bring a lawsuit against Cushman & Wakefield, correct?
MR. SZAL: Objection.
A I was thinking about it.
MR. BERLUTI: Let's mark this as the next exhibit.
(E-mail Thread marked as Exhibit No. 17 for identification.)



Q This is Exhibit 17. Is that the letter --
A Yes. This is it.
Q -- that was sent to Mr. Santora --
A Yes.
Q -- at 4:51 p.m. --
A Yes.
Q -- on June 22nd, correct?
A Yes.
Q Below that is an e-mail that you sent to Katrina Hicks, correct?
A Yes.
Q You sent that before you sent the e-mail to Mr. Santora, correct?
A Yes.
Q Now, you had one conversation with Ms. Hicks prior to sending her this e-mail at 4:14 p.m., right?
A A conversation with Ms. Hicks on the 22nd?
Q Yes.
A I don't recall.
Q I thought you just testified that you said she --
A No. You asked me if I had any conversation after June 22nd. Not on. After.
Q Let's look at the bottom part of the first page of



Exhibit 17. The bottom third is an e-mail from you to Katrina Hicks on June 22nd at 4:14 p.m., correct?
A Yes.
Q It reads, "Katrina, per our conversation earlier today, I am once again advising you that I will not be resigning from my position after 27 years of service."
Did I read that correctly?
A Yes.
Q Is your memory now refreshed --
A Yes.
Q -- that you spoke with Katrina?
A I didn't speak with her. She was calling when we started this conversation in the morning. He said, Andrew is here, and Katrina is here seated next to me.
That's why I put our conversation.
Q So, in addition to Colin and Mr. Hamilton being there, Ms. Hicks was also on the line. Is that your testimony?
A Yes.
Q You knew that at the time that you had the conversation sometime prior to 10 a.m. on June 22nd?
A Yes. Colin told me about.
Q The third line says, "My move to Boston was approved by my manager."

A No.
Q So, approximately 45 minutes later or even less, you then sent a letter -- an e-mail to Mr. Santora, correct?
A Yes.
Q That was the top half of page 1 of Exhibit 17?
A Yes.
Q By the way, had you ever spoken to Mr. Santora before?
A I knew him personally.
Q How did you know him?
A We were about the same age. We started to work for Cushman & Wakefield about the same time. I remembered him as a young man like me years ago.
Q What was your relationship with him?
A No relationship. Just being friendly. Every time he saw me, I ask, How are things?
Q Was his office on the same floor at Cushman & Wakefield headquarters as yours?
A He moved several times. At one time, our offices were next to each other. Yeah.
Q You write on June 22 at 4:51 p.m. "John, please help me understand my abrupt termination."
Again, you were being -- you could keep your job if you were willing to go to New York, right?



A It didn't seem reasonable to offer me what they offer right after I move.
Q I didn't ask you if it was reasonable. I'm simply confirming --
A I wasn't looking for a job. It wasn't a job offer.
Q I'm not asking --
A They told me, We need you in New York.
Q If you were willing to go to New York, you had your job, right?
A That's a way of putting it.
Q That's a way of putting it?
A I wasn't looking for a job.
Q You weren't looking for a job?
A No.
Q "As you know, I have been an employee for over 27 years. I recently moved to Boston with the expectation that I would continue to work remotely until a cubicle in the Boston office was set up. My move was approved by my direct manager, and I put my house on the market."
Again, your house was already on the market before you had any conversation with Mr. Reid, correct?
A Right.



Q Is that correct?
A Yes.
Q So, what you said to Mr. Santora was not accurate?
MR. SZAL: Objection.
A It would come out at the time, and I was under a lot of stress. It was done the same day when I got the knock out of my employer.
Q All I'm saying to you is it's not accurate.
MR. SZAL: Objection.
A It is perfectly accurate. 100 percent accurate.
Q You put your house on the market before you spoke to Mr. Reid about transferring.
A I talked to Mr. Reid before I put it on the market.
Q Mr. Reid never told you you had any permission to transfer prior to your putting the house on the market.
A That's correct. That's correct.
Q "If my manager did not approve my move, I would not sell my house and move to Boston."
A Right.
Q You already had the house under agreement?
A This is also correct, but I would never move. I would never move. I didn't put it right. I was under a lot of stress and pressure, and this is how it came out



but everything is 100 percent accurate.
MR. BERLUTI: Can you read the question and answer?
(Question and answer read as requested.)
Q Your house was already under agreement before you had any conversation with Mr. Reid about your transferring to Boston, correct? Yes or no.
A Yes, but it --
Q That's enough.
A You can get out of this agreement. You changed your mind. You don't want to sell the house. It was at the early stage of the contract.
Q You've answered the question, sir.
"I am upset and confused by the course of today's events."
Did Mr. Santora ever respond to your e-mail of June 22nd at 4:51?
A He did not respond to it, but he had someone to review it. I found out about it from Mrs. Hicks.
Q So, you have some understanding that Mr. Santora did something as a result of receiving your e-mail?
A Yes. What I just told. He had someone to review it.
Q How do you have that understanding?

were selecting to e-mail to yourself were e-mails you thought would be helpful to you?
A Exactly.
Q Helpful to you if you were to sue Cushman & Wakefield?
A Exactly.
Q You did it on for some time on June 22nd, correct?
A Possible. I'm not sure.
Q You did it on June 23rd?
A Yes.
Q You didn't do any work for Cushman & Wakefield --
A I did work. I worked.
Q When you did work for Cushman & Wakefield, you had to enter through your -- how did you enter into the Cushman & Wakefield system? When you worked remotely for Cushman & Wakefield, how did you enter the Cushman & Wakefield system?
A I was able to log on to my e-mail account. In order to work, I need to log on to the AS400.
Q At some point, you were closed out of that system. Is that right?
A Yes.
Q When did that happen?
A I have an e-mail from Cushman & Wakefield to my Yahoo address with the exact date. Like several days after



the 22nd.
Q Several days after the 22nd?
A Yes.
Q How many days after the 22nd?
A I can provide you with this e-mail.
Q I'm going to provide it to you. I'm just asking what your testimony is.
A I'm going to say I had access to the AS400 -- you're asking AS400 or e-mails?
Q You're accessed into the system. How long did you continue to have access to the Cushman & Wakefield system after June 22, 2015?
A Maybe a couple of days.
Q It's your testimony you did work for those next couple of days. Is that correct?
A I think so.
Q You continued to get paid, in any event, by Cushman & Wakefield. Isn't that right?
A I'm not sure how my pay was calculated.
Q You got paid by Cushman & Wakefield until July 10 of 2015. Isn't that right?
A Probably. I didn't check it. Yes.
Q Let me show you what's been marked as Exhibit 19. Exhibit 19 are documents that you provided through



your counsel to me. They are Bates stamped YR1 through YR50, okay?
A Okay.
Q On the first page of Exhibit 19 -- I'm just going to point to it. Do you see here about a third of the way down, it says, "Forward message"?
It's from Yury.Rinsky@cushwake.com to YRinsky@yahoo.com, correct?
A Yes.
Q The document that is forwarded is entitled, "Moving to Boston."
Do you see that?
A Yes.
Q It's actually two e-mails. It's the e-mail from you to Mr. Reid on May 17, 2015. Do you see it? That's at the bottom of the first page.
A Yes.
Q And it's the e-mail from Mr. Reid to you on May 18, 2015?
A Yes.
Q Let's go to page 3 of Exhibit 19. On page 3 of Exhibit 19, at the top, it's an e-mail from Yury.Rinsky@cushwake.com to YRinsky@yahoo.com. Do you see that?



A Yes.
Q You forwarded an e-mail between you and Mr. Reid on May 28, 2015. Do you see that?
A Yes.
Q Why did you think that e-mail was helpful to you in any case you brought against Cushman & Wakefield?
A I didn't analyze it too much. I just thought it may be helpful.
Q Let's go to the next page. YR4. That's another e-mail that you forwarded from your Cushman & Wakefield account to your Yahoo account. It's an e-mail dated May 29, 2015. Do you see that?
A Yes.
Q Those are commission interfaces as of May 28, 2015?
A Uh-huh.
Q Why did you think that would be helpful in any lawsuit?
A I thought that may help. Why? I can only guess today, but maybe it was a proof that I was working from Boston in case they don't -- say I didn't work from Boston. I sent over some e-mails confirming that I was working, communicating with other employees.
Q Let's look at YR5. That's an e-mail -- the second half of this page on YR5 of Exhibit 19. That's an

AS400 system?
A Right. I was trying to log on.
Q You were paid July 10th of 2015, correct?
A Yeah, but I didn't ask for it. They just paid me until it was a review -- my case was review. I didn't ask for it.
Q I didn't ask you if you asked for it. All I'm saying is, as a statement of fact, you were paid your regular salary by Cushman & Wakefield through July 10, 2015?
A Yes.
MR. BERLUTI: Mark this as the next exhibit in line, please.
(Letter dated July 14, 2015, marked as Exhibit No. 20 for identification.)
Q Exhibit No. 20 is a letter dated July 14, 2015, to you from Colin Reid, correct?
A That's what it says, yes.
Q You received this letter, correct?
A Yes.
Q How did you receive it? Do you remember?
A If I'm not mistaken, this letter came to me a week later. It was addressed to my New Jersey mailing address, and then it was forwarded to Winchester.
Q Did you provide anyone at Cushman & Wakefield your



Massachusetts address of 7 Conant Road, Unit 9, Winchester, Massachusetts?
A I don't think so.
Q Do you know if Mr. Reid e-mailed this letter to you to your home e-mail?
A I can take a look to confirm it, but my recollection is I get it in the mail and it was addressed with the New Jersey. It took a long time to deliver it to me.
Q I think you should check because I think it was e-mailed.
A I can check.
Q What response did you make to receiving Exhibit 20?
A That was the last communication between me and at Cushman & Wakefield. That's it. So, that was a confirmation that my case was reviewed and it wasn't, like, in my favor. That's it. Nobody called. No e-mails after that.
Q The next thing you did was hire an attorney, correct?
MR. SZAL: Objection.
A Yes.
Q Your attorney sent a demand letter on your behalf, correct?
A Yes.
Q Did you receive responses from Cushman's attorney to



the letters from your attorney?
A I get this information from my attorney later on.
Q You then filed a charge with the Massachusetts Commission Against Discrimination. Do you recall that?
A Yes.
Q When do you recall you filed that discrimination charge?
A Soon after I hired an attorney. Within a month.
Q Prior to July 10, 2015, did you retain counsel regarding any employment issues at Cushman & Wakefield?
MR. SZAL: Objection. I'm going to instruct you not to answer that.
Q The question is: Did you obtain counsel?
MR. SZAL: I'm going to instruct him not to answer.
Q Do you recall signing a document that was filed with the Massachusetts Commission Against Discrimination?
A Yes.
Q Do you recall that you signed that under the penalties of perjury?
A Yes.
Q Did you review that document carefully before you



signed it?
A I reviewed it. Yeah.
Q What was the discrimination that you were complaining about against Cushman & Wakefield?
A The discrimination was the way it went after they told me to wait for a cubicle, and instead, I got this note from them to resign. It was obvious to me they fired me because they were concerned about my health.
We have always been very busy at Cushman & Wakefield. I was very busy all the time. All the 27 years. I was very busy. Their concern was me taking time off for my treatment.
I had chemotherapy for lymphoma in 2009 and this is -- by the way, this is a time when I told Colin about my illness because the way they handled my chemotherapy was I had to go there for a day of treatment and then I had to stay home. I was very weak. To stay home the second day, and the next week they told me you will be able to work.
So, I told Colin that I need to take two days a week, one for treatment, one to recover. That I will do for eight or nine weeks. Because my cancer was stage 2, and this is when I explained to him what was the illness and details about the treatment.

He was very nice. Very cooperative. He said, Okay. Sure. Take as much time as you need.
I completed the treatment. I was in very bad condition. I couldn't postpone. The lymphoma attacked my respiratory system. I couldn't postpone it even one day. The last day I left the hospital with an oxygen tank. So, I had to start it right away.
Q This is all in 2009, right?
A 2009. Yeah. When the treatment was over, Colin called me in to the conference room, and he usually did it when we need to discuss something important. He also -- again, he was very nice. It was when my treatment was over.
He told me they -- they -- my understanding was his managers. I don't know exactly who. They think that you can work here no problem, but if you keep taking -- they are very busy. We have so much work to do. If you take more time for treatment, we won't be able to employ you. Then the exact same thing happened --
Q Stop for a second. Your employment continued, as it had been, in 2009 before your treatment and after your treatment?



A Yes.
Q All of your benefits, your salary all remained the same?
A Yes, but I --
Q Hold on. Hold on. When was the next time you went out for any medical reason?
A In 2013. No. I'm sorry. I apologize. I broke my elbow. Fell and broke my elbow.
Q When was that?
A December 2009, I believe.
Q So, in December 2009, you had both this cancer bout and later you broke your elbow. Is that right?
A Yes.
Q Did you have to take some time off when you broke your elbow?
A Yes. I work from home with a broken elbow. I insisted. They told me, You shouldn't because you are on disability.
I said, I want to work. I am bored.
They let me work remotely.
Q All your benefits of employment were the same before you broke your elbow in 2009 and after you broke your elbow in 2009?
A Right.



Q The next time you had any health-related issue was in 2013?
A In 2013, I was taken by ambulance to hospital. It was pneumonia, and I spend two weeks in the hospital. It was very bad. They couldn't find antibiotics that would heal it. They tried several. It was very bad two weeks. In two weeks, I went home, and right away, I went to my oncologist. Oncologist looked at the paperwork from the hospital, send me for a CT scan in case the pneumonia was a result of my lymphoma attacking my respiratory system and I need a similar treatment as I had in 2009.
Q Chemotherapy?
A Yes.
Q You went through another regimen of nine weeks of chemotherapy?
A Yes. Yes. The same exact thing happened afterward. Colin again called me to the conference. It was them. Not him. He was just the messenger, but they think if it goes like that, we have so much work to do -- the exact same like it was a recording.
Q When, in 2013, did you contract pneumonia?
A In May.
Q So, you had treatment for the pneumonia and then the nine weeks went through the summer. So, by the fall of 2013, you were done with all your treatment and taking time off, correct?



A Yes.
Q Did you have any other work-related time off after, let's call it, September of 2013?
A Yes.
Q When?
A After the hospital, I experienced some big-time problems with hypertension. My blood pressure was jumping very high and -- a couple of times I took the bus from Fair Lawn to New York, and I couldn't go to work and the ambulance took me to the hospital from the bus terminal.
Q When was that?
A I don't remember the exact date, but it happened a couple of times.
Q How long were you out of work?
A Just for a day or two, but later on, they found the medications that kept my pressure down.
Q Did you continue in the same job and receive the same compensation and the same benefits after you were out for pneumonia and for your chemotherapy treatments in 2013 as you had before you went out in 2013?

A Yes.
Q In 2014, did you ever ask Cushman & Wakefield for any accommodation based upon any disability that you believed you had?
A I didn't have disability. I was able to work.
Q Did you ask Cushman & Wakefield for any accommodation for any disability that you perceive that you had?
A I didn't think I have a disability.
Q Okay. So, the last time you went out of work for more than a day or two was in 2013, correct?
A I had several flu.
Q I said a day or two.
A A day or two. Yeah. They took days, but I had a lot of vacation days a year after 27 years. So, it wasn't a big deal.
Q In connection with you getting a cubicle in Boston, no one at Cushman & Wakefield ever mentioned anything about any medical condition that you had, correct?
A Correct.
Q Have you now told me all of the instances that you contend indicate any source of discrimination against you because of any health-related issue?
A That's it.
Q As I understand your testimony, you don't believe that



you suffer from a disability. Is that correct?
MR. SZAL: Objection.
A It was a short disability during the time of treatment and then I recover, and I was back to normal.
Q Once you got back to normal, you didn't suffer from a disability, correct?
A Yes.
Q Is there any other basis of discrimination that you allege against Cushman & Wakefield?
A No.
MR. BERLUTI: Let's mark this as the next exhibit in line, please.
(Commonwealth of Massachusetts Commission Against Discrimination Complaint marked as Exhibit No. 21 for identification.)
Q Do you recognize Exhibit 21?
A Yes.
Q That's your MCAD complaint, correct?
A Yes.
Q Let me direct your attention to the very last page. Is that your signature, sir?
A Yes.
Q All right. It reads, right above your signature, "I hereby certify under pains and penalties of perjury



that I have read this complaint and the allegations contained herein are true to the best of my knowledge."
Did I read that correctly?
MR. SZAL: Objection. No. You said "certify" instead of verify.
Q Did you read Exhibit A completely before signing it?
A I read it. Yeah.
Q Let's go to paragraph 7, sir. Paragraph 7, the second sentence says, "In the beginning of April 2015, I decided to inquire as to whether the company would allow me to work in the company's Boston office as my duties could just as easily be performed in Boston (or remotely close) as in New York."
Did I read that sentence correctly?
A Yes.
Q You signed this document in August of 2015?
A Right.
Q So, the events that occurred in 2015 were very close in your mind, right?
A Yes.
Q If you say it was the beginning of April 2015 that you decided to inquire whether Cushman & Wakefield would allow you to work in the company's office, was that



truthful?
A It is. I think it is.
Q You think it is. The beginning of April?
A Yes, because of the little time between our conversation at the end of March and when I got the offer and our second conversation when I did inquire about it. Because of a very short time gap between those two events, and it has to be in a brief form. Not in all the details. This is how I put it.
Q Sir, the first time you asked Cushman & Wakefield whether you could transfer to Boston was in the beginning of April 2015. That's what you said in August of 2015. Is that correct?
A Yes. I was trying to combine --
Q You answered the question. Let me direct your attention to paragraph 9. "As a result of the company approving my request to work from Boston, I put my home in New Jersey on the market."
That's not true, is it?
A It's --
Q You put your home on the market before you spoke to anyone at Cushman & Wakefield. Isn't that right? Isn't that the reality?
A It is.

Q You don't understand?
A I decided to go with this offer. That included inspections --
Q There's no question before you. Let's go to page 6 of Exhibit 22. Count 1 alleges age discrimination. You make no claim of age discrimination, do you?
MR. SZAL: Objection.
Q You have no evidence of age discrimination?
A This is when the people, you know, have health issues when they get older and usually at my age or older.
Q Sir, at any time -- did anybody even mention age to you at any time in 2015 from Cushman & Wakefield?
A No.
Q Did anyone mention age in any way, shape, or form in connection with your request to transfer to Boston?
A No.
Q Colin Reid was the person you had interacted with, and he's only two or three years younger than you, correct?
A Yes.
Q You don't know who the decision maker is?
A I don't.
Q Therefore, you don't know how old the decision maker was, right?



A I don't.
Q You don't know what considerations the decision maker had when he made the decision to deny your request to transfer?
A Yes.
Q Okay.
A Can I finish?
MR. SZAL: Yes.
Q No. You finished the answer.
MR. BERLUTI: You want to ask him questions, you can ask him questions.
MR. SZAL: That doesn't mean you can bark at the witness. You've been doing it all day. I've been giving you leeway.
MR. BERLUTI: We are not going to get into this.
MR. SZAL: We are going to get into this.
Q I've already asked you age discrimination. Let me ask you about you about promissory estoppel. What promises were made to you that you relied on?
A Promises they approved my move to Boston. They promised me a cubicle in Boston. They promised me equipment in Boston. That was the promises.
Q You were always an employee at will, correct?



MR. SZAL: He's answered that three times.
A Yes.
Q Number 4. Fraudulent misrepresentation. What's the fraudulent misrepresentation that you claim was made?
A I find it difficult with the language. Maybe you can explain it to me in simple form so I can answer.
Q What did Cushman & Wakefield tell you that was not truthful?
A Not truthful. First they told me that I can go to Boston and work from the Boston office and that was not true. They told me I will get the same things. I will get a work space in Boston. That was not true. I will get equipment in Boston. That's not true.
Q How do you know it wasn't true?
A Because they asked me to resign.
Q How do you know when they made that decision?
A I don't know.
Q You don't know if it was made before or after June 1st, right?
A After June 1st? I don't know when it was made.
Q Who was it who made the misrepresentations to you? Who?
A I only know the people who brought it to my attention, to me. I don't know who makes the decision. They



didn't tell me. It's a mystery to me. Like I said, I didn't have any reason not to trust what Colin said. If Colin told me Andrew approved it, I didn't have any reasons not to trust Andrew. They were not liars. They are always nice people.
Q What's your evidence that anybody told you something that wasn't true at the time they said it?
A It's not what who said. It's what happened is the evidence.
Q Misrepresentation is a statement. So, I'm asking you: Who was it that said something that was not true at the time they said it?
A In this case, it's Colin, and from Colin's words, Andrew. They promised me all that. I didn't talk to anyone else about it.
Q If Colin told you what someone else told him to say, it's not a misrepresentation, is it?
MR. SZAL: Objection.
A I don't know. This is a legal issue. I don't know.
Q So, is it your testimony that Mr. Reid knew at the time that he said something to you that was not accurate? Is that your testimony?
A I cannot say that.
Q You don't know that?

A No. Someone may say to Mr. Reid that it cannot be done, or someone can order Mr. Reid to get rid of me. That could happen. I'm not saying that would happen but that's a possibility.
Q Prior to moving to Boston, you had a job as a software engineer at headquarters at Cushman & Wakefield, correct?
A Yes. Not Cushman & Wakefield's office. At the headquarters.
Q In June of 2015, you still had a job at Cushman & Wakefield headquarters as a software engineer, correct?
A I don't think so because, upon their approval, I moved to Boston. Upon their approval, I was waiting for a work space in Boston.
Q I understand your story. I understand your story. I'm asking you a question.
A Again --
Q It's not a legal question. It's a factual question. What Andrew Hamilton said to you was you had your job in New York, at the headquarters of Cushman & Wakefield in New York, and he told you that on June 22, 2015, correct?
A Yes.



Q That's what he said to you?
A Right. Yes.
Q You didn't want the job at Cushman & Wakefield headquarters any longer beginning May 28, 2015, correct?
MR. SZAL: Objection.
Q Is that true or not?
A I thought -- with the president of the company, I was hoping it will be resolved. May 19th and May 27th until the time they fired me, nothing had changed. Colin and Andrew knew exactly what I was doing, and they knew exactly that I can do it from anywhere in the world.
Q Mr. Rinsky --
A Nothing had changed.
Q You did not -- hold on. Let me finish my question. You did not want your job at the headquarters at Cushman & Wakefield as a software engineer beginning in June of 2015. True or not?
A It was impossible for me to do what they told me.
Q Because you moved?
A Yes.
Q You moved because of family reasons?
MR. SZAL: Hold on.



Q Because of your family reasons, correct?
A No. I moved because I got an approval from them. I didn't have an emergency to move to Boston. There was nothing that I had to do here in June. I could wait two, three years to do it. I wouldn't move. Why would I move? I moved because they approved my move. It was good for me. It was a desirable option to live close to my family.
Q Then you could move back to New York?
A That's not easy. Why would Cushman & Wakefield play Monopoly with my life.
Q It was okay for you move to Boston but not back to New York?
A I find your statement funny.
Q Is that the case?
A Just funny. Yes.
Q What did you do to look for work after June 22, 2015?
A I look for work.
Q What did you do?
A I looked on line.
Q On line?
A Yes.
Q What sites?
A Indeed.



Q Say it again.
A Indeed.
Q I-N-D-E-E-D?
A Yes. .com. Glassdoor.com.
Q Glassdoor.com?
A Monster.com.
Q Monster. Anywhere else?
A That's all. Everything was there. I tried to go somewhere else, but everything was on these three sites.
Q What result did you have from looking at these sites?
A I got no results.
Q What did you do? Other than looking at the sites, what did you do?
A I didn't find any request for a job that even close to mine. The reason for that is that the system for Cushman & Wakefield was a 30-year old system and very limited number of companies are still using it.
If they are using it -- this is what I learn. If they are still using it, they want working on conversion. They don't hire people for the conversion because when there's a conversion, they need people that know both systems. Not just the AS400. They need people who know both systems. That

wasn't my case.
Technically, I was good but it was only AS400. There was absolutely no demand on the AS400. The second reason was I was an expert in brokerage application, commercial real estate. There were no development in this field.
There are a handful of big companies, and they don't do much development. They don't have the AS400.
Q Isn't it true that brokerage firms in New York use the AS400 system? Stock brokerage firms. You don't know that?
A I know a lot of people in my field in New York.
Q How long did you look on these three web sites for a job?
A For months.
Q How many months?
A Over a year.
Q You never applied to one job, correct?
A I called, and as close as I get was a company, Staples, near Boston. In Framingham.
Q Framingham?
A Yes. They were looking for AS400 person but I talk to the manager, and they told me that they cannot use me



because they want someone who knows retail and it was not my applications.
Q So, the only job you applied to was the Staples job?
A Yes.
Q You began collecting Social Security in August of 2015?
A Yes.
Q How much do you receive in Social Security every month?
A I don't know. It's, like, 23,000 a year.
Q Have you done -- have you been gainfully employed in any way since July of 2015?
A I have not.
Q Pardon?
A I have not.
Q Did you stop looking for a job at some point?
A I still look occasionally, but it looks like it completely dead, you know. I need to upgrade my skills, but I'm probably too old for that.
Q Say that again. You need to upgrade your skills but what?
A I need to learn something new. That takes time.
Q Do you know of any AS400 software engineers that work out of the Cushman & Wakefield Boston office?



A I don't think there are any in the Boston office. Only people who use the system but no developers.
Q All the developers are located in New York City, correct?
A Yes.
Q As far as you know, they are still all located in New York City, correct?
A Yes.
MR. BERLUTI: I have no further questions.
MR. SZAL: Can we take, like, five? I might not have any.
(A recess was taken.)
MR. SZAL: Back on. I don't have any questions.
MR. BERLUTI: Do you have any objection to my scanning the exhibits and getting them to you as PDFs?
MR. SZAL: No.
(Whereupon, at 4:30 p.m., the deposition was concluded.)



ATTACH TO THE DEPOSITION OF: YURY RINSKY
CASE OF: YURY RINSKY V CUSHMAN & WAKEFIELD, INC.

ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, please note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Please sign and date this errata sheet (Before a Notary Public, if required).

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition taken on Wednesday, March 1, 2017, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Signature of Deponent Date