UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YURY RINSKY,<br><br>Plaintiff,<br><br>v.<br><br>CUSHMAN & WAKEFIELD, INC.,<br><br>Defendant. | ) | C.A. No. 16-10403 |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS OF RECORD AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED AND PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS OMITTED BY DEFENDANT**

NOW COMES the plaintiff, Yury Rinsky ("Plaintiff"), by and through counsel, and hereby files this response to Defendant's Local Rule 56.1 statement of material facts of record as to which there is no genuine issue to be tried ("Defendant's Statement") and Plaintiff's Concise Statement of Material Facts Omitted by Defendant ("Plaintiff's Statement of Material Facts").

## I. PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT.

1. Not disputed.

2. Not disputed, provided that Plaintiff has filed a motion in limine to limit evidence in this matter to the AS400 Commissions and Accounting Group due to limitations placed on discovery by Defendant. See Plaintiff's Motion in Limine No. 4, Document 25.

3. Disputed. Although assigned to the New York City headquarters, Plaintiff was asked to work from home up to 4 days per week during his last 3 years of employment due to a space issue. See Plaintiff's Statement of Facts, ¶ 5.

4. Not disputed that Plaintiff's area of expertise was a specific computer system, the AS400, on which he worked for the majority of his time at C&W. Disputed that he worked with one other full time programmer, Anna Kleynshteyn, and that there were not other employees working on the AS400 system. Evidence obtained in discovery revealed that there was at least one other full time employee, Thomas Donlan, who worked full time in Plaintiff's department. Disputed that Plaintiff and Anna Kleynshteyn were "located at headquarters." Although assigned to the New York City headquarters, Plaintiff was asked to work from home up to 4 days per week during his last 3 years of employment due to a space issue. Reid Dep., 74: 13-25, 87: 17-22, 103: 23-25, 104: 1-3; Rinsky Dep., 18: 8-10, 19: 18-19.

5. Not disputed that Plaintiff's supervisor was Colin Reid. Not disputed that Mr. Reid reported to Andrew Hamilton, who reported to Leif Maorini, who in turn reported to Craig Cuyar, the Chief Information officer for C&W globally. Disputed that prior to March 2015, all of them reported to, and had offices in, C&W's headquarters in New York. Defendant did not produce any evidence concerning the remote working schedules of Mr. Reid, Mr. Hamilton, Mr. Maorini and Mr. Cuyar in response to discovery requests. Further, no person in Plaintiff's department reported to Defendant's office every day. Rinsky Dep., 14: 11-12.

6. Disputed. Plaintiff's role required connecting with financial personnel all over the country, some of whom he met with in person and other he would connect with by email or phone. Rinsky Dep., 16: 10-18, 17: 5-11. Plaintiff did not need to meet with financial personnel in person or on a set schedule. Rinsky Dep., 97; 19-21, 98; 23-24, 99:1, 12-18, 19-24. Requests for the work Plaintiff performed could come from anywhere in the country within the company. Reid Dep., 19: 15-22.

7. Not disputed.

8. Not disputed.

9. Disputed. Plaintiff never considered a transfer until learning that Reid had been able to transfer. See Plaintiff's Statement of Facts, ¶ 38. Plaintiff had originally planned to move to the Boston area after he retired at age 67, and had no desire to move in 2014. Rinsky Dep., p. 28: 21-24, 29: 1-11.

10. Not disputed, provided that Plaintiff has filed a motion in limine to exclude evidence at trial of Plaintiff's real estate activities in Massachusetts prior to 2014, including Exhibit B to Defendant's Statement. See Plaintiff's Motion in Limine No. 1, Document 21.

11. Not disputed.

12. Not disputed.

13. Not disputed.

14. Not disputed.

15. Disputed. On the same page cited by Defendant for the proposition that "Plaintiff had already made his decision to move to Massachusetts," Plaintiff testified as follows: "I couldn't tell [Reid] that I'm moving to Boston. I was asking for his permission. I didn't tell him I'm moving to Boston." Rinsky Dep., 46: 7-13.

16. Not disputed.

17. Disputed. Mr. Reid never stated that he would need to "obtain approvals." Plaintiff testified that he was told of only one approval needed, Reid's boss Andrew Hamilton. Reid's exact words were "I need to talk to my boss." Reid never told Plaintiff that "approvals" were required above Mr. Hamilton. Rinsky Dep., 51: 11-21, 58: 11, 59: 2-11.

18. Not disputed.

19. Disputed. Plaintiff testified that he retained an attorney "a couple of days after" receiving the offer on April 2, 2015. Rinsky Dep., 67: 20-22.

20. Disputed. Reid also told Plaintiff that Cuyar was very busy and "once he has time, he will call the Boston office and arrange a space for you." Rinsky Dep., 79: 2-10. Plaintiff further testified that Defendant "told me that I can go to Boston and work from the Boston office and that was not true. They told me I will get the same things. I will get a work space in Boston. That was not true. I will get equipment in Boston. That was not true." Rinsky Dep., 187: 3-15. Other statements were made to Plaintiff as well that Defendant omits. Plaintiff emailed Reid on May 17, 2015 to inform him that he would be moving to Boston on May 27, 2015 "as discussed." Reid responded "Ok, we will talk on Tuesday." See Defendant's Exhibit K. See also Plaintiff's Statement of Facts, ¶¶ 57-58.

21. Not disputed.

22. Not disputed.

23. Not disputed.

24. Disputed. See Plaintiff's Statement of Facts, ¶¶ 59-60.

25. Not disputed.

26. Disputed. A leaseback provision was included in the accepted offer for Plaintiff's home, which Plaintiff did not exercise as a result of his approved transfer to the Boston office. See Defendant's Exhibit F ("Sellers will have the option to lease the house back at the lease market value until buying another property.").

27. Not disputed.

28. Disputed. Even before Plaintiff learned of the closing date, Hamilton emailed Reid on May 14, 2015; the purpose was to set up a meeting about Plaintiff's "home purchase in Boston"

and to ask Reid to "think through the options and risks of replacing him." Reid could not recall a meeting between May 14th and May 17th. At some point, however, Reid met with Hamilton and Katrina Hicks ("Hicks") from Human Resources and reviewed their "options." On the same day that Defendant knew that Plaintiff was moving to Boston, it was putting in place its plan to terminate him for alleged "job abandonment." Specifically, Hamilton proposed to (1) hire a contractor to backfill Plaintiff's role; (2) being "knowledge transfer" from Plaintiff to the contractor; (3) process and execute Plaintiff's transfer; (4) retain Plaintiff (working remotely from Boston) for about 9 weeks to cover critical work; and (5) then terminate him while "mitigating litigation risks." In sum, on the day he left for Boston, Defendant was preparing to terminate Plaintiff in 9 weeks, after he performed necessary work for them. Despite daily interactions with Plaintiff, Reid never communicated this to him because he "wasn't allowed to." See Plaintiff's Statement of Facts, ¶¶ 66-71.

29. Not disputed.

30. Disputed. Plaintiff has asserted discrimination claims based on his termination in 2015. See Complaint, Document 7.

31. Disputed. Plaintiff's employment did not "remain the same before and after treatment." After returning to work after his 2009 chemotherapy, Plaintiff was called by Reid into a conference room. Reid delivered a message from his managers to Plaintiff that "if you take more time off for treatment, we won't be able to employ you." In 2013, Plaintiff's lymphoma returned, attacking his respiratory systems and requiring him initially to stay in the hospital for 2 weeks. Plaintiff underwent another 9-week regimen of chemotherapy. When Plaintiff returned to work, "the exact same thing happened…like it was a recording." Reid again delivered a message from

management that Plaintiff's job would be in jeopardy if he required more treatment because there was so much work to do. Plaintiff's Statement of Facts, ¶¶ 14-22.

32. Disputed. Plaintiff claims that his termination was discriminatory. See Complaint, Document 7.

33. Not disputed.

34. Not disputed.

35. Not disputed.

36. Not disputed.

37. Not disputed.

## II. PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1. Defendant employed Plaintiff from 1988, most recently as a Software Engineer working on the AS400 computer system, until his termination in July 2015. Deposition of Yury Rinsky ("Rinsky Dep."), 7: 20-21, 9: 2-3, 16: 7-9. The Rinsky Deposition transcript is attached hereto as Exhibit A.

2. During his entire tenure with Defendant, Plaintiff reported to Colin Reid ("Reid"), Managing Director. Rinsky Dep. 14: 3-7; Rule 30(b)(6) Deposition of Colin Reid ("Reid Dep."), 11: 4-6, 17: 7-10. The Reid Deposition transcript is attached hereto as Exhibit B.

3. Plaintiff was an honest and trusted employee, typically receiving annual reviews of "exceeds expectations" or "excellent." Reid Dep., 22: 2-22.

4. In 2015, Defendant began a "phase out" of its 25-year-old AS400 system. Reid Dep., 11: 16-17, 119: 8-11, 121: 9-15.

5. Plaintiff was asked to work from home up to 4 days per week during his last 3 years of employment due to a space issue. Rinsky Dep., 18: 8-10, 19: 18-19.

6. Reid maintained a calendar that tracked the remote work schedule of his department. Reid Dep., 80: 5-16.

7. Defendant refused to search for Reid's calendar and produce it, objecting based on substantial costs and lack of relevance. See February 28, 2017 Email from Robert Berluti, attached hereto as Exhibit C.

8. Plaintiff's role required connecting with financial personnel all over the country, some of whom he met with in person and others he would connect with by email or phone. Rinsky Dep., 16: 10-18, 17: 5-11.

9. Plaintiff did not need to meet with financial personnel in person or on a set schedule. Rinsky Dep., 97; 19-21, 98; 23-24, 99:1, 12-18, 19-24.

10. Requests for the work Plaintiff performed could come from anywhere in country within the company. Reid Dep., 19: 15-22.

11. No software engineers in Plaintiff's department reported to Defendant's office every day. Rinsky Dep., 14: 11-12.

12. Work in Plaintiff's department could be performed remotely and anywhere with a laptop connection. Reid Dep., 36: 4-20, 76: 10-13.

13. The AS400 system that Plaintiff worked on is stored in a secure, offsite facility that Reid has never even been to. Reid Dep., 12: 20-25, 13: 6-8, 14: 10-12.

14. Since 2009, Plaintiff has been treated for lymphoma, a recurrent form of blood cancer. Rinsky Dep., 168: 13.

15. Plaintiff explained the handicap to Reid and details about the treatment. Rinsky Dep., 168: 22-24.

16. During his 9-weerk chemotherapy regimens, Plaintiff would receive treatment one day and stay home to rest the next. Rinsky Dep., 168: 20-22.

17. After his 2009 chemotherapy, Reid called Plaintiff into a conference room. 169: 10-11.

18. Reid delivered a message from his managers to Plaintiff that "if you take more time off for treatments, we won't be able to employ you." Rinsky Dep., 169: 15-20.

19. In 2013, Plaintiff's lymphoma returned, attacking his respiratory system and requiring him initially to stay in the hospital for 2 weeks. Rinsky Dep., 171: 3-12.

20. Plaintiff underwent another 9-week regimen of chemotherapy. Rinsky Dep., 171: 15-17.

21. When the treatment was completed, "the exact same thing happened…like it was a recording." Rinsky Dep., 171: 17-21.

22. Reid again delivered a message from management that Plaintiff's job would be in jeopardy if he required more time off for treatment because there was so much work to do. Rinsky Dep., 171: 17-21.

23. Reid knew that Plaintiff had recurrent cancer. Reid Dep., 65: 7-25.

24. Defendant submitted a Position Statement under oath to the Massachusetts Commission Against Discrimination ("MCAD") that stated "Reid also specifically denies knowing that Rinsky had lymphoma." See Position Statement, p. 3, attached hereto as Exhibit D.

25. In its Answer to Plaintiff's Complaint, Defendant Denied that "Plaintiff has experienced health issues recently that were known to the Company." See Document 7, ¶ 13 and Document 8, ¶ 13.

26. Reid testified that he may have discussed Plaintiff's handicap with others in management, stating "it could have come up." Reid Dep., 67: 13-20.

27. Reid could not recall whether management expressed concerns about Plaintiff taking time off for medical treatment. Reid Dep., 68: 18-21.

28. Defendant had an understanding that Plaintiff's cancer was not cured and would come back at some point. Reid Depo., 171: 13-22, 172: 1-3.

29. Reid's role is much broader and has more responsibilities than Plaintiff's. Reid Dep., 17: 22-25, 18: 1-25, 19: 1-25, 20: 1-3.

30. In late 2014, Reid sought a transfer to Defendant's Miami office; he officially started working from Miami on April 8, 2015. Reid Dep., 24: 7-8, 62: 2-20.

31. To request his transfer, Reid simply made a verbal request to his direct manager, Andrew Hamilton ("Hamilton"). Reid Dep., 32: 16-19.

32. Reid did not need to fill out any paperwork in connection with his transfer request. Reid Dep., 56: 13-19.

33. Hamilton told Reid that he approved of his transfer request, but that it needed to be approved by the next level of management. Reid Dep., 29: 13-25, 30: 1-10.

34. Reid did not need to take any further action in connection with his transfer request, never spoke directly to the next level of management, and learned from Hamilton in late February 2015 that his request was approved. Reid Dep., 30: 1-10, 33: 8-14.

35. Nothing else was required for Reid to transfer from New York to Miami. Reid Dep., 35: 5-9.

36. Since his transfer to Miami, Reid has only been required to be in New York 3 or 4 times, on an as needed basis. Reid Dep., 34: 12-25, 35: 1-4.

37. Plaintiff had originally planned to move to the Boston area after he retired at age 67. Rinsky Dep., 29: 10-11.

38. Plaintiff never considered a transfer until learning that Reid had been able to transfer. See Affidavit of Yury Rinsky ("Rinsky Aff."), ¶ 2, attached hereto as Exhibit E.

39. Plaintiff had no desire to move to Boston in 2014. Rinsky Dep., p. 28: 21-24, 29: 1-11.

40. Days before Reid left for Miami, Plaintiff asked for his approval and permission to relocate to the Boston office once his New Jersey home was sold. Rinsky Dep., 44: 4-14, 46: 11-20.

41. Reid responded by saying that he was very busy, the sale of the house would take 6 months, and that they could talk about it later. Rinsky Dep., 45: 13-15.

42. Plaintiff listed his house for sale On March 29, 2015. Rinsky Dep., 42: 1-12.

43. Plaintiff received an unusual and attractive offer on April 2, 2015. Rinsky Dep., 48: 1-12.

44. The offer was unusual in how fast it was received, but also in that it had no mortgage contingency and an option for Plaintiff to stay in the house after the sale. Rinsky Dep., 47: 23, 24, 48: 1-3.

45. Upon receipt of the offer, Plaintiff spoke with Reid right away during the first week of April. Rinsky Dep., 48: 8-10, 49: 14-16.

46. Plaintiff left Reid a voicemail saying that he needed to talk about "something important." Rinsky Dep., 53: 1-3.

47. After Reid expressed relief that Plaintiff was not taking more time off for cancer treatment, Plaintiff told Reid about the offer he had received and asked him if Defendant would allow him to work out of the Boston office once the house was sold. Rinsky Dep., 51: 1-3, 53: 4-13.

48. Reid said that he approved, particularly where Plaintiff worked "half the time remotely" anyway, but that he also needed to talk to his boss, Hamilton. Rinsky Dep., 51: 7-21.

49. Reid never mentioned that there were any other layers of approval, stating only "I need to talk to my boss." Rinsky Dep., 58: 11, 59: 1-13.

50. Plaintiff followed up with Reid a few days later and was informed that Reid had not spoken to Hamilton yet because "everyone is busy." Rinsky Dep., 60: 1-9, 15-17.

51. The March to April time frame was very hectic for Reid, with his moving from New York to Miami, the death of his mother, and a major new platform being installed that was a "huge undertaking" requiring "lots of overtime." 27: 21-25; 28: 1-14, 20-21, 29: 5-10.

52. In the middle of April, Reid confirmed that Hamilton had approved Plaintiff's transfer. Rinsky Dep., 78: 12-24.

53. Plaintiff was told that the Global CIO, Craig Cuyar ("Cuyar") would call the Boston office in order to arrange space for him. Rinsky Dep., 79: 9-13.

54. Reid did not mention any approval being needed from Cuyar, Human Resources, or anyone else. Rinsky Dep., 79: 18-20, 81: 22-24.

55. Similar to Reid's transfer, there were no email confirmations and the transfer was represented to Plaintiff as a "done deal." Rinsky Dep. 84, 3-4, 85: 15-19.

56. Plaintiff worked business as usual after learning that his transfer was approved and until learning of the closing date for his home sale on May 17, 2015. Rinsky Dep., 84: 1-8, 89: 1-3.

57. Plaintiff emailed Reid the same day, informing him that he would be moving to Boston "as discussed" on May 27, 2015, needed to take 4 personal days after Memorial Day, and looked forward to discussing the arrangement with him. See May 17, 2017 Email from Yury Rinsky, attached hereto as <u>Exhibit F</u>.

58. Reid responded "Ok, we will talk on Tuesday." See May 18, 2017 Email from Colin Reid, attached hereto as Exhibit G.

59. The "arrangement" Plaintiff was referring to had "nothing to do with approval," and was concerning when he would get a promised cubicle and equipment in Boston, how often he would visit New York, how often he would work remotely, when he would provide after hours support and who would be his administrative contact in Boston. Rinsky Dep., 89: 9-22, 92: 12-24, 93: 1-6, 95: 3-18.

60. Plaintiff met with Reid on May 19, 2015, discussed these questions, and was assured they all would be resolved in time. Rinsky Dep., 90: 15-18, 91: 12-13, 100: 19-24, 101: 1-24.

61. Reid also met with Plaintiff on his last day in the New York office, May 22, 2015, to go over what was "open" on his "list for June." See May 22, 2015 Email from Colin Reid, attached hereto as Exhibit H.

62. There were 10 days between Plaintiff's email concerning his move date and the date itself. See Exhibit F.

63. During those 10 days, Defendant never told Plaintiff that he was not permitted to transfer or risked termination if he moved. Deposition of Leif Maorini ("Marorini Dep."), 94: 1-23. The Maorini Deposition is attached hereto as Exhibit I.

64. In an email dated July 2, 2015, Reid stated "The delay in terminating him, led to him to believe that we were getting him a cubicle in the Boston office. [sic]" See July 2, 2015 Email from Colin Reid, attached hereto as Exhibit J.

65. Plaintiff was never informed that there was any issue with his transfer request until June 22, 2015. Reid Dep., 135: 6-12.

66. Hamilton emailed Reid on May 14, 2015; the purpose was to set up a meeting about Plaintiff's "home purchase in Boston" and to ask Reid to "think through the options and risks of replacing him." See May 14, 2015 Email from Andrew Hamilton, attached hereto as Exhibit K.

67. Reid could not recall a meeting between May 14th and May 17th. Reid Dep., 51: 10-15.

68. At some point, Reid met with Hamilton and Katrina Hicks ("Hicks") from Human Resources and reviewed their "options." See May 27, 2015 Email from Andrew Hamilton, attached hereto as Exhibit L.

69. On May 27, 2015, Hamilton proposed to (1) hire a contractor to backfill Plaintiff's role; (2) begin "knowledge transfer" from Plaintiff to the contractor; (3) process and execute Plaintiff's transfer; (4) retain Plaintiff (working remotely from Boston) for about 9 weeks to cover critical work; and (5) then terminate him while "mitigating litigation risks." See Exhibit L; Reid. Dep. 133: 3-6, 15-25, 134: 1-25, 135: 1-5.

70. Between May 28, 2015 and June 21, 2015, Reid had daily communications with Plaintiff. Reid Dep., 143: 23-25, 144: 1-7.

71. Between May 28, 2015 and June 21, 2015, Reid never communicated to Plaintiff that his transfer was not approved and that the company intended to terminate his employment because he "wasn't allowed to." Reid Dep., 135: 6-12.

72. Defendant did in fact hire a contractor, Edgardo Felix ("Felix"), to backfill Plaintiff's role, who is about 15 years younger than Plaintiff. Rinsky Dep., 121: 15-22; Maorini Dep., 63: 24-25, 64: 1-3.

73. Reid contacted Felix on May 20, 2015, before Plaintiff left for Boston, to inform him that "something might be coming up soon." See May 20, 2015 Email from Colin Reid, attached hereto as Exhibit M; Reid Dep., 130: 5-20.

74. Plaintiff performed important work for Defendant between May 30th and June 22nd, working 14 hours per day 6 days per week. Reid Dep., 143: 23-25, 144: 1-7; Rinsky Dep., 127: 23-24, 128: 1-18.

75. Reid agreed with Hamilton's plan outlined in his May 27, 2015 email because he "didn't have a choice." Reid Dep., 137: 23-25.

76. Hamilton's May 27, 2015 email was addressed to Leif Maorini; neither Reid nor Maorini knew if he responded to the email. Reid Dep., 138: 21-23; Maorini Dep., 58: 22-25.

77. Maorini did not search his sent emails in connections with Plaintiff's request for production of documents. Maorini Dep., 59: 7-9.

78. On June 2, 2015, Plaintiff was asked by Defendant's employee Scott Sommer ("Sommer") whether he still needed his desktop computer in New York. See June 2, 2015 Email from Colin Reid, attached hereto as Exhibit N.

79. Plaintiff responded that "I will need my desktop in a couple of weeks when I get a cubical in Boston office. [sic]," and copied Reid. See Exhibit N.

80. Reid, copying Hamilton, told Sommer to wait because Plaintiff "might be getting new equipment for Boston." See Exhibit N.

81. Reid stated that Plaintiff was led to believe that he would be receiving a cubicle in Boston. See Exhibit J.

82. On June 22, 2015, a conference call was held between Plaintiff, Reid, and Hamilton. Rinsky Dep., 128: 24, 129: 1-24, 130: 1-13.

83. During the call, Hamilton was angry with Plaintiff. Rinsky Dep., 130: 1-13.

84. Hamilton told Plaintiff that he must report to the New York headquarters the next day, and be at work at the New York headquarters 5 days per week going forward in order to keep his job. Rinsky Dep., 129: 3-24.

85. Instead of terminating him, Hamilton pressured Plaintiff to resign, saying that it would be "good" for him. Rinsky Dep., 131: 2-6.

86. Plaintiff refused and ultimately was terminated. Rinsky Dep., 131: 7.

87. Maorini is currently 50 years old, which would have made him approximately 48 at the time of Plaintiff's termination. Maorini Dep., 83: 24, 84: 1.

88. Hamilton is believed to have been in his early 40s at the time of Plaintiff's termination. See Rinsky Aff., ¶ 3.

89. Hamilton's LinkedIn profile indicates that he graduated from college in 1997. See Andrew Hamilton LinkedIn profile, attached hereto as Exhibit O.

90. Cuyar is also believed to be approximately 15 year younger than Plaintiff. See Rinsky Aff., ¶ 4.

91. In its verified filing with MCAD, Defendant stated "Reid also specifically denies knowing that Rinsky had lymphoma." See Exhibit D, p. 3.

92. Reid confirmed at his deposition he did know Plaintiff had lymphoma/recurrent cancer. Reid Dep., 66: 3-13, 171: 13-22, 172: 1-3.

93. Defendant also represented to MCAD that Plaintiff was put on administrative leave immediately after his move to Boston. See Exhibit D, p. 3.

94. Reid confirmed at his deposition that this statement was not accurate. Reid Dep., 59:16-25, 60:1-7.

95. In a May 26, 2015 email from Hicks, she stated, with respect to another transfer request, that "as of last week, all internal transfers have to also be approved by DTZ." See May 26, 2015 Email from Katrina Hicks, attached hereto as Exhibit P.

96. During May 2015, Defendant was in the process of a merger with DTZ, which was finalized on September 2, 2015. Maorini Dep., p. 87: 14-25, 88: 1-4.

97. Cuyar verified the Position Statement. See Exhibit D.

98. In its answer to the Complaint, Defendant denied that (a) Plaintiff has experienced health issues recently that were known to the Company (b) Plaintiff discussed his treatment for lymphoma and the schedule of his treatment with Reid, (c) during his cancer treatments, Plaintiff worked remotely when he was not able to be in the office and tried to take off as little time as possible, (d) Reid stated that Plaintiff's request to work from Boston was acceptable to him, but that it needed to be cleared with his manager, Hamilton, and (e) Plaintiff continued to work remotely in June 2015. See Complaint ¶¶ 13, 14, 16, 26, 36 (Document 6); Answer ¶¶ 13, 14, 16, 26, 36 (Document 7).

99. Reid testified that (a) Plaintiff's recent health issues were known to the Company, (b) Plaintiff discussed his treatment for lymphoma and schedule of treatment with him; (c) during his treatment for lymphoma, Plaintiff worked remotely when he was not able to be in the office and tried to take off as little time as possible, (d) he had told Plaintiff his transfer request was acceptable to him, but that it needed to be cleared by Hamilton, and (e) Plaintiff worked remotely in June 2015 after his move to Boston. Reid Dep., 84: 3-25, 85: 1-6, 10-21, 88: 1-11, 89: 16-25, 90: 1-5.

100. At the same time that the issue of Plaintiff's transfer came to light, Defendant's employee, Jay Leiser ("Leiser"), was requesting relocation for Florida. See Exhibit P.

101. On June 4, 2015, Cuyar, in an email, wrote, in part, the following: "With jay I would like to address his compensation since he is moving to a much lower cost environment. With Yuri I would like for you to work with HR and follow the same precedent that was established when Steve Lipka had an employee move to Florida without or prior knowledge and approval. [sic]" See Exhibit P.

102. On July 3, 2015, Cuyar, in an email, wrote, in part, the following: "I have considered your request but need to stand firm on the decision to not allow Jay, or others, to relocate at this time….The decision is firm and is made with the desire to provide for consistent treatment of staff and to eliminate potential employment disputes and subsequent litigation if we don't." See July 3, 2015 Email from Craig Cuyar, attached hereto as Exhibit Q.

103. Sometime after Plaintiff's termination and Cuyar's July 3, 2015 email, Leiser's transfer to Florida was approved. Maorini Dep., 21: 14-24, 22: 1-16.

104. Plaintiff's replacement, Felix, was initially required to be in Defendant's office every day. Reid Dep., 142: 7-14.

105. At some point after Plaintiff's termination, Felix was permitted to work remotely. Reid Dep., 142: 23-25, 143: 1-19.

106. Plaintiff never would have moved to Boston had he learned that his transfer had not been approved. Rinsky Dep., 110: 17-24.

107. Plaintiff has been unable to secure employment since his termination. Rinsky Dep., 191: 17-24, 192: 1-24, 193: 13-24, 194: 1-2.

108. Plaintiff is the only employee who has been terminated for job abandonment in his department. See Termination Report, attached hereto as Exhibit R.

Respectfully submitted,
**YURY RINSKY,**
By his attorney

/s/Mark D. Szal
Mark D. Szal, BBO#667594
**SZAL LAW GROUP LLC**
589 Tremont Street, Suite 4
Boston, Massachusetts 02118
Tel: (617) 830-2494
mark@szallawgroup.com

/s/John W. Dennehy
John W. Dennehy, P.C. BBO#658247
DENNEHY LAW
127 Main Street, Suite 1
Nashua, NH 03060
(603) 943-7633
(603) 943-7642 (Fax)
jdennehy@dennehylaw.com

DATE: March 27, 2017

**Certificate of Service**

I, Mark D. Szal, hereby certify that on March 27, 2017, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Mark D. Szal