UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - x

YURY RINSKY, :

Plaintiff, :

:

-against- C.A. No.
: 16-10403

CUSHMAN & WAKEFIELD, INC.,
:

Defendant.
:

- - - - - - - - - - - - - - - - - - - x

RULE 30(b)(6) DEPOSITION of COLIN REID, taken by Plaintiff at the offices of 1290 Avenue of the Americas, New York, New York, on Thursday, February 23, 2017 at 9:55 o'clock a.m., before Carol Mele, a Registered Professional Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

SZAL LAW GROUP LLC
Attorneys for Plaintiff
589 Tremont Street, Suite 4
Boston, Massachusetts 02118

BY: MARK D. SZAL, Esq.
(617) 830-2492
email: mark@szallawgroup.com

BERLUTI, McLAUGHLIN & KUTCHIN LLP
Attorneys for Defendant
44 School Street
Boston, Massachusetts 02108

BY: ROBERT R. BERLUTI, Esq.
(617) 557-3030
rberluti@bmklaw.com

ALSO PRESENT:

Stephanie Mercer, Esq., Cushman & Wakefield, Inc.

IT IS HEREBY STIPULATED AND AGREED that the filing and sealing of the within deposition be, and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, be and the same are hereby reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to before any Notary Public with the same force and effect as if sworn to before a Judge of this Court;

IT IS FURTHER STIPULATED that the transcript is to be certified by the reporter.

Reid

(Renotice of Deposition of Colin Reid was marked as Reid Exhibit No. 1 for identification, as of this date.)

(Rule 30(b)(6) Deposition Renotice of Cushman & Wakefield, Inc. was marked as Reid Exhibit No. 2 for identification, as of this date.)

C O L I N R E I D, called as a witness, having been first duly sworn by Carol Mele, a Notary Public within and for the State of New York, was examined and testified as follows:

EXAMINATION BY MR. SZAL:

Q Good morning, Mr. Reid.
A Good morning.
Q My name is Mark Szal. I'm an attorney for the plaintiff in this lawsuit against Cushman & Wakefield Inc., Yury Rinsky.
Have you ever been deposed before, sir?
A I have back in the '90s for a divorce.
Q Okay. So you've been through this

process a while back, but just to give you some of the ground rules, I'm going to be asking you some questions. Everything that you and I say is going to be taken down by the court reporter. So in order to have an accurate record, let's try not to talk over each other. I'll wait until you finish giving an answer before I ask another question and, likewise, if you can just wait until I finish my question before giving an answer. If you need to take a break at any time, please let us know. The only thing I would ask is that you answer the question that's pending in front of you before we take a break.

Do you have any questions?

A No.

Q Okay. The document in front of you, Exhibit 1, is entitled Renotice of Deposition of Colin Reid. Have you seen that document before, sir?

A No, not this particular one.

Q Previous version?

A Yes.

Q Do you understand that you're here to give testimony in the lawsuit entitled Yury

Reid

Rinsky versus Cushman & Wakefield, Inc.?

A Yes.

Q I would ask you to look at Exhibit No. 2. It's entitled Rule 30(b)(6) Deposition Renotice of Cushman & Wakefield. Have you seen this document or a previous version of it?

A Yes.

Q On page 4 that says Schedule A, there's a list of topics. I understand that you're being designated by the company to testify on the company's behalf for certain of these topics. Could you identify which ones that you'll be testifying about today?

A I should identify which ones?

Q Yeah, if you can.

MR. BERLUTI: We'll designate them for him. He will be testifying as to number one; number two, depending on the questions; number three; number five; number six; number seven; number eight, although there are no deficiencies that are alleged. Number nine has multiple facets to it. So depending on the questions, there

Reid

will be some that he will respond to.
Number 10. Depending on the
questions, number 14 and number 26.

Q So, Mr. Reid, again, do you understand that you are testifying on behalf of the company for the topics that your attorney just designated?
A Yes.
Q Okay. Where do you live, sir?
A In Miami.
Q How long have you lived there?
A Since March of 2015.
Q Could you give us your educational background starting with college?
A I have a bachelor's in business and a master's in business, both.
Q Where did you go to college?
A Which college?
Q Yes.
A New York Institute of Technology for my master's and New York Institute of Technology for my bachelor's.
Q What did you do after college?
A What did I do after college?

Reid

Q Can you describe your employment after your education?

A Actually, I started working here while attending college, so I started working at Cushman & Wakefield in 1984 and I got my master's, I believe, a couple of years after that. Before that I was working at several other companies in New York from 1974 to 1984 while I was attending college at nights. I attended college at nights for nine years, first my associate's and then my bachelor's and my master's, and that was all done at nights. From 1974 to 1984, I had six jobs in Manhattan, and then from 1948 on to present I've been working at Cushman & Wakefield.

Q Are you originally from New York?

A No. Originally I'm from Jamaica, but I came here in 1970 and I'm a U.S. citizen.

Q When you started working for Cushman & Wakefield in 1984, what was your initial role with the company?

A My initial role was I was an IT manager. Again, back in the '80s, titles were very abstract. I was an IT -- I was sort of a d/b/a manager. I don't know if they have that

Reid

title much anymore, but I was hired as a d/b/a manager for a new hardware that was being implemented at Cushman & Wakefield.

Q And what hardware was that?

A That was the IBM System 38.

Q How long did you work in that role as a d/b/a manager?

A I would say one to two years.

Q And then what role did you take on after that?

A Then after that I was given a project manager's role for all the HR and financial applications that were on the IBM System 38.

Q How long did you work in that role?

A A few years.

Q What was your next role with the company?

A The next role was manager of information systems which was pretty much where I was now taking over -- in addition to that role, I was taking over operations, management of the operations area.

Q And were these three roles that you

Reid

just described, the second of the two, were each promotions?

A Oh, yes.

Q Added responsibilities, added pay?

A Right.

Q And what did you do after the manager of information systems?

A After manager of information systems, I received another promotion to director which, again, it was just more responsibilities along the same lines that I was accustomed to and it was considered another promotion.

Q Okay. And what year would that have been, around 1990?

A That was later than '90. You know, I have all of this stuff on Linked In, I'm sorry, the exact years.

Q The best of your recollection.

A But that was probably late '90s. And then I was then promoted again around 2004, 2005, to managing director, again, just increased responsibilities within my scope of IT support and I've been managing director for the last several years since the last promotion which was, I think,

Reid

around 2006, but I might not be completely correct.

Q So this last promotion to managing director, is that your current role right now?

A Yes.

Q And is the system the same that you're working with, the IBM System 38?

A Well, originally, I was hired to work on the IBM System 38, and then around 1990 we switched to the IBM AS/400. The IBM System 38 was phased out, it became obsolete, and it was changed to the IBM AS/400 which we have been using for the last 20 years.

Q Okay.

A So since '90, '91, we've been using the IBM AS/400.

Q I've seen this a lot in the documents, this IBM AS/400, so can you explain to a person who doesn't have IT background what the AS/400 is?

A I don't want to call it a mainframe. Some people refer to it as the mainframe because it's not the traditional PC technology. This was the original mid-range systems that IBM came out

Reid

with in the late '80s, early '90s, and it was another step in the hardware processing power, but not exactly at the mainframe level. So it was originally we had the minis back in the '70s. Those came out around, I'd say, '70s. They were what we called the minis, Honeywell, IBM, a couple other vendors. There are only two or three vendors that had minis and IBM started to compete. They came out with their minis and then IBM came out with the mid-range. And AS/400 was originally classified as a mid-range computer, but over the years it has grown to a point where the high-end AS/400s operate similar to a mainframe. So there was some overlapping of the AS/400 with the mainframe and I'm sure you have heard of mainframes as opposed to, you know, now the mainframes you can connect the PCs, the network. Everything is connected to the AS/400.

Q And, again, excuse my ignorance, but is it like a physical thing? Is the AS/400 in a room somewhere in this building?

A Well, it's in a room in Iron Mountain in New Jersey. It's in a secure off-site facility. Originally, we used to have it right in

Reid

the building, not this building, but before we moved here we were actually a few blocks down the street. And I'd say until Craig Cuyar was the new CIO that started in 2008, his first task was to take all the hardware off-site, so I would say after 2009 the AS/400 has been in New Jersey in a secured off-site facility. The AS/400 is hardware and software. So the hardware is -- it's like a server, but the software running on it is proprietary to IBM.

Q Okay.

A And it's a specific knowledge base. So if you hear IT guys talking about, you know, "I work on the AS/400," it's a specific knowledge base that comes with the hardware and the software.

Q Do you know how many other companies use this system?

A Thousands.

Q Thousands?

A Thousands and thousands of companies. It was the number one mid-range computer, you know, up to maybe 10 years ago because a lot of other vendors went out of

Reid

business. Honeywell went out of business and a couple of other companies went out of business. IBM maintained their market.

Q And when you say it's in a secured facility, is it something where, you know, you or someone in the department would need to go and physically do something to the system in that location?

A I have someone who has been -- I have never been in the location. I have never had to go, but I have an operator who originally when we first started in order to do upgrades to the software. So if IBM sent out a new upgrade to the operating system, he would go to the site. Over the last several years -- again, I'm not sure what year, but the off-site facility provides that technician now. So my AS/400 operator who used to do that here and within maybe a year or so after the move, the relocation of the hardware, he no longer has to do that. It's -- everything is done by the owners of the facility. And I can't recall the name of the company that we outsourced it to. There are dozens and dozens of companies who have hardware in that location and they do, you know,

Reid

all the maintenance. They mount the tapes. They change the drives. They do the software upgrades, whatever.

Q Getting back to your role as managing director, how many levels of management are above you? In other words, how many --

A Currently? Currently, there are -- I report to Andrew Hamilton. He reports to Leif Maiorini and Leif reports to Adam Stanley, CIO. So there are three -- three layers above me.

Q Who was the last, Adam?

A Adam Stanley. He's the global CIO.

Q And you mentioned a gentleman earlier, Craig Cuyar?

A Craig Cuyar was Adam Stanley's predecessor.

Q And he is no longer with the company?

A No. He left a couple years ago when -- when we merged. Adam Stanley took over as CIO when we merged with DTZ.

Q What knowledge do you have about that merger? Can you explain what that was?

A The company was put up for sale

Reid

sometime in 2014 and DTZ bought the company. And I believe the merger was officially completed in October of 20 -- let's see, was it 2014 or 2015? I'm not certain when the merger was officially -- I think it's October 2015 the merger was officially completed, but as far as -- what was your question now regarding the merger?

Q Just if you had any information or understanding of what the merger was, so it seems like you do generally. I guess I'll ask a more specific question.

Did the merger have any effect on your department?

A Oh, yes.

Q How so?

A Well, there were significant changes to the IT areas. We were merging their -- their software and hardware and we're still going through that. And Leif can speak better to it, but it's probably going to take another two years. It's a major undertaking to merge where hundreds of IT people, you know, they had their software, their hardware. We had our software, our hardware. We had a new CIO. There are a whole

Reid

lot of new people that came into the organization. There were overlapping of IT skills. It was a tremendous impact on IT and the business.

Q When did you first become familiar with Yury Rinsky?

A Yury started back in the late '80s and we've been working together since then until his departure in 2015. I hired him back in -- I believe it was 1988. I hired him as a programmer and then he was promoted to programmer analyst or senior programmer analyst and then eventually a project manager, but I don't have the specific year that he became a project manager.

Q Project manager was his final role with the company; is that fair to say?

A Yes.

Q Okay. And that's a position that you held in your early time with the company, correct?

A Right.

Q And what is -- will you explain your role as a project manager back in 1986? What was the same or different with Mr. Rinsky's role as a project manager in the 2000s?

Reid

A I would say the difference is Yury had less people than I had. So when I was a project manager, I had five or six programmers and analysts reporting to me. I had a significant number of projects that I was responsible for supporting. With Yury, he had no direct subordinates, per se, that reported to him. What he did have was if he was assigned a project like, for instance, implementing an AP change and that AP change, accounts payable, that change was going to require significant conversation with a business and then programming, he would be assigned a programmer. I would assign a programmer to Yury. Yury would then take the project from beginning to end, meaning he would meet with the business. He would get a better understanding of what they're asking for. He would write down the business requirements. The business would sign off on it. Yury would come up with a project schedule, "Well, I'm going to work with programmer A and programmer A is going to take four weeks to get the programming and the testing done." And then it would move from development to system testing, what we call system

Reid

testing where the programmer and the project manager does system testing to make sure that, you know, everything that was requested is working properly, and then it would move to QA.

Back then we used to have what we called a quality assurance department which was -- it was sort of a liaison between IT and the business. Then it would go into UAT which is user acceptance testing where the business would actually do the testing to make sure that what was requested at the beginning with Yury and what was programmed actually works the way it was expected to work. So Yury would be responsible for that whole process and he would keep me updated on a daily basis. He would come to me if he had issues. He would tell me whether or not, you know, one person would be adequate or if he needed two people and so forth, so the entire initiation to implementation of the change would be what Yury would be responsible for and those would vary.

Since he was, you know, given different projects over different periods of time, one project might take a month, another project might take a day, another project might take six

Reid

months. There was a variety of stuff that could come up.

Q And these projects, are they internal to the company or external for businesses that the company deals with?

A They're all internal.

Q All internal?

A Yeah.

Q And these requests come on an as needed basis?

A Right.

Q Is it only for business units in New York?

A Not necessarily, no. The requirements -- sorry -- the requests could come from different branch offices. The company has changed a lot over the last 30 years since I've been here, so, no, it would not be only New York. It could be any branch office at the time, usually more of a larger branch office as opposed to a smaller branch office. It could be that they're doing, you know, a specific type of business that the programming wasn't done initially to support because we never had that business to think about

Reid

when the initial programs were implemented, so it could have been where he was on the phone with, you know, a business group in L.A. or Chicago or wherever.

Q How would you characterize your working relationship with him over the 27 years that you worked together?

A We had a great working relationship. I thought, you know, we were -- how should I say, not -- we were friendly. We always spoke about our families. He would tell me about his daughter, his son-in-law, his wife, his brother. I met his brother. I went to his house once. I met his brother. I would talk about my family. You know, we tried to -- you have to separate the boundaries when it comes to work, but outside of work it wasn't always work, like heads down, blinders on work, work, work and no friendliness to the relationship, so I thought we had a great relationship throughout the 27 years. That was my opinion.

Q And how would you characterize his work as you were his direct manager?

A His work was terrific. You could

Reid

see from the reviews. I mean, most of the reviews he got were exceed expectations or outstanding. I never had a problem with his work. His work was always -- he was my -- my back-up, per se. He could go to meetings without me. He would come back and ask me questions if he didn't understand something that came up. I relied on him when I was on vacation. If I was sick, if I was traveling, I never had it worry about him not being able to do anything.

Q Did you trust him?

A I trusted him. Sure, I did.

Q Did you feel like he was an honest guy?

A Yes.

Q Did you ever have occasion to think he was lying about anything?

A Work related?

Q Anything.

A Anything. I wouldn't -- no, I don't think so.

Q These projects that Mr. Rinsky worked on, what would be your involvement in those projects? In other words, would Yury get a

Reid

project and he would just be able to run with it or was there interactions with you along the way?

A There were always interactions with me along the way. If it was something new, he would discuss with me what he thought the best route was and I could agree or disagree. That could be with, you know, the level of programming that had to be completed, the timeframe. You know, he might say, "Well, it's going to take two months." And I would say, "No, we don't have two months. I'll give you two people and then I need you to get it done in a month," so we would discuss the project from the beginning throughout the process until implementation occurred.

Q And do you work on projects separate from him?

A Yes.

Q And does he -- did he assist you with your projects at times?

A At times, sure. Not every project I worked on he assisted me with, but, yeah, there would be projects that he would assist me with, sure.

Q And your communications with him

Reid

with you being in Miami and him being in New York, were those generally by phone, by email?

A Well, I was only in New York a couple -- sorry. I was only in Miami a couple of months before he left. You know, I relocated. Officially, I started working in Miami on April 8, 2015, and April 30th in my recollection was when he let me know about his plans to move to Boston, so it was only 22 days after I left to go to Miami that this incident all started.

Q But during that time, so between the 8th of April when you started in Miami and his departure from the company in July, how would you interact given that you were thousands of miles away?

A I was actually here quite frequently. I came up in April which was the time that I remember him talking to me about it. I came up. I left. I had to come up for a family emergency the week before the 27th. Then I came back. I was in New York that whole week, the week of the 27th through May 1st. And at that time things were very -- things were very hectic especially with me being in Miami and the projects

Reid

and the business. And I was actually here -- between April and December, I was probably here two months in time. I was back and forth, back and forth. So when I wasn't here, we were talking on the phone, but when I was here a lot -- but, then again, he wasn't here after the end of May, so the time that we communicated, again, was only between -- I took off to move to Miami the last week in March. I started in Miami April 8th. The incident occurred April 30th where he told me about his departure plans. And then from the emails, he sent another email that he was relocating on Memorial Day weekend, so it was only a couple months, less than two months that we actually, you know, worked with me being in Miami and he being in New York and then, subsequently, him being in Boston, so it was phone, email, and then when I was in New York for the business meetings and so forth.

Q And were you required to be in New York or was that --

A Oh, no, I was required -- well, except for when it was a family emergency. When I came up the first time, it was a family emergency.

Reid

Somebody was really ill. That person subsequently passed away and I came back for the funeral, but I didn't just come back for the funeral. I was in the office half the time. I took maybe two days bereavement, one for the funeral and one for, you know, the day after. And then at least two to three days out of that week I was in the office, and then I was back again in May, so I was back and forth. And, again, it was, you know, the business telling me I had to be here for meetings and so forth.

Q And would that be your direct report -- strike that.

Would that be your supervisor, Andrew Hamilton, who required you to be here or someone else?

A It could have been Andrew. It could have been Leif. It could have been the business. It could have been those three people primarily, but there were times when Leif might have wanted me here. First line would have been Andrew, but I could also have gotten asked by the business, the finance -- what was his title -- VP of finance. There were times when he told me I had to be here

Reid

month after month after month. I would go home for the weekend and I would be back, so there were different people who could have told me that I had to be here.

Q And do you recall any specific reasons why you had to be physically in the building during that time?

A It was -- again, face-to-face meetings work differently from telephone meetings. You just miss a lot I have found, you know, over the time that I've been in Miami. You tend to -- like, we could have done this on the phone, but you're obviously saying it wouldn't have worked on the phone and it's the same thing with IT. You know, getting business requirements and just being able to walk from cubicle to cubicle and saying, "What are you doing? What are you doing? Do you need help?" You know, it's different than picking up the phone and calling.

Q Understood. And when you say things were very hectic outside of your personal situation, what was hectic at the business during this time?

A Well, we were in the process of

Reid

implementing a major new platform which is the Workday system. The other platform that we had -- the Workday system was a complete replacement of our financial applications, general ledger, accounts payable, accounts receivable. The whole gamut of financial apps were being replaced with Workday. We had dozens of people working on this project, not only my team. There were -- Leif can speak to this better, but there were several teams working on this. There were consultants in India working on it. There were people on the help desk in -- I believe it was Romania working on it. It was a huge undertaking.

Q What was your typical work week during that time, 40 hours?

A More than 40.

MR. BERLUTI: Objection.

A Forty hours minimum.

Q Lots of overtime during that time?

A Lots of overtime, yes, but, again, we don't get paid overtime. I don't get paid overtime. My group never got paid overtime. It was just expected. You know, you do what you have to do. There were weekend work schedules that we

Reid

had. There would be nights when we'd have to work. You just work and then, you know, you get a pat on the back or you get a thank you.

Q So during April of this -- of 2015 you moved from New York to Miami, you had a death in the family that you had to attend to and you had a major new platform and a very hectic work schedule; is that fair to say?

A Yes.

Q When did you decide to move to Miami from New York?

A I decided in -- well, I asked Andrew around September of 2014 if I could move to New -- sorry -- Miami, roughly September. Initially, he said he didn't have a problem with it, but he would have to get it approved by Leif and Craig. He got back to me around December that Leif was okay with it, but Craig had to officially sign off on it. So, I mean, I knew at the time that it had to go through Craig. It had to get to Craig. Leif could have turned it down. Andrew could have turned it down. Andrew could have said initially, "No, I need you here full-time."

Andrew first told me that he was

Reid

okay with it, but, again, Leif would have to approve it. It took a couple months for Leif to approve it and then another couple months for Craig to approve it. So, officially, Craig didn't tell me until sometime in February, late February that it was officially approved. And there was a communication from Andrew that it was officially approved and you can start seeking space in the Miami office.

So from that point of view, I still needed time to get everything together and then that took another few weeks. And then the official -- officially I was with the Miami office on April 1st, but I didn't report to work until April -- I believe, April 8th, so it took quite a few months from the time I actually asked. Of course, I was thinking about it for several months before that, but I didn't officially ask until around September.

Q These people we've been talking about, Andrew Hamilton --

A Leif.

Q Leif and --

A Craig.

Reid

Q -- Craig, do they all work in the same space here?

A Yes.

Q You see each other day-to-day?

A When they weren't traveling, yes, pretty much. Well, Craig was on a different side of the building, but Leif was sitting, actually, a couple, maybe four or five rows over from me and Andrew was sitting another maybe four or five rows over from me.

Q Do you have any understanding as to what the process was for these three individuals to approve your request to transfer?

A I don't understand the question.

Q Okay. It's a bad question probably.

You said that you in September went to ask Andrew Hamilton, "I'd like to relocate to Miami."

And he said, "Okay, I don't have a problem with it."

A Right.

Q So you went and had a conversation and he gave you an answer?

A Yes.

Reid

Q I'm just trying to understand what took so long, if you know, for Leif and Craig to sign off on it. It seems like you could go to them and have a conversation and they could give you an answer. Were they thinking about it or was there any other process; do you know?

MR. BERLUTI: Objection.

Go ahead. You can answer.

A I just think they were thinking about it. I don't have any other reason to think why it took so long except that it wasn't a priority or maybe they were busy. I don't know. I don't know. I never fought it because I was in no hurry, so I never took it personal.

Q Were these -- strike that.

Your request to Mr. Hamilton in September, was that verbal or was that --

A Verbal.

MR. BERLUTI: Let him finish the question.

THE WITNESS: Oh, sorry.

Q Was that verbal or written?

A Verbal.

Q And with respect to the sign-offs as

Reid

we're calling them, with Leif and Craig, was that something you directly presented to them or was that done through Mr. Hamilton --

MR. BERLUTI: Objection.

Q -- if that makes sense? I'll ask a better question.

Did you directly speak to Leif and Craig requesting approval of your transfer to Miami?

A No.

Q Is it your understanding Mr. Hamilton made those requests to them for you?

A Yes.

Q Were you given office space in Miami?

A Yes.

Q Where is the office located?

A 200 South Biscayne Boulevard.

Q Did you have office space immediately when you arrived on the 8th for work?

A Yes.

Q And do you maintain the same office today?

A Yes. It's actually a cubicle. When

Reid

you say office space, I just want to clarify. It's not an office, but it's a cubicle.

Q On average, how many days a week are you in the Miami office?

A Four to five.

Q And on those days that you're not in the office --

A I'm working remotely from my home.

Q From your home in Miami?

A Yeah.

Q And outside of things like today, how often are you required to be in New York for work?

A I'd say three to four times a year. In 2015, it was a lot. It was double. It was a lot. Like I said, 2015 was a transition year and it was -- I was here several times in the nine months.

Q The times that you come to New York -- I'm sorry. Were you finished?

A Yes.

Q The times that you come to New York now, are they preplanned or are they as needed for work emergencies?

Reid

A It's more as needed. Whenever the business requires me to be here or IT requires me to be here, I'm here.

Q With your transfer Miami, other than the approvals that we just talked about from Mr. Hamilton and Leif and Craig, was there anything else that you had to do?

A No.

Q And you said that the -- strike that.

How did you learn that your transfer request had been approved? You mentioned in February 2015 you learned it was officially approved. How was that communicated to you?

A I was copied on an email from -- from Craig to Andrew to proceed with getting approval from the operations manager in Miami for space. So up to that point, the Miami office didn't know that I was relocating to Miami until Craig sent that email. He told Andrew to go ahead and request Colin space in the Miami office. That was the first time Miami officially was communicated and told about my pending arrival, and I don't know what would have happened if they

Reid

didn't have space. Of course, you know, it's -- but that's the process.

Q Could you have worked remotely from Miami in terms of -- would you be able to perform your job remotely --

MR. BERLUTI: Objection.

Q -- from your residence?

MR. BERLUTI: You can answer.

You can answer, if you can.

A There are specifics where some of the software doesn't always connect from a remote site. Just like this morning, I was trying to connect my laptop. If I can connect on my laptop, I don't have to be there except for making copies. That tends to be a problem where if I have to fax information, make copies, do certain IT tasks that are a lot easier and able to do from within the office. As far as network support, I can do that remotely. It's -- it's sort of complicated.

Q Yeah. In terms of the IT tasks that you mentioned, can you be any more specific about what types?

A Well, anything that I could do online, if I can do anything online, I can do it

remotely, but as far as, you know, having equipment, I don't have -- I don't have a copy machine at home. I don't have a fax machine. And if the building is experiencing network issues which that has happened, sometimes you just can't connect. If I can't connect, I'm dead. I have to go in because the office always connects. The network is always up at the office. So there have been times where I want to stay home and I want to -- you know, I have a doctor's appointment or something and I just -- it's the middle of the day, I don't want to go to work. But then, if I can't connect, I have to go in; otherwise, I can't do my job. My job is primarily on using the computer.

Q So connectivity, Internet access is essential for your job?

A It's absolutely essential.

Q Other than conversations that you've had with your attorneys which I don't want to know about, what did you do to prepare for today's deposition?

A I just read the documents that were provided to me.

Reid

Q Can you be more specific in terms of what documents that you reviewed? Did you review every document that's been produced by Cushman & Wakefield in this lawsuit?

MR. BERLUTI: He wouldn't know that.

MR. SZAL: Okay.

MR. BERLUTI: He wouldn't know that.

A I don't know. I just know whatever I was provided, I read it. Whatever, you know, I was given by Bobby, I read.

Q Do you recall any specific documents, though, that you reviewed? And if you don't, you don't and we'll go through some of them today, but, I mean --

A I did see this one the Rule 30(b) and there was a plaintiff one with my responses that I had to sign, so I had to make sure that everything was, you know, accurate. And there was another one I saw with Yury where -- where Yury responded to some questions. I think that's it.

Q Are we good? Keep going? Break?

A I'm good.

Reid

MR. BERLUTI: You can keep going. You don't have to wait. I'm just going to get some coffee.

Q You mentioned earlier that you had a cordial relationship with Mr. Rinsky and that you discussed some personal and family matters over the years. Is that fair to say?

A Yes.

MR. BERLUTI: Objection.

Q Were you aware that he had purchased a residence in Winchester, Massachusetts?

A I wasn't aware until when he told me that he was planning to leave which was April 30th. He never told me that before.

Q Do you know when he purchased that residence?

A Well, when he did talk to me in April, he told me that he had already purchased it in -- I think it was December of the prior year.

Q You don't have any recollection of him mentioning a purchase of a residence in Winchester prior to April 30, 2015?

A No, I don't.

Q Do you have any recollection of any

Reid

conversation with Mr. Rinsky before April 30, 2015, concerning his desire and request to transfer to the Boston office of Cushman & Wakefield?

A No.

Q Is it possible that he could have made that request to you and you had not remembered it?

MR. BERLUTI: Objection.

A No.

Q Not possible?

A No, not a request of that magnitude prior to April 30th. No. It was -- that was the first time.

Q Can you summarize the conversation that you had with Mr. Rinsky on April 30th?

A It was a brief conversation. It was -- again, it was when I was up for the funeral and he said he had something to talk to me about and that he pretty much told me that, you know, he had already purchased a home in Boston and he wanted to be close to his daughter. His wife -- I don't remember if his wife had retired, I can't remember, but I know he wanted -- he and his wife

Reid

wanted to be closer to the daughter so that they could be with their grandchildren, and everything was already in motion. He -- he had purchased a home in Boston and he had put his house up for sale. That's the way I remember, that he had already put his house up for sale and he was planning to relocate to Boston.

I said, "Well if you're putting your house up for sale, then it's probably going to take a few months. That will give us time to talk about it more and come up with plans as to, you know, how we're going to proceed with this."

I knew at that time that it wasn't up to me. I couldn't approve this. It had to go through the different channels and I specifically told him that I have to talk to Andrew and Andrew has to talk to his management, but before I could even do that I told Andrew about it either on the same day or the day after which would have been May 1st. And Andrew said the same thing that I said to Yury. Andrew said, "We'll talk about it because obviously it's not going to happen, you know, in the next few weeks." We would have to talk about it and come up with a plan as to how

Reid

we're going to proceed.

And then on -- a couple weeks later he said that the house had been sold and he was moving. He was putting in for vacation.

MR. BERLUTI: The question was what was said --

THE WITNESS: What was said --

MR. BERLUTI: -- in the April 30th conversation.

THE WITNESS: April 30th conversation, sorry.

Q So with your transfer to Miami, your testimony was that you had to get approvals from Andrew Hamilton who then in turn got approvals from Leif and Craig; is that correct?

A Correct.

MR. BERLUTI: Objection.

Q So with Mr. Rinsky's transfer, there was an added layer of approval which was you as the initial approval, correct?

A Correct.

Q Okay. So in September of 2014 you went to Mr. Hamilton and said, "I want to move to Miami." He said he didn't have a problem with it,

Reid

correct?

A Correct.

Q So when Mr. Rinsky came to you in this conversation you recall as April 30th, did you have an objection to it?

A I didn't have an objection to it. I said, "I'm okay with it," but that's it.

Q After April 30th, what's the next communication you had with anyone concerning Mr. Rinsky's request to transfer to the Boston office?

A The next conversation I had was with Andrew. And I don't recall if it was April 30th or 5/1, but since I was leaving to go back to Florida that weekend, I made sure that I spoke to Andrew before I left.

Q Okay. And you just testified about that conversation. So then after that conversation with Mr. Hamilton which you think is either the 30th or the 1st of May, what's the next communication you had concerning Mr. Rinsky's request to transfer to Boston?

A Not until I got the email from Yury that he was moving to Boston.

Q Was that the May 17th email that

Reid

we've seen in various documents in this case?

A Yes.

Q Any conversations with anybody else at Cushman & Wakefield before that May 17th email from Mr. Rinsky?

A Not that I can remember, no.

Q Mr. Rinsky had taken some time off per that email to travel to Boston. I believe it was the end of May where he asked for four personal days. Do you recall that?

MR. BERLUTI: Objection.

Go ahead.

A I think that was the same May 17th email.

Q Let's take a look at that email.

MR. SZAL: Mark that as the next exhibit, please.

(Email dated May 17, 2015, was marked as Reid Exhibit No. 3 for identification, as of this date.)

Q Mr. Reid, this is a document that's been labeled as Exhibit 3. It's an email from you to Andrew Hamilton dated May 17. It's a forwarded email from an email you received from Mr. Rinsky

Reid

on the same date. Do you recall seeing this email?

A Yes.

Q All right. And Mr. Rinsky's portion of the email reads, (reading) Colin, as discussed I will be moving to Boston on 5/27/2015 for family reasons and need to take four personal days after Memorial Day, 5/26 through 5/29.

Did I read that correctly?

A Yes.

Q Okay. Did you approve him taking those personal days?

A Yes.

Q What happened after those personal days were taken?

MR. BERLUTI: Objection.

THE WITNESS: What does objection mean? I'm not supposed to answer or do I --

MR. BERLUTI: No, I'm objecting to the form. You can answer it, if you understand the question.

THE WITNESS: Okay.

Q And I should have said that in the

Reid

instructions. If you don't understand the question, say so and I can try and phrase it better. He's objecting to my bad questions.

MR. BERLUTI: No, it's just very broad: What happened after? If you can just be a little more specific as to what happened with respect to what, if you could.

Q Okay. So Mr. Rinsky was taking four personal days off which you approved to the 29th, so on the 30th his personal days are up, he's ready to come back to work. So what happens?

A He was working from wherever he was using his laptop, right, so he continued to work remotely using his laptop connecting to the network. Work resumed.

Q Until when?

A Until the termination occurred.

Q Your response in this email labeled as Exhibit 3 reads, (reading) Andrew, I just saw this. Is that correct?

A Yes.

Q What did you mean by sending that to -- strike that.

Reid

What was your purpose in forwarding this to Mr. Hamilton and saying, Andrew I just saw this?

A Well, it was a surprise to me, and Andrew and I had not spoken about Yury since I informed him on April 30th or May 1st about Yury's pending relocation plans, so I just wanted Andrew to be aware that Yury was moving to Boston.

MR. SZAL: Can you mark that as Exhibit 4, please?

(Email dated May 14, 2015, was marked as Reid Exhibit No. 4 for identification, as of this date.)

Q Mr. Reid, this is a document that's been labeled as Exhibit 4. I would ask you to read that and let me know if you've seen this email before.

A Okay.

Q This email is dated Thursday, May 14, 2015. It's from you to Mr. Hamilton. It actually appears to be an email from Mr. Hamilton to you. However, for some reason the From line reads Colin Reid and the To line reads Andrew Hamilton. Is that accurate?

Reid

A     Yes.

MR. SZAL:  Off the record.

(Discussion off the record.)

Q     Mr. Reid, we had a discussion with your attorney offline and this appears to be the text of the email, at least an email from Andrew Hamilton to you.  Would you agree with that?

A     Yes.

Q     And it's dated the 14th of May, 2015, and reads, (reading) Colin, let's discuss the situation Yury's put us in with his home purchase in Boston.  On the flight up could you think through the options and risks of replacing him, parentheses, via contractor or permanent role, close parentheses, so we can evaluate all the pros and cons of keeping and replacing him. Thanks, Andrew.

Did I read that correctly?

MR. BERLUTI:  Objection.

Keeping and replacing.  You added him in there which is not in the text.

Q     Keeping and replacing.  Is that --

A     Yes.

Q     Okay.  Do you recall receiving this

Reid

email?

A I don't recall receiving it, but obviously it's an email that I received.

Q And you would agree this is three days before you received the email from Mr. Rinsky that we just discussed earlier as Exhibit 3; is that correct?

A Yes.

Q So how do you reconcile these two emails with your testimony that you were surprised by Mr. Rinsky's May 17th email?

A The May 17th email is when he actually informed me that he was moving. The actual date of the move -- the April 30th meeting which is the one that Andrew is referring to is when he told me that he was moving to Boston. He had purchased a home in Boston and he was putting up his home for sale and he was moving, but we never had a date. That's why I thought when he told me that in April that this was going a take a few months. Normally, it doesn't take a few weeks for your home to be sold and for you to be able to close in a few weeks I just never thought it would be so quick. That's what I was referring to. So

Reid

when Andrew and I spoke again around 4/30 or 5/1, we were -- again, we both were assuming that it would take a few months for this to happen, not a few weeks.

Q Right, but I believe your testimony earlier was that between 4/30 and 5/1 when you had the conversation with Andrew Hamilton and the May 17th email that is Exhibit 3, there were no discussions or communications regarding Mr. Rinsky's transfer; is that correct?

A That's what I said, but that's a mistake. Based on this email, I would say that's a mistake.

Q Given that two weeks had passed since your conversation with Mr. Hamilton, was there any particular reason why you were having these discussions on May 14th, if you recall?

A I don't understand the question.

Q Was there a particular reason why on May 14th you had decided to have this meeting regarding Mr. Rinsky's transfer?

MR. BERLUTI: Objection.

Q In other words, two weeks had gone by since you had a conversation with Mr. Hamilton.

Reid

So was there any particular reason why on May 14th this came to a head again?

A Not that I can recall. This was Andrew's request to have the meeting, not mine. Maybe this was -- again, I don't want to speculate, but this was Andrew's request to have a discussion on what I had told him a couple weeks prior. This wasn't my request.

Q In the subject line, it says, (reading) Accepted AS/400 Resourcing. It appears from the email to be a calendar request for a meeting. Do you have any recollection as to whether that was the case?

A I honestly don't remember.

Q Do you remember if you were flying up to Boston during this time?

A Flying to -- no. I would have been flying to New York.

Q I'm sorry, to New York.

A I must have been on my way back to New York.

Q Do you recall when the discussion took place that's being requested in this email that's Exhibit 4?

Reid

A No, I don't. I don't remember.

Q Did you complete a search for any documents relative to this lawsuit in response to requests made by Mr. Rinsky through me?

A Did I research -- sorry, can you repeat that?

Q It might be more helpful if I show you a document.

MR. SZAL: This is Exhibit 5.

Defendant Cushman & Wakefield, Inc.'s Response to Plaintiff Yury Rinsky's First Request for Production of Documents was marked as Reid Exhibit No. 5 for identification, as of this date.)

Q Mr. Reid, I've placed in front of you a document labeled as Exhibit 5 entitled Defendant Cushman & Wakefield, Inc.'s Response to Plaintiff Yury Rinsky's First Request for Production of Documents. As you'll see, there's a number of requests numbering 30, as well as responses provided by your attorney. Do you recall seeing at least the requests that are contained in this document?

Reid

A No.

Q And, again, I don't want you to testify to any specific communications between you and your attorneys, but were you asked to conduct a search for any documents relative to this lawsuit so that they could be produced?

MR. BERLUTI: I'm going to object and instruct the witness not to answer to the extent that you would be -- that it's based upon any discussions that you had either with me, with any attorney in my office or with Attorney Stephanie Mercer.

THE WITNESS: So what do I --

MR. BERLUTI: So if someone else asked you any -- if you had a discussion with anyone else other than anyone in my office, me or Attorney Mercer, you can testify to that. Otherwise, I'm going to instruct you not to answer because it's communications with counsel.

MR. SZAL: I think he can answer yes or no whether he was asked

Reid

to search for any documents without --

MR. BERLUTI: You can ask what he did. You cannot ask what he was asked to do. To the extent you're asking him what his attorneys may have said to him in anyway, that's privileged.

MR. SZAL: I'm not asking him for the content. I'm asking him a yes or no question as to whether he was asked to search for any documents by anybody.

MR. BERLUTI: I'm not trying to get in your way, okay, but asking if he was asked to do something is asking about the content of communications. I mean, I just note several of these are things he wouldn't have in his possession no matter what anyway, so it would be more helpful if you had more specific questions about specific areas, but that's up to you.

MR. SZAL: Well, I just want

Reid

to know what he searched for, what he produced and what he may not have produced. I mean, obviously, document production has been an issue in this case, so I think I'm entitled to know.

MR. BERLUTI: You can ask him what he did.

A The only thing I was asked to do was to find Yury's job description. Apart from what Bob mentioned, that's the only additional ask that I can remember and that was between Andrew and Kat, if I had his job description. Apart from that, there was no other ask by anyone.

Q So some of these emails that we've looked at, Exhibit 3, Exhibit 4, were emails that are from you. You didn't physically search your emails for these documents and produce them to your attorneys?

A Those -- no. Those were -- this one -- like this one I had not seen before. This one was sent to Kat back in 2015 when we did the termination, the one regarding Yury's communication on May 17th. This one, I didn't remember seeing this one until today, Exhibit 4.

Reid

Q So you didn't personally conduct a search of your emails for documents that would have been requested in this lawsuit; is that correct?

A Correct.

Q Did you personally search any paper files or hard copy documents that would have been requested in this lawsuit?

A I looked through my folder of Yury's reviews for his job description. I still have that folder.

Q Did you have to fill out any paperwork when you moved from New York to Miami?

A I don't recall filling out any paperwork. I know I had to provide my address in Miami. And I honestly don't remember whether it was in writing or via email to HR, but that's as far as I remember.

Q At what point was Mr. Rinsky put on paid administrative leave?

A I'm not sure of the exact dates.

Q Was it right after he arrived in Boston?

A It was after he arrived in Boston,

Reid

but I'm not sure exactly which day. That was something that HR decided. I'm not a hundred percent certain which day after he got to Boston was officially considered paid administrative leave. I honestly don't know.

Q What's your understanding of what paid administrative leave is?

A My understanding is that you're being paid as you normally are and you're still working. That doesn't make sense. I am not sure what paid administrative -- I know Yury was working up until the time we had the conversation with him. I don't know. I don't know when the paid administrative leave began, if it was --

MR. BERLUTI: The question now is, do you know what -- what does paid administrative leave mean to you? That was the question: What does paid administrative leave mean to you?

A To me, paid administrative leave means you're being paid, but you shouldn't be working. That's my interpretation of it. Sorry.

Q Would it be fair to say that paid administrative leave is where you continue to be

paid, but you are not required to do any work?

A Correct.

MR. SZAL: Want to take five?

MR. BERLUTI: Sure.

(Whereupon, at 11:19 o'clock a.m., a recess was taken to 11:35 o'clock a.m.)

(The deposition resumed with all parties present.)

(Letter dated November 12, 2015, was marked as Reid Exhibit No. 6 for identification, as of this date.)

C O L I N R E I D, resumed and testified further as follows:

BY MR. SZAL:

Q Mr. Reid, I've put a document in front of you labeled Exhibit 6. It's dated November 12, 2015, addressed to the Massachusetts Commission Against Discrimination. I just ask you to review that document and let me know if you've ever seen it before?

A I haven't seen this exact document before.

Q Well, let me, I guess, parse it out.

Reid

So the first seven pages are in letter format signed by your attorney and verified by Craig Cuyar. Have you seen the first seven pages of this document before?

A Again, I haven't seen the first seven pages in its entirety before, not the entire document. I've not seen it before.

Q Okay. If you turn to page 3, Mr. Reid --

A Okay.

Q -- the first paragraph third sentence --

MR. BERLUTI: Starting with Rinsky?

Q It says, (reading) Rinsky was granted the four personal days off at the end of May, as he requested. C&W placed Rinsky on paid administrative leave while C&W completed the consideration of his request.

A Okay.

Q Do you feel that's an accurate statement?

MR. BERLUTI: Objection.

THE WITNESS: So I answer?

Reid

MR. BERLUTI: I'm sorry? If you understand the question, you can answer it, yes. I'm sorry.

A Do I feel it's an accurate statement? Based on my interpretation of paid administrative leave, I would say no.

Q And is that because Mr. Rinsky was continuing to work between the time that he moved to Boston and the time that he was ultimately terminated?

A Correct. I was -- well --

Q Just going back to that sentence, while C&W completed the consideration of his request, do you have any understanding of what was involved in that process?

A Not exactly, no. Once I hand it off to Andrew, I'm not -- I mean, I knew it had to go through certain hierarchy levels in the company, but I don't know the exact written process.

Q I see you just read the rest of that first paragraph on page 3. Is there anything that needs to be clarified in that portion in your opinion?

A Well, it says (reading) Reid did not

hear from Rinsky again until June 22nd.
We were communicating prior to that because we were still working together, right? We were still exchanging emails and we might have spoken on the phone regarding work, so I'm not clear on what this means.
Q Moving down to the fourth paragraph, it says, (reading) on June 22, 2015, after notifying Rinsky that his relocation request was denied, Reid offered Rinsky his job if he agreed to be physically present in New York at least four days per week.
Do you recall making that offer to Mr. Rinsky?
A Yes. That was on a telephone call that we had.
Q What was the basis for requiring him to be in New York four out of five days of each week?
A Again, it was more for the business connection. You know, the technical part was not a problem. It was the business connection that we wanted him to be in New York.
Q How does your job differ from that

Reid

of Mr. Rinsky's other than being more senior?

A In addition to being more senior, I have more -- well, more responsibilities in terms of multiple people reporting in, more responsibility to getting projects completed, more of a diverse team, meaning with Yury he was pretty much application oriented. In addition to the applications, I have to deal with the Craigs and the Leifs and the Andrews, the VPs of finance, the operation side, the hardware, making sure that the system is always up, back-ups are done, there's no security breaches, all the paperwork is done as designated by the company. It's -- it's just a much broader IT role and I don't have anyone that I can go to, meaning Yury can come to me. He can, you know, bounce stuff off me. I don't have anyone on the AS/400 side. I'm the ultimate AS/400 manager. There is no other person that knows the AS/400 outside of my team.

Q So you report to Mr. Hamilton, but he doesn't have the technical knowledge that you have?

A No. Zero.

Q And when you say your team, else is

Reid

on your team? So you are the head of the team, so to speak?

MR. BERLUTI: I'm going to object. You need a timeframe on that one.

Q Okay. So at the time --

MR. BERLUTI: 2015?

Q -- 2015, so let's say April 2015, when you moved to Miami, who was on your team?

A There was Anna Kleynshteyn, Thomas Donlon, and I had a couple consultants working from the offshore support team. I had -- there was another lady -- what was her name -- I'd have to research her name, but I had one lady in a consulting company who was helping me on different projects, and I also had access to an offshore team in India that we had contracted with who could have also done liaison work between the 400 and the network, so there were maybe six or seven people in total.

Q Is that including Mr. Rinsky?

A Yes.

Q From your perspective, what goes into the decision as to whether to hire an

Reid

employee or a consultant as you described?

A Okay. That's not entirely up to me. That's decided by the organization. So if I have a particular project that's short-term, most likely it's going to be a consultant, but in the case where these other people were helping out, it was a matter of budgetary demands from the higher uppers. So Andrew would be given a budget and he would be told, you know, I can spend so much. And there were times when I would have to hire the person from the offshore team which was that lady and I can find out her name later if you need it, but she was substantially cheaper, but she had the technical knowledge. So, again, it was more project -- project driven. You know, if you needed a six-month project, then we're not going to hire someone full-time and that's the way it has been for the last few years where it's project driven, project driven and budget driven.

Q And consultants,do you have any understanding of how they're typically paid? Is it hourly or --

A Hourly.

Q Are they provided with benefits or

bonuses with the company?

A No benefits, no bonuses.

Q They're independent contractors; is that correct?

A Yes.

Q During your work with Mr. Rinsky, did you ever come to learn that he had any health conditions?

A Yes.

Q What kind of health conditions?

A I know he had some form of, I believe, cancer that was in remission at one point. Then I believe it came back and I know he also had some problem with his lungs. I know he used to smoke a lot when we first started working together. I mean, back then you could smoke in your cubicle, but I know he stopped smoking because of his health condition. And there was also another time where he fell and broke his elbow one Christmas and he was out for a period of time. I don't remember exactly how long, but he had to have surgery on his elbow and I think they put a plate or something. He had, you know, different issues from the -- over the time that we

Reid

worked together.

Q So if you look on page 3 again of Exhibit 6, seventh paragraph down, the sentence starts, (reading) Reid also specifically denies knowing that Rinsky had lymphoma.

Based on your testimony now, do you feel that is an accurate statement?

MR. BERLUTI: Objection.

Go ahead.

A I don't know where that came from, so I never -- I don't remember denying that I knew that.

Q Let me ask you, understanding that you didn't -- haven't seen the first seven pages of this document before, did you provide any information in connection with Cushman & Wakefield's response to Mr. Rinsky's charge of discrimination filed in 2015?

A Did I provide any form of documentation?

Q Just any information, whether it be documents or verbal information.

A The only information that I provided was what you see around the time of the

Reid

termination back in June or July of 2015. After that everything was quiet until, you know, this -- this came up.

Q During his treatment for cancer, do you know if Mr. Rinsky ever had to take any time off from work?

A I don't remember any significant time being taken off, but whatever was taken off was within guidelines. And there were times when he was allowed to work remotely when he was not feeling well.

Q Do you ever recall communicating with anybody else about -- at Cushman & Wakefield about Mr. Rinsky's cancer that you knew about?

A Communicating with anyone else directly. I don't remember. I can't say. You know, I never mentioned it to anyone else. I can't recall. It could have come up, but I can't say for sure.

Q Any recollection of it of coming up with Mr. Hamilton?

A No recollection of it coming up with Mr. Hamilton.

Q What about Leif?

Reid

A Or Leif.

Q What about Craig?

A Or Craig.

Q Anybody from human resources?

A No. I pretty much had leeway in to what my team was doing when it came to PTO. Like PTO, if you're sick, you're sick. Unless you're going out on disability, then I would have to notify HR because then the pay change where you get paid out of a different account, so I can't recall, again, if I notified HR. HR would have a record of it if I notified HR that he had to go on disability.

Q Do you know if he ever actually did out on disability for any of these treatments?

A I can't remember specifically.

Q Do you ever recall your superiors expressing concern with Mr. Rinsky taking time off for medical treatment?

A No.

Q Did you ever personally have concerns about Mr. Rinsky's job if he continued to take time off for medical treatment?

A Not -- the only concern I had would

Reid

have been the concern that his health was not well, that he wasn't feeling well.

Q But understanding that you approved his time off, did you have any concerns that management above you might look negatively on him taking time off for medical treatment?

A No. Again, I didn't have to report up. The only time I would report is if it was a disability claim and that would affect the payroll and then it would require me to notify HR, but I never had to speak to Craig or Leif or anyone about Yury's condition.

Q The second sentence in that same paragraph 7 says, (reading) Rinsky is very private and did not share his physical condition with Reid.

Do you agree with that statement?

A Unless he had to.

Q Well, you just testified that you knew about his several bouts of cancer, problems with his lung and his broken elbow, so is it fair so say that he did share his physical condition with you?

MR. BERLUTI: Objection.

Reid

A If he was going to be out of work, unable to come to work, he had to share it with me. That's what I would respond.

Q On page 7 of this Exhibit No. 6 --

A Yes.

Q -- you'll see at the bottom there is a verification that's signed on behalf of Cushman & Wakefield, Inc. by Craig Cuyar, Global Information Officer. Do you see that?

A Yes.

Q Do you have any understanding as to why Mr. Cuyar would verify this document as opposed to yourself?

MR. BERLUTI: Objection.

Don't -- that's -- well --

A I have no idea.

Q If you turn to Exhibit C --

A Yes.

Q -- I would just ask if you would review that and let me know if you've seen this letter before.

A Yeah, I've seen that before.

Q When did you draft this letter?

A The date? The date -- what do you

Reid

mean when?

Q Well, the date of the letter is July 14, 2015, so I guess I'm asking if you have a recollection of whether you drafted the letter on the date of the letter or sometime before that?

A My recollection is it would have been that day or maybe the day before in preparation to formally provide it to Yury.

Q And what was the purpose of this letter in your estimation?

A Well, it was a letter that was requested that I provide to Yury after we had had a conversation with him with HR about his -- giving him the opportunity to -- to resign.

Q Is that conversation -- was that the conversation on July 6th that is referenced on the first line of this letter?

A Oh, July 6th -- well, it was a combination of July 6th and July -- June 22nd. June 22nd was the initial conversation and then we must have had a follow-up conversation on the 6th or we had another meeting -- there was another meeting. There were two meetings that I had with Yury on the phone and both of them Kat was

Reid

present -- sorry Katrina Hicks was present, so the July 6th must have been the follow-up.

Q Okay. And in the second paragraph, the fifth bullet point down, it says, (reading) as a courtesy, we placed you on paid leave while we looked into the issue.

Do you see that?

A Yes.

Q That's not true, correct?

MR. BERLUTI: Objection.

A I'm not clear on the paid leave situation. Like I said, we -- we discussed my interpretation of paid leave, but it is my recollection that he was working while we decided on his future. And there are a lot of emails where I was exchanging work product with him, so I can't deny that he wasn't working.

Q Did you actually draft this letter or did somebody draft it for you and you signed your name to it?

A From what I remember, it was a joint effort between myself and HR. Like, some of the bullets I provided. It was a joint task between myself and HR.

Reid

Q Do you know who created the first draft of this? Was it you or was it HR?

A My recollection is it was first drafted by HR.

Q And then you reviewed and made edits to it?

A Yes.

Q Do you have any recollection of what in the initial draft provided by HR was incorrect?

MR. BERLUTI: Objection.

A No, it was so long ago.

Q I would just ask you to turn to Exhibit D in Exhibit 6.

A Yes.

Q I just ask you, did you see this document which is a letter from me to Katrina Hicks dated July 16, 2015, at or about the time it was received by Cushman & Wakefield?

A No.

Q Have you ever seen this document before today that you recall?

A From you, no.

Q On or around July 16th, were you asked by human resources to -- strike that.

Reid

On or around July 16, 2015, were you informed by Ms. Hicks or someone else at Cushman & Wakefield that Mr. Rinsky had asserted a claim against the company via letter?

A I do believe so.

Q Do you recall if you provided any information that would be used in a response to that letter or those claims?

A No. I have not provided anything since exhibit whichever, this July 14th Exhibit C. That was the last thing I provided.

Q Could you describe what the company's policy with respect to your department was during 2015 concerning employees in your department working remotely?

A The policy back then was we were having a space issue and Mr. Maiorini, Leif Maiorini, he asked that department managers create flexibility where possible in their teams remote support and coming to the office. And we actually had some kind of published document that, like, Yury would be in Monday, Wednesday, Friday and Anna would be in Tuesday, Thursday, and so forth. So it was pretty rampant where we were allowed to

Reid

have our teamwork remotely on predetermined days. And it could be flexible, like, if Yury had a doctor's appointment, he was supposed to be working remotely Monday, Wednesday, but he had a doctor's appointment Tuesday, then I was able to change it to Tuesday, Wednesday, and Anna would rotate out or rotate in. It was pretty much left up to me and my team to work out the support.

Q Okay. So during 2015 it's your recollection that Mr. Rinsky was permitted to work remotely three days a week?

A Three days -- some week three days, some week two days. Again, it depended on, you know, the urgency of project going on, but, yes, anywhere from two to three days.

Q And that's not because he requested to work from home. It's because of a space issue; is that what I'm --

A Yeah.

Q Okay. Do you have any understanding why there was a space issue? Was there more employees hired or contractors?

A There were too many employees, too many consultants. We were doing -- like I

Reid

mentioned before, we were doing the work, the implementation and it involved tons of consultants coming in. And they just would -- people would be walking around with their laptops, "Is Yury coming in? Is Colin coming in? Is Brad coming in," whatever. It was very, very difficult to find a space. Even people who had been working here for quite a while was asked to work remotely.

Q Was he able to -- during that time in 2015 when he was asked to work remotely, was he able to perform his job?

A Yes.

Q So in 2015 while he was working in New York, he was working remotely either three or two days a week; is that correct?

A Correct.

Q So my question is, why did you demand that he agree to be in the New York office four days a week in order to keep his job after the move to Boston?

A I don't remember where the four days came from, but it was my recollection that we wanted him to be able to spend a few days here, not -- he wasn't able to do the back and forth

Reid

like when he was in New Jersey. So whether it was four days here or three days, I'm not certain whether it was four days or three days, but he wouldn't have been able to do the back and forth. He would have, you know, maybe be here Monday, Tuesday, Wednesday, back to Boston on Thursday, Friday or some combination. He wouldn't have just had the flexibility that he had in New Jersey or if he were living in New York. I know that was the driver.

Q Do you have any recollection of whether to offer him the opportunity to keep his job if he returned to New York four days a week was your idea or somebody else's idea at Cushman & Wakefield?

A I think it was -- from what I remember, it was a combination of management, what I thought and possibly HR. I'm not sure if HR got involved in that, but I know it was a management decision that he needed to be here for the business face-to-face.

Q When you presented him with that opportunity to keep his job if he worked in New York four days a week, did you expect him to

accept that?

MR. BERLUTI: Objection.

You can answer it.

A Did I expect him to accept it. At the time, I thought it was possible, yes, because there were other people who were -- at least one other person I knew who was living in Boston and working in New York who worked in the IT department, so, yes, it was possible that he could have accepted it.

Q I guess my question is a little different. Did you expect him to accept that offer? I wasn't asking whether it was possible. I was asking whether you, having known him and worked with him for 27 years, expected him to return to New York four days a week after moving to Boston?

MR. BERLUTI: Objection. He's answered that question.

MR. SZAL: I don't think he did.

MR. BERLUTI: I think he did.

A I don't know. I don't know how to answer that question.

Reid

Q Okay. Fair enough.

MR. BERLUTI: Hold on. He's answered the question. His answer was, yes, he thought that he might accept it because he was aware of at least one other person that did it. That is an answer to the question. You then asked him the same question again.

Q Who was that person that you were referring to?

A His name?

Q Yes.

A Steve Lipka. He's a IT person and he's still with the company.

Q Did he initially work in New York and live in New York?

A I don't know if he initially lived in New York. It is my recollection from the time that I met him he was going to work in both cities. I honestly don't know if he ever lived in New York before he came up with this arrangement because he wasn't working with me, you know, directly.

Reid

Q Do you know if he ever requested a transfer to the Boston office where he lived?

A I don't know.

Q You said there was a document that outlined the working remotely schedule for the people in your department?

MR. BERLUTI: Objection.

A Yes. It wasn't a document. It was a calendar that I had to put -- Yury would be in Mondays, Wednesdays, Anna would be in Tuesdays, Thursdays, whatever. Yeah, there was a calendar.

Q Was it like a handwritten calendar or was it an electronic calendar?

A It was -- from my recollection, it was electronic.

MR. SZAL: We would ask that you search for any of those documents and produce them regarding remote schedules, Bob.

MR. BERLUTI: Well, we're not going to do document production in a deposition.

MR. SZAL: Well, he's identifying documents that haven't

Reid

been produced, so I'm asking, respectfully, if you will conduct a search and produce them if they exist?

MR. BERLUTI: Put it in a letter and we'll be happy to respond to it.

MR. SZAL: This will be Exhibit 7.

(Document entitled Complaint was marked as Reid Exhibit No. 7 for identification, as of this date.)

Q Mr. Reid, I've placed a document in front of you labeled as Exhibit 7. It's a copy of the complaint that was filed by Yury Rinsky in Middlesex Superior Court, Massachusetts. I just ask you to take a look at that document and let me know if you've seen that before?

A Yes.

Q Did you provide any information in order for the company to respond to this complaint?

MR. BERLUTI: Objection. To the extent you're revealing any communications with counsel, I'm going

Reid

to instruct you not to answer.
Otherwise, you can answer the question.

A I'm sorry, is there a question again?

MR. SZAL: Would you be able to read that back?

(The record was read.)

A Not since the June or July document. The exhibit that we discussed before, the one that you asked me about if I had drafted or not drafted that document, that was the last document that I provided.

Q And that was --

MR. BERLUTI: Exhibit C.

Q -- Exhibit D -- I'm sorry, Exhibit C, to deposition Exhibit 6; is that correct?

A Yes.

Q Okay.

MR. SZAL: Let's mark this next.

(Document entitled Answer was marked as Reid Exhibit No. 8 for identification, as of this date.)

Reid

Q Exhibit 8 that I placed in front of you is a document which is the Answer of Cushman & Wakefield to the complaint filed by Yury Rinsky filed with United States District Court for the District of Massachusetts. I just ask you to review that document and let me know if you've seen that before.

A No, I've never seen this before.

Q Outside of specific communications with your attorneys, do you know if you provided any information to the company to enable it to respond in this document?

MR. BERLUTI: Objection. I'm going to instruct you not to answer that.

There's no way -- that's an answer filed by the company's attorneys. There's no way he could know the answer to that and it's fraught with problems. He's already testified as to what he's done and what he's communicated to.

So as to the filing of the Answer, I'm going to object to that

Reid

and instruct you not to answer.

Q Well, I'll ask you to look at Exhibit No. 7 which we just looked at as the Complaint --

A Okay.

Q -- paragraph number 13 --

A Thirteen.

Q -- which says, (reading) Plaintiff, which means Mr. Rinsky, has experienced health issues recently that were known to the company. Do you see that?

A Yes.

Q Okay. And in Exhibit No. 8 in response to paragraph 13, it says denied. Do you see that?

A Yes.

Q Okay. You testified earlier that you knew about Mr. Rinsky's health issues; is that correct?

A Yes.

Q And you worked for the company; is that correct?

A Yes.

Q Paragraph 14 says (reading)

Reid

Specifically, plaintiff discussed his treatment for lymphoma and the schedule of his treatment with Mr. Reid. There's a typo in there as well.

Is that an accurate statement?

A Yes.

Q And, again, the company's response to paragraph 14 is to deny that. Do you see that?

A Yes.

Q If you turn to paragraph 16, at the very top --

A Yes.

Q -- it says, (reading) During these times, plaintiff worked remotely when he was not able to be in the office and tried to take off as little time as possible.

Do you agree with that statement?

A Yes.

Q And, again, the company's response in Exhibit No. 8 is to deny that; is that correct?

A Correct.

Q Okay. What are the company's policies, procedures and practices for seeking a transfer from one office to another at the company?

Reid

MR. BERLUTI: Objection.

You can answer it as it relates to the IT department.

A Can you repeat the question?

Q Let me ask a better one.

A Okay.

Q With respect to your department at the company --

A Yes.

Q -- are there any formal policies regarding seeking a transfer?

A The formal policy as I know it would be asking your manager and then waiting for the manager to respond. That's my understanding of it.

Q Are you aware of any written policies to that effect with the company with respect to your department?

A I'm not aware of any written requirements.

Q Would you agree that the company has a practice of allowing, in some instances requiring their employees work remotely?

MR. BERLUTI: Objection.

Reid

A Completely remotely?

Q No, just working remotely.

MR. BERLUTI: Objection.

A I don't know.

Q With respect to your department, was everyone asked to work two to three days remotely?

A Everyone was asked, but not everyone agreed. I have at least one person who did not agree to it. He chose not to. He didn't want to work remotely. He wanted to be here every day, so I didn't think it was necessary to force him to work remotely.

Q So employees were asked as opposed to being told?

A For the most part.

Q Okay. What about specifically with Mr. Rinsky, do you recall whether he was asked to work remotely and had the option to do either or if he was told that he must work remotely?

A No, he was asked to work remotely and he agreed to work remotely, sure.

Q If you look at paragraph 26 of Exhibit 7 which is page 4 of the document, at the top it says, (reading) Mr. Reid stated that

Reid

plaintiff's request to work from Boston was acceptable to him, but that it needed to be cleared with his manager, Andrew Hamilton.

Do you believe that to be an accurate statement?

A Yes.

Q If you look on page 26 -- excuse me -- response to 26 in Exhibit 8, the company has denied that; is that correct?

A Yes.

Q Is it your understanding that Mr. Hamilton approved the request as well?

A No, he never approved it.

Q Do you recall what the discussions you had with Mr. Hamilton were concerning the -- strike that.

You testified just now that he never approved it. Did he deny it?

MR. BERLUTI: Objection.

Denied a request for transfer?

MR. SZAL: Yes. At that time.

Q Strike the whole question. Sorry.

Did Mr. Hamilton ever on his own deny the request that Mr. Rinsky had made to

Reid

transfer to Boston?

A I don't remember.

Q My understanding from your testimony earlier was with respect to your transfer there seemed to be a chain of command that was followed with you asking your direct manager and, if they approved it, they would go to the next level of management to seek approval; is that correct?

MR. BERLUTI: Objection.

A Yes.

Q So how would Mr. Rinsky's request have made it above Mr. Hamilton had he not approved it?

A I don't know the answer.

Q If you look at paragraph 36, Mr. Reid, on page 5 of Exhibit 7, it says, (reading) Plaintiff, meaning Mr. Rinsky, continued to work remotely in June. And this refers to June of 2015.

Do you believe that to be an accurate statement?

A Sure.

Q Yes?

A Yes.

Reid

Q And in response to this paragraph 36 in Exhibit 8, do you see here that the company has denied that?

A Yes.

Q Do you have any understanding as to why the company asked for Mr. Rinsky to resign his employment as opposed to just terminating his employment?

A I can speculate.

Q No, don't --

A Don't speculate.

Q No, only if you know.

A I don't know exactly. I can -- I'm sorry. I can't speculate.

Q Was Mr. Rinsky's role with the company replaced?

A Not directly. I assumed part of his role, the management side, the business side, and we got a consultant in to do the technical side. And that technical consultant pretty much did all the IT work, programming, support that was required from Yury.

Q So you had to take on more work?

A Yes.

Reid

Q Did they give you a raise?

A No -- well, I get an annual raise every year, but.

Q The consultant that you hired, do you recall what his name is?

A Edgardo Felix.

Q Do you recall what the terms of his engagement were? Was he hired as an employee or was it as an independent contractor?

A He's an independent contractor.

Q Do you know how much you were paying him?

A Initially, his first contract was $65 per hour.

Q Do you know how many hours a week he was expected to work?

A Forty.

Q Was he expected to work overtime?

A If necessary.

Q Did that happen on occasion?

A It did.

Q Do you know how long the engagement was expected to last?

MR. BERLUTI: Objection.

Reid

Q Initially.

A Well, initially, it was a six-month engagement.

Q And he was brought on after Mr. Rinsky was terminated?

A No. He started in, I believe, the first week of June, so Yury was still here for a couple weeks after he was brought on.

Q Was assigning some of Mr. Rinsky's duties to you and others to a contractor a cost savings for the company?

A Again, it would require me to speculate.

Q Only if you know.

A I don't know for certain.

Q Do you know how old Mr. Felix is?

A I've never seen his birth date. Again, I would have to guess. You want me to guess?

Q No. Is he younger than Mr. Rinsky?

A I would -- again, I'm guessing. I'm guessing, yes, he's younger than Mr. Rinsky.

Q Do you know if he has any medical issues or illnesses?

Reid

A I mean, he does go to the doctor. He tells me when he's going to the doctor because he's not going to be, you know, putting in for the time, but he has never told me he has any diseases or anything.

Q Is he, meaning Mr. Felix, able to work remotely or does he work exclusively in the office?

A He works both. He's in the office a few days a week and he's remote a couple of days a week. Back in 2015, which is the time that we are talking about, he was here every day. It's just starting last year, I'd say maybe the second half of last year, when things started to quiet down, he was able to start working one day a week. Now he's working two days a week.

Q Okay. So back in 2015, when he was initially hired, he was in the office every day?

A Every day.

Q And now in 2017 you are back to a two to three day a week remote schedule?

A Two for him.

Q Two, okay. What about other people in your department? Is it -- strike that.

Reid

In 2015, was there ever a time where the policy in your department with respect to working remotely was changed?

A In 2015, no.

Q So everybody continued to work remotely, either two or three days a week, depending on who it was?

MR. BERLUTI: Objection.

Q Strike that. Let's move on.

(Email dated May 18, 2015, was marked as Reid Exhibit No. 9 for identification, as of this date.)

Q Mr. Reid, I've placed a document in front of you labeled as Exhibit 9. It is an email from you to Mr. Rinsky dated May 18, 2015, in response to his email of May 17th that we looked at earlier in Exhibit 6.

Do you recall sending this email?

A Yes.

Q And your response to Mr. Rinsky, stating, (reading) As discussed, I will be moving to Boston on 5/27/2015, for family reasons, is to say, Okay, we will talk on Tuesday; is that correct?

Reid

A Yes.

Q Do you recall any other written responses to Mr. Rinsky's request and email on the 17th?

A To Mr. Rinsky, none.

Q The May 17th portion of the email from Mr. Rinsky to you, nobody else is copied on that; is that correct?

A Correct.

MR. SZAL: Mark that as 10, please.

(Email dated May 17, 2015, was marked as Reid Exhibit No. 10 for identification, as of this date.)

MR. SZAL: Off the record for a second.

(Discussion off the record.)

Q Mr. Reid, I placed a document in front of you labeled as Exhibit 10. It appears to be an email message dated 5/17/2015, 7:37 p.m. There's no sender. It's addressed to you and to Andrew Hamilton titled, Moving to Boston. It looks to be the same text of the May 17th email that we previously looked at, except the closing

Reid

says, (reading) Thank you in advance.

Do you ever recall receiving this email?

A No. I know we looked at one where I sent it. I just saw this to Andrew, but I don't know if that's the one with thank you in advance or the one with thanks.

Q But the email request on the 17th that you received from Mr. Rinsky regarding his transfer, Mr. Hamilton wasn't copied on that, correct?

A Correct.

Q Okay.

(Email dated May 22, 2015 was marked as Reid Exhibit No. 11 for identification, as of this date.)

Q Mr. Reid, I've placed a document in front of you labeled as Exhibit 11. It's an email from you to Mr. Rinsky dated Friday, May 22, 2015, entitled, Task List, and the text of the email says, (reading) Let's spend a few minutes going over what's open on your list for June before you leave today.

Did I read that correctly?

Reid

A Yes.

Q Okay. Do you have any understanding of -- strike that.

Was it your practice to go over monthly task lists for people in your department?

A Was it my practice to go over a monthly task list. I would request information as on as needed basis. It was no specific, you know, every Friday or every Monday or every week or every month, whatever. It was on an as needed basis.

Q Do you recall what the needed basis was for you to review what was open on Mr. Rinsky's list as of May 22, 2015?

A The only thing I can remember is it had to be with him going on vacation around the same time. I just wanted to get an idea of where he was on certain projects because he was going to be out. He was going to be moving. That's my recollection of, you know, why I asked what's open because we all -- we didn't communicate every day on everything, so I just wanted a list of what was open.

Q Do you know if you were in New York

Reid

at this point or if you were in Miami?

A May 22nd, I would have to look at a document in my bag.

Q I just thought maybe from your recollection if you recall if going over his list of open items was in person or telephonically?

A Yeah, I don't remember if I was in New York or Miami.

Q Was it your understanding, though, when you sent this email that this was a Friday, the 22nd, so with him taking his prearranged personal days that this would be his last physical day in the New York office?

A It had to be. It had to be because he was going to be gone -- after Memorial Day he was going to be gone, yes.

Q Okay. So whether you met in person or whether it was over the phone -- well, strike that.

Do you know if you actually ever spent a few minutes going over what was open on his list? This email says you are requesting it, but do you know if it ever actually occurred?

A I can't remember. He might have

Reid

sent me the list. We might have spoken on the phone. I -- I don't remember.

Q Do you have any recollection of what he had open on his task list for June?

A Specifically, no.

Q Was he very busy?

A Oh, absolutely.

Q Was he in the middle of a project or anything?

A Well, he was working on this Workday project that I mentioned before, yeah, and it was a very critical time for everyone on the team. That's why I had to bring in the consultant that we spoke about.

Q And did that Workday project end at some point?

A Well, that phase ended October -- it ended in 2016, I believe, either September or October -- September 2016 that phase ended. This project is going to go on for another two to three years, but that phase that Yury was working on, that phase ended in 2016.

Q And what he was working on with respect to that project, were those duties shared

Reid

by you and the consultant after his termination or was the consultant performing them exclusively?

A They were shared.

(Document entitled Finance and HR Applications Tower was marked as Reid Exhibit No. 12 for identification, as of this date.)

Q Mr. Reid, this is an exhibit labeled as Exhibit 12. It's a document that was produced by Cushman & Wakefield in response to requests by the plaintiff.

Could you -- have you seen this document before?

A I'm sure I've seen it before.

Q It appears to be an organization chart for your department. Is that a fair characterization?

A The AS/400 side, yes. I can't speak to the applications, operations side. That's not my department, right. The CBAS AS/400 side is my department.

Q Okay. So the left where it says CBAS AS/400, everything from there down is your department?

Reid

A Yes.

Q And then on the other side where it says application and operations, that is not your department?

A Correct.

Q So for both departments it describes the team lead as Andrew Hamilton, is that correct, in the red box?

A Yes.

Q And then on the CBAS, AS/400, it lists you as product manager, Anna?

A Kleynshteyn.

Q -- Kleynshteyn, thank you, as software engineer, Thomas Donlon as infrastructure operator and Edgardo Felix as contract developer; is that correct?

A Yes.

Q Is this the current make-up of your team?

A Yes.

Q Okay. How is this different from the make-up of your team at the time Mr. Rinsky was asking for a transfer to Boston?

A The only difference would have been

Reid

another box with Yury's name below my name.
That's the question?

Q Yes. So, yes, in terms of -- well, let me ask you. Is this listing a hierarchy of reporting? In other words, you are the top and Edgardo is the bottom, or are the software engineers and infrastructure operator and contract developer all on the same plane?

MR. BERLUTI: Objection.

A Software engineer, infrastructure operator, contract developer are all on the same plane. They're different grades, but they're all on the same plane reporting in to me.

Q And, you know, in terms of grades, what was Mr. Rinsky's grade with respect to other people on his same plane at the time of his termination?

A I don't remember the specific grade number, but he had a higher grade than Anna.

Q Was he the most senior?

A He was the most senior.

Q Did he make the most money?

A He made the most money.

Q Did he make the most bonuses?

Reid

A He made the most bonus.

Q Were you involved in the calculations of yearly bonuses for employees in your department under your report?

A No.

Q Do you know how that was determined?

A Again, I can speculate.

Q No, that's okay. You don't know, you don't know.

MR. SZAL: This is Exhibit 13.

(Email dated March 9, 2015, was marked as Reid Exhibit No. 13 for identification, as of this date.)

Q Mr. Reid, this is a document labeled as Exhibit 13. It's an email from Andrew Hamilton to you dated March 9, 2015. The subject of the email is (reading) For Action: Bonus/Merit Communication Details.

Have you seen this email before, Mr. Reid?

A Yes.

Q It has an attachment which is at least in this document four pages and it lists the three other employees reporting to you in 2014; is

Reid

that correct?

A Yes.

Q On the fourth column to the right where it says (reading) 2014 calibrated PMP rating, is that what you were referring to just a moment ago regarding the grade of employee?

A No.

Q What does that rating mean?

A The rating in column four?

Q Yes.

A That's based on your performance management -- PMP means Performance Management Program and it's basically when you get reviewed, the highest level is exceeds -- sorry, the highest level is -- outstanding would have been a one, two would be exceeds, three would be meets, four was needs improvement and five, I believe, was unsatisfactory.

Q So as of 2014, everybody in your department at least met or exceeded expectations, right?

A Yes.

Q And, in fact, Mr. Rinsky was the only one out of these three employees with a two

Reid

rating, which is exceeds expectations, correct?
A Correct.
Q His base salary was the highest of these employees; is that correct?
A Correct.
Q And if you turn to the next page, page 2 of the attachment, his recommended bonus for 2014 was $17,138; is that correct?
A Yes.
Q And that's almost double the recommended bonus for Anna; is that correct?
A Correct.
Q Do employees typically continue to receive bonuses, meaning after the termination of Mr. Rinsky, do the people in your department, have they continued to receive annual bonuses to your knowledge?
MR. BERLUTI: Objection.
A Yes.
Q I also note on that same page, page 2 of the attachment, that it lists a recommended annual base salary increase and percentage increase; is that correct?
A Yes.

Reid

Q Do employees typically in your department typically receive increases to their base salary on a yearly basis?

A Yes.

MR. BERLUTI: Objection.

Q Is it typically three percent?

MR. BERLUTI: Objection.

You can answer.

A It has been over the last few years since the recession or -- not recession, the market.

Q So do you know if people in your department have received a three percent increase to their base annual salary in 2015?

A You mean for 2015 in 2016? This was for 2014 in 2015.

Q Right. So -- probably a bad question. So for their 2016 annual compensation, do you know if the employees in your department received the same three percent increase that they received for 2015?

A It was around three percent. It could have been 2.5. It wasn't more than three percent.

Q     Okay. And do you know what the percentage increase was for your team, if any, for 2017?
A     We haven't gotten that yet.
Q     Do you know when -- strike that.
This email was sent in March of 2015. Is March typically when those determinations are made?
A     Yes.
Q     So do you expect to receive information on salary increases and bonuses in the next few weeks?
A     Yes.
MR. SZAL: This is probably a good point to stop. I have to do a couple of calls between 1:15 and 1:30.
MR. BERLUTI: Are you done with him?
MR. SZAL: No. We can talk about scheduling and we can pick up with him tomorrow, if need be.
(Discussion off the record.)
(Whereupon, at 1:05 o'clock p.m., the deposition was adjourned to Friday, February 24, 2017.)

C A P T I O N

The Deposition of COLIN REID, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

The Deponent will read and sign the transcript of said deposition.

C E R T I F I C A T E

STATE OF________________________________:
COUNTY/CITY OF_______________________________:

Before me, this day, personally appeared COLIN REID, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_________________________
COLIN REID

SUBSCRIBED and SWORN to before me this___________ day of _____________, 2017, in the jurisdiction aforesaid.

_______________________ _____________________
My Commission Expires Notary Public

DEPOSITION ERRATA SHEET

RE:
FILE NO.
CASE CAPTION: Yury Rinsky vs. Cushman & Wakefield, Inc.
DEPONENT: Colin Reid
DEPOSITION DATE: February 22, 2017
To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request for the following changes be entered upon the record for the reasons indicated.
I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

SIGNATURE:__________________________ DATE:____________
Colin Reid

# I N D E X

| Witness | Examination by: | Page |
|---|---|---|
| COLIN REID | Mr. Szal | 4 |

## E X H I B I T S


| Reid For Ident. | Description | Page |
|---|---|---|
| 1 | Renotice of Deposition of Colin Reid | 4 |
| 2 | Rule 30(b)(6) Deposition Renotice of Cushman & | 4 |
| 3 | Email dated May 17, 2015 | 44 |
| 4 | Email dated May 14, 2015 | 47 |
| 5 | Defendant Cushman & Wakefield, Inc.'s Response to Plaintiff Yury Rinsky's First Request for Production of Documents | 52 |
| 6 | Letter dated November 12, 2015 | 58 |
| 7 | Document entitled Complaint | 81 |
| 8 | Document entitled Answer | 83 |
| 9 | Email dated May 18, 2015 | 94 |
| 10 | Email dated May 17, 2015 | 95 |
| 11 | Email dated May 22, 2015 | 96 |
| 12 | Document entitled Finance and HR Applications Tower | 100 |
| 13 | Email dated March 9, 2015 | 103 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - - x
YURY RINSKY, :

Plaintiff, :

:

-against- C.A. No.
: 16-10403

CUSHMAN & WAKEFIELD, INC.,
:

Defendant.
:
- - - - - - - - - - - - - - - - - - - x

CONTINUED RULE 30(b)(6) DEPOSITION of COLIN REID, taken by Plaintiff at the offices of 1290 Avenue of the Americas, New York, New York, on Friday, February 24, 2017 at 12:55 o'clock p.m., before Carol Mele, a Registered Professional Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

SZAL LAW GROUP LLC
Attorneys for Plaintiff
589 Tremont Street, Suite 4
Boston, Massachusetts 02118

BY: MARK D. SZAL, Esq.
(617) 830-2492
email: mark@szallawgroup.com

BERLUTI, McLAUGHLIN & KUTCHIN LLP
Attorneys for Defendant
44 School Street
Boston, Massachusetts 02108

BY: ROBERT R. BERLUTI, Esq.
(617) 557-3030
rberluti@bmklaw.com

ALSO PRESENT:

Stephanie Mercer, Esq., Cushman & Wakefield, Inc.

Reid

(Defendant Cushman & Wakefield, Inc.'s Responses to Plaintiff Yury Rinsky's First Set of Interrogatories was marked as Reid Exhibit No. 29 for identification, as of this date.)

C O L I N   R E I D,   called as a witness, having been previously sworn, resumed and testified further as follows:

EXAMINATION BY MR. SZAL:  (Continued)

Q     Good afternoon, Mr. Reid.

A     Good afternoon.

Q     As the court reporter said, you are still under oath from yesterday and this is a continuation of your deposition.  I'm going to show you an exhibit that we've labeled as Exhibit 29.  It's entitled, Defendant Cushman & Wakefield, Inc.'s Responses to Plaintiff Yury Rinsky's First Set of Interrogatories.  Have you seen this document before?

A     Some of these documents, they all look alike.

MR. BERLUTI:  Just look at -- let me do this for you.  Then you can

Reid

come forward.

A Yes. Yes, I have.

Q Did you provide all of the information for the defendant to respond to these interrogatories?

MR. BERLUTI: Objection.

A Not every interrogatory, just the ones that I am familiar with.

Q Other than the assistance of your attorneys, who else provided information from Cushman & Wakefield to respond to these interrogatories?

MR. BERLUTI: Objection.

A I'm not aware of who. Again, I could guess a few names, but --

MR. BERLUTI: Don't guess.

Q Don't guess.

A No guessing today. I didn't guess yesterday. Sorry.

Q On page 1 of Exhibit 29, interrogatory number 1 asks Cushman & Wakefield to (reading) please identify each person involved in answering these interrogatories in part; is that correct?

Reid

A Yes.

Q All right. And in the answer, it says, (reading) Colon H. Reid, managing director of infranstructure, C&W, answered these interrogatories with the assistance of counsel; is that correct?

A Yes.

Q But your testimony is you only provided some of the information in this document?

MR. BERLUTI: Objection. The rest of that answer is that there was also reliance upon documents that have been produced by the defendant in response to the plaintiff's first request for production of documents.

Q You verified these answers under oath on page 12; is that correct?

A Yes.

Q Okay. And that verification was based on the information that was known to you at the time which was February 6, 2017; is that correct?

MR. BERLUTI: Objection.

A Yes.

Reid

Q Since you had verified these interrogatories, have you learned any information that would change any of the answers that you verified in this document?

A I mean, I have to look at each one.

Q Well, let me direct your attention to the answer to interrogatory number 2. The interrogatory asks the company to (reading) please identify all persons whom it believes to have any discoverable information concerning the allegations asserted in the complaint and the defenses of the company thereto, and describe the discoverable information that each person is believed to have; is that correct?

A Yes.

Q Okay. And in response, there are six names listed which are Mr. Rinsky, yourself, Mr. Hamilton, Mr. Maiorini, Mr. Cuyar and Ms. Hicks; is that correct?

A Yes.

Q Other than yourself, are you aware of the information that these other individuals have with respect to the complaint and the defenses?

Reid

MR. BERLUTI: Objection.

A Other than myself, am I aware of any information these others have? I'm not sure how to answer that. I know these are the people that were involved, but I don't know what they know or don't know.

Q At the time Mr. Rinsky was terminated, was the company in the process of replacing the AS/400 system?

A Yes.

Q Why was it in the process of replacing that system?

A Because of the merger.

Q What was that --

A The long-term plan -- sorry -- the long-term plan is to replace the AS/400. I actually don't know when it's going to be replaced, but it's been in the works for a couple of years. And I wish I knew when it's going to be replaced, but I don't.

Q Do you know what it's going to be replaced with?

A It currently has the replacement pieces. It's going to be replaced by three new

Reid

systems, Sales Force, Callidus, C-a-l-l-i-d-u-s, and Workday. The Workday was already implemented, Sales Force was implemented, Callidus was implemented, but there is still a lot of data on the AS/400 and software applications that have to be converted to these new systems.

Q Once the replacement of the AS/400 system was complete, would Mr. Rinsky have been qualified to work on the new system?

MR. BERLUTI: Objection.

A I have no idea.

Q Are there things with the new system that you would have to learn in your role?

A Yes.

Q Since this lawsuit was filed, have you had any conversations with Mr. Cuyar?

A Mr. Cuyar, no.

Q So if you turn to page 10 --

A Yes.

Q -- interrogatory -- answer to interrogatory number 15, the last sentence says, (reading) in other sections of the IT department, Mr. Cuyar recalls having both granted and denied requests to relocate including denying one

Reid

individual that wished to relocate to Florida.

Did I read that correctly?

A Yes.

Q That information did not come from a conversation that you had with them; is that correct?

A Correct.

Q In response to interrogatory number 18 on page 11, the last sentence says, (reading) furthermore, the systems and software for which plaintiff was responsible were being phased out to be replaced by a different system throughout the company; is that correct?

A Correct.

Q At the time Mr. Rinsky was terminated, did you have any understanding of when that phase-out would be complete?

A The phase-out was planned to be in phases and, as I mentioned before, it's going to be replaced by Sales Force, Workday and Callidus. The piece that Mr. Rinsky was working on was primarily the Workday piece. And we had a target date known for the Workday implementation, but I don't have that target date specifically in mind

Reid

right now, but I did have a delivery date at the time Mr. Rinsky was terminated and that was the reason why we had brought in Edgardo because Mr. Rinsky claimed what we were in jeopardy of missing that implementation date.

Q Okay. After your transfer to Florida, did anybody else ask your advice as to requesting relocation?

MR. BERLUTI: About anybody?

MR. SZAL: Can you read it back?

(The record was read.)

MR. BERLUTI: Objection.

You can answer it.

THE WITNESS: I can answer it?

MR. BERLUTI: You can, yes.

A I don't recall anyone asking me specifically for advice. That's not to say anyone could not have asked me, "Well, how did your transfer go?" or, "How did you go about making your transfer?" but, no, I don't recall having anyone specifically asking me about that.

Q Do you remember an employee named Anthony Catalano?

Reid

A Anthony Catalano, yes.

Q Did he work in your department?

A He didn't work in my department, but he worked in IT.

Q Do you recall him asking you about requesting relocation?

A He might be one of the people that I mentioned where someone might have casually asked me, but, you know, a lot of people still ask me about it casually, but not formally.

MR. SZAL: This is the next exhibit.

(Email dated 4/22/2015, was marked as Reid Exhibit No. 30 for identification, as of this date.)

Q Do you know if he's still employed by the company?

A No, he's not.

Q Do you know when he left?

A I think he left sometime in 2015, but I'm not certain.

Q We placed in front of you a document that's been labeled as Exhibit 30. It's an email from you to Mr. Catalano dated 4/22/2015.

Reid

A Okay. Yes.

Q It's an email in response to an email that he had sent you entitled, (reading) Question. Do you see that?

A Yes.

Q And, in part, Mr. Catalano states, (reading) I'm seriously looking into relocating to Richmond, VA. Do you see that?

A Yes.

Q In response to his email, you said in part, (reading) best to check with HR or Leif; is that correct?

A Yes.

Q Why did you tell Mr. Catalano that it was best to check with HR or Leif?

A Again, he didn't work with me. He was in another group. I believe it was Leif's group, so I didn't want to be -- again, I didn't want to be responsible for guiding him in the wrong direction. I just don't think it was my place, so I suggested that he checks with HR and his ultimate IT manager. I don't remember if he reported to Leif or in the chain of command to Leif.

Reid

Q When Mr. Rinsky emailed you on the 17th of May regarding his move to Boston 10 days later, you didn't respond to him by saying that it's best to check with HR or Leif, did you?

A No, because we had already spoken about it.

Q Who had already spoken about it?

A I had. He had told me that he was planning to move to Boston, so there was no reason for me to tell him to check with Leif. He couldn't check with Leif.

Q Because it was your responsibility to talk to Mr. Hamilton and Mr. Hamilton's responsibility to talk to Leif, correct?

A Yes.

Q During the time period between March 2015 and July 2015, are you aware of anybody else in the IT department transferring to another Cushman & Wakefield location?

A There was another person that transferred to the Fort Lauderdale office. Again, we didn't work together, but I did hear of it. And I can't specifically say whether it was prior to July or after July, but I know it was in that

timeframe that this person relocated to Fort Lauderdale.

Q And that was Jay Leiser that we spoke about?

A That was Jay Leiser, yes.

Q With respect to your specific department, though, at the time of Mr. Rinsky's request to relocate, from the perspective of an employee transferring -- who had transferred, would you agree that you were the most knowledgeable person in that department with respect to what the process was?

MR. BERLUTI: Objection.

A As far as Mr. Rinsky transferring --

Q Not --

A -- not Jay Leiser?

Q As far as anybody in your department.

A Well, Jay Leiser wasn't in my department.

Q Right.

A So, yes. In my department, yes.

Q Because you had just gone through the process, right?

Reid

A Yes.

Q So Mr. Rinsky shouldn't have had to go in to anybody but you to understand the process, correct?

A Correct.

MR. BERLUTI: Objection.

Q Were there any concerns within your department in May of 2015 that Mr. Rinsky wasn't meeting commitments?

A No.

Q Did there come a time in May of 2015 where you were required to report on Mr. Rinsky's progress daily?

A Not that I remember.

Q Do you recall in May of 2015 revoking Mr. Rinsky's right to work remotely?

A Revoking in what sense? Revoking technically, network, revoking -- I'm not sure -- I'm not clear on the question.

Q Do you recall revoking Mr. Rinsky's right to work remotely until Workday tasks were completed and approved by management?

A I don't recall doing that. I don't, not in May.

Reid

(Email dated 5/13/2015, was marked as Reid Exhibit No. 31 for identification, as of this date.)

Q Mr. Reid, this is an exhibit labeled Exhibit 31. It's an email from you to Mr. Rinsky and another dated 5/13/2015. It states in part, (reading) working remotely is being revoked for both of you effective next week until Workday tasks are completed and approved by management.

Did I read that correctly?

A Yes.

Q Does this refresh your memory of this time period?

A Yes.

Q And do you remember why this action was taken -- strike that question.

Did this edict regarding revocation of working remotely come from you or from your superiors?

A I really don't remember whether it came from me or my superiors. It had to be a project-related reason, but I don't remember whether it was totally my decision or I was advised to do it.

Reid

Q And in this in email you also state that you had been recalled to New York for two weeks; is that correct?

A Yes.

Q Do you recall why the company recalled you from Miami to New York during this period?

A This was due to problems with the project that we were working on. This is when it all began where I was going to be called back and forth continuously for that year, pretty much the year.

Q Okay. Do you recall when you first contacted Mr. Felix regarding coming on as a consultant in 2015?

A It was either April -- it might have been April or May. I'm not sure exactly which month.

(Email chain dated May 30, 2015, was marked as Reid Exhibit No. 32 for identification, as of this date.)

Q Mr. Reid, this is a document that's been labeled as Exhibit 32. It's a series of

Reid

emails, five pages between you and Mr. Felix; is that correct?

A Yes.

Q And if you turn to page 3 at the bottom, it starts, (reading) Edgardo, and then continuing on to page 4 it says, I hope you are keeping well. Something might be coming up soon. Are you still interested, question mark. Do you have any experience with the IFS feature on the AS/400, question mark. Regards. Is that correct?

A Yes.

Q Okay. And this, again, was May 20, 2015; is that correct?

A Yes.

Q And that is between the time that Mr. Rinsky sent his email to you about his move on May 17th and when he actually left for Boston on May 27th; is that correct?

A Yes.

Q And you ultimately did make an offer to Mr. Felix to come on as a consultant; is that correct?

A Yes.

Q And he did backfill at least some of

Reid

the work that Mr. Rinsky was performing; is that correct?

A Eventually, yes.

Q And was the plan at some point to transfer Mr. Rinsky's knowledge to Mr. Felix as the contractor?

A Was there a plan to transfer knowledge of Mr. Rinsky after I knew he was moving to Boston or before? I'm not sure how to answer the question. If I had a better date range. There was no plan -- if Mr. Rinsky had stayed, there was no plan to transfer knowledge. He was just going to be coding, doing work. He would get direction either from myself or from Mr. Rinsky as far as completing tasks.

Q We had looked at a document yesterday -- we may not have looked at that document. I'm going to show you a document that's labeled as Exhibit 15. Did we look at that document yesterday, Mr. Reid?

MR. BERLUTI: Just for the record, my notes indicate that it has Hicks in front of it. And based on our convention, if it was Mr. Reid, it

Reid

said Reid. It would indicate to me this was not marked during Mr. Reid's deposition

MR. SZAL: Right.

A Yes, this was the letter from Andrew to Leif.

Q And you were copied on that; is that correct?

A Yes.

Q Okay. And this is dated the 27th of 2015 -- sorry -- May 27, 2015; is that correct?

A Correct.

Q And it's from Leif -- excuse me -- from Andrew Hamilton to Mr. Maiorini and yourself; is that correct?

A Correct.

Q And it states that you -- that Mr. Hamilton and you had reviewed your options with Kat today; is that correct?

A Yes.

Q Okay. And May 27th was the same date that Mr. Rinsky had indicated to you was the day he was going to be moving to Boston; is that correct?

Reid

A Correct.

Q Okay. So the same day you, Mr. Hamilton and Ms. Hicks reviewed options and Mr. Hamilton subsequently sent this email, correct?

A Correct.

Q Okay. So under number 1, it says essentially, that you're going to extend a six-month opportunity to the person who had -- has been identified as Mr. Felix; is that correct?

MR. BERLUTI: Objection.

A No.

Q No?

A No.

Q It says, (reading) offer a six-month extendable opportunity to the resource Colin has worked with previously, so who does that refer to?

A Okay, offer a six-month extendable opportunity to the resource -- yes, I was reading it incorrectly. That is Ed. The individual working now, Trevor -- I thought he was referring to Trevor in the six-month statement, but that's not the case.

Q Okay. So the first sentence of number 1 on Exhibit 15 refers to Mr. Felix,

correct?

A Yes.

Q Okay. And then number 2 says, (reading) bring the new resource on in the next two weeks to begin KT.

Does KT mean knowledge transfer in your department?

A Yes.

Q And did you have discussions with Mr. Hamilton and Ms. Hicks that day about knowledge transfer?

MR. BERLUTI: Objection.

A I don't remember.

Q From reading this email, who does it indicate to you that knowledge is being transferred from and to?

A From Yury Rinsky to Ed Felix.

Q And in the next sentence on number 2, it says, (reading) we believe we must retain Yury for about nine weeks to cover critical Workday and MK work; is that correct?

A Yes.

Q Okay. So is it fair to say as of the 27th of May 2015 you, Mr. Hamilton and Ms.

Reid

Hicks were proposing to keep Mr. Rinsky on for about nine weeks and then terminate him afterwards?

A That's what it appears, yes.

Q Did you ever communicate to Mr. Rinsky before your conversation on June 22, 2015, that that was the company's plan?

MR. BERLUTI: Objection.

A No.

Q Why not?

A I mean, I wasn't allowed to.

Q Who prevented from you telling him this?

MR. BERLUTI: Objection.

A I wasn't told to do it.

Q Were you told not to do it?

MR. BERLUTI: Objection.

A I don't remember if I was told not to do it, but I know I wasn't told to do it.

Q In your discussion with Mr. Hamilton and Ms. Hicks on the 27th, was it the company's plan to execute Mr. Rinsky's transfer for that nine-week period and then terminate him afterwards?

Reid

MR. BERLUTI: Objection.

A Can you repeat the question?

(The record was read.)

MR. BERLUTI: Objection.

A I don't remember.

Q If you look at number 3 on Exhibit 15, it says, (reading) brief Craig on the situation and prepare him for the transfer of paperwork from Kat.

Did I read that correctly?

A Yes.

Q Who do you understand the transfer paperwork is referring to?

A I would think it's Yury Rinsky.

Q And in the next paragraph, number 4, it says, (reading) process the transfer EAF and take the DTZ review; is that correct?

A That's correct.

Q All right. And EAF is Employee Action Form?

A Yes.

Q And, again, do you understand that to relate to Mr. Rinsky?

A I don't understand what the DTZ

Reid

review is.

Q Neither do I.

A I understand the transfer EAF, but I don't understand what the DTZ review means or meant.

Q Okay. And in number 5, it says, (reading) assuming approval, execute the transfer officially; is that correct?

A Yes.

Q Okay. And, again, you understand it to refer to Mr. Rinsky's transfer?

A Yes.

Q And then six says, (reading) work with Kat as KT unfolds on the official exit, parentheses, mitigating litigation risks, end parentheses; is that correct?

A Yes.

Q And when it says official exit, what do you interpret that to relate to?

A Notifying Mr. Rinsky that it's his termination.

Q Did you agree with this plan?

A I didn't have a choice. I would have to say yes.

Reid

Q So at least as of the 27th, your understanding the plan was -- your understanding of the plan was to hire Mr. Felix, begin transferring Mr. Rinsky's knowledge to Mr. Felix, retain Mr. Rinsky for about nine weeks, processing his transfer to Boston and then terminating him afterwards; is that correct?

MR. BERLUTI: Objection.

A Well, he was never transferred to Boston.

Q I understand that, sir. I'm asking you as of May 27, 2015, was that the company's proposed course of action --

MR. BERLUTI: Objection.

Q -- based on your conversation with Mr. Hamilton and Ms. Hicks and the email we were looking at which is Exhibit 15?

MR. BERLUTI: Objection.

A I'm not clear on the question.

Q Did Mr. Maiorini respond to this email that you can recall?

A I don't remember.

Q If he did respond to this email, would he typically have responded to everybody

Reid

that's on the address list?

A I can't say. I know some people respond to all, all the time and some people respond to just the sender all the time. That's a constant problem in the company.

Q Did you personally conduct any searches in your emails for any response of Mr. Maiorini to this email which is Exhibit 15?

A I don't even have this email. I never saw -- I don't remember seeing this email until it was presented here.

Q Is that because of the age of it, it's archived?

A No. I have access to archived emails, I do, but I never searched for anything with Leif's name on it, so I haven't remembered seeing this email until it was presented yesterday.

Q Did you have any involvement in putting together the consulting services agreement for Mr. Felix in 2015?

A Yes.

Q What involvement did you have?

A Pretty much putting together the

rate and what he would be doing, the requirements for the job, but as far as the -- the agreement, that was a -- I believe it was a blanket agreement that was used before and all you had to do was change some of the names and company names and so forth.

Q There's the agreement itself and then there's an exhibit to it which discusses the scope of work, compensation and travel reimbursement; is that correct?

A Yes.

Q Is that typically the portion of the consulting agreements that is variable?

A Yes.

MR. SZAL: Let's mark this.

(Document entitled, Consulting Services Agreement was marked as Reid Exhibit No. 33 for identification, as of this date.)

Q Mr. Reid, this is a document that's been labeled as Exhibit 33. This is Mr. Felix's consulting services agreement dated effective June 8, 2015; is that correct?

A Correct.

Reid

Q All right. And in Exhibit A there is a heading that says, Summary of Expected Activities; is that correct?

A Correct.

Q And how do those activities compare with the activities that Mr. Rinsky was performing as of June 2015?

A Pretty similar.

Q Under the bulleted points on Summary of Expected Activities, it says, (reading) all services shall be performed on-site at C&W's offices, parentheses, as specified in the preamble to this agreement, end parentheses, unless otherwise directed by C&W; is that correct?

A Correct.

Q Is that a standard clause that's included in consulting agreements, in your opinion?

A Yes.

MR. BERLUTI: Objection.

Q Why is that included in there?

A I don't know.

Q Are consultants typically permitted to operate on a remote work schedule as full-time

Reid

employees in your department?

MR. BERLUTI: Objection.

A Can you repeat the question?

(The record was read.)

A I'm not sure.

Q During the time immediately preceding Mr. Rinsky's move to Boston, I believe it was your testimony that he was working up to three days a week remotely; is that correct?

A Correct.

Q When Mr. Felix was retained in 2015, was he permitted to operate on a similar schedule?

A No.

Q Any particular reason why not?

A The only reason that I could come up with would be the fact that he was new to the operation and he needed to be in the office so that he could get training from his co-workers and interact more with the business initially to meet all the players. That's mainly what I would think the reason was.

Q And since 2015 has that ever changed?

A Yes.

Reid

Q At what point was Mr. Felix permitted to work remotely?

A I know it began sometime in 2016, but it wasn't in 2015. He wasn't given the flexibility in 2015. And I think in 2016 is when it actually -- after he had been here a substantial amount of time that I trusted his ability to work remotely.

Q And do you recall in 2016 the number of days per week typically he was permitted to work remotely?

A Initially, one. He was allowed to work one day a week for most of the year and sometime in the last few months, and I believe it might have even been December, but in the last few months I've allowed him to work up to two days a week because the workload has reduced -- has been reduced immensely since October.

Q You had a conversation with Mr. Rinsky on June 22nd; is that correct?

A Yes.

Q Is it fair to say that between May 30, 2015, and June 22, 2015, Mr. Rinsky was performing work for the company?

Reid

A Yes.

Q And is it fair to say that you and Mr. Rinsky had daily communications either by email or phone concerning the work of your department?

A Yes.

Q During that time period where Mr. Rinsky is performing work, did you ever inform him that his transfer request was being discussed among management?

A I would have to say yes.

Q And how did you communicate that to him?

A It would have been verbally. I know I didn't put it in writing because I looked for it. It's one of the things I looked for, but I know the conversation would have come up.

Q Do you recall what you would have said to him?

A I would have said basically what we discussed, that it's still being decided, "Your transfer is still being decided. I'm waiting to hear back from my management as to what the decision is going to be."

Reid

Q Do you recall what his response was to that?

A Not -- not specifically, just, you know, "Keep me updated. Let me know when you hear something."

Q You had a conversation with Mr. Rinsky on June 22nd; is that correct?

A Yes.

Q Did anybody else participate in that conversation?

A I believe that was the same day that Andrew Hamilton and Kat Hicks were all on a call with Mr. Rinsky.

Q And do you recall what was said to Mr. Rinsky during that call -- strike that.

Between you, Ms. Hicks and Mr. Hamilton, who did the talking?

A Well, we all did the talking.

Q At some point during that conversation, it was communicated to Mr. Rinsky that he was going to be terminated; is that correct?

A I don't remember if he was told he was going to be terminated or he was -- if this

Reid

was the call when he was given the alternative to return. I believe this was the call where he was given the opportunity to return to New York, and if he didn't return to New York he would be terminated.

Q And that was the four day a week schedule that we discussed yesterday?

A Yes.

Q Okay. You had told Ms. Hicks via email that Mr. Rinsky had agreed in principle; do you recall that?

A Had agreed in principle to what?

Q To resign his position.

A I don't remember him saying that he had agreed in principle to resign his position or he might have said that. I -- I --

Q There was an email that we looked at yesterday that was listed as Exhibit 20. Ms. Hicks had written to you on the 22nd saying, (reading) Colin, before I call him, referring to Mr. Rinsky, did he agree to formally resign, question mark.

Your response was, (reading) he agreed in principle, but is asking for the

Reid

extension. He has not provided anything in writing. Do you recall that?

A I don't recall -- I mean, I remember the email, but I don't recall what this was about.

Q This is the email that's Exhibit 20?

A Yes, I remember seeing this yesterday that he's asking for the extension.

Q So is it your recollection that Mr. Rinsky had agreed to resign at some later point?

A I don't remember what this was about.

Q Are you aware that Mr. Rinsky has alleged that he had a conversation with you in March of 2015 concerning his desire to relocate?

A I'm aware of that, but that's not correct. We didn't have a conversation in March.

Q I know you testified to a conversation in April, but you don't recall any conversation in March?

A No, I don't.

Q Are you aware that Mr. Rinsky has alleged that you had approved his request to work with respect to yourself?

A Am I aware -- can you repeat that?

Reid

Q It's probably a bad question.
Are you aware that Mr. Rinsky has alleged that you had indicated that you were okay with him moving to Boston and transferring with the company?
MR. BERLUTI: Objection.
A Yes, I did say I was okay with it.
Q You did?
A Yeah, but I had to get it approved by the company.
Q Did Mr. Hamilton ever indicate that he was okay with Mr. Rinsky relocating to Boston?
A No, not to me he didn't.
Q Did he indicate that he rejected Mr. Rinsky's request?
A I don't remember if he rejected it. I don't remember if he told me that he rejected it.
Q My understanding of your testimony is that your position is that there are layers of approval which, with respect to Mr. Rinsky, would go from you, to Mr. Hamilton, to Mr. Maiorini; is that correct?
A Correct.

Reid

Q So how would Mr. Rinsky's request get from you to Mr. Maiorini without Mr. Hamilton's approval?

A It couldn't.

Q So if it made it to Mr. Maiorini, it had to be approved by Mr. Hamilton; is that correct?

MR. BERLUTI: Objection.

A I didn't give it to Mr. Maiorini, so I'm assuming that it was given to him by Mr. Hamilton.

Q Are you aware that Mr. Rinsky has alleged that in 2009, when he returned from cancer treatment, you had expressed concerns about his job if he had to take off more time for treatment?

A Yeah, that's not correct.

Q Do you ever recall any conversation when he returned to work in 2009 regarding his position and his treatment?

A No. And I have -- I have a retraction regarding the cancer. I googled lymphoma and lymphoma is cancer of the lymph nodes. That's not my understanding of what Yury told me about. And I mentioned it yesterday in my

testimony where it had something to do with his lungs because it was related to smoking. When this condition first started, he had a problem -- a spot on his lungs and he was getting treatment for that. So when you asked me if it was lymphoma and I said yes, I mistakenly answered that it was lymphoma, but it's not lymphoma that I was aware of. It was something to do with his lungs and I know it was apparently some cancer, but it wasn't anything to do with his neck.

Q But you knew he had some form of recurrent cancer; is that correct?

A Yes.

Q Are you aware that Mr. Rinsky has alleged that after he returned to work from cancer treatment and hospitalization for pneumonia in 2013 that you had again expressed concerns about his position with the company if he had to take more time off for treatment?

A I've seen that in the report, but it's not true.

Q Did you have any conversations with him regarding his position related to his health?

A Whatever conversation I would have

Reid

had would have been concern for his health, not to reprimand him for his health.

Q Did you have concerns that persons above you may react negatively to Mr. Rinsky taking more time off for medical treatment?

A No, I have no concerns about that because I've never reported up that he had any specific cancer treatments. He did -- he always asked me to keep it private and he never asked me to report it. The only way I would have reported it is if he needed to go on disability and I think I mentioned that yesterday. I would need to look at the files on that as needed to see if he ever went out on disability.

Q Did Mr. Rinsky ever keep you updated on the progress of his sale of his New Jersey home?

A No. The only two conversations -- well, I'm sorry. I'm not supposed to keep talking.

Q Were you aware of when the house was sold?

A I was aware when the house was sold when he sent the email on 5/17 that he was moving

Reid

to Boston. That's when I was aware the house was sold.

Q That email, though, doesn't say anything about the sale of his house, correct?

A I would have to look at the email again.

Q The email, I believe, said that he was moving to Boston for family reasons?

A Yes. This doesn't say that the house was sold. Again, I assumed the house was sold, but I might -- I assumed the house was sold based on this email.

Q What's the reason why Mr. Rinsky's employment was terminated by the company?

MR. BERLUTI: Objection. The reason for his termination was not a subject designated for Mr. Reid.

MR. SZAL: I have number 9 as being designated by all three individuals that have testified, understanding that some people are testifying only to parts of this as it --

MR. BERLUTI: As to Mr. Reid,

Reid

it applies to communications about the decision, you know, about the employment decision about his termination. Mr. Reid was involved in the communications with Mr. Rinsky. The decision, as you know from the testimony, the person designated as to the decision was Leif Maiorini. The first two components, I believe, of number 9, Mr. Maiorini was designated. The last component about the communications of that decision was Ms. Hicks and Mr. Reid.

Q The systems and software that Mr. Rinsky was responsible for as of July 2015, are they utilized in all company locations and branches?

A Not all. All is an erroneous word. Not all.

Q Some?

A Some.

Q Most?

A I would actually have to look on the list. I would say at least half -- in the U.S.

Reid

company locations in the U.S., at least half.

Q Did Mr. Rinsky have any involvement in business in Mexico?

A Yes. The system was also used in Mexico.

Q Did at some point Ms. Hicks ask you to provide information to her in the course of her investigation of Mr. Rinsky's transfer request?

A Yes.

Q What did you provide her?

A There was a letter that we went over yesterday where there were some bullet points and you asked me if I had prepared that by myself or if it was in conjunction with HR. That's the letter that I provided, some of the specific -- like the dates that I had spoken with him, conversations or emails, yes, that's what I remember providing to Ms. Hicks.

(Email dated July 2, 2015, was marked as Reid Exhibit No. 34 for identification, as of this date.)

Q Mr. Reid, I've placed a document in front of you labeled as Exhibit 34 an email from you to Ms. Hicks dated July 2, 2015; is that

Reid

correct?

A Yes.

Q Okay. Do you recall sending this email?

A Yes.

Q In the last sentence of the first paragraph, it says, (reading) because of his security access and being my back-up, I did not say anything else; is that correct?

A Correct.

Q Okay. What security access are you referring to?

A Security access to the systems meaning --

Q Of -- sorry.

A Sorry. Sorry.

Q No, I will let you answer the question.

A Security access to the system. It's basically a password that he could enter that gives him control over the production databases and the ability to terminate people's access, change people's access, add new people's access. That's basically what security access means.

Reid

Q Did anybody other than yourself and Mr. Rinsky at that time have that security access --
A Yes.
Q -- in your department?
A Yes.
Q Who else had that?
A Thomas Donlon, the IT operator, he has that access. And Anna Kleynshteyn, she could be given that access with my approval or I could provide it to her if Yury was on vacation. And if I wasn't able to get to a computer, I could also allow Anna Kleynshteyn to perform that security.
Q In the second paragraph, it reads (reading) between the time I notified Andrew, parentheses, 4:30 or 5:01, end parentheses, we did not discuss this again until I received the email from Yury on 5/17. Once Andrew saw the 5/17 email, he scheduled that meeting with us on 5/19; is that correct?
A Correct.
Q And based on your review of the documents that have been marked as exhibits in this deposition, do you still believe that to be

correct?
A If I remember correctly from yesterday, there was an email from Andrew to myself where it was sort of messed up with the to/from or from/to where he communicated something to me.
Q Okay. I show you Exhibit 4. Is that what you're referring to?
A Yes, this is what I'm referring to.
Q Okay. And the date of that email is --
A May 14th.
Q Which is obviously before May 17, correct?
A Correct.
Q Okay. The third paragraph of Exhibit 34 says, (reading) in retrospect, had he been terminated on 5/19 or shortly thereafter, we would not be having this issue. The delay in terminating him led him to believe that we were getting him a cubicle in the Boston office; is that correct?
A Correct.
Q So because he was not terminated

Reid

prior to leaving from Boston, his transfer request became an issue; is that correct?

MR. BERLUTI: Objection.

A I'm sorry. I was reading this. Can you repeat the question?

(The record was read.)

A Not in its entirety. What I meant was even if he had been terminated right after he went to Boston or earlier than this whole thing being -- this was a personal feeling that I had having worked with the guy for 20-something years that it was -- it was not -- it was dragged out too long. That was my heartfelt response. At some point, it was decided that he was going to be terminated and it just seemed to drag out where I had to be concerned about his status.

Q If Mr. Rinsky had been told between 5/17 and 5/27 that he risked termination by moving to Boston, might this have had a different outcome?

MR. BERLUTI: Objection.

Don't answer that. That calls for speculation.

Q You transferred to Miami from New

Reid

York, correct?

A Correct.

Q If somebody had told you before you left for Miami that if you left for Miami you might lose your job, would you have left?

MR. BERLUTI: Objection.

You can answer that.

A Probably not.

MR. SZAL: I don't have any other questions right now.

EXAMINATION BY MR. BERLUTI:

Q Mr. Reid, just a few questions. You were just shown an email, Exhibit 4, to you dated May 14th from Andrew Hamilton asking you let's discuss the situation with Yury.

Do you recall actually speaking with him between May 14th and May 17th on this topic?

A Speaking with Mr. Hamilton?

Q Yes.

A No.

Q Okay. So while he asked we need to discuss it, you don't recall as you sit here whether or not you did actually discuss it with him, correct?

Reid

A Correct.

Q So your email, Reid Exhibit 34 to Katrina Hicks on July 2nd, where you say, (reading) between the time I notified Andrew, April 30th or 5/1, we did not discuss this again until I received the email from Yury on 5/17, that very well could be accurate, correct?

A That is accurate.

Q How old are you, sir?

A Sixty-three.

Q Do you know how old Mr. Felix is, Edgardo Felix?

A Not exactly.

Q What is your best estimate?

A Late fifties.

Q You were asked yesterday if you found Mr. Rinsky to be trustworthy. Do you recall that?

A Yes.

Q All right. Do you believe that Mr. Rinsky was being truthful when he has taken the position in this case that you told him his transfer to Boston was approved?

A No, that was incorrect.

Reid

Q And was Mr. Rinsky also not correct when he has taken the position in this lawsuit that you told him that Andrew Hamilton approved his transfer?

A That's also not correct.

Q Is it also not true -- strike that.

You already testified today that it is not true when Mr. Rinsky says that in 2009 you told him that Cushman & Wakefield may not continue to employ him if he took more time off, correct?

MR. SZAL: Objection.

A Correct, that's absolutely -- I have no authority to do that.

Q And the same thing with his reference in 2013 after he came back from medical treatment; is that correct?

A Correct, I never said that.

Q Your correspondence with Mr. Rinsky about anything work-related, was that email correspondence always on Mr. Rinsky's Cushman & Wakefield email address?

A Yes.

Q Now, from the time Mr. Rinsky moved to Boston until June 22, 2015, he was doing some

Reid

work for Cushman & Wakefield, correct?

A Correct.

Q And he was getting paid during that entire time, correct?

A Yes.

Q After June 22nd when he was informed of his options and if he was not going to come back he either could resign or he would be terminated, did he perform any more work for the company between that date and July 10th, the date that he was terminated?

A No.

Q And he continued to get paid during that time, though, correct?

A Yes.

Q So you were asked yesterday some questions from the complaint.

MR. SZAL: Here's the actual exhibit.

MR. BERLUTI: Thank you.

Q Exhibit 7, let's go to paragraph 13. Now, in paragraph 13, it says that (reading) plaintiff has experienced health issues recently that were known to the company.

Reid

Were you aware of any health issues that Mr. Rinsky had in 2015?

A Nothing in 2015.

Q Were you aware of any health issues that Mr. Rinsky had in 2014?

A Nothing in 2014, unless that was when he broke his elbow. I know he broke his elbow, but I can't recall exactly which date. I know it was in December of some year.

Q And whenever he broke his elbow, that was an injury that he then recovered from. He had no ongoing effects from that, correct?

A Correct.

Q In all of your involvement, Mr. Reid, in evaluating Mr. Rinsky's request for transfer, did health ever -- was his health ever discussed as a factor in the company's decision?

A No.

Q Did you ever discuss that Mr. Rinsky has cancer with Mr. Maiorini?

A No.

Q Did you ever discuss that Mr. Rinsky had cancer with Mr. Cuyar?

A No.

Reid

Q Now, you've clarified today that with respect to paragraph 14 of Exhibit 7 that specifically (reading) plaintiff discussed his treatment for lymphoma and the schedule of his treatment with you, that's not accurate, correct?

A Correct.

MR. SZAL: Objection.

Q And, similarly, in paragraph 15, that (reading) plaintiff was hospitalized for two weeks in 2013 with pneumonia and underwent recurrent treatment for recurrent lymphoma, you also did not have that information, correct?

MR. SZAL: Objection. It's asked and answered yesterday.

MR. BERLUTI: This is cross-examination.

Q Go ahead. You can answer.

A Not that I remember.

Q Did you have any specific information about the form of cancer that Mr. Rinsky had, told you that he had?

A The form of cancer that I remember him telling me about was something to do with his lungs, nothing to do with his neck.

Reid

Q Now, prior to Mr. Rinsky moving to Boston, was he ever permitted to work remotely 100 percent of the time?

A No.

Q Looking at Exhibit 6, you were asked yesterday that -- on page 3, you were asked about the phrase that read, (reading) also specifically denies knowing that Rinsky had lymphoma or telling Rinsky that C&W would not continue to employ him if he took more time off. That's a true statement, isn't it?

MR. SZAL: Objection. Can we use the actual Exhibit 2?

MR. BERLUTI: I'm showing him --

MR. SZAL: Well, you've got highlights and marks all over there, so I don't think it's appropriate for you to use your own doctored document.

Q Page 3, directing your attention to the next to last paragraph that reads, (reading) also specifically denies knowing that Rinsky had lymphoma or telling Rinsky that C&W would not continue to employ him if he took more time off,

Reid

is that a true statement?

MR. SZAL: Objection.

A No.

Q It's not a true statement?

A No, it is a true statement.

Q You didn't know he had lymphoma?

A I didn't know he had lymphoma.

Q Right. And you never told him that C&W would not continue to employ him if he took more time off, correct?

A Correct. I would never tell him that.

Q Now, you were asked questions yesterday as to whether or not Mr. Rinsky was able to perform his job remotely. As I understand it, his job consisted of two aspects. One was the technical and one was the business side; is that correct?

A Correct.

Q What part of his job would be more difficult or would be impaired if he did it remotely all of the time?

MR. SZAL: Objection.

A Business.

Reid

Q Now, you testified that even after your transfer you agreed to come to New York when you needed to be in New York; is that true?

A Correct.

Q In fact, you actually continue to own a home in the New York area, correct?

A Correct.

Q And you got called back to New York for two weeks in May of 2015 because of problems with the deliverable of the implementation of a system, correct?

A Correct.

MR. BERLUTI: Can I have Exhibit 15, please?

Q You were asked questions about Exhibit 15. Do you recall that?

A Yes.

Q And you were asked if it was the company's position to do the items listed in paragraphs 1 through 6; do you recall that?

A Yes.

Q All right. I would like to direct your attention to the first line. (Reading) Colin and I reviewed our options with Kat today. Here

Reid

is what we would like to do.

Was this a proposal? Was Exhibit 15 a proposal to Mr. Maiorini --

MR. SZAL: Objection.

Q -- that you and Mr. Hamilton or that Mr. Hamilton was advancing after speaking with you and with Katrina?

A Yes.

Q Did Mr. Maiorini ever approve the action items on 1 through 6 on Exhibit 15?

MR. SZAL: Objection.

A I don't know. I don't know if he approved it because I don't recall getting an email that it was approved.

Q Well, did the action -- let me ask you this: Specifically, that (reading) we believe we must retain Yury for about nine weeks to cover critical workday and MK work only, Mr. Rinsky was never retained for nine weeks, was he?

A No.

Q Is that because -- strike that.

Did Mr. Cuyar ever agree that Mr. Rinsky could be approved for nine weeks?

MR. SZAL: Objection.

Reid

A I don't recall. I don't have any proof that he made that request.

Q Mr. Cuyar never authorized retaining Mr. Rinsky for a period of nine weeks after May 27th 2015, did he?

A Not that I'm aware of.

Q And in response to Exhibit 15, is it possible that Mr. Maiorini responded to Mr. Hamilton and/or you verbally as opposed to through email?

MR. SZAL: Objection, speculation.

A It's possible, but I don't remember.

Q Right.

MR. BERLUTI: Okay. I have nothing more.

RE-EXAMINATION BY MR. SZAL:

Q Just a few more, Mr. Reid.

Mr. Cuyar no longer works for the company; is that correct?

A Correct.

Q Okay. And he would be the best source of information as to what he did or did not approve, correct?

Reid

A Correct.

Q Okay. And Exhibit 6 that we looked at yesterday, I believe it was your testimony that you didn't provide any information in order for the company to provide this response, correct?

MR. BERLUTI: Objection.

A Which response?

Q This document, the first seven pages that are listed as Exhibit 6.

A Correct.

Q And with respect to Exhibit 7, I believe you testified that you had not provided information to the company in order for it to respond to the complaint which is contained in its answer in Exhibit 8; is that correct?

MR. BERLUTI: Objection.

A Correct.

Q And we began your testimony yesterday, correct?

A Correct.

Q And we had to suspend your deposition and continue to today due to alleged scheduling problems with Ms. Hicks' availability; is that correct?

Reid

A Correct.

Q Did you have a chance to think about your deposition testimony from yesterday overnight?

A Yes.

Q In those thoughts, were there some answers that you had wished you had given differently?

A Primarily, the one about the cancer. I struggled with the cancer question and I actually googled it.

Q But, again, you understood that he had recurrent cancer, correct?

A Yes.

Q Which means it comes back and wasn't cured, correct?

A Yes.

Q Which means it was going to come back at some point again, correct?

MR. BERLUTI: Objection.

A Yes.

MR. BERLUTI: He's not a medical doctor. He doesn't know what's going to happen. Nobody knows.

Q That was a yes?
A Yes.
MR. SZAL: That's all I have. And I am, again, suspending Mr. Reid's deposition for the reasons put on the record with respect to Ms. Hicks and Mr. Maiorini, and I note Mr. Berluti's objections will be the same to this.
MR. BERLUTI: That's correct.
(Whereupon, at 2:25 o'clock p.m., the deposition was suspended.)

CAPTION

The Deposition of COLIN REID, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

The Deponent will read and sign the transcript of said deposition.

C E R T I F I C A T E

STATE OF________________________________:

COUNTY/CITY OF_______________________________:

Before me, this day, personally appeared COLIN REID, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_________________________

COLIN REID

SUBSCRIBED and SWORN to before me this___________ day of _____________, 2017, in the jurisdiction aforesaid.

_______________________ _____________________

My Commission Expires Notary Public

DEPOSITION ERRATA SHEET

RE:
FILE NO.
CASE CAPTION: Yury Rinsky vs. Cushman & Wakefield, Inc.
DEPONENT: Colin Reid
DEPOSITION DATE: February 24, 2017

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request for the following changes be entered upon the record for the reasons indicated.

I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________
___________________________________________________

SIGNATURE:_______________________ DATE:___________
Colin Reid

# I N D E X


| Witness | Examination by: | Page |
|---|---|---|
| COLIN REID (cont'd) | Mr. Szal | 115, 169 |
| | Mr. Berluti | 159 |


# E X H I B I T S


| Reid For Ident. | Description | Page |
|---|---|---|
| 29 | Defendant Cushman & Wakefield, Inc.'s Responses to Plaintiff Yury Rinsky's First Set of Interrogatories | 115 |
| 30 | Email dated 4/22/2015 | 123 |
| 31 | Email dated 5/13/2015 | 128 |
| 32 | Email chain dated May 30, 2015 | 129 |
| 33 | Document entitled, Consulting Services Agreement | 140 |
| 34 | Email dated July 2, 2015 | 154 |

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

I, CAROL MELE, a Registered Professional Shorthand (Stenotype) Reporter and Notary Public of the State of New York, do hereby certify that the foregoing Continued Deposition of the witness, COLIN REID, taken at the time and place aforesaid, is a true and correct transcription of my shorthand notes.

I further certify that I am neither counsel for nor related to any party to said action, nor in any wise interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of March, 2017.

_______________________________

Carol Mele, RPR