Berluti McLaughlin & Kutchin
COUNSELLORS AT LAW
BMK

ROBERT R. BERLUTI
RBERLUTI@BMKLEGAL.COM

November 12, 2015

**VIA FACSIMILE- (617) 994-6024**
Tania Taveras
Administrative Assistant to Pamela Myers
Massachusetts Commission Against Discrimination
1 Ashburton Place
Boston, MA 02108

Re: **Yury Rinsky V. Cushman & Wakefield, Inc.**
MCAD Docket Number: 15BEM02468
EEOC/HUD Number: 16C-2015-02214

Dear Ms. Taveras:

This firm represents Cushman & Wakefield, Inc. ("C&W") in the above referenced matter. This letter serves as respondent's Position Statement in response to the allegations contained in the Charge of age discrimination and disability discrimination filed by Yury Rinsky ("Rinsky"). C&W unequivocally denies that it discriminated against Rinsky in any manner, and requests that the Charge be dismissed with the finding of no probable cause.

## I. INTRODUCTION

Rinsky's Charge of Discrimination is completely baseless. As detailed below, the evidence reveals there was no job action taken against Rinsky until he abandoned his position at C&W's headquarters in New York City, where he had worked since 1988, and moved to a suburb of Boston, Massachusetts. The decision to terminate Rinsky had nothing to do with his age or any disability. He was terminated because he abandoned his position.

## II. FACTS

### A. Background of Cushman & Wakefield

C&W is a global commercial real estate services company (hereafter referred to as "the Company" or "C&W"). The Company's global headquarters is located in Chicago with regional headquarters in New York (Americas), London and Sydney. C&W operates in more than 60 countries and has over 43,000 employees. On May 15, 2015, DTZ Jersey Holdings, LLC, backed by private equity giant TPG, agreed to buy C&W. On September 1, 2015, C&W and

DTZ, another commercial real estate services firm also a holding of TPG, was merged into C&W with the C&W name surviving. See Exhibit A.

Information technology is among the functions headquartered in the New York City office. The Global Chief Information Officer is in New York City. The functions of information technology at C&W include information security, application development and design, infrastructure and customer relations. One of the systems located in New York is known as the AS 400 System that was used for commissions, billing and accounting. The AS 400 was supported by C&W's relationship with IBM in New York. The AS 400 and the team that supports it is located in New York. Its primary internal customers are C&W's employees in the finance department. The finance department is located in New York City.

**B. Rinsky's employment at C&W**

C&W hired Rinsky in 1988 as a Senior Systems Analyst earning $50,000.00. He received periodic performance evaluations and several increases in his salary. For 2015, his job title was Information Technology Project Manager and he was earning over $100,000.00 per year. From 1988 until May 2015, Rinsky's job was always located in New York City. Mr. Rinsky was a member of the AS 400 team within the Infrastructure Division of the Global Information Technology Department. Colin Reid ("Reid") was Rinsky's immediate supervisor. Reid is the Managing Director of Infrastructure. Reid reported to Andrew Hamilton, the Managing Director, Enterprise Financial and Human Resource Systems, who reported to Leif Maiorini, Senior Managing Director of Solutions, Design and Delivery, who in turn reported to Craig Cuyar, the Global Information Officer.

According to Paragraph 7 of the Particulars of Rinsky's Charge of Discrimination, in December 2014, he and his wife bought investment property in Winchester, Massachusetts. On April 30, 2015, Rinsky met with Reid and informed him that he had decided to relocate to Boston. Rinsky requested a transfer to C&W's Boston office to work remotely. Reid informed Rinsky that the approval would require several layers including Andrew Hamilton, Leif Maiorini and Craig Cuyar. Reid had no authority on his own to approve Rinsky's request to work remotely. Reid understood that he did not have the authority to approve the request and told Rinsky that the process may take several months prior to a conclusion being reached.

There is no correspondence or discussion between Reid and Rinsky about Rinsky's request. On May 17, 2015, Rinsky emailed Reid with the subject being "Moving to Boston" and stated "As discussed, I will be moving to Boston on May 27, 2015 for family reasons and need to take four personal days after Memorial Day (5/26 – 5/29)". Attached as Exhibit B is a copy of the email. The second sentence of the email shows that Rinsky knew he had not received approval for the transfer. It states "I am confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved." The only reasonable inference to be drawn from Rinsky's own words is that he knew his transfer had not yet been approved.

CAC

This May 17, 2015 email presented Rinskey's move to Boston as a fait accompli. In light of his 27 year employment history, C&W acted in the utmost of good faith and continued to consider his request to transfer. Rinsky was granted the four personal days off at the end of May as he requested. C&W placed Rinsky on paid administrative leave while C&W completed the consideration of his request. C&W ultimately concluded that he could not perform his job remotely in Boston. Reid did not hear from Rinsky again until June 22, 2015. Reid denies that he ever told Rinsky that Andrew Hamilton approved his request. Rinsky was well aware that there were four to five levels of approvals that had to be secured in order to grant his request and then the branch, the Boston office, had to also approve his transfer to their office. Reid was shocked to learn from Rinsky that he had sold his home and had moved to Boston.

Rinsky's claim that he was unaware of the process is wholly specious. In addition to requiring the approvals within the Information Technology Division in New York as well as at the branch level (Boston), Rinsky knew that Human Resources would have to issue the appropriate documentation for his transfer. With over 43,000 employees, utter chaos would occur if managers verbally approved transfers with no documentation.

Reid denies ever telling Rinsky that:

(i) Hamilton approved his request (par. 8 of Exhibit A of the Charge);
(ii) Only Hamilton needed to approve his request (par. 8);
(iii) It would take about 2 to 3 weeks after his move for his workspace to be set in in the Boston office (par. 9).

On June 22, 2015, after notifying Rinsky that his relocation request was denied, Reid offered Rinsky his job if he agreed to be physically present in New York at least four days per week. Rinsky rejected Reid's offer. Craig Cuyar, the Global Chief Information Officer, authorized one additional week of paid administrative leave.

On July 14, 2015 Reid corresponded with Rinsky recapping their conversation with Rinsky of July 6, 2015 and July 10, 2015. See Exhibit C.

C&W was left with no choice but to terminate Rinsky for abandonment of his job.

Reid also specifically denies knowing that Rinsky had lymphoma or telling Rinsky that C&W would not continue to employ him if he took more time off. (Par. 6). Rinsky is very private and did not share his physical condition with Reid. There is no record of Rinsky informing anyone at C&W about his lymphoma. Moreover, he never requested an accommodation as a result of having lymphoma. Over his 27 year employment, Rinsky went out on short term disability because of unrelated medical conditions and never suffered any negative employment consequences.

On July 16. 2015 Rinsky's attorney, Mark Szal, sent a demand letter to C&W. See Exhibit D. C&W immediately investigated the allegations. On July 22, 2015 C&W through its attorney, Stephanie Mercer, responded stating that Rinsky was terminated because he abandoned his job. See Exhibit E.

## III. LEGAL ARGUMENT

### A. Rinsky's age discrimination claim must be dismissed.

Rinsky's claim must be dismissed as he cannot meet his burden of proving all four elements of his age discrimination claim: (a) membership in a protected class; (b) harm; (c) discriminatory animus and (d) causation. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39 (2005). Although Rinsky is 65 years old, and therefore presumptively a member of a protected class, his claim must fail because he cannot prove that C&W acted with any discriminatory motive or state of mind and that there was any causal link between a discriminatory animus and C&W's decision to terminate Rinsky. See Sullivan, 444 Mass. At 49-50; Lipchitz v. Raytheon Co., 434 Mass. 493, 504-506 (2001); Weber v. Community Teamwork, Inc., 434 Mass. 761, 775 (2001). Rinsky has not alleged any direct evidence of discriminatory animus. As a result, he must proceed according to the three-stage, burden shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). The three stages first require Rinsky to establish a *prima facie* case. The burden then shifts to C&W to articulate some legitimate, non-discriminatory reason for the termination and then it reverts to Rinsky to establish the articulated reason was a pretext for discrimination. Abramian v. President and Fellows of Harvard College, 432 Mass. 107, 117 (2000). The three-stage order of proof "does not circumvent the plaintiff's burden to prove all the essential elements of a discrimination claim…" Knight v. Avon Prods., Inc., 438 Mass. 420, 421 (2003). Rinsky has offered no evidence to support even an inference of discriminatory animus on the basis of age, much less evidence to show that any such animus caused the termination decision. As such, Rinsky's age discrimination claim fails and the Charge should be dismissed.

### B. Rinsky cannot meet his burden of proving discriminatory action

1. *Rinsky's allegations fail to establish a prima facie case of discrimination.*

Rinsky has failed to establish a *prima facie* case of age discrimination. To establish a *prima facie* case of discrimination on the basis of age, Rinsky must show that: (1) he is in a protected class; (2) he met the employer's legitimate job performance expectations; (3) his employer subjected him to an adverse employment action; and (4) he was replaced by a similarly or less qualified person who was substantially younger. Knight, 438 Mass. At 420-421.

Without even addressing the first three elements of this *prima facie* case, the Commission can dismiss the Charge because Rinsky was not replaced by a similarly or less qualified younger person… [Has Rinsky been replaced? If so what is the age of the person that replaced him?]

2. C&W had a legitimate, non-discriminatory reason for terminating Rinsky.

Even if Rinsky could establish a *prima facie* case of discrimination, C&W has articulated a legitimate non-discriminatory reason for the termination. Lipchitz, 434 Mass. At 501. C&W terminated Rinsky because of his abandonment of his position and because he failed to perform

TAC

his work in the New York City office. Rinsky has provided no evidence that any member of his team, the AS400 team, performs his or her job outside of New York City. Moreover, Rinsky's customers were in the finance department located in New York City. Rinsky performed hands on work on the AS400 system. He needed to meet with members of his team and they are located in New York City. In addition, given the merger with DTZ that closed a few months later on September 1, 2015, there were many transitional things happening and would be happening in the workplace that made a transfer particularly difficult.

3. Rinsky has no evidence that C&W's action was motivated by discriminatory animus based on age.

Faced with C&W's legitimate, non-discriminatory reason for its action, Rinsky now bears the burden of proving by a preponderance of credible evidence that C&W's action was motivated by unlawful age animus. Sullivan, 444 Mass. At 54-55. Thus, the burden on Rinsky was to produce evidence sufficient to support a finding that: (1) the reason(s) articulated by C&W was not the real reason for its actions (i.e. pretext); and (2) C&W's actions were the result of discriminatory age animus. Blare v. Husky Injection Molding Systems Boston, Inc., 419 Mass. 437, 442 (1995). Rinsky has not met his burden.

First, Rinsky cannot produce any evidence that C&W's stated reason of job abandonment was pretextual. Rinsky has not pointed to any evidence to suggest that the motive behind C&W's termination of him was due to anything other than Rinsky's unilateral move to Boston and his refusal to perform his job in New York City. Second, Rinsky cannot offer any evidence that C&W's actions were motivated by discriminatory age animus. Indeed, before terminating Rinsky, C&W offered Rinsky's job in New York City to him which Rinsky refused.

Absent any evidence of pretext and discriminatory animus, Rinsky's claim fails and the Commission must enter a finding that there is no probable cause to credit his allegations. Saposnik, 2005 WL 2009507, at *5-7 (holding that factors such as plaintiff's age at hire, retention for four years and older ages of employees within the department "negated an inference of discriminatory animus towards him on the basis of age"); Mesnick v. General Elec. Co., 950 F.2d 816, 823-824 (1st Cir. 1991) (stating that the court will not draw speculative inferences, and plaintiff must point to specific facts that support discriminatory intent).

**C. Rinsky cannot meet his burden of proving causation.**

Finally, Rinsky asserts no evidence that discriminatory animus caused his termination. In order to prove causation, Rinsky must establish that C&W terminated him because he is over 40 years of age. Sullivan, 444 Mass. at 49-50 n. 24; Freeman v. Package Mach. Co.; 865 F.2d 1331, 1335 (1st Cir. 1988). Generally, causation is proved by some evidence that discriminatory animus infested the decision-making process leading to the adverse action upon which a complainant's case is based. Id.

Rinsky cannot produce any evidence that C&W took his age into consideration when it decided to terminate him. To the contrary, the record is clear that C&W employed Rinsky for 25

TAC

years while he was in the protective class of workers over the age of 40. Moreover, C&W was willing to continue to employ Rinsky provided that Rinksy was willing to perform his job in New York City. Without any evidence of C&W's consideration of Rinsky's age and its decision to terminate him, Rinsky cannot establish the causation element of his age discrimination claim. See Landry v. Dana-Farber Cancer Institute, Inc., MCAD Docket No. 97-39999 (July 17, 2002) (dismissing discrimination claim where evidence "did not establish a nexus" between employment actions and alleged animus). Accordingly, the Commission must dismiss the Charge with a finding of no probable cause.

**D. Rinsky claim for disability discrimination must be dismissed.**

To prove disability or handicap discrimination, Rinsky must allege that C&W discriminated against him because of his handicap. To recover, Rinsky must prove:

1. that he was a qualified handicapped person capable of performing the essential functions of his job with or without reasonable accommodation;
2. he requested such accommodation, and the employer refused to provide it; and
3. as a result of this refusal, Rinsky suffered some harm.

See G.L. c.151B, §4(16); Alba v Raytheon, 441 Mass. 836, 843 n.9 (2004); New Bedford v. MCAD, 440 Mass. 450, 461-62 (2003).

Although cancer qualifies as a disability under the ADA, there is no evidence that Rinsky ever informed anyone at C&W that he suffered from it. Rinsky exercised his right not to disclose his lymphoma. This decision is understandable since there were no issues with Rinsky's job performance. C&W periodically evaluated Rinsky's job performance over his 27 years and he received good evaluations, often accompanied with pay raises.

Rinsky never requested an accommodation due to his disability. In Paragraph 7 of Rinsky's Charge of Discrimination, he states that in December 2014, he and his wife purchased property in Winchester, Massachusetts as *investment* property. In April 2015, he decided to inquire whether C&W would allow him to work from C&W's Boston office, "as my duties could just as easily be performed in Boston (or remotely) as in New York". Nowhere in the Particulars, nor in his demand letter sent to C&W prior to filing his Charge of Discrimination, does he allege that his transfer request had anything whatsoever to do with his medical condition.

In the end, Rinsky and C&W disagree on whether Rinsky's duties can be performed from Boston. C&W decision has nothing to do with Rinsky's medical condition. C&W is permitted within the bounds of the law to make the employment decision it deems best for its business.

In conclusion, Rinsky has presented no evidence of discrimination of any type that caused C&W to terminate his employment. The termination resulted from Rinsky's self-inflicted abandonment of his job by moving to Boston and unilaterally deciding he could work out of the

Boston office. Accordingly, the MCAD should dismiss his Charge of Discrimination and enter a finding of no probable cause.

Please contact me if you have any questions.

Very truly yours,

Robert R. Berluti

RRB/cd
Enclosures
Cc: Mark D. Szal, Esq. (w/enclosures)

VERIFICATION

I, Craig Cuyar, hereby under oath depose and state: I am the Global Information Officer of Cushman & Wakefield, Inc.; I have reviewed the foregoing Position Statement; and make this verification on behalf of the Corporation; that to the best of my knowledge, information and belief the information set forth in the Position Statement is true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Cushman & Wakefield, Inc.

By: ____________________ Date: November 16, 2015
Craig Cuyar, Global Information Officer

Witness:
Susan Bennette

# EXHIBIT A

CUSHMAN & WAKEFIELD

< BACK TO NEWS (/EN/NEWS)

# CUSHMAN & WAKEFIELD AND DTZ ANNOUNCE COMPLETION OF MERGER

## CREATES ONE OF THE LARGEST COMMERCIAL REAL ESTATE SERVICES FIRMS IN THE WORLD

CHICAGO, Sept. 2, 2015 – The new Cushman & Wakefield, a global leader in commercial real estate services, announced today the successful completion on September 1 of the merger between Cushman & Wakefield and DTZ.

The new Cushman & Wakefield draws on the best of both legacy organizations to create one of the world's largest real estate services firms, with a combined total of $5 billion in revenue, 43,000 employees, more than 4.3 billion square feet under management, and $191 billion in transaction value. Cushman & Wakefield will be led by Chairman & Chief Executive Officer Brett White and Global President Tod Lickerman. Cushman & Wakefield is owned by an investor group composed of TPG, PAG, and OTPP.

"This is a game-changing event in commercial real estate," said Mr. White. "Both legacy firms had been aggressively growing their respective platforms and deepening their reach into the market with new acquisitions and talent. Now we have the opportunity to see these ambitions come together – capturing the momentum in the market and clearly claiming our position at the top of the industry."

Cushman & Wakefield now operates in more than 60 countries around the world and is well positioned in every major market for continued growth. The new Cushman & Wakefield is a top-tier global commercial real estate services provider in every service line and every major geography in the world. With a tenacious, entrepreneurial, and client-centric culture of highly skilled people behind both firms, the new company will be able to tap into greater resources worldwide to ultimately deliver superior results for clients.

Mr. Lickerman said, "The completion of the merger is a historic leap forward, but it isn't the end of our journey. Today is an important milestone that propels us into a future rich with opportunity for our clients, our people, and our company."

"The formation of the new Cushman & Wakefield is the next chapter in the most exciting growth story in the real estate industry," said David Bonderman, TPG Founding Partner. "TPG is excited to partner with Brett and his management team as they continue to grow the business."

**Leadership**

Cushman & Wakefield has built a team that will provide the experience, management skill, business acumen, and client-service expertise necessary to bring an aggressive growth strategy and global platform to life. The new leadership has developed an operating model to organize and mobilize for clients locally, regionally, and globally.

"I am confident that our people, armed with exceptional resources and the excitement of being in the center of this powerful evolution of our industry, will deliver a level of service and quality to our clients equal to the very best our industry has to offer," said Mr. White.

**Global Leadership**

Brett White – Chairman & CEO

Tod Lickerman – Global President

John Santora – Global Chief Operating Officer & Global Chief Integration Officer

Duncan Palmer – Global Chief Financial Officer

Brett Soloway – Global General Counsel

Matthew Bouw – Global Chief Human Resources & Strategy Officer

Adam Stanley – Global Chief Information Officer

**Regional Leadership**

Joe Stettinius – Chief Executive Americas

John Forrester – Chief Executive EMEA

Edward Cheung – Chairman APAC Board & Chief Executive Greater China

Stuart Roberts – Chief Executive APAC

**Service Line Leadership**

Carlo Barel di Sant'Albano – Chairman EMEA and Chief Executive Global Capital Markets & Investor Services

Steve Quick – Chief Executive Global Occupier Services

John Busi – President Valuation & Advisory, Americas & Global Practice Lead

Paul Bedborough – President, C&W Services

Chris Cooper – Chief Executive, DTZ Investors

**New Visual Identity**

As part of the announcement, Cushman & Wakefield is also unveiling a new visual identity and logo reflecting the legacy of a trusted global brand, drawing on a wider history, and positioning the firm for the future.

CUSHMAN & WAKEFIELD

-END-

**About Cushman & Wakefield**
Cushman & Wakefield is a global leader in commercial real estate services, helping clients transform the way people work, shop, and live. The firm's 43,000 employees in more than 60 countries provide deep local and global insights that create significant value for occupiers and investors around the world. Cushman & Wakefield is among the largest commercial real estate services firms with revenues of $5 billion across core services of agency leasing, asset services, capital markets, facility services (branded C&W Services), global occupier services, investment management (branded DTZ Investors), project & development services, tenant representation, and valuation & advisory. To learn more, visit www.cushmanwakefield.com (http://www.cushmanwakefield.com) or follow @CushWake (https://twitter.com/CushWake?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor) on Twitter.

**About TPG**
TPG is a leading global private investment firm founded in 1992 with approximately $75 billion of assets under management and offices in San Francisco, Fort Worth, Austin, Dallas, Houston, New York, Beijing, Hong Kong, London, Luxembourg, Melbourne, Moscow, Mumbai, São Paulo, Shanghai, Singapore and Tokyo. TPG has extensive experience with global public and private investments executed through leveraged buyouts, recapitalizations, spinouts, growth investments, joint ventures and restructurings. The firm's investments span a variety of industries including

healthcare, energy, industrials, consumer/ retail, technology, media & communications, software, financial services, travel, entertainment and real estate. For more information visit www.tpg.com (http://www.tpg.com).

**About PAG**

PAG is one of the largest Asian based alternative investment managers with funds under management across Private Equity, Real Estate and Absolute Return strategies. PAG currently has US$12 billion in capital under management, with over 300 staff and offices in Hong Kong, Shanghai, Tokyo, Beijing, Sydney, Singapore, Seoul, Shenzhen, and Delhi. PAG Asia Capital ("PAGAC"), the private equity strategy of PAG, is a pan-Asian buyout fund and its current portfolio includes control and structured investments across the financial services, pharmaceuticals, automotive services, media and entertainment and consumer retail sectors. In addition to the extensive investment experience in private equity, PAG has a solid track record in real estate, completing over 500 real estate related transactions throughout Asia with total investment value in excess of US$20 billion. For more information visit www.pagasia.com (http://www.pagasia.com).

**About OTPP**

With C$154.5 billion in net assets as of December 31, 2014, the Ontario Teachers' Pension Plan is the largest single-profession pension plan in Canada. An independent organization, it invests the pension fund's assets and administers the pensions of 311,000 active and retired teachers in Ontario. For more information, including our annual reports from 2014 and previous years, visit www.otpp.com (http://www.otpp.com). Follow us on Twitter @Otppinfo (http://www.otpp.com).

**For Further Information Contact:**

Brad Dugard
Managing Director, Corporate Communications
+1 647 268 4599
brad.dugard@cushwake.com (mailto:brad.dugard@cushwake.com?subject=Merger announcement)

Brad Kreiger
Head of Global Communications
+1 312 424 8010
brad.kreiger@cushwake.com (mailto:brad.kreiger@cushwake.com?subject=Merger announcement)

# EXHIBIT B

**From:** Yury Rinsky
**Sent:** Sunday, May 17, 2015 3:59 PM
**To:** Colin Reid
**Subject:** Moving to Boston

Colin,

As discussed I will be moving to Boston on 5/27/2015 for family reasons and need to take 4 personal days after Memorial Day (5/26 -- 5/29).

I am confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved.

Thanks

# EXHIBIT C

CUSHMAN & WAKEFIELD.

July 14, 2015

Yury Rinsky
36-42 Gardenview Terrace
Fair Lawn, NJ 07410

Dear Yury,

This letter serves as a recap of our conversation of July 6, 2015.

First, I took a moment to review how we got to this point....

- Back on 4/30/15, you and I discussed the possibility of your moving to Boston. You informed me you had decided to relocate, that you had taken out a home equity loan, put your home up for sale, and purchased a home in Boston.
- In that meeting, I told you a request to work remotely had to go through the IT process, requiring approvals from Andrew Hamilton, Leif Maiorini, and Craig Cuyar. I also reminded you that my own personal relocation had taken several months to be approved. You asked me to do my best to get your request approved. Given the discussion about the approval process, you knew it was a possibility that your request would not be approved.
- At no time in our conversation did I commit or approve your request to work remotely
- You and I did not discuss the matter again until I received your email on 5/17, in which you indicated you would "be moving to Boston on 5/27/2015 for family reasons" and that you needed to take 4 personal days after Memorial Day (5/26 – 5/29)
- As a courtesy, we placed you on paid leave while we looked in to the issue. Meanwhile, I discussed your request with Andrew, Leif and Craig. In the end, the request was not approved because the work itself must be performed in the NYC office.
- In our conversation on June 22, I indicated your role must be performed in the NYC office, and offered you the chance to return to your job here. You refused the offer.

I then outlined where things stood as of July 10:

- Because you are not willing to perform your duties in our NYC office, your employment will as of Friday, July 10th. This equates to three weeks of non-work pay as a transition from the company.
- I provided you the option to voluntarily resign your position. If that was not your choice, I indicated your employment will be terminated by C&W as "Job abandonment". I also outlined that you are not eligible for severance because your role has not been eliminated
- You responded you were not going to resign. As such, you have been terminated from the company, effective July 10, 2015.
- In the next few days, you will receive a termination letter from HR that outlines what happens with your final pay and benefits.

If you have any questions, please call me at (212-841-7845) or Katrina Hicks, our aligned HR Director at (212-713-6735).

Yury, I'm sorry your employment is ending this way. I wish you well in your future endeavors, and thank you for your service with Cushman and Wakefield.

Sincerely,

Colin H. Reid

Colin H. Reid
Managing Director
Sr IT Infrastructure Manager

Cc: Yuri Rinsky employment file
CC: Katrina Hicks, HR Manager, Corporate Groups

# EXHIBIT D

Szal Law Group LLC
LITIGATION & COUNSELING

*BOSTON*
*589 Tremont Street, Suite 4*
*Boston, Massachusetts 02118*

*Main 617.830.2494*
*www.szallawgroup.com*

*CAPE COD*
*40 Worcester Court*
*Falmouth, Massachusetts 02540*

*Mark D. Szal, Esq.*
*mark@szallawgroup.com*

July 16, 2015

***Via Email and First Class Mail***

Ms. Katrina Hicks
Human Resources Manager
Cushman & Wakefield
1290 Avenue of the Americas
New York, New York 10104-6178

**Re: Yury Rinsky**

Dear Ms. Hicks:

This Firm represents Yury Rinsky in connection with the termination of his employment with Cushman & Wakefield (the "Company"). Mr. Rinsky, an employee of the Company since 1988, is sixty-four years of age with a history of lymphoma. Recently, Mr. Rinsky asked if his worksite could be reassigned from New York to Boston, and multiple layers of management approved his request. After selling his house in New York and moving to Boston, the Company later revoked its approval and terminated Mr. Rinsky when he refused the Company's demand that he resign. These actions were taken was despite the fact that Mr. Rinsky had performed his assigned duties for the Company at an acceptable level for 27 years.

The actions of the Company are clearly contrary to state and federal anti-discrimination laws. It is our intention to file a Charge of Discrimination in the appropriate forum unless we hear from you or your representative promptly to discuss resolution. Please also accept this letter as an immediate demand for production of Mr. Rinsky's personnel file with the Company.

**Background**

Mr. Rinsky was hired by the Company in June of 1988 as a Senior Systems Analyst, and worked in that role for approximately 10 years. In 1998 he was promoted to Project Manager. In 2009, the Company's Information Technology management was completely replaced, and during this time Mr. Rinsky's position was changed to Software Engineer II. Mr. Rinsky viewed this to be a demotion despite the fact that his salary stayed the same.

During his tenure, Mr. Rinsky played a key role in the development of various projects for the Company's core business system (Legacy), reporting to Managing Director Colin Reid. He was responsible for conceptual design, detail design, development, testing, implementation, post-implementation maintenance and support of business software for the Legacy system. The software is used in all Company offices in the United States and Mexico.

Mr. Rinsky generally worked directly with users with little or no supervision, completing most projects either on his own or with a small group of independent consultants under his supervision. Mr. Rinsky's annual reviews were always "very good" or "meeting expectations"; for most years, he received a rating of "expert" or "exceeds expectations."

Mr. Rinsky has experienced health issues recently that were known to the Company. In 2013, Mr. Rinsky was hospitalized for two weeks with pneumonia and underwent treatment for recurrent lymphoma. During these times, Mr. Rinsky worked remotely when he was not able to be in the office and tried to take off as little time as possible. Upon returning to work from lymphoma treatment, Mr. Rinsky was told by Mr. Reid that the Company would not keep him employed if he took more time off for something similar soon.

In December 2014, Mr. Rinsky and his wife bought an investment property in Winchester, Massachusetts. In the beginning of April 2015, Mr. Rinsky decided to inquire as to whether the Company would allow him to work from the Company's Boston office. Mr. Rinsky's duties could just as easily be performed in Boston (or remotely) as in New York.

Mr. Risky requested a meeting with Mr. Reid to discuss "something important." At the beginning of the meeting, Mr. Reid expressed relief that the meeting was not to discuss further health problems of Mr. Rinsky. Mr. Reid stated that Mr. Rinsky's request to work from Boston was acceptable to him, but that it needed to be cleared with his manager, Andrew Hamilton. A week later, Mr. Reid told Mr. Rinsky that Mr. Hamilton approved his request as well.

As a result of the Company approving his request to work from Boston, Mr. Rinsky put his home in New York on the market. On May 15, 2015, Mr. Rinsky received a cash offer for his New York home. Two days later, Mr. Rinsky told Mr. Reid about the offer and that he intended to move to Boston at the end of May. Mr. Reid raised no objection. Two days later, Mr. Rinsky and Mr. Reid spoke again about the move; Mr. Rinsky was told that it would take about 2 to 3 weeks after his move for his workspace to be set up in the Company's Boston office. As a result of Mr. Reid's additional

confirmation that Mr. Rinsky could move to Boston, Mr. Rinsky accepted the cash offer and sold his New York home.

Mr. Rinsky took 3 approved personal days to move to Winchester, Massachusetts and began to work remotely on Friday, May 29, 2015 as he awaited the setup of his workspace at the Company's Boston location. On June 2, 2015, Mr. Rinsky emailed Scott Sommer to inform him that he would need his desktop computer in a couple of weeks when he was provided his workspace in the Company's Boston office. Mr. Reid, copied on the email, told Mr. Sommer to wait until Tuesday when he was back in New York, and that "Yury might be getting new equipment for Boston, since I have an AS400 consultant sitting there next week."

Mr. Rinsky continued to work remotely in June. On June 22, 2015, Mr. Rinsky was informed by Mr. Reid that the Company now determined that he could not work in Boston, and were demanding that he resign. He was provided with a draft resignation request that Mr. Rinsky was told that the Company's Human Resources Department was expecting, which read:

> *After informing you of my decision to relocate and understanding the need for my role is located in the C&W NY office, I have decided not to continue my employment. Therefore I formally resign and my last day with C&W will be June 22, 2015.*

Mr. Rinsky refused to resign, and was told that if he did not, he would be terminated. Mr. Rinsky contacted the President of the Company on June 25, 2015 concerning his expected termination, and was told by Human Resources that the matter would be reviewed. On Monday July 6, 2015, Mr. Rinsky was informed that the Company's decision stood and that he would be terminated effective July 10, 2015.

On July 14, 2015, Mr. Rinsky received a letter from Mr. Reid that purported to summarize the events leading up to Mr. Rinsky's termination. The letter, sent 4 days after Mr. Rinsky's termination and weeks/months after events that are referenced, is full of inaccurate and false statements that appear to be an attempt to "document" a revised history and provide the Company with a justification for its actions.

## Applicable Law

State and federal law prohibit age and handicap discrimination in employment. See, e.g. G.L. c. 151B; 29 U.S.C. 621 *et seq.* Employees over the age of 40 are protected from discrimination. Further, any employee who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with a

reasonable accommodation, is deemed to be a qualified handicapped person and thus also protected from discrimination.

Even if a company can articulate a legitimate non-discriminatory reason for its adverse employment decision regarding a protected employee, that employee may establish that the proffered reasons were not the real reasons, but rather were a "pretext" for age discrimination. Taking an adverse employment action based on age or handicap is actionable, and entitles a successful plaintiff to lost wages and benefits, emotional distress, and attorneys' fees and costs, among other damages.

The conduct of the Company also gives rise to common law claims, including but not limited to negligent misrepresentation and promissory estoppel.

**Pre-Litigation Document Preservation Demand**

We formally request that you take steps to preserve all evidence, in any form, that in any way concerns, refers or relates to Mr. Rinsky's employment with the Company and termination, including but not limited to all written or electronic documents, correspondence and electronically stored information ("ESI"). No discoverable documents, communications, ESI, or any other discoverable material should be destroyed, deleted, or modified, and any procedures that modify or alter any of the foregoing should be suspended. Failure to preserve discoverable information can result in spoliation sanctions in the event that a lawsuit is filed.

**Resolution**

It has clear that Mr. Rinsky's employment was unlawfully terminated due to his age and medical condition. Based on the assurances of the Company, on which he reasonably relied, Mr. Rinsky sold his New York home and moved to Massachusetts to continue working for the Company. Once there, the Company used the move as a pretextual justification for his termination. Quite simply, had the Company not approved Mr. Rinsky's move to Boston, he would have remained in New York to work for the Company and the Company would have had no reason to terminate his employment or demand his resignation.

Mr. Rinsky would like to resolve this matter amicably, but is fully prepared to assert his claims before the appropriate state and federal agencies and/or in a court of law. Accordingly, we request that you or your representative contact us before July 24, 2015 to discuss resolution of this matter. Notwithstanding, Mr. Rinsky expressly reserves all of his rights available to him under applicable state and federal law.

Please also provide a copy of Mr. Rinsky's personnel record, as defined and required by G.L. c. 149, § 52C, within 5 days.

Very truly yours,

Mark D. Szal

cc: Yury Rinsky

# EXHIBIT E

**Stephanie A. Mercer**
**Division General Counsel**
**Litigation & Employment**

**CUSHMAN & WAKEFIELD**

**Cushman & Wakefield of Texas, Inc.**
Licensed Real Estate Brokers
2101 Cedar Springs Road, Suite 900
Dallas TX 75201
(972) 663 [illegible] Tel
(972) 663 [illegible] Fax
stephanie.mercer@cushwake.com

July 22, 2015

Mr. Mark Szal
Szal Law Group LLC
589 Tremont Street, Suite 4
Boston, Massachusetts 02118

Re: Yury Rinsky

Dear Mr. Szal:

This letter is written on behalf of Cushman & Wakefield, Inc. ("C&W"). As I previously advised, a copy of your correspondence dated July 16, 2015 has been provided to me.

We have now had an opportunity to review internally the circumstances leading up to the termination of Mr. Rinsky's employment and determined that the facts appear to differ from what you describe in your correspondence.

When Mr. Rinsky first approached his supervisor, Colin Reid, on April 30, 2015 about relocating to C&W's Boston office, Mr. Rinsky advised Mr. Reid that he had already made the decision to relocate, had taken out a home equity loan, put his home on the market and purchased a home in Boston. Mr. Reid advised Mr. Rinsky that, be that as it may, relocation to another C&W required approval beyond Mr. Reid. He even reminded Mr. Rinsky of the length of time (several months) it took for Mr. Reid to have his own relocation approved. Mr. Rinsky thus knew that there was a possibility that the relocation would be denied. To be clear, at no time in that conversation did Mr. Reid approve Mr. Rinsky's relocation.

Subsequent to that conversation, there was no further discussion between Mr. Rinsky and Mr. Reid about the relocation until Mr. Rinsky advised Mr. Reid on May 17 that he would be taking personal time off after the Memorial Day holiday to move his family to Boston. Subsequent to that communication, there was no further communication on the subject until Mr. Rinsky appeared unexpectedly at the Boston office to go to work.

Mr. Rinsky's relocation was not approved. He was hired to work in the NY office of C&W and that is where his support is required. When offered the opportunity to return to

the NY office and his existing job, Mr. Rinsky declined. Thus he abandoned his job and was terminated.

Any claim of age discrimination or discrimination based upon medical condition is baseless. Mr. Rinsky would not have been terminated and would have continued in his role at C&W if he had not chosen, unilaterally, to relocate. C&W did not have any complaints about his performance and looked forward to his continued employment. It is unfortunate that Mr. Rinsky chose to step outside the process and relocate without the appropriate approvals in place, but that was an action that he took and C&W had no choice but to react as it did.

Very truly yours,

Stephanie A. Mercer

Stephanie A. Mercer
Division General Counsel &
Assistant Secretary

cc: Katrina Hicks
Sue Zamorski