UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS YORK
- - - - - - - - - - - - - - - - - - - x
YURY RINSKY, :

Plaintiff, :

:

-against- C.A. No.
: 16-10403

CUSHMAN & WAKEFIELD, INC.,
:

Defendant.
:
- - - - - - - - - - - - - - - - - - - x

RULE 30(b)(6) DEPOSITION of LEIF MAIORINI, taken by Plaintiff at the offices of 1290 Avenue of the Americas, New York, New York, on Thursday, February 24, 2017, at 9:55 o'clock a.m., before Carol Mele, a Registered Professional Shorthand (Stenotype) Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S:

SZAL LAW GROUP LLC
Attorneys for Plaintiff
589 Tremont Street, Suite 4
Boston, Massachusetts 02118

BY: MARK D. SZAL, Esq.
(617) 830-2492
email: mark@szallawgroup.com

BERLUTI, McLAUGHLIN & KUTCHIN LLP
Attorneys for Defendant
44 School Street
Boston, Massachusetts 02108

BY: ROBERT R. BERLUTI, Esq.
(617) 557-3030
rberluti@bmklaw.com

ALSO PRESENT:

Stephanie Mercer, Esq., Cushman & Wakefield

IT IS HEREBY STIPULATED AND AGREED that the filing and sealing of the within deposition be, and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, be and the same are hereby reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to before any Notary Public with the same force and effect as if sworn to before a Judge of this Court;

IT IS FURTHER STIPULATED that the transcript is to be certified by the reporter.

Maiorini

L E I F  M A I O R I N I, called as a witness, having been first duly sworn by Carol Mele, a Notary Public within and for the State of New York, was examined and testified as follows:

EXAMINATION BY MR. SZAL:

Q Good morning, sir. Could you state your name for the record?

A My name is Leif Maiorini.

Q Mr. Maiorini, my name is Mark Szal. I represent Yury Rinsky in a lawsuit that's been brought against Cushman & Wakefield.

Have you ever before deposed before?

A Once, but a very long time ago, previous employer.

Q Just to give you some of the ground rules, I'm going to be asking you some questions and I'm expecting you to answer them. The court reporter over here is going to do a great job of taking down everything you and I say, so it's important that we don't talk over each other. So if I ask a question, wait until I'm finished before answering even if you anticipate what it is and, likewise, I'll let you finish your answer

before speaking again.

If you need to take a break at any time, please let us know. I just ask that you answer the question posed to you at that time. If you don't understand any of my questions, ask me to rephrase it or indicate that you don't understand.

A Okay.

Q Any questions?

A No. No.

Q I'm going to place in front of you a document that's been labeled as Exhibit 2. It's titled Rule 30(b)(6) Deposition Re-Notice of Defendant Cushman & Wakefield, Inc., and just ask if you've ever seen and reviewed that document before?

A Yeah, I've seen this document. Robert showed this to me earlier.

Q And do you understand that you are being designated today to testify on behalf of the company with respect to certain topics?

A Yes.

Q And do you know which topics on Schedule A that you've been designated to testify

Maiorini

about?

A I believe topic 9.

MR. BERLUTI: Just to be clear, there will be aspects of topic 9 which would be the first two subparts, the reasons plaintiff was terminated and the manner in which such decision was made. Mr. Maiorini is not being offered on the topic of the manner in which such decision was communicated to plaintiff.

MR. SZAL: That portion is designated as Mr. Reid and Katrina or just Katrina?

MR. BERLUTI: Well, both. Both.

MR. SZAL: Okay.

MR. BERLUTI: Depending on the questions. I think I said that. Depending on the questions.

MR. SZAL: Okay.

Q Any other topics that you've been designated to testify to here today?

A Not to my knowledge, no.

Maiorini

Q Could you give us your educational background, please, starting with college?
A Sure. Undergraduate in computer sciences from LaSalle University and then graduate school at University of Pennsylvania, Wharton School, master's of science and engineering.
Q What year did you graduate undergrad?
A '89.
Q How about grad school?
A 2003.
Q And could you give us your employment history after college at LaSalle?
A Okay. While I was at LaSalle, I was with a direct marketing firm called RMH Telemarketing. I was there for nine years. I went then to CDG Management which was a fundraising company. We did North American not-for-profit fundraising. I was there for 13 years and then I took the job here with Cushman & Wakefield, and I'll be here, I believe, eight years in April.
Q You would have been hired 2009?
A Yeah.

Maiorini

Q And when you were hired at Cushman & Wakefield, what was your initial position here?

A Strategy and planning. So I worked on setting the IT strategy, determining how the company needed to move forward from an IT perspective, and then also all the planning around that including budgeting.

Q Did you have a job title at that time?

A I think it was, like, senior managing director of IT strategy and planning.

Q Has your role changed at all in the time you've been with the company?

A Yeah, it's changed quite a bit. So I went from -- I went from that position to being in charge of what we call service design and delivery which was all of our enterprise applications globally, so everything from our global ERP systems that run our finance and HR functions to the operational systems that are used by our service lines to perform normal course of business.

Q Is that your current role?

A No. My -- actually, a couple weeks

ago my role just changed to focus solely on revenue generation within the -- within the service line systems and strategy, so it's a -- it's a subset of, you know, what my overall responsibilities were for. As we transition the other things into more operational, like we just got done doing our ERP and things like that, we're actually going to move those over to somebody else to run day-to-day.

Q Between March 2015 and July 2015, what was your role during that period, if you recall?

A That would have been, you know, the enterprise applications base that would have been the solution to service design and delivery role.

Q And did you have at that time direct reports?

A Yeah.

Q Who were your direct reports? I'm sorry. How many direct reports did you have?

A I believe eight direct reports.

Q Okay. Was Andrew Hamilton one of your direct reports?

A Yeah, Andrew was over the HR and the

Maiorini

finance systems including things like our commission system and, you know, ancillary systems that feed into HR and finance.

Q And at that time, again, we're talking about March 2015 through July 2015, who did you report to directly?

A Craig Cuyar.

Q And what was his position?

A He was a global CIO, chief information officer.

Q During that time, did you work exclusively in the New York office?

A Exclusively -- I worked a lot in the New York office, but during that timeframe we were also doing the Massey Knakal acquisition, and then also the DTZ integration was starting around that time, so I was spending some time in Chicago with that team as well.

Q But work you performed, was it always in the office or did you work remotely?

A Previously always in the office. I commute into the city pretty much every day.

Q Where do you live?

A I live in southern New Jersey. I

actually live closer to Philadelphia than I do to New York.

Q Is that where you've lived for the past three years?

A Yeah. Yeah. I grew up in Philadelphia, my family is in Philadelphia, my wife's family's in Philadelphia, so we stayed in that area, but, yeah, I've been there for quite a long time.

Q When did Craig Cuyar leave the company; do you know?

A It was prior to September of '16 because he wasn't here when we did the official merger of the companies when we finished the final -- I think it was that -- the summer of -- of '15.

Q Of '15 or 16?

A '16, I'm sorry, '16. I think this makes sense, right? It was right around August timeframe, something like that.

Q When you say the merger with DTZ was finalized, when did it begin to your knowledge?

A Like, six months prior that we were doing, you know, all of the -- you know, they had,

basically, the letter of intent and we knew that they were going to acquire -- I don't think the deal actually closed until September.

Q And how did that merger affect your department?

A Just, you know, a lot of work, right, because now you had two companies that were basically about 2.5 billion in revenue that were merging. Both of us had similar kind of, you know, acquisition, growth, so, you know, you had lots of smaller companies that were -- that were part of that whole -- lots of different systems. Our application portfolio was probably double the size, if not more. So what that meant was we had to figure out how we were going to integrate all of those things into, you know, a smaller application, like, who were we going to move where, how were we going to handle specific business functions like HR, finance, commissions, et cetera.

Q Did the acquisition affect the decision-making of Cushman & Wakefield employees in your department?

A Oh, yeah.

Maiorini

MR. BERLUTI: Objection.

Can you be clear about which acquisition?

Q The acquisition by DTZ.

A Yes. Yeah, because one of the, you know, things that came out of the merger of the two companies was you had a lot of redundancies, right, in different roles and positions that we needed to evaluate and figure out from a staffing perspective who was going to, you know, stay and who we were going to transition.

Q And was that true before the sale was finalized?

MR. BERLUTI: Objection.

Q Let me ask a better question. You mentioned that there was a period where there was a letter of intent and there was a transition before the deal closed, so to speak.

A Right.

Q During that time, did DTZ have a say in decisions that were made in your department, if you know?

A Not -- I wouldn't say directly. Of course, you know, they pretty much -- because the

Maiorini

way that the -- to explain the way it worked, so there is a -- DTZ was actually purchased by a company called TPG which is, you know, a large investment -- private equity company, and so TPG is actually the parent. They own both companies, right? So when Cushman was -- when the market recognized that Cushman was up for sale, TPG was actually the person who came in and bought that company and then put the two together. So TPG I think definitely had done their due diligence on what would be the synergies that would come out of a merger and how would that affect the overall, you know, P&L of a merged company, what would that look like and would there be value there for the capital that they were investing. So I think I'm answering yes, that, of course, they would have some influence over what their expectations were when this was going to be done.

Q Did you have to run employment decisions by them with respect to hiring and terminating employees?

MR. BERLUTI: Again, this is the March to July 2015 timeframe?

MR. SZAL: Yes, the time

Maiorini

period between March 2015 and, say, July 2015.

A We -- yes, in the fact that not necessarily for terminations, but for hiring, yes, but we had done that more in a pre-approved fashion, right? So we would have -- we had certain open positions that were -- that were on the books and that we had to do justifications for those positions if we were going to -- if we were going to fill them, but we did those ahead of time, right? So we weren't going with each position as we needed them to -- to TPG. We had that all done beforehand.

Q And did you personally have contact or liaison at DTZ or TPG that you were working with at this time personally?

A I -- the person who eventually took over the global CIO role, Adam Stanley, yeah. So I had a number of, basically, peers that were across both organizations that I interfaced with. And we also worked with -- I'm trying to think of who the HR person was at that point. I don't recall, but, yeah, we had contacts, like, in HR and finance.

Maiorini

Q And Adam Stanley, he took over Craig Cuyar's position eventually?

A Yes. Yes. They worked together for a while and then they made a -- like almost everything, right, you basically had two of -- almost like Noah's ark, right? You had two of almost every position or more and the executives made a decision based on, you know, who would they keep in each role. So, effectively, Craig and Adam did the same position.

Q And do you know how the company evaluated who to keep and who to terminate?

A No, I have no idea. No, I wasn't involved in that.

Q Did Colin Reid -- again, the time period March 2015 to July 2015 -- did Colin Reid report directly to you?

A No.

Q Did you have interactions with him?

A Yeah. I mean, Colin and I sat, you know, in very close proximity and, you know, we all -- the entire group is all pretty friendly, right? So everybody knows everybody else, but, yeah, I have, you know, regular interactions with

Maiorini

Colin.

Q Did you have any input on his request to relocate to Miami?

A Yes, I did.

Q In what respect?

A So he -- actually, Andrew Hamilton brought it up to me that -- I would say maybe a year to six months before he relocated that, you know, "Colin is looking to retire in Miami." You know, "He's been talking about this for quite a while," you know. "I think we'd be able to do that." You know, "We'd have to do a longer transition because of the clients that he serves." You know, "Is that something that you'd be open to?" And I think we try to be accommodating when we can and, so, yeah, I was definitely part of that decision.

Q Were you approving of his request?

A Well, I'm not the ultimate approver of that request. It would have to go through HR and then Craig, but, yes. I mean, it goes up the food chain. So Andrew was comfortable with it, I was comfortable with it and we brought that to Craig and said, "Here's the plan as to how we'll

Maiorini

transition this role and we're," you know, "in favor of it."

Q And what was his response?

MR. BERLUTI: Objection, as to "his."

Q Craig Cuyar.

A Oh, his response was to work with HR to, you know, put the necessary paperwork together to facilitate that transfer.

Q And this chain that went from Mr. Reid, to Mr. Hamilton, to you, to Craig Cuyar, was it all verbal or was it in writing, if you recall?

A It was definitely verbal. I'm sure there's stuff in emails and writing, but I just can't say for sure. That I don't recall, but definitely we talked about it, there's no doubt, and I'm sure there's HR paperwork that's associated with it.

Q And you, and Mr. Hamilton, and Mr. Reid, and Mr. Cuyar at that time period, March to July 2015, were you all sitting in the relatively same area in the office?

A Yeah, pretty much. I mean, most of IT is on one side of the eighth floor and Craig's

office was down the hall, but, yeah, we were in the same physical.

Q Is there any particular reason why the process for Mr. Reid took so long?

A I think it's more the systems that Colin manages are old, I mean, like 25 years old, right? They're all custom, homegrown commission systems. And our brokers are -- I don't know if you're familiar at all with our business, but our brokers are, like, commission-based brokers who do some of the largest deals in the world as far as, you know, global real estate are concerned, so deals that are worth in some cases millions and millions of dollars. One World Trade, for example, is one of our marquis properties. So the systems that Colin manages control their income, right, their commission splits, and so there's a lot of sensitivity around making sure that those systems are up and running, that when we need changes that they're done in a certain way.

And all of the finance team, the commissions accounting team that was really in charge of those systems for our finance group sat here on the same floor, in fact, right next to IT

Maiorini

for the most part, so they had a lot of interaction. And what we wanted to make sure was that Colin's job could be done remotely, that they were comfortable with him moving, that we could test that model out and make sure that prior to him leaving that nothing was going to go south as a result of him going south to Miami.

Q But in terms of just the approval by the people we just mentioned, it was possible for Mr. Reid to ask Mr. Hamilton, and Mr. Hamilton to ask you, and you to ask Mr. Cuyar on the same day because you're sitting in the same office, right?

A Oh, sure. Yeah. Yeah.

Q How has Mr. Reid's transfer to Miami worked out?

A It's actually been quite well. I think a lot of that has to do with the fact that we, you know, prepped so longed for that and made sure that everybody was comfortable with it, but what Colin does is he does a lot of the management of the team that does the actual coding and the maintenance of the -- of the AS/400 and the commission system, so a lot of that is meeting with the stakeholders, scheduling, making sure

Maiorini

things get done on time. It's a lot of management responsibility. He's not actually physically doing, you know, the work to the system. So as long as he's able to have the conference calls and the videoconferences and things like that, it seems to work pretty well.

Q Have you been involved with any other employee transfer requests within your department?

A Yeah.

Q Do you recall the specific people that requested transfer?

A I know Jay Leiser is one of the people who we eventually -- he moved to -- his wife had an opportunity in Florida and he requested to, you know, be transferred to one of our offices in Florida. We initially denied that and basically, you know, for similar reasons, just saying, "Look, the job is in New York City, the compensation model is based on New York City," you know, "compensation. The work that you do is pretty much done here."

And, you know, we -- we initially denied the request when it was made. He chose to

commute for -- for quite a long time, actually, from Florida to New York, so we tried to work with him because he was in a difficult situation with his wife, so we made an arrangement with him that he could have, like, one day working remote, but the rest of the time was in New York City. He did that at his own expense for quite a while. And then, when the merger finished and we looked at the resulting staff, during that time we evaluated what could be moved of his role and did kind of the same thing we did with Colin. We did it on an experimental basis. And then eventually, you know, allowed him to work from -- I want to say it's Boca Raton, but I'm not -- I'm not positive, but it's in Florida.

Q Okay. So Mr. Leiser's transfer request initially was denied, but ultimately was granted at some point?

A Yes.

Q Do you know when that was?

A I don't.

Q So currently he's working in the same role that he had when he was working here, but out of the Florida office?

Maiorini

A Correct.

Q In addition to whether his job could be done remotely, were there any other factors that you considered in approving or denying the request?

A His job -- his being Jay?

Q Jay Leiser, I'm sorry.

A So repeat that question?

Q Were there any other factors that you considered other than whether he could do his job remotely and do it to the same level that he did it here?

A No. I think a lot of it had to do with really the way he went about it, right, which was making sure he followed, you know, the protocol to get approval, you know, first, that he was willing to, you know, do the job from New York for quite a while. It was at least six months that he was going back and forth between New York and Florida and making sure that he could fulfill, you know, all of those responsibilities remotely.

Jay does a little bit of a different role than Yury or Colin. Jay is a technical lead and a lot of the team that Jay manages on behalf

of our valuation and advisory service line is actually in India. They actually work for Cognizant, so his role is managing offshore teams that do development work for us.

Q I think you had mentioned Mr. Leiser had a difficult family situation. Was that part of the evaluation process in deciding whether to deny or accept his request?

A No. I don't -- I think if he would have said, "Look, I want to live in a warmer climate. I want to go down to Florida," we would have said, "Okay, we need to figure this out and make sure that it works for us because your role today is physically in New York City. Your main interactions today are in New York City. Let's figure this out and make sure that that makes sense before we," you know, "before we approve that."

But, of course, I mean, I think as a manager you try to take into account, you know, the fact that his wife was down there and that was probably distracting for him, and you want to try to get the best productivity that you possibly can and do the right thing for him.

Q Is it fair to say that with respect to Mr. Leiser there was some sort of trial period to determine whether or not this would work?

A Yeah, I think that's fair.

Q Do you know how long that would have been?

A I don't know. I know it was at least six months of him going back and forth. Katrina would be able to answer that for you as to when we did the official transfer for him.

Q Any other employees that requested a transfer to another location within your unit that you can recall?

A Not that I can recall, no.

Q Did you ever work with a gentleman named Robert Maison?

A Yeah. Robert was a New York employee who worked for Steven Lipka who is a peer of mine who was in our security and risk assessment group.

Q Is that part of your department?

A No, no.

Q What kind of interactions did you have with Mr. Rinsky during your time with the

Maiorini

company with respect to just day-to-day operations?

A I would say, like, casual conversations. You know, just like, we talked about, like, tea. You know, just like family stuff, just like normal, day-to-day stuff. You know, every once in a while I would ask him about something that was going on specifically with the commission system, if I was solicited by one of my, you know, colleagues in finance or HR, but not really -- you know, there wasn't a lot of, you know, work interaction on a day-to-day basis.

Q Fair to say just on an as needed basis?

A Yeah.

Q In your casual conversations, what did you come to know about Mr. Rinsky? Did you know about his family?

A I mean, a little bit. He was pretty private. You know what I mean? He didn't share a lot of information. I think he had a daughter who had just -- I don't know if she had just had a baby or was pregnant, so we talked a little bit about that, but he was not very, you know,

forthcoming. And I respected that. You know what I mean? It's not -- it's not something I would probe into if somebody doesn't want to share.

Q Did you know his daughter lived in the Boston area?

A I found that out after. Like, when Colin originally told me about, you know, that he wanted to move to Boston and that he basically moved to Boston, you know, that came up that he was going there because his daughter was there.

Q And did you work in the same department with Mr. Rinsky for the whole time that you were at the company up until his termination?

A I would say -- I'm trying to think of when I actually took over the HR and finance ops, but from that point forward of the eight years it's probably six that we worked -- that we worked in the same structure.

Q Did you have occasion to have any opinion about his work product?

A No, just what I heard from, you know, Colin and Andrew, that he was a good worker. And, you know, we never had any discussions about him not being a good worker which I would say is

Maiorini

more typical. If he wasn't doing a good job, we would definitely have a conversation to that nature.

Q Did you have any input during 2015 into whether employees in your department were permitted to work remotely?

A I would have had input into that, absolutely. Yeah.

Q For employees that were reporting to Colin Reid, would you have input into that?

A Yeah.

Q Did you during 2015 have input into whether Mr. Rinsky could work remotely up until his move to Boston?

A No, no. In fact, I guess that's the -- that's the nuance in the question, right, is that when I found out about it, he had already moved.

Q So a better question is up until the time, let's say, between January and April of 2015, did you have any input into whether Mr. Rinsky was permitted to work remotely?

A No.

Q Did you have any knowledge of how

Maiorini

often he was in the office performing his job functions?

A No, other than knowing that, you know, I would see him every day, so I would see him physically be here, so he was definitely here more than not. And we had a policy that, you know, you could work remotely, you know, a day a week or, if you had something going on at home, a doctor's appointment, something like that and you needed to be remote that you could do that, but for the most part you needed to be, you know, in your office because your constituents were in the office.

Q Do you recall seeing him every day during that time period? And the reason I ask is there's been testimony that Mr. Rinsky was working up to three days a week from home during that period.

A I can't tell you for sure. I wouldn't have kept track of that. I wouldn't have even made a mental note of that.

Q So that decision at that point did not need to be run through you, a decision to allow Mr. Rinsky to work from home from the period

of January 2015 until April 2015?

A Not if it was outside the normal, accepted you know, kind of policy, no, it would not have.

Q Is there a written policy regarding working remotely?

A No, not -- well, let me take a step back. Not to my knowledge there's not.

Q Do you know if there was at the time?

A I don't.

Q Do you know if there is -- if there was at the time of Mr. Rinsky's request for transfer a written policy regarding transfer requests?

A I don't know that there was a written policy regarding transfer requests. I know there was a policy in HR that they had a procedure for doing transfers, but I don't know that there was a written policy for when and if you had to, you know.

Q Do you know if there is now currently?

A I don't. I don't know.

Maiorini

Q Okay.
A I'm embarrassed to say it, actually. I guess I should, but I do not.
Q During the period between January of 2015 and April 2015, do you recall noticing how often Mr. Rinsky was in the office?
MR. BERLUTI: Objection.
A No.
Q During that time period, do you recall there being any effect on Mr. Rinsky's work based on working remotely?
MR. BERLUTI: Objection.
A Not to my knowledge.
Q Were you ever involved in a decision to revoke an employee's ability to work remotely?
MR. BERLUTI: Objection.
A No, that never came up.
Q When was the first time that you became aware that Mr. Rinsky had requested to transfer to the Boston office?
A Never. And let me qualify that because I've never been aware of him making a request to transfer to the Boston office. My knowledge of the facts are that he basically

informed us of the fact that he was moving to the Boston office.

Q And what do you base your knowledge of the facts on?

A Conversations with Colin and with Andrew. That's when I first found out about it.

Q When did you become aware that there was a request from Mr. Rinsky to transfer to the Boston office?

A I would say it's got to be in that April timeframe when Colin talked to me saying that, basically, he was surprised that Yury had informed him that he had bought a house in Boston and that he was going to work out of our Boston office and Colin was bringing it to my attention because he hadn't approved it. He hadn't gone through HR. It was highly unusual. We never had really anything like that occur, you know, so he was bringing it to my attention, so that's when I first found out about the situation.

Q Isn't it true that there is a step, according to you, between Mr. Reid's approval and your approval?

A Yeah, it would go through Andrew

Maiorini

Hamilton. Now, Colin -- like, something like that, right, if I saw Colin in the hallway after he had the conversation with Yury, he would, of course, bring it up to me. He wouldn't -- there's not -- there's nothing that says that you can't talk to me until you talk to Andrew and I'm sure if he -- well, I'm speculating now, but I'm sure if he saw Craig in the hallway, he would have mentioned it to Craig, right, without necessarily mentioning it to me. I mean, we're pretty informal -- it's not -- you know, as far as communication is concerned.

Q So did you ever become -- strike that.

Let me show you an exhibit.

A Sure.

Q This has been marked as Exhibit 3 in a previous deposition. This is an email from Colin Reid to Andrew Hamilton forwarding an email sent by Mr. Rinsky to Mr. Reid. You are not copied on this email. I'm just curious if you have seen this email before?

A No, I have not.

Q This is dated May 17th, 2015.

Maiorini

A Yes.

Q So is it fair to say that you knew of Mr. Rinsky's desire to move to Boston before this date?

MR. BERLUTI: Objection.

A I don't know, to be honest. I can't recall exactly when I had that conversation with Colin.

Q Did you have any discussions with Mr. Hamilton before this date of May 17, 2015, concerning Mr. Rinsky's desire to move to Boston?

A I honestly don't know.

Q I'll show you another exhibit.

A Sure.

Q This is marked as Exhibit 4.

A Do you need this back?

Q Yes. Thank you. This is an email dated May 14th from Mr. Reid to Mr. Hamilton. I just ask if you've ever seen this email before?

A No, I have not.

Q Okay. This email from Mr. Hamilton says in part, (reading) Colin, let's discuss the situation Yury has put us in with his home purchase in Boston.

Maiorini

And it appears that there was a meeting request in connection with this email that was accepted that says AS/400 resourcing. Were you involved in any meetings or discussions during this time regarding Mr. Rinsky's desire to move to Boston?

A When you say during this time, do you mean specifically this meeting or --

Q Did you have -- were you involved in this meeting?

A I was not. I was not.

Q Did you have any conversations between May 14th and May 17th with Mr. Hamilton or Mr. Reid concerning --

A I can't honestly -- I wish I could, but I can't say for sure.

Q What was your opinion upon learning of Mr. Rinsky's desire to move to Florida -- excuse me -- Boston as to whether or not that request should be granted?

MR. BERLUTI: Objection.

Hold on. Can I just have that again?

(The record was read.)

Maiorini

MR. BERLUTI: Okay, no objection. Go ahead.

A Clearly, it was outside of the normal, you know, policy. I had, you know, definitely concerns about that, right, like, it's very strange that you have an employee basically come in and say, "Oh, by the way, I'm moving to Boston," right? I mean, there's definitely protocol that you would go through, approvals that you would go through to make that happen, so I was extremely concerned about that. With whether, you know, he could, you know, actually work effectively from Boston, my concerns were around the fact that almost all the people that he interacted with on a regular basis were New York based and that, you know, I'm not sure he could do his job from another location effectively.

Q Didn't it seem strange to you that an employee that had been with the company for 27 years up and moved to Boston without any approval?

A Absolutely.

Q Is it reasonable to think that somebody would do that without having approval from someone?

Maiorini

MR. BERLUTI: Objection.

A No. That's -- that's, I guess, my problem with the decision, right? It's a completely unreasonable request. It's strange, right, like, it's -- it's never happened before. We've never had anybody just say, "Oh, by the way, I've moved. Now transfer me."

Q Was there some sort of consideration period during which you evaluated whether or not the request to relocate should be approved?

A Well, I think there was a lot of discussions that happened after that, right, because there's -- there's two things going on here. I think that ultimately the key to the decision was the fact that did he not receive prior approval and that was not a precedent that we could set with anyone. So I think that it was pretty much dead on arrival at that point, right, that -- that we were not going to set a precedent that an employee could just come into the office and say, "I'm insisting on moving."

The issue, though, specifically with Yury is the fact that this is a customized system that runs our commissions for probably, you know,

Maiorini

a -- the vast majority of our income as a company, and not having some transition period where we can, you know, that that knowledge and transfer it to somebody else who is going to physically be here is concerning. So there was a lot of trepidation, you know, and there was at the time a lot of trepidation around that decision.

Q Do you have any recollection as to how long -- well, strike that.

The evaluation of Mr. Rinsky's request to transfer to the Boston office, was that done collectively between yourself, Mr. Cuyar, Mr. Hamilton and Mr. Reid?

A And Katrina.

Q Ms. Hicks?

A I would say yes.

Q Anybody else have input in that?

A No, not -- well, not to my knowledge. Nobody.

Q Did you, you know, personally ever land on a decision as to whether or not you thought personally the request should be approved or denied?

A I thought the request should be

denied based on the fact that we did not want to set that precedent. I was undecided and it was really Craig's decision on whether we would allow some type of transition period, right, whether we would allow him to support us from Boston for a set amount of time, right, but it was my opinion that, you know, we were going to do a transition, that, you know, that that role needed to stay in New York until we could prove that it didn't need to be in New York, and that the way that Yury went about requesting it was completely inappropriate and not something that we were going to entertain, you know, from -- from him or from any other employees.

Q Was there any evaluation as to whether or not Mr. Rinsky's job could be performed in Boston as well as it was performed here?

A We would have probably gone through that evaluation, but I think the first issue of him basically saying, "Hey, I'm moving to Boston," pretty much negated any discussion about that.

Q So because it's your understanding that he did not receive any prior approval to transfer to the Boston office and unilaterally

left New York for Boston, it's your position that that precluded any type of evaluation period as to whether he could perform the job remotely from Boston?

A Yes.

Q The manner in which it was done?

A It was the manner, yes, in which it was done. So and we, you know, I think we -- I'm sure we gave him the option of retaining his job in New York. So, you know, even with all of this craziness, we never said, like, you know, "You can't work for Cushman anymore." We said, "The role that you fill is in New York City and if you wish to stay in New York and commute or however you want to handle that, similar to Jay, you are more than welcome to do that. We'd be happy for you to do that."

Q Were you involved in any discussions as to the terms on which Mr. Rinsky could return to his job in New York?

A Just basically that he would have to be here at least four days a week.

Q Why was the decision made to offer him his job back in New York only if he worked

four days a week in the office?
A Because we felt that that was a sufficient amount of time to be with the people that he works with in finance to do his role.
Q And you testified earlier that you weren't aware that prior to him leaving for Boston he was working up to three days a week from home?
A Correct. I'm just saying, you know, basically we had to -- we had to make an offer, right, to basically say, here's what we'll do at that point with the knowledge that we had at that point and that's what we came up with. Now, if Yury would have come back and said, "I can do it three days a week," we would have potentially entertained that, but that's not the way that discussion went.
Q Were you personally involved in that discussion with him?
A I was not. I was not.
Q Do you know who was?
A I know Katrina was. I do not know who else.
Q Do you recall Mr. Cuyar having any specific input on Mr. Rinsky's situation?

Maiorini

A I know Craig, yeah, basically said, "The role is in New York." You know, "We need Yury to be in New York City."

Q Is it fair to say that he made the ultimate decision?

A Yes. Yes, which would be typical in this type of situation. That's not atypical.

Q Again, though, there seems to be a level between Mr. Hamilton and Mr. Cuyar, so how does it get to Mr. Cuyar if you are not accepting of the request?

MR. BERLUTI: Objection.

Go ahead.

A Because I could be wrong. I would still bring it to Craig to let him make the ultimate decision. You know, I had my own opinion of it, but there wasn't -- it wasn't like Craig and I didn't talk about things and that he wouldn't be persuasive to say, "Look, I think that this is the right thing to do. Let's move in this direction."

Q Did you make any efforts to search for documents or communications that would be relevant to this lawsuit?

Maiorini

A Yes.

Q What did you do in that regard?

A I just checked my email. Like, when I knew that I was going to be deposed, I wanted to refresh myself as far as, you know, what I could find, but I guess we moved everything to archives because I couldn't find anything.

Q So you did a --

A I did a --

Q -- term search?

A No, I actually just searched for Yury's name in my in-box.

Q And you didn't find anything?

A I didn't find anything.

Q So if there are documents that have been produced, emails with your name on it, those were collected by somebody else?

A Yeah, probably. I mean, I'm guessing that we've searched. We have a certain amount of time where our email moves from accessible into, like, an archive storage. And I'm guessing that that's where those emails were at if I'm on them, but I didn't spend the time to go that deep into the -- into the search.

Maiorini

Q Are you aware Mr. Rinsky filed a claim of discrimination with the Massachusetts Commission Against Discrimination?

A I am aware that discrimination was part of what we're talking about today, but, no, I was not aware of the specifics of where he filed or what he filed.

Q Did you provide any information in order for the company to respond to Mr. Rinsky's charge of discrimination?

A No.

Q I'm just going to show you Exhibit 6 --

A Sure. Thank you.

Q -- and ask you if you've ever seen this document?

A No, I've never seen this.

Q If you look at Exhibit A to that document, Exhibit 6, it's an announcement that says, (reading) Cushman & Wakefield and DTZ announce completion of merger.

A It's in the back?

Q Yes.

MR. BERLUTI: I'll find it for

you.

A Okay.

Q Have you seen that document before?

A What's funny is I don't recall, but I'm sure I've seen it somewhere.

Q Does the -- in your opinion, does the merger of Cushman & Wakefield and DTZ have any bearing on this lawsuit?

A No.

Q If you look at Exhibit C, it's a letter dated July 14, 2015, from Mr. Reid to Mr. Rinsky. Did you ever see that letter?

A I have not.

Q I'll give you a second to take a look, but I'm just curious if you've ever seen the content of that letter in any other form, specifically email?

A Yeah, I don't recall seeing this. I mean, the facts seem familiar, so I don't know whether I've heard them in conversation or I've seen them in email, but I don't -- I don't recall ever seeing this.

Q And I'm just asking if you've seen it in this specific bulleted form in an email or

anything?

A Yeah, I can't honestly say that I have.

Q Okay. When did you become aware there Mr. Rinsky had asserted a claim of discrimination against the company?

A I'm trying to think even how I found out about it. I think it might have been through HR.

Q Well, let me ask you, if you look at Exhibit D, it's a letter from myself to Katrina Hicks dated July 15, 2015. I'm just curious if you've ever seen this before?

A I have not, no.

Q Does that refresh your memory as to when you might have learned about the lawsuit?

A No.

Q If you look at Exhibit E --

A I mean, I definitely, you know, heard that, you know, there was something going on, but I just can't tell you exactly when I -- when I first found out about it.

Q And Exhibit E is a letter from Ms. Mercer dated July 22, 2015, to me. Do you

Maiorini

recall being asked to provide any information in connection with this response letter?

MR. BERLUTI: Objection.

A No, I don't recall.

Q Okay. Did you ever review the complaint that was filed by Mr. Rinsky in court?

A No, I haven't.

Q Did you ever review the answer to the complaint that was filed by the company?

A No.

Q Were you ever asked to provide any information in order for the company to answer Mr. Rinsky's complaint?

A Not to my knowledge, no.

Q Were you aware of what Mr. Rinsky was working on in terms of project as of May 2015?

A Not specifically. You know, we had -- like I was saying before, we had a lot going on, so we had the Massey Knakal integration and you had the things that we were preparing for with the merger with DTZ, so that all had impact to the commission system that he would work on, so I'm sure there were things of that nature on his plate, but not specifically, no.

Maiorini

Q Do you have any involvement in determining whether employees under Mr. Reid's report receive salary increases per year?

A As part of the -- as part of the year-end, yeah, performance management process, sure. I would get a listing of all the employees that report to me in some way, shape or form and review that and make sure that, you know, everything was within guidelines before it gets submitted to HR.

Q And is that the same with respect to bonuses?

A Yeah. Yes.

Q Were you aware that at the time of his termination Mr. Rinsky was the highest paid employee under Mr. Reid's report?

A I'm sure I know that, but consciously have I sat down and said, "Oh, Yury's the highest paid employee under Colin," I can't honestly say that I've done that, but I'm sure I know the numbers or have seen the numbers.

Q Do you recall Mr. Hamilton making any proposals as to what should happen with Mr. Rinsky's employment in his role?

Maiorini

MR. BERLUTI: After he moved to Boston?

MR. SZAL: Yes.

A After he moved to Boston, meaning, like, while we were still in a period of trying to figure out what to do or --

Q Well, just to be more specific, the email that we looked at earlier that you testified that you hadn't seen was May 17, 2015, and it was stated -- from Mr. Rinsky to Mr. Reid which stated, (reading) Colin, as discussed, I will be moving to Boston on 5/27 --

A Right.

Q -- for family reasons. I need to take four personal days after Memorial Day, 5/25 to 5/29. That's the time period I was referring to.

MR. BERLUTI: Objection.

A I'm not sure. Can you ask me again because I'm not sure I understand what you're --

Q Were you presented with any options or recommendations from Mr. Hamilton concerning what should be done with Mr. Rinsky's employment and role during the time period of late May 2015?

Maiorini

A I can't -- I can't honestly say that I recall those discussions. I'm sure that, you know, I know that we, you know, had options to bring in consultants. I know that we had even, you know, discussed the -- like we were talking about before -- the ability to transition him for a period of time, so I just don't know whether those things were discussed specifically in that -- you know, in that timeframe.

Q I'm going to show you an email that was labeled as Exhibit 15 in Ms. Hicks' deposition. This is an email from Mr. Hamilton to yourself and Mr. Reid.

A Okay.

Q It's dated 5/27/15, the same day Mr. Rinsky indicated that he was moving to Boston. I just ask if you recall that email?

MR. BERLUTI: What did you just -- can you read back the day he said he was moving to Boston?

(The record was read.)

MR. BERLUTI: Objection. The question misstates the evidence.

MR. SZAL: The reason I said

Maiorini

that is the email that we looked at earlier, Mr. Rinsky stated, (reading) As discussed, I will be moving to Boston on 5/27, so his email was dated the 17th, but he indicated that 5/27 was the date of the move.

MR. BERLUTI: Okay.

A Okay. Yeah, I mean, the truth is I don't specifically recall this email, but clearly I recall the facts on here as to what we were discussing, so --

Q You remember the content of this email?

A Yeah. Yeah.

Q Were you involved in this proposed plan?

MR. BERLUTI: Objection.

Q Excuse me. I'll rephrase it.

Were you involved in proposing this plan?

MR. BERLUTI: Objection.

A No.

Q Were you involved in reviewing and providing your opinion on this plan?

Maiorini

A Sure.

Q So this indicates on 5/27 Mr. Hamilton is proposing to hire a consultant for six months; is that fair to say?

A Yes. So it -- well, it's two things, right? It's extend this person who is working part-time, Trevor, for six months and then bringing in another resource to begin knowledge transfer.

Q Do you know if that was actually ever done?

A That's Edgardo, yes. Edgardo. Edgardo Felix, I believe, is his last name.

Q Do you know what it means when it says, (reading) Cognizant lacks context?

A Oh, Cognizant is a supplier of ours that does -- I don't know if you recall when I was talking about Jay Leiser, right, so a lot of our application development and support is outsourced to either Cognizant or TCS. They're suppliers of ours and they have a -- trying to think of what the right word is. Propensity is not the right word, but they have expertise around outsourcing certain types of IT functions. This is not one of

them because of the nature of the software and because it's customized. This happened to be something like I was saying before, the Peoplesoft or Workday. It was very, you know, like -- likely that they could help us in this area, but for something like this they really wouldn't have any expertise.

Q And when it says capital K, capital T, does that mean knowledge transfer?

A Knowledge transfer, at least that's the way I read it, yeah.

Q In the second point in this email labeled number 2, in the second sentence it says, (reading) We believe we must retain Yury for about nine weeks to cover critical Workday and MK work.

Did I read that correctly?

A Yes. Yes, you did.

Q Can you explain, if you know, what that means?

A So we were doing a global launch of Workday as our ERP for managing finance and HR at the time and there are interfaces between Workday and the AS/400 that Yury was responsible for, so there's information, basically, that gets passed

between the two systems so that we can accurately, you know, pay commissions to our brokers. And then for Massey Knakal it's the same thing, right? They had commission brokers and other individuals that we were bringing over into the AS/400 that you know, Yury was, I'm sure, responsible for in some way, shape or form supporting that work.

Q Was he in the midst of a project during this time that needed to be completed or was this simply to transfer knowledge during that time?

A No, I would -- I don't know for sure if we had an exact project plan, but I am sure that he had tasks that he was responsible for that were related to the scope of work.

Q Number 3 says, (reading) Brief Craig on the situation and prep him for the transfer of paperwork from Kat.

Do you have any understanding of what that relates to?

A Well, I'm speculating.

MR. BERLUTI: Don't.

Q Don't.

MR. BERLUTI: Don't speculate.

Maiorini

A I don't know.

Q Was there anybody else during this time that was requesting a transfer in your department to another location?

A Not to my knowledge, no.

Q Four says, (reading) Process the transfer EAF and take the DTZ review.

Do you know what EAF is?

A Employee Action Form.

Q Do you know whose EAF Mr. Hamilton is proposing that be processed for transfer?

A I would say that that's -- in this case, that would be for Yury.

Q When it says take the DTZ review, do you have any understanding of what that refers to?

A No. No.

Q The next line says, (reading) Assuming approval, execute the transfer officially.

Again, do you believe that refers to Mr. Rinsky?

A Yes.

Q Where it says assuming approval, do you take that to mean approval from DTZ as

Maiorini

referenced in the line before?

A Yeah, no, I don't know. I don't know whether that would be approval from DTZ, approval from Craig or more than likely all of the above, but.

Q And six says, (reading) Work with Kat as KT unfolds on the official exit, parentheses, mitigating litigation risks, end parentheses.

Kat, do you understand that to be Ms. Hicks?

A Yes.

Q When it talks about official exit, do you take that to mean as referring to Mr. Rinsky?

A Yes.

Q So based on this email, is it fair to say that Mr. Hamilton is proposing that Mr. Rinsky be transferred to the Boston office for nine weeks to cover critical Workday and MK work and then after that time be terminated?

A Yes.

Q Do you have any -- do you know if that actually happened?

A No, it did not happen.

Q Did he perform work while in Boston to cover critical Workday and MK work?

A I don't know.

MR. BERLUTI: Objection.

Q Do you have any involvement in analyzing the risk of employee lawsuits?

A No.

Q The last line says, (reading) Any concerns with this approach, question mark.

Again, this email is addressed to you from Mr. Hamilton. Did you have any concerns with this approach?

A Oh, absolutely, because it was clearly -- it was clearly not what we were talking about before, right? The fact that, you know, it is the act of telling us that he was moving to Boston without asking for permission that was the primary influencer for our decision. Whether this is about their nervousness about how do we cover all of those things that we're doing, you know, in a world where Yury is no longer an employee of Cushman & Wakefield, so, yeah, sure. Sure, there were concerns about this and this would have to go

to Craig.
Q If there were such serious concerns about the manner in which you believe Mr. Rinsky moved to Boston, why wasn't he terminated immediately?
A I don't know.
Q Was it because you needed him to cover work?
A No.
Q So he could have been terminated immediately, you're saying?
A If HR would have approved that, absolutely.
Q So is HR the final say with respect to Mr. Rinsky's employment?
A Well, it would have been HR informing Craig and Craig would have made -- would have made that call, but I would not go out on a limb as being an HR expert, so I would never just take an action without their counsel.
Q Did you respond to this email?
A I don't know whether I responded to it in email, or responded to it verbally, or if I ever responded.

Maiorini

Q 2015, would those be emails that are archived in your email box?
A I'm not sure what the timeframe is, but I would bet because I wasn't able to find anything on it, so I would think it's got to be.
Q Did you check your sent mail as well as your incoming mail?
A Actually, no, I didn't do that, but --
MR. SZAL: We ask --
A -- but I'm sure we would have found something in the regular in-box, right, because that would have been -- you had things that I was cc'd. on that I didn't find either.
Q Just in general, is it your practice to respond to these type of emails with a response email or with a conversation?
A Some of both. I mean, it's not --
Q Do you recall what you did specifically in response to this email, whether you responded in writing or verbally?
A I think I -- yeah, I think I already said I don't recall.
THE WITNESS: I'm sorry. I

Maiorini

keep forgetting that you're writing everything down. Talking into the table is not helpful to you.

Q Did you have any input on the timing of Mr. Rinsky's termination?

A Other than agreeing to the final recommendation, no.

Q I'm going to show you another document here.

A Sure. Thank you.

Q This is a document that's been labeled as Exhibit 17. It's an email chain in which you are copied in some responses and the initial email comes from you to Mr. Hamilton and Mr. Reid dated June 15, 2015. Do you recall that email?

A I mean, I don't specifically recall it, but it's clearly my email.

Q It indicates you had a conversation with Mr. Cuyar the preceding Friday?

A Yes.

Q Do you remember what the content of that conversation was?

A It was probably related to our

options with Yury, how we were going to move forward.

Q Do you know what had transpired with Mr. Rinsky and his employment between 5/27 when he moved to Boston and June 15th when you sent this email?

A No.

Q Do you know what he was doing?

A No.

Q Do you know if he was working or not?

A I do not.

Q Do you know if he was on administrative leave?

A No.

THE WITNESS: By the time we're done, I'll pretty much have this down.

Q Well, it states in part, (reading) We need to more forward with Yury's termination as quickly as possible; is that correct?

A Yes.

Q Do you have any recollection as to why on June 15th there was an urgency to move

forward with Mr. Rinsky's termination?
A I think Craig was just, you know -- Craig's, you know, overall, you know, opinion on the whole thing was that Yury did not follow the proper procedure, that we can't set a precedent. And if I could get into his thought process, it was that we were finding reasons to delay this; this needs to just happen; we need to take action and just get this done; that there's not a lot of room for debate on whether this was the right or the wrong thing; that we just need to move forward.
Q And you weren't privy to any conversations that Mr. Rinsky had with Mr. Reid, were you?
A No.
Q Okay. So your understanding of what was discussed between Mr. Rinsky and Mr. Reid came from Mr. Reid, correct?
A Yes. Yes. I never --
Q So you took Mr. Reid's word for what --
A Absolutely. Yes.
Q I show you an exhibit that's been

labeled Exhibit 19. It's an email dated 6/16/2015, from Ms. Hicks to yourself and some other recipients. Do you recall this email?

A I do, yeah. Yes.

Q Did you provide any response to this email?

A No, I don't believe I did.

Q Were you involved in any discussions before this email was sent concerning whether or not Mr. Rinsky should be offered the opportunity to resign?

A Katrina brought that up as an option. I'm not sure whether she brought that up as an option in email or discussion, but I do know that was an option.

Q Did you have any opinion on that?

A Yeah. I mean, I -- the way that it was positioned was that if he chose to resign, he would be eligible for two weeks compensation. And my opinion was that, you know, we should offer that to him because whatever we could do for him would be a good thing.

Q What happened with Mr. Rinsky's role after he was terminated?

Maiorini

A We basically filled it with a consultant.

Q Do you have any involvement in the decision as to whether to fill a role with a consultant or a full-time employee?

A I mean, it's normally based on the recommendation of, you know, one of my direct reports as to what's the best way to do it. I think in this position, we were in a -- in a -- in a position where there was some risk with Yury's transition because of his knowledge. Edgardo had done, from my knowledge, some work with us before, so he was familiar overall with the system, although it had been a while since then. Colin was pretty, you know, comfortable with the fact that it would give him the best chance of getting up to speed quickly, so it just seemed to make sense to me that we would bring somebody in who had some prior working knowledge rather than starting somebody who -- especially given the circumstances.

Q Was there any consideration to bringing on Mr. Felix as a full-time employee?

A I don't -- no, I don't know

Maiorini

whether --

Q Does he still work here?

A Yes.

Q Is he still a contractor?

A He's still a contractor, yeah.

Q Is he still in the same role?

A Yes. Yes.

Q Does the company have a policy to your knowledge regarding severance payments for employees who were terminated?

A There is a -- I'm not sure what the details of the severance are. It was normally based on number of years of service or something like that. And I'm not sure whether it's changed since we merged, as far as, you know, the amount of time around that, but, yeah. If your position's eliminated, there's usually some severance that's associated with that.

Q And because a contractor is filling Mr. Rinsky's job responsibilities, is that why you consider it to be not an eliminated position?

MR. BERLUTI: I'm going to object to this. This is outside the scope of his designation. I think if

you had questions along these lines that would have been more appropriately put to Katrina Hicks from Human Resources. I granted some leeway on some of the preliminary questions, but I think it's now beyond his -- the scope of his designation.

Q We'll move on. I'll show you Exhibit 21 which is an email from Ms. Hicks to yourself and others dated 6/22/2015. It begins, (reading) Hi all, I think we need to sit down and discuss given this new information.

Do you recall this email?

A Oh, this was after they had the conversation with him. Right. I think, yeah, this was -- this was related to the fact that I think that Yury felt that he was given permission or that I guess we arranged for equipment for him or something to that extent where Katrina wanted to just cross all the i's -- cross all the t's and dot all the i's and make sure that we didn't communicate to Yury in any way a confusing message that maybe he misinterpreted as being approved to relocate, so I remember having this conversation

with them.

Q There appears to be three attachments to this email which the first one says, (reading) Moving to Boston, the second one says, Re: Moving to Boston, and the third says, Re: Missed conversation with Scott Sommer.

Do you recall reviewing the attachments to this email?

A I don't.

Q This is Exhibit 22 which I'll represent to you was one of the attachments to this email. The title of the email is Missed conversation with Scott Sommer. I just ask if now that you are reviewing the document, if that refreshes your memory as to whether you saw that?

A I don't recall. See, I think -- well, this doesn't matter if there was anything before this because I'm wondering why, like, what initiated this conversation, but.

Q Well -- I'm sorry. This is my only copy.

A Oh, no, no, no, not a problem.

Q It appears to start with an instant message from Mr. Sommer to Mr. Rinsky which

states, (reading) Good afternoon. Your desktop is still in New York. Do you need it?

Is that accurate?

A Yeah.

Q As of the date of this email which is --

A Right, this is --

Q -- June 2, 2015, was there any consideration being given to Mr. Rinsky being allowed to transfer to Boston?

A No.

Q Was there --

A Well, I mean, other than what we've talked about, I think that, you know, reading this it seems like, you know, Colin -- Colin hasn't had the conversation with Yury yet that he's not going to be permitted to -- you know, he's not given the options yet and it looks to me like he's just trying to keep things status quo until, you know, we can have that communication with Yury. I mean, I'm --

Q As of the date of this --

A -- this is based on how I read it.

Q Sorry. I understand you didn't

Maiorini

write it and you didn't receive it.

At the time of this email which is June 2, 2015, was there any consideration being given to Mr. Rinsky being granted office space in Boston?

A Yeah, I can't honestly say that. I don't know when Craig made the final decision that that -- that we were not going to follow the plan that we had outlined in that previous email or the consideration that we had outlined, so my answer would be based on when Craig made that decision.

Q I'll show you -- let's trade.

A Sure. Thank you.

Q This is a document that's been labeled as Exhibit 24. This is involving Jay Leiser's relocation request that we discussed earlier.

A Yes.

Q Do you see at the bottom of page 1 of that document there's an email from Mr. Cuyar to Mr. Wolf copying yourself and Ms. Hicks which states in part, (reading) I have considered your request, but need to stand firm on the decision not to allow Jay or others to relocate at this

Maiorini

time.

Did I read that correctly?

A Yes.

Q So as of July 3, 2015, Mr. Leiser's relocation request had been denied; is that correct?

A Correct.

Q And is it your understanding that as of this time no one in your department was going to be allowed to relocate anywhere?

A Yes.

Q Any reason for that decision at that time?

MR. BERLUTI: Objection.

A I don't know.

Q The timing of this denial, is this the same time period during which the company was considering Mr. Rinsky's employment status?

MR. BERLUTI: Objection.

A I'm not sure how to answer that. I don't know. It comes down to when Craig made the final decision that we were not going to move Yury because Bill's clearly initiating this on July 2nd and I'm not sure whether -- so he's initiating the

conversation to Craig; Craig is reacting to that. I'm not sure that -- when Craig made the actual decision on Yury, like, the final decision. That's the information I would need to be able to answer your question and I don't know that answer.

Q I show you a document that we looked at earlier. It's Exhibit C to Exhibit 6 and it's the letter dated July 14, 2015, from Mr. Reid to Mr. Rinsky, in which he states in the second bullet from the bottom that his, Mr. Rinsky's, employment has been terminated effective July 10, 2015; is that correct?

MR. BERLUTI: Say which second bullet --

A So this conversation happened on July 6th, so the decision had to have been made before July 6th.

MR. BERLUTI: July 10th.

THE WITNESS: Well, no. July 6th, though, is the day they had the conversation, right, so he delivered this message on July 6th.

A I know I'm not supposed to assume, but Craig made that final decision before

Maiorini

July 6th, otherwise this wouldn't be here.

Q But whether it's July 6th, July 10th, July 14th, the dates referenced in this letter, those are all after July 3rd, right?

A Yes.

Q So the decision on Mr. Leiser preceded the decision on Mr. Rinsky?

MR. BERLUTI: Objection.

A I don't know.

Q The decision on Mr. Leiser was made during the same time period in which Mr. Rinsky's employment status was being considered?

MR. BERLUTI: Objection.

A I don't know.

Q Okay.

A Just because that letter says one thing --

MR. BERLUTI: You answered the question.

Q You testified earlier, though, that at some point at a later time Mr. Leiser's relocation request was granted, correct?

A Yes. Yes.

Q Do you have any understanding of why

this firm policy that's being stated in this email by Mr. Cuyar changed?

A Well, based on the -- you know, the fact that we had time to take a look at, you know, Jay's role, Jay was moving back and forth. You know, we made sure that there wouldn't be any impact from, you know, Jay moving to Florida. And the fact that we were now a new company that was a little bit more tolerant of people working remotely, it seemed like a good time to -- to revisit that, so we had much more information at that point about Jay's ability to be effective remotely than we had prior to that.

Q Was Mr. Rinsky's situation -- strike that.

Did Mr. Rinsky's situation play any role in the decision made regarding Mr. Leiser's transfer request?

MR. BERLUTI: Objection.

A I -- yeah, I don't know. I don't know.

Q Were you concerned about Mr. Rinsky bringing a lawsuit?

MR. BERLUTI: Objection.

A No.

Q Do you know if Mr. Cuyar was?

A I have no idea.

Q In the final sentence of his email dated July 3rd on Exhibit 24, it says, (reading) This decision is firm and is made with the desire to provide consistent treatment of staff and to eliminate potential employment disputes and subsequent litigation if we don't.

A Then, yes, he did consider it.

MR. SZAL: Take a break?

MR. BERLUTI: Sure.

(Whereupon, at 11:27 o'clock a.m., a recess was taken to 11:40 o'clock a.m.)

(The deposition resumed with all parties present.)

L; E I F M A O I R I N I, resumed and testified further as follows:

BY MR. SZAL:

Q Did you approve the scope of work for the contractor that was backfilling Mr. Rinsky's role?

A No.

Maiorini

Q Did you sign it?

A Did I sign it? I could have, yeah. I mean, I normally do sign contracts, so.

Q So you were the signatory, but you don't necessarily review them?

A Well, I review them, but I don't know that I recall the precise scope of work that was on the contract.

Q Do you remember when you might have seen the scope of work?

A No. I'm sure it was around the timeframes we're discussing, right, because we were bringing in Edgardo specifically to take over, you know, the role that Rinsky had, so -- that Yury was performing.

Q To your knowledge, did anybody tell Mr. Rinsky during late May and early June that a contractor had been brought in to backfill his role?

A Not to my knowledge, no.

Q Who would have been responsible for communicate that information?

MR. BERLUTI: Objection.

Q If you know.

Maiorini

A I mean, that would be Colin or potentially be Andrew.

Q Did you have any input in terms of the timing of Mr. Rinsky's termination?

MR. BERLUTI: Objection.

Q I'll ask a better question. Did you make any suggestions as to how soon the termination should occur?

A Well, on that one email it said as soon as possible. That was based on Craig's feedback. My involvement at that point was once, you know, I felt that Yury had done the wrong thing that that went to HR and that went to Craig to make that decision, so I clearly carried out whatever the decision, you know, that was made was, but, no, I didn't have.

MR. SZAL: Let's mark this as the next one, please.

Q Were you asked to provide any information with respect to written questions that were sent to Cushman & Wakefield in this lawsuit?

A Not to my knowledge.

Q Did you review any of the responses?

A No.

Maiorini

(Email dated 6/4/2015, was marked as Maiorini Exhibit No. 25 for identification, as of this date.)

Q This is an exhibit that's been labeled 25. It's an email from Mr. Hamilton to Mr. Reid dated 6/4/2015. In the first line, it says, (reading) Risa has not reassigned the desk, so we can swoop in next week.

Do you have any idea what that refers to?

A Because we're a bunch of vultures around here. No, we've had issues, or at least at that time we had issues with seating. Because of the merger and everything else we were doing, there were just so many people in this office that desks were at a premium. So Yury had clearly an assigned desk, so, of course, if he was -- wasn't going to be here, we were going to look to reassign that desk.

Q The next line, says (reading) Also spoke to Leif and will make a last case for some more time for Yury to manage the risk of transition, but Leif echoed your impression of immediate action perhaps by Wednesday.

Maiorini

Did I read that correctly?

A Yes.

Q Do you recall the conversation that's been referenced by Mr. Hamilton in this email?

A Yeah, I don't know if what he's talking about as the immediate action is the termination of Yury or whether it is the bringing on of Edgardo. It's hard to tell. I don't recall. Yeah, I don't know.

Q Just in terms of the conversation he's referring to, you don't have any recollection of that specific conversation, do you?

A I don't.

MR. SZAL: Exhibit 26.

(Email dated 6/4/2015, was marked as Maiorini Exhibit No. 26 for identification, as of this date.)

Q The document that's been placed in front of you and labeled as Exhibit 26 is email dated 6/4/2015, from Mr. Reid to you and Mr. Hamilton. I just ask if you'd review that email and if you can explain what's being discussed in there with respect to Mr. Rinsky's work?

Maiorini

A This is related to what we were talking about before where Yury maintained the commission accounting system. And because of the work we were doing with Workday, we needed to make some changes to that system to account for brokers appropriately, and that's what he's talking about, the use of the E number versus the W number. That's what's he is referring to because there was a -- basically, there's a difference in the numbering of the two systems and he's going to have to make changes for that to work properly.

And then he found, basically, tentacles in other systems, 129 programs that would need to be changed as a result of that and he's estimating that it's probably 27 man-days to do that, and I guess Colin's saying he would add some additional time.

Q Are you being asked in this email to provide any input?

A No. This is just an update.

Q So you are just being copied to keep you in the loop?

A Yeah.

Q Okay.

Maiorini

MR. SZAL: Mark this one, too.

(Email dated 6/5/2015, was marked as Maiorini Exhibit No. 27 for identification, as of this date.)

Q This is a document that's been labeled as Exhibit 27, an email from Andrew Hamilton to yourself copying Mr. Reid dated 6/5/2015. The subject matter is (reading) Reflection on timing for Yury's separation; is that correct?

A Yes.

Q Do you recall this email?

A Not specifically, but it's clearly an email that I received. I mean, we had a lot of conversation around the subject matter, so I do recall the subject matter.

Q Is it fair to say that as of 6/5/2015, the decision had been made to terminate Mr. Rinsky, but the date of that termination had not been decided yet?

A I don't know.

Q Do you know if you provided any type of response to this email?

A I don't.

Maiorini

Q With respect to Workday deliverables, is that something where you would have deferred to Mr. Hamilton's opinion?

A Yeah. Andrew -- both Andrew and Colin I would have definitely -- they were, you know, running different aspects of that -- of that project. Sure.

Q Do you know who Sue Bennetti is? Susan Bennetti?

A Susan, yeah, I do. Susan Bennetti. Who was -- I know the name.

Q I'll ask you another question. Do you recall having a meeting or conversation between yourself, Ms. Hicks, Mr. Reid, Susan Bennetti, Craig Cuyar and Mr. Reid regarding Mr. Rinsky's personnel issue?

A I don't recall specifically, but it doesn't mean it didn't happen.

Q If I showed you an email that's scheduling a meeting between all those people on June 25, 2015, is that going to help your recollection at all as to what was discussed?

A No, it's not.

Q We won't bother, then.

Maiorini

A That's driving me crazy. Susan Bennetti. Must be HR.

Q In your opinion, sir, had Mr. Rinsky requested transfer prior to his moving to Boston, would you have considered the request differently?

A Yes.

Q Is there a possibility that if he had asked to move to Boston in advance that that request may have been allowed?

MR. BERLUTI: Objection.

A Yeah, but likely with modification.

Q What do you mean by "modification?"

A So, again, I think the trepidation that we would have had on the request was that the role was a New York based role, that his constituents were all in New York. Similar to Colin and to Jay, I think we would have wanted assurances that that role could be performed outside, so we would do that over some timeframe to make sure that that would work before approving it.

Q And, again, you weren't involved in evaluating any of Mr. Rinsky's work between the time he moved to Boston and the time he was

terminated; is that correct?

A That's correct, yeah.

Q You weren't privy to any conversations that Mr. Reid might have had with Mr. Hamilton concerning this issue, are you?

A No.

Q And in your opinion -- strike that.

What is the reason that the plaintiff, Mr. Rinsky, was terminated by the company?

A Basically, for not notifying his supervisor prior to moving to another location.

MR. SZAL: That's all I have.

MR. BERLUTI: I have a couple of questions.

EXAMINATION BY MR. BERLUTI:

Q Let's pick up with that one. When you say without "notifying his supervisor," do you mean by that by not obtaining --

A Approval.

Q -- approval by the company for the transfer?

A That's exactly what I mean.

Q How old are you, sir?

A Fifty.

Q Did anything --

A No, no, really I am. I am. I know it's hard to believe. I'm sorry.

Q Did -- do you know how old Mr. Rinsky is?

A I do not.

Q At the time in 2015, did you have any knowledge of how old Mr. Rinsky was?

A I did not.

Q What if any role did age play in the decision of the company not to grant Mr. Rinsky's request for transfer?

A None. I mean, you know, even when we said if he was willing to work out of New York, he would probably still be working here today.

Q In 2015, Mr. Maiorini, did you have any knowledge of any medical condition that Mr. Rinsky suffered from?

A No.

Q What role, if any, did any medical condition that Mr. Rinsky may have had play in the decision of the company not to grant his request to transfer to Boston?

Maiorini

A None.

Q What role, if any, did either age or any medical condition have in the company's decision to terminate Mr. Rinsky's employment on July 10, 2015?

A None.

Q You were asked some questions, Mr. Maiorini, about the date of the merger between Cushman & Wakefield and DTZ.

A Right.

Q Do you recall that?

A I do.

Q I'm going to show you a document which is a notification of the merger that was attached as Exhibit A to Exhibit 6, Colin Reid 6, and ask you to take a look at that announcement. I'm going to direct your attention specifically to the line about a quarter way down that says, (reading) Chicago, September 2, 2015.

A Correct.

Q And after reviewing that document, Mr. Maiorini, is your memory refreshed as to when the merger of Cushman & Wakefield and DTZ was completed?

Maiorini

A Yes.

Q And when was it?

A September 2nd of 2015.

Q Okay. So when you testified 2000 --

A I think I said '16.

Q Then you went back to '16. It's -- 2015 is the correct date?

A '15.

Q You were also asked the question about what effect, if any, the merger had between Cushman & Wakefield and DTZ on Mr. Rinsky's job at the Cushman & Wakefield?

A Right.

Q What effect did it have?

A It definitely made the job more complex in the matter of, you know, you were now doing a lot more work as a result of the -- of the merger to bring things together in finance and HR and all of the supporting applications, so there was a lot more work, let's say, going on at that time --

Q Okay. And just to --

A -- and the urgency of that work, you know, because it has to be done within a certain

Maiorini

timeframe.

Q So the Massey, M-a-s-s-e-y, Knakal -- I believe it's K-n-a --

A K-e-l.

Q -- k-e-l merger occurred in the fourth quarter of 2014?

A Correct.

Q And so some of the work being done to assimilate those employees and those systems was occurring in the first and second quarter of 2015?

A That's -- that's reasonable, yes.

Q We saw some references to MK in the emails.

A Yes. Yes. Yes. And that was -- that was Massey Knakal.

Q Okay. And in addition to that, there was this new system called Workday that was being implemented, correct?

A Yes.

Q And, in addition, there was the work in connection with the Cushman/DTZ merger. All of that had information technology ramifications; is that correct?

Maiorini

A Correct.

Q And all of that impacted both the quantum of work and the deadlines of the work being done by Mr. Rinsky; is that correct?

A That's correct.

Q You were asked some questions about Robert Maison. Do you recall that?

A Yes.

Q And you testified that Robert Maison, who was in the security and risk assessment group, was not part of your group; do you recall that?

A I do.

Q All right. Now, was Mr. Maison in the group -- in a group that ultimately reported up to Mr. Cuyar?

A Yes.

Q So the policy enunciated about transfers by Mr. Cuyar applied to Mr. Maison as they did to Mr. Reid, Mr. Rinsky and Mr. Leiser?

MR. SZAL: Objection.

A Yes.

Q Now, you were asked some questions about when you learned about Mr. Rinsky moving to

Boston, and I believe you testified it was the April timeframe. I would like to see if we can sharpen that a little bit.

First of all, you learned about Mr. Rinsky moving to Boston from whom?

A Colin Reid.

Q And do you recall what it was that Colin Reid told you when he first told you about Mr. Rinsky's desire to move to Boston?

A Yeah. It was a conversation with -- with Colin where Colin basically said we have an issue that Yury informed him that he was moving to Boston and that he wanted to work out of the Boston office, and that he had a -- you know, had a date that he was moving, et cetera, like it was pretty much a foregone conclusion that he was moving, and that he had let Colin know that.

Q So at the time that Mr. Reid spoke to you about this issue, it was not a request to move. Mr. Rinsky had already announced that he was moving; it was a fait accompli. He was moving?

MR. SZAL: Objection.

A Based on the -- based on the content

Maiorini

of the conversation with Colin, yes.

Q And I'm going to show you again Colin Reid Exhibit 9 and the email dated May 17, 2015, Mr. Rinsky to Mr. Reid. (Reading) Colin, as discussed, I will be moving to Boston on May 27, 2015, for family reasons and need to take four personal days after Memorial Day, May 26th to May 29th.

Was the information in Exhibit 9, the lower part of Exhibit 9, this May 17th email from Mr. Rinsky to Mr. Reid, what Mr. Reid conveyed to you?

A Yes.

Q So after looking at that are you able to estimate when it was that you first learned that Mr. Reid -- excuse me -- that Mr. Rinsky had moved to Boston?

A Yes. It would be, you know, in that May timeframe.

Q Sometime --

A Sometime after.

Q -- after May 17th?

A Yeah.

Q Okay. You testified as to why

Maiorini

Mr. Rinsky's request was essentially dead on arrival because he did not follow the process that was required of getting approval first. You also testified about his constituents being in New York City. Do you recall that?

A Yes.

Q All right. Let me ask you about his compensation level. Does where a person's job is based have anything to do with the level of their compensation?

A Yes.

Q And how is the compensation level for people based in New York assessed as to other locations and, specifically, Boston?

A We do that through HR, so where we're hiring the role, HR will go through a process of figuring out what the acceptable salary bands are for that role in that geographic location.

Q And had -- by Colin moving without asking anyone, HR had not done an assessment as to whether or not his compensation level, if he was allowed to transfer to Boston, would be changed at all, correct?

MR. SZAL: Objection. You also said Colin, so.

Q Let me strike that and start over again.

With Mr. Rinsky moving without permission, were you aware of whether there was any assessment done as to his compensation level between Boston and New York?

MR. SZAL: Objection.

A Yeah, no, I'm not aware that there was any. I mean, they wouldn't just do that, right? It would have to -- there would have to be some catalyst for them to do that.

Q At any time when you spoke to Mr. Reid in connection with Mr. Rinsky's move to Boston, did Mr. Reid ever tell you that he had told Mr. Rinsky that it was okay for him to move to Boston?

MR. SZAL: Objection.

A No.

Q You were asked some questions about Jay Leiser's transfer. Do you recall that?

A Yes.

Q And I believe your testimony was

that eventually Mr. Leiser's request to transfer was approved. Do you recall that?

A Yes.

Q Do you know who it was that ultimately approved -- strike that.

First of all, when it was rejected, who was it that rejected Mr. Leiser's request to transfer?

A Craig Cuyar.

Q When Mr. Leiser's request to transfer was approved, who was it that approved it?

A It would have been Adam Stanley.

Q Mr. Cuyar's successor?

A Yes.

MR. BERLUTI: Nothing else.

MR. SZAL: Just a couple of follow-ups.

RE-EXAMINATION BY MR. SZAL:

Q Exhibit No. 9 that we looked at earlier, this is the email on May 17, 2015, from Mr. Rinsky to Mr. Reid, as well as Mr. Reid's response on May 18, 2015; is that correct?

A Correct.

Q Okay. And in this, Mr. Rinsky says, (reading) As discussed, I will be moving to Boston on 5/27/2015, in part; is that correct?
A Yes.
Q And is it fair to say that there were 10 days between when he sent this email and when he was planning to move to Boston?
A Yes.
Q Okay. As such, during that time there was an opportunity for the company to tell Mr. Rinsky he was not permitted to do so; is that correct?
A Yes.
Q Okay. And the company had the opportunity to tell Mr. Rinsky that if he moved to Boston on 5/27, he risked termination; is that correct?
A Yes.
Q Are you aware of anybody communicating that information to Mr. Rinsky before he moved to Boston?
A I am not.
Q Are you aware of anybody communicating that information to him prior to the

Maiorini

conversation Mr. Reid and Ms. Hicks had with him on June 22nd?

A I am not.

Q When you said Mr. Rinsky's constituents, what did you mean by that term?

A The business employees that he works with, the finance personnel that he -- that he works with.

Q Did he work exclusively with people in the New York office?

A Yes.

Q He didn't do any work for a company outside of --

A I mean, he may have -- I'll let you finish the question. I'm sorry.

Q He didn't do any work for anyone outside of the New York office to your knowledge?

A I mean, to my knowledge, if so, it was minor. I mean, the commission accounting group that uses that system is all New York based.

Q Are you aware that when Mr. Leiser initially requested a transfer that the company wanted to evaluate his compensation based on the cost of living in Florida?

A Yes. That makes sense.

Q Was that ever done with respect to Mr. Rinsky and Massachusetts?

A I don't believe so, no.

Q Was there ever any consideration to allowing Mr. Rinsky to keep his job and work in Boston, but at a lower salary?

MR. BERLUTI: Objection.

A No, not to my knowledge.

MR. SZAL: I have no further questions and, as with yesterday, I am going to suspend this deposition pending production of further documents that this witness may need to be questioned on as a designee of the company.

MR. BERLUTI: Same objections as to his reservation.

(Whereupon, at 12:10 o'clock p.m., the deposition was suspended.)

C A P T I O N

The Deposition of LEIF MAIORINI, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

The Deponent will read and sign the transcript of said deposition.

C E R T I F I C A T E

STATE OF________________________________:

COUNTY/CITY OF_______________________________:

Before me, this day, personally appeared LEIF MAIORINI, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_________________________

LEIF MAIORINI

SUBSCRIBED and SWORN to before me this___________

day of _____________, 2017, in the jurisdiction aforesaid.

_______________________ _____________________

My Commission Expires Notary Public

DEPOSITION ERRATA SHEET

RE:
FILE NO.
CASE CAPTION: Yury Rinsky vs. Cushman & Wakefield, Inc.
DEPONENT: Leif Maiorini
DEPOSITION DATE: February 24, 2017

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request for the following changes be entered upon the record for the reasons indicated.

I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________
______________________________________________________

SIGNATURE:_________________________ DATE:____________
Leif Maiorini

I N D E X


| Witness | Examination by: | Page |
|---|---|---|
| LEIF MAIORINI | Mr. Szal | 4, 93 |
| | Mr. Berluti | 83 |


E X H I B I T S


| Maiorini For Ident. | Description | Page |
|---|---|---|
| 25 | Email dated 6/4/2015 | 77 |
| 26 | Email dated 6/4/2015 | 78 |
| 27 | Email dated 6/5/2015 | 80 |

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

I, CAROL MELE, a Registered Professional Shorthand (Stenotype) Reporter and Notary Public of the State of New York, do hereby certify that the foregoing Deposition, of the witness, LEIF MAIORINI, taken at the time and place aforesaid, is a true and correct transcription of my shorthand notes.

I further certify that I am neither counsel for nor related to any party to said action, nor in any wise interested in the result or outcome thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of March, 2017.

_______________________________

Carol Mele, RPR