UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YURY RINSKY,<br><br>Plaintiff,<br><br>v.<br><br>CUSHMAN & WAKEFIELD, INC.,<br><br>Defendant. | C.A. No. 16-10403 |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL**

NOW COMES Plaintiff, Yury Rinsky ("Plaintiff"), by and through counsel, and hereby files this opposition to Defendant, Cushman & Wakefield, Inc.'s ("Defendant") Motion for a New Trial ("Rule 59 Motion").

## I. BACKGROUND

Defendant seeks a new trial by rearguing points the Court did not find persuasive on summary judgment and the trier of fact did not find persuasive at trial. In doing so, the Defendant failed to cite to the record even though it obtained daily transcripts. Plaintiff recounts some the essential facts here, which are overwhelming, while also expressly making reference and incorporating the facts from its opposition to Defendant's motion for summary judgment and Plaintiff's Rule 56.1 statement of facts herein, all of which were established at trial.

Plaintiff began working for Defendant in 1988. Transcript of Jury Trial ("TJT"), p. 46 (transcripts of Day 2 through 5 of trial are attached hereto as Exhibits A1, A2, A3 and A4). Plaintiff's area of expertise was the AS/400 computer system. TJT, p. 46. In 2015, Defendant started to phase out the AS/400 system. TJT, p. 48. Beginning in 2012, Defendant told Plaintiff to work remotely because of a space issue in the New York City office. TJT, p. 55. Between 2012 and 2015, Plaintiff typically worked remotely three or four days per week, spending one or

two days per week in the New York City office. TJT, p. 56. Defendant did not restrict where Plaintiff performed remote work. TJT, p. 64.

Plaintiff, who was 63 years old at the time of his termination, planned to retire when he was 66 or 67. TJT, p. 60. He and his wife purchased an investment property in the Boston area in 2014, intending to fix it up and rent it until Plaintiff's retirement. TJT, p. 62. Plaintiff requested approval from Defendant for a transfer to Boston at the end of March 2015 after learning transferring was a possibility. TJT, pp. 69-70. Plaintiff asked his manager, Colin Reid ("Reid"), but was told that Reid was busy and unable to talk about the request at that time. TJT, p. 70. Plaintiff spoke with Reid again a few days after receiving an offer on his house. TJT, p. 73. He again asked for approval to transfer to Boston. TJT, p. 74. Reid told him that he approved, but that Reid also needed to talk to his manager, Andrew Hamilton ("Hamilton"). TJT, p. 74. Reid did not explain that any other process or approvals were necessary. TJT, p. 75. A few days later, Plaintiff followed up with Reid; he was told that Reid had not spoken with Hamilton yet because everyone was busy. TJT, p. 77. About four days later, Plaintiff again spoke with Reid, who told him that Hamilton had approved the transfer. TJT, pp. 77-78. Plaintiff was told that Global CIO Craig Cuyar ("Cuyar") would call to obtain office space for him in Boston. TJT, p. 78. At this point, Plaintiff understood that his transfer request was approved. TJT, p. 79.

Plaintiff continued to work business as usual in New York after the approval of his transfer. TJT, p. 79. Upon learning of the closing date for the sale of his house, Plaintiff emailed Reid on Sunday, May 17th, informing him that he would be moving to Boston on May 27th. TJT, p. 80; Trial Exhibit ("TE") #12, attached hereto as Exhibit B. Reid responded, "OK, we will talk on Tuesday." TJT, p. 81; TE #13, attached hereto as Exhibit C. Plaintiff met with Reid on Tuesday; they discussed logistics concerning the transfer. TJT, pp. 82-83. On May 22nd, Plaintiff's last day of work in the New York City office, Reid met with Plaintiff to go over his

list of tasks for June. TJT. p. 84. Plaintiff then made the rounds, saying goodbyes to co-workers before leaving.[1] TJT, p. 84. Plaintiff closed on the sale of his house[2] on May 25th and moved to the Boston area two days later. TJT, p. 90. During the period between Plaintiff's May 17th email and his departure for Boston on May 27th, no one ever told Plaintiff that his transfer was not approved or that he risked termination by moving to Boston. TJT. p. 232.

Unbeknownst to Plaintiff, on the day he was moving to Boston, Defendant was putting together a six-point plan to (1) replace Plaintiff with Felix; (2) begin knowledge transfer between Plaintiff and Felix; (3) process Plaintiff's transfer and retain him for about 9 weeks to cover important work; and (4) then terminate him while "mitigating litigation risks." TJT, pp. 229-230; TE #20, attached hereto as Exhibit I.

Upon arriving in the Boston area and obtaining Internet access, Plaintiff emailed Reid a day earlier than expected and began to work remotely. TJT, pp. 86-87. Shortly thereafter, an employee of Defendant emailed Plaintiff to ask if he still needed his desktop computer in New York. TJT, p. 92. Copying Reid on the email, Plaintiff responded saying he would need it when

---

[1] Even before Plaintiff left New York City, there were many things going on behind the scenes in preparing for his termination. Even before Plaintiff's May 17th email, Hamilton was discussing terminating Plaintiff. See TE #11 attached hereto as Exhibit D. The same day Reid met with Plaintiff to discuss the logistics of his transfer, he was meeting with Hamilton to discuss terminating Plaintiff. See TE #15 attached hereto as Exhibit E. The next day, Reid solicited Edgardo Felix ("Felix") to replace Plaintiff. See TE #23 attached hereto as Exhibit F. On Plaintiff's last day in the New York City office, Reid and Hamilton set up a meeting for the following week to discuss Plaintiff's termination. See TE #18 attached hereto as Exhibit G. The meeting that ultimately resulted in a plan on how Defendant would terminate Plaintiff.

[2] The jury saw Defendant's significant reliance on and argument concerning Plaintiff's home purchase for what it was: a red herring. The sale of Plaintiff's house had no effect on his job. The evidence at trial clearly established that the offer Plaintiff received for his house contained an option to rent back the house after it was sold. TJT, p. 71; see TE #5 attached hereto as Exhibit H. Plaintiff's requested transfer did not have any effect on the sale, because if the request had been rejected rather than approved, Plaintiff had the option to remain in his house. TJT, p. 77. He did not need to move. TJT, p. 72. Once he understood that his transfer had been approved, Plaintiff closed on the sale and did not execute the leaseback provision. TJT, pp. 85-86.

he obtained space in the Boston office in a couple of weeks. TJT, p. 93. Reid replied to all, copying Hamilton, stating that Plaintiff "might be getting new equipment in Boston." TJT, p. 94; TE #13, attached hereto as Exhibit J.

During June, Plaintiff had daily interactions with Reid by email and phone, which were "business as usual." TJT, p. 98-99. During this time, Plaintiff worked fourteen-hour days, six days per week. TJT, p. 92. Plaintiff was invited to participate in a conference call with Reid and Hamilton on June 22nd. TJT, p. 100. During the call, Hamilton angrily told Plaintiff that he needed to report to New York the next day, and work in the New York City office five days per week; if he did not, he could either resign or be terminated. TJT, pp. 101-103. Plaintiff was later sent an email with the text of a resignation letter; Plaintiff refused to resign. TJT, pp. 106-107. After a period of review by Defendant, Plaintiff was terminated per a letter from Reid emailed to him on June 14th, which contained numerous false statements. TJT, pp. 117-122.

All of the decision makers concerning Plaintiff's employment were in their 40s, significantly younger than Plaintiff.[3] TJT, p. 75. Neither Hamilton, a current employee of Defendant, nor Cuyar, a former employee of Defendant working in New York City, were called to testify at trial.[4] Plaintiff's replacement, Edgardo Felix was approximately 48 years old at the

---

[3] Although Defendant attempts to compare Reid and Anna Kleynshteyn to Plaintiff, each had a significantly different job than Plaintiff. TJT, p. 95, 209. Neither is a comparator for purposes of a discrimination analysis. See, e.g. Robles v. Cox and Co., Inc., 987 F. Supp. 2d 199, 207 (E.D.N.Y. 2013) ("comparator must be similarly situated to the plaintiff in all material respects"). At trial, Defendant offered no evidence as to whether either were, for example, "subject to the same performance evaluation and discipline standards" as Plaintiff or "engaged in comparable conduct." Id. Further, Ms. Hicks testified that management kept information from her relative to Mr. Rinsky's situation. And Mr. Reid admitted that emails about his transfer and desktop arrangements were similar to those sent to Mr. Rinksy. The jury had ample evidence to determine that the entire transfer was a ruse for terminating an older worker.

[4] Plaintiff did not seek an absent witness instruction, although one would have been appropriate. See Latin Am. Music Co. v. Am. Soc. of Composers Authors and Publishers, 593 F.3d 95, 101 (1st Cir. 2010). The instruction "informs the jury that a party's failure to produce a

time of Plaintiff's termination. TJT, p. 99. Evidence was also introduced at trial that during the relevant period, another younger employee (Jay Leiser) had sought a transfer to Florida because his wife was starting a dental practice there. Cuyar, who did not testify at trial, stated in an email that he wanted to handle the transfer requests differently. With Leiser, he wanted to address his compensation because Leiser was moving to a state with a lower cost of living; in contrast, he ordered that Plaintiff be terminated. TJT. pp. 393-395; TE #33, attached hereto as Exhibit J. Later, when Plaintiff's prospective termination had become a legal issue, Cuyar ordered that no one would be allowed to transfer in order to "eliminate potential employment disputes and litigation." TJT, pp. 341-342; TE #57, attached hereto as Exhibit K. After the dust had settled, however, Leiser was transferred to Florida and currently manages a team in India, while Plaintiff was terminated. TJT, p. 407.

## II. STANDARD OF REVIEW

"A party seeking to overturn a jury verdict faces an uphill battle." Lund v. Henderson, 807 F.3d 6, 12 (1st Cir. 2015) (citation omitted). "A motion for a new trial is not to be taken lightly but should only be granted when an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." Starski v. Kirzhnev, CIV.A. 06-10157-DPW, 2011 WL 923499, at *3 (D. Mass. Mar. 15, 2011), aff'd, 682 F.3d 51 (1st Cir. 2012) (citation omitted).

Although a court may weigh evidence in a Rule 59 motion, "a district judge cannot displace a jury's verdict merely because [s]he disagrees with it or because a contrary verdict may have been equally supportable." Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009) (internal quotation marks omitted). The case law is clear that the court should refrain from substituting its view of the evidence for the jury's, and should not interfere with both parties' "right to have

---

particular witness may justify the inference that the witness' testimony would have been unfavorable to that party." However, the jury may have made that inference on its own.

questions which are fairly open resolved finally by the jury at a single trial." See Ahern v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996). "Moreover, the trial court's discretion is quite limited concerning motions for new trials. A trial judge may not upset the jury's verdict merely because he or she might have decided the case differently. On the contrary, a trial judge may grant a new trial only if she 'believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.'" Velazquez v. Figueroa-Gomez, 996 F.2d 425, 428 (1st Cir. 1993) (citations omitted).

A new trial on the basis of jury instructions is inappropriate unless the party who properly objected establishes that the instructions were (1) misleading, unduly complicated, or incorrect as a matter of law, and (2) cannot be considered harmless. Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir. 1989). A new trial should only be ordered where an erroneous instruction affected "the essential fairness of the trial, or would have changed the outcome." Elwood v. Pina, 815 F.2d 173, 177 (1st Cir. 1987). See also Fed. R. Civ. P. 61 ("[A] court must disregard all errors and defects that do not affect any party's substantial rights.").

## III. ARGUMENT

### A. The Verdict Was Consistent With The Weight Of The Evidence.

Defendant essentially argues there is no direct evidence of its discriminatory intent, and therefore a new trial should be granted. To the contrary, courts have long held that "[b]ecause an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

In that regard, a plaintiff may establish that an adverse employment action is discriminatory by, among other things, demonstrating "weaknesses, implausibilities,

inconsistencies, or contradictions" in the employer's proffered reasons for its action. Zann Kwan v. Andalex Group LLC, 737 F.3d 834, 846 (2d Cir. 2013). "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Id. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Reeves, 530 U.S. at 147.

Here, the jury clearly did not credit Defendant's proffered reason for Plaintiff's termination. Among other things, a reasonable jury could disbelieve that (1) Plaintiff, who had worked for Defendant for twenty-seven years, unilaterally transferred to Boston without approval; and (2) Defendant needed Plaintiff to be in New York City five days a week, particularly where he had worked up to four days per week remotely before his move and testimony at trial established that Defendant did not care where Plaintiff performed his work, as long as he was available. TJT, p. 433. A reasonable jury could also disbelieve that Defendant wanted to continue employing Plaintiff and decided to terminate him based on his failure to report to New York City. To the contrary, the evidence at trial established that the decision to terminate Plaintiff had been made before he even left for Boston. A reasonable jury could also disbelieve that Defendant never discussed Plaintiff's age internally and harbored no discriminatory animus, despite no direct evidence of the same.

In the same regard, the jury was entitled to credit and believe, among other things, that (1) in 2015, Defendant began a "phase out" of its 25-year-old AS400 system, Plaintiff's only basis of knowledge; (2) Defendant did not need Plaintiff to be physically in the New York office, and in fact asked him to work from home up to four days per week during his last 3 years of

employment; (3) work in Plaintiff's department could be performed remotely and anywhere with a laptop connection; (4) Plaintiff was told in April 2015 that his transfer was approved; (5) in May 2015, Defendant was putting in place a plan to terminate Plaintiff even while he was still working in New York City, which included a step to approve the very transfer Defendant asserts was denied (such conduct meant to string Plaintiff along); (6) Defendant solicited Plaintiff's replacement while Plaintiff was still working in New York City; (7) Plaintiff's replacement was 15 years younger than him; (8) the decision makers concerning Plaintiff's employment were all substantially younger than Plaintiff and in their 40s; (9) in June 2015, Defendant continued to lead Plaintiff to believe his transfer was approved by telling him he might be getting new computer equipment in Boston; (10) Defendant hid its plan from Plaintiff, until ambushing him during a telephone call in which he was told that if he did not return to New York the next day and every day thereafter, he would be fired; and (11) Defendant made its unreasonable demand for Plaintiff to return to New York City for the purpose of forcing him to resign or to provide a justification for his termination.

"A jury's verdict on the facts should only be overturned in the most compelling circumstances." Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 811 (1st Cir. 1988). This is certainly not one of those circumstances. The weight of the evidence was more than enough for the jury to return a verdict in favor of Plaintiff.

**B. The Weight Of The Evidence Supported An Award Of Punitive Damages.**

The First Circuit has stressed that "only infrequently—and then, for compelling reasons—will we, from the vantage point of an algid appellate record, override the jury's judgment as to the appropriate amount of non-economic damages to which a plaintiff is entitled." Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 174 (1st Cir. 2009) (citation omitted). "Under New York law, whether to

award punitive damages and how much to award are primarily questions which reside in the sound discretion of the original trier of the facts." Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (internal quotations omitted).[5] A motion for a new trial pursuant to Fed. Civ. P. Rule 59 should be granted sparingly, and only when the verdict is "against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." Johnson v. Spencer Press of Maine, Inc., 364 F.3d 368, 375 (1st Cir. 2004) quoting Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999); See also Bogosian v. Mercedes-Benz, 104 F.3d at 482-83 (1st Cir. 1997) ("A new trial is warranted only if the verdict, though rationally based on the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarrange of justice.").

Here, the jury reasonably found that Defendant's conduct rose to the level that made punitive damages appropriate. Among other things, the jury could reasonably have found that Defendant led Plaintiff, a loyal employee of twenty-seven years, down the primrose path, leading him to believe that he had been allowed to transfer, in order to provide a justification for terminating him and replacing him with a substantially younger contractor. This is supported by the numerous emails introduced at trial showing the backroom scheming of Defendant regarding how and when to pull the rug out from underneath Plaintiff. Defendant had every opportunity to

[5] "Courts have also been instructed to consider the wealth of the defendant, see McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc., 256 A.D.2d 269, 682 N.Y.S.2d 167, 170 (1998), because punitive damages are meant to punish and deter defendants and others from similarly willful or outrageous misconduct." Greenbaum, 67 F. Supp. 2d at 267. Plaintiff requested that the Court give the following instruction, taken from the New York Pattern Jury Instructions: "You may also consider the Defendant's financial condition and the impact your punitive damages award will have on Defendant." The Court refused to include this instruction. Indeed, the punitive damages award may have been much higher had the jury understood that it could consider that Defendant is a multi-billion dollar corporate giant in determining what amount of money would punish Defendant for its conduct.

inform Plaintiff before he moved that his transfer was not approved. It intentionally chose not to, and instead plotted the firing while Plaintiff was still in the building.

This type of conduct, whether considered to be evil, malicious, wanton, reckless, reprehensible, or wrongful (or all), supports an award of punitive damages. Defendant also fails to direct the Court to any case where a new trial was ordered under New York law because a punitive damages award was against the weight of the evidence.[6] For these reasons, the Rule 59 Motion should be denied.

**C. The Court Has Subject Matter Jurisdiction**

Despite being styled as a Rule 59 argument, Defendant's claim that the Court lacks subject matter jurisdiction is a disguised post-trial motion for failure to state a claim, which is barred as a matter of law and was waived by Defendant in any event. Defendant does not seek a new trial based on subject matter jurisdiction; it seeks post-trial dismissal. Accordingly, the Court need not consider this argument under Rule 59.

Even if the Court were to substantively consider Defendant's argument, however, it should be rejected. Defendant's position throughout the entire case and at trial was that Plaintiff's transfer was never approved. Therefore, despite the fact that Plaintiff may have been working from the Boston area immediately before his termination, it was Defendant's position that the location of his job never changed. According to Defendant, Plaintiff's job was in New York City, as it had been for the preceding twenty-seven years. Moreover, New York law is clear that it does not allow employers to terminate employees who have been induced to work remotely in order to immunize themselves from state and city laws.

---

[6] Defendant does not argue that the award was excessive, nor could it, and has thus waived that argument.

Defendant's reliance on Hoffman v. Parade Publications, 933 N.E.2d 744, 748 (N.Y. 2010) is misplaced. The plaintiff in Hoffman had only a very tangential connection to New York City as a resident of Georgia who maintained the defendant's Atlanta office. He attempted to avail himself of the New York State and City Human Rights Laws based on his constant communications with defendant's New York City office, occasional personal visits to that office, and the fact that the decision to terminate him was made and communicated to him from the New York City office. Id. at 748. The case is not factually analogous in any regard.

However, Wexelberg v. Project Brokers LLC, 13 CIV. 7904 LAK MHD, 2014 WL 2624761, at *11 (S.D.N.Y. Apr. 28, 2014), also cited by Defendant, is instructive. The case involved an employee who was terminated and who brought claims under the New York State and City Human Rights Laws. In denying defendant's motion to dismiss and for summary judgment, the court noted that despite the Hoffman court's attempt to simplify the jurisdictional analysis, "there are circumstances that may be classified as falling in a grey area." The Plaintiff in Wexelberg worked in defendant's New York City office for six weeks, and then remotely for five weeks. "[T]he five weeks when plaintiff was not physically located in the New York office, he was working remotely from his home for the New York office." Id. at *11. In finding that the plaintiff had made an adequate showing in order to claim under New York State and City discrimination laws, the Court noted that "this arrangement may present quite a different scenario from the caselaw that addresses a claim by an employee stationed at an out-of-state office." Id. The Court also expressed concern about the "form of victimization" that would result from "the simple stratagem of directing a targeted employee to do his work at home rather than at the New York office where he normally works, and then terminating him a few days or weeks later," in an attempt to immunize itself from liability under both State and City statutes. Id.

Here, similar to Wexelberg, Plaintiff initially performed work at Defendant's New York City headquarters. Believing he had been granted a transfer, Plaintiff began to perform work for the New York City headquarters remotely from the Boston area while awaiting office space and equipment. Several weeks later, he was terminated. Given the behind the scenes mendacity exhibited by Defendant with respect to Plaintiff's employment, it could very well have been Defendant's intention to employ the "simple stratagem" of terminating Plaintiff while he was working remotely from Massachusetts to immunize itself from New York law. This is not a case similar to Hoffman, where an employee staffs an out-of-state office of a company headquartered in New York. And although Defendant relies on Plaintiff's residence at the time of his termination, the case law it cites in its consolidated memorandum of law makes clear that "a plaintiff's residence is irrelevant to the impact analysis." Robles v. Cox and Co., Inc., 841 F. Supp. 2d 615, 624 (E.D.N.Y. 2012). In any event, Defendant is estopped taking this position.[7]

Beyond these facts, there was a discriminatory impact in New York City. The decision to terminate Plaintiff was not only made in New York City, but also while Plaintiff was physically working in the New York City headquarters the week before he moved to Boston. The evidence at trial showed that even before Plaintiff informed Reid of the date of his move to Boston, plans were being put in place to terminate Plaintiff. On May 14th, Hamilton asked Reid to consider replacing Plaintiff. On May 19th, the same day that Reid was meeting with Plaintiff concerning logistics of his transfer, he also met with Hamilton to discuss terminating Plaintiff. The next day, Reid contacted Plaintiff's replacement, informing him of the opportunity. On May 22nd, Reid

[7] Defendant previously agreed that Plaintiff's location at the time of termination is immaterial, and should also be judicially estopped from making this argument now. It its Trial Brief in Support of Application of New York Law, Defendant stated as follows: "Plaintiff was based out of the New York Headquarters for twenty-seven years, and lived in the New York metropolitan area that entire time. That Plaintiff attempted to work remotely for three to four weeks after his move in May 2015, and was terminated while (indeed, because) he was living there, should not outweigh the twenty-seven years he spent working in the New York City headquarters."

and Hamilton scheduled a meeting to discuss Plaintiff's termination. On May 27th, a plan was put in place to hire Felix to backfill Plaintiff's role, begin knowledge transfer from Plaintiff to Felix, process Plaintiff's transfer, retain Plaintiff for about 9 weeks to cover critical work, and then terminate him.

All of this planning occurred in the New York City office before Plaintiff even arrived in Massachusetts. The fact that Defendant did not ambush Plaintiff with its decision until weeks later while he was in Massachusetts is immaterial. Moreover, the reason Defendant advanced for terminating Plaintiff was that he failed to appear at the New York City office and therefore abandoned his job in the New York City office. The fact that Plaintiff did not discover until obtaining documents in discovery that his termination had been decided upon and his employment had been impacted while has he was in New York City should not bear on the issue, and so this argument fails and the motion should be denied

**D. There Were No Prejudicial Errors in the Jury Instructions/Verdict Form**

**1. "But-For" Is Not The Causation Standard Under The NYCHRL**

Contrary to Defendant's assertion, "but for" is not the correct causation standard for claims under the NYCHRL.[8] In a recent case, the United States District Court for the Eastern District of New York held that "the but-for causation standard established in *Nassar* should not be applied to NYCHRL claims." Joseph v. Owens & Minor Distrib., Inc., 5 F. Supp. 3d 295, 322 (E.D.N.Y. 2014) (emphasis added), aff'd, 594 Fed. Appx. 29 (2d Cir. 2015) (unpublished). The decision was later affirmed by the Second Circuit. Rather than a but for standard, a plaintiff must

[8] It is beyond disturbing that defense trial counsel made a concerted and persistent effort to encourage the Court to instruct the jury improperly. See TJT, pp. 465-470, 473-474, 549. This is certainly not the first time that defense trial counsel has intentionally misled the Court as to the law, arguing before trial that punitive damages were not recoverable under New York law. See Document #45. Now, with five lawyers and two law firms on brief, Defendant continues to advance an argument that is not supported by the law, and fails to disclose law directly adverse to its position. See Mass. R. Prof. Cond. 3.3(a)(1)-(2); Fed. R. Civ. P. 11(b)(2).

"establish that there was a causal connection between [the] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for her termination was pretextual or 'motivated at least in part by an impermissible motive." Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429, 455 (E.D.N.Y. 2013), citing Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789, 792 (App. Div. 2013).

"Claims brought pursuant to the City Law require a separate analysis." Holleman v. Art Crating Inc., 12 CIV. 2719 VMS, 2014 WL 4907732, at *22 (E.D.N.Y. Sept. 30, 2014), citing Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109, 113 (2d Cir. 2013) (requiring that City Law claims be analyzed separately from state and federal claims). The reason for the separate analysis is that claims under the NYCHRL "are viewed under a broader interpretation than Title VII and NYSHRL and must be analyzed independently." Id. "The NYCHRL has been amended to abolish the parallelism between the [NYCHRL] and federal and state anti-discrimination law, Noel v. BNY–Mellon Corp., 514 Fed. Appx. 9, 11 (2d Cir. 2013), and is interpreted according to its own rules of construction." Id.

Courts interpreting claims under the NYCHRL have repeatedly rejected the imposition of the but for causation standard. See, e.g. Calhoun v. Cnty. of Herkimer, 980 N.Y.S.2d 664, 667–68 (2014) (stating plaintiff's burden of establishing causation is showing that "the defendant was motivated at least in part by an impermissible motive"); Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789, 792 (2013) (same); Taylor v. Seamen's Soc. For Children, No. 12–CV–3713, 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) (but for causation standard applied to Title VII and NYSHRL claims but not claim under the NYCHRL).

In Sass v. MTA Bus Co., 6 F. Supp. 3d 238 (E.D.N.Y. 2014), a jury returned a verdict for the plaintiff on a retaliation claim under the NYCHRL. The jury was charged that in order to establish liability, Plaintiff had to prove that "one or more of his protected activities played an

important role in [D]efendant's decision to terminate [P]laintiff," and that "[P]laintiff's participation in protected activities were more likely than not a motivating factor in [D]efendant's termination of [P]laintiff." Defendant moved for a new trial and, after denial, later appealed, arguing that the "but-for" causation standard announced in Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013) applied and thus the jury instructions were incorrect. The Court held that Nassar did not change the causation standard for NYCHRL claims, and concluded that there was no error. Id. at 248. Here, there was no error in not including the incorrect but for causation standard in the special verdict form.

**2. The Court Defined Substantial Factor As But-For at Defendant's Request.**

There was no error in the jury instructions or special verdict form, where the Court defined "substantial factor" causation as "but for" causation. As a result, even if the but for causation standard is higher than substantial factor, the jury was in fact instructed on but for causation, and returned a verdict in favor of Plaintiff under the alleged heightened standard.[9]

Specifically, the Court instructed the jury that "in order for the plaintiff to recover, he must prove by a preponderance of the evidence that his age, a disability, or both was a determining or substantial factor in Defendant, Cushman and Wakefield's decision to terminate him." TJT, p. 577. In that regard, it was clear that the Court was using "substantial" and "determining" interchangeably, and defined them as follows: Age and/or disability are determining factors if Plaintiff would not have been terminated but for his age and/or disability. TJT, p. 577 (emphasis added). Despite deliberating over two days, the jury never asked any

[9] It is not clear that the but for and substantial factor causation tests are different under New York law. Although not in the context of discrimination, courts interpreting New York law have held that there is "little distinction in practice between the substantial factor and but for causation tests." Point Productions A.G. v. Sony Music Ent., Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002), opinion amended on reconsideration, 93 CIV. 4001 (NRB), 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002).

questions about the instructions, special verdict form or otherwise.[10] It is clear that the jury was not confused by the instructions or special verdict form, particularly where it came to contrary results on the two discrimination claims.[11]

A Court commits harmless error when it holds a plaintiff to a higher standard of proof, but the jury nonetheless finds in favor of the plaintiff despite the incorrect instruction. See Biggins v. Hazen Paper Co., 953 F.2d 1405, 1415 (1st Cir. 1992), vacated on other grounds, 507 U.S. 604 (1993). That is precisely what happened here. There was no error where the incorrect heightened standard was baked into the substantial factor terminology on the verdict sheet.

**3. The Court Correctly Applied The Preponderance Of Evidence Standard**

A trial court has "wide discretion" to formulate jury instructions as it sees fit. Kelley v. Airborne Freight Corp., 140 F.3d 335, 352 (1st Cir. 1998). Absent law from a state's highest court, a federal court sitting in diversity must predict how the state law ambiguity would be resolved. Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000); see also Rosenbaum v. Lefrak Corp., 438 N.Y.S.2d 794, 798 (N.Y. App. Div. 1st Dept. 1981) (noting that it "would be almost presumptuous for us to call the judge's charge fundamental error" in view of split of authority between appellate departments.). It is clear that the Court took this approach, as opposed to blindly applying the law of New York's First Appellate Department.

Defendant wrongly suggests that the view of the appellate division presiding over the

[10] Even Judge Young, who admitted he did not know anything about the case, noted upon reviewing the verdict that the jury gave "obvious care" and "careful scrutiny" to the evidence. See TJT, p. 597.

[11] Defendant does not, of course, ask the Court for a new trial on Plaintiff's disability claim, decided in Defendant's favor, based on erroneous instructions or a flawed special verdict form.

county in which Plaintiff worked should be applied. The Second Circuit[12] has expressly rejected the approach. In Michalski, "because of an apparent split in authority among the Appellate Divisions …the district court decided to follow the law of the Third Department, reasoning that this was the law that would have been applied in the state trial court in the district where this accident occurred and where the suit was originally filed."[13] The Second Circuit held that "taking this shortcut led to the wrong result," reversing and remanding the case. The proper approach was instead to predict how the New York Court of Appeals would rule on the issue. Id. at 116-117. The Second Circuit has noted that in these circumstances, courts must "undertake the imprecise but necessary task of predicting on a reasonable basis how the New York Court of Appeals would rule if squarely confronted with this issue." DiBella v. Hopkins, 403 F.3d 102, 111–112 (2d Cir. 2005). Federal courts siting in diversity "are not strictly bound by state intermediate appellate courts." Id.

The United States Court of Appeals for the Southern District of New York undertook the analysis of the standard of proof to apply with respect to punitive damages claims under the NYCHRL in Greenbaum, and came to the same conclusion as this Court. The Court noted that

> it is difficult to justify subjecting only one form of damages to a different evidentiary standard than all of the other elements of the claim at issue—at least without clear direction from either a statute of controlling judicial authority. Given that there is no such clear direction here, it is more reasonable to apply the same burden of proof with respect to one aspect of a claim as is applied to other aspects of the claim.

Greenbaum v. Svenska Handelsbanken, 979 F.Supp. 973, 977 (S.D.N.Y. 1997).

---

[12] On this issue, the decisions of the state and federal courts of New York are instructive, where New York has four appellate divisions that are empowered to come to different conclusions on legal issues, whereas Massachusetts has only a single intermediate appellate court.

[13] The case involved the open and obvious hazard rule.

The Court also observed that New York law infrequently imposes higher burdens of proof. As a result, after an extensive discussion of the issue, the Greenbaum court held that "until one of these higher authorities elects to address the question, the preponderance of the evidence standard should apply to punitive damages deliberations under the [NYCHRL]."[14]

The cases cited by Defendant in support of applying a clear and convincing standard are inopposite, where they involved claims for punitive damages in connection with core claims sounding in negligence. See Munoz v. Puretz, 753 N.Y.S.2d 463 (N.Y. App. Div. 1st Dept. 2003) ("punitive damages are not available for ordinary negligence"); Randi A.J. v. Long Island Surgi-Ctr., 842 N.Y.S.2d 558 (N.Y. App. Div. 2d Dept. 2007) (involving negligent disclosure of medical information). Here, rather than just adopting the approach of the appellate division embracing New York City, the Court undertook an analysis of how the highest court of New York would rule on the ambiguity. It is clear that the Court found that the Greenbaum decision was persuasive, given that it involved a claim under the NYCHRL, as opposed to claims of negligence. The Court correctly found it more reasonable to apply the same burden of proof in order not to confuse the jury. With the answer not resolved by the highest authority in New York, the Court was within its wide discretion to adopt the preponderance of the evidence standard. There was no error in the instructions, and the Rule 59 Motion should be denied.

**4. The Special Verdict Form Was Proper.**

[14] The fact that the evidentiary standard may be clarified by virtue of a certified question is of no moment. The Supreme Court has made clear that "a court is to apply the law in effect at the time it renders its decision." Bradley v. Sch. Bd. of City of Richmond, 416 U.S. 696, 711 (1974) ("to retry this case because of a statutory change enacted after the trial was completed would be an injustice and a waste of judicial resources. We apply procedural rules to pending cases, but we do not invalidate procedures followed before the new rule was adopted."). Accord Landgraf v. USI Film Products, 511 U.S. 244 (1994) (statute creating right to recover compensatory and punitive damages did not apply to case pending on appeal when statute was enacted).

"District courts have 'considerable discretion about the formulation, nature, and scope of the issues' on a special verdict form." Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010). Upon review, the consideration must be of "the court's instructions and the wording of the verdict form as a whole." Sanchez–Lopez v. Fuentes–Pujols, 375 F.3d 121, 134 (1st Cir. 2004). The central inquiry is "whether the instructions and verdict form fairly presented the core issues." Alejandro, 597 F.3d at 435.

Defendant's requested preliminary question was an incorrect statement of law. Beyond the fact that the preliminary question requested by Defendant contained the clear and convincing standard rejected by the Court after analysis, Defendant requested that the jury be instructed that in order to award Plaintiff punitive damages, it must find that Defendant's acts were conjunctively "wanton and reckless and malicious." TJT, p. 477. New York law provides that punitive damages may be awarded where a defendant's actions are "wanton and reckless or malicious." See, e.g. Marinaccio v. Town of Clarence, 986 N.E.2d 903, 906 (N.Y. 2013) (emphasis added).[15] Moreover, Defendant points to no authority that suggests that failure to include a preliminary question (that also misstates the law) is error. The Court, in its wide discretion, formulated a proper special verdict form that, when viewed together with its instructions, accurately reflected the law and properly informed the jury.

## IV. REQUEST FOR RELIEF

WHEREFORE, for the reasons stated herein, Plaintiff, Yury Rinsky respectfully requests that this Honorable Court DENY Defendant's Motion for a New Trial.

[15] "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings." Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979). See also Duerr v. Star Supermarkets, Inc., 367 N.Y.S.2d 191, 193 (N.Y. Sup. Ct. 1975) (noting the distinction between "the disjunctive 'or' instead of the conjunctive 'and'").

Respectfully submitted,

**YURY RINSKY,**
By his attorneys,

/s/Mark D. Szal
Mark D. Szal, BBO#667594
**SZAL LAW GROUP LLC**
589 Tremont Street, Suite 4
Boston, Massachusetts 02118
Tel: (617) 830-2494
mark@szallawgroup.com

/s/John W. Dennehy
John W. Dennehy, P.C. BBO#658247
DENNEHY LAW
127 Main Street, Suite 1
Nashua, NH 03060
(603) 943-7633
(603) 943-7642 (Fax)
jdennehy@dennehylaw.com

DATE: June 8, 2017

## Certificate of Service

I, Mark D. Szal, hereby certify that on June 8 2017, a true and correct copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/Mark D. Szal