UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YURY RINSKY,

Plaintiffs,

v.

CUSHMAN & WAKEFIELD NATIONAL CORPORATION,

Defendant.

Civil Action No. 1:16-cv-10403-ADB

April 11, 2017
9:49 a.m.

Pages 26 to 236

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
BOSTON, MA 02210

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
joanmdaly62@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

JOHN W. DENNEHY
Dennehy Law
127 Main Street
Suite 1
Nashua, New Hampshire 03060
603.943.7633
johnwdennehy.com

MARK D. SZAL
Donovan Hatem, LLP
53 State Street
8th Floor
Boston, Massachusetts 02109
617.406.4500
mark@szallawgroup.com

FOR THE DEFENDANT:

ROBERT R. BERLUTI
EDWARD F. WHITESELL, JR.
MICHAEL A. BEDNARZ
Berluti McLaughlin & Kutchin, LLC
44 School Street
Boston, Massachusetts 02108
617.557.3030
rberluti@bmklegal.com
ewhitesell@bmklegal.com
mbednarz@bmklegal.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on April 11, 2017, out of the presence of the Jury.)

09:48:37 THE COURT: I thought more about the estoppel and 09:48:40 the misrepresentation claims overnight and yesterday 09:48:43 afternoon. I think where I come down on the subject of 09:48:48 commentary by the parties is the misrepresentation claims are 09:48:53 premised on the idea that he was told that if he moved to 09:49:01 Boston, he'd be keeping his job. That feels like an end 09:49:05 around the employment statutes. And I think the case law 09:49:08 supports the idea that even if somebody says that you can 09:49:10 keep your job, that it doesn't get you there when you're an 09:49:15 employee at will. So I think that the two misrepresentation 09:49:17 claims are out.

09:49:18 On the estoppel claim, to the extent that the 09:49:30 estoppel claim looks for a remedy outside of the employment 09:49:35 context, it's possible that it's viable. But the only 09:49:37 damages that I think that can emanate from the -- the 09:49:46 representation on which the estoppel is based is you can move 09:49:49 to Boston. And then he moves to Boston and he loses his job.

09:49:54 I think, discrimination aside, as an employee at

will, they can fire him when he get to Boston, but there might be an -- that he's entitled to moving expenses, but I don't think there's any remedy that goes to his job, back, front pay, getting his job back. Estoppel, I can see a path to getting moving expenses.

Mr. Berluti, you first.

MR. BERLUTI: I do, Your Honor. I think the critical element in New York is that there has to be reasonable reliance. And the whole point here is whether or not he could reasonably rely upon a statement --

THE COURT: That's a factual issue, not a legal issue, right?

MR. BERLUTI: No, I think it's a legal issue. As a matter of law, as an employee at will, he can't rely on a statement about continued employment.

THE COURT: I agree. That's why the misrepresentation claims are out.

MR. BERLUTI: I think it's true about promissory estoppel as well.

THE COURT: Forget about the employment. If they say to him, "You can move to Boston"?

MR. BERLUTI: I hear that, Judge. In a purely estoppel context, in a contract context separate and apart, different kind of contract. You just can't divorce the fact that this is an employment context. That's my point. You

09:51:14 can't -- your only relationship is within the employment context. So any reliance upon that statement is one that I think is barred under New York law.

09:51:25 THE COURT: I don't have the estoppel law on New York law. I was actually looking under the Massachusetts case law because that's what I have with me. Do you think the New York law is different than the Massachusetts law on the estoppel question?

09:51:39 MR. BERLUTI: I do.

09:51:40 MR. WHITESELL: Yes, Your Honor. And I think it's in our supplemental trial brief that we kind of talk about the distinction. It's a subtle one, but Massachusetts focuses more on the category of damages, which I think we're kind of discussing here, which is what's barred under Massachusetts law on a promissory estoppel claim is back pay, front pay type damages.

09:52:01 What New York law says is it takes it one step further. It looks at a different element of promissory estoppel claim, which is whether the employee can rely on it in the first place. So while I think Your Honor is getting at the distinction as it relates to the employment-related damages, I think that under New York law, it knocks the element out entirely -- the entire element out of the claim.

09:52:22 THE COURT: The law in New York, estoppel is in the supplemental.

MR. WHITESELL: It's in the supplemental trial brief. I think we probably have a copy here. There's a whole section in there which compares New York to Massachusetts law. There's a subtle distinction under which element each state focuses on.

THE COURT: I'll look at that this morning. Do you want to go forward with that, Plaintiff, if it's just on moving expenses?

MR. DENNEHY: We actually haven't disclosed moving expenses. We've disclosed the lost wages. And I'll just continue to say the same thing. I mean, if you had these common law claims, whether it's under New York or Massachusetts, and the jury determined that he was terminated for discrimination, so that was their determination, at that point I would say that all those common law claims would fail.

If you did a jury select, and we'd stop there. The reason why is that they're focused on this idea of reliance on continued employment. Well, if he was fired -- like if he moved to Boston and they said, "It's not working out like the way of the setup, we hoped it was going to work, you can't have expected it," then that would be the claims would fail. If they found that it was discrimination, the claims would fail.

But the way this case is uniquely set up is they

said, "You could move to Boston," and then they terminated him solely because he moved to Boston, so that's --

THE COURT: I understand what you're saying. But my reading of the case law is that if they say to him -- it's analogous to the case where they say, "Look, you're good here. You can work here for the next five years," and then people do things in reliance on that. And the case law is pretty clear that you can't rely on those sorts of verbal commitments in the context of at-will employment.

MR. DENNEHY: I agree with that, Your Honor. But what I say here is that they tell him he can move to Boston. It's reasonable to rely that they said, "You can move to Boston," and soon after he moved to Boston, they say, "You're fired for moving to Boston." That's reasonable for him to rely upon that, and it's not that he's seeking forward pay from that.

It's just in the context it takes a couple of years to get to trial, and he's in a circumstance where he's in a phased-out type situation. This is really just like lost wages from the time of the bad conduct to the time of trial. I could even see where the Court would say the wages from after trial going forward are speculative, but I think that it's reasonable and foreseeable that if you tell someone they can move to Boston, and then he moves to Boston, and then you fire him for moving to Boston, that's how the jury found that

that was the facts, it's reasonable that any damages that would ensue from moving to Boston would be applicable, whether they're wages or moving costs.

THE COURT: I hear your argument, and I actually sympathize with your argument, but I just don't think the case law supports it.

MR. DENNEHY: I think the reason why the case law doesn't support it is a classic example of this very issue wasn't litigated. Those are dealing with different circumstances and it's case law. Those cases aren't on point with that. Even if they had a case from Wisconsin where they found this exact type of circumstance, then I would say, "Okay, maybe let's look at how Wisconsin would deal with it." This very circumstance is not in those cases.

THE COURT: But I think what the cases say is the an at-will employee, you have basically no rights to continued employment, and that any promise made in that context can be reneged for any reason at any time.

MR. DENNEHY: I totally agree. That's what the cases say, and I totally agree that's what the law is.

That's not our argument. The argument isn't that he was told, "You're going to continue to keep working and we're relying upon that." It's that he was told, "You can go to Boston," that that's believed, and they fired him for going to Boston. It's not like if he had gone to Boston,

they fired him for any reason out of the world except for that, I would totally agree with you. But they fired him for the very reason why they said he could move, that he could move. The move itself is the reason for termination.

THE COURT: So if they say to him -- I know, Mr. Berluti, you want to speak. I'm going to send Jarrett up to the jury room, and I'll give you your time to talk before doing that.

If they say to him, "You can move to Boston," and he gets to Boston and they say, "We changed our mind for wholly random reasons, we don't want you in Boston anymore," maybe he can get his moving expenses to Boston and maybe he can get his moving expenses back, but I don't think he gets anything under the estoppel theory.

I don't think he gets anything related to the employment because I think they always have the right to terminate for any reason under the employment. So I think the promissory estoppel only doesn't get you a remedy for employment purposes. I think the estoppel gets you remedies for things outside the employment.

MR. DENNEHY: I don't see --

THE COURT: That depends on my looking at New York law again for them.

MR. DENNEHY: There's an interesting thing in discovery. This is why I think this is an issue for jury

09:57:22 instructions after the close of evidence. During discovery, there was testimony that he would never have been fired had he just stayed in New York, that they anticipated that he would have had continued employment.

09:57:34 They premised their entire case on "We fired you because you went to Boston." And if a jury said that "You went to Boston because you were -- believed that you could move to Boston, reasonably believed you could move to Boston because they told you," I think the circumstances of this case are much different than those other cases.

09:57:53 And I'm not framing this as back pay, forward pay. I'm framing it as just lost wages similar to the gas and moving expenses. He moved and then he lost his job because of that very reason. This circumstance isn't in any of those cases. And we're not looking for -- we're not saying that -- we're not arguing that he would have kept working there for five years either.

09:58:17 We're actually just arguing that he lost his job for the very reason they told him he could move to Boston. He lost his job because he moved to Boston. He hasn't been able to replace it. So he's got more lost wages than maybe a younger worker would have had.

09:58:31 That's my position and I think the evidence should come in, and then the Court should make a decision on what to charge the jury. I think our side's -- we've been trying to

09:58:39 be careful not to muddle this issue for the jury.

09:58:43 THE COURT: What evidence are you thinking this
09:58:45 keeps out?

09:58:50 MR. DENNEHY: I don't think it keeps evidence out.
09:58:55 I think that I brought up a point that the Court might not
09:58:58 have been aware of, like the testimony about them that they
09:59:02 said he would continue to have employment.

09:59:04 THE COURT: Right, I understand that. You just
09:59:06 said, I think, I should let in the evidence and make the
09:59:08 decision later. I don't have any idea that this is keeping
09:59:11 out any evidence.

09:59:12 Let me hear from Mr. Berluti before we get the
09:59:15 jury.

09:59:15 MR. BERLUTI: Your Honor, I think you just made the
09:59:17 point. They keep saying he got fired because he moved to
09:59:19 Boston. That's not the case. His job was always in
09:59:24 New York. He wanted permission to go elsewhere and never
09:59:28 have to come to the office, to work remotely 100 percent of
09:59:31 the time.

09:59:32 It wasn't even the case, when he worked in
09:59:36 New York, that whether he could work remotely or not would
09:59:38 continue on no matter what. There's evidence on May 13 that
09:59:44 Mr. Reid sent an email not only to Mr. Rinsky but also to the
09:59:48 other software engineer, Anna Kleynshteyn, and said, "Your
09:59:53 privilege to work remotely is withdrawn until the Workday

deliverables are completed." And he said, "I myself am being called back to New York for two weeks."

Mr. Rinsky could have lived anywhere. That's not why he got fired. He got fired because he didn't want to come to New York, which is where his job had been for 27 years. I think Your Honor hit it right on the head. Even if they said, "Yeah, it's okay that you go there," this is a dynamic workplace. They could have then changed their mind and said, "Now you have to come back."

It's obviously disputed as to whether or not he had any approval that he couldn't work permanently remotely. But that aside, nothing prevents the company from saying, "You know what, we now think it's appropriate that you have to come to New York at least four days a week." And it's the fact that he didn't want to do that.

THE COURT: Jarrett, can you go get them.

MR. DENNEHY: I'll just say he just misrepresented the evidence again. That email says that the ability to work was revoked for two weeks. It actually had a timeframe. This is what I'm saying. This is the type of situation I think is not going to change the evidence. Let the evidence in, and then the Court can make a decision whether the jury gets charged. I think we're doing it prematurely.

THE COURT: That's fine. Obviously, I'm taking your point that it's fluid, and I haven't made a definitive

ruling on it although -- I'm keeping you apprised of my thought process on it. So if you think it's premature, it's premature.

I don't think the misrepresentation claims go. I'm wrestling with the promissory estoppel. We're going to bring the jury down now. I hope they're all here. We can continue this discussion, but you all should think about whether you want me to charge on the promissory estoppel and see where it comes out and then sort it out later.

Because if they obviously come back in your favor on it, you've killed the appellate issue and we don't need to retry the case. If they come back with something on the promissory estoppel theory, and then I determine it's not appropriate, then we -- I'll leave that to you.

MR. BERLUTI: I think it would never get there anyway. Like you said, the only thing they get is transfer costs and there are never -- and moving costs. Those have never been disclosed. As a matter of prejudice, it shouldn't come in at this point anyway.

We've got a couple of other things, Your Honor.

THE COURT: Go ahead.

MR. BERLUTI: I want to straighten out and be clear on your sequestration order. First of all, I understand that the sequestration order does not apply when Mr. Rinsky testifies, correct?

THE COURT: They're entitled to have their representative testify here. If his wife is going to testify, she's out.

MR. BERLUTI: I understand.

THE COURT: You can have one representative in here and then --

MR. BERLUTI: During Rinsky's testimony, we can have everybody here, right? We're not sequestered as to when Mr. Rinsky testifies?

THE COURT: No. Anyone that hasn't testified is out. You can have one person here during his testimony unless they're going to agree to the two. The whole point is that one person's testimony should not be influenced by another person's testimony.

MR. BERLUTI: Typically that's on your own side because you're trying to conform. I've never seen it, quite honestly, that it applies to opposing testimony.

THE COURT: I've never done it any other way.

MR. DENNEHY: I've never seen it any other way.

THE COURT: If they won't agree to the two, that's fine. Otherwise, we have one in, one out.

MR. BERLUTI: As to the company representative, does it matter if the company representative is going to be ultimately a witness, correct?

THE COURT: Yes. You're entitled to have a company

10:03:09 representative like they're entitled to have Mr. Rinsky.

10:03:12 MR. BERLUTI: Okay. The second point was that

10:03:12 there --

10:03:15 Your Honor, before I mention the second point, the

10:03:18 page of the brief that we discussed is on 7 and 8. And

10:03:26 Your Honor actually cited the main case from New York in her

10:03:27 order. The original order from last Friday was Marino v.

10:03:30 Oakwood Care Center. The quote is, "Since the plaintiff was

10:03:32 offered only at-will employment, she cannot establish

10:03:34 reasonable reliance, a necessary element to recover damages

10:03:37 on theories of fraudulent misrepresentation, negligent

10:03:41 misrepresentation and promissory estoppel."

10:03:44 THE COURT: I will take a look at that again, but I

10:03:46 think that that precludes them from getting

10:03:53 employment-related damages. But I'm not sure if it precludes

10:03:56 them from getting, for example, moving expenses.

10:03:58 MR. BERLUTI: Understood, Your Honor. The other

10:03:59 brief point is just an objection for the record, which I

10:04:02 don't think has been made clear in any place so far. There's

10:04:05 been a lot of briefing, but I don't think this particular

10:04:07 point has been made clear.

10:04:10 C&W objects to the New York City Human Rights Law

10:04:13 being applied. I know it's in Your Honor's order from last

10:04:16 Friday. Our position on this is what was pled was state law

10:04:20 claims. He availed himself of the MCAD. He availed himself

of MGL 151B. These are state law claims. There is a New York counterpart to MGL 151B, and that is the New York State Human Rights Law.

And our position is although Your Honor has already ruled on this, it would be the state law claims that would be the analog to the Massachusetts claims that have been pled.

THE COURT: Okay. That wasn't clear. So thank you.

THE CLERK: All rise for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you all so much for being here on time, especially on such a nice day. Thank you also to counsel for being here on time. You can call your first witness.

You all can be seated.

MR. SZAL: I'm sorry, Your Honor, can we have a quick side bar?

THE COURT: We just stood here for a half hour and talked, and you need a side bar the minute the jury comes out?

MR. SZAL: There's people in the courtroom we don't know who they are.

THE COURT: Okay. Come on up.

(Bench conference held off the record and outside the hearing of the Jury.)

MR. SZAL: Plaintiff calls Yury Rinsky.

(Yury Rinsky duly sworn.)

THE CLERK: Would you please state and spell your name for the record.

THE WITNESS: Good morning. I'm Yury Rinsky.

THE CLERK: Can you spell your full name, please, for the record.

THE WITNESS: Yury Rinsky. Y-U-R-Y R-I-N-S-K-Y.

THE COURT: Mr. Rinsky, pull that microphone right up to your mouth.

DIRECT EXAMINATION

BY MR. SZAL:

**Q**. Good morning, Mr. Rinsky.

**A**. Good morning.

**Q**. Would you please tell us where you currently reside.

**A**. I reside at 7 Conant Road, Apartment 9, in Winchester, Massachusetts.

**Q**. Does anybody live with you at that address?

**A**. Yes. My wife, Raisa Rinsky.

**Q**. How long have you been married?

**A**. I've been married for 45 years.

**Q**. Do you have any children?

**A**. Yes.

**Q**. How many children do you have?

**A**. One daughter.

10:08:40 **Q.** What's her name?
10:08:45 **A.** Karina.
10:08:45 **Q.** Is your daughter married?
10:08:47 **A.** Yes.
10:08:47 **Q.** Do you have any grandchildren?
10:08:48 **A.** Yes.
10:08:49 **Q.** How many?
10:08:49 **A.** Two.
10:08:50 **Q.** How old are your grandchildren?
10:08:53 **A.** Eight and two.
10:08:54 **Q.** Where do your daughter and your grandchildren live?
10:08:57 **A.** In the same town, in Winchester at 79 Randall Street.
10:09:03 **Q.** How long has your daughter lived in Massachusetts?
10:09:06 **A.** Since she went to college in 1993.
10:09:10 **Q.** Where did she go to college?
10:09:14 **A.** Excuse me?
10:09:14 **Q.** Where did she go to college?
10:09:16 **A.** She went to Northeastern University.
10:09:19 **Q.** What's her date of birth?
10:09:23 **A.** February 10, 1975.
10:09:27 **Q.** What's your birthday, sir?
10:09:33 **A.** August 30, 1951.
10:09:36 **Q.** And how old are you currently?
10:09:37 **A.** I'm 65, turning 66 in August.
10:09:45 **Q.** How long have you lived at your Massachusetts address?

**A.** Since end of August, 2015.
**Q.** Are you sure about that?
**A.** Since end of May, I'm sorry. Since end of May 2015.
**Q.** Okay. Before the end of May 2015, where did you reside?
**A.** At 3624 Garden View Terrace in Fairlong, New Jersey.
**Q.** And how long did you live at that address in New Jersey?
**A.** For 27 years.
**Q.** Did you attend college?
**A.** Yes.
**Q.** Where did you attend college?
**A.** Moscow.
**Q.** What did you study?
**A.** I studied civil engineering and computer science.
**Q.** How long did you attend college for?
**A.** It was six years.
**Q.** And did you graduate?
**A.** Six-year program. Yes, I graduated.
**Q.** Did you receive a degree?
**A.** Yes.
**Q.** What kind of degree did you receive?
**A.** It's an equivalent to a master's degree.
**Q.** Are you an American citizen?
**A.** Yes.
**Q.** How long have you lived in the United States for?
**A.** Since 1981.

**Q.** When did you become an American citizen?
**A.** In 1986.
**Q.** After coming to the United States, did you become employed?
**A.** Yes.
**Q.** Where was the first company you were employed with?
**A.** I worked for Marsh McLennan.
**Q.** What was your position with Marsh McLennan?
**A.** I worked as a program analyst.
**Q.** Where was this job located?
**A.** New York City.
**Q.** How long did you work as a programmer analyst for Marsh McLennan?
**A.** About two years.
**Q.** Did you work somewhere after that?
**A.** Yes. After that, I worked as a full-time employee of a consulting company, Computer Generated Solutions.
**Q.** What was your position there?
**A.** Senior programmer analyst and then project manager.
**Q.** Where was that job located?
**A.** New York City.
**Q.** How long did you work there?
**A.** About four years.
**Q.** Did you become employed after leaving Computer Generated Systems?

**A.** Yes.
**Q.** Where did you work next?
**A.** Cushman & Wakefield.
**Q.** What year did you become employed with Cushman & Wakefield?
**A.** 1988.
**Q.** And how long did you work for them?
**A.** For 27 years.
**Q.** What was the position that you were initially hired for at Cushman & Wakefield?
**A.** I was hired as a systems analyst.
**Q.** Did you have somebody you reported directly to?
**A.** Yes. Mr. Colin Reid.
**Q.** Do you have a particular area of expertise at the company?
**A.** Yes.
**Q.** What was that?
**A.** Computer system AS/400.
**Q.** And could you explain what the AS/400 computer system is?
**A.** The AS/400 was a very successful IBM midrange business computer that came out in 1988.
**Q.** How long did you perform the role of senior systems analyst?
**A.** For ten years.
**Q.** What was your next position at Cushman & Wakefield?

**A.** After that, I was promoted to project manager.
**Q.** And approximately when did you begin that position?
**A.** Approximately 1998.
**Q.** Was this a promotion?
**A.** Yes.
**Q.** Did you have somebody that you reported directly to in this new role?
**A.** It was through Colin Reid.
**Q.** How long did you perform the role of project manager?
**A.** Until 2009.
**Q.** Between beginning at the company and 2009, did you receive any performance reviews regarding your work?
**A.** Yes. Every year.
**Q.** What kind of reviews did you receive?
**A.** They were exceeds expectations or excellent.
**Q.** What was your next position after project manager?
**A.** In 2009, my position was changed from project manager to software engineer.
**Q.** Did you have somebody you reported directly to?
**A.** Yes. Colin Reid. I was reporting to Colin Reid for my entire time at Cushman & Wakefield.
**Q.** Was the position of software engineer your last role with the company?
**A.** Yes.
**Q.** Do you have an understanding of when the AS/400 computer

10:14:35 system was implemented by the company?
10:14:37 **A.** In 1989.
10:14:41 **Q.** Do you have an understanding of the company ever making changes to the AS/400 system that you worked on?
10:14:51 **A.** Yes. In 2015, the company started to phase out the system.
10:15:00 **Q.** Between 2009, when you became a software engineer, and the end of your employment, did you receive any performance reviews concerning your work?
10:15:11 **A.** Yes.
10:15:11 **Q.** What kind of reviews did you get?
10:15:13 **A.** Exceeds expectations or excellent.
10:15:16 **Q.** Did Mr. Reid ever complain about your performance during the 27 years you were with the company?
10:15:21 **A.** No, never.
10:15:22 **Q.** While you were performing the role of software engineer, did you experience any health issues?
10:15:26 **A.** Yes.
10:15:27 **Q.** What kind of health issues did you experience?
10:15:33 **A.** In 2009, I was diagnosed with cancer.
10:15:37 **Q.** Do you have an understanding of what kind of cancer you were diagnosed with?
10:15:41 **A.** Yes. It was lymphoma.
10:15:44 **Q.** Do you have an understanding of what lymphoma is?
10:15:47 **A.** Yes. Lymphoma is a recurring form of cancer that --

10:15:55 MR. BERLUTI: Objection. Move to strike, Your Honor.
10:16:00 THE COURT: I'm going to let him have that. I just want to caution the jurors, he's not a medical professional. Okay? He can testify about his understanding of what his illness is, but he's not a doctor. Okay?
10:16:11 MR. BERLUTI: Your Honor, the question was --
10:16:12 THE COURT: I understand the question. I heard the answer. And you know my prior ruling, but you can have that and proceed.
10:16:22 **A.** So lymphoma attacks your immune system, lymph nodes, and some organs of your body. In my case, it was my respiratory system.
10:16:36 BY MR. SZAL:
10:16:37 **Q.** When you were diagnosed with cancer, did you have an understanding of what your prognosis was?
10:16:41 MR. BERLUTI: Objection, Your Honor.
10:16:43 THE COURT: No. Overruled. He can have that.
10:16:45 **A.** Yes.
10:16:46 THE COURT: Again, with the understanding he's not a doctor, he's just testifying about his understanding.
10:16:53 **A.** My understanding was there was a high possibility of it coming back, of this illness coming back after the treatment.
10:16:59 BY MR. SZAL:
10:16:59 **Q.** Did you have any understanding of any particular triggers

10:17:01 for cancer might coming back -- might be coming back?
10:17:06 **A.** Yes. My understanding was stress would be a trigger.
10:17:11 **Q.** Did you undergo any treatment as a result of your cancer?
10:17:15 **A.** Yes.
10:17:15 **Q.** What kind of treatment did you undergo?
10:17:18 **A.** I received nine weeks of chemotherapy regimen.
10:17:28 **Q.** Can you describe what that entailed.
10:17:30 **A.** I was treated for one day, and then I needed a day to
10:17:34 rest. For one day a week and then a day to rest.
10:17:40 **Q.** Did you discuss your diagnosis and treatment schedule
10:17:45 with anybody at the company?
10:17:46 **A.** I discussed it with my manager, Colin Reid.
10:17:51 **Q.** What did you discuss?
10:17:55 **A.** First of all, I needed to take off. I explained him the
10:18:05 needing of the treatment, I would be in the hospital, and the
10:18:08 next day I would need to rest. And I also told him that
10:18:15 there was a chance that it was coming back --
10:18:18 MR. BERLUTI: Objection, Your Honor.
10:18:19 THE COURT: What's the basis of the objection? The
10:18:21 same?
10:18:23 MR. BERLUTI: His statements to Mr. Reid. Hearsay.
10:18:32 THE COURT: I'm going to let him have that.
10:18:34 Go ahead.
10:18:36 BY MR. SZAL:
10:18:37 **Q.** Did you, in fact, take two days off a week during your

cancer treatment of nine weeks?
**A.** I didn't come to the office on those days, but I was able to read the emails the second day and reply to emergencies, and I was trying to do as much job as I could.
**Q.** Did you receive any paid time off with the company?
**A.** Yes.
**Q.** Did you use any of this paid time off for your cancer treatment?
**A.** Yes.
**Q.** What was the process for requesting paid time off time?
**A.** I could just talk to my manager or email him about it.
**Q.** In 2009, were you able to perform work from your home?
**A.** Yes.
**Q.** How were you able to do that?
**A.** With computer and Internet connection. I was able to log into Cushman & Wakefield's network and into the AS/400 system.
**Q.** Could you log in remotely to the AS/400 system?
**A.** Yes.
**Q.** And you could log in remotely to your emails, right?
**A.** Yes.
**Q.** Do you have any understanding of where the AS/400 system is actually housed?
**A.** It was -- in about 2009, it was moved from our headquarters to a facility in New Jersey.

**Q.** After your cancer treatment in 2009, did you return full-time to the company?
**A.** Yes.
**Q.** Did you meet with anybody when you came back from your treatment?
**A.** I met with Colin Reid.
**Q.** Do you recall where that meeting occurred?
**A.** We talked in the conference room.
**Q.** And were you told anything during that meeting by Mr. Reid?
MR. BERLUTI: Objection, Your Honor.
**A.** Yes.
THE COURT: Okay. "Were you told anything," he can have that. What's your next question?
BY MR. SZAL:
**Q.** What did he say to you in the meeting?
THE COURT: He's objecting on hearsay.
MR. DENNEHY: Party witness. He was a 30(b)(6). Admission of the company.
THE COURT: Overruled.
MR. BERLUTI: It's also relevance, Your Honor.
THE COURT: Overruled on relevance.
BY MR. SZAL:
**Q.** Did Mr. Reid say anything to you during this meeting?
**A.** Yes.

10:21:07 **Q.** What did he say?
10:21:08 **A.** He said that "If you take more time for your treatments, they will not be able to employ you."
10:21:17 **Q.** What was your reaction to that?
10:21:22 **A.** It was weird. I didn't want to lose my job because of the cancer.
10:21:29 **Q.** You said "they." Did you have an understanding of who "they" were that he was referring to?
10:21:34 **A.** My understanding is that the message doesn't come from Colin. It comes from his managers.
10:21:40 **Q.** Were you concerned about your job because of this statement?
10:21:43 **A.** Yes.
10:21:46 **Q.** Now, as a software engineer, what did your role entail? Could you describe some of your job responsibilities.
10:21:54 **A.** I was responsible for implementation of various projects and support of the users of Cushman & Wakefield commission billing and accounting system.
10:22:11 **Q.** Did you receive any requests from other departments within the company?
10:22:15 **A.** Yes.
10:22:16 **Q.** What kind of requests would you typically receive?
10:22:20 **A.** Typically it was a detailed description, and I was receiving it via email, sometimes by phone.
10:22:31 **Q.** Would these be technical issues?

**A.** Yes, they were technical issues.
**Q.** And how did you typically receive these requests?
**A.** Typically, I would say 90 percent, through the email system.
**Q.** And the remainder, how would you receive those?
**A.** Most of them through the phone because they could just call me.
**Q.** In your work, did you work with people in the New York City headquarters?
**A.** Yes.
**Q.** Did you work with people outside of the New York City headquarters?
**A.** Yes.
**Q.** Was the process for handling requests the same for people in the New York City headquarters and people outside?
**A.** Yes.
**Q.** Did you hold in-person meetings at times with people making requests?
**A.** Occasionally.
**Q.** How were the majority of your requests handled?
**A.** Through emails.
**Q.** Were you ever asked to work remotely by the company?
**A.** Yes.
**Q.** When did that occur?
**A.** In 2012. The beginning of 2012, I think.

10:23:46 **Q.** During your cancer treatment in 2009, you worked remotely, correct?
10:23:58 **A.** Yes.
10:23:59 **Q.** And that was on your request for paid time off time?
10:24:01 **A.** Yes.
10:24:02 **Q.** In 2012, did you request to work remotely?
10:24:05 **A.** No. I was told to work remotely.
10:24:07 **Q.** Do you have an understanding of why you were told to work remotely?
10:24:10 **A.** That was because of the space issues IT department experienced at the time.
10:24:16 **Q.** Can you explain what you mean by "space issues"?
10:24:21 **A.** We implemented a new system, and there were a lots of new engineers working on this system, and there was just a shortage of space in the office.
10:24:37 **Q.** And this is in 2012?
10:24:40 **A.** Yes.
10:24:40 **Q.** Do you know if that space shortage ever cleared up between that and the time that you left the company?
10:24:48 **A.** It was still the same when I was fired.
10:24:51 **Q.** Do you know if other people in your department worked remotely?
10:24:57 **A.** All people in my level, all software engineers worked remotely just like me. The managers, probably most of them worked in the office. But all software engineers worked on

10:25:12 the same schedule as me.
10:25:13 **Q.** Between 2012 and 2015, how often did you typically work remotely each week?
10:25:22 **A.** Three to four days.
10:25:23 **Q.** And how often would you be in the New York City headquarters?
10:25:26 **A.** A day or two.
10:25:27 **Q.** During the time that you worked remotely three or four days a week, did the company express any issues with your job performance?
10:25:37 **A.** Never.
10:25:39 **Q.** Did you continue to receive annual reviews?
10:25:41 **A.** Yes.
10:25:42 **Q.** What kind of reviews did you receive?
10:25:46 **A.** Excellent or exceeds expectations.
10:25:48 **Q.** And how many years did you work for the company?
10:25:50 **A.** Twenty-seven.
10:25:51 **Q.** Did you ever receive a poor performance evaluation?
10:25:54 **A.** Never.
10:25:55 **Q.** Did you have any further health issues after your 2009 cancer?
10:26:01 **A.** Yes.
10:26:02 **Q.** When was that?
10:26:06 **A.** In 2012, I was taken by an ambulance and brought to hospital, and I was diagnosed with bacterial pneumonia.

10:26:26 Bacterial pneumonia.
10:26:30 **Q.** How long did you stay in the hospital?
10:26:33 **A.** I stayed in the hospital for two weeks.
10:26:36 **Q.** After leaving the hospital, did you consult with anyone?
10:26:40 **A.** Yes. I immediately consulted my oncologist.
10:26:43 **Q.** Were any tests performed?
10:26:45 **A.** Yes.
10:26:47 **Q.** What kind of tests were performed?
10:26:51 **A.** Different blood work, different blood tests, and CT scan.
10:26:55 **Q.** Do you have an understanding of what the tests showed?
10:27:00 **A.** Yes. My understanding is it was that I needed immediate treatment. The pneumonia was the result of my lymphoma.
10:27:22 **Q.** Did you require any treatments subsequent to this hospital stay?
10:27:26 **A.** Yes.
10:27:27 **Q.** What kind of treatments did you undergo?
10:27:32 **A.** I underwent similar treatment that I had in 2009.
10:27:38 **Q.** Okay. And can you remind us of what that treatment was.
10:27:42 **A.** Nine weeks course of chemotherapy, one day a week.
10:27:47 **Q.** And did you need to take time off from work again?
10:27:49 **A.** I had to take one day to rest after that.
10:27:52 **Q.** So you took two days a week; is that correct?
10:27:54 **A.** Yes.
10:27:56 **Q.** Did you request any paid time off for this time? Did you use any of your paid time off time?

**A.** Yes. I used paid time off.
**Q.** What was the process for requesting that in 2013?
**A.** I just talked to my manager.
**Q.** Anything else?
**A.** No.
**Q.** Did you discuss this second diagnosis and treatment schedule with anybody at the company?
**A.** Yes.
**Q.** Who did you discuss it with?
**A.** I discussed it with Colin.
**Q.** Did you, in fact, take two days off a week for the nine-week treatment that you underwent?
**A.** Say it again, please.
**Q.** Did you, in fact, take the two days per week off that you were requesting during this treatment?
**A.** Yes. It was just like in 2009. I didn't go to the office, but I tried to do whatever I can remotely from home.
**Q.** In 2013, you were able to work remotely from home?
**A.** During the treatment. Not when I was in the hospital with pneumonia.
**Q.** And when you were home, how would you work remotely? Was it the same process as in 2009?
**A.** I had a company laptop and Internet connection.
**Q.** Did you return to work full-time at the company after your cancer treatment in 2013?

10:29:14 **A.** Yes.
10:29:16 **Q.** When you returned to work, what was your work schedule?
10:29:23 **A.** It was the same as before the treatment.
10:29:26 **Q.** And how many days would you have been in the office typically per week?
10:29:30 **A.** Typically it was still three or four days a week working remotely.
10:29:35 **Q.** And how many in the office?
10:29:37 **A.** A day or two.
10:29:40 **Q.** Did you meet with anybody when you returned to the office after the 2013 treatment?
10:29:45 **A.** Yes. A couple of days after I returned from the treatment, I talked to Colin Reid.
10:29:51 **Q.** And do you recall where that meeting occurred?
10:29:55 **A.** In the conference room of the company.
10:29:57 **Q.** And did Mr. Reid say anything to you during that meeting?
10:30:01 **A.** Yes. It was like a recording of the conversations that happened after my first treatment in 2009. He said the exact same words, "If you take more time off for your treatment, they won't be able to employ you. We are too busy, we have so many things to do."
10:30:19 **Q.** Okay. And again, who did you understand the "they" that he was referring to to be?
10:30:25 **A.** They, it was my understanding it wasn't Colin like the previous time. It was his managers.

10:30:34 **Q.** Were you concerned about your job because of this statement?
10:30:37 **A.** Yes.
10:30:39 **Q.** Did you experience any other health issues in 2013?
10:30:45 **A.** No. I had -- I didn't say it right. I experienced some serious problem with hypertension.
10:31:00 **Q.** Did you require any treatment for hypertension?
10:31:05 **A.** I didn't need treatment for it, but a couple of times on my way to work, I was taken to a hospital and I just spend the day there.
10:31:15 **Q.** Did you ever communicate these health issues to the company?
10:31:20 **A.** All the people in my group knew about my problem with --
10:31:24 MR. BERLUTI: Objection as to whether the people knew, Your Honor. Move to strike.
10:31:30 THE COURT: That's sustained. The question was, "Did you ever communicate those health issues to the company?"
01:11:07 BY MR. SZAL:
10:31:37 **Q.** Did you ever communicate those health issues to the company?
10:31:39 **A.** Yes. To the people in my group, yeah.
10:31:43 **Q.** Did you ever give any consideration to when you wanted to retire from Cushman & Wakefield?
10:31:47 **A.** Yes. I was planning on retiring when I was 66 or 67.

10:31:57 **Q.** Did you ever consider leaving the company and looking for a job at a different company?
10:32:02 MR. BERLUTI: Objection, Your Honor.
10:32:04 **A.** No.
10:32:05 THE COURT: Basis?
10:32:07 MR. BERLUTI: Speculation. He's talking about did he ever consider it.
10:32:10 THE COURT: Overruled.
01:11:07 BY MR. SZAL:
10:32:16 **Q.** Did you ever think about where you'd like to retire?
10:32:18 **A.** Yes.
10:32:19 **Q.** Where did you want to retire?
10:32:22 **A.** We wanted to retire to Massachusetts, to the Boston area where our daughter was.
10:32:29 **Q.** Why would you want to retire to Massachusetts?
10:32:33 **A.** I just wanted to be closer to our daughter and her children.
10:32:39 **Q.** During your employment with Cushman & Wakefield, did you make any visits to Massachusetts?
10:32:45 **A.** Yes. We were visiting our daughter since she went to college.
10:32:53 **Q.** And after your grandchildren were born, did you continue to make visits to Massachusetts?
10:32:58 **A.** Yes.
10:32:59 **Q.** How often typically would you come up to visit?

**A.** All the time. We were able to go like every three or four weeks, on holidays, on long weekends.
**Q.** In 2014, did you look for any properties to purchase in Massachusetts?
**A.** Yes.
**Q.** Did you eventually purchase a property in 2014?
**A.** Yes. It took us almost a year, and we found a property in the same town close, very close, to where our daughter lives. It was not crazy expensive, and we decided to buy it. We liked it.
**Q.** What was the purpose of your purchase?
**A.** The purpose of the purchase was to live there after I retired.
**Q.** And did you intend to move there in 2014?
**A.** No.
**Q.** When did you intend to move to Massachusetts?
**A.** When I retired.
**Q.** When you bought the property, did you intend at some time in the future to occupy that property as your principal residence?
**A.** Yes.
**Q.** What did you intend to do with the property between 2014 and when you intended to retire?
**A.** We intended to fix it up and rent until -- rent it until I'm 66 or 67. This is when I was going to retire.

**Q.** And did you, in fact, fix up the property?
**A.** Yes.
**Q.** What did you do to it?
**A.** Replaced appliances. Broke a partition in the kitchen. We took old carpet, put hardwood floor in the bedroom. Replaced some toilets and sinks. I painted the whole apartment.
**Q.** Did you continue to work for the company after you made the purchase of the condo?
**A.** Yes.
**Q.** Did you continue to work in the New York City office during the week?
**A.** Yes.
**Q.** How many days a week were you working in the New York City headquarters?
**A.** Just basically the same, about three or four days per week.
**Q.** I'm sorry, sir?
**A.** Three, four days per week.
**Q.** Was that your in-office schedule or was that your remote schedule?
**A.** I'm sorry. Three, four days remotely and a day or two in the office.
**Q.** Were you able to perform your job duties?
**A.** Yes.

**Q.** Did you continue to receive requests from departments within the company?
**A.** Yes.
**Q.** Did the company ever require, when you worked remotely these three or four days a week, that you perform that work from your house in New Jersey?
**A.** No.
**Q.** Did the company require that when you worked remotely three or four days a week, that you perform that work close enough that you could go into the New York City office at any moment?
**A.** No.
**Q.** Could you have worked remotely from Boston during these three or four days a week?
**A.** Yes. When I visited my daughter, I worked from Boston, yeah.
**Q.** And the three or four days that you worked remote, could you have performed that work from Florida?
**A.** Absolutely, yes.
**Q.** Did you ever learn that Colin Reid at some point was transferring from the New York City office?
**A.** Yes.
**Q.** When did you understand -- excuse me. Where did you understand that he was transferring to?
**A.** He was transferring to the Miami office of the company.

**Q.** And do you recall when you learned that he was transferring?
**A.** Sometime in the middle of March 2015.
**Q.** Before learning that Mr. Reid was transferring, did you ever consider transferring within the company?
**A.** No.
**Q.** Did you ever consider transferring to Boston?
**A.** No.
**Q.** Did you have an understanding of the process that Mr. Reid went through to effectuate his transfer?
**A.** No.
**Q.** Are there any written policies or procedures that you were provided concerning transfer requests?
**A.** I am not aware of any procedures like that.
**Q.** Now, at some point, did you decide to put your home in New Jersey on the market?
**A.** Yes.
**Q.** How did that come about?
**A.** I was approached by a real estate broker who sold the house next door.
**Q.** When did that occur?
**A.** It occurred at the end of March 2015.
**Q.** Was this around the same time that you learned of Mr. Reid's transfer?
**A.** Yes.

**Q.** Do you have any understanding of why the real estate broker approached you?
**A.** Yes. Because of --
MR. BERLUTI: Objection, Your Honor.
**A.** Because of --
THE COURT: Hold on.
Why don't you ask him how he came to that understanding. Let's see what we have.
BY MR. SZAL:
**Q.** Did you have any understanding of the real estate market in New Jersey in 2015?
**A.** Yes. It was very bad. The houses were not selling. People were waiting a year or two, even longer, to sell a house. The prices went down.
**Q.** Did you have an understanding --
**A.** There was a big inventory in the town.
**Q.** Did you, in fact, try to sell your house?
**A.** Yes.
**Q.** Did you use the broker that approached you?
**A.** No.
**Q.** Who did you use?
**A.** Used another broker we knew from a long time ago.
MR. SZAL: Your Honor, I want to show Mr. Rinsky a document that has not been agreed to. I'd like to have him authenticate it and ask that it be admitted.

10:39:21 THE COURT: They haven't seen it or it's been objected to?

10:39:24 MR. SZAL: It's been objected to.

10:39:25 THE COURT: Okay. Go ahead.

10:39:33 Just for the members of the jury, the way this works, if there's an agreed-upon exhibit or I admit an exhibit, when they show it to a witness, it will pop right up on the screen in front of it you. If I need to make a decision whether it's properly admitted or not, it first comes up just in front of me so I can make a ruling on it before you all see it.

10:39:52 So right now I can see it, the lawyers can see it, and the witness can see it. If it comes in, you will also be able to see it. But for the moment hopefully you can't.

01:11:07 BY MR. SZAL:

10:40:04 **Q**. Mr. Rinsky, this has been labeled for identification as Exhibit B. I'm just asking you, do you see that document?

10:40:09 **A**. Yes.

10:40:09 **Q**. Do you recognize it?

10:40:10 **A**. Yes.

10:40:11 **Q**. What do you recognize it to be?

10:40:12 **A**. This is a picture of my house in New Jersey where we were for 27 years.

10:40:18 **Q**. Is that a fair and accurate depiction of the house?

10:40:22 **A**. Yes.

**Q.** How did you go about obtaining this picture?
**A.** I just entered my address in Google Images and got this picture.
**Q.** Was this picture a best representation of the house that you found?
**A.** Yes.
MR. SZAL: Your Honor, we'd just ask that this be admitted as an authenticated document.
MR. BERLUTI: Objection. Relevance. But also it's cumulative. It's already in a picture in Exhibit 2.
THE COURT: In Exhibit?
MR. BERLUTI: Two. Agreed-to Exhibit 2.
MR. SZAL: Exhibit 2 is -- the way it was produced --
THE COURT: Just tell me what Exhibit 2 is.
MR. SZAL: It's the listing, but the house is like barely visible.
THE COURT: I'm going to overrule the objection. We're not going to go through all the internal, but the picture of the house is fine.
MR. SZAL: I'd just ask that it be published for the jury.
THE COURT: Published to the jury. Does this exhibit have a number? I don't want to...
MR. SZAL: It would be 75, Your Honor, in order.

10:35:50 **Q.** Did you continue to receive requests from departments within the company?
10:35:56 **A.** Yes.
10:35:57 **Q.** Did the company ever require, when you worked remotely these three or four days a week, that you perform that work from your house in New Jersey?
10:36:05 **A.** No.
10:36:06 **Q.** Did the company require that when you worked remotely three or four days a week, that you perform that work close enough that you could go into the New York City office at any moment?
10:36:17 **A.** No.
10:36:20 **Q.** Could you have worked remotely from Boston during these three or four days a week?
10:36:25 **A.** Yes. When I visited my daughter, I worked from Boston, yeah.
10:36:29 **Q.** And the three or four days that you worked remote, could you have performed that work from Florida?
10:36:34 **A.** Absolutely, yes.
10:36:36 **Q.** Did you ever learn that Colin Reid at some point was transferring from the New York City office?
10:36:41 **A.** Yes.
10:36:41 **Q.** When did you understand -- excuse me. Where did you understand that he was transferring to?
10:36:49 **A.** He was transferring to the Miami office of the company.

THE COURT: Jarrett, 75.

(Exhibit 75 marked for identification.)

BY MR. SZAL:

**Q.** Mr. Rinsky, you said that you contacted a different broker; is that correct?

**A.** Yes.

**Q.** Okay. Do you remember his name?

**A.** Michael Delman.

**Q.** Did the broker come to view your house?

**A.** Yes.

**Q.** Did the broker agree to list the house?

**A.** Yes.

**Q.** And when you listed the house for sale, did you have any intention of relocating at that time?

**A.** No.

**Q.** After learning of Mr. Reid's transfer, did you make any requests to him?

**A.** Yes.

**Q.** What kind of request did you make?

**A.** That was when I was going to put my house on the market. I was trying to ask him whether or not I can work from the Boston office when the house was sold. I was asking to transfer me to Boston when my house is sold.

**Q.** Do you recall when this conversation occurred?

**A.** It occurred a couple of days before he left for Miami,

THE COURT: Jarrett, 75.

(Exhibit 75 marked for identification.)

BY MR. SZAL:

**Q**. Mr. Rinsky, you said that you contacted a different broker; is that correct?

**A**. Yes.

**Q**. Okay. Do you remember his name?

**A**. Michael Delman.

**Q**. Did the broker come to view your house?

**A**. Yes.

**Q**. Did the broker agree to list the house?

**A**. Yes.

**Q**. And when you listed the house for sale, did you have any intention of relocating at that time?

**A**. No.

**Q**. After learning of Mr. Reid's transfer, did you make any requests to him?

**A**. Yes.

**Q**. What kind of request did you make?

**A**. That was when I was going to put my house on the market. I was trying to ask him whether or not I can work from the Boston office when the house was sold. I was asking to transfer me to Boston when my house is sold.

**Q**. Do you recall when this conversation occurred?

**A**. It occurred a couple of days before he left for Miami,

approximately March 28, 2015.

**Q.** What was Mr. Reid's response to your request in March 2015?

**A.** He suggested that the sale of the house will take a long time, at least six months, and we will have plenty of time to talk about it later. And he said, "Right now, I am very busy and I cannot talk about it."

**Q.** What was the purpose of this conversation you had with Mr. Reid?

MR. BERLUTI: Objection. He's already testified to what the purpose was, testified as to what it was.

THE COURT: Overruled.

**A.** The purpose was to let Colin know that I'm selling my house and just to ask him for an approval to work from the Boston office.

BY MR. SZAL:

**Q.** After this conversation, did you understand that your transfer request had been approved?

**A.** No. We didn't do it through the conversation never. It didn't happen.

**Q.** Did Mr. Reid explain any process at that time that was necessary for your transfer request?

**A.** No. He said, "We will talk about it later."

**Q.** After that conversation did you receive an offer to purchase your house?

**A.** Yes. I received an offer just a few days later.
**Q.** Okay. Do you recall when you received it?
**A.** I received it in an email on April 2nd, 2015.
**Q.** Okay. Mr. Rinsky, I'm going to show you a document, agreed-upon Exhibit 6, and just ask if this is the email that you were referring to?
**A.** Yes.
**Q.** And at the top, it looks like there's an attachment. Is that accurate?
**A.** Yes.
**Q.** What's the title of this email?
**A.** Updated Offer.
**Q.** Is this the offer you were referring to that you received?
**A.** Yes.
**Q.** Showing you a document that's been listed as Exhibit 5, I'd just ask if you could take some time to review that, and let me know if this is the attachment to the email.
**A.** Yes, this is it.
**Q.** This is the offer that you received?
**A.** Yes.
**Q.** Did you have any reactions to this offer?
**A.** We were very surprised that we got this offer that soon. And this offer was so good for us. It was much more than we expected. It was the asking price, and then without the

mortgage. The mortgage didn't include -- the offer didn't include mortgage contingency. And also it includes an option for us to rent back the house after we sell it.
**Q.** What was your understanding of whether -- did you have an understanding of whether you had to move from the house as a result of the sale?
**A.** I had an option to stay there after I sell it.
**Q.** What's the basis for that understanding?
**A.** I didn't have to move out.
**Q.** What do you base that understanding on?
**A.** Just on the wording of the offer.
**Q.** Mr. Rinsky, we've highlighted -- zoomed in on a portion here, 29, "Additional contractual provisions, if any." Could you read the last line under "additional contractual provisions, if any."
**A.** "Sellers will have the option to lease the house back at the lease market value until buying another property."
**Q.** Was that condition an important term in the offer to you?
**A.** It was an important -- it was very important, yes.
**Q.** Why?
**A.** Because at the time I didn't know -- I didn't have the approvals, and I didn't even talk to them about moving to Boston, and I -- that allowed me to stay in the house after I sell it.
**Q.** After receiving this offer, did you have a conversation

with anybody at the company about it?
**A.** Yes. After a couple of days, we waited, a couple of people -- two more people showed up to look at our house. And in a couple of days, by the end of the first week of April, we decided to go with this offer.
**Q.** And did you speak with anybody at the company about the offer?
**A.** I let Colin know right away.
**Q.** How did you get in touch with him?
**A.** I left him a voicemail, I believe, and I told him, "I need to talk to you about something important.
**Q.** When you left him this voicemail, did you have an understanding of where he was, whether he was in New York or somewhere else?
**A.** I don't remember that.
**Q.** Did he get back to you?
**A.** Yes.
**Q.** What did he tell you when you spoke with him?
**A.** He told me that -- he started saying that he's relieved that something important is not an issue with my cancer, like I need another treatment. He was happy about it.
**Q.** Did you tell him about the offer that you received?
**A.** Yes. And then I told him that I received an excellent offer, it's a cash offer, and I don't have to wait for the buyer to receive a mortgage, and I could stay in the house

10:50:07 after it sold. I told him that.
10:50:10 **Q.** Did he say anything about the fact that you received a cash offer?
10:50:18 **A.** Yes.
10:50:18 **Q.** What did he say?
10:50:19 **A.** He made a joke. "Oh, so now you have a lot of cash."
10:50:25 **Q.** Did you make any requests to Mr. Reid during this telephone call?
10:50:28 **A.** Yes.
10:50:29 **Q.** What did you request?
10:50:31 **A.** So I asked him that -- I asked for his approval to work out of the Boston office once the house had sold.
10:50:43 **Q.** What was his response?
10:50:45 **A.** He said that "It's okay with me, but it's not just me. I need to talk to my manager."
10:50:52 **Q.** Did he tell you anything else?
10:51:04 **A.** That's it, I think.
10:51:06 **Q.** Who did you understand Mr. Reid's boss to be?
10:51:09 **A.** Oh, I'm sorry, I apologize. I missed -- he also said, "Anyway, you are working half of the time remotely, and we never had a problem with this so I'm okay with it."
10:51:22 **Q.** And again, who did you understand Mr. Reid's boss to be?
10:51:25 **A.** Mr. Andrew Hamilton.
10:51:29 **Q.** Did you have interactions with Mr. Hamilton during your work?

10:51:34 **A.** Very, very minimal.
10:51:37 **Q.** How old is Mr. Hamilton?
10:51:39 **A.** He was about the age of my daughter. He was like about
10:51:46 42 years old, something like that.
10:51:48 **Q.** During this conversation with Mr. Reid, were you telling
10:51:54 him that you were moving to Boston?
10:51:55 **A.** No. I was asking for permission to move out of the
10:52:00 Boston office.
10:52:02 **Q.** After this subsequent conversation, did you understand
10:52:04 that your transfer request had been approved?
10:52:08 **A.** No.
10:52:10 **Q.** And during this conversation, did Mr. Reid explain any
10:52:13 process necessary other than what you discussed?
10:52:18 **A.** No.
10:52:27 **Q.** Did you feel the need to investigate any further as to
10:52:31 whether there were any other approvals or procedures
10:52:33 necessary?
10:52:34 **A.** No.
10:52:36 **Q.** Why not?
10:52:38 **A.** I worked with Colin for 27 years, and his word was enough
10:52:44 for me. I trusted him completely.
10:52:54 **Q.** Mr. Reid had just transferred himself, correct?
10:52:56 **A.** Yes.
10:52:58 **Q.** Did you have an understanding of anyone else at the
10:53:01 company who would have known the process any better than

Colin?

**A.** No. Colin, of course, was the best person to trust about it. I didn't know anyone else who was transferred to another office.

**Q.** Did you accept the offer eventually that you received on your house?

**A.** I did.

**Q.** Do you recall when you accepted it?

**A.** I don't remember the exact date.

**Q.** Did you eventually sign a document in which you accepted the offer?

**A.** I did.

**Q.** And do you recall when you signed it?

**A.** I don't recall it.

**Q.** Do you have a copy?

**A.** No, I don't have a copy.

**Q.** During this lawsuit, did you make any efforts to obtain a copy of that?

**A.** Yes. On the request of Cushman & Wakefield attorney in this case, I emailed my broker and asked him to provide me with this document.

**Q.** Was he ever able to provide you with it?

**A.** He wasn't able to provide me with this document. He said the listing itself.

**Q.** And at the time you accepted the offer, did you

understand that your transfer request had been approved?
**A.** No.
**Q.** Did you have any cause for concern because of that?
**A.** I didn't worry about it too much because I had an option to stay in the house once it sold.
**Q.** Now, after this conversation, did you have any other follow-up conversations with Mr. Reid?
**A.** Yes.
**Q.** Do you recall when that occurred?
**A.** Couple of days later, I asked Colin if he talked about my request with his manager, Andrew Hamilton.
**Q.** What was his response?
**A.** That he hasn't talked to him yet. Everyone is busy. That was his response.
**Q.** All these conversations we're discussing, did you take any notes or the minutes of these discussions?
**A.** No, I didn't.
**Q.** Why not?
**A.** I just trusted Colin's word.
**Q.** Did you have any further conversations with Mr. Reid?
**A.** Yes.
**Q.** Do you recall when the next one would have occurred?
**A.** About four days later, I asked Colin again about Andrew Hamilton's opinion about my request, whether or not he talked to him, and he said, "Yes, I discussed it with him."

**Q.** And in terms of timeframe, where are we in April at this point?

**A.** It's middle of April 2015.

**Q.** Okay. What did he say specifically about Andrew?

**A.** He said that Andrew is okay with it.

And I asked him, "What exactly did he say?"

And Colin said that "Andrew said that he knows that you handle most of the work on the AS/400, and he has no problem for you to work out of the Boston office."

**Q.** Did you say anything in response?

**A.** Yes. I was happy. I said, "Great. What else do I need to do? What's the next step?"

**Q.** So did he tell you what the next step was?

**A.** He told me that "Our chief information officer, he's now traveling, but when he comes back and when he has a chance, he will get in touch. He will call the Boston office and arrange a cubicle for you in the Boston office."

**Q.** Did he say anything about the chief information officer having to approve your transfer request?

**A.** No. Just that he would take care of the space. He would arrange a cubicle for me.

**Q.** What was your understanding of the transfer process at this point?

**A.** After he told me that Andrew approved it and Mr. Cuyar, our chief information officer, will arrange a cubicle for me,

10:57:35 my understanding was that that's it, it's completed.
10:57:40 **Q.** At this point, did you understand that your transfer request had been approved?
10:57:43 **A.** Yes.
10:57:44 **Q.** Did you confirm this in an email or anything like that?
10:57:52 **A.** No.
10:57:52 **Q.** Any reason why you didn't?
10:57:54 **A.** Same thing. I trusted Colin. His word is good enough.
10:57:58 **Q.** Now, at this point, did you know when you would transfer to Boston?
10:58:01 **A.** I didn't know the exact date. It depended on the date of the closing.
10:58:09 **Q.** Did you have an understanding of when you would be able to transfer to Boston?
10:58:17 **A.** I thought I would be able to transfer as soon as I finished with the sale of the house, right after closing.
10:58:28 **Q.** Now, after this period of time that we're discussing, what happened at work? Did you continue to work?
10:58:37 **A.** I continued working. Everything was business as usual.
10:58:47 **Q.** During this time, did you continue to speak with Mr. Reid about your transfer?
10:58:50 **A.** No. We didn't really talk about the transfer for a while.
10:58:57 **Q.** At some point did you learn what the closing date for your house sale would be?

10:59:01 **A.** Yes.
10:59:02 **Q.** Do you recall when you learned of that?
10:59:06 **A.** I learned it on May 17, 2015.
10:59:08 **Q.** And did you take any actions after learning what the closing date for your house would be?
10:59:15 **A.** Yes. I was trying to find a mover right away. I called a couple of moving companies. And after that, I send an email to Colin and said, "I will be moving to Boston on May 26."
10:59:42 **Q.** Mr. Rinsky, this is a document that's been marked as Exhibit 12. I'd just ask you to take a look at it and tell me if you recognize this document.
10:59:51 **A.** Yes.
10:59:52 **Q.** Is that the email that you were just referring to?
10:59:54 **A.** Yes.
10:59:55 **Q.** Could you read for us what the email says.
11:00:01 **A.** "As discussed, I will be moving to Boston on May 27, 2015, for family reasons and need to take four personal days after Memorial Day, May 26-May 29."
11:00:19 **Q.** Can you read the rest of it too, please.
11:00:23 **A.** "I'm confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved."
11:00:37 **Q.** What was your intention in sending this email?

**A.** First of all, to let Colin know the exact day I am moving. And the second one, to resolve all this arrangement and issues he said previously that we would discuss later.
**Q.** You wrote in this email, "Coming up with an arrangement." What did you mean by that it?
**A.** By "arrangement," I meant when they finally get my cubicle in Boston, what kind of equipment I will get in Boston. I didn't want to work using the company laptop. I wanted a bigger screen. I wanted to know who would be my administrator in the Boston office in case I need some supplies or a printer. I needed to know how many days I would have to come to New York City office of the company.
**Q.** Now, did this email to Mr. Reid have anything to do with seeking approval?
**A.** No. Approval was already granted.
**Q.** Did Mr. Reid respond to this email?
**A.** Yes.
**Q.** How did he respond?
**A.** He will talk about it. Okay, he will talk about it Tuesday, I think he said.
**Q.** I'll show you a document that's been marked as Exhibit 14. I'd just ask you to take a look at it and let us know if you recognize that.
**A.** Yes.
**Q.** Is this the response that you were just referring to?

11:02:35 **A.** Yes.
11:02:35 **Q.** Can you read what it says?
11:02:38 **A.** "Okay. We will talk on Tuesday."
11:02:44 **Q.** Did you form any understandings concerning his response?
11:02:48 **A.** My understanding was his reply -- his acknowledgment that I'm moving on this date, and he was willing to discuss the issues we were going to discuss.
11:02:57 **Q.** And did you, in fact, meet with the Mr. Reid on Tuesday?
11:03:00 **A.** Yes.
11:03:01 **Q.** And do you recall what was discussed during that meeting?
11:03:07 **A.** Excuse me?
11:03:10 **Q.** Do you recall what was discussed during that meeting?
11:03:20 **A.** Yes. First, we discussed how many days I need to come to New York. We discussed the issue with equipment. He told me we would find out later who would be the person, your contact in the Boston office. Like that.
11:03:48 **Q.** And with respect to times that you'd need to come to the New York City office, did Mr. Reid indicate anything to you about how often that would be necessary?
11:04:00 **A.** I suggested to come one day per week, and he said that that may not be necessary. It would probably be occasionally on an as-needed basis or maybe for month's end. We usually have a lot of work when we close the month, you know.
11:04:22 **Q.** Would that have been okay with you?
11:04:23 **A.** Yes.

11:04:24 **Q.** Did Mr. Reid make any recommendations to you concerning your move?
11:04:49 **A.** Yes. He said, "Your move will be probably similar to my move." And he suggested me to get Internet access as soon as I can because he had a lot of problems with this when he moved. And when I asked him, "How soon will I get the cubicle," he said, "Craig Cuyar, our chief information officer, was supposed to call the Boston office. He said he's too busy, he didn't get to it, but it will probably be like in my case in two or three weeks."
11:05:29 **Q.** Did you have an understanding of when you'd be provided work space in Boston?
11:05:39 **A.** Yes.
11:05:39 **Q.** Was that the two or three weeks that you were just referring to?
11:05:44 **A.** Yes.
11:05:45 **Q.** Did you work in the New York City office during the week leading up to your move to Boston?
11:05:51 **A.** Yes.
11:05:51 **Q.** I'll show you a document that's been marked as Exhibit 16. I'd ask if you'd take a look at this and let me know if you --
11:06:05 **A.** Yes, I recognize it.
11:06:11 **Q.** This is an email between Colin Reid and yourself; is that correct?

**A.** Yes.
**Q.** Could you read what it says?
**A.** "Let's spend a few minutes going over what's open on your list for June, before you leave today."
**Q.** Now, May 22nd, 2015, was that actually your last day in the New York City headquarters before moving to Boston?
**A.** Yes.
**Q.** Did you, in fact, meet with Mr. Reid on your last day?
**A.** Yes.
**Q.** What was the purpose of that meeting?
**A.** To just discuss the projects I was working on at the time and continue working in June. We went over each project and I explained to him the detail where exactly I am, what does -- when they will be completed to my estimate.
**Q.** And the weekend following this, was this Memorial Day weekend?
**A.** Yes.
**Q.** During the week leading up to your move to Boston when you were in the New York City headquarters, did you have any interactions with other employees?
**A.** The last week?
**Q.** Yes.
**A.** Yes, we -- I had interaction. Business as usual. The last couple of days, I was making rounds to say good-bye, that I'm moving to Boston, and I will be working from there.

**Q.** Did you have any discussions with Mr. Reid during that week?
**A.** No.
**Q.** Did you have any discussions concerning work?
**A.** No. Just he told me that I should work from -- get Internet access as soon as I can and work from my new home until I get the cubicle in the Boston office.
**Q.** During that week, did Mr. Reid tell you that there were any issues with your transfer request?
**A.** No.
**Q.** During that week, did Mr. Reid tell you that your transfer request was under consideration still?
**A.** No.
**Q.** Did he tell you any other approvals were necessary other than himself and Andrew?
**A.** No.
**Q.** Did you, in fact, go through with the closing of the sale of your house?
**A.** Yes.
**Q.** Do you recall when the closing occurred?
**A.** On May 25th.
**Q.** On May 25th, did you execute the leaseback provision that we looked at earlier?
**A.** No. I didn't need that.
**Q.** Why not?

**A.** I didn't need to stay in New York because my transfer was approved, and I was moving to Boston.
**Q.** Did you do anything else in connection with preparing to move from New York to Boston?
**A.** Yes. We hired the mover. We packed our belongings, it took us awhile after 27 years, and we moved the next day after closing.
**Q.** Did you take any time off from the company to move from New York to Boston?
**A.** Yes. As I requested, I had four paid time off days and plus a long weekend, Labor Day weekend.
**Q.** And the email we just looked at requesting those four days off, did you need to do anything else to request that time off?
**A.** No.
**Q.** Mr. Rinsky, I'm going to show you a document that's been marked as Exhibit 21. The bottom portion of that email, can you read what that says, please.
**A.** Oh, I was able to get Internet access a day earlier than we expected and on Thursday May 28, I sent Colin an email about it that I have Internet access and I am ready to work, let me know what has to be done first.
**Q.** Okay. And this email was sent on the 28th, correct?
**A.** Yes.
**Q.** And that's a day that you had already take off, paid time

off, right?
**A.** I was still on my day off, but I told him that I'm ready to work a day earlier."
**Q.** And do you recall -- well, Mr. Reid appears to have responded to this email at the top portion; is that accurate?
**A.** Yes.
**Q.** Do you have an understanding of what Mr. Reid is asking you to do in this email in response to yours?
**A.** Yes. He was updating me of the changes that happened during the time I was moving and telling me where we are with this, and like he was asking me to proceed to work on this part of the project.
**Q.** And did you perform that work?
**A.** Yes.
**Q.** Mr. Rinsky, I've pulled up a document that's been marked Exhibit 22. I'd just ask you to take a look at this email chain, which is lengthy. And once you've had an opportunity to do it, let me know and I'll ask you the next question.
**A.** Yes. During the time I was moving, there was a discussion about a couple of issues here. As you can see, several people -- many people were involved. And by sending me this email, Colin was telling me what happened, and he assigned me to complete this to resolve this issue.
**Q.** Is he asking you to perform work, in this email?
**A.** Yes.

11:13:45 **Q.** Did you perform that work?
11:13:46 **A.** Yes.
11:13:49 **Q.** These top two emails that we just looked at, is that typical of the requests you received in connection with your work at the company?
11:14:01 **A.** Yes. This is a brief description of -- sometimes it was more detailed. But that was enough for me to start working on it and understand what has to be done.
11:14:17 **Q.** What's the date of this email?
11:14:41 **A.** May 28.
11:14:49 **Q.** On May 28, did you have any understanding that there were any issues with your transfer?
11:14:53 **A.** No.
11:14:53 **Q.** Mr. Rinsky, I'm going to show you a document that's been marked as Exhibit 20. What's the date of this email?
11:15:10 **A.** May 27th.
11:15:11 **Q.** Have you seen this email before?
11:15:52 **A.** No, I didn't see it.
11:15:53 **Q.** Are you copied on this email?
11:15:54 **A.** No.
11:15:55 **Q.** Who is the email from?
11:15:59 **A.** This is an email from Colin Reid's manager, Andrew Hamilton.
11:16:09 **Q.** And who's it to?
11:16:12 **A.** To his manager, Leif Maiorini.

11:16:18 **Q.** Is there a copy to anybody?
11:16:20 **A.** And a copy to Colin Reid.
11:16:22 **Q.** Who is Leif?
11:16:26 **A.** Leif is a senior managing director, manager of Andrew Hamilton.
11:16:34 **Q.** What kind of interactions did you have with him during your employment?
11:16:38 **A.** Practically none. Very minimal.
11:16:41 **Q.** Did you need to interact with him to perform your work?
11:16:45 **A.** No, not at all.
11:16:47 **Q.** What about Andrew Hamilton?
11:16:51 **A.** I had minimal, very little interaction.
11:16:54 **Q.** Do you have any understanding of what Mr. Hamilton's expertise is with respect to the AS/400 system?
11:17:05 **A.** He wasn't familiar with the system. It was a complex system. At the beginning, when he started four years before I was fired, he was trying to learn it, but then he gave up. He said it's too complicated and he didn't even try to learn it.
11:17:33 **Q.** Let me ask you to look at Point Number 2. If you can read it for us.
11:17:40 **A.** "Bring the new resource on" --
11:17:44 **Q.** I'm sorry. Number 2, Mr. Rinsky. There should be a pink dot next to it.
11:17:54 **A.** That's what I'm reading.

11:17:55 **Q.** I'm sorry, yeah, you are. Yep. Go ahead.
11:18:00 **A.** "Bring the new resource on in the next two weeks to begin KT. We believe we must retain Yury for about nine weeks to cover critical and MK work."
11:18:28 **Q.** Do you have an understanding of what Workday work is referred to in this statement?
11:18:32 **A.** The company was implementing the new financial systems, replacing PeopleSoft with Workday applications.
11:18:48 **Q.** And MK work, do you have any understanding of what that refers to?
11:18:51 **A.** MK? MK, I wasn't involved with it. But as far as I remember, at the time Cushman & Wakefield bought a company, and we had to merge the data of the new company with Cushman & Wakefield data. That was the project.
11:19:16 **Q.** It says, "In the next two weeks to begin KT." Do you have any understanding of what KT refers to?
11:19:34 **A.** Probably knowledge transfer.
11:19:35 **Q.** Knowledge transfer, is that what you said?
11:19:37 **A.** Yes.
11:19:51 **Q.** Was May 27th the day that you moved to Boston?
11:19:59 **A.** Yes.
11:19:59 **Q.** That's the same day as this email, correct?
11:20:01 **A.** Yes.
11:20:02 **Q.** On your move to Boston, did you have any understanding that you were only going to be retained for nine more weeks

11:20:11 to cover critical work?

11:20:15 **A.** No.

11:20:16 **Q.** Did you continue to receive requests for your services after the emails that we just looked at?

11:20:27 **A.** Yes.

11:20:28 **Q.** Were you able to perform that work?

11:20:31 **A.** Yes.

11:20:31 **Q.** From your house outside of Boston?

11:20:33 **A.** Yes.

11:20:34 **Q.** Was there anything in these requests that required in-person attention in New York City?

11:20:39 **A.** No. The people who were involved in this project --

11:20:47 MR. BERLUTI: Move to strike, Your Honor. He answered the question.

11:20:54 THE COURT: That's sustained.

11:20:55 You can rephrase.

11:20:56 BY MR. SZAL:

11:20:56 **Q.** After you moved to Boston, what kind of schedule were you working?

11:21:08 **A.** We had a lot of changes in the requirements for the project. I was working constantly for the project. It didn't depend on us. We weren't late. But almost every day, new changes in the requirements of the project were coming, and I didn't want to hold anyone up so I had to redo a lot of programming I'd already completed based on the new

requirements. And I worked almost all the time, like about 14 hours a day and Saturdays too.

**Q.** And where would you perform this work?

**A.** From my new apartment in Winchester.

**Q.** Now, did you have an understanding of where your work would be performed when you moved to Boston?

**A.** Yes. From the Boston office of the company.

**Q.** Mr. Rinsky, I'm going to show you an exhibit that's been marked as No. 29. I'd just ask if you can review it and let us know if you've seen that document before.

**A.** Do you want me to read it?

**Q.** Yes, please. Just review it and let us know if you've seen it before.

**A.** Yes, I recognize it.

**Q.** Could you describe what's going on in this email?

**A.** One of my coworkers, the person responsible for computers inventory and replacing them, was asking me that "Your desktop is still in New York. Do you need it?"

**Q.** And Scott Sommer, who is he?

**A.** Scott Sommer, he was handling computers, inventory replacement of them, leasing computers.

**Q.** The bottom portion of that email, what's the subject line of the email from Mr. Sommer to you?

**A.** "Missed Conversation With Scott Sommer."

**Q.** Was there some sort of messaging system within the

company?

**A.** I didn't say it right. I missed his call. He left me a voicemail. That's why it's saying "missed conversation."

**Q.** Can you read the portion of the email that Mr. Sommer wrote to you?

**A.** I can't see it.

Oh, okay. "Good afternoon. Your desktop is still in New York. Do you need it? "

**Q.** Okay. And then can you read your response?

**A.** "Scott, I will need my desktop in a couple of weeks when I get a cubicle in Boston office."

**Q.** What are the dates on these emails?

**A.** June 2nd.

**Q.** 2015, correct?

**A.** 2015.

**Q.** This is a few days after the emails that we've just looked at, correct?

**A.** Yes.

**Q.** And did you copy anybody on this email?

**A.** Yes. I copied Colin Reid.

**Q.** Why did you copy him?

**A.** Because he was involved in getting me -- he was my manager, and he was responsible probably for getting me the new equipment in the Boston office.

**Q.** Could you read Mr. Reid's response to your email.

11:25:34 **A.** "Scott, please wait until I'm back in New York tomorrow. Yury might be getting new equipment in Boston since I have an AS/400 consultant sitting there next week."
11:25:55 **Q.** Does he copy anybody on this email?
11:25:58 **A.** "And please advise," yes. Colin, yes, he copied his manager, Andrew Hamilton.
11:26:12 **Q.** What was your understanding after receiving this email from Mr. Reid?
11:26:23 **A.** My understanding was that Colin wasn't sure whether to send my old equipment to Boston or to get me a new one. And his other concern was that a consultant was starting -- a new AS/400 consultant was starting at the same time. And probably to speed up his settings, Colin was going to give him my old equipment.
11:26:57 **Q.** The AS/400 consultant that is referred to in this email, did you have any understanding of who that was?
11:27:04 **A.** Yes. It was Mr. Edgardo, Felix.
11:27:10 **Q.** Mr. Felix, had you ever worked with him before?
11:27:12 **A.** Yes, I worked with him previously for Cushman & Wakefield.
11:27:15 **Q.** Did anything about this email exchange lead you to believe that there was any problem with your transfer?
11:27:28 **A.** Not at all.
11:27:31 **Q.** During this time, who else was working on your team within the company?

11:27:42 **A.** There were two full-time employees, Anna Kleynshteyn and Tom Donlon, and there were a couple of consultants in Colin's group.

11:27:56 **Q.** Now, Ms. Kleynshteyn, how long had she been with the company?

11:28:02 **A.** She's been with the company about the same time as me.

11:28:09 **Q.** And what about Mr. Donlon?

11:28:17 **A.** He was with the company at the time maybe for 15 years.

11:28:24 **Q.** Did you have any understanding of how much money you made with respect to the other people on your team?

11:28:41 **A.** Yes. My -- my earning was more because I had a different job title. I was a project manager.

11:28:50 **Q.** Now, Mr. Felix, this consultant that had been hired, did you have any understanding of why he was hired?

11:29:03 **A.** I wasn't exactly sure why he was hired, but probably --

11:29:09 MR. BERLUTI: Objection, Your Honor. Speculation.

11:29:12 THE COURT: Overruled.

11:29:14 **A.** We were busy at the time, and he was probably hired for several months to help us out during this time.

11:29:22 BY MR. SZAL:

11:29:32 **Q.** Did you have any understanding of whether or not the people on your team knew you were working out of the Boston office?

11:29:37 **A.** Yes.

11:29:37 **Q.** What did you base that understanding on?

11:29:44 **A.** Before I left, we talked about it and he told me about it. The last days -- not before, but during the last days, they found out about it.

11:30:02 **Q.** I'll show you an exhibit that's been marked as No. 32, and ask if you would review this exhibit. Let me know when you've had a chance to do so.

11:30:26 **A.** Yes.

11:30:26 **Q.** Can you describe what's going on in this email?

11:30:32 **A.** Yes. Someone send an email that the donuts are available in our area, and I send an email to the people in my team, "Please save one for me." I was trying to be funny. And one of my coworkers, Anna Kleynshteyn, also made a joke. She replied to me, "I already did, Boston cream donut."

11:31:13 **Q.** And that was a joke because the donuts were available in New York City and you were in Boston?

11:31:17 **A.** Yes.

11:31:23 **Q.** Now, did you perform work for the company during the first week of June 2015?

11:31:28 **A.** Yes.

11:31:31 **Q.** What type of work were you performing during that time?

11:31:35 **A.** The beginning of June, I was doing my regular job supporting the users and the system for month's closing, for May closing. In addition to that, I was working on implementation of the Workday project.

11:31:58 **Q.** During this time, were there any changes to the process

by which you received assignments?

**A.** No.

**Q.** Did you continue to work on the Workday project?

**A.** Yes.

**Q.** What kind of work did that involve?

**A.** The AS/400 provided information to Workday, different type of information. And that involved for us to create several what we call interfaces, different types of data to be sent to Workday, some of them in real time, some of them daily, some of them monthly. And that was our part of the project, to fill the Workday with information from the AS/400.

**Q.** Did this work involve any meetings with other people?

**A.** Yes. We had meetings.

**Q.** What people would you meet with? Where were they located?

**A.** The people that were involved, there were people from Deloitte involved in this project. There were a couple of person from Workday involved. There were consultants. Some of the people were located, you know, all over the country. And most of this was still through the conferencing.

**Q.** Did you have access to teleconference when you were with the company?

**A.** Yes. Yes.

**Q.** Did you have access to video conferencing when you were

with the company?

**A.** Yes because we had Cushman & Wakefield meeting center.

**Q.** Now, during this first week of June 2015 when you were performing work, did you have any interactions with Mr. Reid?

**A.** Yes. Practically every day or about that.

**Q.** And how would those interactions take place?

**A.** Emails, phone calls.

**Q.** Mr. Rinsky, this is a document that's been marked as Exhibit 36. I'd just ask you to take a second to review it and let me know if you recall receiving this email.

**A.** Yes.

**Q.** And could you read it for us, please.

**A.** This is an email from Colin Reid to me. "Please send me your current task list with projected completion dates so that I change your priorities."

**Q.** Was it common for Colin to review your task lists and project completion dates?

**A.** It wasn't common, but he did it when I was working on big projects.

**Q.** When it says "change your priorities" in that email, do you have any understanding of what is meant by that?

**A.** Yeah. My understanding is that, like I said, there were a number of interfaces that we had to send to Workday, and he was coordinating the job of our group and he was just trying to set the priorities what interface should be completed

first.
**Q.** A little while ago, you mentioned a contractor named Edgardo Felix; is that correct?
**A.** Yes.
**Q.** Do you have any understanding of how old he is?
**A.** He's about 15 years younger than me.
**Q.** Did you perform work with him in the past at the company?
**A.** Yes.
**Q.** Did you have any understanding of where he was performing his work in the company?
**A.** He was hired after I left for Boston, but I guess he was in the company headquarters.
**Q.** Do you know if he was sitting at your desk?
**A.** I'm not sure. I don't know.
**Q.** Did you continue to perform work for the company during the second and third weeks of June?
**A.** Yes.
**Q.** What kind of work were you performing during the second and third weeks of June?
**A.** Preliminarily I was working on the Workday project.
**Q.** Were you having interactions with Mr. Reid during that time?
**A.** Right. It was business as usual with Mr. Reid and the other members of the team, yes.
**Q.** Did you exchange emails with Mr. Reid?

**A.** Yes.
**Q.** Did you speak with him on the phone?
**A.** Yes.
**Q.** During that time did anything come up concerning your transfer?
**A.** No.
**Q.** At some point in June, we asked to participate in a conference call between you, Mr. Reid, and Andrew?
**A.** Yes.
**Q.** And do you recall when that was?
**A.** That was on June 22nd, 2015.
**Q.** And how did you receive notification that there would be a conference call?
**A.** I received an invite, and the subject of the invite was "Supporting the System from Boston."
**Q.** Based on that subject line, did you have an understanding of what the purpose of the conference call was?
**A.** Yes, I was very happy. My understanding was that they would tell me when I can finally start working from the Boston office.
**Q.** And did you, in fact, have that conference call on the 22nd?
**A.** Yes.
**Q.** Who participated in that call?
**A.** Colin Reid; his manager, Andrew Hamilton; and they told

me that there was a person from HR in this meeting.
**Q.** And did you say anything at the outset of this call?
**A.** Yes. I was trying to make a joke at the beginning. I said, "Can you hear I already got the Boston accent?"
**Q.** Did anyone say anything in response?
**A.** They were very serious. They weren't joking. Colin said, "Are you waiting for your cubicle in the Boston office? Here is Andrew. He will explain you everything."
**Q.** And did Andrew say anything to you?
**A.** Yes.
**Q.** What did he say?
**A.** He said, "We need you in New York."
**Q.** Do you have an understanding of what he meant by that?
**A.** I thought they want me to come to New York for a meeting.
**Q.** So what did you say?
**A.** "Of course. When do you want me to come?"
**Q.** Did anybody respond to that?
**A.** Yes. Andrew was the one who did all the talking, yes.
**Q.** What did he say?
**A.** He said, "We need you in New York every day starting tomorrow."
**Q.** June 22nd, what day of the week was that, do you recall?
**A.** Monday.
**Q.** What was Andrew's tone of voice during this call?
**A.** He was tense. He sounded kind of angry at me. I didn't

understand why.
**Q.** Did you respond to Mr. Hamilton?
**A.** Yes.
**Q.** What did you say?
**A.** I said, "What do you mean, five days a week in New York? I just moved to Boston. I moved all my belongings to Boston. You approved it. I got all the permissions. And now you want me to come back to New York five days a week?"
**Q.** Did he respond at all to you?
**A.** He said, "Yes, that's what we decided. And if you want to keep your job, you have to report to the office every day -- in New York every day."
**Q.** And he wanted you to report the next day; is that correct?
**A.** Yes. He said, "Starting tomorrow."
**Q.** At this point the sale of your house has already gone through, correct?
**A.** Yes.
**Q.** And you had already foregone the leaseback provision in the contract, right?
**A.** Exactly. I didn't need it.
**Q.** Did you respond at all to Mr. Hamilton's further statements?
**A.** Yes. I told him, "Why are you doing this? You know that I have an expertise on the system. It will be bad for you.

It will be bad for me. Why are you doing this? Are you trying to save money on me or what?"

**Q.** Did he respond to you in any way?

**A.** He said, "No, we are not trying to save money. We want you in New York. That's it. You have to decide. If you don't want to come in the office in New York every day, then we want you to resign."

**Q.** You testified earlier about there being a space issue in the New York City headquarters. Did you have any understanding that that space issue had changed at this point?

**A.** It hadn't changed. It got probably even worse because of new people working on the Workday project.

**Q.** Did you feel that their demand that you report the next day and every day thereafter five days a week in the New York City office, did you think that was reasonable?

**A.** I didn't think it was reasonable.

**Q.** Why not?

**A.** I just moved to Boston after their approval. I moved all my belongings to Boston, and I was working from Boston for about three weeks, and we were talking about coming to New York -- the agreement was coming to New York on an as-needed or occasionally. And it didn't sound reasonable to me too.

I think they asked me for impossible, just like

they were playing like Monopoly game with my life. "You moved. Come back tomorrow. Not in a couple of days, not in a week, tomorrow. You have to be there tomorrow."

**Q.** Before your move to Boston, you were working three or four days a week from home, correct?

**A.** Correct.

**Q.** Did the company ever offer you your job back on the same terms as when you left New York?

**A.** No.

**Q.** You mentioned that Mr. Hamilton said that he wanted you to resign. Did you have any understanding as to why he asked you to resign?

**A.** I didn't understand it, but he was pushing me. He was telling me, "That would be good for you. It's better for you. No one would ever find out that you were fired. It wouldn't look like you were fired. Resign, it's good for you." He was pushing for me to resign.

**Q.** Did you respond to his request that you resign?

**A.** I told him I had honestly worked for the company for 27 years, I did a good job according to my reviews, and everyone knows it. I have my reputation with the people I work with, and I'm not resigning. I wasn't going to resign at this time. I'm not resigning.

**Q.** Did you ask for forgiveness during this call?

**A.** Forgiveness?

**Q.** Forgiveness.
**A.** For what?
**Q.** We heard a lot in the opening statements -- you were in the courtroom yesterday, correct?
**A.** Yes.
**Q.** Attorney Berluti said that you had asked for forgiveness rather than ask for permission, right?
MR. BERLUTI: Objection, Your Honor.
THE COURT: Sustained.
Don't answer that. That's sustained.
BY MR. SZAL:
**Q.** Did you ask for forgiveness from the company?
**A.** No.
**Q.** Why not?
**A.** There was nothing to forgive. I did nothing wrong.
**Q.** Now, during this call with Mr. Hamilton, Mr. Reid, and somebody from human resources on the 22nd, how were you feeling?
**A.** I was shocked. My blood pressure went through the roof. I was very upset.
**Q.** Anything else during this call?
**A.** Yes. They told me that "We will send you an email which will describe what HR expects from you, what kind of reply HR expects from you based on our conversation."
**Q.** Did you, in fact, receive an email?

11:46:55 **A.** Yes.
11:46:56 **Q.** Who did you receive an email from?
11:47:02 **A.** I think it was from Colin.
11:47:55 **Q.** Mr. Rinsky, this is a document that's been marked as Exhibit 44. Is this the email on the 22nd that you were just referring to?
11:48:01 **A.** Yes.
11:48:02 **Q.** Could you read the top portion where the pink dot is.
11:48:10 **A.** Yes. This is from Colin to me, copy Andrew Hamilton. "Yury, this is the response that HR is expecting from you based on our conversation this morning."
11:48:35 **Q.** That portion of the email, was there anything strange about the way it's addressed?
11:48:41 **A.** Yes.
11:48:43 **Q.** What's that?
11:48:44 **A.** The first thing I noticed, I worked with Colin for 27 years and Colin perfectly knew how to spell my name. In this email, my name was misspelled. My name's spelled Y-U-R-Y, and here we have Y-U-R-I.
11:49:05 **Q.** It's asking for you to send an email to him, Andrew Hamilton, and Katrina Hicks. Do you have an understanding who Katrina Hicks was?
11:49:21 **A.** Katrina Hicks was the HR manager, I think. Her name was mentioned on the call on June 22nd. They told me that Katrina is also in the meeting. She didn't talk, but she was

listening.
**Q.** Could you read the rest of the email where the pink dot is now.
**A.** Yes. This is the information they wanted me to send them. "After informing you of my decision to relocate and understanding the need for my role is located in the Cushman & Wakefield New York office, I have decided not to continue my employment. Therefore, I formally resign and my last day with Cushman & Wakefield will be June 22nd, 2015."
**Q.** That's the date of the email, right?
**A.** It was the date of the email, yes.
**Q.** What was your reaction to this portion of the email?
**A.** This was not true, what they were asking me. I wasn't going to send it to them.
**Q.** Did you ever agree to resign?
**A.** I never agreed to resign, no.
**Q.** After receiving this email, did you do anything in response to it?
**A.** Yes.
**Q.** What did you do?
**A.** Like I said, I was very upset and my blood pressure was very high. I took some time to relax. And later on, I sent emails to Katrina Hicks, Colin Reid, and the president of the company.
**Q.** Did you try and call anybody?

**A.** I tried to call Colin.
**Q.** Were you able to get in touch with him?
**A.** No. He didn't pick up the phone and he didn't reply to my voicemail. He sent me a text message that "I am waiting for Katrina. Talk to Katrina if you have any questions. She will explain you everything."
**Q.** Did you talk to Katrina?
**A.** Yes, I think I did.
**Q.** Do you remember what you spoke about with her?
**A.** I told her that "I didn't do anything wrong. What was happening? Why all of a sudden everything was changed."
She told me that "You left without talking to your manager and to HR. That's why."
**Q.** Who's your manager?
**A.** Colin Reid.
**Q.** Did you talk to him before you left?
**A.** Several times.
**Q.** Did you get approval from him?
**A.** Yes.
**Q.** Did he indicate there was approval from his boss?
**A.** Yes.
**Q.** Did he ever tell you you had to talk to Katrina Hicks?
**A.** Never.
**Q.** You said you also sent an email to Ms. Hicks; is that correct?

**A.** Yes.
**Q.** We're still on Exhibit 44. It contains several emails. Is this the email that you're referring to?
**A.** Yes.
**Q.** Could you read it for us, please.
**A.** This is from me to Katrina Hicks. "Katrina, per our conversation earlier today, I am once again advising you that I will not be resigning from my position after 27 years of service. Per my annual reviews, my job exceeds expectations. My move to Boston was approved by my manager, and I was told to work remotely until I was given a work space in Cushman & Wakefield Boston office. I am not familiar with the formal protocols you mentioned, and my manager never advised me that such protocols exist.
"Once I received the approval, I sold my house and moved to Boston. The move to Boston has not impacted my ability to perform my job in any way. My expectation, based on conversation and correspondence with my manager, was that I would work remotely until he set up my Boston office cubicle. I would like to know why everything was changed today and why I am being asked to resign."
**Q.** And this email response to Katrina Hicks, it's the same day that you had the call with her, Andrew, and Colin, correct?
**A.** Sent the same afternoon of the same day.

**Q.** And it's the same day that you received the email that we just read earlier asking you to resign, correct?
**A.** Yes. I received it right after our call with Colin and Andrew about 9 or 10:00 in the morning.
**Q.** Now, did Ms. Hicks immediately respond to you? Did she immediately respond to this email?
**A.** No.
**Q.** Did you send any other emails that day?
**A.** Yes. I sent an email to Colin and to the president of the company.
**Q.** Still on Exhibit 44. This is an email from you to John Santora. Is he who you understood to be the president of the company?
**A.** Yes, at the time he was the president of the company.
**Q.** Why did you send this email?
**A.** I thought what happened was very wrong, and I asked him for help.
**Q.** Could you read this email for us, please.
**A.** "Please help me understand my abrupt termination. As you know, I have been an employee for over 27 years. I recently moved to Boston with the expectation that I would continue to work remotely until a cubicle in the Boston office was set up. My move was approved by my direct manager, and I put my house on the market. If my manager did not approve my move, I would not sell my house and move to Boston.

"I'm upset and confused by the course of today's events. This morning I was told that I should forcibly resign, and my manager sent me an email with specifics about my letter of resignation to human resources. I have no intention of resigning today or ever. I have done my job for almost three decades exceeding every expectation, and I think I am still very useful to the company.

"I'm forwarding you the correspondence between my direct manager and human resources. Please help me to make sense of this and let me know if there's anything you can do to help. I appreciate your help."

**Q.** Did Mr. Santora respond directly to you?

**A.** He didn't respond to me, but my understanding was that because of the --

MR. BERLUTI: Objection, Your Honor. No foundation.

THE COURT: That's sustained.

BY MR. SZAL:

**Q.** He didn't respond to this email, correct?

**A.** He didn't respond.

**Q.** In this email you just read, it says, "My move was approved by my direct manager and I put my house on the market." Your house actually went on the market before your move was approved, correct?

**A.** Yes. That was my mistake, but it was a very have

stressful day for me, and I just missed it -- didn't put it right, this part.

**Q.** The top portion of that email you're not copied on, but it's from Ms. Hicks to Mr. Reid, saying "I am managing." Was it your understanding after the 22nd, that Katrina was your point of contact at the company regarding this issue?

**A.** Yes. I received one of the emails where it says -- I think it was in Colin's email, "that if you have any questions, contact Katrina Hicks," and nobody else wanted to talk to me since this conversation on the 22nd.

**Q.** Did you ever talk to Ms. Hicks subsequent to this day and these emails?

**A.** Yes.

**Q.** Do you recall when you might have talked to her?

**A.** I think it was June 25th.

**Q.** Do you recall what was discussed during that conversation?

**A.** Yes. On the 22nd, I believe she told me that my case will be reviewed based -- I guess based on my email I sent to the president of the company. That was the reason.

And three days later, I inquired -- I told her, "You mentioned that my case will be reviewed. Please let me know what is the status of my employment with Cushman & Wakefield." The result, I wanted to find out the result of this review.

**Q**. In connection with these email exchanges, did you provide any documentation to the company that you thought was relevant to the approval of your transfer?
**A**. Yes. I attached an email -- a couple of emails to the one I sent to the president of the company, an email about setting up my equipment in the Boston office. And if I'm not mistaken, there was another email I attached, but I don't recall what it was.
**Q**. Mr. Rinsky, this was Exhibit 12 that we looked at earlier. Did you provide this to the Katrina Hicks in connection with the issue with your transfer that had arisen?
**A**. Yes.
THE COURT: Can I interrupt you? How much do you have left for him? It's time for the hunch break, but if you're wrapping up, I'll let you finish. If you're not wrapping up, I'm going to send them out for lunch.
MR. SZAL: I think we should send them.
THE COURT: Okay. Is this a good place? Do you want to finish your thought?
MR. SZAL: No. It's okay.
THE COURT: All right. We're going to send you back for lunch, which, if Jarrett is as efficient as I think he is, it's waiting upstairs for us. I'm not sure how much time you want for lunch. I'm going to give you 45 minutes for today. If you decide it's too long or you need longer --

12:02:32 I want you to have time to stretch your legs -- we can adjust. So we will resume at quarter to 1. We'll recess until then.

12:02:41 THE CLERK: All rise for the jury.

12:02:43 (Jury exits the courtroom.)

12:03:22 THE COURT: Is there any possibility that we close tomorrow?

12:03:25 MR. BERLUTI: I hope so.

12:03:28 THE COURT: We'll get you a draft of the charge by tonight so you can look at it overnight. We'll try to have a charging conference tomorrow morning. Okay?

12:03:36 You guys are free until quarter of one as well.

12:03:43 (Court recessed at 12:03 p.m.)

AFTERNOON SESSION

THE CLERK: All rise for the Jury.

(Jury enters the courtroom.)

THE CLERK: You may be seated.

THE COURT: Mr. Rinsky, you're still under oath. When you're ready.

CONTINUED EXAMINATION

BY MR. SZAL:

**Q**. Good afternoon, Mr. Rinsky. Before we broke for lunch, we were discussing some documentation that you had provided to the company that you believe supported your transfer approval. Looking here at Exhibit 12 that we looked at earlier dated May 17th from you to Mr. Reid. Is this one of the documents that you provided to the company?

**A**. Yes.

**Q**. And this is Mr. Reid's response that we looked at earlier, Exhibit 14. Did you also provide this document to the company?

**A**. Yes.

**Q**. This is Exhibit 29 that we looked at earlier concerning your desktop computer in New York and new equipment for Boston. Did you provide a copy of this email to the company?

**A**. Yes.

**Q**. Why did you provide these three documents to the company?

**A**. I wanted to save it as it proves that I was working after

I left for Boston, and that's basically it.

**Q.** Do you maintain a personal email address in addition to your Cushman & Wakefield address?

**A.** Yes.

**Q.** With Yahoo?

**A.** Yes.

**Q.** Did you forward any of your emails from the company to your Yahoo address during this time?

**A.** Yes. I forwarded them to my personal Yahoo account.

**Q.** Why did you do that?

**A.** Just to save them.

**Q.** Were you saving them for anything in particular?

**A.** I saved the last emails I received and several more emails regarding the work, what was going on there during the last week or so.

**Q.** Now, at some point was your access to the AS/400 system disabled?

**A.** Yes. My access to the AS/400 system was disabled the following day after our conversation on the 22nd.

**Q.** And was your access to the Cushman & Wakefield email address cut off at any point?

**A.** Yes. Several days later.

**Q.** And were you able to perform any work without access to the Cushman & Wakefield email or access to the AS/400 system?

**A.** No.

**Q.** Did the company continue to pay you for a period of time while your access was disabled?
**A.** I'm not sure.
**Q.** Did you receive any payments after June 23rd?
**A.** Yes. Probably yes. It was difficult for me to check because I had a lot of PTO days left, but I assume it was included. They paid me probably.
**Q.** During this period, did you have any understanding of what was being reviewed?
**A.** Yes. What was reviewed was the way they handled my transfer and the decisions they made to terminate me.
**Q.** Did you have any understanding of who was involved in that process?
**A.** My understanding is management, IT management, and probably HR was involved.
**Q.** At some point, did you learn the results of the company's review process?
**A.** Yes.
**Q.** How were you informed of that result?
**A.** I believe it was an email from Colin.
**Q.** Email from Mr. Reid?
**A.** Yes.
**Q.** Mr. Rinsky, this is a document that's been labeled as Exhibit 66. I'd ask you to review the first page of this, and let me know if that's the email that you were just

referring to.

**A.** Yes.

**Q.** Does this email have an attachment?

**A.** Yes.

**Q.** Is this the attachment to the email?

**A.** Yes.

**Q.** This is a letter from Colin Reid to you?

**A.** Yes.

**Q.** Did you review this letter after you received it?

**A.** Yes.

**Q.** Did you believe the letter to be accurate?

**A.** A lot of it was inaccurate.

**Q.** There are several bullet points in this email. I'm going to ask you to read the first bullet point where the arrow is pointing.

**A.** "Back on 4/30/15, you and I discussed the possibility of you moving to Boston. You informed me you had decided to relocate, that you need taking out a home equity loan, put your home up for sale, and purchase a home in Boston." This is completely inaccurate.

**Q.** Is there anything in that statement that's false?

**A.** Everything.

**Q.** What's false in that statement?

**A.** First of all, I don't recall talking to Colin on 4/30/15. We didn't discuss the possibility of me moving to Boston on

4/30, even if we did talk, because by that time all the approvals were granted. In the middle of April, all the approvals were granted.

I told him -- he was saying, "You informed me you had decided to relocate." That happened before he left for Florida. Then he's saying, "You had taken a home equity loan." I took home equity loan like many months ago. "Put your home up for sale." He also found out about it at the end of March, beginning of April. "And purchased a home in Boston." That happened in December of 2014. So everything here is not accurate.

**Q.** Let me ask you to read the second bullet point in that letter where the arrow is pointing right now.

**A.** "In that meeting, I told you a request to work remotely had to go through the IT process, requiring approvals from Andrew Hamilton, Leif Maiorini, and Craig Cuyar. I also reminded you that my own personal relocation had taken several months to be approved. You" -- I can't read it. "Thank you. You asked me to do my best to get your request approved. Given the decision about the approval process, you knew it was a possibility that your request would not be approved."

**Q.** Is there anything in that statement that's false?

**A.** Yes.

**Q.** What in that statement is false?

12:59:12 **A.** Again, it wasn't the right date. When I informed him about my plans to move to Boston, it's not that I told him I decided to move to Boston. When it happened in the beginning of April, I was requesting a permission to move to Boston, approval and permission to move to Boston. I didn't say, "I'm moving to Boston."

12:59:47 **Q.** The statement mentions approvals being required by Leif Maiorini. Were you ever told about approvals needed by Leif Maiorini?

12:59:58 **A.** No. I never heard about it. He just told me, like I said before, "I need to talk about it to my boss. It's not just me, I need to talk to my boss." That's what he said at the time, and it wasn't April 30.

01:00:12 **Q.** And his boss was Andrew Hamilton, right?

01:00:14 **A.** Yes.

01:00:15 **Q.** And you testified earlier that Leif is Andrew's boss?

01:00:21 **A.** Yes.

01:00:21 **Q.** Do you know how old Leif is?

01:00:25 **A.** Leif, at the time, he was in his late 40s.

01:00:29 **Q.** And then Craig, did you have any interactions with Craig at the company?

01:00:36 **A.** Very minimal.

01:00:37 **Q.** Did you have any understanding of how old he was?

01:00:44 **A.** He was also in his late 40s. Now, he come as a person in this letter saying, "I also reminded you that my own personal

relocation had taken several months to be approved."

I didn't know about that. When I told Colin about it the first time, he made that joke. He told me, "It took me almost ten years to get transferred to Florida."

I thought it a joke. I just told him that "because you're so important, you're managing director, and I'm just a software engineer." But I understood ten years as a joke.

**Q.** The third bullet point moving down, where the pink dot is right now, could you read that for us.

**A.** "At no time in our conversation did I commit or approve your request to work remotely."

**Q.** Is there anything about that statement that's false?

**A.** This is not accurate. He told me that he's approving it, that he's okay with it. He said, "Anyway, you work half of the time remotely. I'm okay with it." And then he said, "I need to talk to my boss."

**Q.** I'd ask if you can read bullet point five where the dot is now.

**A.** "As a courtesy, we placed you on a paid leave while we looked into the issue. Meanwhile, I discussed your request with Andrew, Leif, and Craig. In the end, the request was not approved because the work itself must be performed in New York City."

**Q.** Is there anything about that statement that's false?

**A.** Yes.

**Q.** What about that statement is false?

**A.** I knew nothing and I still don't know nothing about paid leave because I was working to the last day -- to the 22nd of May, I was working in New York. And after I moved, started May 29th, I was working until the last day, until they called me and told me to resign. I was working all the time. There was no any paid leaves. I was getting paid for my job, for my work.

**Q.** Between the time you got Internet access in Boston and the time your access was cut off, you were performing work, correct?

**A.** Yes.

**Q.** And you were getting paid for your work, right?

**A.** Yes.

**Q.** You were earning your pay, correct?

**A.** Yes.

**Q.** During your employment with Cushman & Wakefield, did you have the opportunity to review written communications from Colin Reid?

**A.** Yes. He was sending me practically every day, yeah.

**Q.** Was this letter similar or different to the communications that you had with him over 27 years?

**A.** This definitely doesn't look like it was written by Colin.

**Q.** Did you have any further discussions with anyone at the

company after receiving this letter?
**A.** I didn't have any discussions.
**Q.** Do you understand that your employment had ended because of this letter?
**A.** Yes.
**Q.** Has the termination of your employment had any impacts on you?
**A.** Yes.
**Q.** What impacts has it had?
**A.** I think it had a big emotional impact on me.
**Q.** Were you able to find work after you were terminated?
**A.** I wasn't able to find comparable work even with a loss in pay. I wasn't able to find work, no.
**Q.** Did you make efforts to look for work after you were terminated?
**A.** Yes.
**Q.** What kind of efforts did you make to look for work?
**A.** I was searching in several employment portals like Glassdoor, Indeed, Monster.
**Q.** What did you find based on those searches?
**A.** I found that the market for my technical skills on the AS/400 were practically dead. There was no demand at all. There were several ads where the company were trying to convert their application from the AS/400 to the new system, but they required knowledge of both sides, AS/400 and the

other system.

That was the reason I wasn't able to find a job because of the part of the job is technical, programming skills, and the other part is knowledge of applications, and commercial real estate is not a common application, and I didn't work with commercial available software. I worked on the custom-made system for Cushman & Wakefield and was not familiar with popular systems that thousands of companies get.

**Q.** Did you have any specific discussions with any companies concerning open positions that you were interested in?

**A.** I had a couple of discussions. One of them was with IT manager at the Staples headquarters in Framingham near Boston. And first, they were waiting to look at my technical skills. But then when it got to the applications, they told me that "We are sorry, but we are looking for someone who has experience working with retail applications," and I didn't have that experience.

**Q.** Did you ever find any opportunities comparable to your job at Cushman & Wakefield?

**A.** No.

**Q.** Did you want to keep working?

**A.** Yes.

**Q.** Do you want to keep working now?

**A.** Yes.

**Q.** Do you still look for work?
**A.** I do.
**Q.** Have there been any limitations on your ability to find comparable employment?
**A.** Yes.
**Q.** What kind of limitations?
**A.** Like I said, I think my age is a limitation. Not too many people are willing to hire people at my age.
MR. BERLUTI: Objection, Your Honor. That's speculative.
THE COURT: That's sustained.
**A.** And then like I explained before, the almost 30 years old AS/400 system was not in demand at all. Companies hire IT personnel when they have new development, and nobody -- practically nobody does new development on a system that is going away and being, you know, transferred to another system. That was the other reason.
BY MR. SZAL:
**Q.** Does it feel like the termination of your employment was a limitation on finding comparable work?
**A.** Yes.
**Q.** Did you experience any other limitations while you trying to find comparable work after your termination?
**A.** Yes.
**Q.** What other limitations?

**A.** There was another reason. My cancer come back in October and I was treated again for six months.

MR. BERLUTI: Objection, Your Honor.

**A.** -- for six months in --

MR. BERLUTI: Hold on.

Move to strike.

THE COURT: Hold on. Hold on.

MR. BERLUTI: I'd like to have a side bar with this.

THE COURT: Okay.

(The following bench conference was held outside the hearing of the Jury.)

MR. BERLUTI: He just said that his cancer just came back. Is that what he said?

THE COURT: That's what he said.

MR. BERLUTI: There was nothing in any pretrial discovery that his cancer had come back. There was nothing in his deposition that was taken in March that his cancer came back. There was nothing in the opening statement that his cancer came back. There's no medical documentation that his cancer has come back. So I move to strike it.

MR. DENNEHY: He's never asked any of this.

MR. SZAL: It's a simple thing for medical documentation. He didn't ask for any.

THE COURT: What's the relevance?

MR. SZAL: You've already said he's not a doctor. It's a limitation.

MR. DENNEHY: Post termination, he's been unemployed part of the time because he's treating for cancer. He's never asked for any of this in deposition.

MR. BERLUTI: How do you know? You weren't even there.

MR. DENNEHY: Of course I read the --

MR. BERLUTI: Don't start.

MR. DENNEHY: You don't tell me not to the start. I'm not your employee.

THE COURT: Stop. Stop. Okay.

MR. SZAL: Listen, he never asked for any medical documentation. He testified for a whole day. He never asked about them. They made a mitigation of damages argument which goes to his inability to find work after. And you've already made a limiting instructs that he's not a doctor.

MR. BERLUTI: Your Honor, I asked him about his efforts to work and whether or not it was impeding him to work. He said he doesn't have his skills because it's AS/400, and he testified about the Framingham opportunity was that he didn't know the retail business.

He said nothing about having a physical limitation or health limitation in order to work. There was nothing said in the opening statement. There was nothing that we

asked him about damages that he talked about a loss of salary, nothing about his inability to work due to health.

MR. DENNEHY: He didn't ask about physical limitations. This all goes to the weight of the evidence. If he has something that says "You didn't mention this in your deposition," let him find the line in the deposition where he asked about physical limitations on work.

THE COURT: You can have it very briefly. Okay? That he was rediagnosed. And I presume he's going to say he had treatment one day and couldn't work the next for six months.

MR. SZAL: It's a different treatment.

MR. BERLUTI: It's different.

MR. SZAL: Are you a doctor, Bob?

THE COURT: Stop. The Jury is right there in the box. Cut it out. If you want to argue in the hallway, go ahead, but not in front of them.

MR. SZAL: It was a different treatment.

THE COURT: Was it the same kind of cancer or not?

MR. SZAL: Yes.

THE COURT: What was the treatment?

MR. SZAL: He went to chemotherapy for six months as opposed to nine weeks.

THE COURT: So he's done with it now?

MR. SZAL: Yes. This was in 2015.

THE COURT: Clarify the year. He had chemotherapy one day a week for six months.

MR. SZAL: I believe so, yeah.

THE COURT: And then did he need a day of rest after that or no?

MR. SZAL: It was a different treatment so he was sick.

THE COURT: You're going to tell them that he couldn't have worked at all for six months? He didn't let them know before we got here.

MR. SZAL: All I asked him was was it a limitation. I didn't say he was incapacitated.

THE COURT: We'll leave it at that, that he was diagnosed in October and we'll leave it at that.

MR. SZAL: Can we at least have the period of treatment?

THE COURT: It's not fair to spring it on him that he didn't.

MR. DENNEHY: He didn't ask the for any of this. He dropped the ball.

MR. SZAL: He didn't even confirm that he had lymphoma. He never asked for one medical document in the whole case.

MR. BERLUTI: Judge, it's not our duty. It's their burden of proof. It's their burden to prove.

THE COURT: This is not relevant to the burden of proof.

MR. BERLUTI: Judge, he never said he was not able to go back to work. This is a brand-new thing that's coming up, particularly that they're claiming that he now was rediagnosed in 2015. This is nothing that he told anybody.

THE COURT: I'm going to let the diagnosis in briefly. But what concerns me more is that this idea, instead of two days a week in treatment to, he can't work at all for six months, that's a major mitigation.

MR. SZAL: The diagnosis is what it is. The period of treatment, if you don't want to go into the effects of it, that's fine. I think he already said it's a limitation. We don't need to get into the nitty-gritty.

Just the fact that he was diagnosed and period of treatment.

(The following held in the presence of the Jury.)

BY MR. SZAL:

**Q**. Mr. Rinsky, could you tell us when you were rediagnosed with cancer after your employment? Do you recall what year it was?

**A**. The last time?

**Q**. Yes.

**A**. In October of 2016.

**Q**. 2016 or 2015?

01:15:56 **A.** I'm sorry. 2015.
01:16:05 **Q.** Without getting into the details of your treatment, which are personal I'm sure, could you tell us how long your treatment lasted for your cancer in October of 2015.
01:16:13 **A.** Yes. The last one was different. It was they were using stronger --
01:16:17 **Q.** Just the period of treatment, sir. How long did it last?
01:16:19 **A.** Six months.
01:16:20 **Q.** Six months. Okay.
01:16:29 Now, at the time of your termination, how much were you earning in salary per year?
01:16:34 **A.** After 27 years of service, I was earning $133,000 a year.
01:16:43 **Q.** Did you typically receive salary increases from year to year?
01:16:49 **A.** Yes.
01:16:49 **Q.** How much did your salary typically increase from year to year?
01:17:02 **A.** About 3 percent.
01:17:03 **Q.** The $133,000 you were making in 2015, that's not what you were making when you started at Cushman & Wakefield, right?
01:17:10 **A.** No. That was when I was terminated.
01:17:12 **Q.** How much did you make when you started at Cushman & Wakefield?
01:17:15 **A.** In '88, my starting salary was 50,000 a year.
01:17:19 **Q.** And did you receive annual increases to get to the level

you were at in 2015?
**A.** Yes.
**Q.** Do you believe you earned your salary?
**A.** Yes.
**Q.** Do you recall if you received a bonus in 2014?
**A.** Yes.
**Q.** Do you know about how much you made in bonus money?
**A.** Approximately $17,000.
**Q.** Seventeen?
**A.** Seventeen.
**Q.** And your yearly bonus, when would you typically receive that? Would it be the next year?
**A.** Yes. It would be about the same.
**Q.** Mr. Rinsky, this was April email that was produced in discovery. It's been labeled Exhibit 4, an email from Andrew to Mr. Reid titled "Bonus/Merit Communication Details."
I'd just ask if you can look at the -- this is the attachment to the email. Are those the full-time employees in your department as of 2015?
**A.** Yes.
**Q.** And does this document accurately reflect your base salary as of 2014?
**A.** I think so.
**Q.** And you were the highest paid member of your team?
**A.** Yes.

**Q.** Under the third column -- excuse me, third row down, it says, "New annual base salary as of 4/1/2015." And under the third row, it says, "133,738." Does that accurately reflect your base salary at the time of your termination?

**A.** Yes.

**Q.** And the row to the far right in the third column, it says, "2014 recommended bonus incentive," and it lists, "$17,138." Does that accurately reflect the bonus you received for 2014?

**A.** Yes.

**Q.** Did you have any understanding in 2015 about what your targeted bonus would be?

**A.** I didn't, but usually it was in the same range, around this amount.

**Q.** Did you receive a bonus for the year 2015?

**A.** Yes.

**Q.** You received a bonus after your termination?

**A.** Not for 2015, no, because I was terminated this year.

**Q.** When you were working for the company, did you receive any other fringe benefits?

**A.** Yes.

**Q.** What kind of benefits did you receive?

**A.** My insurance, medical insurance, dental, disability insurance, and paid time off. After 27 years of service, I was receiving 35 days a year.

01:21:37 **Q.** And in terms of the medical, dental, and disability, do you have an estimate of what the monetary value of those were per year?

01:21:44 **A.** The company was paying for it partially and I paid the other part. The company contribution was, I would say, like between 6 and $8,000.

01:22:00 **Q.** And the paid time off, how many days did you get per year?

01:22:04 **A.** Thirty-five.

01:22:05 **Q.** And if you didn't use the paid time off, would you get paid for it at the end of the year, or did it roll over to the next year?

01:22:16 **A.** It was rolled over to next year, but I was never able to use all of them. Usually I was just using a week or two weeks because it was just too many days. I had work to do. I couldn't take all 35 days.

01:22:36 **Q.** Do you have an approximation of about how much those seven weeks of PTO time equate to?

01:22:44 MR. BERLUTI: Objection, Your Honor.

01:22:51 THE COURT: Basis?

01:22:52 MR. BERLUTI: There's no foundation about what the type of the benefit was. This witness doesn't know.

01:23:02 THE COURT: You have to rephrase the question. You asked him if he has an approximation, but you haven't asked him if he has any basis for knowing what the amount would be.

01:23:10 Okay?

01:23:11 MR. BERLUTI: I'm talking about the nature of the benefit.

01:23:13 THE COURT: The question was -- let's see if he can do it.

01:23:18 BY MR. SZAL:

01:23:19 **Q**. Do you have any understanding of what the value of the paid time off days that you accrued were?

01:23:34 **A**. It was about $17,000.

01:23:36 MR. BERLUTI: Objection.

01:23:38 THE COURT: You still didn't lay the foundation.

01:23:39 BY MR. SZAL:

01:23:40 **Q**. What do you base that understanding on?

01:23:42 **A**. Based on the number of days and how much I was making per day. You know, based on my annual salary.

01:23:49 MR. BERLUTI: Still move to strike, Your Honor. The nature of the benefit, whether it could get rolled over, whether it could get paid out, there's no foundation.

01:24:04 MR. SZAL: I just asked him how much the monetary value was.

01:24:10 THE COURT: Well, but it's relevant if it carries over. It doesn't, right? If he's entitled to it after -- I think you need to -- right?

01:24:31 MR. SZAL: I don't think so. If you get vacation time, it has a monetary value. You're not at work. You

01:24:37 would have gotten paid had you been at work and you took the time off. Whether he gets paid out on it or not, it had a monetary benefit.

THE COURT: Separate from his salary?

MR. SZAL: Well, if he doesn't use it.

THE COURT: Only if it gets paid out.

BY MR. SZAL:

**Q**. So did you ever receive any money for unused paid time off?

**A**. There was a rule. It was rolled over, unused time was rolled over until next year, but if you don't use it within a month or two, then you lose it. That was the rule.

**Q**. At the time of your transfer to Boston, did you expect your salary, bonus, and benefits to continue?

**A**. Yes.

**Q**. What happened to your medical insurance when you were terminated?

**A**. Because of my medical issues, I needed the insurance very badly without any interruptions, and I went with COBRA through Cushman & Wakefield.

**Q**. Did you have to pay that out of pocket?

**A**. Yes. It cost me more than $800 a month.

**Q**. Did Cushman & Wakefield contribute anything to your medical insurance after July of 2015?

**A**. No.

**Q.** Did you have any expectation as to how long your salary, bonus, and benefits would continue after you moved to Boston?

MR. BERLUTI: Objection.

THE COURT: That's sustained.

BY MR. SZAL:

**Q.** Did you want to continue earning your salary, benefits, and bonus after moving to Boston?

**A.** Yes.

**Q.** How long did you want to continue to earn your salary, bonus, and benefits after moving to Boston?

MR. BERLUTI: Objection.

THE COURT: Overruled.

**A.** Until I retired.

BY MR. SZAL:

**Q.** Did you have any expectation as to when you wanted to retire?

**A.** When I am 66 or 67. See, in about three years.

**Q.** The funds, the salary, benefits, bonus we just discussed, have you been able to replace those through other employment since your termination?

**A.** No.

**Q.** You mentioned earlier that you had some emotional impacts as a result of your termination. Could you describe what those are?

**A.** Yes. Especially the beginning, I was constantly thinking

01:27:34 about what happened, why did they do it to me, why did they lie to me. I couldn't sleep at night thinking about it. I couldn't think. I would think how would I get another job at my age and with the problems with the system and applications I just told you about before.

And I started to have anxiety attacks because of it. I was constantly worried about my new job, and there is no demand for my skills, what would I do.

MR. SZAL: That's all the questions I have right now. Thank you.

THE COURT: While they're switching places, if you all want to stand up and stretch and move around a little bit, you're welcome to.

CROSS-EXAMINATION

BY MR. BERLUTI:

**Q**. May it please the Court. Mr. Rinsky, my name is Robert Berluti. I represent Cushman & Wakefield.

We met once before at a deposition. Do you recall that, sir?

**A**. Yes.

**Q**. You testified, sir, that you came to the United States in 1981; is that correct?

**A**. Yes.

**Q**. And you worked for Marsh McLennan; do you recall that?

**A**. Yes.

**Q.** And you worked in New York City; is that correct?
**A.** Yes.
**Q.** You worked there for two years, and then you worked for Computer Generated Solutions, and that was for four years, right?
**A.** About that.
**Q.** That was all in New York City, correct?
**A.** Yes.
**Q.** And then you applied for a job at Cushman & Wakefield, and you applied for that job at the New York City headquarters, correct?
**A.** Yes.
**Q.** And that's where you became employed for Cushman & Wakefield, was the New York City headquarters; is that right?
**A.** Yes.
**Q.** And that's where you reported to work every day for 28 years; isn't that right?
**A.** Yes.
**Q.** You had a cubicle or an office at the New York City headquarters in New York during the times you were employed there; isn't that right?
**A.** Yes.
**Q.** You were 37 years old when Cushman & Wakefield hired you?
**A.** Yes.
**Q.** And so you worked some 24 years after turning age 40 or

older; is that correct?
**A.** Yes.
**Q.** And during that entire 27 years, you received job promotions, correct?
**A.** Just one.
**Q.** You received pay increases?
**A.** Yes.
**Q.** Almost every year, right?
**A.** Almost every year, like anyone else.
**Q.** And you received good performance reviews; is that right?
**A.** Yes.
**Q.** And you enjoyed a good relationship with your supervisor for 27 years, Colin Reid; is that right?
**A.** Yes.
**Q.** You trusted Colin, correct?
**A.** Yes.
**Q.** And he was good to you; is that right?
**A.** Yes.
**Q.** Now, the only negative job action that you complain about after 27 years of employment at Cushman & Wakefield is the fact that they didn't approve your requested transfer to Boston; is that right?
**A.** No.
**Q.** Is that correct?
**A.** Approved the --

01:31:40 MR. SZAL: Objection.
01:31:42 THE COURT: Hold on. When someone makes an objection, you have to stop answering until I rule on the objection. Okay?
01:31:48 What's the basis of the objection?
01:31:49 MR. SZAL: Mischaracterizes the testimony. He said failure to approve the transfer, and the allegation is he was terminated.
01:31:58 THE COURT: All right. I'm going to overrule that.
01:32:02 He can answer the question. He heard the question.
01:32:03 **A**. Yes, they did approve it. But then they changed their mind a month later after I was already in Boston awaiting for a cubicle.
01:32:14 BY MR. BERLUTI:
01:32:15 **Q**. You know that Mr. Reid has testified otherwise in terms of that, correct?
01:32:18 **A**. Yes.
01:32:19 **Q**. Mr. Reid does not agree that your transfer was ever approved. You understand that, correct?
01:32:25 **A**. From his email, yes.
01:32:26 **Q**. And you understand that Cushman & Wakefield's management doesn't agree that they ever approved your transfer; is that correct?
01:32:32 **A**. Yes.
01:32:37 **Q**. Now, your responsibilities at Cushman & Wakefield was as

a software engineer; is that right?
**A.** As a project manager and then as a software engineer, yeah.
**Q.** And as a project manager and as a software engineer, you worked on projects independently, correct?
**A.** Yes.
**Q.** You supported the financial systems for Cushman & Wakefield in the New York City headquarters, correct?
**A.** Yes.
**Q.** You worked on the main -- the main system you worked on was the commission system for the real estate brokers, correct?
**A.** The commission system and commission system interfaces to other systems, yes.
**Q.** And the other people at Cushman & Wakefield that were responsible for calculating commissions were all located at the New York City headquarters, correct?
**A.** No.
**Q.** Virtually every month you had to meet with people in New York City about the commissions; isn't that right?
**A.** No. That was Colin's job, not mine.
**Q.** You designed, implemented, and -- you were involved in the design, implementation, and post implementation of supporting new projects; is that correct?
**A.** Yes.

**Q.** As a software engineer, you did not manage people; is that right?
**A.** Right. I managed people before when I was a project manager, a couple of consultants.
**Q.** Colin Reid was your supervisor for 27 years, and he was the one that managed people in the IT department there in the area that you worked in, correct?
**A.** Yes.
**Q.** And he had to manage other people; isn't that right?
**A.** Yes.
**Q.** You said the AS/400 system was implemented by Cushman & Wakefield in 1989?
**A.** Yes.
**Q.** And it was an IBM midrange computer; is that correct?
**A.** Yes.
**Q.** And IBM continued to support that mainframe computer at Cushman & Wakefield while you were employed there; isn't that right?
**A.** Yes.
**Q.** They were the main service partner for that system, weren't they?
**A.** We didn't do anything with IBM.
**Q.** They were not a service partner for Cushman & Wakefield?
**A.** I had nothing to do with IBM. I worked this software development and support, software custom made for Cushman &

Wakefield. I didn't deal with IBM.
**Q.** You personally didn't deal with IBM. What I'm asking you is that IBM was the service support partner for Cushman & Wakefield; isn't that right?
**A.** Yes, periodically the operating system was updated, like with your phone, and that IBM performed it, yeah.
**Q.** In 2015, Mr. Rinsky, the only other full-time Cushman & Wakefield employee working on the AS/400 system was Anna Kleynshteyn; isn't that right?
**A.** Yes.
**Q.** And she reported to Cushman & Wakefield's New York City headquarters; isn't that right?
**A.** Yes.
**Q.** And she's about your age, wasn't she?
**A.** About five years younger.
**Q.** Okay. And she's still employed at Cushman & Wakefield, as far as you know, isn't that right?
**A.** As far as I know, yes.
**Q.** Now, the AS/400 system was used for commissions, billing, and accounting at Cushman; is that correct?
**A.** Yes.
**Q.** And it was supported -- strike that.
And the Cushman & Wakefield team that supports the AS/400 is located in New York, correct?
**A.** I don't understand what it means.

01:36:24 **Q**. Well, the Cushman & Wakefield team that supports the AS/400 computer system, they are located in New York, in the New York City headquarters, aren't they?
01:36:36 **A**. Our team, you mean, right?
01:36:38 **Q**. Yes.
01:36:40 **A**. We were located there, yes.
01:36:41 **Q**. The primary internal customers are Cushman & Wakefield employees in the finance department; isn't that right?
01:36:46 **A**. No.
01:36:47 **Q**. That's not correct?
01:36:52 **A**. No. That also included office Cushman & Wakefield -- almost all Cushman & Wakefield offices all over the country, an office in Mexico, and various Cushman & Wakefield departments located in different states like the tech department, the legal department. So it wasn't just the group in New York.
01:37:16 **Q**. Sir, you were responsible for the financial system, including the commissions that were paid to brokers; isn't that right?
01:37:23 **A**. I was responsible for the software of the system. Accountants were responsible for the numbers.
01:37:31 MR. BERLUTI: Can we go to his deposition, page 16, please. Can you post it up a little bit. Line 10.
01:11:07 BY MR. BERLUTI:
01:37:57 **Q**. You just testified that, "In 2015, you were responsible

for the financial system, including the commissions that were paid to brokers, correct?"

And your answer was, "Right."

Do you see that, sir?

**A.** Including the commissions system.

**Q.** Okay.

**A.** I wasn't an accountant. I was supporting people like accountants and financial people.

**Q.** And those people were located in New York City in the headquarters; am I right?

**A.** Some of them. Some of them all over the country.

**Q.** Right. And many of the people in the New York City office, you had to meet with or you did meet with; isn't that right?

**A.** Occasionally I met with them, yes.

**Q.** Over 27 years you met with them; isn't that correct?

**A.** Yes. You work in the same space, you meet these people, yes.

**Q.** Sir, there were no AS/400 software engineers working out of the Cushman & Wakefield Boston office at any time that you were employed at Cushman & Wakefield; is that correct?

**A.** Yes.

**Q.** Specifically in 2015, there were no AS/400 software developers working in the Boston office, correct?

**A.** I think never, yes.

**Q.** In the 27 years that you worked at Cushman & Wakefield, you never had to travel to the Boston office for any business information technology-related purpose; is that correct?
**A.** Correct.
**Q.** Is that correct?
**A.** Correct. But I worked on the -- okay.
**Q.** In 2015, Craig Cuyar was the global chief information officer for Cushman & Wakefield; is that correct?
**A.** Yes.
**Q.** And below him was Leif Maiorini, correct?
**A.** Yes.
**Q.** And below Mr. Maiorini, in terms of the chain of command, was Andrew Hamilton, correct?
**A.** Yes.
**Q.** And Andrew Hamilton, Leif Maiorini, and Craig Cuyar were all stationed in the New York City headquarters; is that right?
**A.** Yes.
**Q.** Colin Reid was your immediate supervisor, and he managed both you and Anna Kleynshteyn and some other consultants, correct?
**A.** Yes.
**Q.** Now, Mr. Reid -- I want to ask you some questions about age discrimination, sir. Colin Reid is only two years younger than you; is that right?

01:40:31 **A.** Yes.
01:40:31 **Q.** His request for transfer to Florida was approved, correct? At least so far as you know?
01:40:39 **A.** Yes.
01:40:40 **Q.** You know that he, in fact, transferred to Miami?
01:40:43 **A.** Yes.
01:40:43 **Q.** You don't know when he first requested the transfer to Miami, do you?
01:40:49 **A.** I don't know.
01:40:49 **Q.** And you don't know that his age had anything to do with his transfer being approved, correct? You have no idea that his age played any role, correct?
01:41:00 **A.** I don't know.
01:41:01 **Q.** Now, in all of your discussions with Mr. Reid in 2015, he never mentioned anything about your age, correct?
01:41:20 **A.** Yes.
01:41:21 **Q.** And in 2015, other than expressing pleasure that you weren't suffering from any health-related issue, he never mentioned your health either anytime you had any discussion about your request to transfer to Boston, correct?
01:41:34 MR. SZAL: Objection. The word "pleasure," it's not in evidence.
01:41:40 THE COURT: Overruled.
01:41:42 **A.** Colin Reid was always nice and sensitive about the issues to my health, yes.

BY MR. BERLUTI:
**Q.** Right. You don't think that Mr. Reid did anything against your employment because of your age, do you?
**A.** Correct. I don't.
**Q.** You don't. And you don't think he did anything negative about your employment because of your health, do you?
**A.** I don't.
**Q.** Now, in your 27 years of employment, you have never made a claim against Cushman & Wakefield for the way they treated you; am I right?
**A.** Yes.
**Q.** The one and only claim that you made was for job abandonment after you moved to Boston; isn't that correct?
**A.** Yes.
**Q.** Mr. Hamilton, you never spoke to Mr. Hamilton about your transfer; is that correct?
**A.** I never spoke with Mr. Hamilton, but Colin Reid told me that he talked to him about it and it has been approved. I never talked to him about my transfer. I practically never talked to him at all.
**Q.** The only time you spoke to him was on June 22nd in a telephone call, correct? That's the only time you spoke to Mr. Hamilton?
**A.** About my transfer, yes.
**Q.** And he never mentioned age, did he?

**A.** He didn't.
**Q.** He didn't mention your health either, did he?
**A.** He didn't.
**Q.** As a matter of fact, you never informed Mr. Hamilton that you had any health condition, did you?
**A.** Never. We had very little communications.
**Q.** And you never told Leif Maiorini about any medical condition that you had, did you?
**A.** No. For the same reason.
**Q.** And the same thing with Mr. Cuyar, correct?
**A.** Yes.
**Q.** Now, you say, sir, the earliest date of discrimination occurred on June 22nd, 2015; is that right?
**A.** Yes.
**Q.** You never told Katherine Hicks, the HR representative, that you thought age or your health was the reason your request for transfer was denied, correct?
**A.** Correct.
**Q.** And, indeed, when you wrote to John Santora, the president of the company, on June 22nd, you didn't tell him that you thought age or your health had anything to do?
**A.** No. I just described what happened.
**Q.** Right. And Mr. Santora you had known for almost your entire 27 years at Cushman & Wakefield; isn't that right?
**A.** Yes. Briefly.

01:44:32 **Q.** He was about your same age, right? You both started at Cushman & Wakefield at the same time, correct?
01:44:37 **A.** Yes. I just want to say that it was --
01:44:49 THE COURT: Hold on, sir. There's no question before you.
01:11:07 BY MR. BERLUTI:
01:44:52 **Q.** Now you say, sir, in 2009, you had some treatment for your cancer, correct?
01:44:56 **A.** Yes.
01:44:57 **Q.** And you needed chemotherapy that took a day to receive, correct?
01:45:04 **A.** Yes.
01:45:04 **Q.** And you took the next day off, right?
01:45:07 **A.** To rest, yes.
01:45:08 **Q.** And that happened for nine weeks; am I right?
01:45:10 **A.** Yes.
01:45:11 **Q.** And Cushman & Wakefield accommodated your need to get chemotherapy and to take the time off that you needed; am I right?
01:45:18 **A.** Yes.
01:45:19 **Q.** And Colin Reid, during this time and afterwards, was always very nice to you; is that right?
01:45:25 **A.** Yes.
01:45:27 **Q.** As a matter of fact, he told you to take as much time as you needed for your treatment; isn't that correct?

01:45:33 **A.** Yes.
01:45:36 **Q.** In 2009, your employment continued after your treatment
01:45:40 as it was before your treatment, correct?
01:45:42 **A.** Yes.
01:45:43 **Q.** The same terms, conditions, position, everything stayed
01:45:47 the same, right?
01:45:48 **A.** Yes.
01:45:52 **Q.** All of your salary and benefits remained the same after
01:45:56 your treatment as before, correct?
01:45:57 **A.** Correct.
01:45:58 **Q.** Now, what you didn't testify to during your direct
01:46:01 examination was that you had a second health issue in 2009.
01:46:06 Do you recall that you broke your elbow in 2009?
01:46:09 **A.** I did.
01:46:10 **Q.** You did. And you broke it on or about December of that
01:46:16 year?
01:46:16 **A.** Right.
01:46:16 **Q.** And you were out for December of 2009 and into January of
01:46:20 2010, correct?
01:46:21 **A.** Yes.
01:46:21 **Q.** And you actually went out on disability benefits,
01:46:24 short-term disability for that time; isn't that correct?
01:46:27 **A.** Yes.
01:46:28 **Q.** And how long were you out in total, sir?
01:46:36 **A.** Excuse me?

**Q.** How long were you out on short-term disability for your elbow in 2009 and '10?
**A.** I don't recall the exact number of days, but I was working half of the time, maybe more.
**Q.** Sir, my question was how long were you out on short-term disability? Do you remember the number of weeks, sir?
**A.** I don't remember. It --
**Q.** Were you in a cast?
**A.** Yes.
**Q.** Did you have to have a plate put into your elbow?
**A.** Yes. I just couldn't commute. So I asked to work from home, to call me --
**Q.** There's no question, sir.
Now, all of your benefits at Cushman & Wakefield remained the same after you returned from your broken elbow as they were before, correct?
**A.** Yes.
**Q.** Now, sir, isn't it true that you believed that in 2009 you had a short-term disability when you had to get your cancer treatment, but after you took the treatment, you weren't disabled anymore; isn't that correct?
**A.** I didn't take a short-term disability. I was using my PTO time.
**Q.** No, no. I understand. I didn't mean it in that way.
All I'm saying is that you felt any disability that

01:47:58 you felt because of chemotherapy, you believed it to be short-term; isn't that right?

01:48:03 **A**. I don't know what definition of "disability" is. I was able to work.

01:48:08 **Q**. Okay. All I'm saying is that after you got your treatment, you didn't feel you suffered from any disability?

01:48:16 MR. SZAL: Objection.

01:48:17 **A**. Again, I --

01:48:18 THE COURT: Hold on. Mr. Rinsky, hold on. There's an objection pending.

01:48:22 MR. SZAL: Speculation. He already said he doesn't know.

01:48:30 THE COURT: He said he didn't know. I'm going to overrule it on speculative, but he said he didn't know so change the question up.

01:48:38 MR. BERLUTI: Let's go to his deposition, please, page 174, line 1 -- actually let's go to the page before that, 173, at the bottom, line 24.

01:11:07 BY MR. BERLUTI:

01:49:08 **Q**. "As I understand your testimony, you don't believe that you suffer from a disability; is that correct? "

01:49:22 MR. SZAL: Objection. It's characterizing his earlier testimony, as was the earlier deposition. It's talking about testimony before and the attorney's understanding of it.

THE COURT: Well, I think what he's asking is, "When you came back to work, you were okay," right?

MR. BERLUTI: Exactly right.

MR. SZAL: It's a piece of a deposition in which he obviously answered --

THE COURT: Why don't you ask that question. I think he's having trouble with the word "disability." Just stay away from the word "disability."

MR. SZAL: That's the exact terminology he used in the deposition, sir.

BY MR. BERLUTI:

**Q.** After you came out and you got treatment with your chemotherapy, when you returned, you felt you were back to normal, correct?

**A.** Yes.

**Q.** Do you recall being specifically asked, "Once you were back to normal" --

MR. BERLUTI: Let's stay right there, Mike, please, page 174, line 5.

MR. SZAL: Objection.

THE COURT: Basis?

MR. SZAL: He's trying to impeach him without a question pending.

THE COURT: I don't think he's trying to impeach him. This is the same that was up a minute ago, right?

MR. SZAL: The witness is --

MR. BERLUTI: This is a line down.

THE COURT: You can't use the deposition unless he says something that's inconsistent with the deposition. Okay?

MR. BERLUTI: It's an admission, Judge. It's a deposition.

THE COURT: You have to ask him the question.

MR. BERLUTI: I was about to.

THE COURT: Okay. Without the deposition.

BY MR. BERLUTI:

**Q.** Once you got back to normal, sir, isn't it true that you believed you didn't suffer from a disability, correct?

**A.** I was able to work. I didn't suffer, yes.

**Q.** You did not suffer from a disability?

**A.** Yes. Again, I don't know what the definition of "disability" is.

THE COURT: Definition of "disability" is a legal determination, and I will instruct the Jury on it later. I don't want him testifying about a legal concept.

MR. SZAL: I understand, Judge.

THE COURT: He testified --

MR. SZAL: He's been talking about his condition the whole direct.

THE COURT: I know, but "disability" is also a

legal term that they're going to have to make a decision about. So if you want to say, "Based on your understanding of disability."

BY MR. BERLUTI:

**Q.** Sir, let me ask you this. After your chemotherapy treatment, you didn't suffer from any health issues that impeded your ability to work; am I right?

**A.** At what time?

**Q.** After your chemotherapy treatment.

**A.** In 2009?

**Q.** In 2009.

**A.** No, I didn't.

**Q.** You didn't suffer from any problems at all, correct?

**A.** Yes.

**Q.** The same thing after you had chemotherapy treatment in 2013, it was the same, right?

**A.** Maybe I was a little to the weak side, but I was able to work. I was fine, yes.

**Q.** Right. Once you got beyond being a little bit weak, you were fine?

**A.** Yes. It takes awhile to recover from chemotherapy treatment. It takes a couple of months to get back -- really back to normal. But I was able to work right after the treatment ended.

**Q.** Now, in 2010, you had no -- no noteworthy health problems

01:52:26 in 2010, correct?
01:52:29 **A**. Right.
01:52:30 **Q**. And in 2011, you had no noteworthy health problems,
01:52:33 correct?
01:52:33 **A**. Yes.
01:52:34 **Q**. And in 2012, you had no noteworthy health conditions,
01:52:37 correct?
01:52:38 **A**. Correct.
01:52:39 **Q**. And in 2013, in around May, you developed pneumonia,
01:52:43 correct?
01:52:44 **A**. Yes.
01:52:44 **Q**. And you were out for two weeks, you were in the hospital
01:52:47 for two weeks, correct?
01:52:48 **A**. Yes.
01:52:48 **Q**. And Cushman & Wakefield accommodated you being in the
01:52:51 hospital for those two weeks; am I right?
01:52:53 **A**. Yes.
01:52:54 **Q**. And then after that, you said you went through another
01:52:56 round of chemotherapy, nine weeks in which you had treatment
01:52:59 one day and you had to recover the next day, correct?
01:53:02 **A**. Correct.
01:53:03 **Q**. And again, they accommodated you during that time in
01:53:07 2013, correct?
01:53:08 **A**. Correct.
01:53:08 **Q**. So by the time the fall rolled around, September of 2013,

again, you were back to normal; am I right?
**A.** Yes.
**Q.** You continued with all of the same job benefits and the same position in 2013 after you had chemotherapy from when you had it before you had chemotherapy, correct?
**A.** Yes.
**Q.** Again, in 2014, you had no noteworthy health problems, correct?
**A.** Correct.
**Q.** In 2015, same thing? In July of 2015, you had no noteworthy health problems, correct?
**A.** Correct.
**Q.** Nothing that you told Colin Reid about, correct?
**A.** Correct.
**Q.** In 2015, you never asked Cushman & Wakefield for any sort of accommodation because of your health, correct?
**A.** Correct.
**Q.** Indeed, when you spoke to Mr. Reid about transferring, you never mentioned your health, did you?
**A.** I did not.
**Q.** Now, sir, you believe that there were only two incidences in which health or age -- in which you suffered from any negative actions because of your health or your age; am I right?
**A.** Can you repeat the question?

**Q.** Sure. There were only two incidences during your employment at Cushman & Wakefield that you believe that you suffered from any age or disability discrimination, correct?
**A.** There was none, right.
**Q.** Do you recall answering some interrogatories in this case, some written answers, sir?
**A.** I don't understand.
**Q.** Do you recall that prior to trial, written questions are exchanged by the parties and the other party -- and you have to answer them and you signed them under oath. Do you recall that?
**A.** Yes.
**Q.** Okay. And one of them asks you about any instances in which you were a victim of age and/or disability discrimination. Do you recall that?
**A.** Yes.
**Q.** And you said there were two incidences, one was in 2009 and one was in 2013?
**A.** Right. Right.
**Q.** Do you remember that?
**A.** Right.
**Q.** And what you pointed to was what Mr. Reid -- what you say Mr. Reid said to you when you came back, in which he said the management may not allow you to go out -- words to the effect of management may not allow you to take more time off. Do

you recall that?

**A.** Correct.

**Q.** So the only person that you identify as the person that did any discrimination was Colin Reid. Do you recall that?

MR. SZAL: Objection.

**A.** No, it wasn't Colin Reid.

THE COURT: Hold on. Hold on. Hold on. There's an objection pending.

What's the basis of the objection?

MR. SZAL: Mischaracterizing testimony on direct. He testified that Mr. Reid said "they."

THE COURT: He can answer that.

**A.** It wasn't Colin Reid. Colin Reid was the messenger. He clearly explained to me that they think it. "They" means his managers.

MR. BERLUTI: Can we go to the answers to interrogatories, please, the proposed.

This is not agreed to.

Number 11. Can you blow it up a little bit, please.

BY MR. BERLUTI:

**Q.** Do you recall, Mr. Rinsky, being asked in these interrogatories, "Please list any and all instances that Mr. Rinsky experienced personal discriminatory animus based on his age and/or disability."

The answer, "Plaintiff states as follows: I believe that the termination of my employment was based on my anal and/or health condition. There were two incidences that I know of during which discriminatory animus was shown. After my chemotherapy treatment in 2009, Mr. Reid called me into a conference room and told me that I could continue working for the company, but that if I needed to take more time off from treatment, 'The company won't be able to keep you here.'

"After my pneumonia hospitalization and chemotherapy treatment in 2013, a similar incident occurred. Mr. Reid once again called me into a conference room and told me the same thing."

Do you recall that answer?

**A**. Yes, this is exactly what they said, the company. It wasn't Colin Reid. He represented the opinion of the company about it, not his own opinion.

**Q**. Okay. Do you also recall being asked, "Identify any and all individuals from whom Mr. Rinsky experienced discriminatory animus based on his age and/or disability and describe the circumstances of this discriminatory conduct."

And your answer was refer to your prior answer that I just read, correct?

**A**. Yes.

**Q**. Okay. Now, Mr. Rinsky, you did not move to Boston

01:59:15 because of any health issue, correct?
01:59:17 **A.** Correct.
01:59:19 **Q.** You wanted to move for family reasons, and the family reason was that your only child lived in Boston, right?
01:59:25 **A.** Yes.
01:59:27 **Q.** And by 2014, she had one child and another one on the way, correct?
01:59:31 **A.** Correct.
01:59:32 **Q.** And your second grandchild was born in January of 2015, right?
01:59:37 **A.** Yes.
01:59:37 **Q.** And during 2014, you looked for a house in Winchester; isn't that right?
01:59:42 **A.** Yes.
01:59:42 **Q.** And by December of 2014, you purchased a house in Winchester, correct?
01:59:49 **A.** Correct.
01:59:54 **Q.** And Exhibit 1 is the deed in which the house was conveyed to you and the recording of that deed --
02:00:10 MR. BERLUTI: Go to the first page, please, on the recording date.
01:11:07 BY MR. BERLUTI:
02:00:18 **Q.** This deed was recorded on December 19, 2014, correct?
02:00:22 **A.** Yes.
02:00:30 **Q.** And after purchasing the house, you began renovations,

correct?
**A.** Yes.
**Q.** Strike that. At the time that you purchased the house, you were represented by an attorney; isn't that correct?
**A.** Yes.
**Q.** And his name was Mr. Tedesco from Woburn?
**A.** Yes.
**Q.** And at the time that you purchased the house, you also signed another formal document; isn't that correct?
**A.** Probably.
**Q.** The title of that document was a Declaration of Homestead; isn't that correct?
**A.** Probably.
MR. BERLUTI: Pull that up. This is not agreed to.
THE COURT: This is or is not agreed to?
MR. BERLUTI: Not agreed to.
BY MR. BERLUTI:
**Q.** Call that up and please go to the second page. Mr. Rinsky, do you see -- is that your signature on the second page?
MR. BERLUTI: Can you please blow it up, Mike.
**A.** Yes.
BY MR. BERLUTI:
**Q.** It's dated December 18, 2014, correct?
**A.** Yes.

02:01:51 **Q**. And it's your signature, and do you also recognize your wife's signature?
02:01:56 **A**. Yes.
02:01:56 MR. BERLUTI: Can you go to the first page, please.
01:11:07 BY MR. BERLUTI:
02:02:13 **Q**. Do you recall signing this document on or about December 18, 2014, at the same time you purchased your house in Winchester?
02:02:23 **A**. Yes. Yes, I do.
02:02:23 MR. BERLUTI: I offer this as the next exhibit in line.
02:02:26 MR. SZAL: Objection.
02:02:27 THE COURT: Basis?
02:02:29 MR. SZAL: He hasn't done anything to authenticate it, number one. Number two, it's not consistent with -- why is it being offered?
02:02:37 THE COURT: Overruled.
02:02:38 MR. SZAL: It's also hearsay.
02:02:40 THE COURT: It's adequately authenticated.
02:02:44 MR. BERLUTI: This is Exhibit -- what's the number? Exhibit 76.
09:50:18 (Exhibit 76 marked for identification.)
02:02:53 BY MR. BERLUTI:
02:02:54 **Q**. Mr. Rinsky, it says this is a Declaration For Homestead By Homes Owned For Natural Persons. And it says, "We" --

MR. BERLUTI: Can everybody see it? Okay.

BY MR. BERLUTI:

**Q**. "We, Yury B. Rinsky and Raisa L. Rinsky" --

Raisa is your wife, correct, sir?

**A**. Yes.

**Q**. -- "hereby declare homestead pursuant to Massachusetts statute and state that I/we own the home described below and occupy or intend to occupy the home as my or our principal residence," correct? I read that correctly?

**A**. Yes.

**Q**. Now, beginning in December right through April of -- December 2014 through April of 2015, you were performing these significant renovations in your new home, correct?

**A**. No, sir. I just want to say when you -- I bought a house. I signed a bunch of documents. If you ask me about the contents of any of those documents, I wouldn't be able to tell you. The attorney recommended it. It said -- I remember he said, "This is something to protect you for creditors," and I signed it. What is wrong with this?

**Q**. Sir, let me just ask you questions, sir. Let me just ask you a question.

Beginning in December, once you bought your new home, right through April of 2015, you were performing these renovations that you talked about on direct exam, correct?

**A**. Yes.

02:04:24 **Q.** And those renovations included removing a partition, correct?
02:04:28 **A.** A little partition in the kitchen, right.
02:04:30 **Q.** And you removed a wall, correct?
02:04:34 **A.** The partition.
02:04:34 **Q.** Partition. You replaced 100 percent of the appliances; isn't that correct?
02:04:39 **A.** Yes.
02:04:39 **Q.** And you redid the hardwood floors?
02:04:42 **A.** In the bedroom, yeah.
02:04:44 **Q.** Changed toilets and sinks, correct?
02:04:46 **A.** Yes. Whatever was in bad shape, I replaced, yeah.
02:04:53 **Q.** And the whole inside of the house was repainted; isn't that right?
02:04:57 **A.** The whole house was repainted.
02:04:58 **Q.** You completely redid the entire property; isn't that correct?
02:05:03 MR. SZAL: Objection.
02:05:06 **A.** I --
02:05:06 THE COURT: Hold on.
02:05:07 What's the basis.
02:05:08 MR. SZAL: It's not accurate. He said the entire house.
02:05:12 THE COURT: He can say it's not accurate. It's cross-examination.

BY MR. BERLUTI:

**Q.** Did you redo the whole house, sir?

**A.** No.

MR. BERLUTI: Let's go to his deposition, please, page 30. Let's go to 31, please, line 10 -- actually, boost up the whole page if you could.

BY MR. BERLUTI:

**Q.** At the top, I said, "What did you do to Conant Road?"

And you said you fixed it up and you were going through all of the different things that you were doing.

And I was asking you, "Hardwood floors?"

And your answer at number 10 said, "Hardwood floors. We painted everything. Replaced the toilets, sinks. What else? That's it. Everything. We redid the apartment."

**A.** Yes. This is how I said it, but much more could be done to make it everything.

**Q.** Thank you, sir. Now, you also testified on direct that you put your house in New Jersey up for sale in 2015, correct?

**A.** Yes.

**Q.** And you listed it with a Michael Salman, who was a real estate broker that you had known for many years in New Jersey, correct?

**A.** Yes.

**Q.** He speaks Russian, that's how you knew him, from the

Russian community, correct?

**A.** Yes.

**Q.** And he came out to your house and you signed the listing agreement, correct?

**A.** Yes.

**Q.** And you listed the house in March of 2015, correct?

**A.** Yes.

**Q.** Now, in order to buy the house in Winchester at 7 Conant Road, you had to take out a home equity loan on your New Jersey property; isn't that correct?

**A.** Yes.

**Q.** So from the time you bought the Conant Road property in December of 2014 until you sold the New Jersey property, you were paying two mortgages; isn't that right?

**A.** Yes.

**Q.** You were paying a mortgage on the Conant Road property, correct?

**A.** Yes.

**Q.** And you were paying a mortgage on the New Jersey property; isn't that right?

**A.** Yes.

**Q.** You decided to put your house on the market in New Jersey before you ever spoke to anyone at Cushman & Wakefield about it; isn't that correct?

**A.** Yes.

02:08:31 **Q.** Your home was first listed in the Multiple Listing Service on March 27th; isn't that correct?
02:08:35 **A.** Yes.
02:08:38 **Q.** And by March 31st, a buyer signed a purchase and sale agreement for the full asking price and with no mortgage contingency; isn't that correct?
02:08:48 **A.** It's not.
02:08:49 **Q.** Excuse me?
02:08:50 **A.** It is not.
02:08:56 **Q.** It's not correct?
02:08:56 **A.** It's not correct.
02:08:56 MR. BERLUTI: Okay. Can we go to --
02:08:59 **A.** Let me explain first. We don't need to go. It was --
01:11:07 BY MR. BERLUTI:
02:09:01 **Q.** I just want to show the agreement, sir. I just want to go to the exhibit. That's it.
02:09:02 **A.** Okay.
02:09:06 MR. BERLUTI: Can we go to the purchase and sale agreement. Blow this up in the first page. First, the date in the upper right-hand corner.
02:09:45 So this document is dated March 31st, 2015.
02:09:52 And could you now go to the --
02:09:55 **A.** This is the date the buyer put on the document.
01:11:07 BY MR. BERLUTI:
02:09:57 **Q.** I understand.

**A.** I received it on April 2nd as an attachment to email that he send me on April 2nd.
**Q.** Right, right. Mr. Salman sent you an email that was called the updated offer, correct?
**A.** Yes.
**Q.** And that's when you say you first saw it; isn't that right?
**A.** Yes.
**Q.** Did Mr. Salman call you up on March 31st to say, "Hey, good news, we got an offer on the house"?
**A.** I don't recall that. Probably, but he sent me this email.
**Q.** He probably called you to tell you --
**A.** I'm not sure about.
**Q.** All right. You testified, sir, that you were particularly happy about this offer because of the provision regarding you being able to stay there, correct?
**A.** That was one of the provisions, yeah.
**Q.** All right. Can we go to that section, the additional provisions.
Now, you read a part of this, sir, and the part that you read it's the third one. It says, "Seller will have the option to lease the house back at the lease market value." And then you stopped reading that, sir. The rest of the phrase is "until buying another property."

02:11:19 Did I read that correctly?
02:11:20 **A.** Yes.
02:11:21 **Q.** Okay. Now, by March 31 you had already bought another property. You had already closed in December of 2014 on your home in Winchester, correct?
02:11:31 **A.** Yes.
02:11:31 **Q.** And you didn't want to own two properties, one in New Jersey and one in Massachusetts, did you?
02:11:37 **A.** I didn't.
02:11:37 **Q.** You did not. Because you didn't want to carry two mortgages, correct?
02:11:54 **A.** I don't understand the question.
02:11:55 **Q.** You just said when you bought your house in Massachusetts in December of 2014, you got a big stack of papers. Do you remember you just testified to that?
02:12:04 **A.** Yes. I --
02:12:07 **Q.** Now, when you sold your property in New Jersey, you also had a big stack of papers, didn't you?
02:12:12 **A.** Yes.
02:12:13 **Q.** You can't find your purchase and sale agreement, isn't that right, the actual final purchase and sale agreement that you signed. You don't have that, right?
02:12:22 **A.** No.
02:12:23 **Q.** On April 2 when you got the email from Mr. Salman you hired an attorney pretty much right away to represent you in

the sale of your house in New Jersey, correct?
**A.** Yes. When we decided to go with this offer, yes.
**Q.** His name, was it James Banks, correct?
**A.** Yes. I just want to -- can I say something?
**Q.** Your attorney can ask you questions. He's going to have another opportunity to ask you questions.
Then there was an inspection of the house in New Jersey. Do you recall that?
**A.** Yes.
**Q.** And as a result of the inspection and some back and forth, you had to sign an addendum to the contract to change the purchase price.
Do you recall that?
**A.** Yes.
**Q.** And on April 28, 2015, you signed an addendum to reduce the purchase price by $4,000. Do you recall that?
**A.** Yes.
**Q.** Can we show that, please. Now, that's your signature above seller, correct?
**A.** Yes.
**Q.** And that's your wife's signature, correct?
**A.** Yes.
**Q.** Can you pull up the date, please. That was signed on or about April 28, 2015, correct?
**A.** Yes.

**Q.** Your house was under agreement -- I'm going to ask you a yes or no question, sir. Your house was already under agreement before you had any conversation with Mr. Reid about your transferring to Boston; isn't that correct?
**A.** On April 28?
**Q.** I'm asking was your house already under agreement before you had any conversation with Mr. Reid about your transferring to Boston?
**A.** I missed. What days was amendment?
**Q.** I'm not referring it to a date, sir. Just listen to the question, please. Your house was already under agreement before you had any conversation with Mr. Reid about your transferring to Boston, correct?
**A.** No.
**Q.** No?
**A.** No.
**Q.** All right. Can we go to his deposition, page 152, please, line 6. You were asked, sir, "Your house was already under agreement before you had any conversation with Mr. Reid about your transferring to Boston, correct? Yes or no." And your answer was, "Yes, but it --" and then it got cut off. Correct, sir?
**A.** This is correct. But I understood your last question as of date when I signed the amendment. At that time --
**Q.** I'm going to ask you a question, Mr. Rinsky. It's true

that you accepted the offer on the house before you had permission from Mr. Reid that you say you got about putting your house on the market, correct?
**A.** Yes.
**Q.** Okay. Now, do you recall signing an affidavit related to this matter in August of 2015? Could we go to the MCAD affidavit, please? I understand.
Do you recall signing an affidavit, sir, in August of 2015?
**A.** Can I see it?
**Q.** We're going to put it up. You don't recall if you did it as you sit here? You don't recall if you did or not?
**A.** No.
**Q.** Okay. Let's go to the last page, please. Is that your signature at the bottom of the third page, sir?
**A.** Yes.
**Q.** Right below, excuse me, where it says, "I hereby verify under the pains and penalties of perjury that I have read this complaint, and the allegations contained herein are true to the best of my knowledge."
That's your signature right after that, correct?
**A.** Yes.
**Q.** Okay. Go to paragraph 7, please.
THE COURT: How much do you have left? Because it's time for their break. Do you want to take the break

02:17:00 or --

02:17:01 MR. BERLUTI: Yes. Why don't we take a break.

02:17:03 THE COURT: We're back a little after 2:30.

02:17:07 THE CLERK: Rise for the Jury.

02:17:09 (Jury exits the courtroom.)

02:17:43 THE COURT: You can take a break, too. You're not to talk about his testimony or cross-examination. Okay? He's on cross. There's all sorts of the documents that you guys have been showing. I have no idea what's an exhibit or not at this point. The purchase and sale agreement, is that --

02:18:01 MR. BERLUTI: That was already an exhibit.

02:18:03 THE COURT: You have to be clear for Jarrett what is an exhibit and what is not. Maybe someone can clear that up at the end of the day. Take a break. See you at 2:30.

02:18:17 (Court recessed at 2:18 p.m.)

02:34:19 THE CLERK: All rise.

02:36:28 (Pause.)

02:36:29 THE CLERK: All rise for the Jury.

02:36:31 (Jury enters the courtroom.)

02:36:34 THE CLERK: You may be seated.

02:36:36 CONTINUED CROSS-EXAMINATION

02:36:36 BY MR. BERLUTI:

02:36:40 **Q**. May it please the Court. Mr. Rinsky, you testified on direct testimony that you learned about Mr. Reid's transfer

02:36:49 to Florida in mid March 2015; is that correct?
02:36:53 **A.** Yes.
02:36:54 **Q.** And you testified that you never considered transferring to Boston until after you learned about Mr. Reid transferring, correct?
02:37:04 **A.** I do.
02:37:04 **Q.** I was asking you about an affidavit that you signed earlier. Do you recall signing that affidavit?
02:37:15 **A.** I need to look at it.
02:37:17 **Q.** I'm sorry?
02:37:19 **A.** Can I look at it?
02:37:20 **Q.** Sure. Let's look at what's been marked for identification as E.
02:37:27 (Exhibit E marked for identification.)
02:37:36 BY MR. BERLUTI:
02:37:36 **Q.** That's your signature at the bottom, correct?
02:37:38 **A.** Yes.
02:37:40 **Q.** And paragraph 7 says, paragraph 7 discusses when you first decided to inquire to the company about allowing you to work from the Boston office.
02:37:56 Do you recall that?
02:37:57 MR. SZAL: Objection.
02:38:01 THE COURT: What's the basis?
02:38:03 MR. SZAL: It's a hearsay document. Hearsay contained within the document.

THE COURT: I don't know what the document is. All I know is it's been marked E as identification.

MR. BERLUTI: It's an affidavit that he signed. He's already identified his signature.

MR. SZAL: It's hearsay. It's an affidavit.

THE COURT: Are you using on the basis that he's testifying inconsistently with the affidavit?

MR. BERLUTI: No. I'm going to offer this as an exhibit, Judge.

THE COURT: Why don't you just ask him the questions. When it's inconsistent with the affidavit, you can use it. But if he's not inconsistent with the affidavit --

MR. BERLUTI: I want to offer it separately. It's a statement. I want to offer it as evidence.

THE COURT: What was the affidavit prepared for? Or do you want to discuss it at side bar? I have no idea what this is.

(The following bench conference was held outside the hearing of the Jury.)

MR. DENNEHY: So our position is that --

MR. BERLUTI: Don't you want to know what it is?

MR. DENNEHY: I'm talking. It's an affidavit. It's attached to the MCAD complaint. It's just like a verified complaint or any affidavit. It's a hearsay

document. The most it can be used for at trial is to impeach someone in an inconsistent statement, and it would not be used as an exhibit similar to a deposition transcript.

And at the time he was using it, what he was citing was not inconsistent with even with what the witness has said. If the witness makes a statement that's inconsistent with that, he can then say didn't you say.

THE COURT: That's true.

MR. BERLUTI: It's a statement by a party, Judge. So it's an admission, and it can be used for any purpose so long as it's relevant. It's clearly relevant because he filed it in the MCAD case. It's a precursor to the filing of this entire lawsuit.

THE COURT: What's a rule that you are citing that supports a statement like that?

MR. BERLUTI: It's 80 --

THE COURT: Hold on. Stay there.

MR. DENNEHY: The rule is not stating that it can come in as an exhibit. It just allows you to use it just like you can any out of court statement.

THE COURT: My understanding is what he just said.

MR. BERLUTI: It's a declarant witness. The difference is this is a party. This is not hearsay.

MR. DENNEHY: He can ask the question, but it doesn't allow the document.

THE COURT: It's not hearsay. It's an admission by a party opponent.

MR. BERLUTI: Right.

MR. DENNEHY: He can ask about the statement, but it doesn't allow the document to come in.

THE COURT: The contents of the statement shall be considered --

MR. DENNEHY: He doesn't need to take the whole document and put it in. It's tantamount to a pleading anyway.

THE COURT: It says it's not hearsay.

MR. DENNEHY: I agree that he can ask the question. The entire document itself doesn't get to come in.

THE COURT: What's the rule for that?

MR. DENNEHY: Because it's an entire document that he's pulling out one piece of it. Do you need to redact the whole document except for that the paragraph?

THE COURT: It's an affidavit.

MR. DENNEHY: It's an affidavit. The entire document is a hearsay document. It's not a --

THE COURT: It's not a hearsay document.

MR. DENNEHY: It's a document.

THE COURT: Everything he says in the document is not hearsay, right?

MR. DENNEHY: It's an MCAD complaint. It's an

entire document --

THE COURT: I'll take a look at it. You already did admit it. I don't know what the basis is you're trying to keep it out on if it's not hearsay.

MR. DENNEHY: It is hearsay.

THE COURT: It's not hearsay.

MR. DENNEHY: I guess we can talk about it later.

THE COURT: It's an admission by a party opponent.

MR. DENNEHY: He can put the admission --

THE COURT: How do you think he's going to get the admission?

MR. DENNEHY: He just says it.

THE COURT: I don't agree.

MR. DENNEHY: I've never seen an affidavit in a case ever admitted in court from a party or not.

(The following was held in the presence of the Jury.)

BY MR. BERLUTI:

**Q**. Mr. Rinsky, you did not inquire from Cushman & Wakefield until the beginning April 2015 about whether or not you can work from Cushman's office in Boston, correct?

**A**. No.

**Q**. Take a look at paragraph 7, sir. Again this is from the document I just showed you your signature.

THE COURT: Is this an agreed upon exhibit?

MR. BERLUTI: Not yet.

THE COURT: Is it part of the affidavit?

MR. BERLUTI: Yes.

BY MR. BERLUTI:

**Q.** It says you had "bought a house with your wife in December of 2014 as investment property in Winchester. And that in the beginning of April 2015 I decided to inquire as to whether the company would allow me to work from the company's office as my duties could just as easily be performed in Boston remotely as in New York."

Did I read that correctly, sir?

**A.** No.

**Q.** I did not read that correctly?

**A.** No. No, you read it correctly.

**Q.** I read it correctly?

**A.** Yes. I would like to explain.

**Q.** Hold on, sir. This was an affidavit signed when? Please go to the date. This was a document that you signed on or about August 13, 2015, correct?

**A.** Yes. I was --

**Q.** You'll be asked questions from your attorney, sir. Now, from the beginning of April you had purchased a home in Massachusetts?

**A.** In December of the prior year.

**Q.** Of 2014. And you were undergoing a major renovation in

your home?
**A.** We were fixing it up. It wasn't a major renovation. We were fixing it up.
**Q.** Those renovations cost you in excess of $30,000; is that right?
**A.** Right.
**Q.** You listed your property for sale, and you had accepted a purchase price by the beginning of April?
**A.** Yes.
**Q.** Now, you say that once you decided to inquire, you wanted to speak to the Mr. Reid personally, correct? Once you decided you wanted to move to Boston, you wanted to speak to Mr. Reid personally, correct?
**A.** How else could I speak to him?
**Q.** You didn't want to send him an email, you didn't want to call him by telephone. You wanted to talk to him in person?
**A.** I decided to talk to Mr. Reid about it.
**Q.** In person?
**A.** Whatever is available.
**Q.** You said to him you wanted to talk about something important, right?
**A.** Yes.
**Q.** Okay. And then a meeting was set up with Mr. Reid, correct?
**A.** No.

**Q.** It wasn't?
**A.** No.
**Q.** When you spoke with Mr. Reid, did you speak with him in person or not?
**A.** At the end of March before he left for Florida, I spoke to him in person. After that meeting when I informed him that I got an offer and I will go with it, that meeting appeared later, he -- I don't recall whether or not he was in Florida at that time or not, but I talked to him.
**Q.** Mr. Rinsky, what I'm saying is according to this document that's dated August of 2015, you didn't even decide to inquire about moving to Boston until the beginning of April, correct?
**A.** I did. Because the conversation has not happened. I was trying to approach him. But Colin said he doesn't want to talk about it now. I just said --
MR. SZAL: Objection.
BY MR. BERLUTI:
**Q.** You said he said it will take six months to sell your house?
THE COURT: Hold on. What's the objection?
MR. SZAL: He's cutting off the witness. He's cutting off his answer.
THE COURT: Let him answer the question.
**A.** It was the first time I was trying to approach Colin Reid

about this was a couple of days before he left for Florida end of March.

MR. BERLUTI: That wasn't my question, Judge. He's just answering what he wants to.

THE COURT: He's going to give you time to answer the question. He's not going to interrupt you. You're going to answer the question that he asks. If you want to answer a different question, your lawyer will have the opportunity ask that question and talk to you. You answer the question that he asked. You give him time to answer.

MR. BERLUTI: I will.

BY MR. BERLUTI:

**Q.** The first time you spoke to Mr. Reid about your request to work in the Boston office, Mr. Reid said to you, It's going to take about six months to sell your house, correct?

**A.** Exactly.

**Q.** And he didn't say yes or no about whether or not he had --

**A.** He said, I'm extremely busy, I cannot talk about it, no.

**Q.** And do you recall -- in August you made a statement that you didn't decide to inquire until the beginning of April 2015. Do you recall also in August of 2015 saying that you didn't get an offer on your house until May of 2015?

Do you recall that?

**A.** On your request all the paperwork about selling my house

02:50:35 was provided to you.

02:50:36 **Q**. That's right. Sir, did you make a statement under oath
02:50:48 in August of 2015 that you did not receive an offer to sell
02:50:54 your house in New Jersey until May of 2015? Did you make
02:50:59 that statement?

02:51:01 **A**. It was a mistake. Obviously it was a mistake. And you
02:51:07 have all the documents to understand that it was a mistake.

02:51:10 **Q**. Let's go to paragraph 8, please. Let's go to paragraph
02:51:38 9, sir. It says, "As a result of the company approving my
02:51:41 request to work from Boston, I put my home in New Jersey on
02:51:47 the market. On May 15, 2015, I received a cash offer for my
02:51:53 New Jersey home."

02:51:55 That's all incorrect, isn't that right, sir?

02:51:57 **A**. Cannot be May 15. It was beginning of April. And you
02:52:01 have the documents confirming it. It was a mistake. I'm
02:52:06 telling you. You have the documents to confirm it.

02:52:10 **Q**. And then two days after you received that offer, you say
02:52:13 that you spoke to Mr. Reid about the offer, and that you
02:52:17 intended to move to Boston at the end of May. That's also
02:52:21 not accurate, is it, sir?

02:52:29 **A**. At the end of May.

02:52:30 **Q**. Right. You informed Mr. Reid you were going to move to
02:52:33 Boston in an email on Sunday, May 15, 2015, correct?

02:52:41 **A**. Yes.

02:52:42 **Q**. In this affidavit you filed in May 15, 2015, you said it

was two days after you received an offer on your home?

**A.** Two days after I received an off on my home which happened on April 4.

**Q.** Excuse me?

**A.** Which happened on April 4. Two days later. I did discuss it with Colin.

**Q.** You also say in two days later you claim when you spoke to Mr. Reid that you were going to move -- could you keep that up, please. That you were going to move in two to three weeks, correct?

**A.** I told him when I was going to move only when I found out the day of the closing.

**Q.** Right. And that was on May 17. You testified to that on direct, right?

**A.** Rights.

**Q.** You found out the day of the closing and you found a mover. That was on May 17, correct?

**A.** Yes.

**Q.** That wasn't two days after you received an offer on your home in New Jersey, correct?

**A.** I didn't say that I'm moving two days later.

**Q.** That was your statement in August of 2015.

**A.** Can I please look at it? How could I say --

**Q.** Paragraph 9, sir.

MR. BERLUTI: Your Honor, I'm going to be offering

this.

BY MR. BERLUTI:

**Q.** When Mr. Reid spoke to you, and you told him you were going to be moving, he told you this was happening too fast, too fast.

Do you remember him saying that to you?

**A.** Too fast?

**Q.** Yes.

**A.** He was referring to I received the offer too fast.

**Q.** And the whole thing was happening too fast. Your trying to move was happening too fast?

**A.** Maybe the whole thing. But my understanding is he was referring how soon I received the offer.

**Q.** Okay. You weren't asking him if could accept the offer. You were informing him you were going to accept the offer.

**A.** Correct.

**Q.** Now, you then informed him for the first time the actual date you were moving by this email on May 17, right?

**A.** Yes.

**Q.** There were several things that had to be worked out, correct? Could we go to that email May 17, please. That's Exhibit 11, I believe. No. May 12. The second sentence of Exhibit 12, we looked at this a few times now, says that you're confident that you can continue to work to the best of my ability remotely. And you're looking forward to sitting

down with him and coming up with an arrangement that benefits all involved.

And you knew at that time that you were going to have to still go back to New York, right? That was one of the arrangements that you wanted to work out, correct?

**A.** Still to go back to New York?

**Q.** That you had to go back to New York periodically, correct? That's one of the arrangements?

**A.** Yes.

**Q.** That you testified about on direct?

**A.** Yes.

**Q.** That had to be worked out, right?

**A.** Yes.

**Q.** Because up until then you were required to meet with people in New York monthly and sometimes weekly?

**A.** No. That was Colin's job. Colin meets his people in New York on a weekly and monthly basis. I only work on detailed particular issues mostly through the email and the phone like I told before.

**Q.** Sir, one of the open issues, according to what you said, one of the arrangements that had to be worked out was how frequently you had to go back to the New York office, correct?

**A.** Correct.

**Q.** You knew that there would be some requirements because

you'd been doing it for 27 years that you would have to be physically in the New York City headquarters; isn't that right?

**A.** No, I don't agree. I don't agree.

**Q.** You did not know who would support you -- you did not know how you would support the users that you had been supporting up until that time, the people in New York City?

**A.** I knew it perfectly. I worked for years, three four days remotely. And nobody had problems with it. I did the same work remotely. Does it make a difference is it done from New Jersey or from Massachusetts? I don't think so.

**Q.** Okay. Could we go to deposition page 95, line 9, please. Start at line 6, please.

I'm asking you about this May 17 email, and I said, "What were you referring to as far as coming up with an arrangement?" And your answer was, "I just explained myself, the arrangement, how often I need to come to work. This is an arrangement. How do I support the users I usually supported from New York? Who would be the administrative person in the Boston office? Should I stay and work from home or from the office? Would I need to support the users after hours?"

That was your testimony, right?

**A.** Exactly. And I supported the users at the time when they were working late. And for that I usually stayed home so I

02:59:31 saved time on commuting, and I could work sometimes until 8 or 10 at night.
02:59:38 **Q**. Mr. Rinsky, you gave a deposition on March 1 of 2017, correct? That's when you came to my office and gave a deposition, correct?
02:59:46 **A**. Yes.
02:59:47 **Q**. And do you recall your attorney was there with you for that deposition?
02:59:51 **A**. Excuse me?
02:59:52 **Q**. Do you recall your attorney was with you at the time of this deposition?
02:59:56 **A**. Yes.
02:59:56 **Q**. And there was a court reporter taking down the questions and answers just like this court reporter, correct?
03:00:01 **A**. Yes. But I need to explain. Supporting the users meant do I have to do it the same way as I do from New York, from home again? It wasn't the support --
03:00:23 **Q**. The closing on your home, sir, was May 25, 2015, correct?
03:00:32 **A**. Yes.
03:00:33 **Q**. Let's go back to because I didn't put it up. Let's go back to I think it's Exhibit 5, the conditional conditions. You testified on direct, sir, that you weren't concerned about selling your home, about entering into this purchase and sale agreement because there was an option for you to lease back your home in New Jersey.

Do you recall that testimony?

**A.** Yes.

**Q.** Let's read that condition. It says, "Sellers will have the option" it's the third one, "to lease the house back at the lease market value until buying another property."

And before you signed this purchase and sale agreement you had already purchased another property, correct?

**A.** I think this is a general phrase that real estate brokers use in this case. What is another property?

**Q.** So that was not a provision that you negotiated into your contract, correct?

**A.** No. I was told that I could stay in the house. In addition to this that was in the body of the contract, number 99, basically is the same phrase, maybe slightly rephrased, was in the email itself.

**Q.** Mr. Rinsky, selling your home for $340,000 or so is an important transaction for you, correct?

**A.** Yes.

**Q.** You read the contract before you signed it, correct?

**A.** I did. And that was my mistake.

**Q.** We don't have a copy of that contract, the final form, do we?

**A.** The final form?

**Q.** The final contract, we don't have the final contract?

**A.** No. It was just us. Maybe you're interested in --
**Q.** You had an attorney before signing this purchase and sale agreement, correct?
**A.** Yes. He's attorney asking if I need to exercise this option. And because I didn't need it, I said no.
**Q.** Sir, because you already bought a house. That's why you didn't need it, correct?
MR. SZAL: Object.
**A.** No.
BY MR. BERLUTI:
**Q.** Sir, you were asked questions about Edgardo Felix. Do you recall that?
**A.** About what?
**Q.** Edgardo Felix.
**A.** Yes.
**Q.** You learned that -- Edgardo Felix was someone that you had worked with at Cushman many years before, correct?
**A.** Right.
**Q.** Mr. Felix was looking to get work at Cushman, and, in fact, at the end of 2014 had sent an email to you and to Mr. Reid saying, hey, if you need anything, keep me in mind.
Do you recall receiving that?
**A.** Yes.
**Q.** And then you saw an email that Mr. Reid sent out -- strike that.

So you knew as a result of Exhibit 29, this is the email string in which Mr. Sommer left a voicemail that was printed out and that you responded --
**A**. Yes.
**Q**. -- about your set up?
**A**. Okay.
**Q**. And you responded and copied Mr. Reid. And Mr. Reid responded, and he tells you that you might be getting -- "Wait until I'm back in New York tomorrow. Yury might be getting new equipment for Boston since I have an AS400 consultant sitting there next week."
So you knew as early as June 2 that Cushman was bringing in another consultant, correct?
**A**. Yes.
**Q**. And you knew that consultant was going to be a consultant working on the same system that you were working on, the AS400?
**A**. I didn't know for sure. But I assumed it was Edgardo Felix, yeah.
**Q**. And you said you were in constant contact with Mr. Reid at this time, right, by email, by telephone? That's what you testified to on direct, correct?
**A**. Yes.
**Q**. Did you ask him about who the consultant was? Did he tell you it was going to be Edgardo Felix?

**A.** I don't recall.

**Q.** You don't recall?

**A.** I don't recall.

**Q.** Now, when you were first employed with Cushman & Wakefield in 1988, you were an at-will employee, correct?

**A.** Correct.

**Q.** You understood that an at-will employee means that at any time if you decided you could go in and say I resign my position or I quit. I no longer want to be employed.

**A.** I understand that.

**Q.** And the flip side of that is that the employer can say to you, thank you for your service, but we don't need your service anymore, and they can terminate you, correct?

**A.** I understand this.

**Q.** And you remained an employee at will the entire time that you were employed at Cushman & Wakefield, correct?

**A.** Correct.

**Q.** And indeed, there was nothing about you moving to Boston that changed your at-will employment status with Cushman & Wakefield, correct?

**A.** Correct.

**Q.** You were an at-will employee in June of 2015?

**A.** Yes.

**Q.** Now, you say you did some work for Cushman in June of 2015 up to June 22. You were paid for all that work,

correct?
**A.** Correct.
**Q.** There's no claim in this case for nonpayment of wages, correct?
**A.** Not at all.
**Q.** And after June 22 you testified that you were, I think your term was disabled from the AS400 system, correct?
**A.** Yes.
**Q.** And you were taken and you were disabled from the Cushman & Wakefield email system, correct?
**A.** A couple of days later, yeah.
**Q.** And I believe your testimony was once that happened you had no ability to do work for Cushman & Wakefield?
**A.** Correct.
**Q.** But you didn't get terminated until July 10; is that right?
**A.** Yes. I found about it later, yes.
**Q.** And you were paid until July 10; is that correct?
**A.** I didn't ask for it.
**Q.** I'm sorry?
**A.** I didn't ask for it. I found it out when I got the check.
**Q.** I'm saying you were paid until July 10, correct?
**A.** Yes.
**Q.** Now, according to your testimony, sir, you had a

conversation with Mr. Reid on May 19, two days after the May 17 email. And you say that Mr. Reid told you that it might be two or three weeks for you to get a cubicle in Boston; is that correct?
**A.** Two or three weeks, yes.
**Q.** And two or three weeks would have meant that you would have gotten a cubicle in Boston by the first or maybe the second week in June, correct?
**A.** Yes.
**Q.** And you never got a cubicle in Boston, did you?
**A.** I didn't.
**Q.** And you knew that Mr. Cuyar was the head of the whole global -- he was the global information technology person, correct?
**A.** Right.
**Q.** And it's your testimony that it's Mr. Cuyar that was going to get involved in terms of finding you space in Boston, right?
**A.** Yes.
**Q.** And you would have been the only AS400 software engineer in Boston in 2015?
**A.** Yes.
**Q.** Now, once you learned that you were going to -- once you had this conversation on June 22, sir, you said that you had to rest, you took a nap after you had the conversation,

right?
**A.** Yes.
**Q.** With Mr. Hamilton and Mr. Reid, you took a nap?
**A.** Yes.
**Q.** After that you went into your system and you began to take emails that you thought would be helpful to you, and you began to forward them to your personal Yahoo account, correct?
**A.** Right.
**Q.** And at that point you were thinking about a lawsuit, correct?
**A.** I was thinking about it, yes.
**Q.** And then later in the day after 4:00, you sent an email to Katherine Hicks, right?
**A.** Yes.
**Q.** Let's look at number 47. I think you were shown this or at least a part of it on your direct exam. Now, this is Exhibit 47. The bottom part of 47 is an email from you to Ms. Hicks on June 22 at 4:14 p.m.; is that right?
**A.** Yes.
**Q.** And it says in the middle, "My move to Boston was approved by my manager, and I was told to work remotely until I was given a work space in the C&W office."
Did I read that correctly?
**A.** Yes.

**Q.** Further down it says, "My expectation based on conversation and correspondence with my manager was that I would work remotely until he set up my office cubicle."

And then you attached three emails, your email of May 17, Mr. Reid saying that you you were moving to Boston. Mr. Reid's response saying okay, we'll speak Tuesday. And then that email string with Mr. Sommers. Those were the both emails that you could put together that you felt you could establish that you were given approval, is that correct?

**A.** Yes.

**Q.** You never wrote back to Mr. Reid to confirm that you believed that you had actual approval prior to June 22, correct. There's no email to Mr. Reid on that, correct?

**A.** There is no email on that.

**Q.** Let's look at -- and then just a few minutes later at 4:51, about half an hour later, 4:51, you sent an email to Mr. Santora, the president, in the middle of this it says, "My move was approved by my direct manager, and I put my house on the market."

That sequence is not accurate, is it, Mr. Rinsky? You had put your house on the market before you even spoke to Mr. Reid. Isn't that true?

**A.** Both of these events are true.

**Q.** Can you just answer my question?

**A.** I put my house on the market and it was approved by my

03:12:25 manager. We are not talking sequence here. I'm just in a brief form describing what happened.
03:12:30 **Q**. So you're not putting it in sequence, but this is how you wrote it.
03:12:33 **A**. Yes. I didn't --
03:12:34 **Q**. You said --
03:12:37 **A**. I put what I believed in a short email to tell what happened.
03:12:41 **Q**. Then let's look at the next sentence, sir. You just said you weren't talking about sequence. The next sentence says, "If my manager did not approve my move, I would not sell my house and move to Boston."
03:13:00 Now, you had already accepted and entered into a contract to sell your property before you even told Mr. Reid, isn't that true?
03:13:09 **A**. Yes. The first part of the sentence is not correct. I was under a lot of stress. I wasn't feeling well. And just this is how it came out under the circumstances. What I meant is that I would not move to Boston if my transfer wasn't approved.
03:13:28 **Q**. But you were already under contract to sell your house, correct, in New Jersey?
03:13:33 **A**. Yes.
03:13:33 **Q**. And you didn't want to carry two mortgages, right? By selling the New Jersey home, you were able to pay off that

mortgage and pay off some of the original mortgage, right?
**A.** If my transfer wasn't approved, I would never move to Boston. I would never jeopardize my job. I had an option to stay in the house. I would stay in something else. I had different options.
**Q.** When you spoke to Mr. Reid and Mr. Hamilton on June 22, they told you your job is here in New York, and you can come back to New York, correct?
**A.** Yes.
**Q.** You never did that, correct?
**A.** I never did that.
**Q.** Instead you just said -- they said you could resign or if you don't resign I'm going to have to terminate you, right, because your job is here in New York?
**A.** Yes. And I also sent an email to Colin Reid that I don't think was mentioned today that Colin, I'm not resigning, I will continue working tomorrow as usual.
**Q.** Now, you made a decision that you wanted to stay in Boston and not return to New York to your job, correct?
**A.** Yes.
**Q.** So you stayed in Boston. You were terminated on July 10. What you testified about was that you started to look at some websites to try to find another job, correct?
**A.** Yes.
**Q.** You looked at the website Indeed.com, Glassdoor.com and

Monster.com, correct?
**A**. Right.
**Q**. And you never found a single job in the Boston area that even interviewed you?
**A**. That were even close to my skills, yes.
**Q**. But you weren't even invited for an interview; is that correct?
**A**. I called. I didn't get an interview.
**Q**. But you did speak to one company, Staples, correct?
**A**. Correct.
**Q**. And they told you that you may know the AS400 system, but you did not -- you had no retail experience, correct?
**A**. Correct.
**Q**. So there was two aspects to your job. There was the technical part about the AS400. And when you worked with Cushman & Wakefield you had expertise in commercial real estate, correct?
**A**. Correct.
**Q**. That was your second area of expertise, right?
**A**. I wouldn't call it commercial real estate. Commercial real estate software, yeah.
**Q**. The let's look at his deposition page 193. I'm sorry, Bob. It's the page before. You were asked on the page before, page 192, line 13, "What did you do? Other than looking at the sites, what did you do? " And you said, "I

didn't find any request for a job that even close to mine. The reason for that is that the system for Cushman & Wakefield was a 30-year old system and very limited number of companies are still using it."

"If they are using it, this is what I learn. If they are still using it, they want working on conversion. They don't want to hire people for the conversion because when there's a conversion, they need people that know both systems. Not just the AS400. They need people who know both systems. That wasn't my case."

"Technically I was good but it was only AS400. There was absolutely no demand on the AS400. The second reason was I was an expert in brokerage application, commercial real estate. There was no development in this field."

"There are a handful of big companies and they don't do development. They don't have the AS400."

That's what you testified to in your deposition?

**A.** That's exactly what I just said, yes.

**Q.** And you know a lot of people in New York that are AS400 software developers like you, correct?

**A.** There is a very limited number of companies similar to Cushman & Wakefield.

**Q.** But where they are they're located in New York?

**A.** When I started looking for a job, I made a list of

Cushman & Wakefield competitors, and I called all of them.

**Q.** But you called all of them in Boston, right, not in New York?

**A.** I called all of them because some of them are based -- could be based in Chicago and have departments here. I called all of them. I made a list of real estate companies.

**Q.** So is it your testimony that you were considering moving to Chicago if you got a job there?

**A.** No. A company could be based in Chicago, headquarters in Chicago, have an IT department in Boston.

**Q.** But you didn't find any?

**A.** I didn't even find companies that had AS400.

**Q.** Based upon your experience, sir, you knew other AS400 software engineers like yourself that did have work in New York, correct?

**A.** Not really. There aren't that many software engineers who do similar work as me.

**Q.** The ones that you knew were in New York City, correct?

**A.** Yes, but not in commercial real estate.

**Q.** And you never decided to go back to New York to get a job, correct?

**A.** I never decided to go back to New York because of the way it was offered to me and because after what happened after my transfer has been approved, and I moved, I lost trust in what they were saying.

**Q.** Forget about Cushman. I'm saying you didn't try to go back to New York to another company that had AS400 needs?
**A.** I was already in Boston.
**Q.** Sir, is it your testimony that you remained able to work at all times since you left Cushman in July of 2015? Is that your testimony?
**A.** Yes.
**Q.** So there's nothing about any health issues that occurred after that that prevented you from working if you were able to get a job, correct?
**A.** There were some minor limitations.
**Q.** Minor limitations?
**A.** Yes.
**Q.** You're not disabled now, are you?
**A.** No.

MR. SZAL: Objection.

**A.** The way I understand it.

THE COURT: Hold on a second.

MR. SZAL: I think you ruled earlier on this. It's a legal definition.

THE COURT: When he asks if he's not disabled now, he's referring not to a legal definition but it's his understanding of whether or not he can go about his business. Is that correct, Mr. Berluti?

MR. BERLUTI: Yes.

BY MR. BERLUTI:
**Q.** You are able to work, is that your testimony now?
**A.** Yes.
**Q.** There's nothing preventing you from working now, correct?
**A.** No. But I cannot take any job.
**Q.** Excuse me?
**A.** I cannot take any job. I just physically cannot commute for a very long distance and things like that.
**Q.** You can't commute a long distance, right?
**A.** Huh?
**Q.** You can't commute a long distance?
**A.** I wouldn't take a job which takes me two hours to get to. I just physically wouldn't be able to do it. But basically I'm capable to of working.
**Q.** You wouldn't be able to commute to New York, correct?
**A.** Commute to New York?
**Q.** Commute to New York.
**A.** Occasionally like it was discussed in Cushman case. Not five days a week. I would be able to commute one or two days a week like I worked in New York. I would be able to do it.
**Q.** When you were working remotely, sir, you said you were working remotely four or five days a week. Isn't it true that was more like two or three days a week?
**A.** No. It was three to four days a week.
**Q.** And isn't it true, sir, that before you even informed

Mr. Reid of the date of your move, your option to work remotely had been revoked because of work demands; isn't that right?

**A.** No.

**Q.** Let's look at Exhibit 10, please.

**A.** No, I remember it. You don't have to bring it up. That was an email from Colin that you have to work, to report every day to the office. Okay? But Colin -- the next instruction from Colin was you're going to work from Boston from your home and wait for the cubicle, and that overrides his previous instruction.

**Q.** Sir, let's look at Exhibit 10. By May 13 of 2015 Mr. Reid was now based in Miami, Florida, correct?

**A.** Yes.

**Q.** And Mr. Reid says not only to you but to you and to Anna Kleynshteyn, "Colin Reid. I have been recalled to New York for two weeks. I will set up a conference call with the three of us for tomorrow. Working remotely is being revoked for both of you effective next week until Workday tasks are completed and approved by management."

Did I read that correctly?

**A.** Yes.

**Q.** And you continued to work on Workday tasks right into June; isn't that correct?

**A.** Yes.

03:24:03 **Q**. As a matter of fact, you worked on Workday tasks right until your last day of rendering services on June 22, 2015, isn't that right?

03:24:11 **A**. Yes. Including four days.

03:24:15 **Q**. And Anna Kleynshteyn during that time was reporting to the New York City office every day based upon Mr. Reid's directive; isn't that right?

03:24:24 **A**. I don't know. Probably.

03:24:25 **Q**. You don't know. Probably she was though, right?

03:24:28 **A**. Yes.

03:24:30 MR. BERLUTI: Nothing further.

03:24:32 THE COURT: Redirect?

03:24:33 MR. SZAL: Briefly, Your Honor.

03:24:34 MR. BERLUTI: Your Honor, I'm going to reserve. I'd like to offer the affidavit. You can rule on that later.

03:24:45 REDIRECT EXAMINATION

03:24:50 BY MR. SZAL:

03:25:40 **Q**. Good afternoon, Mr. Rinsky.

03:25:42 **A**. Afternoon.

03:25:43 **Q**. Attorney Berluti had shown you what has been marked now as Exhibit 76.

03:25:49 **A**. Yes.

03:25:50 **Q**. It's the Declaration of Homestead. When you signed this document, did you intend to occupy the Winchester condo as a principal residence?

03:26:04 **A.** Yes.
03:26:04 **Q.** When?
03:26:06 **A.** When I retired in two or three years.
03:26:10 **Q.** In connection with the sale of your house, did you sign other documents? I'm sorry. The purchase of your condo in Winchester.
03:26:24 **A.** Yes. I signed a ton of documents.
03:26:26 **Q.** Did you scrutinize all those documents before you signed them?
03:26:39 **A.** I just signed it. There was no time to read any.
03:26:48 **Q.** You were asked on cross about your team being located in New York. Who was your supervisor for your team?
03:26:57 **A.** Mr. Colin Reid was managing our team.
03:27:00 **Q.** Where was he located as of May 2015?
03:27:04 **A.** He already transferred to Florida. But occasionally he had some problems with baggage and such, and he was back and forth there. His base was in Miami.
03:27:22 **Q.** Did you perform the same job with Mr. Reid?
03:27:28 **A.** No. His job was much higher. He coordinated it the projects of the whole team, and I was just responsible for particular projects.
03:27:50 **Q.** During your employment you worked many hours a week; is that right?
03:27:53 **A.** Yes.
03:27:54 **Q.** You testified earlier you worked on weekends?

**A.** Yes. Occasionally.
**Q.** Did you ever complain about working long hours?
MR. BERLUTI: Objection. Beyond the scope.
THE COURT: Overruled.
**A.** No.
BY MR. SZAL:
**Q.** Did you ever complain about working weekends?
**A.** Never.
**Q.** Did you receiver overtime for working long hours or weekends?
MR. BERLUTI: Objection, Your Honor.
THE COURT: Sustained.
BY MR. SZAL:
**Q.** Did you ever complain about your salary or bonus as it related to the work you were performing?
**A.** Never.
**Q.** You testified on cross-examination that Mr. Reid was nice to you, correct?
**A.** Correct.
**Q.** He was always nice to your face, correct?
**A.** Yes.
**Q.** You don't know what happened when you weren't face to face, right?
**A.** I don't. I have no idea.
MR. BERLUTI: Objection, Your Honor. Leading.

03:28:51 THE COURT: Don't lead him.
03:29:08 BY MR. SZAL:
03:29:09 **Q.** Mr. Berluti asked you about breaking your elbow in 2009;
03:29:12 is that correct?
03:29:12 **A.** Yes.
03:29:12 **Q.** Did you ever break your elbow again?
03:29:14 **A.** No.
03:29:15 **Q.** While you were working in New York and you owned the
03:29:24 Winchester property, you were asked about carrying two
03:29:27 mortgages. What was your intent with respect to the
03:29:30 Winchester property once it was fixed up?
03:29:32 MR. BERLUTI: Objection again. Beyond the scope,
03:29:36 Judge.
03:29:36 THE COURT: Overruled.
03:29:38 **A.** I intended to rent it and then to use it for ourselves
03:29:51 when I retired.
03:29:52 BY MR. SZAL:
03:29:53 **Q.** We looked at an affidavit on cross-examination. Do you
03:29:56 recall that just now?
03:29:57 **A.** Yes.
03:29:57 **Q.** You signed the document, correct?
03:30:05 **A.** Yes.
03:30:05 **Q.** Did you write the document?
03:30:07 **A.** No. You wrote the document.
03:30:08 **Q.** And did you identify errors in what I had written later?

03:30:14 **A.** I noticed this later.
03:30:16 **Q.** And did you make effort --
03:30:18 **A.** After it was sent out.
03:30:19 **Q.** And did you make efforts during this lawsuit to correct those?
03:30:24 **A.** I didn't.
03:30:24 **Q.** You didn't?
03:30:25 **A.** No.
03:30:26 **Q.** Did you sign documents that corrected the dates that you had originally --
03:30:34 **A.** Can you repeat the question?
03:30:35 **Q.** You testified that there were some incorrect dates in what I wrote and what you signed.
03:30:39 **A.** Yes.
03:30:39 **Q.** Did you make efforts during this lawsuit to correct those dates and put the right ones in?
03:30:45 **A.** Yes.
03:30:49 **Q.** The affidavit that we talked about describes some of the circumstances relevant to this the lawsuit. Were all the details of this lawsuit included in that document?
03:30:58 **A.** No.
03:31:00 **Q.** Why not?
03:31:04 **A.** Because later on in the process a lot of more questions and issues come up.
03:31:24 MR. SZAL: That's all I have.

RECROSS-EXAMINATION

BY MR. BERLUTI:

**Q.** Mr. Rinsky, you said that you bought the place in Winchester as investment. Is that what you just testified to?

**A.** We were planning to use it as an investment property for two or three years until I retired.

**Q.** You never listed it with a real estate broker, did you?

**A.** I didn't.

**Q.** You never put a classified ad out looking for a tenant, did you?

**A.** No. I just talked to the broker and he told me that there is a big demand for it, that it wouldn't be a problem.

**Q.** But you never took any steps to rent it out?

**A.** We didn't get to it because --

**Q.** Because you renovated it --

**A.** No. Because my move to Boston was approved.

**Q.** And you wanted to --

THE COURT: Let him finish, please.

**A.** And I didn't need to do it.

BY MR. BERLUTI:

**Q.** Sir, you had made a decision that you had a new grandchild in January, and you wanted to move to Boston; isn't that right?

MR. SZAL: Objection.

THE COURT: Overruled.

**A.** I wasn't breastfeeding. I had a grandchild. It wasn't an emergency for me to jump and move to Boston. I visited my grandchildren, yes.

BY MR. BERLUTI:

**Q.** That's what you wanted to do?

**A.** Say it again.

**Q.** That's what you wanted to do was to move to Boston?

**A.** To move to Boston when I retire.

**Q.** That's right.

**A.** Yes.

**Q.** You never took any steps to do anything with the Winchester property, to put it on the market and treat it like an investment property, correct?

**A.** I started to fix it to make it ready. It was in bad shape. I was making it ready to rent it.

**Q.** When you say investment property, you were going to rent it out. You weren't fixing it up to resell it?

**A.** I was fixing it up to rent it. This is how it started.

**Q.** You never took any steps to rent it?

**A.** No. Because I didn't need it.

**Q.** And you signed the document in December of 2014 saying you intended to live there as your principal residence, correct?

**A.** Yes.

MR. BERLUTI: Nothing further.

THE COURT: Thank you, Mr. Rinsky. You're excused.

THE WITNESS: Thank you.

THE COURT: Call your next witness, please.

MR. DENNEHY: We call Katrina Hicks.

THE COURT: While they're switching places, if you want to stand up and move around, please do.

(Witness Katrina Hicks duly sworn.)

THE CLERK: Could you please state your name and spell it for the record.

THE WITNESS: Katrina Hicks, K-A-T-R-I-N-A. Last name is Hicks, H-I-C-K-S.

MR. DENNEHY: Your Honor, just a clarification on the witnesses being sequestered. The next witness is actually in the courtroom.

THE COURT: Him?

MR. DENNEHY: Yes.

THE COURT: He's allowed in as a corporate representative.

DIRECT EXAMINATION

BY MR. DENNEHY:

**Q.** Good afternoon, Ms. Hicks. How are you?

**A.** I'm good. How are you?

**Q.** Are you sworn in?

**A.** Yes.

**Q.** You work at Cushman & Wakefield, correct?
**A.** Correct.
**Q.** Can you tell us your position there?
**A.** I am an HR manager.
**Q.** How long have you worked for Cushman & Wakefield?
**A.** Two years.
**Q.** How long have you worked for human resources?
**A.** Ten years in April.
**Q.** So over ten years in human resources. Currently where do you work?
**A.** Cushman & Wakefield.
**Q.** In what office.
**A.** In the Washington, D.C., office.
**Q.** And how long have you been there?
**A.** A year.
**Q.** Where did you work before that?
**A.** The New York City office.
**Q.** So you worked in the very office building that -- did you work in the same building that Mr. Rinsky worked in?
**A.** Yes.
**Q.** You held the human resources role at that point in time, correct?
**A.** That's correct.
**Q.** In this period of time that you held the human resources role and this issue with the transfer came up with

Mr. Rinsky, was Cushman & Wakefield undergoing a merger?
**A.** Correct.
**Q.** Do you know the name of the company that it was merging with?
**A.** DTZ.
**Q.** Did you have any understanding whether that was a large transition period for the company?
**A.** Yes, it was.
**Q.** And do you have an understanding of whether there was any increased computer IT needs due to the transition?
**A.** Not to my understanding.
**Q.** Did you have any understanding of how the various departments worked on their budgeting? For instance, you knew that Mr. Rinsky was a software engineer, correct, through your involvement in this?
**A.** Correct.
**Q.** And you understood that he reported to Mr. Reid who is in the courtroom, correct?
**A.** Correct.
**Q.** And did you have an understanding that Mr. Reid had a few people that worked for him?
**A.** Correct.
**Q.** And did you have an understanding that the people that worked for Mr. Reid, there was a budget for them?
**A.** Not to my understanding. As far as what the budget was,

no.

**Q.** But Mr. Reid's people, there would be a budget for them?

**A.** All of them have budgets, correct.

**Q.** And they would have a budget for bonuses, too, correct?

**A.** Correct.

**Q.** Fair to say at the time all this was going down that Mr. Rinsky was the oldest person in that department?

**A.** Can you repeat the question?

**Q.** Did you have an understanding when all this was going down that Mr. Rinsky was the oldest person in the department?

**A.** No, I did not.

**Q.** Did you have an understanding when all this was going down that he was the highest paid person in that department?

**A.** No, I did not.

**Q.** Did you have an understanding whether due to this merger that there was any pressure points that the department to have decreased costs?

**A.** No, I did not.

**Q.** Nobody brought that to your attention?

**A.** No.

**Q.** In your role in the human resources department, you are routinely contacted about employee transfers if they want to move from one office to another, correct?

**A.** Correct.

**Q.** In fact, prior to this happening there was a guy that

03:39:04 wanted to go to New Jersey, correct? No. Wanted to go to Florida. He wanted to move to Florida.

03:39:10 Do you remember that circumstance, an employee whose wife had a dental practice in Florida?

03:39:14 **A.** Correct, yes.

03:39:15 **Q.** And when that came up the process was his immediate supervisor brought it to that person's manager, correct?

03:39:25 **A.** Can you rephrase that?

03:39:26 **Q.** This individual was a technician, and he wanted to move to Florida because his wife had a dental practice there?

03:39:36 **A.** That's correct.

03:39:37 **Q.** And when he wanted to move to Florida, he put his house on the market and he contacted his manager and said I want to move to Florida, let's make this happen?

03:39:47 **A.** As far as putting his house on the market and bringing the details, I don't know those details.

03:39:51 **Q.** After he brought it to his manager's attention, his manager brought it up the chain of command, correct?

03:39:59 **A.** Correct.

03:39:59 **Q.** After a short period of time you were contacted about the transfer?

03:40:03 **A.** About the transfer, that's correct.

03:40:05 **Q.** And in your experience isn't that how that typically is happening?

03:40:11 **A.** So what happens is a manager would reach out to me with

the request that I would require, to send me details, whether it's approvals, whether it's the details of compensation. There's a ton of kind of a checklist that I would go through with the direct manager just to make sure things were aligned before the transfer, correct.

**Q.** And that usually happens, you get involved in early in the process of from what I can see for this guy that wanted to transfer to Florida, correct?

**A.** Right.

**Q.** When it came to Mr. Rinsky's situation, I believe you testified at your deposition that you weren't brought into that equation until he had actually already moved to Boston, correct?

**A.** Correct.

**Q.** So what happened at that time an issue had arisen, he's in Boston and they want to talk to you, correct?

**A.** That's correct.

**Q.** And your job is to give some insight into these human resources situation, correct?

**A.** From a perspective, yes, that's correct.

**Q.** Isn't part of your role as a human resources person also to kind of watch out for the company to some extent? Isn't that fair?

**A.** I wouldn't say that that's fair. My job is to understand the perspective of the company and the employee, not just

solely the company.

**Q.** Isn't it part of your role to look at risk management? You don't consider that at all in your role when you give advice to the company and the managers?

**A.** When I give advice, I give my advisement on the situation based upon information that's been presented to me.

**Q.** Okay. Isn't it fair to say in this situation that the chain of command for Mr. Rinsky was he was a technician, and then he reported to Mr. Reid who was his immediate supervisor, correct?

**A.** His immediate supervisor, but that's not the end of the chain of command.

**Q.** I'm just kind of taking it step by step.

**A.** Yes.

**Q.** Mr. Rinsky is a technician. The first layer of management is Mr. Reid, correct?

**A.** Correct.

**Q.** The next layer of management is this Andrew Hamilton, correct?

**A.** Correct.

**Q.** And then he reported to Leif Maiorini?

**A.** That's correct.

**Q.** And then Leif Maiorini, above him was Craig Cuyar?

**A.** That is correct.

**Q.** And those with two C's, correct? Craig Cuyar is with two

03:42:57 C's?
03:42:58 **A.** That's correct.
03:42:59 **Q.** Now, you also took a role in this case in handling some level of document production. Do you recall in your deposition in New York that you served as a corporate designee deponent in terms of being deposed?
03:43:16 **A.** That's correct.
03:43:16 **Q.** And part of your role there was to review certain documents -- all the 30(b)(6) respondents were to review certain documents and be responsive to the document production process, correct?
03:43:33 **A.** That pertained to my involvement, that is correct.
03:43:35 **Q.** You understood that you were supposed to do certain document review, retention and then provide a deposition, correct?
03:43:42 **A.** That's correct.
03:43:42 **Q.** And you've been involved in this litigation and this circumstance from the time you were first involved -- I think in the deposition you didn't know the exact date, but you said it was after Mr. Rinsky had moved to Boston, correct?
03:43:54 **A.** That's correct.
03:43:55 **Q.** So fair to say you were probably involved after -- some time after late May, early April 2015 until the present?
03:44:05 **A.** Correct.
03:44:09 **Q.** Now, isn't it fair to say that upper management was

misled by lower management in terms of Mr. Rinsky's situation in this case?

MR. BERLUTI: Objection, Your Honor.

THE COURT: Sustained.

BY MR. DENNEHY:

**Q.** You've been involved in the case and were copied on numerous emails, correct?

**A.** Correct.

**Q.** I'm going to have you -- we'll pull up Exhibit 39. Exhibit 39 is in front of you. As you can see it's an email chain, and it's from Colin Reid to you at the top.

Do you see that?

**A.** That's what references, "Katrina, Yury has taken four PTO days year to date."

**Q.** And can you see the email chain slightly below where Leif has sent -- given it's an email from Leif to Andrew Hamilton, and you're copied on the email?

**A.** I can see that.

**Q.** And it says given -- this is the third full sentence. "Given that he left without notifying his manager or HR is unacceptable, and we need to take action as quickly."

Did I read that correctly?

**A.** Yup, I see that.

**Q.** So this statement says that Mr. -- and you're copied on it. It states that Mr. Rinsky picked up and left without

giving any notice to anyone. Does that read correctly?

**A.** It says, "Without giving notice to his manager or HR." That's how it reads.

**Q.** And you're copied on that, correct?

**A.** That's correct.

**Q.** Now let's pull up Exhibit 15. This is an email from Colin Reid to you dated July 2, 2015. Do you see that?

**A.** Yes, I see that.

**Q.** Okay. And in it, Katrina -- do you see the second paragraph, this is Colin Reid, "Between the time I notified Andrew (4/30 or 5/1) we did not discuss this again until I received the email from Yury on 5/17. Once Andrew saw the 5/17 email he scheduled that meeting to us on 5/19."

Did I read that correctly?

**A.** Yes.

**Q.** So doesn't this say that Yury actually told Mr. Reid about him moving before he left?

**A.** If you look at the bottom of the email, he mentioned verbal approval. But as far as when I say -- I'm assuming when Leif was saying, oh -- in the previous email you just showed me, without approval, meaning that he didn't know that he had already left and went to Boston -- I was going to say Baltimore. Sorry.

MR. DENNEHY: I'm going to move to strike because it calls for speculation, what we thought.

THE COURT: You're going to move to strike your own witness' answer?

MR. DENNEHY: Yes.

THE COURT: No. Sorry.

BY MR. DENNEHY:

**Q.** In any event the email that we read before this one used the word notify, not approval, didn't?

**A.** Yes, it did.

**Q.** Upper management in the email before we got to this one stated, and you were copied on that chain, and you were copied on the email that it was unacceptable that he left without notifying people. And if you read this email, it's an admission that he did notify people, correct? And not only did he notify Mr. Reid, but Mr. Hamilton seems to have known about what's going on.

**A.** My perception of it is he notified him of the ask to move, not the fact that he had already moved.

**Q.** Okay. And the next sentence says, "In retrospect, if he had been terminated on 5/19 or shortly thereafter, we would not be having this issue."

Did I read that correctly?

**A.** That's correct.

**Q.** It says, "The delay in terminating him led him to believe that we were getting him a cubicle in the Boston office."

Did I read that correctly?

03:49:33 **A.** That's correct.
03:49:36 **Q.** Now, this is dated July 2, correct?
03:49:40 **A.** Thursday, July 2.
03:49:42 **Q.** And can we go back to 39 for a second. And 39 is dated June 15, correct?
03:49:55 **A.** That's correct.
03:49:57 **Q.** And let's just read that again to be careful. It says, "Given that he left without notifying his manager." It says notifying. It doesn't say anything about approval, correct?
03:50:09 **A.** That's correct.
03:50:09 **Q.** Okay. We're going to go to Exhibit 20 for a moment. This is an email dated 5/27/2015. And this is an email -- you're not copied on this email, are you?
03:50:34 **A.** No.
03:50:34 **Q.** Were you aware of this email?
03:50:36 **A.** I was aware of this email when it was shown to me during my deposition.
03:50:43 **Q.** Okay. It does say, "Colin and I reviewed our options with Kat today." Are you Kat?
03:50:50 **A.** That's right.
03:50:51 **Q.** Is Kat short for Katrina?
03:50:53 **A.** That is correct.
03:50:54 **Q.** And this talks about processing the transfer on number 4, correct?
03:51:02 **A.** "Processing the transfer EAF and taking this to DTZ

review." That's what number four says.
**Q.** And number 5 says, "Assuming approval, execute the transfer officially." Correct?
**A.** Correct.
**Q.** If we go back to Exhibit 59 for one second. Exhibit 59, it says, "Once Andrew saw the 5/17 email."
Did I read that correctly?
**A.** That's correct.
**Q.** On 5/17 they didn't talk to you though, did they?
**A.** I can't recall the exact date they spoke with me, but -- I can't say if it was 5/17 or 5/18.
**Q.** Okay. Go back to 20. As of May 27 they're talking about bringing in a consultant to ramp up the resources that Yury had, correct?
**A.** Can you show me where it says --
**Q.** Number 1, "Offer a six month extendable opportunity to the resource Colin has worked with previously."
Do you see that?
**A.** Yes. I was saying can you show me a reference to "ramp up to what Yury was doing."
**Q.** Why don't we take it this way. You're on the email. It's dated 5/27/2015, correct?
**A.** Yes.
**Q.** And at this point in time, Mr. Reid has already had a discussion with Yury at least as of as April 30, 2015,

correct, from the other exhibit we saw?
**A.** Can you show me the other exhibit again just so I can confirm the date?
**Q.** Okay. This one we have, he said between -- he says, "I notified Andrew as of 4/30 or 5/1." That's what Reid says. And then he says, "Andrew saw the 5/17 email and scheduled a meeting on 5/19."
Correct?
**A.** That's correct.
**Q.** So April 30, May 1, Colin Reid knows about Yury wanting to transfer. Andrew Hamilton knows about Yury wanting to transfer. And they actually have a meeting on the 19th to talk about it. And you're not invited to the meeting, are you?
**A.** I don't recall being at a meeting on 5/19.
**Q.** And you never saw a document in the document production -- you looked at documents for the production that related to issues that you were involved with, correct?
**A.** Correct.
**Q.** And you don't recall being invited to a meeting on 5/19, correct?
**A.** Not that I recall, no.
**Q.** Okay. Go back to 59. We can agree you were copied on a number of these Yury emails, correct?
**A.** I was copied on a few.

03:55:04 **Q.** But you weren't copied on all of them, correct?
03:55:08 **A.** Correct.
03:55:09 **Q.** On this one here -- there we go. That one. 20. Exhibit 20, you weren't copied on this one, and this is the one where there's a plan and the plan is number 1, "Offer a six-month extendable opportunity to the resource Colin has worked with previously."
03:55:29 Did I read that correctly?
03:55:30 **A.** That's correct.
03:55:31 **Q.** Number 2, "Bring the new resource on in the next two weeks to begin KT."
03:55:39 Did I read that correctly?
03:55:41 **A.** That's correct.
03:55:42 **Q.** Number 3, "Brief Craig on the situation and prep him for the transfer paperwork from Kat."
03:55:48 Do I read that correctly?
03:55:50 **A.** That's correct.
03:55:50 **Q.** 4, "Process the transfer." Did I read that correctly?
03:55:54 **A.** I'm sorry. Can you repeat that?
03:55:56 **Q.** 4, "Process the transfer."
03:55:58 **A.** "For the transfer paperwork for Kat." You're talking about number 3?
03:56:04 **Q.** Number 4, "Process the transfer", does that state that?
03:56:07 **A.** "Process the transfer EAF and take the DTZ review." That's what it says.

**Q.** And number 5, "Assuming approval, execute the transfer officially."

Did I read that correctly?

**A.** Correct.

**Q.** So all of these individuals did know about Mr. Rinsky looking to transfer, and that Mr. Hamilton actually saw Mr. Rinsky's May 15 email, correct?

**A.** Well, this email is referencing a transfer. It doesn't say process Yury's transfer EAF and take it to DTZ.

**Q.** I'm not talking about this email before. Step away from it. I'm just saying in general we just looked at three different documents, and it's fair to say that from looking at these documents that Mr. Reid and Mr. Hamilton knew before they even contacted you that Mr. Rinsky was planning a move to Boston. Is that fair?

**A.** I don't think that's fair to say. I don't know what they knew.

**Q.** Is it fair to say from looking at these emails that they knew that he wanted to move to Boston, and that Hamilton had read a May 17 email to that effect, correct?

**A.** The email that you showed me prior to this makes me aware that Colin was aware that he wanted to move because Colin was the person that wrote the email.

**Q.** Documents where Colin admits that he wanted to move. Upper management says that he left without notifying anyone,

right? But Colin knew.
**A**. Correct Colin was aware before --
**Q**. And Andrew Hamilton knew before he left. At least as of May 17, when he saw that email, scheduled meetings, he knew before he left, didn't he?
**A**. I can't confirm that.
**Q**. It's in the emails. We just went. Number 59.
THE COURT: Let her finish her answer.
MR. BERLUTI: Objection, Your Honor.
THE COURT: You're cutting her off. Is that your objection, or do you have another one?
MR. BERLUTI: It's also argumentative, Judge.
**A**. The email that I'm looking at now is the from Colin to me stating that, "When he informed me on April 30, I told him that this had to go through the IT process of Andrew, Leif, Craig, and reminded him that my relocation had taken several months to get approved."
The reason why I'm reading it is -- oh, here it is. "Between the time I notified Andrew." So Colin is stating that he notified Andrew between 4/3 or 5/1. So that is accurate.
BY MR. DENNEHY:
**Q**. The question, ma'am, is that this email clearly shows that Andrew Hamilton knew of Mr. Reid wanting to transfer as of 4/3 or 5/1?

03:59:00 **A.** That's correct.

03:59:00 **Q.** And as of this email that's in front of you, Mr. Hamilton saw Mr. Reid's email of 5/17, correct?

03:59:10 **A.** Correct.

03:59:11 **Q.** And we all know that the Mr. Rinsky didn't leave until May 22, correct?

03:59:16 **A.** Correct.

03:59:16 **Q.** But nobody said -- there's no email, no document in this case where Mr. Reid or Mr. Hamilton said, Hey, Yury, wait a minute, what are you doing, you don't have authority yet, transfer is not coming through, correct?

03:59:33 **A.** That's correct. But I also don't have anything that says it's been approved. And there's a process that we have on the HR side which is called an employee action form which was stated a few times in the other email you showed me, which would have given me the proof to transfer someone.

04:00:17 **Q.** Why don't we turn to number 54.

04:00:20 THE COURT: How much time do you have left with her do you think? More or less than one minute?

04:00:28 MR. DENNEHY: Far more than one minute.

04:00:30 THE COURT: Okay. It's 4:00. We're going to call it a day. Thank you all. You've been very attentive today. My usual instructions: Keep an open mind. Don't talk to anyone about the case. No social media. And we'll see you tomorrow at 10.

**A.** That's correct.

**Q.** And as of this email that's in front of you, Mr. Hamilton saw Mr. Reid's email of 5/17, correct?

**A.** Correct.

**Q.** And we all know that the Mr. Rinsky didn't leave until May 22, correct?

**A.** Correct.

**Q.** But nobody said -- there's no email, no document in this case where Mr. Reid or Mr. Hamilton said, Hey, Yury, wait a minute, what are you doing, you don't have authority yet, transfer is not coming through, correct?

**A.** That's correct. But I also don't have anything that says it's been approved. And there's a process that we have on the HR side which is called an employee action form which was stated a few times in the other email you showed me, which would have given me the proof to transfer someone.

**Q.** Why don't we turn to number 54.

THE COURT: How much time do you have left with her do you think? More or less than one minute?

MR. DENNEHY: Far more than one minute.

THE COURT: Okay. It's 4:00. We're going to call it a day. Thank you all. You've been very attentive today. My usual instructions: Keep an open mind. Don't talk to anyone about the case. No social media. And we'll see you tomorrow at 10.

THE CLERK: All rise for the jury.
(Jury exits the courtroom.)
THE COURT: You can stand down. The affidavit as far as I can see it comes if under 802(d)1.
MR. DENNEHY: My position on it is that it's just like a deposition. You can use it -- you don't get an entire document -- if the witness is available, you can ask the question, and it comes in that way through verbal testimony. But to admit the entire affidavit when he's like picked out two paragraphs, it doesn't come in.
You don't put a whole deposition in. You don't put an affidavit in. You don't put a verified pleading in.
THE COURT: It's not hearsay. It's an admission of a party opponent. He could go through every -- documents get admitted all the time where no one's gone through all of it, right? The questions go to a piece of it and the document comes in.
MR. DENNEHY: I think my position is that the statement itself, that's the admission that comes in. The rest of it does not.
THE COURT: What do you mean the statement itself?
MR. DENNEHY: The statement itself that's verbally read into the record, that's what happened.
THE COURT: I've spent some time up here today looking at the rules. And I don't see any reason why it

doesn't come in. If you want overnight to brief it.

MR. DENNEHY: I would because I've never seen an affidavit come in in any case --

THE COURT: I actually have seen it like that. You're right. It's not the typical way. But I don't think there's anything in the rule that precludes it.

MR. DENNEHY: It's not like it's a document he's written out himself.

MR. WHITESELL: He signed it.

THE COURT: It's an affidavit that he attested to.

MR. DENNEHY: It's no different than a verified pleading. That's what it really is.

THE COURT: No, it's not. He signed it under the pains and penalties of perjury.

MR. DENNEHY: A verified pleading you sign under the pains and penalties of perjury.

THE COURT: A complaint, he doesn't sign it.

MR. DENNEHY: I will look at it.

THE COURT: I'm happy to have you look at it.

MR. WHITESELL: Your Honor, if I could just mention Rule 32(a)3 actually does say that, "In a deposition of a party agent and designee, an adverse party may use for any purpose the deposition of a party..."

THE COURT: Right.

MR. WHITESELL: "Or anyone who, when deposed, was

the party's officer, director, managing agent or designee."

MR. DENNEHY: I'm not saying it can't be used. I'm saying it doesn't come in as an exhibit to the jury.

THE COURT: The deposition comes in.

MR. DENNEHY: The evidence comes in verbally just like someone sitting on the stand.

THE COURT: If you find some authority for that, I'm happy to consider it. Anything else for tonight? I'll be available by 9:30 tomorrow morning. Otherwise I'll see you at 10 if you don't want to come in at 9:30.

(Court adjourned at 4:04 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Joan M. Daly, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 11th day of April, 2017.

/s/ Joan M. Daly

________________________________

Joan M. Daly, RMR, CRR

Official Court Reporter

10:33:21

10:33:21