09:25:10

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

YURY RINSKY,

Plaintiff,

v.

CUSHMAN & WAKEFIELD NATIONAL CORPORATION,

Defendant.

Civil Action No. 1:16-cv-10403-ADB

April 12, 2017
9:51 a.m.

Pages 237 - 448

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
BOSTON, MA 02210

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
joanmdaly62@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

JOHN W. DENNEHY
Dennehy Law
127 Main Street
Suite 1
Nashua, New Hampshire 03060
603.943.7633
johnwdennehy.com

MARK D. SZAL
Donovan Hatem, LLP
53 State Street
8th Floor
Boston, Massachusetts 02109
617.406.4500
mark@szallawgroup.com

FOR THE DEFENDANT:

ROBERT R. BERLUTI
EDWARD F. WHITESELL, JR.
MICHAEL A. BEDNARZ
Berluti McLaughlin & Kutchin, LLC
44 School Street
Boston, Massachusetts 02108
617.557.3030
rberluti@bmklegal.com
ewhitesell@bmklegal.com
mbednarz@bmklegal.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
09:31:20 April 12, 2017, outside the presence of the Jury.)

09:31:20 THE CLERK: All rise.

09:51:59 THE COURT: We didn't finish the jury instructions
09:52:02 last night. We just got yours too late to really incorporate
09:52:05 them, so I'm not sure we're going to get to the closing today
09:52:08 anyway. But my proposal is is that if we do -- we'll do the
09:52:11 first part of the charge, the part that's not case specific,
09:52:14 the credibility and all that. I have that for you. I'll
09:52:19 pass that out. And then if we get that far, we can do the
09:52:26 witnesses, we can do the preliminary charge, and then
09:52:29 closings or not closings, however you want to close, without
09:52:32 seeing the final charge.

09:52:33 Does that make sense to everyone?

09:52:35 MR. BERLUTI: Yes, Judge.

09:52:37 MR. DENNEHY: Yes, Your Honor.

09:52:48 THE COURT: Let's see, how many copies do you guys
09:52:49 need? Here are two copies for you both.

10:00:20 THE CLERK: All rise for the Jury.

10:00:22 (Jury enters the courtroom.)

THE COURT: Thank you, everyone. I appreciate it.

Witness can take the stand.

(Continued direct examination of Katrina Hicks by Mr. Dennehy.)

THE COURT: You're still under oath.

THE WITNESS: Thank you.

BY MR. DENNEHY:

**Q**. Good morning, Ms. Hicks. How are you?

**A**. Good morning. How are you?

**Q**. Good. We're picking up where we left off yesterday. I think you testified you have slightly over ten years of experience in human resources, correct?

**A**. That's correct.

**Q**. And part of your role in human resources is to deal with employee issues in general, correct?

**A**. Correct.

**Q**. And you attend meetings sometimes in that process, correct?

**A**. Correct.

**Q**. And in human resources, it's a natural case to take notes during those meetings; is that correct?

**A**. That's correct.

**Q**. And isn't it true that you've had some personal meetings in relation to Mr. Rinsky during your role as a human resources manager in this case, correct?

**A.** Can you explain what you mean by "personal meetings"?
**Q.** In-person meetings.
**A.** In-person meetings, yes, I did have in-person meetings.
**Q.** Did you produce any notes from those meetings in discovery?
**A.** Any notes that I would have produced, I would have typed up, summarized.
**Q.** Okay. But did you produce any notes in this case that you recall?
**A.** No. I didn't produce any handwritten notes. That's correct.
**Q.** Did you produce any written meeting minutes?
**A.** No, I did not. And usually we don't really have meeting minutes from our conversations.
**Q.** Do you recall that you were deposed in this case, correct?
**A.** Yes.
**Q.** And during the course of your deposition, you were asked about this EAF form, the transfer form, correct?
**A.** Correct. And "EAF form" stands for employee action form, so all actions that would have been taken for that employee.
**Q.** And you testified during your deposition that the EAF form would include the address of the current employee's location and the address of where they're going to move -- requesting to move to, correct?

10:03:16 **A.** Address for work location, that is correct.
10:03:18 **Q.** And then it had a spot for the supervisor to sign the form, correct?
10:03:24 **A.** That's correct.
10:03:24 **Q.** Okay. There's no spot on there for upper level management to sign the form, correct?
10:03:33 **A.** Supervisor would entail either line manager or upper-level manager, depending upon the organization or the service line.
10:03:39 **Q.** Okay. But it just says -- you said in your deposition the manager signature on the form, correct?
10:03:45 **A.** Supervisor signature.
10:03:46 **Q.** Okay. That's right. In this case the supervisor for Yury Rinsky was Mr. Colin Reid, correct?
10:03:55 **A.** That's correct.
10:03:55 **Q.** Okay. And you did testify during your deposition that sometimes these forms get approved through a verbal process or an email exchange, correct?
10:04:03 **A.** Correct.
10:04:03 **Q.** And I think you used the term "oversight" to describe some of your role involved with helping out in the transfer process, correct?
10:04:19 **A.** Can you give me a little bit more detail as to what you're referencing?
10:04:23 **Q.** Would it be fair to say that you -- in your part of your

role in human resources, when you deal with these transfers, is to help provide the business side of it with some oversight?

**A**. Oversight and advisement, that's correct.

**Q**. All right. And during your deposition, you said that after Yury had already moved to Boston, Colin Reid and Andrew Hamilton wanted to meet with you to discuss the situation, correct?

**A**. Correct. After he already moved.

**Q**. Okay. And during your deposition you testified that the issue they wanted to discuss and what you took it from is that formal approval hadn't been given for the transfer, correct?

**A**. That's correct.

**Q**. And you used the term "formal approval" a number of times in discussing the situation, correct?

**A**. That's correct.

**Q**. And you also admitted during your deposition that this form that we're talking about is something that the manager or supervisor would process, correct?

**A**. Correct. In this particular case, in the IT organization, it would be Craig Cuyar.

**Q**. Well, in terms of who would initiate the processing, it would be the supervisor would process the form?

**A**. Initiate the steps, that is correct.

**Q.** From where you sit there today, you have no knowledge whatsoever one way or the other whether Colin Reid initiated that process as soon as Yury Rinsky told him he wanted to move to Boston, correct?
**A.** You mean told him as informed him of moving? No. There was no trail that that communication had trickled upper-level.
**Q.** Okay. And you mentioned, sitting here today, that there's no documentation to show that Colin Reid told Yury Rinsky that this form had to be submitted, correct?
**A.** I'm sorry. Can you repeat the question?
**Q.** You haven't seen any documents in this case and you haven't participated in any conversations that would lead you to believe that Colin Reid actually told Mr. Rinsky about this EAF form, correct?
**A.** No. He told him that there was a process. He didn't specifically specify EAF, that is correct.
**Q.** And when you had this first meeting with Andrew Hamilton and Colin Reid, you did not recommend that Mr. Rinsky be terminated, correct?
**A.** No, I did not. I did not make any recommendations that day.
**Q.** And you testified that when the discussions were taking place about Mr. Rinsky's transfer to Boston, that you yourself were not personally aware that the IT department was

seeking -- having discussions with a consultant that might assume Mr. Rinsky's role, correct?

**A.** No. I was not aware of any of those details.

**Q.** Fair to say that when you're trying to give oversight and advisement from a human resources perspective, that it's helpful for you to have all the details?

**A.** Correct.

MR. DENNEHY: Let's go to Exhibit 11. This is an agreed-to exhibit, so it's there.

BY MR. DENNEHY:

**Q.** And this is an email from Colin Reid to Andrew Hamilton dated May 14, 2015. It says, "Let's discuss the situation Yury has put us in with his home purchase in Boston."

Did I read that correctly?

**A.** "Colin, let's discuss the situation Yury has put us in with his home purchase in Boston." That is correct.

**Q.** And it says, "On the flight up, could you think through the options and risks of replacing him (via contractor or permanent role) so we can evaluate all the pros and cons of keeping and replacing?"

Did I read that correctly?

**A.** That's correct.

**Q.** And this is May 14th this email was sent, and it's your understanding in this case that Mr. Rinsky left for Boston on May 27th, correct?

**A.** That's my understanding, correct.
**Q.** So this email predates Mr. Rinsky even leaving the New York office, correct?
**A.** This email's dated the 14th of May, that's correct.
**Q.** And this email that talks about the risks of replacing him via contractor or permanent role, when you met with Andrew Hamilton and Colin Reid, had they forwarded this email to you in any way, shape, or form?
**A.** No, I didn't see this email. I wasn't copied on this email as well.
**Q.** You weren't copied on the email? It wasn't forwarded to you, correct?
**A.** No, not that I remember.
**Q.** They didn't print it and show it to you during the meeting, correct?
**A.** No, not that I remember.
**Q.** And they didn't mention replacing him during the meeting, correct?
**A.** No. It was strictly to talk through options.
**Q.** Well, here they're talking about an option, even before he's left Boston, of getting rid of him either through a contractor or a permanent role, and that option didn't come up in their meeting with you, correct?
**A.** No.
**Q.** And then you remember, from your deposition on May 18,

Colin Reid wrote an email to Yury Rinsky saying, "We'll talk on Tuesday," and that was about the transfer. Do you remember that?

**A.** I don't remember the date. If you have it, you can show it to me.

**Q.** Okay. We can pull it up. It's Exhibit 14.

**A.** Yes, I remember this email.

**Q.** You read this email. It's from Colin Reid to Yury dated May 18th. And it says -- "Moving to Boston" is the subject. It says, "Okay, we'll talk on Tuesday."

Did I read that correctly?

**A.** Yes.

**Q.** This email here, was this email -- you weren't copied on this email, correct?

**A.** Correct.

**Q.** And just so we're clear, you weren't blind-copied on this email?

**A.** No, absolutely not.

**Q.** Just curiosity, you understand what the term "blind copy" means?

**A.** Yeah. I can explain it if you'd like. "Blind copy" means that you're copied on an email, but the person that's receiving the email doesn't see your name in the subject line.

**Q.** And is it your experience -- I don't know if you know

this, but if someone is blind-copied and the email is printed like that or produced like that, the blind copy doesn't even show up?

**A.** Yes, that's correct.

**Q.** And just so we're clear, when we've been talking about in this case in your deposition and now, at no point in time, in these emails where you were not copied and your name shown, were you blind-copied, right?

**A.** Not that I recall I was blind-copied on anything.

**Q.** It's your practice if you're being copied the way your company worked is your name would show on there if you were receiving an email?

**A.** If I was copied, it wouldn't -- I don't know if you can see the email, but the cc line means that I'm copied on the email so I can see the exchange, and so can the person that's receiving it.

**Q.** So turning to this May 18th email with Colin Reid where it says, "We'll talk Tuesday," let's just be clear, you weren't copied on this email, correct?

**A.** No, not that I remember.

**Q.** To be clear, you were never -- at the time this email was sent or before you had the meeting with them, with Colin Reid and Mr. Hamilton, this email wasn't forwarded to you, correct?

**A.** I received this email. As far as timing of when it was

forwarded to me, I can't recall.
**Q**. You can't recall. You saw it in the process of this issue coming up?
**A**. Correct, I did see it in the process. Timing of when it was forwarded, I really don't remember.
**Q**. Okay. And there's no statement in here as to, "Hold on, your transfer is still being processed," correct?
**A**. Can you repeat the question? I'm not sure what you're asking me.
**Q**. In this email, Colin Reid doesn't state to Yury Rinsky that, "Hey, hold on." Yury's saying in the email below, "I'm going to move to Boston." It just doesn't say -- it says, "Okay, we'll talk Tuesday." It doesn't say, "Hold on, the form's not done, the process isn't done," correct?
**A**. No. The form says, "Okay, we will talk on Tuesday."
**Q**. Okay. And it doesn't say, "We're thinking of replacing you with a contractor or a permanent role," correct?
**A**. It does not address replacing Yury.
**Q**. Fair to say that this email on May 18th is, again, sent prior to Mr. Rinsky leaving on the 27th, correct?
**A**. Correct. And at the bottom of the email, it addresses the date that he wants to move. It says, "I'll be moving to Boston on 5/27/2015."
**Q**. Okay. And it's your understanding, through your role in all of this, that there were some discussions between Colin

Reid and Mr. Rinsky about Mr. Rinsky wanting to move to Boston, correct?

**A.** Likely there may have been conversations by the way the email is written.

**Q.** Okay. And just so it's clear for the Court, it's your understanding that there were actual -- some type of discussions between these two individuals about the move to Boston, correct?

MR. BERLUTI: Objection as to the word "discussions," plural.

MR. DENNEHY: She can answer.

THE COURT: Overruled.

**A.** Can you repeat the question?

BY MR. DENNEHY:

**Q.** I said it was your understanding, through your role in this process, that there were discussions between these two individuals about Mr. Rinsky moving to -- wanting to move to Boston, correct?

**A.** There were some verbal conversations about wanting to move, correct.

**Q.** Okay. Thank you. I'm going to just go to Exhibit 15 for a second. And it's kind of a sideways thing, but I'll represent to you that -- there we go.

This is a calendar invite between Colin Reid and Andrew Hamilton. Do you see that?

**A.** Yes. It's the same verbiage you just showed me a couple minutes ago.
**Q.** And it's titled "AS/400 Resourcing." Do you see that?
**A.** I do.
**Q.** Okay. And just to be clear, because you know how the system works better than any of us, you're not invited to this meeting, correct, on the invite?
**A.** On the calendar invite, I'm not invited.
**Q.** Am I correct this invite is for May 19?
**A.** Correct.
**Q.** And just to be clear, you're not invited to this calendar invite, were you invited to this meeting either verbally or by email separate?
**A.** Not that I can remember.
**Q.** And you don't recall attending this -- just to be clear, you testified earlier that your involvement was after Mr. Rinsky moved to Boston. So we can agree that your first discussions with Hamilton and Reid would have been after May 27, correct?
**A.** That's correct.
**Q.** And so as of May 19, you weren't invited to this meeting and you didn't attend this meeting, right?
**A.** No.
**Q.** Okay. Let's go to Exhibit 20. Now, this is an email we've all seen a few times. It says, subject line, "Next

Steps on AS/400 Support." Do you see that there on the subject line?

**A**. Yes, I do.

**Q**. And it's from Andrew Hamilton to Leif Maiorini and Colin Reid. Do you see that?

**A**. Yes, I see that.

**Q**. And you're not copied on this email, correct?

**A**. No, I am not.

**Q**. And this email was sent at 9:07 p.m. Is that Eastern Standard Time?

**A**. Likely. It depends upon where Andrew was at the time, but it's probably. I don't know.

**Q**. Andrew was based in the New York office, correct?

**A**. That's correct.

**Q**. If he sent it from his desktop -- some of these computer systems, there are companies that you work in New York but the mainframe in Seattle has a date time stamp. So just I'm trying to get from you on these dates and times, is it your understanding if an email was sent from the New York office, that the timing will show Eastern Standard Time?

**A**. If Andrew was in the New York office when he sent this email, it would be Eastern Standard Time, that is correct.

**Q**. Okay. So it's from Andrew Hamilton at the time he was based in New York, and it says 9:07 p.m., correct?

**A**. I said if he was based in the New York office when he

sent this email, it would be Eastern Time.
**Q.** Okay. And what I'm just saying is it says 9:07 p.m.?
**A.** Correct.
**Q.** And this is dated 5/27/2015, correct?
**A.** That's correct.
**Q.** And that's the day that Yury Rinsky had planned to leave for Boston, correct?
**A.** Correct.
**Q.** And the email states that they had discussion with Kat, and that's you, correct?
**A.** That's correct.
**Q.** Looking at this and going over all this, does it refresh your recollection that your first discussion about Mr. Rinsky's situation was on the 27th, that day?
**A.** It's likely it could have been that day. It could have been the day before. It was on or around the time of the 27th.
**Q.** But you had testified in your deposition and in court that your recollection that Mr. Rinsky had already left for Boston when you were first contacted?
**A.** Correct. So he could have left over the weekend and then talked to me on a Monday. He could have left Monday morning. Like I said, it was on or around the 27th.
**Q.** Okay. And one of the questions I had asked you yesterday was, "In your role, do you get involved with trying to

mitigate risk for the company?"

**A.** Is that a -- can you repeat the question?

**Q.** Yes. In your role in human resources, isn't part of it to give advice to the company so they don't make missteps that could lead to litigation and claims?

**A.** My role in human resources is to represent the company and to represent the employee. Whatever case may be, cases vary, but my role is dual. I represent both.

**Q.** If you look at -- there's a Bullet Point Number 6 that's written here. And it says, "Work with Kat" -- that's you -- "as KT unfolds on the official exit (mitigating litigation risks)."

Did I read that correctly?

**A.** That's correct.

**Q.** Okay. Working with you to mitigate litigation risks, is that a fair interpretation of what this states?

**A.** That's what he's requesting, but I'm not sure if that's what happened.

**Q.** Okay. And then -- to just kind of go over this, though, it says -- it's May 27. It's from Andrew Hamilton to Leif Maiorini, and Colin Reid's copied. You're not copied, even though there was a discussion with you. And it says, Number 1, "Offer a six-month extendable opportunity to the resource Colin has worked with previously."

Did I read that correctly?

**A**. You didn't read the whole thing. It says, "Offer a six-month extendable opportunity to the resource Colin has worked with previously. The individual working now (Trevor) has multiple clients, can only admit to the 20 hours/week, and is unavailable working on-site. Cognizant lacks content."

**Q**. Okay. What I want to do is -- we're not going to read every line of every email, so I'm going to just try to focus on some points to read. And when I ask you if I read it correctly, if your counsel wants to go over more of this, I'm just looking that when I read something correctly, whether I read it correctly or not. It's a yes-or-no question.

The next point says, "Bring the new resource on in the next two weeks to begin KT."

Did I read that correctly?

**A**. Yes. The first part of Number 2, you read correctly.

**Q**. Okay. Then it says, "We believe we must retain Yury for about nine weeks to cover critical workload and MK work."

Did I read that correctly?

**A**. That's correct.

**Q**. And then it says, "Brief Craig on the situation and prep him for the transfer of paperwork from Kat."

Did I read that correctly?

**A**. That's correct.

**Q**. Number 4 says, "Process the transfer EAF and take the DTZ

review." Did I read that correctly?
**A.** That is correct.
**Q.** Number 5 says, "Assuming approval, execute the transfer officially."
Did I read that correctly?
**A.** That's correct.
**Q.** And Number 6 says, "Work with Kat as KT unfolds on the official exit (mitigating litigation risks)."
Did I read that correctly?
**A.** That's correct.
**Q.** Okay. So this email, it follows up, it says that they talk to you and then they send the email. We can agree that it says that, right?
**A.** Yes.
**Q.** And we can agree that around this time you did have a discussion with them about the situation with Mr. Rinsky, correct?
**A.** That's correct.
**Q.** And we can agree that this email and this discussion is talking about going forward with processing Mr. Rinsky's transfer to Boston, correct?
**A.** It doesn't specifically say "processing." It says "processing the EAF." It doesn't reference Yury's transfer.
**Q.** That's the transfer form, though, correct?
**A.** Yeah, but it doesn't -- I'm just stating that it doesn't

specify Yury.

**Q.** That's what we're talking about, Yury, correct? "Processing the transfer," we're talking about Yury Rinsky?

**A.** I can't confirm if that's who they're talking about in this particular bullet because, like I said, in this bullet it just says, "Transfer the EAF and take to DTZ for review." I just don't want you to -- that's just not what it says.

**Q.** At this time, Yury's transfer is the one that's being discussed, right? You had a discussion with them probably that very morning about Yury's transfer. This is an email on the very day that he's leaving, and he's the IT guy that works on the AS/400 that's looking for a transfer, correct? And this is talking about AS/400 resourcing, right?

MR. BERLUTI: Objection as to the form.

THE COURT: Sustained.

BY MR. DENNEHY:

**Q.** Isn't it true, at the very time that you're talking about going forward with the transfer of Yury, that IT management and with Andrew consulting with you, they're talking about terminating him and getting a replacement, correct?

**A.** No, that's not correct. We didn't talk about terminating him.

**Q.** Okay. You talked about replacing him with somebody else, correct?

**A.** No, we did not talk about replacing Yury during that

meeting.

**Q.** You didn't talk about terminating him?

MR. BERLUTI: Objection. Asked and answered.

**A.** No.

THE COURT: You have to stop leading the witness. I'll let you have --

MR. DENNEHY: Your Honor, she works for the opposition. We're taking her as a hostile witness. We ask the right to take --

THE COURT: If you want to do that, we're going to talk about it at side bar. You can't just do it. If you want her to be treated as that, let's talk about it up here.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench outside the hearing of the Jury.)

THE COURT: You don't just announce in front of the Jury she's a hostile witness. You know better than that. If you want permission to lead her as their representative, we can talk about that. But to declare she's hostile and impact her credibility isn't the way to do it.

MR. BERLUTI: There's no evidence that she's hostile. I think she has to demonstrate, based upon her demeanor, based upon that she's not answering questions as best as she can and whatnot, that the Court makes the determination that she's hostile, and then he can begin to

lead. There's been no evidence of that whatsoever.

THE COURT: There's been some evidence of that.

MR. DENNEHY: I believe that like yesterday she was nonresponsive to some very basic questions. And today I asked her to read a very basic thing, and she wants to read more into it. She's nonresponsive to very basic questions, and I think that the pattern is it will be difficult to get through this examination without taking her as a hostile witness.

THE COURT: Do you want to add something based on your counsel's edification?

MR. BERLUTI: Based upon the fact that you could probably hear him in Boston, he should speak more softly.

THE COURT: He seems genetically incapable of whispering.

MR. DENNEHY: I'm actually partly deaf.

THE COURT: I've given up on it.

MR. BERLUTI: I respectfully disagree. I don't think his questions have been particularly artful at times. I'm not being critical. I'm just saying I don't think that she has demonstrated that she is not willing to answer questions. I think he's led her from the beginning. I've given her some leeway as far as that goes.

But he wants to interpret what the emails say as opposed to reading the language, and she has not adopted his

interpretation. He says, "I don't want to read the whole email," he just wants to take her testimony to be in line with the email. That doesn't make her hostile.

I think he has to ask her questions. I think there has to be more of a determination that she's not willing to answer things in a balanced way. And I don't think there's been any evidence of that.

THE COURT: Well, she's an opposing party.

MR. BERLUTI: I agree.

THE COURT: So I'm going to give you some latitude in leading her, but I don't think she's trying not to answer your questions. But because she is a party opponent, I'm going to give you some latitude.

MR. DENNEHY: Okay.

MR. BERLUTI: One thing, Judge, is I think he easily slips into having argumentative questions. Again, even if she's a hostile witness. He's not permitted to argue with her. I just raise that as a concern.

THE COURT: Yes.

(The following is held in open court in the presence of the Jury.)

THE COURT: We were trying some new technology this morning. She was supposed to be able to hear us over there with a microphone without having to get up and move over there, which obviously did not work.

BY MR. DENNEHY:
**Q.** Okay. So we're back at this exhibit with the email of May 27, 2015. And Number 2 -- if you'll look at Bullet Number 2, the second sentence in that bullet, it says, "We believe we must retain Yury for about nine weeks to cover critical Workday and MK work."
Did I read that correctly?
**A.** Yes, that's correct.
**Q.** Okay. So the idea that they want to retain him for about nine weeks, does that not reflect that your discussion with him was to terminate him?
**A.** My discussion with him was not to terminate him.
**Q.** Let's go to Number 28. Okay. This is an email. The subject line says, "As Discussed for Execution: SOW, AS/400."
Did I read that correctly?
**A.** Yes.
**Q.** And this is from Andrew Hamilton, correct?
**A.** That's correct.
**Q.** And it says, "To: Leif Maiorini," correct?
**A.** Correct.
**Q.** And it's copied to Colin Reid, correct?
**A.** Correct.
**Q.** And you're not copied on this email, correct?
**A.** No, I'm not.

10:34:01 **Q**. And it reads, "Leif, attached are the SOW for the AS/400 resource to backfill Yury/support the MK work. You are the signatory."

Did I read that correctly?

10:34:19 **A**. That's correct.

10:34:19 **Q**. And it says, "The value through December about $65,000 with a bit of overtime allowance."

Did I read that correctly?

10:34:27 **A**. That's correct.

10:34:30 **Q**. And you weren't copied on this, and it's sent June 2, 2015, correct?

10:34:38 **A**. That's correct.

10:34:40 **Q**. So a few days after the May 27th email, this is being circulated, correct?

10:34:53 **A**. Correct.

10:34:59 MR. DENNEHY: Can we go to 31.

01:11:07 BY MR. DENNEHY:

10:35:18 **Q**. Okay. This is an email. The subject line says, "Regarding Setup for Edgardo, Felix."

Did I read that correctly?

10:35:29 **A**. Yes.

10:35:29 **Q**. And it says, "From: Andrew Hamilton," correct?

10:35:35 **A**. Correct.

10:35:35 **Q**. And "To: Colin Reid," correct?

10:35:39 **A**. That's correct as well.

10:35:43 **Q.** And you're not copied on this, correct?
10:35:47 **A.** No, I am not.
10:35:48 **Q.** And it's dated 6/4/2015, correct?
10:35:52 **A.** Correct.
10:35:54 **Q.** And your recollection is that you had that initial discussion with Colin Reid and Andrew Hamilton on or about May 27, correct?
10:36:10 **A.** That's correct.
10:36:10 **Q.** And do you have an idea when you had your next follow-up, like, discussion with them?
10:36:15 **A.** I don't remember.
10:36:16 **Q.** Do you have any idea in terms of, like, was it days or weeks?
10:36:20 **A.** I don't remember. It was around the same time.
10:36:23 **Q.** Okay. And this email says, "Riza has not reassigned the desk so we can swoop in next week."
10:36:31 Did I read that correctly?
10:36:35 **A.** That's correct.
10:36:36 **Q.** It says, "Also spoke to Leif. I will make a last case for some more time for Yury to manage the risk of transition, but Leif echoed your impression of immediate action (perhaps by Wednesday)."
10:36:55 Did I read that correctly?
10:36:59 **A.** Yes, that's correct.
10:37:00 **Q.** And this email is in response to a June 4 email, so of

the same day, from Colin Reid to Andrew. And it says, "I am requesting an AD and VPN account for Edgardo. Should I request a laptop, or will he be able to use Yury's desktop? A desktop PC is preferable. The cubicle is now occupied."

Did I read that correctly?

**A.** Yes.

**Q.** In your discussions with Colin Reid and Andrew Hamilton or anybody in the IT department, did you have an understanding, after Yury left, that his desk space would be utilized by somebody else?

**A.** We never talked about desk space.

**Q.** That never came up in your discussions?

**A.** No, not that I recall.

**Q.** Did you have any discussions with anybody in the IT department that after Yury left the New York office, that his desktop might be used by somebody else?

**A.** No, not that I recall.

**Q.** At any point in time, was this email that we're discussing here -- during the time that all this was happening prior to Yury being terminated, at any time was this email forwarded to you?

**A.** No, not that I recall.

**Q.** At any point in time, did you have discussions with the IT department about these issues in terms of utilizing the desk space and computer space of Yury prior to even deciding

whether or not to terminate him?
**A.** We never discussed desk space.
**Q.** Do you remember in your deposition that you had testimony about -- there was a process after a number of these discussions, you actually -- Cushman & Wakefield, with the help of the human resources department, presented an offer to Yury whether he wanted to be terminated or he was given the opportunity to resign? Do you recall that?
**A.** There were three options: He can resign, he can be terminated, or he can return back to his role in New York. There were three options.
**Q.** Okay. That was your discussions. And do you know when that final decision of making that position actually happened?
**A.** Can you rephrase the question?
**Q.** When did the actual communication of those options, when were they made to Mr. Rinsky?
**A.** I don't recall the time, but there was a conversation between him and his manager, Colin, but I don't remember when the time was.
**Q.** Do you recall that there was actually significant discussion around June 22nd about these options, and there was a phone call, a multi-party phone call on June 22nd? Does that ring a bell?
**A.** The date -- I know that there was a phone call, but I

just can't recall the date.
**Q**. We can get to that. But we can agree that June 4 is earlier in time than June 22nd? We can agree on that, correct?
**A**. That's correct.
**Q**. When you had discussions with the IT department and you got into this offer of return to current role, did you get into any specifics with the IT department on what that would encompass, return to current role, in terms of coming back to New York?
**A**. Would you like to give me a detail about what you mean by "specifics"? Examples or anything of that sort.
**Q**. Okay. Did you understand -- well, at the time of this happening, you didn't know that Yury Rinsky was working at home three days a week, did you?
**A**. No, no. I did not know he was working three days a week.
**Q**. At the time all this happened, did you know yourself that he had had a couple of bouts of cancer?
**A**. No. I had no idea.
**Q**. And at the time that you yourself was involved with this, you didn't actually know his exact age, correct?
**A**. No, I did not.
MR. DENNEHY: Let's go to Exhibit 54.
BY MR. DENNEHY:
**Q**. Okay. This is an email from Colin Reid, and it's written

to you, Katrina Hicks. It's dated June 24, 2015.
Did I read that correctly?
**A.** That's correct.
**Q.** And it says, "Subject: Moving to Boston."
Did I read that correctly?
**A.** That's correct.
**Q.** Below in this email is the one we've seen before, the May 17 email from Yury to Colin. And then at this point, on June 24, Colin forwards you that email, correct, and then he writes a note to you below it; is that correct?
**A.** Correct. He forwarded me the email.
**Q.** Okay. And it says, "As discussed refers to 4/30/15, when I was in New York for a funeral. He had already decided to relocate, took out a home equity loan, purchased a new home in Boston, and put his home up for sale."
Did I read that correctly?
**A.** That's correct.
**Q.** "There were only 17 days between 4/30 and the email below. I want you to be aware that some of what he is saying regarding getting approval from Andrew or me is totally incorrect."
Did I read that correctly?
**A.** That's correct.
**Q.** Did you ever follow up with Colin Reid to find out what part of what Yury was saying was true?

**A**. I probably, like, had a phone conversation with Yury or -- I mean with Colin, and I asked him what he meant. He said that he didn't give him formal approval to relocate.
**Q**. Okay. That wasn't the question, though. That's the question of -- that would answer some of what he's saying getting approval is incorrect. What I'm saying is what part of what Yury said was correct? Did you ever ask that?
**A**. Can you rephrase the question? I'm not sure what you're asking me. I had a conversation with him. And from that conversation, he said to me he didn't have approval to relocate.
**Q**. Okay. But he says, "I want you to be aware that some of what he is saying is incorrect." So that would mean that some of what Yury is saying is correct. And did you ever find out what Yury said that was correct?
**A**. What he said to me was what I stated. That's the details. So I asked the question and that was his response. His response was, "Katrina, he didn't have formal approval to relocate."
**Q**. You had discussions with Yury at some point, correct?
**A**. Yes, I did.
**Q**. And you had emails from Yury at some point, correct?
**A**. Yury forwarded me about two or three emails.
**Q**. He also sent you his own emails. We'll get to those, but he sent them to you, correct?

**A.** Correct. He sent me those emails.
**Q.** In that process, Yury said that he had approval from Colin to transfer, correct?
**A.** Correct. He said he had emails. And I asked for those emails so that he can produce those emails to me in saying, you know, "He said he had approval. Let me see what those approvals are."
**Q.** Okay. But what I'm saying is his position -- Yury's position was that he had approval from Colin to transfer, correct?
**A.** He said he thought he had approval from Colin to transfer.
**Q.** And he didn't say anything else other than that, correct?
**A.** We talked about a few things on the phone call so I'm not sure what you mean.
**Q.** In terms of his transfer.
**A.** All he said to me was, "Katrina, I thought I had approval to relocate."
I said, "Can you please forward to me any email chains or anything in writing that would confirm that."
**Q.** Okay. And he explained to you that Colin had told him this verbally, though, correct?
**A.** Correct. He said he had verbal approval, some sort of verbal approval.
**Q.** And you actually testified in your deposition that it's

not unusual for the transfers to happen through a verbal approval, correct?

**A.** No, that's not what I said. Transfers happen through a process, and verbally is a part of that process. But the formalization wouldn't move through unless I had it written down on an EAF form, which we talked about a little bit earlier.

**Q.** But you did say that verbal approval is part of the process?

**A.** Verbal approval is a part of the process, not the final process.

**Q.** Okay.

MR. DENNEHY: Why don't we go to Number 29.

BY MR. DENNEHY:

**Q.** Okay. So this is an email and the subject is, "Missed Conversation with Scott Sommer."

Did I read that correctly?

**A.** Yes. So that's likely this is a linked message.

**Q.** And it's from Colin Reid. It's dated June 2nd, 2015, correct?

**A.** Are we starting from the bottom or the top?

**Q.** I'm starting from the top, actually. And then it's to Yury Rinsky, and it's copied to Andrew Hamilton. Do you see that?

**A.** It's from Colin Reid to Yury, and it's copying Andrew.

**Q.** Right. That's what I said. That's correct, right?
**A.** Yeah.
**Q.** You're not copied on this email, correct?
**A.** No.
**Q.** You were brought into the matter prior to this happening, correct?
**A.** Yes. I was brought into it prior to June 2nd.
**Q.** This email was sent within a week of you being brought into the issue, correct?
**A.** Correct.
**Q.** And Mr. Hamilton, once again, is Colin Reid's manager, correct?
**A.** Correct.
**Q.** And at the bottom of this, it's a chain, it starts from Scott Sommer. It's dated June 2nd and it's to Yury. And it says, "Good afternoon. Your desktop is still in New York. Do you need it? "
Did I read that correctly?
**A.** Correct.
**Q.** And then Yury responds, "Scott, I will need my desktop in a couple of weeks when I get a cubicle in Boston office. Thanks." And that's from Yury to Scott Sommer, and then he copies Colin Reid, correct?
**A.** That's correct.
**Q.** And the response is from Colin Reid to Yury and to

Mr. Sommer and copied Hamilton, "Scott, please wait until I am back in New York tomorrow. Yury might be getting new equipment for Boston since I have an AS/400 consultant sitting there next week. Andrew, please advise. Thanks."

Did I read that correctly?

**A.** That's correct.

**Q.** So at this point Mr. Rinsky is talking about a cubicle in Boston, correct?

**A.** Correct.

**Q.** And Colin Reid and Andrew Hamilton are on the email, and nobody says to Mr. Rinsky, "You're not supposed to be in Boston," correct?

**A.** No. But it says, "Please advise," from Colin to Andrew, who is his direct manager, meaning that there needs to be some sort of response to this.

**Q.** Okay. But they don't respond until -- you've looked at the documents. At no point in this case have you seen a response to this email where it says, "Hey, Yury, you're not supposed to be in Boston, get back here," in response to this email?

**A.** No.

**Q.** Nobody says, "Hey, wait, what are you talking about a cubicle in Boston," correct?

**A.** No. The email says, "Please advise."

**Q.** In fact, the email says that the cubicle in Boston is

10:51:00 being filled by someone else, right?

10:51:02 MR. BERLUTI: Objection.

10:51:06 THE COURT: Basis?

10:51:08 MR. BERLUTI: It misstates the evidence. The cubicle is not referenced in Boston. It's in New York, that's being filled.

10:51:16 THE COURT: I'll sustain that on that basis. I think you misspoke, but ....

10:51:21 MR. BERLUTI: Right.

10:51:30 BY MR. DENNEHY:

10:51:31 **Q.** He says, "Since I have an AS/400 consultant sitting there next week." Isn't your understanding, in reading this email chain, that a technician is sitting in Yury's cubicle or desk in New York and using his desktop?

10:51:47 **A.** That's not my interpretation of that.

10:51:49 **Q.** Okay. Let's go to 35. Let's start with the part at the bottom. It's from Andrew Hamilton to Leif Maiorini, copied Colin Reid. It's dated June 4, 2015. It says, "reflection on timing for Yury's separation."

10:52:35 Did I read that correctly?

10:52:38 **A.** Yes, that's correct.

10:52:40 **Q.** You weren't copied on this email, right?

10:52:42 **A.** No, I am not.

10:52:44 **Q.** And at this point in time -- this email is sent prior to your sending the notice to Yury that he has the three

options: Coming back, terminating, or resigning, correct?
**A.** You said prior to me sending, meaning you have some sort of timeframe of when I sent it?
**Q.** This is prior to the notice going out at the end of June about, "Yury, you have these three options," correct?
**A.** Correct.
**Q.** And before Yury even responds to whether he wants to come back, they're putting together a plan for separation; isn't that correct?
**A.** It says, "Reflecting on the timing of Yury's separation, I think we should weigh the risk of our Workday deliverance against the timing of his exit."
**Q.** I'll read the thing. "Leif, reflecting on the timing of Yury's separation, I think we should weigh the risk to our Workday deliverables against the timing of his exit."
Did I read that correctly?
**A.** That's correct.
**Q.** This is sent before he's given the option to come back to New York, they're talking about the timing of his exit, correct?
**A.** Correct. They're talking through a plan. Most managers do that. I mean, whenever you have a project such as large as Workday -- and I'm not sure if you guys know what Workday deliverables are. It's managers developing how they're going to push the deliverables through. Workday's a huge project

and at that time we were pushing it through. So developing the plan, managers would just naturally do to get the deliverables complete.

**Q**. Okay. But they're trying to figure out the work plan and how to get some use out of Yury before they separate him, terminate him, correct?

**A**. It doesn't specify "use out of Yury." I think that's not the term that they're referencing here at all.

**Q**. "Reflecting on the timing of Yury's separation," as a human resources person, don't you take that as him leaving the company?

**A**. "Separation" means leaving, that's correct.

**Q**. Okay. And they want to get some work out of him on these Workday deliverables before his exit, correct?

MR. BERLUTI: Objection.

THE COURT: Basis?

MR. BERLUTI: It's not in the email. She didn't receive this email. She didn't write the email. No foundation.

THE COURT: If she knows.

MR. DENNEHY: I think she's answered the question.

THE COURT: If she answered it, I didn't hear the answer.

BY MR. DENNEHY:

**Q**. Okay. The question was, based on your experience in

human resources, "separation" means leaving the company, correct?
**A.** My response to that was "separation" means leaving. That's what the word "separation" means.
**Q.** "Separation" means leaving the company, we can agree on that?
**A.** I said "separation" means leaving.
**Q.** Okay.
MR. DENNEHY: Let's go to 34. And this is another agreed-to exhibit.
BY MR. DENNEHY:
**Q.** It's from Colin Reid to Leif Maiorini and copied Andrew Hamilton, June 4, 2015. Did I read that correctly?
**A.** That's correct.
**Q.** Subject line, "Consulting." Did I read that correctly?
**A.** That's correct.
**Q.** "Leif, I am working on finding another consultant in addition to Edgardo, Felix."
Did I read that correctly?
**A.** That's correct.
**Q.** And you weren't copied on this, correct?
**A.** No, I was not copied on this email.
MR. DENNEHY: Let's go to 36.
BY MR. DENNEHY:
**Q.** Okay. This is an email, Colin Reid to Yury Rinsky, dated

10:57:18 6/9, and it says, "Open Tasks." Did I read that correctly?
10:57:22 **A.** It does. That's correct.
10:57:23 **Q.** June 9. And it says, "Please sent me your current task
10:57:26 list with projected completion dates so that I can change
10:57:29 your priorities."
10:57:30 Did I read that correctly?
10:57:31 **A.** That's correct.
10:57:32 **Q.** Okay.
10:57:34 MR. DENNEHY: Let's go to Exhibit 37. Hold on.
10:57:40 Can we just look at the timing of that.
01:11:07 BY MR. DENNEHY:
10:57:42 **Q.** That's Colin Reid, and the time it's sent, 1:59 p.m.,
10:57:49 correct?
10:57:51 **A.** Correct, 1:59 p.m.
10:57:56 **Q.** And Colin is based in Florida. That's East Coast Time,
10:58:01 correct?
10:58:01 **A.** I'm sorry, I didn't hear you.
10:58:03 **Q.** At that time, Colin Reid was based in Florida, and
10:58:07 Florida is on an East Coast Time, correct?
10:58:09 **A.** I don't know where he was when he sent this email, but he
10:58:12 is based in Florida and it's East Coast Time.
10:58:14 **Q.** Okay. Thank you.
10:58:15 MR. DENNEHY: Number 37.
01:11:07 BY MR. DENNEHY:
10:58:27 **Q.** Okay. This is an email from Craig Cuyar to Leif

Maiorini, 6/9, and it's 5:58 a.m. Did I read that correctly?
**A.** It's from Craig Cuyar to Leif, 5:58 a.m., yeah.
**Q.** It says, "Reflection on Timing for Yury's Separation." Did I read that correctly?
**A.** I'm sorry, where are you?
**Q.** The subject line at the top.
**A.** Okay. Yes.
**Q.** "Reflecting on Timing for Yury's Separation." Did I read that correctly?
**A.** Yes.
**Q.** And it says, this is Craig saying to Leif -- no, from Leif saying to Craig, "I was exchanging email with Colin and Andrew this morning, and there are a number of AS/400 changes that will need to be made to support the on-boarding of Massey, the movement of employee numbers to accommodate Workday, and the integration with DTZ commissioned brokers potentially."
Did I read that correctly?
**A.** Correct.
**Q.** And then it says, "Yury is critical to many of these items, and I would like to discuss the risk prior to giving Kat the final go-ahead."
Did I read that correctly?
**A.** That's correct.
**Q.** "We have brought in one consultant and will likely need

another for the volume of work that we are contemplating. Given that Yury wrote all of these applications, we are still going to be at risk to support the system without additional, longer-term resources."

Did I read that correctly?

**A.** That's correct.

**Q.** Now, the first sentence of this references an email exchange between Colin and Andrew earlier that morning, and obviously with Leif Maiorini, Colin, and Andrew, an email exchange. Do you know if that email exchange was produced in the case?

**A.** I do not know.

**Q.** Do you recall ever seeing another email exchange about this subject that would have taken place earlier on June 9, 2015?

**A.** I do not know.

**Q.** If you look below, there's an email that's June 5. It's from Leif Maiorini to Craig Cuyar, and it has the same subject line, "Reflection on Timing for Yury's Separation."

Do you see that there?

**A.** Uh-huh.

**Q.** And it says, "Just some food for thought. Kat and I are planning on separation for next week currently."

Did I read that correctly?

**A.** That's correct.

**Q**. So even though the plan is that he might have the option to come back to New York, you, the management, are planning on his separation, him leaving the company, correct?
**A**. That's how it reads. I just don't remember the verbal conversation Leif and I had. We talked about a few options.
**Q**. Well, let's just say this. It says in that middle email, "Kat and I are planning separation for next week currently." Does that email accurately reflect your conversations with Leif?
**A**. It might. I can't recall. We had a conversation and we talked about options. As far as separation being the final option, I can't confirm that that's what it was.
**Q**. Okay. Okay.
MR. DENNEHY: I'm going to 39 again. Go to the bottom part of it.
BY MR. DENNEHY:
**Q**. This is from Leif Maiorini to Andrew Hamilton, Colin Reid, with a copy to you. It says, "Subject: Yury Rinsky." It's dated June 15, 2015. Did I read that correctly?
**A**. That is correct.
**Q**. And it says, "I spoke with Craig on Friday, and we need to move forward with Yury's termination as quickly as possible."
Did I read that correctly?
**A**. Mm-hmm.

**Q.** "The position that Yury fills is located in New York City. Given that he left without notifying his manager or HR is unacceptable, and we need to take action as quickly."

Did I read that correctly?

**A.** That's correct.

**Q.** "Craig is willing to let us have a week or two to transition the responsibilities if Katrina is comfortable with this arrangement."

Did I read that correctly?

**A.** That's correct.

**Q.** It says, "Katrina, I will be back in the office tomorrow. We can discuss the specifics with Andrew and Colin if you have a moment."

Did I read that correctly?

**A.** That's correct.

**Q.** And that third sentence, "given that he left without notifying his manager," that's not an accurate sentence, correct?

**A.** When he says "given that he left without notifying his manager," I believe he's referencing that he left already without formal approval, meaning he was already in Boston.

**Q.** Isn't it true that before Mr. Rinsky left, at least ten days beforehand, he sent an email notifying his manager of his plans to leave?

**A.** He's planning to --

MR. BERLUTI: Your Honor, we've been over this yesterday. It's been asked and answered. This exact email, we went over this exact subject yesterday.

THE COURT: I'll give him a little bit of latitude on it. Overruled.

**A.** Repeat the question, please. Thank you.

BY MR. DENNEHY:

**Q.** Well, the fact is that Yury did notify Colin Reid before he left to go to Boston; isn't that true?

**A.** He notified him of the plan to leave. That is true.

**Q.** Okay. And at the time this email was sent, they knew that he was in Boston, correct?

**A.** Yes. When this email was sent, he was already in Boston.

**Q.** Okay. And this is from Katrina Hicks, from you, to Leif Maiorini, Andrew Hamilton, Colin Reid. It says, "Sounds good. When I spoke with Craig a few weeks ago, he wanted to handle the situation the same way HR did for Lipka's employee (similar situation). I looked at Nicole's notes. It was a resigned due to relocation. Is that the same approach we want to take?"

Did I read that correctly?

**A.** That's correct.

**Q.** Did anybody ever respond to this email?

**A.** I can't remember.

**Q.** The next email above is about you saying that Yury has

11:05:51 four PTO days year to date, correct?
11:05:55 **A**. That's not me. That's Colin. So he's addressing me. At the top it says, "Katrina, Yury has taken four PTO days year to date."
11:06:07 **Q**. So that's the response. Colin's asked about the four PTO days, correct?
11:06:13 **A**. That's a response to the PTO days from Colin to me.
11:06:26 **Q**. Okay.
11:06:38 MR. DENNEHY: Let's go 41.
01:11:07 BY MR. DENNEHY:
11:06:45 **Q**. Okay. So this is an email from you, Katherine Hicks --
11:06:50 **A**. Katrina.
11:06:50 **Q**. Katrina. Sorry. And it's 6/16/2015, correct?
11:06:55 **A**. Correct.
11:06:56 **Q**. And it's -- Leif Maiorini is a recipient, Colin Reid is a recipient, Andrew Hamilton is a recipient, correct?
11:07:05 **A**. Correct.
11:07:05 **Q**. And copied to is Joan Hynes. Do you know who she is?
11:07:08 **A**. Correct. My direct manager at the time.
11:07:10 **Q**. Okay. And then the subject is "Yury Rinsky," correct?
11:07:17 **A**. That's correct.
11:07:17 **Q**. And it says, "Hi, all. Per our conversation, given Yury relocated without notifying his manager or human resources, we are unable to accommodate his request to work outside the New York office."

Did I read that correctly?

**A.** Yes.

**Q.** And this, again, uses the word "notifying his manager," correct?

**A.** Correct.

**Q.** And in your deposition what you said was the issue with Yury Rinsky was that he hadn't gone and gotten formal approval for the transfer, correct?

**A.** Correct. He had no formal approval.

**Q.** And it says, "The current and long-term needs to have this resource in New York. If he is unable to commute from his current location, we are requesting he formally resign from his position. Please see below a sample of the communication he can submit to his manager."

Did I read that correctly?

**A.** Correct.

**Q.** And below it says -- this is the sample language you give to them. "After informing you of my discussion to relocate and understanding the need for my role is located in the C&W New York office, you have decided not to continue my employment. Therefore, I formally resign and my last day would be" -- and there's a blank and a period.

Did I read that correctly?

**A.** Correct.

**Q.** And Mr. Rinsky never signed this, correct?

**A.** Not that I remember.
**Q.** And he never agreed to this position, correct?
**A.** I'm sorry?
**Q.** Mr. Rinsky never agreed to do this? He never agreed to resign, correct?
**A.** He never agreed to resign, nor did he agree to come back into the New York office.
**Q.** Okay. And at the time you wrote this -- this is 6/16 -- it says -- you're talking about "if he is unable to commute from his current location," you state that, correct?
**A.** Correct. "His current location" meaning Boston since he was already there.
**Q.** And at the time you sent this, you didn't know that he had been telecommuting three days a week in New York?
MR. BERLUTI: Objection. Asked and answered, Judge.
MR. DENNEHY: It was actually a different timeframe than when I asked before.
THE COURT: Overruled.
**A.** Can you ask it again, please.
BY MR. DENNEHY:
**Q.** At the time that you sent this email, June 16, 2015, you didn't know that Yury Rinsky was telecommuting from home, correct?
**A.** Correct. No, I didn't know.

**Q**. Just to be clear, at the time you sent this, you didn't know that before Mr. Rinsky left to Boston, he was telecommuting from home, correct?
**A**. Correct. I did not know that.
**Q**. Okay. At the time you sent this, did you know that he was telecommuting, like in working from his home in Boston?
**A**. I'm sorry, can you rephrase the question? I don't know what you mean.
**Q**. After Mr. Rinsky left on May 27 to Boston and the time you sent this email, did you know that -- have an understanding that he was actually telecommuting from Boston, he was working at home on his laptop?
**A**. I don't remember if I had an understanding of that, no.
MR. DENNEHY: Why don't you go to 42 and scroll to the top.
BY MR. DENNEHY:
**Q**. Okay. This is Exhibit 42, and it has a similar chain that we've seen before. It says, "Just some food for thought. Kat and I are planning separation for next week currently." And this is dated June 5, 2015. And the email that we just saw before this was dated June 16, 2015, correct?
**A**. Correct. And this is the same email, again, that you showed me like three or four slides ago.
**Q**. There's two exhibit numbers, but it's the same email?

**A.** Yeah, it's the same email.
**Q.** But the fact is it it's talking about the statement up above that "Kat and I are planning separation for next week currently." I read that correctly, right?
**A.** You read that correctly.
**Q.** And the one before this, June 16th when you sent the sample resignation letter, that email is proposing that he might still have an opportunity to work in New York, correct?
**A.** To my understanding, my recommendation was he always had an opportunity to work in New York.
**Q.** Okay.
MR. DENNEHY: Let's go to 43.
BY MR. DENNEHY:
**Q.** Okay. So this is Exhibit 43. The bottom of it is that June 16th email. We'll look at the one in the middle. The one in the middle is from Leif Maiorini. It's dated June 18, two days later, and it's to Andrew Hamilton and Colin Reid. Did I read that correctly?
**A.** Correct.
**Q.** And it says "Yury Rinsky" is the subject line, correct?
**A.** Correct.
**Q.** And it says, "You guys are going to have this discussion with Yury Monday morning, correct? "
Did I read that correctly?
**A.** That's correct. Excuse me.

**Q.** So at this point in time, you've sent this sample resignation letter language, and Leif is reaching out to Andrew Hamilton, Colin Reid, and saying, "You're going to have a discussion with Yury Rinsky on Monday," correct?
**A.** That's what it says.
**Q.** And you're not copied on that email?
**A.** No, I'm not.
**Q.** And is it your understanding that conversation went forward on June 22nd?
**A.** You mean the con -- it's my understanding that conversation happened. As far as the dates, I can't really remember.
**Q.** So when this call happened, it was a phone call, correct?
**A.** It was a phone call, mm-hmm.
**Q.** And Andrew Hamilton and Colin Reid called Yury to discuss the situation, correct?
**A.** I know Colin Reid called him. I don't know if Andrew was on the call or not. I can't confirm that.
**Q.** Were you on that call?
**A.** The original call, no. I don't remember being on that call.
**Q.** Did you ever see any meeting minutes from that call?
**A.** No. No.
**Q.** Have you ever seen any document that would confirm that when they had that call, that they told Yury Rinsky, "You

have the option to come back to New York and do the same thing you were doing before and under the same circumstances"?
**A.** Can you repeat the question?
**Q.** Did you see any document at any point in time in this case that reflected the discussion of that call that took place when Andrew Hamilton and Colin Reid contacted Yury?
**A.** No. I didn't see any documentation on that, no.
MR. DENNEHY: Let's go to Exhibit 44.
BY MR. DENNEHY:
**Q.** At the bottom of this, it's Yury Rinsky reaches out to you, Katrina Hicks, on June 22nd via email. It says, "Employment Status with Cushman & Wakefield."
Did I read that correctly?
**A.** Correct.
**Q.** If I represent to you the call that Colin Reid and Andrew Hamilton had with Yury was June 22nd, would you have anything to refute that or think it's untrue?
**A.** No. It probably was June 22nd. It's likely.
**Q.** Okay. And this says, "Katrina, per our conversation earlier today, I am once again advising you that I will not be resigning from my position after 27 years of service."
Did I read that correctly?
**A.** That's correct.
**Q.** And does this point that Yury makes reflect that he had

an actual discussion with you personally that day?

**A.** Absolutely. Him and I did discuss. We did talk.

**Q.** And did you talk with him after he talked with Colin and Andrew?

**A.** It was likely after because we did a follow-up conversation with each other. We did talk.

**Q.** Okay. And he says, the next sentence, "Per my annual reviews, my job exceeds expectations. My move to Boston was approved by my manager, and I was told to work remotely until I was given a workplace in C&W Boston office."

Did I read that correctly?

**A.** That's correct.

**Q.** And he sends this email out the very day that you all had these discussions with him, correct?

**A.** That's correct.

**Q.** "I am not familiar with the formal protocols you mentioned, and my manager never advised me that such protocols exist. Once I received the approval, I sold my house and moved to Boston. The move to Boston has not impacted my ability to perform my job in any way. My expectation, based on conversation and correspondence with my manager, was that I would work remotely until he set up my Boston office cubicle. I would like to know why everything was changed today and why I am being asked to resign."

Did I read that correctly?

**A**. That's correct.

MR. DENNEHY: Okay. Scroll it.

BY MR. DENNEHY:

**Q**. Then what he does is he -- this guy, John Santora, he was the head of the company at the time, correct?

**A**. He was one of the heads of the company at the time, correct.

**Q**. And he sends an email to John and copies you and Colin, correct? And it has the same subject line. And he forwarded his email from you to -- in with this email to John, correct?

**A**. He forwarded his email to me in the email. That's correct. I didn't respond to this email.

**Q**. Okay. And it says, "John, please help me understand my abrupt termination. As you know, I have been an employee for over 27 years. I recently moved to Boston with the expectation that I would continue to work remotely until a cubicle in the Boston office was set up. My move was approved by my direct manager, and I put my house on the market. If my manager did not approve my move, I would not have sold my house and move to Boston. I am upset and confused by the course of today's events.

"This morning I was told that I should forcibly resign, and my manager sent me an email with specifics about my letter of resignation to human resources. I have no intention of resigning today or ever. I have done my job for

almost three decades exceeding every expectation. And I think I am still very useful to the company.

"I am forwarding you the correspondence between my direct manager and human resources. Please help me make sense of this and let me know if there's anything you can do to help. I appreciate your help. Yury."

Did I read all that correctly?

**A.** That's correct.

**Q.** And then above, it says -- email from Katrina Hicks to Colin Reid, and it says, "I spoke with Yury and I am managing. We need to discuss in the morning, then speak with Craig regarding options."

Did I read that correctly?

**A.** That's correct.

MR. DENNEHY: Go to 45. Okay. This is Exhibit 45, agreed-to exhibit.

BY MR. DENNEHY:

**Q.** It says, "From: Katrina Hicks." Dated June 22nd, 2015. All the same day of the other ones we've just seen. It's to Andrew Hamilton and to Colin Reid and to Leif Maiorini. It says, "Employment Status with Cushman & Wakefield" and it has a few attachments, correct?

**A.** That's correct.

**Q.** It says, "Importance: High." It says, "Hi, all. I think we need to sit down and discuss this given new

information. Although Colin is not approving him to work out of the Boston office, this email chain doesn't completely deny his request. I think there was some miscommunication on both ends. I spoke with the head of employee relations, and maybe we should consider a two-week transition period for him to work remotely given there is actual work he can do.

"Although this is a business call, with his 27 years of service, I can understand him being caught off guard by this morning's conversation. I do not think he will be returning to the New York office, but I want to give him the opportunity to formally resign.

"Can we connect tomorrow morning? Thanks, Kat."

Did I read that correctly?

**A.** That's correct.

MR. DENNEHY: Let's go to 46.

BY MR. DENNEHY:

**Q.** And this is an email from Colin Reid. He sends it on to you, and it's on the 22nd. He says, "This is the only response that I provided. It was an acknowledgement of receiving his email."

Did I read that correctly?

**A.** That's correct.

**Q.** And it says, "Okay, we will talk on Tuesday." That's the email he's talking about in the chain below, correct?

**A.** That's correct. Same email you showed me earlier.

**Q**. Doesn't the email chain express that Colin Reid was notified of Yury moving to Boston?
**A**. I'm sorry. Repeat the question.
**Q**. Doesn't this email chain show that Colin Reid was, in fact, notified that Yury was moving to Boston?
**A**. Yes, he was notified that he was planning to move to Boston on 5/27/15.
**Q**. Okay. So when Leif Maiorini mentions that Yury did not notify his manager before moving to Boston, that would be an incorrect statement based on all these documents, correct?
MR. BERLUTI: Objection.
THE COURT: Basis?
MR. BERLUTI: Documents speak for themselves.
THE COURT: Overruled.
**A**. So my understanding of what Yury was -- I mean, I'm sorry, my understanding of what Leif was mentioning notifying his manager, he's meaning approval, formal approval.
Notifying and planning to do something, we can all plan to do something, but notifying meaning approval is the context I think he meant it in.
MR. DENNEHY: Let's go to 48.
BY MR. DENNEHY:
**Q**. Okay. This is an email sent June 22 to Colin Reid, copy to Andrew Hamilton. The email chain's not clear, but it's an email from Yury to Colin. And it says, "Colin, I was told

that my move to Boston was approved by you and Andrew. The note below is news to me. I do not understand it."

Did I read that correctly?

**A.** Yes, but I -- you're correct, I can't understand who it's coming from, who this email is coming from.

**Q.** But it reads, "I was told that my move to Boston was approved by you and Andrew."

Did I read that correctly?

**A.** Correct.

**Q.** "The note below is news to me. I do not understand it," correct?

**A.** Correct.

**Q.** And then below that, it says, "Yury, this is the response that HR is expecting from you based on our conversation this morning." And it's the resignation language below that, correct?

**A.** Correct.

**Q.** Okay. So you talked to your -- you reviewed a number of these emails. Some of them, you were copied on. Some of them not. And at every point in time, Yury says, "My move to Boston was approved," correct?

**A.** Correct.

**Q.** And he refused to resign, correct?

**A.** Correct.

**Q.** At no point did he beg for forgiveness, did he?

MR. BERLUTI: Objection.
THE COURT: Sustained.
BY MR. DENNEHY:
**Q.** Are you aware of at any point in time that Mr. Rinsky begged for forgiveness?
MR. BERLUTI: Objection.
THE COURT: Sustained.
MR. DENNEHY: What's the basis, Your Honor?
THE COURT: It's not an appropriate question. If you want to ask did he -- if you want to expand on the term and get to the actual conduct that you're asking her about, you can do that.
BY MR. DENNEHY:
**Q.** At any point in time, did Yury ask for the company to forgive some type of mistake that he made?
**A.** Not that I remember.
**Q.** Let's go to 53. Let's look at this exhibit and there's a few other exhibits we'll get to.
Just to be fair, after this discussion, Colin Reid and Andrew Hamilton have this discussion with Yury. Then you have a discussion with Yury. Then there's these emails that we just saw went back and forth. Yury decided not to resign, correct?
**A.** Correct.
**Q.** And so on your end, you took other steps to try to deal

with the situation, correct?
**A.** I did an investigation, correct.
**Q.** And you took other steps, and we're going to get to that. So weren't those steps to help try to look into the situation and then draft another response email or letter?
**A.** Letter to who? Can you elaborate on your question?
**Q.** Well, didn't you have some discussions and look at some emails and then help Colin Reid draft a letter that would be -- or an email that would actually be eventually sent on to Yury?
**A.** So to explain how an investigation works, when someone brings new information to my attention, whether that's the employee or the manager, what happens is it's my responsibility to take that information, hear all sides of that information, and summarize how we're going to respond to the person that's bringing the new information to my attention.

So with that said, to answer his question, what I did was I did work with Colin to summarize a response to Yury given the new information he had brought to my attention during our phone call.

MR. DENNEHY: Okay. Let's scroll down this. Okay. Here we go. So here we are. She's right in the middle of this. Scroll down a tiny bit. No. Up. There.
BY MR. DENNEHY:

**Q.** From Andrew Hamilton to Katrina Hicks, copying Colin Reid and Leif Maiorini. And it says -- subject line is the same. "Employment Status with Cushman & Wakefield, C&W."

"If our risk is mitigated by paying him for two weeks (term with pay), I am okay with that. But actual work is done. Best not to take the risk of improper actions."

Did I read that correctly?

**A.** That's correct.

**Q.** And what they're talking about is giving him two weeks of severance pay in order to get him to resign?

**A.** No, that's not what this states. So to go back to what I was saying before to you guys around an investigation, because we were doing an investigation, at this particular time, because of the nature of his role, to have him on IT systems and working while I was doing an investigation based upon new information was a risk.

"The level of access that Yury had from an IT perspective, it was concerning to me personally. It was also concerning because of my experience in HR. Someone in IT can -- he's not in the office. So giving him two weeks of pay saying, "We'll pay you for two weeks while we're investigating the situation so we can understand more detail." So that's why I suggested the two weeks.

So you'll see here at the bottom -- I'm not sure if you can see what I see -- it's saying, given his 27 years of

service, I felt that that was the best way to accommodate.
**Q.** Okay. And did you actually go ahead and do that?
**A.** Yes, I did.
**Q.** So he wasn't terminated on June 22, was he?
**A.** No, he was not. He gave me new information during our conversation that allowed me the opportunity to investigate it further.
**Q.** Okay. And then during that time, did Andrew Hamilton or Colin Reid or Leif Maiorini come to you and say, "Hey, one thing we didn't discuss with all this was that we're looking to terminate Yury and hire a consultant"? Did they ever mention that to you?
**A.** No. A consultant was never mentioned to me at all.
**Q.** Okay.
**A.** A replacement for Yury was never mentioned to me at all.
**Q.** Okay. Let's roll ahead. This is from Craig Cuyar to you dated 6/23. It says, "My suggestion to the team and advices from Sue, if we still want to move forward with the termination, I want to at least give him the opportunity to resign with two weeks notice/pay."
Did I read that correctly?
**A.** That's correct.
**Q.** Okay. Let's go to 55. On that last exhibit, there seems to be some level of discussion about in the email that Exhibit No. 20 talked about mitigating litigation risks. In

the last email, there was a note about --

MR. DENNEHY: Let's go back to that last one for one second. It's 53.

BY MR. DENNEHY:

**Q**. The one in the middle with Andrew Hamilton, "If our risk is mitigated by paying him for two weeks (term with pay), I am okay with that. But actual work is done."

There's been numerous instances during this case where there's this discussion about litigating -- litigation risks. And at the time that this was all going on was when Cushman & Wakefield was trying to merge with this other company, correct, DMZ?

**A**. DTZ.

**Q**. What is it?

**A**. DTZ.

**Q**. DTZ, okay. And through that process, there were other age discrimination claims, correct?

MR. BERLUTI: Objection.

THE COURT: Basis?

MR. BERLUTI: Relevance.

MR. DENNEHY: It's related to the transfer.

MR. BERLUTI: There's also no foundation.

THE COURT: There's no foundation for sure.

MR. DENNEHY: It's a --

THE COURT: Come up to side bar, please.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

THE COURT: Are you looking for her to say that they tried to get rid of all the old people in connection with this merger?

MR. DENNEHY: No. That's not what I'm trying to get her to say. What I am trying to say is there were select -- I'm not trying to get her to say that at all. There were -- in connection with this merger, there were various position changes. Older people replaced with younger people or phased out due to this merger to presumably save money or change the balance sheet of the equation.

THE COURT: You want to say that there were personnel changes or do you want to say there was age discrimination imbedded in those personnel changes?

MR. DENNEHY: In some of them. Not all of them.

THE COURT: How are you going to prove that? What is she going to say?

MR. DENNEHY: She's going to say that she's aware of some allegations to that effect.

THE COURT: Were they substantiated?

MR. DENNEHY: Some of them were. Some of them have been settled.

MR. BERLUTI: There's absolutely nothing in her deposition about any of that.

THE COURT: It feels very out of left field at this point. We haven't established a pattern or practice.

MR. DENNEHY: I don't understand why he thinks everything has to be in a deposition. It's a discovery deposition. You don't ask everything in a deposition.

THE COURT: What does --

MR. DENNEHY: It was actually raised in the deposition.

MR. SZAL: I took the deposition. He limited the deposition very tightly.

THE COURT: It doesn't have to be in the deposition. If he asked in interrogatory, in deposition, and she didn't respond, that's one thing. But it doesn't need to be asked. We're not going to go into some vague allegations of age discrimination in the context of a merger. You have to flesh it out.

MR. DENNEHY: I think I laid the foundation earlier that -- his salary -- he had three people that were like his peers. His salary was like almost -- his salary and benefits was almost the other two. He was the oldest person. There's a merger. They get rid of him. That's what happened. There's other instances of it happening.

THE COURT: They can get rid of him because he's expensive. They can't get rid of him because he's older.

MR. DENNEHY: That's right. It's part and parcel.

It's a pattern.

THE COURT: I want to understand what her testimony is going to be. Are you going to ask her, "Are there any other allegations of age discrimination in the merger?" She's going to say yes. And what's your next question?

MR. DENNEHY: Probably move on to another question.

MR. BERLUTI: That's misleading.

THE COURT: I'm not going to leave that out there.

MR. DENNEHY: Why not? It's a fair question.

THE COURT: Does he have the files to be able to go back and check whether those were substantiated?

MR. DENNEHY: They didn't produce them. We asked.

MR. BERLUTI: Judge, if we're going to have a discovery dispute now, they asked about any other discrimination claims within the IT.

MR. SZAL: No.

MR. BERLUTI: We limited it to the IT. I understand. They asked for everything in the company. We said that's overbroad and overburdensome. We'll give you everything within Colin Reid and within that IT department. We responded to that. There weren't any. And they never moved to expand it. So now to try to ask a question as a fishing expedition during trial --

MR. DENNEHY: It's not a fishing expedition.

MR. BERLUTI: They've got no basis that she's going

to say anything at all. Judge, it's prejudicial. Excuse me. We don't know from his question whether he's referring to C&W, whether he's referring to DTZ because he says it's in connection with the merger.

It's way out left field, Judge. It's absolutely prejudicial. It's inappropriate. We're here for this case. Was there age discrimination in this case? It doesn't even matter if there are 100 cases in which it was there. You've got to know it's these supervisors in this context. There's absolutely no foundation. There's no testimony it was with anybody.

MR. DENNEHY: There was like a senior manager. There was a woman, a lesbian --

THE COURT: Hold on a second. If you guys want to stand up and stretch while we're doing this, go ahead. Don't feel confined to those seats.

MR. DENNEHY: At the time this happened, she had gone over to San Francisco. When this merger happened, they got rid of her and replaced her with a 39-year-old white guy. There was like a whole pattern. There was an Asian woman that they got rid of. There's a whole pattern that of getting rid of anyone that didn't fit the WASP mold. That's the pattern. And those are the allegations, and they're particularly strong.

MR. BERLUTI: WASP? You've got an African-American

woman testifying. Colin Reid is Jamaican. There is no evidence that these people -- I don't know that we're talking about anything to do with Colin Reid, Andrew Hamilton, or Craig Cuyar. It is absolutely inappropriate. This is absolutely prejudicial.

THE COURT: If you're going to ask the question, I'm going to give an instruction -- I'm going to give an instruction.

MR. BERLUTI: There are no allegations.

MR. DENNEHY: There were allegations.

MR. BERLUTI: She didn't testify about any allegations.

THE COURT: You can cross-examine whether it was offered in her deposition if he didn't ask her.

MR. BERLUTI: The discovery was limited to the IT department. They have to at the very least show --

MR. DENNEHY: You denied his motion on limine.

MR. BERLUTI: Judge, there was no motion to compel in discovery. You have to show that there's some relevance in a 49,000 person --

THE COURT: In this merger, if they were getting rid of all the old people, there's --

MR. BERLUTI: This is not a reduction in force. The evidence is his position remained. There was nothing to do with the merger that had to do with this decision.

THE COURT: That may well be, but he's entitled to ask the question.

MR. BERLUTI: No, Judge, respectfully he's not.

THE COURT: I understand that it is a close call. Okay?

MR. BERLUTI: It's more than a close call.

THE COURT: I'm going to give an instruction on it and you can cross-examine her on it.

MR. BERLUTI: I also want an instruction, Judge, a statement about a hostile witness. I want some sort of instruction that it's up to the Jury to determine credibility of a witness.

THE COURT: Yes. He'll ask the question. I'll give that instruction and this instruction at the same time. Okay?

MR. BERLUTI: Note my strenuous objection on it. This is a mistake.

THE COURT: I hear you.

(The following is held in the presence of the Jury.)

MR. DENNEHY: Your Honor, for now what I'm going to do, even with your instruction, I'm going to move to another area and come back to that later.

THE COURT: Okay. Do you want me to give the other part of the instruction right now?

MR. BERLUTI: Yes, Judge.

THE COURT: Okay. We just had a lengthy discussion at side bar, as you're aware of. We hashed out a few issues that have come up from this morning. One thing that I wanted to clear up right now is that you heard some discussion back and forth about whether this witness was hostile or not. That is sort of a legal term.

There are some witness that's you're allowed to lead, and there's some witness that's you're not allowed to lead. I'm letting him do some leading of her, not because she's hostile. That's sort of legal shorthand. And the actual term and the reason that he's being allowed to cross-examine her is that she is a witness identified with the opposing party. In other words, she works for Cushman & Wakefield. So that's why he's being allowed to lead.

The word "hostile" has no meaning beyond how the parties are arranged at these tables. So you're not to draw any conclusions from the use of that terminology. You will evaluate her credibility just like you'll evaluate everybody else's based on her demeanor and what she's said.

I'll give to you an instruction about how to evaluate the witness' credibility. But there's no meaning and you should not attach any significance to the use of the word "hostile." It just has to do with whether or not he can lead her or not. Because she's identified with Cushman &

Wakefield, he's being allowed to lead her to some extent.

Okay? Is that sufficient?

MR. BERLUTI: Yes, Your Honor. Thank you.

MR. DENNEHY: Let's move ahead to Exhibit 59.

BY MR. DENNEHY:

**Q.** So this is an email from you to Sue Zamorski. It's dated July 6. Did I read that correctly?

**A.** Yes, that is correct.

**Q.** Can you tell us who Sue Zamorski is?

**A.** So Sue Zamorski is the head of employee relations. Employee relations -- whenever I have any type of employee relations issue where I need some advisement or guidance, we always run them past employee relations from general questions to terminations. It's a natural protocol cross-check.

**Q.** Do you have an understanding of Sue Zamorski's educational background?

**A.** No, I do not.

**Q.** Do you know if she's an attorney?

**A.** No, I do not.

**Q.** We'll go to the bottom of this exhibit. This is from you, Katrina Hicks, to Colin Reid dated July 2, 2015. It says, "Hi, Colin. Before our meeting on Monday, when I spoke with Yury, he mentioned he received 'verbal' approval from you. Can you confirm any conversations with him? I just

want to have a better understanding of both sides. Thanks, Kat."

Did I read that correctly?

**A.** That's correct.

**Q.** Let's go up ahead. And it says -- this is from Colin to you. It says, "There was no verbal confirmation. When he informed me on April 30, I told him this had to go through the IT process of Andrew, Leif, Craig, and reminded him that my relocation had taken several months to get approved. He asked me to do my best to get it approved, which to me indicated he knew it was a possibility of not getting approved."

Did I read that correctly?

**A.** Yes, that's correct.

**Q.** Then go above to the next email. It says, "FYI. Today, meeting at 1:30 p.m.," correct?

**A.** Correct.

**Q.** And what you ended up doing was seeking further input from Colin Reid and his position in all of this, correct?

**A.** Correct. So as part of a formal investigation, like I stated, you hear both sides. Yury had expressed to me that there was some verbal communication. The natural next step for me was to confirm with Colin if that even happened.

**Q.** Okay. Let's go to 60. Okay. This is an email. It says, "From: Katrina Hicks." It's to Sue Zamorski. It's

dated July, it looks like 8, and it says, "Talking Points."
**A**. July 6.
**Q**. Okay. It's a little bit small on my screen. July 6. "Talking Points for Colin to Yury."
MR. DENNEHY: We can make that a tiny smaller. Okay.
BY MR. DENNEHY:
**Q**. This is from you to Sue, and it says, "This is perfect. I will send to Colin!"
Did I read that correctly?
**A**. Yes.
**Q**. And below that it's from Sue Zamorski to you, and it says, "Talking Points for Colin to Yury," correct?
**A**. Correct.
**Q**. And it says, "Hi, Kat. Thanks for putting together some talking points for Colin. I might suggest the talking points look a bit more along the lines of the following. Let me know if you'd like to discuss. Thanks."
And then there's a list of points. "Yury, let's take a moment to review how we got to this point." And then it lists a number of points. "Back on 4/30/15, you and I discussed the possibility of you moving to Boston. You informed me you had decided to relocate, that you had taken out a home equity loan to put your home up for sale and purchased a home in Boston.

"In that meeting I told you a request to work remotely had to go through the IT process, requiring approvals from Andrew, Leif, Craig. I also reminded you that my own personal relocation had taken several months to be approved. You asked me to do my best to get your request approved. Given the discussion about the approval process, you knew it was a possibility that your request would not be approved."

Next bullet. "At no time in our conversation, did I commit or approve your request to work remotely."

Next point. "You and I did not discuss the matter again until I received your email on 5/17, in which you indicated you would be moving to Boston on 5/27 for family reasons and you needed to take four personal days after Memorial Day, 5/6 [sic] through 5/29."

Let me just stop there for a second. This states -- in the first bullet, it requests a discussion on 4/30 between Yury and Colin, correct?

**A.** Correct.

**Q.** And then it states that Colin's position is that he explained to Yury there's a process, correct?

**A.** Correct.

**Q.** And at the time this list is being put together, you understand that Yury's position is that he was told that the transfer was approved, correct?

11:50:33 **A.** At the time that this email was written, he was under the impression that it was approved.
11:50:40 **Q.** But Yury's position is not indicated in this discussion point, is it?
11:50:46 **A.** This was a draft of the conversation -- the information that we were going to send over to Yury. So I'm not sure what you mean by Yury wasn't -- I had verbally spoken to Yury and explained to him that I had no documentation that said it was approved, so he was aware.
11:51:02 **Q.** Well, we can agree that you haven't seen any document where Colin said after he got the 5/17 email from Yury that, "Hey, wait, the process hasn't been approved," correct?
11:51:18 **A.** I'm sorry, I don't understand your question.
11:51:19 **Q.** You testified in your deposition that you never saw any communications, any document saying that the process was denied; we can agree on that?
11:51:26 **A.** Yeah. Mm-hmm.
11:51:27 **Q.** And we can agree at no point did anyone say when they're getting these communications from Yury that, "Hey, hold on, the process isn't finished -- gone through the whole approval process," correct?
11:51:42 **A.** I can say that it wasn't approved, nor was it denied. That's what caused the confusion and allowed me to investigate.
11:51:47 **Q.** But the status of this transfer was never communicated to

Yury, correct, in any document that you've seen?

**A.** In documentation that I've seen -- the email that was below this or the one before that, that Colin said, when I asked and I wanted to double confirm as a part of my investigation, to say, "Are you sure you did not confirm with him verbally?"

Because at the time Yury didn't provide anything substantial in writing that said it was approved. So my conversation was to cross-check with Colin to make sure that there weren't any verbal confirmations, which he denied happened as well.

**Q.** Colin's standpoint. But my point is Colin never told Yury, when Yury said, "I'm moving to Boston," "Don't go," right?

**A.** He never said, "Don't go," and he also never said that it was approved. That's my statement.

**Q.** Understood. The next bullet point after that is, "The next communication I received from you was in June." There's a blank there. It says, "in which you indicated you were in the Boston office and looking to set up a work office there."

Did I read that correctly?

**A.** That's correct.

**Q.** At no point when Yury was e-mailing back and forth about the desktop that was going to be set up in the Boston office, did Colin say, "Hey, stop, this process isn't even approved

yet. Why are you already setting up offices? Hold the phone." Nobody ever said anything like that, did they?
**A**. No. But in that same email chain, he copied Andrew Hamilton, a few slides back, that says, "Please advise," meaning that it was above Colin, that an answer needed to come through.
MR. DENNEHY: Objection. Move to strike. It's nonresponsive. We didn't ask about -- and it's speculative.
THE COURT: We're not going to strike it.
You listen to his question. You answer the question that he asks. Okay?
MR. BERLUTI: Respectfully, Your Honor, I think it was responsive to the question.
THE COURT: Whatever. The instruction stands.
You listen to the question. You answer the question that he asks.
THE WITNESS: Okay. That's fine.
BY MR. DENNEHY:
**Q**. It says, "As a courtesy, we placed you on paid leave while we looked into this issue. Meanwhile, I discussed your request with Andrew, Leif, and Craig. In the end, the request was not approved because the work itself must be performed in the New York City office. In our conversation on June 22, I indicated the role must be performed in the New York City office, and I offered you the chance to return

to your job there. You refused the offer."

Did I read all that correctly?

**A.** Yes, you did.

**Q.** And this doesn't say what the job requirements would be if he came back to New York City, what they were demanding him to do, does it?

**A.** No, it doesn't specify. That's a business call.

**Q.** Okay. And then there's nothing in this chain that, like, shows Yury's point of view, correct? This chain is an email chain -- or a document meant to provide a document that expresses the company's position that's favorable to the company, isn't it?

MR. BERLUTI: Objection.

THE COURT: Sustained.

BY MR. DENNEHY:

**Q.** Did you not take part in drafting these bullet points on this document?

**A.** It was a partnership, correct.

**Q.** And your understanding when you did this was you're documenting the company's position, correct?

MR. BERLUTI: Objection.

THE COURT: Overruled.

**A.** No. This is a summary of events. So my understanding of writing this was to give Yury a summary of the events that took place.

BY MR. DENNEHY:
**Q**. Well, it doesn't have any of the summary of them looking for a consultant, correct?
MR. BERLUTI: Objection.
THE COURT: Overruled.
**A**. I'm sorry. Repeat the question.
BY MR. DENNEHY:
**Q**. This summary doesn't include any steps where they were looking for a consultant, correct?
**A**. No. Because that was never brought to my attention, as I mentioned.
**Q**. Okay. And this summary doesn't talk about that they're planning to terminate him?
MR. BERLUTI: Objection.
THE COURT: Overruled.
**A**. No. Because at the bottom of this email, it says, "You have the option to voluntarily resign from your position. If that's not your choice, your employment will be terminated."
BY MR. DENNEHY:
**Q**. Okay. So before this list was put together, it doesn't include all the communications that were happening in the IT department, does it? It doesn't include every step?
MR. BERLUTI: Objection.
THE COURT: Overruled.
**A**. It only includes the steps that I was included on.

BY MR. DENNEHY:
**Q.** Okay. Let's go to 64. Okay. This is Exhibit 64. It's from Colin Reid to Katrina Hicks. It's dated July 13, 2015. It says, "Katrina, I don't have Yury's new address unless he entered it online in the PeopleSoft HR. It was never given to me. Regarding the 'next communication sentence' where he was in the Boston office, this never happened. He has always been at home waiting to hear when he could report to the Boston office."
Did I read that correctly?
**A.** Yes, you did.
**Q.** And what that's referring to is he's correcting you on that summary of events, and he's telling you that -- you're stating that he's in the Boston office and he was actually working from home. Is that your understanding of this email?
**A.** My understanding is that he wasn't in the Boston office, and he was working from home.
**Q.** But the little list that we discussed before had noted that, and so you had to make a change before it was finalized, correct?
**A.** I'm sorry. You're confusing me. I don't know what you mean.
**Q.** The list that we discussed before --
**A.** Okay.
**Q.** -- Colin's giving you feedback on an edit to that list,

correct?

**A**. Is there a way for you to show me the full email so I can understand where the chain started?

**Q**. Okay.

**A**. Thanks.

There's the attached, okay.

**Q**. This is all the PTO back and forth. And then it comes up with the formula for days earned and then goes onto the next page. Talk about calculation of those days.

**A**. Okay.

**Q**. Then you can look at the bottom just to highlight that. On July 7, there's an email to you and Colin Reid. Can you tell us who that's sent from?

**A**. An email -- oh, Stevannie Sierra, yes.

**Q**. Who is that?

**A**. She's my HRC, my HR coordinator. So HR coordinators only manage transactional parts of HR. They don't do any consulting. They don't meet with the business. They're more in the back office side and they do more of the transactional things that happen in the system.

**Q**. It says, "I can calculate. What is the termination date? I don't see it listed in the chain below." And then Colin Reid responds, "July 10."

Did I read that correctly?

**A**. Yes.

**Q.** So at this point on July 7, you're selecting the termination date to be July 10, correct?
**A.** Correct.
**Q.** And then the next email is Katrina Hicks to Colin Reid. And it says, "Please see term letter," and that means termination letter, correct?
**A.** Correct.
**Q.** It says, "Please see term letter we have created for you to send over to Yury's personal email. Please fill in the areas in yellow. I don't know the answers to before sending. We would like to keep this for our records."
Did I read that correctly?
**A.** Correct.
**Q.** Then he writes to you that -- in quotes, next communication sentence, he points out, "Where he said he was in the office, you need to correct that."
Does that refresh your recollection that he was making an edit to the termination letter?
**A.** Correct.
**Q.** So the termination letter that went out was not written solely by Colin Reid? It was written by a number of people at Cushman & Wakefield, correct?
**A.** It was a partnership, as I stated.
**Q.** Okay.
THE COURT: How much more do you think you have

with her? I'm just asking for the lunch break. I'm not trying to rush you.

MR. DENNEHY: I think we should take the break.

THE COURT: That's fine. You don't need to explain.

We're going to break for lunch. Was 45 minutes good yesterday? Longer, shorter, 45 minutes?

JUROR: Forty-five is good.

THE COURT: Forty-five minutes. We'll see you back at quarter to one.

(Jury exits the courtroom.)

THE COURT: All right. I'll see everyone back -- let's make it like 12:40.

(Court recessed at 12:02 p.m.)

(Jury enters the courtroom.)

THE COURT: We're going to resume. The lawyers have asked me to remind you that questions from the lawyers are not in themselves evidence. Okay? So as you see, the plaintiff is done questioning her. We've now switched to cross-examination.

MR. DENNEHY: I'm not quite finished.

THE COURT: I saw you switch places so I assumed you had. If you have more questions, go ahead.

MR. DENNEHY: At this time the plaintiff rests, Your Honor.

THE COURT: With this witness, right?
MR. DENNEHY: With this witness.

CROSS-EXAMINATION

BY MR. BERLUTI:
**Q.** Good afternoon, Ms. Hicks.
**A.** Good afternoon.
**Q.** Please describe for the Jury your educational background.
**A.** So I graduated from Ramapo College in Mahway, New Jersey, with a bachelor's degree.
**Q.** And briefly describe your work history in human resources.
**A.** So I started in the financial services industry working in human resources, and then I transitioned into commercial real estate.
**Q.** And how long have you worked in commercial real estate?
**A.** I was in commercial real estate for about eight out of the ten years.
**Q.** And you've been with Cushman & Wakefield for approximately two years?
**A.** Approximately two years.
**Q.** What is your title with Cushman & Wakefield?
**A.** Human resources manager.
**Q.** And what does a human resources manager at Cushman & Wakefield do?
**A.** Human resources managers usually manage between the on-

and off-boarding of employees, employee relations, commission changes, partnership with the actual business from the human resources perspective side of the business.

**Q**. Among the things you do in human resources is to enforce the policies that the company has with respect to human resource issues?

**A**. That is correct.

**Q**. I'd like to show you what's been marked for identification purposes as Exhibit D.

(Exhibit D marked for identification.)

BY MR. BERLUTI:

**Q**. Is it up? Do you recognize it?

MR. DENNEHY: We have an objection to this. It may call for a side bar.

THE COURT: It's not up on my screen either.

MR. BERLUTI: It's marked for identification purposes.

THE COURT: It's not on our screens. Do you have it? Do you have hard copies of the exhibit? Let's give Jarrett a minute to try and fix this. Why don't we talk at side bar about whatever the objection is.

If you guys want to move around a little bit, feel free.

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

THE COURT: What's the objection?

MR. DENNEHY: The objection was this was not produced until after her deposition. They did a rolling document production. They produced one that was inappropriate. It wasn't in the timeframe for her deposition. It came to light during the deposition that they didn't have the right document and they didn't produce this until later. She's never been able to be examined and discovery has never been taken on this document.

THE COURT: You never asked me to open discovery to look at the document.

MR. DENNEHY: It's a late-produced document and should be excluded.

THE COURT: They produced the wrong version?

MR. BERLUTI: Exactly.

THE COURT: So you knew they had this type of document that was going to be --

MR. SZAL: They produced a document that was after his termination.

THE COURT: Like a revised version of this?

MR. BERLUTI: It was dated September. The one that was produced was dated September 2015. And in the questioning, Counsel asked, "Does that mean that it came out in September of 2015?"

And she said, "I think it does mean that."

He said, "Do you have a prior one?"

She said, "Yes, I'll get it."

We got it. We produced it. And that's what this is.

THE COURT: They can have that. Assuming he lays an appropriate foundation, I'm going to admit the document.

(The following is held in open court in the presence of the Jury.)

THE COURT: Do you know if the juror screens are working? You don't have anything on there now anyway. Can someone pop up a document and let's see if the juror screens are working.

MR. WHITESELL: There's one up.

THE COURT: There's one up, but we're not looking at it.

Now it just came up. Good job, Jarrett.

BY MR. BERLUTI:

**Q**. Among the policies that Cushman & Wakefield had --

MR. DENNEHY: Objection. This goes beyond the direct examination.

THE COURT: So I'm going to overrule that because he could re-call her and ask her whatever he wants. So in the interests of efficiency, I'm going to let him have it.

BY MR. BERLUTI:

**Q**. Ms. Hicks, among the policies that Cushman & Wakefield

had in 2015, did they include policies and procedures regarding equal opportunity and affirmative action?
**A.** That's correct.
**Q.** And other policies such as disability accommodations and sexual and other harassment policy?
**A.** That's correct.
**Q.** As well as complaint procedures?
**A.** That's correct.
**Q.** I'm showing you a document. Can you please look through that and see if can you identify it.
**A.** Yes.
**Q.** I see on page 1 that the revision date -- up in the upper right-hand corner, the revision date is January of 2011. Is this the policy that was in effect through July of 2015?
**A.** That is correct.
MR. BERLUTI: I offer this as the next exhibit.
MR. DENNEHY: Objection. She wasn't there at the time of this document. She can't authenticate it.
BY MR. BERLUTI:
**Q.** When did you start with Cushman & Wakefield?
**A.** In 2015.
**Q.** And in what month?
**A.** February.
**Q.** In February 2015 and the months thereafter, did you become familiar with the policies and procedures that were

actually being used at that time and applied to Cushman & Wakefield's employees?
**A.** That's correct.
**Q.** And among those policies is the policy that you have in front of you?
**A.** Yes.
**Q.** And you know from your work and from your position that this was the policy regarding affirmative action and antiharassment policies that was in effect certainly from the time of your employment in February 2015 through July of 2015?
**A.** Correct.
MR. BERLUTI: I offer this.
THE COURT: Admitted.
(Exhibit 77 marked in evidence.)
BY MR. BERLUTI:
**Q.** I believe your testimony, Ms. Hicks, was that you first learned about the Rinsky situation after Mr. Rinsky had moved to Boston; is that correct?
**A.** That's correct.
**Q.** Now, why don't you describe what happened from your standpoint. What happened with respect to Mr. Rinsky and your becoming involved in the situation?
MR. DENNEHY: Objection. It's too broad. It deals with speculation.

THE COURT: Overruled.

**A.** So I was called by Colin. He said, "We needed to schedule some time to discuss. I have an employee." And at that time he didn't even name it was Yury. He said, "I have an employee that had already relocated without approval." So he scheduled time with myself, Andrew -- it was the three of us. We all sat down and we all talked.

During that time, I wanted to understand what happened. It was close to the Memorial Day holiday, if I'm not mistaken. So I asked him to give me some detail as to what had happened. They explained to me they had Yury, an employee that was working in the New York office that had relocated.

MR. DENNEHY: Objection. Hearsay.

THE COURT: You need to avoid talking about what other people told you. Okay?

THE WITNESS: Okay.

**A.** So during that meeting, they wanted to discuss with me options. So we sat down and we discussed what those options were. I explained to them I then needed to go back to Craig Cuyar, who was the head of IT, for him to give me any approval or any feedback from his end as the leader of the department.

BY MR. BERLUTI:

**Q.** Okay. So at the time that you met with Mr. Reid and

Mr. Hamilton, you knew at that point that Mr. Rinsky reported to Mr. Reid, who in turn reported to Mr. Hamilton, correct?
**A**. That's correct.
**Q**. But you just said that you instructed them, and you had to go to speak to Mr. Cuyar. So why is that? Why did you have to speak with Mr. Cuyar?
**A**. Because Craig Cuyar is the person that I would receive any final approval on any changes within the IT department.
**Q**. To your understanding, did Mr. Reid have any authority to approve Mr. Rinsky's request to move to Boston?
**A**. No. Because Craig Cuyar is the person that I would speak to for that type of approval.
**Q**. Same with Andrew Hamilton?
**A**. That's correct. The chain would go up to Craig.
**Q**. And we've already gone through it, and I don't want to belabor it, but the link between Mr. Hamilton and Mr. Cuyar was who?
**A**. Craig. I mean, it was Mr. -- I'm sorry, it was Colin, Andrew, Leif, Craig.
**Q**. Now, did you speak with Mr. Cuyar?
**A**. Yes, I did.
**Q**. And did you learn, as a result of speaking with him, whether or not Mr. Cuyar had ever approved Mr. Rinsky's request to transfer?
**A**. No. And he actually stated he was never aware.

**Q.** Your best estimate of when was it that you first spoke to Mr. Cuyar about --

MR. DENNEHY: Objection. Move to strike the last answer was hearsay. He said.

THE COURT: No, that's not hearsay. That is -- it's not being admitted for the truth of the statement. It's just information that she was given and then acted on.

Go ahead.

BY MR. BERLUTI:

**Q.** What is your best estimate of when you first spoke to Mr. Cuyar about Mr. Rinsky's request to move to Boston? When?

**A.** I don't remember when, but it was definitely after the 27th of May.

**Q.** Now, you were shown a series of emails between Leif Maiorini, Andrew Hamilton, and Craig Cuyar that you were not on. Do you recall that?

**A.** Yes.

**Q.** Did you have an understanding that at the end of May, into June, and into July, whether or not the role that Mr. Rinsky had in New York was going away?

**A.** No.

**Q.** Did you have an understanding as to whether it was going away?

**A.** Whether it was going away? I didn't have the

understanding that it was going away.

**Q.** As a result of that, what is -- who was it that would determine how the role that Mr. Rinsky had would be filled?

MR. DENNEHY: Objection. Foundation.

**A.** Could you rephrase that?

BY MR. BERLUTI:

**Q.** Sure. Who was it that would determine -- who was it that would make the business decision as to how Mr. Rinsky's responsibilities, duties, job tasks would be filled if Mr. Rinsky were not there?

MR. DENNEHY: Objection. Foundation.

THE COURT: If she knows.

**A.** I'm sorry. It threw me off. Can you repeat the question?

BY MR. BERLUTI:

**Q.** I understand. Mr. Rinsky had moved to Boston, correct?

**A.** Mm-hmm.

**Q.** You understood that his role was continuing in New York, correct?

**A.** That's correct.

**Q.** And Mr. Rinsky reported to Mr. Reid, who reported to Mr. Hamilton, correct?

**A.** That's correct.

**Q.** And Mr. Hamilton reported to Mr. Maiorini?

**A.** That's correct.

**Q**. Who would decide -- who within that group or amongst that group would decide how -- what IT people or how that function that Mr. Rinsky was performing would be filled?
**A**. It's my understanding --
MR. DENNEHY: Object.
BY MR. BERLUTI:
**Q**. If you know.
**A**. It would be Craig Cuyar. He would be the person that would have the partnership conversation with all those leads.
**Q**. And before it got to Mr. Cuyar, what is your understanding as to who else would discuss it?
**A**. Leif. Leif would be the person.
MR. DENNEHY: Same objection.
THE COURT: Overruled.
BY MR. BERLUTI:
**Q**. Is there anything unusual in the information technology department about bringing on consultants to fill an unmet need?
MR. DENNEHY: Objection. Foundation.
THE COURT: Just ask her if she knows. Okay?
BY MR. BERLUTI:
**Q**. Do you know, based upon your experience, whether there's anything unusual at Cushman & Wakefield for the information technology department to bring on consultants to fill unmet needs?

**A**. No, that's not unusual.
**Q**. Okay. What is the human resource role when a consultant is brought on to fulfill an unmet need?
**A**. It's to go through the same series of questions that we would a new hire, meaning the EAF form would need to be complete with the details from the department that's requesting the consultant.
**Q**. Okay. Who decides if the need to be met would be filled by a consultant or by an employee?
MR. DENNEHY: Objection. This is just a speculative situation now.
MR. BERLUTI: I'll withdraw it.
BY MR. BERLUTI:
**Q**. In the information technology department in 2015, do you have an understanding as to who would decide whether that unmet need would be filled by a consultant or by a new hire?
**A**. No, I don't. It would go through the business. I don't know who in the business would decide that.
**Q**. It would be a business decision?
**A**. That's what I mean. It would be a business decision.
**Q**. Now, you were asked some questions on direct about a Jay Leiser. Do you recall that?
**A**. Yes, I do.
**Q**. I'm going to ask it a little bit more broadly. Are you familiar -- strike that.

In connection with your discussions with Mr. Cuyar as well as your own experience there, were you aware of other people in the information technology department that sought transfers to other offices?

**A**. Yes.

MR. DENNEHY: Objection. We didn't even mention the name Jay Leiser.

MR. BERLUTI: There's a reference in an email to someone that transferred, Judge. She was asked about it.

THE COURT: Is that your objection, that the name wasn't made specific?

MR. DENNEHY: He's going down the whole road that really wasn't open on our examination. We just mentioned one transfer that she had known of, and we didn't even mention anything --

(WHEREUPON, at this point in the proceedings, there was a conference held at the bench outside the hearing of the Jury.)

Bench conference held off the record.)

MR. DENNEHY: He can ask that question, I agree. But what he's about to do is he's going to ask a question about a transfer before she ever got there. He's going to ask questions that's subject of a Motion in Limine. He's --

THE COURT: You can ask about the transcript of it. I thought that was the same person that he asked about.

MR. BERLUTI: It is, but there's also a couple of others. The issue in this case is state of mind.

THE COURT: You can have the question. She just may not be the person to ask.

MR. BERLUTI: Just hear me out, Judge.

THE COURT: Okay.

MR. BERLUTI: This person is the right person to ask to this extent. She's the one that spoke to Craig Cuyar. He's the one that made the ultimate decision. His state of mind is he wanted to treat Yury Rinsky the way they treated other people. And I should be able to have that to show that this was done consistently.

THE COURT: You're definitely entitled to have that. What's this witness' competency?

MR. BERLUTI: She was directly involved in it. She wasn't directly involved in every termination. She was directly involved in dealing with Craig Cuyar. She's the HR manager, okay? And she had to look at the --

THE COURT: She can talk about her dealings with -- she can't talk about things that's in these other -- this other guy's personnel file that she wasn't present for and didn't know.

MR. BERLUTI: They're business records. As a matter of fact, Craig Cuyar reported to her.

MR. DENNEHY: She doesn't have knowledge.

MR. BERLUTI: If I can speak without being interrupted.

MR. DENNEHY: You talk so much that no one else can talk.

THE COURT: Stop it.

MR. BERLUTI: What she was instructed to do was to treat Mr. Rinsky the way another employee was treated, and he referenced the person that he reported to.

THE COURT: How did she find out how that person was treated?

MR. BERLUTI: Because she went to the personnel files. Those are business records.

MR. SZAL: Which weren't produced. That's a subject of Motion in Limine.

MR. DENNEHY: This is a major issue.

MR. SZAL: Let me finish. You said Robert Maison. There's no -- that's a redacted termination report.

THE COURT: Company policies and practices?

MR. SZAL: I think it's the fourth one. You denied the motion, but what you said was if it wasn't produced, it doesn't come in. What we got was a name and a termination report with a redaction. We don't even know who it was.

THE COURT: Did you ask for it?

MR. SZAL: Yes.

MR. BERLUTI: Here's a report that was run

expressly for what they wanted. It's in the IT department and it's all the people that were terminated and the reasons for the termination because they wanted a point of fact. There's a number in there with Craig Cuyar that we've already discussed.

THE COURT: I remember the email.

MR. BERLUTI: An email that's going to be offered, Judge, is where she emails to Mr. Cuyar saying, "Do you remember the name of Stephen's employee who was terminated for relocation by approval? I am taking a look at Nicole's old files to view the similar protocol. The name is Robert Maison." That's as far as we're going into it.

THE COURT: That's fine. You guys don't have to be so nasty to each other.

(The following held in open court in the presence of the Jury.)

BY MR. BERLUTI:

**Q.** Ms. Hicks, you were asked questions on direct about an individual that transferred as a result of his wife, who was a dentist, got a job in Florida. Do you recall that line of questioning?

**A.** Yes. I was asked yesterday.

**Q.** What was that employee's name?

**A.** Jay Leiser.

**Q.** And what happened in connection with that transfer? How

was that treated by Cushman & Wakefield?
**A.** Jay Leiser asked his direct manager to transfer to -- I believe it was the Florida office for personal reasons. His wife was becoming a dentist. It went up the food chain to Leif. Leif then brought it to Craig Cuyar, and that's when I was pulled in.
Craig Cuyar advised that he needed to -- it was denied. The request was denied -- and got options that he can commute into the office, he can resign from his position, or his role would be terminated. So he chose to commute into the office, and he currently commutes.
**Q.** In your discussions with Mr. Cuyar, did he give you direction as to how he wanted to treat Mr. Rinsky's situation?
**A.** Yes. The same as he did a previous employee.
**Q.** Okay. You didn't know the name of that employee; is that correct?
**A.** No, I didn't.
**Q.** So you emailed him and asked him who the name of that employee was?
**A.** Correct.
**Q.** I'm going to show you what's been marked for identification F.
(Exhibit F marked for identification.)
BY MR. BERLUTI:

**Q.** Do you recognize this email from you to Mr. Cuyar asking the name of the person he was referring to in his response?
**A.** Yes.
**Q.** And this was done on June 8, 2015?
**A.** Correct.
MR. BERLUTI: I offer this email chain into evidence.
THE COURT: Any objection?
MR. DENNEHY: Yeah. All the bases that's we gave at side bar. The scope -- to be able to cross-examine with this has been limited because of that. And it's not relevant -- we don't know if it's relevant because we haven't gotten any discovery on it.
THE COURT: It's admitted.
(Exhibit 78 admitted in evidence.)
BY MR. BERLUTI:
**Q.** What was the name the person that Mr. Cuyar informed you about?
**A.** His name was Robert Maison.
**Q.** What happened with Mr. Maison's request for transfer?
MR. DENNEHY: Objection. Side bar. He's gone beyond it.
THE COURT: Overruled.
**A.** His request was also denied, but he decided to resign.
BY MR. BERLUTI:

**Q.** Was he given the opportunity to resign or to remain?
MR. DENNEHY: Objection. Foundation.
THE COURT: Lay a foundation, please.
BY MR. BERLUTI:
**Q.** What options was Mr. Maison given?
MR. DENNEHY: Objection. Does she even know?
THE COURT: Do you know what options Mr. Maison was given?
THE WITNESS: Yes, because I spoke --
MR. DENNEHY: The basis of her knowledge.
THE COURT: How do you know that?
THE WITNESS: I spoke with Craig Cuyar, who was the head of IT.
MR. DENNEHY: Objection. Hearsay. She wasn't even there when this happened.
THE COURT: She can testify as to what he told her. If it needs a limiting instruction, we'll give it a limiting instruction.
BY MR. BERLUTI:
**Q.** Go ahead.
**A.** I spoke with Craig Cuyar when I asked him what happened with this particular employee. Once I spoke with Craig Cuyar, I went to his personnel file, and I saw that he formally -- well, he resigned from his position. I asked Craig Cuyar, I said, "Craig, can you confirm to me what

happened in this case?"

He said to me, "He had the same options. He can resign, he can come into the office, or his role would be terminated."

MR. DENNEHY: Objection.

THE COURT: I'm going to give you a limiting instruction on that. So this is what's called hearsay. It doesn't come in for the truth of the matter asserted, but it comes in for what he told her. She doesn't know if it's true or not because it's only what he told her, but it comes in for the fact that that's what he told her. And then she takes that information and does whatever she does with it because he gave it to her. Okay?

Go ahead, Mr. Berluti.

BY MR. BERLUTI:

**Q**. And you were aware that Colin Reid had recently transferred from the New York office to the Miami office, correct?

**A**. Yes, I was aware.

**Q**. And the other request for relocation was Mr. Rinsky, correct?

**A**. That's correct.

**Q**. And he elected not to resign or to commute and he was terminated, correct?

**A**. That is correct.

01:14:38 MR. BERLUTI: Now I'd like to look at Exhibit 57,
01:14:40 please, the bottom half from Craig Cuyar to Bill Wolf.
01:11:07 BY MR. BERLUTI:
01:14:58 **Q**. Again, this is Exhibit 57. On July 3, 2015, Mr. Cuyar
01:15:07 sent an email to Bill Wolf. Who is Bill Wolf?
01:15:10 **A**. Bill Wolf is the line manager for Jay Leiser.
01:15:14 **Q**. And you were copied on this email, as well as Leif
01:15:17 Maiorini, correct?
01:15:18 **A**. That's correct.
01:15:19 **Q**. And Mr. Cuyar says, "Bill. Thanks for the additional
01:15:24 information and perspectives on Jay. I have considered your
01:15:27 request but need to stand firm on the decision to not allow
01:15:32 Jay or others to relocate at this time. We seem to have a
01:15:39 number of requests recently, mostly from the service design
01:15:43 team, to work from other locations. These individuals were
01:15:46 all hired with full knowledge that their roles were based in
01:15:48 New York and accepted our offer of employment. We cannot
01:15:55 allow certain service design team members to work from C&W
01:16:01 locations in other states while denying similar opportunities
01:16:03 for others.
01:16:04 I would like for our IT organization to maintain a
01:16:07 consistent policy for all employees so that we treat everyone
01:16:13 fairly and provide them with the same employment
01:16:15 opportunities. This decision is firm and is made with the
01:16:19 desire to provide for consistent treatment of staff and to

eliminate potential employment disputes and subsequent litigation if we don't."

I'd like to direct your attention to Exhibit 33.

MR. DENNEHY: There was no question made on Exhibit 57. He just read it.

MR. BERLUTI: It's in evidence.

THE COURT: You can't read it. She needs to read it, but go ahead.

BY MR. BERLUTI:

**Q**. All right. We'll go back to 57. Let me ask you this, Ms. Hicks. Is what Mr. Cuyar wrote to Mr. Wolf consistent with all of your conversations with Mr. Cuyar in this June and July 2015 timeframe?

MR. DENNEHY: Objection.

THE COURT: Basis?

MR. DENNEHY: One, foundation. Two, it's speculation. And three, he hasn't put any of the documents of this type of nature, this type of discussion, or any evidence whatsoever other than this at this period of time.

THE COURT: You can lay a better foundation. But it's not speculative. Ask her if she had any other conversations, during what timeframe they took place.

MR. BERLUTI: I'd be happy to, Judge.

BY MR. BERLUTI:

**Q**. Ms. Hicks, did you have some conversations with Mr. Cuyar

in the May, June, and July 2015 timeframe?
**A.** Yes.
**Q.** And did those conversations include discussions about employees that had made requests to transfer from New York to another Cushman & Wakefield office?
**A.** Yes.
**Q.** And is what Mr. Cuyar wrote in Exhibit 57, the email that I just read on July 3, 2015, consistent with the discussions that you had with Mr. Cuyar on this topic of employee transfers?
**A.** Yes.
**Q.** Let me direct your attention to Exhibit 33, please.
Actually, I'm sorry. You weren't in on that. I'm not going to go there.
Now, when you were asked questions about a notice of a meeting between Colin Reid and Andrew Hamilton, this was in connection with Exhibit 15, and it was a request for a meeting that Andrew sent to Colin Reid for a meeting on May 19, 2015. Do you recall those questions?
**A.** Yes.
**Q.** Do you remember that exhibit?
**A.** Yes.
**Q.** Do you have any personal knowledge whether Mr. Reid and Mr. Hamilton actually met on May 19?
**A.** No, I don't.

**Q.** Now, there were questions about retaining Edgardo Felix. Do you recall those questions?
**A.** Yes.
**Q.** And that was a decision to retain Mr. Felix, that was a decision made by the business side people?
**A.** That's correct.
**Q.** And they executed a consulting contract for Mr. Felix?
**A.** That's correct.
**Q.** That didn't require your direct involvement?
**A.** No. I don't get involved in the contracts.
**Q.** Now, you learned -- on or about June 22, you heard from Mr. Rinsky, correct? You knew that Mr. Reid and Mr. Hamilton spoke to him that morning. And based upon your discussions with them, they informed him what Cushman & Wakefield's position was, correct?
**A.** That's correct.
**Q.** And Mr. Rinsky called you?
**A.** Yes -- well, actually, no, I called him. I called him.
**Q.** Okay. And in that discussion he told you that -- what did he tell you exactly?
**A.** He said to me, "I spoke with Colin. I don't know what's going on here. I had formal approval. I had approval to move."

So I asked him, I said, "This is news to me. Can you provide me any documentation that states you had

approval?"

He said, "I'll send you a few emails. I'll send you the few emails that I have."

I said, "Because from my understanding, there was no approval."

**Q.** And as a result of the information that Mr. Rinsky gave you, what did you do?

**A.** I brought that information. I circled back with the team. I said, "He's bringing me new information that I now need to investigate because he's saying that he had approval."

**Q.** Do you recall that the three emails that he sent you, one was the email on May 17 saying, "I'm moving on May 27." Do you recall that?

**A.** Yes.

**Q.** And the other email that he sent you was Colin Reid's response saying, "Okay, we'll speak on Tuesday." Is that the second?

**A.** That's correct.

**Q.** And the third one was the email string back and forth with Scott Sommer saying, "I will need my desktop when I get assigned a cubicle in Boston in a couple of weeks." Do you recall that email?

**A.** Correct. Yeah, I saw that today.

**Q.** Did he send you anything other than those three emails?

**A.** No, not that I remember.
**Q.** As a result of receiving -- as a result of having a conversation with him and him saying, "I got approval from Colin" and receiving these emails, what did you do?
**A.** I then went back to Colin and I went back to Leif -- I went back to all the IT people that were involved, and I said, "Based upon this information that I have, I'll do a full investigation and ask everyone's perspective, but I don't have anything in writing that was solid enough for me to say he had formal approval."
**Q.** And in May of 2015, who was the only person in the IT department that was authorized to give approval for Mr. Rinsky to move from New York to Boston?
**A.** It would have been Craig because Craig actually signs the EAF forms.
**Q.** So you were asked some questions about a letter dated July 14 that Mr. Reid sent to Mr. Rinsky that you said was drafted as part of a partnership with yourself, Mr. Reid, and Sue Zamorski had some input on, correct?
**A.** That's correct.
**Q.** First of all, who is Sue Zamorski?
**A.** Sue Zamorski is the head of employee relations for Cushman & Wakefield.
**Q.** Where is she located?
**A.** She's located in Chicago.

**Q.** And as a result of your partnership, you developed a letter that you felt was accurate?
**A.** Yes.
**Q.** What was the purpose of sending that letter to Mr. Rinsky?
**A.** The purpose was to summarize the events as they happened.
**Q.** Did Mr. Rinsky ever respond to that letter?
**A.** Not that I remember.
**Q.** Do you recall him e-mailing you after receiving that letter?
**A.** I don't remember. I'm trying to figure out when he emailed me, meaning like me and John Santora, when he sent all that information out as -- and to when he got the letter. I just don't remember.
**Q.** Okay. Let me see if I can help you.
MR. BERLUTI: Let's take a look at Exhibit 47, please. The bottom part.
BY MR. BERLUTI:
**Q.** Please take a look at Exhibit 47, this portion the email string. Is your memory refreshed as to when Mr. Rinsky emailed you?
**A.** Yes. So it was June 22nd.
**Q.** I was just asking you about the letter that he was sent on July 10, 2015. Do you recall -- having seen this now, do you recall any communications from Mr. Rinsky in response to

the letter that he was sent by Mr. Reid on July 10, 2015?
**A**. No, I don't recall.
**Q**. In any of your conversations with Craig Cuyar, Leif Maiorini, Andrew Hamilton, or Colin Reid in this May, June, July 2015 timeframe, was Mr. Rinsky's age ever discussed?
**A**. No, it was never discussed.
**Q**. What role, if any, to your knowledge did his age play in the decision not to approve his transfer?
**A**. Nothing at all because it was never discussed.
**Q**. Same questions with disability. In any of your discussions with Mr. Reid, Mr. Hamilton, Mr. Maiorini, or Mr. Cuyar, was Mr. Rinsky's health brought up in any way, shape, or form?
**A**. No. I never discussed that.
**Q**. What role, if any, to your knowledge did his health play in the decision to not approve his transfer to Boston?
**A**. Nothing at all.
MR. BERLUTI: Nothing further.
THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. DENNEHY:
**Q**. It's fair to say that the business side of things didn't keep you in human resources apprised of all the different facts related to Mr. Rinsky, correct?
**A**. Correct. We didn't talk about everything.

**Q.** And fair to say that you only have in your role a limited amount of information on some of these issues?
**A.** Can you give me specifics when you say "some of these issues"?
**Q.** Well, I think you just went on to talk about in some length and detail with your counsel about Jay Leiser when you testified that his transfer was denied and he was working in the New York office, correct?
**A.** He's commuting.
**Q.** Isn't it true that he's actually working out of Florida?
**A.** Working out of Florida today or working out of Florida in 2015?
**Q.** Today. At this time.
**A.** I don't know where he's working at this time. I don't support that group anymore.
**Q.** Fair to say that Leif would know better than you where he's working today?
**A.** Likely.
**Q.** You were shown the July 3 email from Craig Cuyar about having a consistent transfer progress -- process in place, and your counsel just went over that with you, correct?
**A.** That's correct.
**Q.** Isn't it true that prior to July 3, him sending that email, that he had never sent an email saying, "We need a consistent transfer process in place"? Isn't that true?

**A.** I don't know what he sent out prior to that date if I wasn't copied on it.
**Q.** Right.
**A.** To me, that's the email that I received, correct.
**Q.** That's the one. And isn't that because they were starting to go through the merger process with this big company?
**A.** I don't think it had anything to do with the merger.
**Q.** Okay.
MR. DENNEHY: We rest with this witness.
MR. BERLUTI: Your Honor, the only thing I have, Judge, is nothing specifically with this witness. I simply move in evidence the joint trial exhibits. I don't think that's been done. I just want to move them into evidence. That's all.
THE COURT: Those are all the ones that are agreed upon?
MR. BERLUTI: Yes.
THE COURT: That's fine.
MR. BERLUTI: I have no further questions of this witness.
THE COURT: You're excused.
Call your next witness, please.
MR. SZAL: Plaintiff calls Leif Maiorini.
THE COURT: If you all want to stand up a little

bit and move around while they're switching places, that's fine.

THE CLERK: Raise your right hand.

(Leif Maiorini duly sworn.)

THE CLERK: Please state and spell your full name for the record.

THE WITNESS: Leif Maiorini, L-E-I-F M-A-I-O-R-I-N-I.

DIRECT EXAMINATION

BY MR. SZAL:

**Q**. Good afternoon, Mr. Maiorini?

**A**. Good afternoon.

**Q**. You and I met for a deposition over a month ago in New York, right?

**A**. Yes.

**Q**. Welcome to Boston.

**A**. Thank you.

**Q**. You were hired by Cushman & Wakefield in what year?

**A**. 2009.

**Q**. What role were you hired for?

**A**. I started off in strategy and planning.

THE COURT: Could you do me a favor and pull that microphone closer.

THE WITNESS: I'm sorry. Is that better?

THE COURT: Yes.

BY MR. SZAL:

**Q.** What year did you graduate college?

**A.** Undergraduate 1989 and then graduate 2003.

**Q.** You went to LaSalle and then you went to the Patton Wharton School?

**A.** Yes.

**Q.** And your current role now is different, right?

**A.** Slightly different. I do service line technology. So all the technology systems it supports are front end delivery services.

**Q.** You have a number of direct reports, right?

**A.** I do.

**Q.** Do you know how many?

**A.** Six.

**Q.** And is one of those Andrew Hamilton?

**A.** It is no longer Andrew Hamilton, but he was one of my direct reports previously, yes.

**Q.** You had testified, when we met in New York, that you had eight direct reports, and Mr. Hamilton was one of them.

**A.** In my previous role, yes.

**Q.** So that's changed between when we met last?

**A.** I think it was just changing when we met.

**Q.** Okay. Fair enough. In 2015, the January to June timeframe, who was it that you directly reported to?

**A.** Craig Cuyar, who was our global CIO.

01:34:52 **Q.** Okay. We've heard his name a number of times in this lawsuit. He no longer works for the company, right?
01:34:59 **A.** He does not.
01:35:01 **Q.** In 2015, were you based out of the New York headquarters?
01:35:12 **A.** Yes.
01:35:12 **Q.** Did you perform other work in other places?
01:35:14 **A.** On occasion. I had to travel from time to time. But yes.
01:35:19 **Q.** You performed some work in Chicago, right?
01:35:21 **A.** Chicago, St. Louis, yeah.
01:35:25 **Q.** In this 2015 timeframe -- you have an understanding of Mr. Rinsky's termination was in July of 2015, correct?
01:35:42 **A.** Mm-hmm. Yes.
01:35:43 **Q.** Okay. So during the timeframe where the subject of his employment became an issue, there was a merger going on with a different company; is that correct?
01:35:52 **A.** Yes.
01:35:53 **Q.** And that company is DTZ?
01:35:56 **A.** DTZ.
01:35:59 **Q.** And as a result of this merger, there was a lot of work going on, correct?
01:36:03 **A.** Yes.
01:36:03 **Q.** Okay. And that's because the two companies are very large, right?
01:36:11 **A.** A little bit over 2 billion each.

**Q.** Two and a half billion, right?
**A.** Yeah, about that.
**Q.** And as a result of this merger, were there any redundancies?
**A.** In that timeframe or specifically?
**Q.** Well, in that timeframe or as a result of the merger going forward.
**A.** Yes.
**Q.** So you have two companies merging. You have maybe two people doing the same role, coming together, and you've got to decide which one you're going to keep and which one you're going to let go?
**A.** Correct.
**Q.** And that's actually what happened to Mr. Cuyar, correct? Somebody was doing his role at DTZ and he was let go?
**A.** Correct.
**Q.** Did you play any role in deciding, from a staffing perspective, of who was going to stay and who was going to go?
**A.** Specifically which role?
**Q.** Any role under your direct report.
**A.** Yes.
**Q.** And your role currently, at least the last time we met, was solely revenue generation, correct?
**A.** Yes. That's what I'm focused on now, is revenue

generation.
**Q.** Generating revenue for the different parts of the company or just the IT department?
**A.** Through all of our service lines that we operate in, working with them to figure out how we can make them either more efficient or we can increase market share through different services that we don't offer today.
**Q.** Okay. And so did you have an office or a cubicle in the New York City headquarters?
**A.** Yes.
**Q.** And that's 1290 Avenue of the Americas in Midtown?
**A.** At that time it was 1290. Now it's 275 Madison, but relatively close to each other.
**Q.** Did you have an office or a cube?
**A.** Cube.
**Q.** Cube. Okay. Back in 2015 -- again, the time relevant to this proceeding -- you sat in close proximity to Colin Reid, correct?
**A.** Yes.
**Q.** And Andrew Hamilton?
**A.** Yes.
**Q.** And Craig Cuyar?
**A.** Craig was further down the hall, but we were on the same physical floor of the 1290 building.
**Q.** Okay. Is it fair to say that everybody in your

management team was pretty friendly with each other?
**A.** Yeah. I think that's fair.
**Q.** At some point Andrew came to you regarding a transfer request for Mr. Reid; is that fair to say?
**A.** Andrew and I talked about it. My initial recollection is my initial conversation was with Colin.
**Q.** Colin directly --
**A.** Yes.
**Q.** -- about his relocation to Miami?
**A.** Well, it was actually that he -- it wasn't about Colin -- because Colin himself had relocated to Miami prior to that. That wasn't the conversation that I thought you were referring to. You were referring to the conversation about Mr. Rinsky, correct?
**Q.** No. You have an understanding that Mr. Reid currently is based out of Miami, right?
**A.** Yes.
**Q.** At a certain time he was based out of the New York City headquarters?
**A.** Correct.
**Q.** And he transferred?
**A.** Yes.
**Q.** Did you have any input on his transfer?
**A.** I did.
**Q.** What input did you have?

**A.** Well, we worked with -- Colin was in the transfer process, let's say, for almost a year, if not longer. He had mentioned that he had family in Miami, that he was eventually looking to retire there, would we entertain him moving there.

Andrew Hamilton and I discussed those options, discussed that with HR, with Craig Cuyar, and talked about what a transition plan would need to look like to make that happen.

The group that Colin works with is extremely high maintenance, if you will. And so we needed to make sure that those individuals were comfortable with him being able to work remotely before we would approve that transfer.

**Q.** Eventually did you land on a decision as to how you felt about it?

**A.** Yeah.

**Q.** What was that?

**A.** We approved his transfer, and he moved to Miami to work out of our Miami office.

**Q.** The transfer process that you just talked about, can you describe what your understanding is of this transfer process?

**A.** Sure. An employee will make an overture to their manager. Their manager will then take it up the food chain, if you will. Craig has the ultimate say, as the global CIO, as to whether that transfer would be approved or not.

But there's an HR process that has to get done as

well. If there's going to be approval, we have do to what's called an employee action form, which is basically like -- it's the paperwork to make the transfer happen because they'll need office space in a new location. There's different payroll taxation, of course, because if you work in New York City, there's different local taxes than there are in, let's say, Florida or Miami that have to be accounted for. So all of those things have to be worked out prior to an employee being able to move.

**Q.** Is HR the final step, or is that -- when does HR get involved? What's your understanding of that?

**A.** HR would -- when the employee requests the transfer, we make HR aware of that, and Craig would be the final -- or whoever is holding that role as the CIO would be the final approver of whether that would be allowed to happen or not.

But HR would have to do the final processing of the employee action form, and then that would flow through to payroll and all of the other areas it needs to flow through in order for that employee to be basically activated in that new location.

**Q.** When an employee makes a transfer request to their manager, is it fair to say that the manager takes it from there?

**A.** Yeah. I think that's fair.

**Q.** They do whatever is necessary to get the approvals and

then report back to the employee, correct?
**A.** Correct.
**Q.** So the employee doesn't have to go desk to desk, to you, to Craig, to whoever? They can just rely on what their manager tells them, right?
**A.** Yes.
**Q.** Mr. Reid's transfer was obviously approved. He's in Miami. Those transfer communications, other than this employee action form that you spoke about, those are all verbal communications, right?
**A.** I don't know. They were definitely verbal. Whether there's emails behind those or not, I don't know.
**Q.** I'm going to pull up his deposition.
THE COURT: Jarrett, not on the juror screens, please.
BY MR. SZAL: When we met a little over a month ago when we were talking about Mr. Reid's transfer, you said, "It was definitely verbal. I'm sure there's stuff in emails and writing, but I can't say for sure. That, I don't recall. But definitely we talked about it, there's no doubt, and I'm sure there's HR paperwork that's associated with it."
So it was definitely verbal, correct?
**A.** Yeah, I definitely agree with that statement.
**Q.** Okay. And are you aware of any emails or anything with respect to Mr. Reid's transfer that you were involved with?

01:44:17 **A.** I said I don't know. I don't specifically recall.
01:44:20 **Q.** Do you know if you sent an email to Mr. Reid saying, "At
01:44:25 least at my point in the chain of command, it's okay with
01:44:29 me"?
01:44:29 **A.** I don't recall doing that.
01:44:30 **Q.** The systems that Mr. Reid and Mr. Rinsky were working on,
01:44:42 the AS/400 system, that's an old system, right?
01:44:46 **A.** It's an old computer-based platform that we run our
01:44:50 commissions accounting software on, yes.
01:44:52 **Q.** About 30 years old, right?
01:44:54 **A.** Twenty-seven to thirty years, yeah.
01:44:56 **Q.** And your brokers -- you work with commercial real estate
01:45:01 brokers, right?
01:45:05 **A.** Correct.
01:45:05 **Q.** And these brokers, they do some of the largest real
01:45:08 estate deals in the world, right?
01:45:09 **A.** Yeah.
01:45:10 **Q.** These are deals that are in the millions and millions of
01:45:13 dollars, right?
01:45:14 **A.** Can be, yup.
01:45:17 **Q.** And you have very large properties, correct? One of your
01:45:23 properties that you interact with is One World Trade Center;
01:45:26 is that correct?
01:45:26 **A.** Yes.
01:45:27 **Q.** The Freedom Tower in New York?

**A.** Yes.
**Q.** The systems that Mr. Reid manages, he manages -- it controls the commission splits on those properties, correct?
**A.** Correct.
**Q.** Can you explain what commission splits are?
**A.** Sure. So for each transaction that happens, in this case it's kind of -- if you think about it in retail real estate, you have a broker who helps you sell your house or who helps you buy a house. There's a commission percentage that each of them get as a result of that transaction.
In commercial, it's the same thing. So there's a contract with our commercial brokers. They have different commission splits based on the size of the transaction, based on, in some cases, the amount of money that they've transacted over the year, things of that nature.
If they're working with other brokers in the firm, they'll have a pre agreement on how they'll split that commission amongst the other brokers.
**Q.** So is it fair to say there's a lot of sensitivity around the systems that Mr. Reid and Mr. Rinsky were working on because they control this commission system?
**A.** Absolutely, yes.
**Q.** And if somebody's out of the office, that could have an effect on the commission system, correct, if they're not able to be at work?

**A.** Correct.
**Q.** Now, with respect to either Mr. Reid's transfer or Mr. Rinsky's or anyone else's that has to go up the chain to Mr. Cuyar, it's possible --
You're all sitting in the same place, right? If you're all in the office on the same day, you could really just go desk to desk and get it all hashed out in one day, couldn't you?
**A.** Theoretically possible, sure.
**Q.** Is there any particular reason why Mr. Reid's transfer took a year if you're all sitting in the same place?
**A.** Mr. Reid's transfer didn't take -- it didn't take a year because of communications amongst people. It took a year because we wanted to make sure that he could physically do that job from a remote location because he deals with a lot of our commission accounting staff.
They're used to basically, when they have an issue, getting up out of their chair, walking over to either Colin or Yury or Anna or one of those individuals, and asking them a question directly or helping them troubleshoot because, as you said, it's very time sensitive. They want their answers immediately because there's real dollars at the other end of that transaction.
**Q.** With respect to personal interactions, being able to, as you say, go over to Colin or Yury or whoever, Anna, they can

just email them too, right?
**A.** Sure.
**Q.** They can have a conference call, right?
**A.** Absolutely.
**Q.** You guys have video conferences, Skype, whatever?
**A.** Yeah.
**Q.** Okay. Did you work with those systems frequently, or do you have in-person meetings all the time?
**A.** Our culture tended to be lots of in-person meetings at Legacy Cushman & Wakefield, but we've used all of those technologies that you've mentioned as substitutes when we needed to.
**Q.** There was some testimony earlier that there was an employee named Jay Leiser that was seeking a transfer down to Florida?
**A.** That's correct.
**Q.** Does he or did he report to you?
**A.** No, he -- well, he reported in my organizational structure, but through one of my direct reports, Bill Wolf.
**Q.** Okay. Was there anybody between you and Bill Wolf?
**A.** No.
**Q.** So this is not in the same department as Mr. Reid and Mr. Rinsky, correct? This is a different --
**A.** It was all under my organization, but you're correct, there were different branches of that group. So Andrew

Hamilton and Bill Wolf were peers, if you will, if that helps.

**Q.** With respect to Andrew Hamilton, Bill Wolf is the Andrew Hamilton of the Jay Leiser transfer, right?

**A.** Yes.

**Q.** When did you first become aware that Mr. Leiser wanted to transfer to Florida?

**A.** If I recall, it was, I'm going to say, in the July timeframe.

**Q.** And did you have any understanding of why he wanted to go to Florida?

**A.** Yeah. I think his wife had an opportunity in Florida, so she was going to move from New York. He wanted to still stay with Cushman & Wakefield. He knew that we had an office near where his wife was taking her position in Boca Raton, and he asked for permission to work out of the Boca Raton office.

**Q.** Is he still employed with the company, do you know?

**A.** He is.

**Q.** Still working from Florida?

**A.** He is.

**Q.** When you found out about the this request, did you have any opinion as to whether or not it should be approved?

**A.** I did.

**Q.** What was that?

**A.** I thought that it should be approved. Most of Jay's work

was with offshore teams in India, and I didn't see any difference between him sitting in New York City and doing those remote interactions and/or being in Florida and doing those interactions.

**Q.** Isn't it true that you felt like he was in a difficult situation with his wife and her dental practice.

**A.** Well, sure. But policy would be policy. If we couldn't do the transfer, we couldn't do the transfer. But as a human being, absolutely. I wanted to be able to make him whole.

**Q.** You wanted to try and work with him?

**A.** Absolutely, yeah.

**Q.** As part of your consideration, was what he earned for salary part of that?

**A.** No.

**Q.** Isn't Florida a little easier cost of living than New York City?

**A.** It definitely is, yeah.

**Q.** Were you aware of any time that the company wanted to address his compensation model in connection with his move to Florida?

**A.** Yeah. I think Craig brought that up, and we worked with HR on that to figure out what the difference in comp would be if he were employed in Boca Raton versus if he were employed in New York City.

**Q.** Do you know if there was ever a decision on that? Was a

condition of his transfer that he had to take a reduced salary?

**A.** I don't know.

**Q.** I think part of your deposition testimony was that the compensation model for employees that are working at Cushman & Wakefield is based because it's a New York City company?

**A.** For people who are employed in New York, absolutely, yeah.

**Q.** New York is an expensive place to live, right?

**A.** Absolutely.

**Q.** More expensive than Florida?

**A.** Yes.

**Q.** And Boston?

**A.** Yes.

**Q.** Was there any trial here -- I think you said with Mr. Reid that you wanted to see how it worked out before given the final okay. With Mr. Leiser, was there any similar-type situation?

**A.** Yeah. There actually wasn't even a trial period. When we floated the idea of Jay moving to Florida, Craig had pretty much the same response, that he was not going to entertain people doing work that were hired in New York and other geographies, and that Jay would basically have to make arrangements to go back and forth from Florida to New York if he wanted to keep his job.

01:53:27 **Q.** But before he was actually permanently transferred to Florida, was there some sort of trial basis where he performed work from Florida, the company evaluated that work and --
01:53:43 **A.** (Witness shakes head negatively.)
01:53:43 **Q.** There's no experimental-type basis where you did that?
01:53:46 **A.** No. I mean, not to my knowledge, no.
01:53:53 **Q.** The role he works out of in Florida now is the same as when he worked in New York, the title?
01:54:04 **A.** Yes.
01:54:07 **Q.** Is it fair to say that an important factor in your evaluation of his transfer request was based on your understanding how he went about it?
01:54:20 **A.** Absolutely.
01:54:20 **Q.** Making sure that he got the protocols approved that he understood?
01:54:29 **A.** Yes.
01:54:30 **Q.** People under your charge, how are they informed of what the protocols are to transfer?
01:54:35 **A.** When they bring it up to their manager, we normally go through what the steps are -- what's going to happen basically. And pretty much everybody knows that Craig is going to be -- at least at that time Craig was going to be the final say as to whether we were going to be able to do that transfer or not, and it would also need HR approval.

**Q.** But this is a verbal from manager to their reports?
**A.** Correct.
**Q.** There's no handbook or policy that's written that's in the coffee room that says, "If you want to transfer, here's how you go about it," right?
**A.** There's no sign in the coffee room, no.
**Q.** Okay. Did you communicate those protocols to Jay Leiser?
**A.** No.
**Q.** Who would have done that, Bill? Wolf?
**A.** Bill Wolf would have done that, yes.
**Q.** Do you know what, if anything, Bill said to Jay when Jay said, "I want to go to Florida"?
**A.** I don't. I know Bill told him it would have to go to Leif and then it would have to go to Craig, and he would work with us on finding out if we can do that or not. But that was all verbal communication between Bill and I.
**Q.** This is the deposition again. A little bit ago, you didn't seem to recall that there was any kind of trial or experimental period. I just want to read to you a part of your deposition a little over a month ago. My question was, "Is it fair to say that with respect to Mr. Leiser, there was some sort of trial period to determine whether or not this would work?"
Your answer was, "Yeah, I think that's fair."
**A.** He went back and forth between Florida and New York for

six months on his own dime, so I think that that's fair. I guess -- you know, it's how you determine trial period. There was no formal, quote/unquote, trial period. We didn't make a decision on -- he was going back and forth for six months. We didn't make any other determination. At that point he asked if he could transfer, and we granted the transfer at that time.

**Q.** Now, with respect to Mr. Rinsky, is it fair to say you didn't really have a lot of work interactions with him?

**A.** No.

**Q.** You might see him in the office, you knew he liked tea, you knew he had a daughter, you knew he had some grandchildren, right?

**A.** I didn't know he had grandchildren, but I knew he had a daughter.

**Q.** With respect to Mr. Rinsky's work schedule, what input, if any, did you have in his work schedule?

**A.** None.

**Q.** Did you have any input with respect to whether he could work three or four days remotely from his home?

**A.** No.

**Q.** And you didn't have any input on whether he had to be in the office one or two days a week, correct?

**A.** No.

**Q.** At that point, it didn't concern you, right?

**A.** No, there was nothing that would have driven my concern at that point. Nobody was complaining about anything. Nobody brought anything up that -- and I know somebody was always in the office.
**Q.** But you didn't keep track of when he was there or not?
**A.** No, of course not. And there's lots of days that I'm not in the office that I'm traveling. No, I did not keep track every day of who's in and who's not.
**Q.** In terms of your management of Mr. Rinsky, face time wasn't really a concern of yours?
**A.** No.
**Q.** And in early 2015, so let's say January to April, did you have any understanding of how often Mr. Rinsky was working from the New York City headquarters and how often he was working from his home in New Jersey?
**A.** No.
**Q.** You testified at your deposition that you were never informed that Mr. Rinsky had requested a transfer; isn't that correct?
**A.** That's correct.
**Q.** You didn't have any direct discussions with Mr. Rinsky about his transfer request, did you?
**A.** I did not.
**Q.** So your knowledge of the facts with respect to his transfer come from where?

**A.** Come from the conversation with Colin where he said, "Yury just informed me that he's moving to Boston and wants to basically work out of the Boston office."

**Q.** So your understanding of what transpired came from Mr. Reid, right?

**A.** Yes.

**Q.** Anything with respect to Mr. Hamilton?

**A.** I could have had conversations along the same line with Andrew as well. I remember initially it was a conversation with Colin.

**Q.** Different than Mr. Leiser's transfer request, you had some issues with Mr. Rinsky's transfer, correct?

**A.** Yes.

**Q.** And what were the bases for those issues?

**A.** Really the proximity. Him being in New York, working with a team that is New York-based, commission accounting, all of the things that you had previously mentioned. All of the high visibility with the systems that he supports, and the impact of, you know, that he's not available on our business potentially if there's not someone there to be able to answer questions or take care of problems when they arise.

**Q.** Well, isn't it true that your biggest problem was that he didn't go through the right process as has been communicated to you by Mr. Reid?

**A.** Yeah.

**Q.** It wasn't necessarily that he wasn't in the office? You didn't even keep track of when he was in the office, right?
**A.** I didn't keep track of when he was in the office. You're right. I'm more concerned with our customers in commission accounting getting supported.
**Q.** You were concerned with the process, though, right?
**A.** The process, yeah.
**Q.** He didn't follow the rules, right?
**A.** (Witness nods in the affirmative.)
**Q.** Right?
**A.** Correct.
**Q.** So this process that we've heard a lot about the last couple of days, at least with Mr. Rinsky, it's alleged that he has to go to Mr. Reid, Mr. Reid goes to Mr. Hamilton, who goes to you, who goes to Craig, right?
**A.** Mm-hmm.
**Q.** And then Craig goes to HR, and they --
**A.** No, no. Actually, I asked -- I asked Andrew and Colin to get HR involved because that was somebody coming and saying that they were -- basically saying that they've already moved or that they were moving. That's not something that normally happened day to day, and so I asked them to get Katrina from HR involved right away because that's definitely outside the normal day-to-day operations.
**Q.** Okay. But on a standard -- let's put Mr. Rinsky aside.

There's a transfer request today in his department, assuming everybody was still the same. Or let's say in 2015 when everybody is there. It goes to Mr. Reid, to Andrew, to you, and then Craig or HR then?
**A.** It could go either. It could go -- it should actually kind of go parallel. We should start to have the talks with HR. And, at the same time I would probably mention that to Craig, "Look, we have an employee that wants to transfer."
**Q.** So where in the process does HR get involved? Does it differ from case to case?
**A.** Well, it does if it's -- you know, a lot of times if it's, you know, out of the ordinary, my first reaction is to get HR involved. So if there was somebody who said, you know, they were bullied in the workplace, if there's somebody who said that they felt like they were being discriminated, if there's somebody who said -- you know, those are things that are completely out of the ordinary, we would immediately get HR involved so that they could start to look into that situation.
**Q.** With respect to these transfers, is it fair to say that the process is a little flexible?
**A.** Yeah. But again, it always follows the same protocol. Craig is the decision maker. He's the one who's going to make the yes or no decision based on, you know, the process.
**Q.** Supposed to end up with him --

**A.** Yeah.
**Q.** -- but how it gets there might be a little different from time to time? It's not a rigid process?
**A.** I would agree with that.
**Q.** You can kind of skip steps or ignore steps? I mean, if Colin wanted to skip over Andrew and go to you, he could do that?
**A.** Yeah.
**Q.** He could go right to Craig, the final word?
**A.** Sure.
**Q.** Your department at the time in 2015 with respect to management that we're discussing here, you guys were pretty informal, right?
**A.** Pretty much.
**Q.** Informal with respect to communications?
**A.** Yeah. I mean, there's definitely some processes that you have forms and things you have to fill out, but, yeah, for the most part, it's informal. Some email, some verbal.
**Q.** Not taking meeting minutes and things like that, right?
**A.** Yeah.
**Q.** And you don't have any personal knowledge whether Mr. Rinsky had conversations concerning his transfer before May 17, 2015, correct?
**A.** Correct. I have no idea.
**Q.** You don't know if he had conversations with Colin in

April, right?
**A.** Correct.
**Q.** You don't know if he had conversations in March?
**A.** Correct.
**Q.** Wouldn't you agree that it's strange for an employee to come in and say, "Oh, by the way, I've been here for 27 years, but I'm moving to Boston"?
**A.** Yes.
**Q.** Okay. That's not something that would usually happen?
**A.** Absolutely correct.
**Q.** Work at a job for 27 years and say, "I'm moving to the other office"?
**A.** Agreed.
**Q.** Okay. Have you ever had an employee say, "Oh, by the way, I've moved, now transfer me"?
**A.** No.
**Q.** Doesn't go that way, right?
**A.** No.
**Q.** You ask first and then you go?
**A.** One would think, yes.
**Q.** You would. Did you have any concerns with respect to whether Mr. Rinsky could work effectively from Boston?
**A.** I don't know if I gave it much thought. I mean, would I have concerns? Yes, I would have concerns, the same kind of concerns that I had with Colin. And the fact that one of the

reasons that we allowed Colin the transfer was the fact that the team that Colin managed was staying in New York City.

So I'd probably want the same -- I'm speculating here, but I'd probably want the same assurances before I would allow something like that to happen or at least put my stamp of approval on it, right, is that I'd want some type of trial period or something to say that that job can effectively be done in another location and that our clients wouldn't get upset.

**Q**. Okay. But when you became involved in the process, Mr. Rinsky was already in Boston, right?

**A**. Correct.

**Q**. So he's in Boston. He's performing work for Mr. Reid. Did you give him any trial period to see if this was going to work out?

**A**. No.

**Q**. He's already in Boston. He's already performing work. So you didn't perform any evaluation to say, "Let's see how this work is. Is Yury doing the same level of work he did for the last 27 years?" You didn't do any of that, right?

**A**. We did not.

**Q**. Did you that with Jay, though, right?

**A**. Again, not formally with Jay. Jay basically moved back and forth for six months. He was, for all intents and purposes, for those six months working out of New York City.

But when he was remote for the one or two days that he was remote, we didn't see any difference in work output.

**Q.** There was nothing that would stop the company from saying, "Well, Yury is already up in Boston, he's got his laptop, he's on Internet, we've got an office down the street in Boston. Let's see how this works out. If it works, great. If not, we'll have him come back to New York"? Nothing stopping the company from doing that, right?

**A.** Nothing stopping the company from doing it, no.

**Q.** You didn't want to?

**A.** Well, I don't know if that's the case or not. We didn't even take that approach.

**Q.** You didn't even consider it, right?

**A.** No.

**Q.** Did you know what he was working on at the time?

**A.** There was a lot going on at that time with the merger and with Workday going live and major projects like that. So I know he's involved in those things, but I don't know exactly day to day what he was working on in relation to those projects.

**Q.** Now, your understanding, when it came to your desk, is that, at least according to Mr. Reid, is that Mr. Rinsky had moved without approval or notification of his manager, correct?

**A.** Correct.

**Q.** And when the issue --
**A.** I want to be clear. More without approval than notification.
**Q.** At some point did you understand that he hadn't even notified Colin that --
**A.** I didn't know. I just knew, like we had said before, that my first communication was that he had already moved to Boston and was expecting to work out of the Boston location.
**Q.** But the lack of approval, the lack of process that we're talking, that's the biggest issue you considered?
**A.** Correct.
**Q.** And you testified that when it came to your desk, the issue of Mr. Rinsky wanting to transfer to Boston, that was dead on arrival, correct?
**A.** No. I wouldn't say it was dead on arrival. I mean, we had subsequent conversations about it, but it -- like we were talking about before, I mean, it's pretty bizarre. You normally don't have employees come to you and say, "By the way, starting Monday, I'm going to be in the Boston office." That's highly unusual.
**Q.** Your deposition a little over a month ago, you say, "well, I think there was a lot of discussions out there" --
**A.** Can I see the question?
**Q.** Sure. "Was there some sort of consideration period during which you evaluated whether or not the request to

relocate should be approved?"

Your answer, "Well, I think there was a lot of discussions that happened after that, right, because there's -- there's two things going on here. I think ultimately the key to the decision was the fact that he did not receive prior approval and that was not a precedent that we could set with anyone. So I think that it was pretty much dead on arrival at that point, right. I -- that -- that we were not going to set a precedent that an employee could just come into the office and say, 'I'm insisting on moving.'"

Did I read that accurately?

**A.** You did.

**Q.** So is that --

**A.** Well, this is describing -- you were talking about the end result. This is past tense. So what I'm talking about is, from Craig Cuyar's standpoint, when that process happened the way that it did, it was DOA.

You were asking me the question from my viewpoint, and at that period of time we still went through a bunch of hoops that we wouldn't have gone through if it was dead on arrival. You have all the documentation on the other things that we've done.

**Q.** So at what point was it DOA?

**A.** When it went to Craig. When it went to Craig, because of the way that the process happened, in my opinion, it was dead

on arrival at that point. He did not want to set that precedent that an employee could come in and basically decide where they were going to work from and dictate that to Cushman & Wakefield, because that was a dangerous precedent to set.

**Q.** And that was the understanding that they had from Mr. Rinsky's manager, correct?

**A.** Correct.

**Q.** Okay. It was Mr. Cuyar that made the final decision?

**A.** Yes.

**Q.** You thought he should be terminated too, correct?

**A.** Yes, I did.

**Q.** There was some testimony earlier that there was a conversation between some company employees and Mr. Rinsky in June of 2015, and Mr. Rinsky was told that if he wanted to remain employed, he needed to be back in the office five days a week.

Were you involved in any decisions as to what the terms of Mr. Rinsky's continued employment should be?

**A.** No.

**Q.** So you didn't play any role in whether he should be in the office five days, four days, or --

**A.** No. I know that we decided to make the offer to Yury to say that his job was in New York, the role was in New York. Similar to Jay Leiser, if he wanted to work out of the

New York office, that his job was there.
**Q.** This conversation that I just mentioned where this offer was made, you didn't participate in that, did you?
**A.** I did not.
**Q.** Were you aware it was happening?
**A.** Yes.
**Q.** Did you play any role as to the timing of when that conversation happened?
**A.** Did I play any role in the time the conversation happened? I'm sure I was aware of it and I probably had the conversation with Katrina, so yeah.
**Q.** At what point did you become aware that the company wasn't going to approve this transfer?
**A.** The first time I talked to Craig.
**Q.** Do you recall -- can you put a timeframe on it?
**A.** No. We went back several other times to Craig with other kind of overtures. The first time his concern was about the process being violated.
MR. SZAL: I want to start going through emails, Your Honor.
THE COURT: Okay. Why don't we take the break.
We'll see you back at 2:30.
THE CLERK: Rise for the Jury.
(Jury exits the courtroom.)
THE COURT: How much longer do you have with him?

02:15:38 MR. SZAL: Half hour, if that.
02:15:42 THE COURT: We need to get this -- I really need to
02:15:45 get this to the Jury tomorrow. Are we on track to do that?
02:15:50 MR. SZAL: I think so.
02:15:51 THE COURT: Okay. Thanks everyone.
02:15:54 (Court recessed at 2:15 p.m.)
10:04:51 (Jury enters the courtroom.)
02:32:00 BY MR. SZAL:
02:32:00 **Q**. Before the break, I think you testified that you didn't
02:32:02 recall exactly when you got brought into the process on the
02:32:07 issue of Mr. Rinsky's transfer?
02:32:09 **A**. Correct.
02:32:10 **Q**. I want to go through a few documents to see if you
02:32:16 recall. This has been marked as Exhibit 11. It's an email
02:32:30 from Colin Reid to Andrew Hamilton. You're not copied on
02:32:34 that email, correct?
02:32:35 **A**. Correct.
02:32:41 **Q**. This email in part is asking Mr. Reid to evaluate the
02:32:46 pros and cons of keeping and replacing Mr. Rinsky, correct?
02:32:51 **A**. Correct.
02:32:51 **Q**. This is before you got involved in the process; is that
02:32:58 fair to say?
02:32:58 **A**. Yes.
02:32:59 **Q**. So you didn't know at this point that they're already
02:33:02 discussing replacing him, correct?

02:33:04 **A**. Correct.
02:33:23 **Q**. This is an email, it's Exhibit 14, initially an email from Mr. Rinsky to Mr. Reid and Mr. Reid's response. In part, Mr. Rinsky says that he's going to be moving to Boston on the 27th of May of 2015, and Mr. Reid's response is, "Okay, we will talk on Tuesday"; is that correct?
02:33:44 **A**. Correct.
02:33:52 **Q**. And you're not copied on this email, correct?
02:33:55 **A**. That is correct.
02:33:56 **Q**. And at this point you weren't aware that this communication had taken place, correct?
02:34:07 **A**. Correct.
02:34:08 **Q**. This is a document that's been marked as Exhibit 23. It's a series of emails between Colin Reid and Edgardo Felix. Are you familiar with Mr. Felix?
02:34:47 **A**. Yes. He's an AS/400 consultant.
02:34:50 **Q**. And on May 20, 2015, Mr. Reid writes, "Edgardo, I hope you are keeping well. Something might be coming up soon. Are you still interested? Do you have any experience with the IFS feature on the AS/400? Regards."
02:35:13 Did I read that correctly?
02:35:15 **A**. Yes.
02:35:15 **Q**. And as of this date, May 20, 2015, Mr. Rinsky was still in New York, right?
02:35:26 **A**. I believe so. I don't know for sure.

**Q.** Were you aware of this email before this litigation?
**A.** I don't recall it.
**Q.** You're not copied on it, right?
**A.** Not on this section of the email.
**Q.** This is an exhibit that's been marked as Exhibit 20. It's an email that you're on. It's addressed to you and copied to Mr. Reid from Andrew Hamilton. Do you recall seeing this email?
**A.** Yes.
**Q.** Do you understand that this is where -- the time period that you may have been brought into this issue?
**A.** Well, I was brought in apparently before 5/27 because they've had the conversation with Kat, and that was the conversation that I asked them to have, so it was on that date or before that.
**Q.** The conversation you asked them to have with who?
**A.** With Katrina, HR.
**Q.** So Mr. Hamilton, Mr. Reid, you asked them to talk to?
**A.** Yeah. I said that before. When Colin brought it to me I said he needed to go to HR and have that conversation with Katrina. So that was on the 17th, this is the 27th. So somewhere within those ten days I was brought into the loop.
**Q.** Okay. So between the time of Mr. Rinsky's email saying that he's moving to Boston and the day he actually moves, you say, "Colin, Andrew, go talk to Kat," right?

02:37:12 **A.** The day that I actually found out is the day that I -- when I had that initial conversation with Colin, that was my response. "That's highly unusual, you need to bring HR into the loop."
02:37:22 **Q.** Okay. And so in this email you're presented with the options that the team came up with, right?
02:37:34 **A.** Correct.
02:37:36 **Q.** And the first option is to offer a six-month opportunity to a resource that Colin had worked with, correct?
02:37:47 **A.** Correct.
02:37:48 **Q.** Okay. And that was Edgardo Felix, correct?
02:37:55 **A.** I can only assume so.
02:37:59 **Q.** The next plan is to bring the resource in within the next two weeks and begin KT, right?
02:38:09 **A.** Correct.
02:38:10 **Q.** What's KT?
02:38:11 **A.** Knowledge transfer.
02:38:13 **Q.** And based on this email, do you have an understanding of where the knowledge was being transferred to and from?
02:38:22 **A.** It would be transferred from Yury to -- again, I'm assuming Edgardo is who's being referenced in this email. He was eventually the person who took that position, so --
02:38:35 **Q.** And it says that they believe they need to retain Yury for about nine weeks to cover critical work, correct?
02:38:42 **A.** Correct.

**Q.** Then it's being proposed to brief Craig on the situation and get the transfer work prepared for him to execute, right?
**A.** Correct.
**Q.** And then you're going to process the transfer EAF and take the DTZ review, right?
**A.** Correct.
**Q.** And then assuming approval, execute the transfer officially, correct?
**A.** Correct.
**Q.** There's no doubt that this email pertains to Mr. Rinsky, correct?
**A.** No doubt.
**Q.** And lastly, "Work with Kat as KT unfolds on the official exit (mitigating litigation risks)," correct?
**A.** Correct.
**Q.** And the official exit is Mr. Rinsky, correct?
**A.** Yes.
**Q.** And so at this point, at least with respect to Mr. Hamilton, his approach was hire somebody new, backfill Yury's role, get Yury's information and knowledge transferred to that person, let them work for a few weeks, because we need him to cover critical work, and then fire him, right?
**A.** Yes.
**Q.** Are you involved in attempts to mitigate litigation risks?

**A.** No.
**Q.** Who would be involved with that?
**A.** That would be HR.
**Q.** Lastly, it says, "Any concerns with this approach," correct?
**A.** Correct.
**Q.** Did you respond to this email?
**A.** I don't know. Did I? I don't know.
**Q.** I've never seen it.
**A.** I don't know. I'm sure that if you guys didn't turn it up in discovery, then no.
**Q.** Well, what did you do to search for documents in this lawsuit? Did you do anything?
**A.** Like I told you during the deposition, I looked through my inbox, but I didn't find anything that was related to this at all. It must have all been archived.
**Q.** This email we're looking from, it didn't come from you, right?
**A.** No. I didn't provide any of the information that you have.
**Q.** Okay. But you went through your email box and you put in -- what, you put in Yury's name?
**A.** Yeah.
**Q.** You searched everything and you got zero?
**A.** Correct.

**Q.** And then somehow we got this email from your counsel?
**A.** Yes.
**Q.** Okay. And you don't know how that happened?
**A.** Well, we have a system that only keeps a certain amount of email online at any given time and then it moves it off to offsite storage. So I'm assuming that the discovery process they went through goes to that online archive and pulls that data.
So I no longer have access to it, but it doesn't mean that we've removed it from being able to be found for this type of purpose in the future.
**Q.** I didn't say you removed it. I just asked if you searched for it.
**A.** Yeah. Yeah.
**Q.** Did you search not only your inbox, but your sent mail?
**A.** I did not search the sent mail.
**Q.** So there could be an email out there responding to this that you didn't find and you didn't produce in this litigation?
**A.** Sure, yes.
**Q.** Staying on this exhibit, not everything in this proposal happened, correct?
**A.** Correct.
**Q.** Pretty close, right? You hired the resource, right? That turned out to be Edgardo, Felix?

**A.** We did.
**Q.** You got Yury's knowledge transferred to him during a process when there was a review going on of the transfer, correct?
**A.** Could you repeat? I'm sorry.
**Q.** You hired the resource.
**A.** Edgardo, yes.
**Q.** Mr. Yury was retained for a period of time after he moved to Boston and worked with Mr. Felix to transfer what knowledge he had to him?
**A.** I don't know.
**Q.** You don't know the answer to that?
**A.** I don't know that.
**Q.** You know that Mr. Rinsky was retained for a critical period of time while this was going on?
**A.** Correct. While we were going through this process, Yury was still employed.
**Q.** And we know that the transfer paperwork was never actually processed, right?
**A.** Correct.
**Q.** But we all know that there was an official exit, right? He was terminated?
**A.** Correct. Steps 2 and 6 happened.
**Q.** And 1, right? You offered the opportunity, Mr. Felix accepted it, Mr. Rinsky worked for a period of time, and then

he was fired?

**A.** Correct, yes.

**Q.** Isn't it fair to say -- Craig's not on that email, right, that's being proposed to you?

Do you want to see it again?

**A.** Please.

**Q.** Yeah.

**A.** That would be correct, he's not on this email.

**Q.** This is from Andrew to you, right?

**A.** Andrew to me, with Colin copied.

**Q.** So based on this email, it's his opinion that Mr. Rinsky should be terminated in about nine weeks, correct?

**A.** Correct.

**Q.** Okay. So is it fair to say that even before it got to you, this issue was dead on arrival when it got to Hamilton?

**A.** I don't know that because I don't know the date between the 17th and the 27th that we actually talked about it, so I don't know that I can say that definitively. At least as of the 27th, this email, his opinion, if you go through these steps, is that we would terminate Yury at the end of this process.

**Q.** That's pretty much what happened. It wasn't nine weeks, but it was a period of time, right?

**A.** Yes.

**Q.** Okay. On the 27th, Mr. Hamilton's proposing to terminate

him. This is an email that's been marked as Exhibit 29. This is another email that you're not on. And this is an email where Mr. Rinsky is being asked whether he needs his computer equipment from New York and Boston.

He says, "Yes, I'll need it in a couple of weeks when I get a cubicle."

And Mr. Reid says, "Yeah, hold off. Yury might be getting some new equipment in Boston. I've got an AS/400 consultant sitting in New York," right?

**A.** Yes.

**Q.** Were you aware at the time that you were discussing this plan to hire a new resource and terminate Mr. Rinsky, that at the same time he's being told he may be getting his old desktop or he may be getting new equipment?

**A.** I wasn't on this email. I wasn't aware.

**Q.** This is an email from June 2, about a week after the May 27 email that we were just looking at. It's from Andrew to you, copying Colin, attaching the Statement of Work, SOW, for the AS/400 resource to backfill Yury/support the MK work. You are the signatory. The value is about 65 grand.

Do you see that?

**A.** I do.

**Q.** Did you sign off on the Statement of Work?

**A.** I did.

**Q.** Did you draft it?

**A.** I did not.
**Q.** Do you have standard forms that you go through with independent contractors?
**A.** Not really. We have a standard MSA, but not necessarily standard SOW's.
**Q.** You forwarded Andrew's email and the attachment, the Statement of Work, to Craig?
**A.** Correct.
**Q.** And you say, "I need to make this happen."
Did I read that correctly?
**A.** You did.
**Q.** Okay. The Statement of Work is given to you on June 2, and that's the same date of the email we just looked at when Mr. Rinsky is being told he might get new computer equipment in Boston, correct?
**A.** Correct.
**Q.** Okay.
**A.** Just one clarification. I don't know that Yury was being told that he might be getting new computer equipment. That Yury was being told he might be getting new equipment, I think that was a response from Colin to Scott. Yury may have been copied on that, but that was not directly to Yury that he was getting new equipment in Boston, if I recall that email unless you want to pull it back up.
**Q.** The Jury has seen it. We're trying to summarize some of

these emails so we don't have to read everything to the Jury.
**A.** I just want to make clear who's communicating to who.
**Q.** This is Exhibit 33. It's another email that you're on. And this is with respect to Jay Leiser that we were talking about, correct? It references JL?
**A.** Correct.
**Q.** This is June 4, 2015, correct?
**A.** Correct.
**Q.** Okay. To summarize this email, it seems like there's two requests for transfer going on at this point, right? There's Jay and then there's Yury?
**A.** Correct.
**Q.** And based on this email, Craig's decision is, "I want to handle these two situations differently," right?
**A.** In this email, yes.
**Q.** "With Jay, I want to let him move to Florida, but we want to pay him less because it costs less to live there," right? It addresses his compensation model?
**A.** Yeah. But it doesn't say he's okay with Jay moving. It just says, with Jay, "I would like you to address his compensation since he is moving to a much lower cost environment."
**Q.** Well, don't you interpret that as asking you to approach him and say, "Jay, we're okay with you moving, but you need to take a little less because you'll be living in sunny

Florida"?

**A.** This wasn't discussed with Jay at all at this point. So Jay made the request to move. We're discussing this here. Right? Craig is basically saying, "I want to see what the difference in compensation is. But Jay is not involved in this. We're not giving Jay any indication as to whether this is approved or not at this point."

**Q.** So it's asking you to take a look at how much he makes and what would be an appropriate salary for Florida?

**A.** Correct.

**Q.** So once you did that, and if you saw a difference, then he might say, "Well, Jay, the cost of living is less down there. Your job gets paid less down there. So we're going to address your compensation," right?

**A.** Or Craig could still say no.

**Q.** Okay.

**A.** Because, like I said, none of this has been discussed with Jay at this point, so this is still all factfinding.

**Q.** Okay. But one of the facts that was being evaluated was, "Hey, should we be paying him as much if he's moving down there?"

**A.** Correct.

**Q.** So with Jay, we're going to go through this consideration, we're going to consider this factor and think about it, in the same email we're talking about Yury,

correct?
**A.** Yes.
**Q.** So with Jay, "We're going to do that." With Yury, "We want to follow the HR process and follow this precedent with another employee," right?
**A.** Correct.
**Q.** So is it fair to say, as of June 4, Craig's decision was, "Let's consider Jay, let's fire Yury"?
**A.** Correct.
**Q.** Was that communicated to Mr. Rinsky on June 4?
**A.** I don't know. I don't believe so.
**Q.** It wasn't through you, right?
**A.** Not through me.
**Q.** Okay. Are you aware of Mr. Hamilton communicating that to him?
**A.** Not aware.
**Q.** What about Mr. Reid?
**A.** Not aware.
**Q.** What about Ms. Hicks?
**A.** Not aware.
**Q.** And based on your response, you agreed with his approach, correct?
**A.** Correct.
**Q.** And you're apologizing that this took him by surprise, correct?

**A.** Correct.
**Q.** And you say, "I will work with Kat to make this happen," right?
**A.** Correct.
**Q.** So at least with Mr. Rinsky, as of June 4, it's your job to work with Kat to terminate Mr. Rinsky?
**A.** Or to work with Jay to get the salary marketed because that's what HR does.
**Q.** But with respect to Mr. Rinsky, the marching orders are, "He's going to be terminated, we're going to follow the precedent of some other employee," so you're going to work with Kat?
**A.** Kat on both issues, yes.
**Q.** Do you know when Mr. Rinsky was actually terminated?
**A.** I don't. I think it was in July.
**Q.** This is an email that's been marked as Exhibit 35. It's a response by Mr. Reid to an email from Andrew. Andrew's email is to you and to Mr. Reid, and it's titled "Reflection on Timing of Yury's Separation"; is that correct?
**A.** Yes.
**Q.** So as of June 4, the decision is made he's going to be fired. We just don't know when we're going to do it; is that correct?
**A.** I don't think we had the final decision from Craig, but I would say yes.

**Q**. Okay. The first sentence says, "Leif, reflecting on the timing of Yury's separation, I think we should weigh the risk to our Workday deliverables against the timing of his exit."

Do you have an understanding of what Workday deliverables are?

**A**. There were a bunch of activities that were going on. We were doing a global implementation of Workday, which is an HR and finance system, and that system has interface points into our commission system. This is probably work that's related to those interfaces.

**Q**. Okay. So we're definitely going to terminate him, we just don't know when, and we want to make sure that any important work that he's doing right now, he completes that even though he's in Boston, right?

**A**. Correct. The only thing I want to clarify, though, is he's saying "reflecting on the timing of Yury's separation." I think in Andrew's mind, and I agree with that, is we were going down the path of separating Yury. There's no doubt about that.

But that final decision is with Craig. We're not making that decision. We're assuming that that's the final decision that's going to be made, so this is prepping for that if that were to come to fruition.

**Q**. Do you have an understanding of whether Mr. Rinsky performed work for the company between the time that he moved

to Boston and the time that he was terminated?
**A.** No.
**Q.** You don't know whether he performed work?
**A.** I know there were a few weeks that he was working from Boston from home, not from the Boston location. I don't know exactly what he was working on during that time.
**Q.** Okay. Is it fair to say, based on this email, that there were considerations with respect to the business relative to the timing of his separation?
**A.** Yes.
**Q.** Okay. And that the company wanted him to perform some more important work before he was fired?
**A.** Andrew and Colin wanted him to be available to perform that work, correct.
**Q.** And you don't know whether he performed it, right?
**A.** I'm sure he didn't perform all of it in the number of weeks that he was available, but again, I'm not sure of the specific tasks.
**Q.** And you don't know where he performed it, right?
**A.** No.
**Q.** There's nothing in this email that says, "We have some concerns about Workday deliverables, we need Yury to perform some work, and he needs to get back to New York to perform that"?
**A.** Correct.

**Q.** Okay. The work that was being contemplated, he could perform from Boston, right?
**A.** I don't know. I don't know. I mean, I think you're in a situation here where the employee is already there. These guys are concerned that we're not going to be able to meet the business objectives, the deliverables, if we were just to separate with him, right? So there's risk mitigation there.
He's in Boston. There is no bringing him back to New York at this point in our mind. So what they're basically saying is, "Worst case scenario, can we still get him to do this work remotely?"
**Q.** There's no bringing him back to New York; is that what you just said?
**A.** Yeah. I think -- but I don't want to -- I think they're reflecting had the same thing. None of us had any kind of idea, you know, that Yury would even entertain coming back to New York. We eventually made the offer to him that his job was in New York. If he wanted to come back to New York, we were happy to have him fill that role. But I don't think anybody had any thinking that he was going to choose that based on the fact that he had moved to Boston.
**Q.** You made him an offer to return back to the New York office full-time, but you didn't have any expectation he was going to take it, right?
**A.** We had no idea, but I mean --

**Q.** You just said that --
**A.** I didn't -- knowing that he had moved to Boston, I didn't think he'd take that, no. But we would have been happy to have him come back. He'd probably still be working at Cushman today. The rest of the team is.
**Q.** You talked a lot about process and procedures, following the rules, setting precedent. If that was such a concern, why didn't you just fire him on June 4? Why didn't you have a conference call with you and him and Colin and Andrew and say, "Yury, you didn't go through the right process, I'm sorry, but today is your last day"?
**A.** Not my decision. That, again, had to go through Craig to get that final approval. HR needed to be involved in that. So it's not something that I could just pull the trigger on and just decide that that's a conversation that we were going to have. We were in the middle of going through all of this, so clearly that would have had to have been something that was coordinated.
And as you can see, these guys are clearly articulating that they have concerns about the work getting done, that the role is still important to the company, and that they would like for Yury to be able to still perform this role.
**Q.** I think you testified earlier that the food chain, so to speak, goes from Reid to Andrew to you to Craig, right?

**A.** I said parallel between HR and Craig, but yes.
**Q.** So if an employee goes to their direct manager and says, "I want to transfer," and the manager says, "No," it doesn't even make it up to the rest of the process, right?
**A.** Yes. I would agree with that.
**Q.** And so based on Mr. Hamilton's proposal that we just looked at, the six-point plan and the 5/27 email, he's not going to approve that transfer, right? He's recommending that he be terminated?
**A.** He's assuming he's going to be terminated.
**Q.** Well, doesn't he have to -- isn't he the next level of approval over Mr. Reid? If he doesn't approve it, how does it even get to you?
**A.** But this situation has already gone to HR at that point. Craig's already been in the loop. We've already had these conversations across all of those different levels. The content of the email is correct, but the context -- I mean, he's assuming that the answer, based on Craig's initial reaction, is going to be Yury is no longer going to be an employee of Cushman & Wakefield.
**Q.** Yeah, but he's proposing the plan to you, and he's saying, "Do you have any concerns with the approach?"
**A.** Because that's what we do, right? We have work that needs to get done. We believe that this is the situation that's going to play out, and we need to prepare for being

03:01:27 able to do that work in Yury's absence.
03:01:30 **Q.** Okay. So understanding it's your position that Mr. Cuyar
03:01:36 is the final say on this, isn't it fair to say that you were
03:01:39 the final say with respect to the timing of Yury's
03:01:44 separation?
03:01:44 **A.** No.
03:01:45 **Q.** Okay. Well, let's look at Exhibit 37. This is an email
03:01:48 from the next day, June 5. And this is from you to Craig.
03:01:59 It's forwarding the email that we just looked at from
03:02:03 Mr. Hamilton, and it says, "Just some food for thought. Kat
03:02:07 and I are planning separation for next week currently,"
03:02:11 correct? Is that what it says?
03:02:13 **A.** That's exactly what it says, yes.
03:02:15 **Q.** You're telling Craig when you're going to fire Yury,
03:02:18 right?
03:02:18 **A.** This is all based on conversations that Craig, Kat, and
03:02:21 myself and others --
03:02:24 **Q.** I'm just asking what the email says.
03:02:27 **A.** Yeah.
03:02:31 **Q.** And he wasn't terminated the next week, though, right?
03:02:38 **A.** I don't believe so, no.
03:02:55 **Q.** Now we're at the 16th of June. Okay? Mr. Rinsky is
03:03:01 still in Boston. He's performing work for the company. And
03:03:03 this is an email from you to Mr. Reid and Mr. Hamilton asking
03:03:06 them -- it says, "Do you want to plan the separation on

Friday of this week"; is that correct?
**A.** Correct.
**Q.** And then Colin says, "That's fine, but please speak with Katrina. I spoke with her yesterday, and she want might this done sooner"; is that correct?
**A.** Correct.
**Q.** And do you know if you responded to Mr. Reid's email?
**A.** I don't know.
**Q.** Do you know if he was separated on Friday, the 19th?
**A.** I don't believe he was.
**Q.** Fair to say that in this June timeframe, there's a lot of emails that are going back and forth between you and Reid and Hamilton and Katrina about when exactly you're going to pull the trigger on his termination, correct?
**A.** Correct.
**Q.** And at any time you could have just picked up the phone and said, "Yury, we made another decision," correct?
**A.** Who is "you" in that statement?
**Q.** The company.
**A.** Yes.
**Q.** Or you personally.
**A.** No.
**Q.** You couldn't have done that?
**A.** No.
**Q.** Why not?

**A**. Because I would have had to make sure that we were all in agreement before doing that.
**Q**. But if you were all in agreement, you could have made the call, right?
**A**. Sure.
**Q**. But you didn't. You weren't on the call where Mr. Rinsky was informed that his transfer has been --
**A**. No. Typical ly that's the manager and HR who is on that call.
**Q**. Okay. The manager and HR?
**A**. Yeah.
**Q**. So that would be Colin, right?
**A**. And Katrina.
**Q**. And Katrina. Okay. Do you know who actually was on that call?
**A**. I do not.
**Q**. Do you know if it was just Colin and Katrina, not anyone else?
**A**. I do not.
**Q**. If I told you it was Andrew Hamilton that delivered the message, that would be out of the ordinary?
**A**. It wouldn't be out of the ordinary because he's Colin's manager, but I would expect that Colin would be on that call.
**Q**. Andrew Hamilton really didn't need to be on that call, right?

**A.** Didn't need to be.
**Q.** All right. This is an email that's been marked as Exhibit 42. In part, it's an email from you to Mr. Cuyar, again updating him on when you're actually going to terminate him. It says, "We are having the separation conversation with him on Monday. We will let him know that he can report in New York City on Tuesday or resign his position."
Did I read that accurately?
**A.** You did.
**Q.** You met with Mr. Reid and Mr. Hamilton and Ms. Hicks, and you came up with a proposal that "We're going to call him on Monday morning, and we're going to say, 'Be here on Tuesday or hand in your resignation'"?
**A.** Correct. I'm sure Craig was involved in that too, because Katrina basically came back with, "This is what I want to go back to Yury with based on our discussions." We all agreed on that, and that's the result of this email, is basically saying, "This is how we're going to deliver that message."
**Q.** Okay. But your testimony has been that he didn't follow the proper process, he didn't follow the rules, correct?
**A.** Correct.
**Q.** So the conversation wasn't, "Yury, you didn't go through the right process, you're terminated," right? "You broke the rule and you're fired." The process was, "Be here tomorrow

morning from Boston to New York, be here every day"?
**A.** They're not mutually exclusive. The conversation, the way it was structured was, "Your role is in New York City. You've abandoned your role. We'll allow you to come back to work from New York City. Your role is in New York City. If you choose to do that, fine. If you choose not to, then you're fired."
That's the context of the conversation. So it's for violating the procedure, not for anything else.
**Q.** But up to that point, we talked about it earlier, you don't know what his work schedule is, you don't know when he's in the office, you don't know when he's not. But here, "June 17, we're going to tell him be in the office or else"?
**A.** Correct.
**Q.** And that's a change from your position when you were working with him in New York, right? You didn't keep track of when he was in the office?
**A.** I personally did not keep track of when he's in the office, but I'm sure Colin did and I'm sure others did.
**Q.** Colin was in Florida, right?
**A.** Colin was in Florida, yeah. But he was back and forth between Florida and New York. But, yes, Colin was based in Florida.
**Q.** So we talked a little bit earlier about Jay Leiser. His role is different than Mr. Rinsky's, correct? It involves

management, right?
**A.** It's just a different role altogether, yeah.
**Q.** I think you said he manages a team in India for the company, correct?
**A.** Correct.
**Q.** As we sit here today, Jay Leiser is working from Florida managing a team that's in India, right?
**A.** Correct.
**Q.** And it's fair to say that that's quite a bit further than Boston, right?
**A.** Correct.
**Q.** Do you make any evaluations concerning employee productivity?
**A.** I don't understand that. Can you be more specific?
**Q.** Let's say with somebody seeking a transfer, is one of the considerations whether the person might be more productive in a different location?
**A.** That would be one of the considerations, sure. I don't think it was the overriding consideration here because we have never had problems with Yury's productivity or with Jay's productivity, for that matter.
**Q.** And you weren't aware of his work schedule when he moved to Boston, right?
**A.** I was not.
**Q.** So if he was working 14 hours a day, six days a week,

that wouldn't have made it to you, right?
**A.** Would not.
**Q.** Do you know if Mr. Felix is still working at Cushman & Wakefield?
**A.** He is.
**Q.** Do you know if he's still a contractor or if he's a full-time employee?
**A.** He's still a contractor.
**Q.** Do you know his work schedule?
**A.** I don't.
**Q.** You don't know when he's in the office and when he's working remotely?
**A.** No. In fact, you know, I'm in a completely different office than he is now. He's still at 1290.
**Q.** Is he under your direct report?
**A.** No.
**Q.** He's under Colin, correct?
**A.** He's under Colin, but Colin is no longer under my direct report.
**Q.** Okay. So that's changed?
**A.** Yeah.
**Q.** And you said Mr. Hamilton isn't either?
**A.** Correct.
**Q.** And that's because your role has changed?
**A.** Yes.

**Q.** Are you still working in New York City?
**A.** I am.
**Q.** Did you find any emails or documents from Craig Cuyar stating that Mr. Rinsky's transfer had been denied?
**A.** No.
**Q.** No email or document saying "denied"?
**A.** You said did I find any documents, and the answer to that is no.
**Q.** Are you aware that any exist?
**A.** No.
**Q.** We know you didn't find any emails. Did you find any other documents? Did you search paper documents in connection with this litigation?
**A.** I did not.
**Q.** You did an email search, nothing came up and that was it?
**A.** Correct.

MR. SZAL: That's all I have for this witness right now.

CROSS-EXAMINATION

BY MR. BERLUTI:

**Q.** Good afternoon, Mr. Maiorini.
**A.** Good afternoon.
**Q.** When did you become employed with Cushman & Wakefield?
**A.** April of 2009.
**Q.** Will you please describe Cushman & Wakefield's business.

**A.** We're a global real estate services firm, so we do things like leasing of properties. We do what are called capital markets transactions where we'll buy and sell a property or portfolio of properties. We do valuation and advisory work where we do -- it would be kind of paramount to your home appraisal, but we do it for very large properties like Yankee Stadium or like a casino in Atlantic City or something like that, or whole portfolios of properties for large RETs and entities like that.

We also do service-based businesses where we have employees that act on behalf of the tenant or the landlord to provide services for their property. So we'll do everything from managing the property and paying the bills on the landlord's behalf to doing the janitorial, the engineering, or even, in our case, we run all the conveyor belts for Amazon, so we do the engineering for them.

**Q.** So you used a term. You said selling entire portfolio for RETs. What's a RET?

**A.** It's a real estate investment trust. They're large companies that own multiple properties that they package into a portfolio.

**Q.** And that entire package of properties get sold at one time?

**A.** Or a section of it, sure.

**Q.** You've mentioned a lot of different types. But is it

true that, at least for some of the things that Cushman & Wakefield does, the brokers get paid on a commission basis?
**A.** In the U.S., it's almost exclusively on a commission basis. They're the guys who do -- the men and women who do mostly the leasing of space. So any large real estate transaction that involves leasing, all of those brokers are commission-based.
**Q.** And you described in your direct that there are different aspects of how the commissions get broken down depending on who's involved in the transaction, depending on how much commission income they've earned so far that year, etc.; is that correct?
**A.** That's correct, yeah.
**Q.** Now, in 2015, do you know what Mr. Rinsky's role was in the information technology department at Cushman & Wakefield?
**A.** Yes.
**Q.** What was it?
**A.** So he worked for Colin Reid's team. He was part of the team that managed the commissions system on the AS/400. And their role was to maintain that application that accounted for all of the broker commissions, took a look at the transactions that were coming in, figure out what the commission splits were, and then fed that information into payroll so that those individuals could get paid or into our financial systems for people who weren't on payroll who were

contractors who got checks cut to them for commission.
**Q.** Where were the users of Mr. Rinsky's services and capabilities? Where were they located?
**A.** Almost exclusively at 1290 Avenue of the Americas in New York City.
**Q.** Were any of them in the Boston office?
**A.** No.
**Q.** Where was Mr. Rinsky's cubicle in relation to the financial and accounting people that he supported?
**A.** Initially it was the next row down. And then eventually it was like maybe three or four rows down.
**Q.** Where did you sit -- this is now, again, in the 2015 timeframe. Where did you sit in relation to Mr. Rinsky, 2014-2015?
**A.** Maybe three cubicle rows away, maybe 50 feet, not even.
**Q.** So when he was in the office, did you see him?
**A.** Little bit more specific? Like every day? I've seen him in the office absolutely, but I wouldn't say that I see him every single day.
**Q.** I understand. But was there ever a period of time where you didn't see him at all in the all -- all five days at a time for an extended period of time?
**A.** Not that I recall.
**Q.** There's been a suggestion in this case that, in 2014 and 2015, Mr. Rinsky was working remotely four to five days per

week. Is that consistent with your memory of seeing him in the office during that timeframe?

MR. SZAL: Objection.

THE COURT: Basis?

MR. SZAL: Mischaracterizes the evidence. There's no testimony that he was working four to five days a week remotely in New York.

THE COURT: That's fair. Rephrase the question, please.

BY MR. BERLUTI:

**Q.** There's been a suggestion in this case that Mr. Rinsky was out of the office working remotely during 2014 and 2015 and was rarely in the office. Is that consistent with your memory?

**A.** No.

MR. SZAL: Object.

BY MR. BERLUTI:

**Q.** You said he worked on the AS/400 system; is that correct?

**A.** That's correct.

**Q.** Please describe that system for those of us that aren't computer people.

**A.** So it's an older system that was used mainly by financial institutions. In fact, there are still a lot of New York-based companies in the financial sector, in the insurance sector that still use AS/400 equipment. IBM has

since rebranded it to I Series, but it's kind of Unix-based platform that has its own specific programming language. It was used for a lot of high tolerant, high available systems.

**Q.** Is Cushman & Wakefield still using the AS/400 today?

**A.** We are.

**Q.** Is there some plan in the future that they will phase out the AS/400?

**A.** I think eventually in the future, but there's no short-term plans or near-term plans to phase it out.

**Q.** Do you have any estimate at this time as to when the AS/400 will be completely phased out of Cushman & Wakefield?

**A.** Five to ten years.

**Q.** You just mentioned that the AS/400 is used quite a bit in the financial sector, including the insurance sector; is that correct?

**A.** That's correct.

**Q.** And based upon your job in New York, do you interface with other people, other comparable people like you in these other financial industries?

**A.** Yes.

**Q.** As a part of that, have they expressed to you that they have a need for AS/400 software developers in New York?

**A.** Yes.

**Q.** And do you have any sense, based upon your discussions with them, as to whether or not there is a substantial need

for AS/400 developers or if it's just very, very sparse?
**A.** I know they have problems finding them.
**Q.** There's been some references -- let's do this. Let's go to Exhibit 27 -- excuse me, Exhibit 20, the May 27 exhibit. Let me just ask you, there's a reference here to Workday. What is the reference to Workday? It's in Number 2, "Critical Workday," what is that referencing?
**A.** Workday is a global enterprise resource planning system, so it basically manages HR and finance functions for Cushman & Wakefield globally. And we were in the process of doing a rollout of that system to all the countries where Cushman & Wakefield operates.
**Q.** Now, directing your attention specifically to 2015 and specifically to the timeframe of April, May, June, July of 2015, do you recall if there was specific deliverable dates that had to be met or milestones that had to be met with respect to implementing Workday at that time?
**A.** I'm sure there were because we were on a timetable to deliver Workday. I'm sure there were associated AS/400 deliverables that coincided with that schedule.
**Q.** And do you know if Mr. Reid had been called back from Florida to New York expressly to try to achieve those deliverable dates in the May 2015 timeframe?
**A.** I believe he was, yes.
**Q.** There's a reference here to -- let me see, to MK work.

What does MK refer to?
**A.** MK is Massey Knakal. They're a smaller real estate firm that we had acquired in that timeframe. In fact, that's the building that I sit in now. The 275 Madison Avenue building was the prior Massey Knakal offices.
**Q.** Briefly, what was the nature of the Massey Knakal business that was acquired by Cushman?
**A.** They did very similar business to what Cushman did, but on a smaller scale so they dealt with smaller properties mostly in the New York City and the boroughs around New York City area.
**Q.** So did that mean that there was an influx of people that were coming in as a result of that acquisition into the Cushman & Wakefield systems?
**A.** Correct.
**Q.** And did that have to be input or absorbed in the financial and accounting systems that Cushman & Wakefield had?
**A.** Yes.
**Q.** And this was being done at this same timeframe, that is, March, April, May, June of 2015, correct?
**A.** Correct.
**Q.** And that's different than the merger that we've heard about with DTZ; is that correct?
**A.** That's correct.

**Q.** Please briefly describe the DTZ merger.

**A.** So the DTZ merger, we were looking -- we were owned by a company called EXOR out of Italy. They were the majority shareholder of Cushman & Wakefield. They also had companies like Ferrari and Maserati and -- and I guess a couple of the large car manufacturers in the U.S. as well.

Our CEO at the time was looking for a different partner, so EXOR put us out to bid, basically to find could they sell Cushman & Wakefield to another partner. We were looking to put some more money into the company so we could grow. DTZ was purchased by a company called TPG Group, which is a very large private equity fund. When TPG found out that Cushman & Wakefield was in the market, they decided to make a play to purchase Cushman & Wakefield from EXOR. So that was pretty much taking two companies of similar size but different geographies and then bringing those two companies together.

**Q.** And in terms of the thrust of this Exhibit 20, you understood this to be a proposal that Mr. Hamilton was making to you about how to deal with the fact Mr. Rinsky had gone to Boston?

**A.** Correct.

**Q.** Did you have any understanding how frequently Mr. Rinsky had to meet and deal directly with the financial and accounting people in New York City in this 2015 timeframe?

03:25:19 **A.** I don't know exactly, but it was quite often, and most of it was informal. They would walk over and ask questions or ask about certain tasks that were being done or they would troubleshoot. They were having some problem with the system that they needed his input or Colin's input to resolve.

03:25:35 **Q.** And if Colin wasn't there because Colin had moved to Florida, who would be the next person to help, if you will, to respond to their needs?

03:25:44 **A.** That would be Yury.

03:25:45 **Q.** Now, there's been some testimony in this case about Anna Kleynshteyn. Do you recognize that name?

03:25:50 **A.** I do.

03:25:50 **Q.** Okay. Who is Anna Kleynshteyn?

03:25:52 **A.** So Anna is also a person would works on the AS/400 platform. Her focus -- she has in the past been basically Yury's backup if he's been on vacation or something like that. But they actually -- between the two of them, they have different sets of applications that they support. So Yury is much more on the commission side of the house, Anna on the facility services side and doing the payrolls for those and other tasks that are related to our facility services business.

03:26:22 But on occasion when one of them, like I said, was out on vacation or something like that, they had the ability to back each other up. It wasn't as effective, of course, as

having the person responsible for those systems in place, but they could do a decent job.

**Q**. Mr. Rinsky's function in the New York office wasn't going away just because he moved to Boston; is that correct?

**A**. Correct.

**Q**. As a result of the merger with DTZ, how did that affect the operations at Cushman & Wakefield in terms of the information technology department?

**A**. During what timeframe?

**Q**. During this 2015 timeframe, especially as we're getting into the May, June, July timeframe.

**A**. It didn't affect us all that much, with the exception of myself and others were starting to have those integration conversations with DTZ. They had signed, like, a letter of intent. I don't know if that's specifically what it's called in this scenario. So we were doing factfinding between the two companies.

But until the actual sale was accomplished in September, we weren't exactly allowed to exchange a lot of information. Like we couldn't exchange, like, salaries or things of that nature. But we did have an agreement with them that any staffing or major expenses over a certain threshold -- and I can't remember quite remember what that was -- would be discussed between the two companies like a governance board prior to being approved.

**Q.** You said that Mr. Rinsky reported to Mr. Reid reported to Mr. Hamilton, and they were the ones that were tasked to making sure some of these Workday deliverable milestones and dates were met; correct?
**A.** That is correct.
**Q.** Can you please turn to Exhibit 37, specifically the top. Now, we've seen this before. It says, "Reflection on the Timing of Yury's separation." And this is an email to Mr. Cuyar from you. What was your purpose in sending this email to Mr. Cuyar?
**A.** So what was here was there were clearly some -- there was trepidation on behalf of my team because the things that we were doing with the integration of Massey Knakal and the things we were doing with DTZ potentially, Yury was critical to all of those things. They were all going to be impacting systems that he supported.
This is basically an overture to him to say, "When you're making this final decision on termination, you might want to think about -- you might want to think about these circumstances and make sure that those risks are taken into account before you make that decision."
**Q.** When you say "him," you mean Mr. Cuyar?
**A.** Yes. Craig Cuyar.
**Q.** Is it fair to say Mr. Hamilton, Mr. Reid felt a lot of stress about the fact that they didn't have Yury's services

in the way they had before when he was located in New York?
**A.** Yes.
**Q.** Now, you were asked on direct whether or not you had any awareness of whether Mr. Rinsky was working 14 hours a day, six days a week. Do you recall that question?
**A.** I do.
**Q.** And I believe your answer was that you didn't. Let me ask you more generally. Were you aware that anyone in your chain, your department, was working 14 hours a day, six days a week in the April, May, June, 2015 timeframe?
**A.** No.
**Q.** I asked about the phasing out of the AS/400. Was there any desire, to your knowledge -- once it became known that Mr. Rinsky wanted to move to Boston, was there any desire to phase him out as an employee?
**A.** No.
**Q.** Are you aware of any financial incentive or cost saving to Cushman that would cause Cushman to deny Mr. Rinsky his request for transfer?
**A.** No.
**Q.** You were asked some questions about Edgardo Felix. Do you recall that?
**A.** I do.
**Q.** You were shown an email that said -- I think it was your email to Mr. Cuyar for a Statement of Work, and it said that

the expected cost for Mr. Felix was about $65,000. That was for the balance of the year, correct?

**A.** Correct.

**Q.** So do you recall that the rate at which he would have been retained at was about $65 an hour?

**A.** I don't recall that specifically.

**Q.** All right. We have an exhibit. Let me try to pull it up. Let's go to Exhibit 68. If we could go to -- I think it's Exhibit A.

First of all, let's look at the first page of this at the top, the first paragraph. This is Exhibit 68.

This is an agreement to be effective January 1, 2016, between Cushman & Wakefield, Inc., and Edgardo Felix. Is this the consulting agreement that was renewed at the end of 2015?

**A.** Yes.

MR. BERLUTI: Could we blow up a little bit more of it, please. Let's go to the Engagement Number 1. Does that have a term in it?

Let's go to Exhibit A of this agreement, I'm sorry, and let's blow this up.

BY MR. BERLUTI:

**Q.** Do you see under Compensation --

**A.** Yes.

**Q.** -- that beginning January 1, Mr. Felix would be paid at

the rate of $70 per hour?
**A.** Yes.
**Q.** Do you have a recollection if that was an increase from -- well, okay, he was hired for 40 hours a week, correct?
**A.** Correct.
**Q.** And more if he had some overtime; is that right?
**A.** Correct. He would bill by the hour.
**Q.** So 40 hours a week at $70 an hour on an annualized basis, that's about $145,000 a year?
**A.** Correct.
**Q.** Trusting my math?
**A.** I'm trusting your math.
**Q.** Let's go to Exhibit 27 and the first paragraph again. This is the initial consulting agreement that entered into with Mr. Felix, and this is dated June 8 of 2015, correct?
**A.** Correct.
**Q.** All right. Let's go Exhibit A, please, down to Compensation. And so his compensation at the middle of the page was at $65 an hour, correct?
**A.** Correct.
**Q.** So he was hired from June until December for $65 an hour, and if my math is right, that was at the rate of approximately $135,000 a year; is that fair?
**A.** That's fair.

**Q.** And Mr. Felix has been rendering services continuously with Cushman & Wakefield from June of 2015 to the present; is that right?
**A.** Correct.
**Q.** And he's doing the job that essentially Mr. Rinsky was doing?
**A.** Correct.
**Q.** And do you have an estimate as to how old Mr. Felix is?
**A.** He's not 30.
**Q.** Do you have a best estimate of how old he is?
**A.** I would say he's 50-plus.
**Q.** Let me ask this: Explain why Mr. Rinsky's job was in New York City.
**A.** Because the people that he serviced were in New York City, and they were high touch individuals. So these were people who were very demanding, wanted answering immediately. The clients that they dealt with were our highest compensated employees and also our most demanding employees. The bulk of those, if not all of them, sit at 1290 in New York City. Those were basically the people he worked with on a daily basis.
**Q.** And if he had been allowed to transfer to Boston and work from Boston, he'd be essentially working remotely 100 percent of the time; is that correct?
**A.** That's correct.

03:37:31 **Q.** And why was his working 100 percent of the time remotely not acceptable to Cushman & Wakefield?
03:37:38 **A.** Because he wouldn't have that day-to-day interaction or at least that needed physical interaction with the employees that were in 1290. And the other piece there too is, you know, even if he had a day where he was working remotely when he was New York-based, we've had times where you can't access the system remotely. You just can't.
03:37:59 **Q.** What do you mean? Why couldn't you?
03:38:01 **A.** Because for whatever reason, we use a technology called Citrix to basically remote into the system. If for whatever reason that is not working correctly, you need to physically be on the network that AS/400 is to access it. So having somebody who is -- if they were New Jersey-based or New York-based who could get into the office within 60 minutes, that's fine. Having somebody who would have to travel six and a half hours, not so much.
03:38:32 **Q.** So you've heard testimony that Colin Reid, Mr. Rinsky's supervisor, requested and ultimately was allowed to transfer to Miami, correct?
03:38:40 **A.** Correct.
03:38:40 **Q.** Please explain why Mr. Reid was permitted to transfer to Miami given the demands of his job.
03:38:48 **A.** Again, Colin notified us really early in the process. We had been probably talking to Colin for years about his

eventually wanting to move to Miami to retire there with family, so we knew that that was something that he wanted to do for quite a while. Colin was more management-related so he managed the work. He made sure --

He didn't have hands on the AS/400. He wasn't doing coding every day. He wasn't changing the software, doing any of that stuff every day. So we felt that that was a job that he could do from Miami. But even then we wanted some timeframe to get those same customers comfortable with that, the fact that they were used to walking to Colin's cube, that they'd have to pick up the phone and call him or text him and get him on a call, would they be comfortable with that, and we worked that over a series of six to eight months with them.

**Q.** And if Mr. Reid was not there, would it be Mr. Rinsky that they would then speak to?

**A.** Depending on the application, like we talked about before, it would be either Yury or it would be Anna.

**Q.** So what role, if any, did Yury Rinsky's age play in the decision to not grant his transfer request?

**A.** None.

**Q.** Prior to this lawsuit and prior to being deposed a couple of months ago, did you have any knowledge about any health issues that Mr. Rinsky had?

**A.** I found out about his health issues at the deposition.

**Q.** What role, if any, did Mr. Rinsky's health play in the decision to not grant his transfer request?
**A.** None.
**Q.** Indeed, was there ever a time in any of the conversations that you had, whether it was with Katrina Hicks, whether it was with Andrew Hamilton, whether it was with Colin Reid, whether it was with Craig Cuyar, did Mr. Rinsky's health even get brought up in the conversation?
**A.** No.

MR. BERLUTI: No further questions.

REDIRECT EXAMINATION

BY MR. SZAL:

**Q.** You just testified that now you are aware of Mr. Rinsky's presence in the office?
**A.** No.
**Q.** I thought you just testified you took note of --
**A.** I didn't say I took note. I was asked if I had observed Yury being in the office. I think you asked me a similar question, and that I said that I did. And that I was not aware of any lengths of time where I didn't see him in the office.
**Q.** And Edgardo Felix, you're aware that he took Mr. Rinsky's desk, right?
**A.** I'm not aware of that.
**Q.** Do you know where he sits?

**A**. I don't. I know I've seen him at 1290 on occasion, but I'm not exactly sure where he sits.
**Q**. There was a space issue going on in 2015, correct, in the office?
**A**. Correct.
**Q**. Did that change at any time in 2015?
**A**. When we had Massey Knakal and began to move people around, it got much better. We were space constrained for quite a while.
**Q**. Okay. And again you testified you didn't know what Mr. Rinsky's remote work schedule was, correct?
**A**. Correct.
**Q**. So if he was working three days a week from home, that's not something that you would have taken note of, correct?
**A**. Correct.
**Q**. And did you have any understanding when the offer or demand was being made that he return to New York on Tuesday the 23rd, if he had taken you up on that offer, did you have any understanding of where he would sit?
**A**. I'm assuming that he would sit at the desk that he sat at before.
**Q**. Do you know if there was space for him?
**A**. Yes. Because he actually had a permanent desk in New York. We had some flex space in New York and we had some people that had a permanent desk. He had a permanent desk.

**Q.** Edgardo Felix, you don't know where he's sitting, right?
**A.** No.
**Q.** Could be at Mr. Rinsky's desk, correct?
**A.** Could be, sure.
**Q.** I think you just testified that Mr. Rinsky was I think you called him Mr. Reid's back up; is that correct? If Mr. Reid is in Miami --
**A.** I don't know that I would call him his back up, but if someone had a question about the commission system, the AS/400, they couldn't get ahold of Colin, they would go directly to Yury. But that wasn't always the chain of command.
I'm sure if one of the commission accountants had a specific question that they knew that Yury could answer, they would go directly to Yury and ask that question.
**Q.** Okay. We've already established that the commission system handles big dollars and it's important, correct?
**A.** Yes.
**Q.** If there's problems with it, it needs to be troubleshooted, correct?
**A.** Yes.
**Q.** And if Colin can't handle it because he's in Miami, that would need to be going to Yury, correct?
**A.** Correct.
**Q.** If a problem arises and Colin is not available, and

Mr. Rinsky is not available to work, that would be a problem, right?
**A**. Yes.
**Q**. Okay. So if he had to be out of the office a day a week for any reason and some trouble arose, and he wasn't there to troubleshoot it, that could really jeopardize a lot of money at the company, correct?
**A**. Sure.
**Q**. Okay. If he was out two days a week for any reason, he wasn't there to troubleshoot a commission problem, that would be a big problem, wouldn't it?
**A**. Correct.
**Q**. If he was out for months for any reason, that would be a huge problem, wouldn't it?
**A**. Absolutely. We would have to make some arrangements, absolutely.
**Q**. You might have to hire a contractor, right?
**A**. Yeah. In fact, I think at different times we've had other contractors and Edgardo in the mix during very busy times for just such cases, yeah.
**Q**. But that takes a little time, right? We looked at Mr. Reid contacts Edgardo on May 20. They have some back and forth. A Statement of Work is put together. It goes to you. It's signed. It's not overnight, right?
**A**. It's not overnight. One of the reasons that Edgardo was

a good choice is because he had some familiarity with the systems at Cushman. He'd worked on them before.
**Q.** But in May of 2015 if a trouble arose, Colin's in Miami, not available, Mr. Rinsky is not able to be in the office for whatever reason, that could jeopardize millions of dollars at the company, right?
**A.** Oh, yeah. We're going to -- like I said, we're going to Anna to see if she can troubleshoot the system. And in that time we're trying to get ahold of Colin and/or Yury or whoever else is available to get them back here as quickly as possible to fix the problem.
**Q.** But after Colin, Mr. Rinsky would be the next troubleshooter, right?
**A.** He would be the next logical choice, yeah.
**Q.** So it's important that he's in the office, right? It's important he's available?
**A.** It's important he's available.
**Q.** He doesn't have to be in the office. Just as long as he's available?
**A.** He has to be available. There may be circumstances again where he needs to be physically in the office because of some issue, but he needs to be available.
**Q.** Okay. So if you knew of some reason, meaning the company that he might not be available at some time in the future, that would be concerning, correct?

03:47:13 **A.** Yes.
03:47:13 **Q.** And you would do something proactively to head that off, correct?
03:47:19 **A.** We would, yes.
03:47:20 **Q.** So if you knew there was a chance that he might not be in the office, you would take steps to address that?
03:47:25 **A.** Yes.
03:47:25 **Q.** And one of those steps would be hiring a contractor, right?
03:47:28 **A.** Yes.
03:47:29 **Q.** And in this case a contractor was hired to back fill his role before he was terminated, correct?
03:47:33 **A.** Correct.
03:47:34 **Q.** Okay. You don't really know Mr. Felix's age, right?
03:47:40 **A.** I don't.
03:47:41 **Q.** You just guessed, right?
03:47:42 **A.** Complete guess. I don't know Yury's age.
03:47:44 **Q.** How old are you?
03:47:45 **A.** 50.
03:47:46 **Q.** Okay. So in 2015 you would have been what, 48, 47?
03:47:52 **A.** I guess, yes.
03:47:53 **Q.** When's your birthday?
03:47:54 **A.** It's October 1. I would have been 48.
03:48:00 **Q.** You testified about physical interaction that Yury needed to have with the users I guess is the term. Did Colin report

to you about Yury's physical interaction with users?
**A.** No.
**Q.** Did these, I think you call them "high touch" individuals?
**A.** Yes.
**Q.** Did you receive complaints from high touch individuals saying Yury is not giving me enough physical interaction?
**A.** No.
**Q.** That never was an issue, right?
**A.** Not to my knowledge it wasn't, no.
**Q.** And you just testified it didn't matter whether he was in the office, as long as he was available, right?
**A.** Yes.
**Q.** If there was a problem?
**A.** If there's a problem.
**Q.** If there's a problem, he's in Florida, as long as he's available to troubleshoot it, we're good?
**A.** And if he can troubleshoot it. The whole thing is can he take actions on the problem, we're good.
**Q.** As long as the commissions come in?
**A.** As long as we can answer their questions and fix the system and make sure they're up and running, yes.
**Q.** Now, I think you had testified a little while ago that the company was not planning to phase out the AS/400 system?
**A.** Correct. Well, planning not to phase out -- there's no

near term plans to phase out the AS/400.

**Q.** None?

**A.** No.

**Q.** Okay. I'm going to show you an exhibit that has not been agreed upon. I don't want to show it to the Jury. Exhibit A. The title of this document is Defendant Cushman & Wakefield, Inc.'s Responses to Plaintiff Yury Rinsky's First Set of Interrogatories.

Do you see that?

**A.** I do.

**Q.** Did you play any role in answering any written questions that Mr. Rinsky sent to your company?

**A.** I did not.

**Q.** Did you review any of the answers?

**A.** I did not.

**Q.** Do you know who did?

**A.** I do not.

**Q.** Is it your understanding that if you received written questions in this lawsuit they would go to the person who had the most knowledge about the question?

**A.** I would imagine so.

**Q.** And you see this where it says verification?

**A.** Yes.

**Q.** And it's Colin Reid declaring that he's read the foregoing answers, he's familiar with their contents, and

he's declaring under the penalties of perjury under the laws of the United States of America that the foregoing response to the interrogatories are true and correct.

Do you see that?

**A.** I do.

**Q.** And that's his signature?

**A.** That is.

**Q.** Are you familiar with his signature?

**A.** Yes.

**Q.** It looks like it?

**A.** It does look like it.

**Q.** Okay. Do you see interrogatory 10?

**A.** Yes.

**Q.** If the plaintiff was replaced or if the company engaged a non employee, including but not limited to an independent contractor, to perform plaintiff's job function it's, please identify such individual, including when he or she was offered the position or engagement, when he or she accepted the position, his or her age, his or her salary, compensation, and benefits."

Do you see that?

**A.** I do.

**Q.** And there's an answer, right? There's an objection by your attorney, right?

**A.** Okay. Yep.

**Q**. And then it says, "Subject to those objections defendants states that it did not replace plaintiff in the specific job function that he performed in part because C&W was in the process of replacing the AS/400 system."
Do you see that?
**A**. I do.
**Q**. So you testified that you're not in the process and there's no plans to replace it, correct?
**A**. Correct.
**Q**. And Mr. Reid under the pains and penalties of perjury testified that they are in the process of replacing it.
**A**. Okay.
**Q**. So who's wrong? You're testifying under oath. He testified under oath.
**A**. Two years later we still have that entire team working on the AS/400 today. That's fact. So we put in a new commission accounting system for the entire company after we merged the two companies, right? So we put in a new system called Callidus that manages the commissions.
That part of the AS/400 was phased out, but we still have a number of applications on the AS/400 that run today.
**Q**. Okay. That's a little bit different than the answer that you gave to Attorney Berluti, isn't it? You said there's no plans, it could be five or ten years from now. Now we hear

that a part of it is being phased out, right?
**A**. Okay. Yes.
**Q**. And you're under oath and Mr. Reid was under oath when he signed these, right?
**A**. Yes.
**Q**. Do you know when he signed these? Do you see the date there?
**A**. Yes.
**Q**. February 6, 2017, right?
**A**. Yes.
**Q**. Not long ago?
**A**. Mm-hmm.
**Q**. We're not talking about 2015. Not much has changed between February and today, right?
**A**. Correct.
**Q**. This should have been accurate at the time it was signed, right?
**A**. Correct.
**Q**. And as far as your testimony in here and this answer --
**A**. His answer is the question is talking about in 2015. You were asking about the job responsibilities being replaced then. Yes or no?
**Q**. Right. And the answer --
**A**. Right. So the fact that it's dated -- so the fact that it's dated February 6, the question is based on a 2015

answer. It's based on when this was all going on. Unless I'm missing the point.
**Q.** Let's look a little bit more about the job function. The specific job function is not replaced, right? Is that accurate you think?
**A.** It's divided -- according to Colin it's divided between him and Edgardo. He took over the project management pieces. Edgardo took over the development pieces.
**Q.** So part of the job Mr. Rinsky did is being done by Mr. Reid?
**A.** Correct.
**Q.** And Mr. Reid does that part of Mr. Rinsky's job from Florida, correct?
**A.** Correct.
**Q.** And the company has no issue with that, correct?
**A.** Correct.
**Q.** They never went to Mr. Reid and said, "If you want to continue to perform part of Mr. Rinsky's job, you've got to come back to New York." Correct?
**A.** Correct.
**Q.** Okay. With respect to the users that we've been talking about, they were in various offices, weren't they?
**A.** No. The majority of the users were in New York City.
**Q.** I didn't say the majority. Some of the users --
**A.** Some of the users are outside. But the majority of the

users that they interact with on a day-to-day basis are all in New York City. The commission accounting group that is in charge of making sure that all of our people are paid correctly at that time were all New York City based.

**Q.** Okay. And part of what Mr. Rinsky worked on was, I think you testified earlier, accounts receivable applications; is that correct?

**A.** I don't know that for sure.

**Q.** Okay. I thought you testified that Workday had replaced the financial applications?

**A.** Workday replaces the financial applications. The commission system interfaces with the accounts receivable systems, the accounts payable systems and the payroll systems.

**Q.** Okay. So Workday was replacing something, right?

**A.** Workday was replacing PeopleSoft.

**Q.** So PeopleSoft was being phased out, too?

**A.** Yes.

**Q.** Part of the AS/400, PeopleSoft, stuff that Mr. Rinsky worked on being phased out, right?

**A.** Yes.

**Q.** Are you personally aware of any conversations that Mr. Reid may have had with Mr. Rinsky concerning his health condition?

**A.** I am not aware.

03:56:51 **Q.** Okay. So you don't know whether Mr. Reid ever said if you take any more time off for treatment, management might not keep you around?
03:57:01 **A.** I am not aware.
03:57:02 **Q.** So you don't know if that happened in 2009, right?
03:57:04 **A.** I'm not aware of that happening ever.
03:57:10 **Q.** Did you ever ask?
03:57:13 **A.** No.
03:57:13 **Q.** In connection with this lawsuit?
03:57:14 **A.** No.
03:57:16 **Q.** And the first time you learned of Mr. Rinsky's health condition was when you and I met in New York a couple of months ago?
03:57:23 **A.** Yes.
03:57:23 **Q.** So you didn't review the complaint in this case?
03:57:26 **A.** I did not.
03:57:26 **Q.** Did you review any of the position statements submitted to the Commission Against Discrimination?
03:57:33 **A.** I did not.
03:57:34 **Q.** Did you provide any information for the company to respond to the complaint in this matter?
03:57:40 **A.** I did not.
03:57:41 **Q.** For the position statement?
03:57:42 **A.** Did not.
03:57:43 **Q.** To these interrogatories that Mr. Reid just signed, did

you provide any information on that?

**A.** Did not.

**Q.** And we already covered the documents, correct? So your first involvement in this case in terms of the litigation was your deposition, correct?

**A.** Correct.

MR. SZAL: Those are all the questions I have. Thank you.

RECROSS-EXAMINATION

BY MR. BERLUTI:

**Q.** Mr. Maiorini, as part of the arrangement that you had with Mr. Reid, was there an arrangement that Mr. Reid would return to New York whenever he was needed?

**A.** Yes.

**Q.** And in 2015 how frequently did he return to New York?

**A.** Quite frequently.

**Q.** As a matter of fact, we have an email, and I can put it up if you'd like, that in May of 2013 he was called back for two straight weeks, correct?

**A.** Correct.

**Q.** Do you know if Mr. Reid continued to own a home in New York even after he moved to Florida in 2015?

**A.** He does, yes.

**Q.** And he does to this day, right?

**A.** Correct.

**Q.** Now, you were asked a question about the answer to an interrogatory and the process of replacing the AS/400 system. And it says that C&W was in the process of replacing the AS/400 system. How old is the AS/400 system?
**A.** Close to 30 years old.
**Q.** Okay. And is it undergoing some sort of a process by IBM to rebrand it?
**A.** It is. It's being rebranded as the I Series.
**Q.** So the AS/400 as it existed in 2015 is indeed being phased out, isn't it?
**A.** Yes.
**Q.** It doesn't mean that the skills and technology and the software skills to program it can't be used on the current AS/400, does it?
MR. SZAL: Objection. Foundation.
THE COURT: Overruled.
**A.** No.
BY MR. BERLUTI:
**Q.** Just as a part of the point of the verification, counsel didn't read the entire thing. So for purposes of completion, I'm going to read the whole thing. "Colin H. Reid declares I'm a managing director and senior IT infrastructure manager for Cushman & Wakefield, Inc, the defendant in this action. I have read the foregoing Answers of the Defendant to Plaintiff's Interrogatories and am familiar with their

contents. The answers set forth herein, subject to inadvertent or undiscovered errors or omissions, are based on and therefore necessarily limited by the records and information still in existence, presently collected, thus far discovered in the course of the preparation of these answers, and currently available to Cushman & Wakefield, Inc. Consequently, Cushman & Wakefield, Inc., reserves the right to make any changes in, or additions to, any of the answers if it appears at any time that errors or omissions have been made therein or that more accurate or complete information has become available. Subject to the limitations set forth herein, based on the books and records maintained by Cushman & Wakefield, Inc., on information furnished to me by employees of Cushman & Wakefield, Inc., or based upon my personal knowledge, I affirm that these answers are true to the best of Cushman & Wakefield's present knowledge, information and belief. I declare under the pains and penalties of perjury under the laws of the United States of America that the foregoing responses to interrogatories are true and correct."

One last question, sir. You were asked about compiling documents and looking for things. You said that you looked through your inbox of your computer, correct?

**A.** Correct.

**Q.** You didn't find anything?

**A.** Did not.
**Q.** But you also said that your emails -- that the normal system of Cushman & Wakefield is that they only store so much and then it goes to archive, correct?
**A.** Correct.
**Q.** When you search the archive system, sir, does it include both the inbox as well as the sent box and anything else that might have been through your email address?
MR. SZAL: Objection.
THE COURT: Overruled.
**A.** I think so, but I'm not sure. I'm not sure whether it searches the sent email box or not. And that's the same response that I gave during the deposition.
BY MR. BERLUTI:
**Q.** Okay.
THE COURT: How much more do you have for him?
MR. BERLUTI: I don't, Your Honor. I just have -- I just have one question actually.
BY MR. BERLUTI:
**Q.** You said the majority of the users are in New York City and there may be some in other parts of the country. In the other parts of the country, are there only one or two people, but that the density of the people that are the users are in New York City?
**A.** Correct.

MR. BERLUTI: I have nothing further.

THE COURT: We're done for the day. My usual instructions. Keep an open mind. Don't talk about the case with anyone. No social media. We'll anticipate that we'll have closing arguments and jury charge tomorrow. Once you start deliberating, anticipate that you might be here past 4:00. It is in your hands, but we generally presume a full day while deliberations are going on. So thank you. We'll see you tomorrow morning at 10:00.

THE CLERK: Rise for the Jury.

(Jury exits the courtroom.)

THE COURT: I have draft verdict forms and draft jury instructions for you all. You all, your proposed points for charge sort of had us charging on the whole McDonnell Douglas rubric, and I don't think that's appropriate. So the charge isn't drafted like that. I'm happy to hear from you, but I think that's a fair mark for summary judgment and not a fair mark for jury charge.

MR. SZAL: I think, Your Honor, we took most of our instructions from the pattern New York instructions.

THE COURT: You'll see what we did. We can talk about tomorrow. Can we meet at 9:00 to have a charging conference on this?

MR. SZAL: Sure.

MR. BERLUTI: Yes.

THE COURT: I have a bunch of copies. I made two for each of you. But if anyone needs any more, I have some extra copies. Here you go. See everyone at nine.

MR. BERLUTI: Just one thing, Your Honor. We need for all the agreed-to exhibits to be admitted.

THE COURT: Yes.

MR. BERLUTI: There was an open item that I moved in evidence yesterday. The affidavit, the MCAD complaint, I want to move that in evidence.

THE COURT: The affidavit. Not the whole complaint, the affidavit.

MR. BERLUTI: The affidavit. All right.

THE COURT: They were going to look at it last night, submit additional briefing. That didn't happen.

MR. DENNEHY: I don't need additional briefing. I have a response to it. My response, Your Honor, is that the document -- I think this is in practice why you see this happen. Whether it's an interrogatory, an affidavit, a police report, whatever, there's a statement in there that they want to use as an inconsistent statement. And what typically happens with the document is they can use the statement in an examination. It comes into evidence verbally.

And if they want the document admitted as an exhibit, it's redacted. The reason why? Because it's

prejudicial to the Jury that the document is used as an inconsistent statement. And what the Jury could easily believe is that the entire document is a bunch of inconsistent statements. If they want it redacted and put in, they can do so.

THE COURT: You haven't given me a single case to support that. So what you can do is -- I'm going to admit that. But if there's portions of it that you want redacted as prejudicial, you let me know and we'll take a look at it.

MR. DENNEHY: Okay. The case law that I'm relying upon is there's a whole body of case law when something is unduly prejudicial.

THE COURT: If there are parts of it that are unduly prejudicial, you point them out to me. I'm not going to keep it out because you think it's prejudicial because he said the same thing twice.

MR. DENNEHY: I'm not saying that. I'm saying that the parts of it that aren't being used for an inconsistent statement are being put in there, and the Jury will be easily confused and think that it is an inconsistent statement. That's my position. That's my objection. If you want to put it in, you can. I'm not going to go get a redacted copy.

If he wants to take the document he has with two paragraphs that he wants to use and throw it in there with 50 paragraphs so no one ever sees it and is confused, that's

fine with me.

MR. SZAL: And there is a case, Your Honor. It's out of this court. It's in connection with summary judgment. It says under Rule 56(e), Affidavits, although not themselves admissible at trial, may be offered at summary judgment.

THE COURT: But this affidavit is admissible at trial. I think they're talking about an affidavit that's not admissible at trial.

MR. SZAL: It was summary judgment. So it hadn't --

THE COURT: I understand. Portions of it that you want redacted, ask him to redact it. If you want to reconsider and only put in the portions that you want so it's better highlighted, that's up to you.

Mr. Dennehy, we're all just trying to do our jobs here. We may as well try and get through it in as pleasant way as possible. I don't know why you feel the need to be rude to me or rude to anybody else, but I'd appreciate it if you ratchet it down tomorrow. The case is recessed. I'll see you at 9.

(Court recessed at 4:08 p.m.)