09:10:04

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

YURY RINSKY,

Plaintiff,

v.

CUSHMAN & WAKEFIELD NATIONAL CORPORATION,

Defendant.

Civil Action No. 1:16-cv-10403-ADB

April 13, 2017
9:01 a.m.

Pages 449 to 591

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
BOSTON, MA 02210

JOAN M. DALY, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
joanmdaly62@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

JOHN W. DENNEHY
Dennehy Law
127 Main Street
Suite 1
Nashua, New Hampshire 03060
603.943.7633
johnwdennehy.com

MARK D. SZAL
Donovan Hatem, LLP
53 State Street
8th Floor
Boston, Massachusetts 02109
617.406.4500
mark@szallawgroup.com

FOR THE DEFENDANT:

ROBERT R. BERLUTI
EDWARD F. WHITESELL, JR.
MICHAEL A. BEDNARZ
Berluti McLaughlin & Kutchin, LLC
44 School Street
Boston, Massachusetts 02108
617.557.3030
rberluti@bmklegal.com
ewhitesell@bmklegal.com
mbednarz@bmklegal.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on April 13, 2017, outside the presence of the Jury.)

THE COURT: I'm going to start, and then I'm going to let you guys go. I need to do it pretty informally so just shout it out.

On page 9, there's the language about the deposition, about the deposition coming in. I left it in because we're not done with the evidence. I don't think that's applicable at this point.

Page 9, I could say if you want me to, "You've heard deposition testimony referred to throughout the trial. A deposition is simply a procedure where, prior to trial, an attorney from one side may question a witness or adverse party under oath."

I could get rid of the first half of the first sentence and the last sentence because there's been no deposition testimony admitted. Or I can say, "You may consider the testimony that a witness has given at a deposition according to the same standard." I can just delete the end, "admitted as evidence part."

MR. BERLUTI: That will be fine, Judge.

THE COURT: I will delete the first sentence from -- the word "some." I will delete it. "Some of the testimony before used in the form of a deposition that has been received in a deposition and," I will delete that. That sentence will begin with "you."

The last sentence will now read, "You may consider the testimony of a witness given at a deposition according to the same standard you would use to evaluate the testimony of a witness actually given at trial." Right?

The other thing is on page 4, right now we talk about stipulations. Are there going to be any stipulations?

MR. BERLUTI: No, Judge.

THE COURT: What I would propose to say is the second sentence which currently says "evidence is presented at trial in one of three ways," I'm going to say "evidence was presented at this trial in two ways," and delete the paragraph that begins with "third." Okay?

MR. SZAL: Yes.

MR. BERLUTI: Yes.

THE COURT: You guys want to start? Do you want to go page by page? Is that easier?

MR. BERLUTI: Whatever you want to do. We do have several comments. I don't know if you have.

THE COURT: Why don't we start with him and then

we'll go to you.

MR. SZAL: The first comment was on element of the claims on page 10. Now that the common law claims are not in the case, at-will employment really isn't relevant, and I think the inclusion of at-will employee here could be confusing to the Jury and it's not necessary.

At-will employment doesn't allow you to take actions that are discriminatory, and I don't see the need to put the at-will employment here now that we're not talking about negligent misrep and reliance and things of that nature.

MR. BERLUTI: We disagree, Judge. The point is this was an at-will employment. There was testimony to that extent from Mr. Rinsky. And I think that that is the situation. That is the legal status of Cushman & Wakefield and Mr. Rinsky, that he was an employee at will. So I think it absolutely has to come in because it's clear that they can terminate him for any reason, including no reason.

THE COURT: I think that's right. I think it seems obvious to us, but I don't think it's going to be so obvious to the Jury that they could fire him as long as it was not for discrimination. So if you don't want "at-will employee," I could say he didn't have a contract. I think in some way we have to make clear to them, but for the discrimination, they could terminate him. I can take out "undisputed that,"

but I hate to --

MR. BERLUTI: That's accurate, Judge.

MR. DENNEHY: The instructions are not for recap of the testimony. That's for closing argument.

MR. BERLUTI: Respectfully, Judge, I think both as a matter of fact and as a matter of law in this case, he's an employee at will. As a matter of fact, he testified to it. As a matter of law, he --

THE COURT: Did he testify he was an employee at will?

MR. BERLUTI: I specifically asked him. I asked him specific questions. Was he an employee at will when he was hired? Was he an employee when he went out -- before he moved to Boston? And was he an employee at will after he moved to Boston? On all of those, he admitted that he was.

THE COURT: I can say, "if you find that he was an at-will employee," but then I feel like I have to define for them what an at-will employee is.

MR. SZAL: You're suggesting, generally speaking, without a contract, an employee can be terminated at any time for any reason as long as it's not discriminatory. I think the word "at will" twice really goes to more of the common law claims.

THE COURT: If the problem is that it's there twice, we can say instead "because he was an at-will

09:10:04 employee, he could have been terminated by the defendant at any time for any lawful reason."

09:10:04 MR. BERLUTI: I've got an issue with that last phrase. I think the law is clear, whether it's in New York or Massachusetts, Judge, that an at-will employee can be terminated for any reason, including no reason. It just can't be an unlawful reason. There's no burden that an at-will employee must be terminated for a lawful reason.

09:10:04 In this case, a lawful reason is just so that it's not an unlawful reason.

09:10:04 THE COURT: So I can say "terminated by the defendant at any time so long as it was not for an unlawful reason"?

09:10:04 MR. BERLUTI: Yes. I would ask that you add "at any time for any reason or no reason, so long as it's not an unlawful reason." That's what I would request because I think that's an accurate statement of what an at-will employment is.

09:10:10 THE COURT: I'm going to change the end of that to 09:10:12 say "at any time and for any reason so long as that reason 09:10:19 isn't unlawful."

09:10:23 All right. Now, back to the beginning. If you 09:10:30 want -- so I'm going to take out the first sentence, "it is 09:10:33 undisputed that," okay, taking that out, and I'm going to 09:10:37 say, "because he was an at-will employee, he could have been

terminated by the defendant at any time for any reason so long as that reason wasn't unlawful."

MR. SZAL: Well, can we just say an at-will employee can be terminated as opposed to giving the conclusion that he is? "An at-will employee can be terminated by the defendant at any time for any reason so long as that reason isn't discriminatory."

THE COURT: "An at-will employee can" --

MR. SZAL: "An at-will employee can be," and then the rest.

THE COURT: "Can be terminated by his employer"?

MR. SZAL: Yes.

THE COURT: Okay.

MR. BERLUTI: I want to press back once more, Judge. Okay? There is no dispute in this case that he was an at-will employee. There is no dispute.

THE COURT: I know, but it hasn't been stipulated to so I can't instruct them that it's a fact.

MR. BERLUTI: I think, Judge, that -- you know, you've heard the evidence.

THE COURT: I've heard the evidence and so have they. I don't think it's disputed, but I am not going to instruct them on a fact if they're not growing to agree that I can.

MR. BERLUTI: I think it's fact and law based upon

the evidence, and I think based upon that, the original statement is accurate, that it is undisputed that he is an at-will employee.

In some respects, it opens up more of a Pandora's box because it requires more of a definition than what an at-will employee is. There's no question about whether or not he was an at-will employee. I mean, it's just he has no contract. They haven't asserted that he has a contract. They haven't asserted that he has any basis of any legal rights.

THE COURT: You're going to have to deal with it in closing. I don't think he's seriously going to dispute it, but if he's not going to agree that it's undisputed, then I'm not going to charge it as a stipulated fact.

Go ahead.

MR. SZAL: On the back pay and front pay, the last line on page 14, "Plaintiff loses the right to claim back pay or front pay," in terms of mitigation, I think that should be changed to "Plaintiff's right to claim back or front pay may be reduced as opposed to."

In other words, mitigation is a reduction in front pay or back pay. It doesn't mean -- in other words, if he was due $150,000 and he went out and got a job for 50, you'd reduce it and get 100. I don't think it cuts off.

THE COURT: It came out of your -- I didn't know if

it was right or not, but I figured I would put it in and we could have the discussion.

MR. BERLUTI: It came out of my what?

THE COURT: It's in your proposed points for charge. That's where it came from.

MR. BERLUTI: The point about mitigation, Judge, if the facts were that he obtained other employment, it's true that it would be a reduction of what he actually earned. But there's no rule that says if he doesn't earn any wages, that it can't be reduced to zero. So I think if mitigation does -- if he fails to mitigate -- if the Jury finds that he failed to mitigate his damages, he does lose his right to recover anything. If he partially mitigated, then it's a reduction.

MR. SZAL: Again, though, I think we're getting into the evidence and determining what the testimony was. This is to just state what the law is.

MR. BERLUTI: And I think what I've just stated is the law, Judge. I think that there's no -- by saying that it may be reduced where there's no evidence, all I'm saying is that it's misleading -- I think it's misleading to the Jury.

THE COURT: I think that needs to be reworded, but let me think about that. The idea that we really want is more of a sliding scale, right? If you make some efforts, you're reduced by some. If he makes no efforts, he can --

MR. BERLUTI: Respectfully, Judge, I think the law would be this. If he made reasonable -- if he didn't make reasonable efforts, he's not entitled to anything. If he made reasonable efforts and, in fact, found another job but at a reduced rate, then he gets the difference between what he earned and what he did.

But what you've stated here is absolutely accurate. If the plaintiff failed to make reasonable efforts, what you've stated is 100 percent accurate. If he failed to make reasonable efforts -- I agree that it's up to the Jury to determine whether or not it was reasonable. But if he made reasonable efforts, that's a question for them.

What you've stated here as a matter of law is absolutely accurate. If they make a finding that he did not use reasonable efforts, he does lose his right to recover wages. That's what the law of mitigation is.

THE COURT: "If you find that the defendant has shown the plaintiff failed to make any reasonable efforts to find other suitable employment, Plaintiff loses the right to claim front or back pay. It is up to you to decide if he made reasonable efforts or not." How is that?

MR. BERLUTI: I think it's closer, but I think if you find the defendant has shown that the plaintiff's efforts were not reasonable efforts, I think that would be a more accurate statement. "Any efforts" means -- you know, if he

read a classified ad, that might mean any effort. But is that reasonable?

The focus has to be reasonable. If you find that his efforts were not reasonable efforts --

THE COURT: Isn't that what it says, "If you find that the evidence shows that the plaintiff failed to make any reasonable efforts, he only gets -- no pay if he made no reasonable efforts. If he made some reasonable efforts, he gets some pay," right? So we're going to have this sentence that he loses the right to all pay. We need to make very clear that it's a -- right?

MR. SZAL: I think that was my point about reduction.

MR. BERLUTI: I stand on our position, Judge, that we have to prove -- it's our burden of proof to show that he failed to make reasonable efforts. I think by putting the word "any" in makes it look like if he made any effort, it becomes a reasonable effort.

THE COURT: I think if he's going to lose the right to claim all back or front pay, that it's a pretty high bar. I can take it out, right? I mean, I could take the last sentence out altogether.

MR. BERLUTI: I don't think that's the -- what the law of mitigation is, Judge. I think you're leaving it short if you do that.

09:18:56 THE COURT: I could put in a whole other sentence that says, "If you find that the defendant has shown" -- we could take it on a gradation. No reasonable effort, some reasonable efforts, and add a line about how some reasonable efforts, he gets some front and back pay.

09:19:26 MR. BERLUTI: I think the quantum of his efforts -- if it's some, none, or a lot -- is for the Jury. I think that they make the determination as to whether or not his efforts were reasonable under the circumstances, and I think that's where it goes. If they find his efforts were not reasonable under the circumstances, then he's not entitled to cover damages.

09:19:58 THE COURT: All right. How about this: "If you find that the defendant has shown that the plaintiff failed to make any reasonable efforts to find other suitable employment, Plaintiff loses the right to claim back or front pay. It is up to you to decide if he made reasonable efforts or not and to what extent those efforts mitigated damages"?

09:20:16 MR. BERLUTI: I like that.

09:20:17 MR. SZAL: That's fine.

09:20:20 THE COURT: Okay. Next.

09:20:22 MR. SZAL: Page 15, punitive damages, last sentence. We took the pattern jury instructions in order to have a more balanced instruction here, and so we just went with the apparent instructions which seem to be captured

here, except for the last paragraph where it says, "You should not consider the defendant's ability to pay an award, any award that you make."

And I think that you're taking out part of the pattern jury instructions where it says, "You may consider the defendant's financial position and the impact your punitive damage award will have on the defendant." So not only you've taken it out, but it seems like you've put in an instruction that --

THE COURT: I'm happy to take that whole last sentence out. I don't know if it even belongs in there. It's another one I put in as a discussion point. There's been no -- I think that discussion usually comes in when someone says it's going to put them out of business or whatever, right? So I'm happy to take the sentence out.

MR. BERLUTI: We can give you the basis for it.

Go ahead. Okay.

THE COURT: Take it out?

MR. BERLUTI: I don't see that this is going to put Cushman out of business, Judge. I can't say that.

THE COURT: I'm going to just take it out. As long as we're on the subject of discussion points, the other thing I sort of wrestled with in this section is present value. Do you guys want that instruction in there?

MR. BERLUTI: Yes.

09:22:00 MR. SZAL: Yes.
09:22:01 THE COURT: Okay. All right.
09:22:02 Mr. Szal, anything else?
09:22:05 MR. SZAL: I'll just put on the record that we'd
09:22:07 like the pattern instruction, "You may consider the
09:22:10 defendant's financial condition and the impact your punitive
09:22:12 damage award will have on the defendant."
09:22:17 THE COURT: I think that the punitive damage
09:22:21 instruction pretty well captures that, that it's supposed to
09:22:25 be to punish.
09:22:27 MR. SZAL: Okay.
09:22:27 THE COURT: I don't think $10 is going to punish
09:22:30 Cushman & Wakefield, so I think they'll get the idea.
09:22:34 Anything else, Mr. Szal? I'm happy to circle back
09:22:38 when Mr. Dennehy gets here.
09:22:40 MR. SZAL: Just with respect more with the Jury
09:22:43 special verdict form.
09:22:44 THE COURT: Yes.
09:22:46 MR. SZAL: You know, I think just -- you know,
09:22:50 obviously should be consistent with the instructions. We had
09:22:56 originally proposed having just one question. "Do you find
09:23:03 that they discriminated against him because of age and/or
09:23:06 disability?"
09:23:10 And I think in your discussion of discrimination,
09:23:14 it actually says, "Have we proven by a preponderance of the

evidence that his age, a disability, or both was a substantial contributing factor?" So if it's more of a question -- I don't want to confuse the Jury, you know, by having two questions. If they think it's a little bit of both but not completely that, they have to vote "no."

THE COURT: If it's a little bit of both, I don't think that gets you there.

MR. SZAL: The instruction says "by a preponderance of the evidence that his age or disability or both."

THE COURT: Yeah, that means question one and question two. That doesn't mean you get to find half of question one and half of question two.

MR. SZAL: I don't think that's what I meant by "little of both," that they were both factors. The combination of the factors was part of the decision. If you think having one question will confuse the Jury more, then we're happy to have the two questions, but I just want to make sure that the instructions are captured on the verdict form.

THE COURT: I actually have a different issue on the verdict form while we're on it, so this is what I did as sort of a starting point. The other way to do it would be, "Did he prove that his age was a substantial factor in the termination decision?" So I can either go with "substantial factor" or "preponderance." I think it gets to be a

confusing question if you try and sort of bake both of those in there.

MR. SZAL: "Preponderance" is fine.

MR. BERLUTI: I think we're getting into something else, Judge, that's imbedded in one of my comments.

THE COURT: We can -- hold on.

MR. BERLUTI: I think what your instruction says is, "Age and/or disability is a determining factor if plaintiff would not have been terminated but for his age and/or disability."

THE COURT: Give me a page number.

MR. BERLUTI: Sure. It's page 10, Judge. It's in the second paragraph. And I think that that really is the law.

THE COURT: Are you commenting vis-a-vis the verdict form, or are you asking me to change something here?

MR. BERLUTI: In the next sentence, I am. What I'm saying is vis-a-vis the Jury verdict form, they have to prove by a preponderance of the evidence that but for age discrimination. Second question, "But for disability discrimination, the plaintiff would not have been terminated." I think that has to be determined by a preponderance of the evidence.

THE COURT: You're telling me you want to put both concepts into the Jury verdict? I'm not sure what you're

asking me for.

MR. BERLUTI: You're saying substantial factor, Judge. It says "but for age discrimination, the plaintiff" -- they have to find was Yury Rinsky terminated -- they have to find by preponderance of the evidence that, but for age discrimination, Cushman & Wakefield would not have terminated him. I'm doing it on the fly. I think the "but for" aspect should be captured in the question.

THE COURT: "Substantial factor" and "but for" sort of seem the same thing to me. Right?

MR. BERLUTI: To you. I think it's clearer, respectfully, to say "but for." I'm not sure that the standard is different. I agree with that, but I think it's a clearer statement to say "but for."

MR. SZAL: I don't agree. That's a legal term. They're not lawyers. "Substantial factor" is more akin to what their experience is going to be. I don't agree to incorporating another standard in the verdict. You're saying "preponderance of the evidence" and "but for." You're kind of giving like a double bar in there.

THE COURT: Where I came down on that -- I thought about this. Where I came down on it "was preponderance of the evidence," it is the legal standard. So put that in there. And then "discriminated against him," I thought we were covering in the jury charge itself by defining

"substantial factor but for -- but for causation." That's where I came down on it.

MR. BERLUTI: But, respectfully, the instruction says that "Age and/or disability is a determining factor if plaintiff would not have been terminated but for his age and/or disability." So you've actually quasi-defined "determining factor" by saying that the plaintiff -- that the plaintiff proved that the plaintiff would not have been terminated but for his age and/or his disability.

THE COURT: Right.

MR. BERLUTI: And I think now, in the Jury verdict question, it's changing that a little bit.

THE COURT: Well, it's --

MR. BERLUTI: Actually, Judge, if you don't want to put both in, trying to hear this -- I'm not so concerned -- they're going to be instructed about the burden of proof. So I guess the question should be, "Has the plaintiff proven that but for age discrimination, he would not have been terminated? Has the plaintiff proved that but for disability discrimination, he would not have been terminated."

And if you want "the preponderance," that can go sort of at the top with a colon, and then one, two below it. I think the real point here is the -- that the burden of proof is always with the plaintiff to show that but for the unlawful discrimination, the job action would not have been

taken.

THE COURT: We could leave it as it is. Instead of a question mark, put a comma, meaning that -- I think it gets very -- and I like a verdict form to be very clean.

MR. BERLUTI: I agree with you. What I'm saying is, Judge, say, "Has the plaintiff proven by a preponderance of the evidence," colon, number one, "but for age discrimination, his job would not have been terminated?"

THE COURT: How about if we do it -- let me take another stab at the verdict form. I think I'm going to go with "substantial factor" instead of "but for." It's defined in there, but that's not a bad idea. "Did he prove by preponderance" -- that sort of solves your problem too.

MR. SZAL: It takes the word "discrimination" out. I'm not suggesting that. "But for age discrimination, the decision would not have been made."

THE COURT: Let me take another stab at that while we're taking the last witness. I'm not done, I'm just wondering how much longer I'm going to have to do this.

MR. SZAL: Hour and a half, two hours. Probably go to lunch.

THE COURT: Plenty of time. All right. Back to the charge.

MR. BERLUTI: Again, page 10, the next sentence, page 10 under Elements of Discrimination.

09:31:16 THE COURT: Okay.

09:31:17 MR. BERLUTI: "In other words, if you can find that the defendant has proved" -- I guess the word "can" --

09:31:27 THE COURT: You're right. That's out.

09:31:28 MR. BERLUTI: "If you can find that the defendant that it would have discharged the plaintiff even if it had not taken his age and/or disability into account, you will find for the plaintiff." I respectfully think that's a misstatement of the law.

09:31:40 THE COURT: I think that's a remnant from the burden shifting.

09:31:43 MR. BERLUTI: I think it -- at best, it wasn't the burden shifting law. I think, at best, there was a burden of production by Defendant of a legitimate nondiscriminatory reason. The burden of proof never shifts to the defendant. So I think that language is wrong respectfully.

09:32:07 THE COURT: Why don't I just take out the entire -- I'm going to take out the whole sentence that begins with "in other words," and I'm going to take out two sentences right there. The whole thing can go. It's a remnant from when I had the McDonnell Douglas charge in here.

09:32:29 It will say "age and/or disability is a determining factor" -- I'm going to say "are determining factors if plaintiff would not have been terminated but for his age and/or disability. Discrimination is rarely admitted and may

be inferred from the existence of other facts." Okay?

MR. BERLUTI: I think that's better, yes.

THE COURT: I agree. I hope you have the same issue on page 11 because I think there are some issues in there that are also remnant.

MR. BERLUTI: I do, Judge.

THE COURT: I didn't have time to fix it this morning. I figured we'd do it out here.

MR. BERLUTI: The problem is at the bottom, Judge, I think you've got some language in here about pretext. Again, I don't think it's the law.

THE COURT: I think you're right. My law clerk pointed it out this morning. I just didn't have a chance to deal with it and thought we'd deal with it out here. I think it goes to the --

I think, backing it up a little bit, the paragraph that begins with "if you find," I think that paragraph should likely come out, right?

MR. BERLUTI: I think the concept should be the burden of proof is always on the plaintiff to prove that discrimination is the reason for his job termination. That's the ultimate instruction that I think has to be given, Judge. That's what I think the statement of the law is.

THE COURT: What about taking out the last three paragraphs in their entirety?

MR. SZAL: I don't agree that an instruction shouldn't be in there saying, "If the reason they gave the termination is false, then you can find for the plaintiff." I don't agree that that's the law. I don't care about having the word "pretext" in there, but the whole concept is if you find --

THE COURT: I think it's baked into discrimination, right? If they find that their reason is a pretext, then there's discrimination, right?

MR. SZAL: I think they need to be instructed on that, though.

THE COURT: I'm not going to instruct them that it is discrimination. If you want language about pretext in there, I'll do it, but I don't think it's right the way it is now.

MR. SZAL: Like I said, I don't care about the word "pretext" or "burden shift" or anything, but I think there has to be an instruction that they understand if the reason given is false, they can infer unlawful discrimination.

MR. BERLUTI: No. Respectfully, Judge, that's just not the law. That was the law under Blare v. Husky. It's not even the law in Massachusetts anymore.

MR. SZAL: We're in New York law now. That's what you asked for.

MR. BERLUTI: I understand that. I don't think

it's the law under New York either. It's not the law under any of the standards of discrimination.

THE COURT: I think he's right. You can put in something saying that they can consider whether the reason put by Defendant was a pretext, but I don't think I can tell them that they can -- I don't think I can take the next step.

MR. SZAL: But they can infer, not that they can find.

THE COURT: You have to infer by a preponderance of the evidence, right?

MR. SZAL: Right. But for.

MR. BERLUTI: The case of Melman versus Montefiore Medical, Judge, it's a New York case. I'm happy to hand it up to you. This is New York State Supreme Court, right?

MR. WHITESELL: No. This is the Appellate Division, New York City.

MR. BERLUTI: Appellate Division, New York City. "In order to nevertheless succeed on [his] claim, the plaintiff must prove that the legitimate reasons proffered by the defendant were merely a pretext for discrimination by demonstrating both that the stated reasons were false and that discrimination was the real reason."

I think that's an accurate statement of the law really across all the discrimination statutes at this point. I'm happy to hand this up to you.

THE COURT: Okay.

MR. BERLUTI: I'll just note, Judge, that that's a case that was also cited by the plaintiffs.

THE COURT: Is this a summary judgment case?

It's a summary judgment case. That's why the McDonnell Douglas thing is so baked in there.

MR. BERLUTI: It may be, but the issue of pretext applies. The thrust, Judge, is that at all times the burden of proof is on the plaintiff that discrimination -- that but for discrimination, that discrimination was the reason that the person was terminated.

So what has come down if they say, "We terminated you because you have blond hair," and that wasn't the real reason, but the real reason was because they were disruptive in the workplace, then that's pretext, but it's not pretext for discrimination.

And that's why these laws have evolved the way they have. They have to prove ultimately that the determining factor, that but for age discrimination or disability discrimination, the job action would not have been taken. I think pretext is a part of it.

And they begin to at least go there if they find that the reason given was not the real reason. But at the end of the day, you can't jump from the reason given was not the real reason to discrimination. That's not --

THE COURT: It does weigh in there, right?

MR. BERLUTI: I agree with that. I agree it does weigh in there. All I'm trying to say is I think that that statement of the law is accurate. That if it's a pretext -- they have to find that it's both a pretext and that discrimination was the reason for the job action, so it's a one plus one.

THE COURT: I'm going to need to think. I can't do that one on the fly. We'll come back to that one.

MR. BERLUTI: Just a couple more.

THE COURT: That's fine.

MR. BERLUTI: Under Damages, page 13, what I've typically seen is a short preamble to a damages instruction. It says, "Just because I'm instructing you on damages, you should not infer that" --

THE COURT: Yes. I'll add that in.

MR. BERLUTI: Then on page 15, Punitive Damages, Judge.

THE COURT: I'm sorry. What page?

MR. BERLUTI: Page 15, Punitive Damages. We believe, Judge, that there is a different burden of proof that applies to the Jury awarding punitive damages. This is a Manhattan case, First Department, and I believe the standard is clear, unequivocal, and convincing evidence that the defendant's conduct was so wanton or reckless as to

justify an award of punitive damages.

THE COURT: Clear, unequivocal, and what?

MR. BERLUTI: Clear, unequivocal, and convincing evidence. I'm happy to hand up that case, Judge.

THE COURT: I don't think that's a standard. They don't have to find damages by a preponderance, right? Damages just have to have kind of a rational basis, right? I don't think that's talking about clear and convincing evidence like clear and convincing evidence. I'm happy to read the case, but there's never been a burden of proof on damages like that.

MR. BERLUTI: In order for them to award it -- again, this is on punitive damages, Judge.

THE COURT: Obviously, we're instructing that it has to be wanton, reckless, or malicious. It's definitely a different standard.

MR. BERLUTI: I'm going to provide this.

THE COURT: I'm happy to look at it.

MR. BERLUTI: It says specifically, "They must demonstrate by clear, unequivocal, and convincing evidence."

THE COURT: I've just never heard of that. I'm happy to look at.

MR. BERLUTI: Punitive damages are not widely awarded. Most of us in civil cases, the idea of compensatory damages, they don't have to be proven by mathematical

certainty and all of that. I get that. But I think now you're in a punitive situation, it's punishment. As you know, there's a higher burden, and I think that New York law certainly contemplates that.

THE COURT: I'll take a look at it.

MR. SZAL: Again, we used the pattern instructions that have been developed in New York. We didn't just cherry-pick a case here and there. We tried to have fair and balanced instructions. I don't agree with that standard. Punitive damages, they're available on common law claims in New York. I don't even know if that's a discrimination case or just a common law case.

MR. BERLUTI: If you were to look at the pattern instructions, Judge, they specifically make a note of this in the comments, Judge. They discuss this.

MR. SZAL: It's in the comments. It's not in the instructions.

THE COURT: I'm looking at it in the text. It goes on to say that "evidence fails to establish that they were motivated by malice, vindictiveness, or criminal intent or that its conduct is intentionally outrageous or oppressive or undertakes a wanton disregard for public safety." They sort of back away from that.

They don't say that "evidence fails to establish by clear and convincing." They just say "it fails to

establish." I'll read the case, though, and take a look at it.

We have a couple of hours. I take your point.

MR. BERLUTI: I'm happy to hand up to you, Judge, so you have all of it. It's the pattern instruction and the comment.

THE COURT: That's fine. I'll take that too.

MR. BERLUTI: I'll highlight the part just to help. The point here, Judge, that it's in the first -- I'm sorry, I don't mean to sit down. And the real significant thing here is that it's in the First Department, which is part of the five boroughs, which is what this is.

THE COURT: Anything else?

MR. BERLUTI: No, Judge. I guess the only other thing would be this, Judge, and you're still working on the Jury verdict slip. We would request that as a part of this -- part and parcel of this, that under the Jury verdict slip prior to the punitive damages, you just have it listed, back pay, front pay, emotional pay, punitive damages.

That is, before punitive damages, there be a question, "Did Yury Rinsky prove by, clear unequivocal, and convincing evidence that Cushman & Wakefield's acts were wanton and reckless and malicious, thereby warranting an award of punitive damages, yes or no?"

THE COURT: I'm not going to do that.

MR. BERLUTI: I think it should be a preliminary question, Judge. I'm offering this as language. It comes right out of the case. I think there should be a preliminary question before we go right to punitive damages.

THE COURT: Are you losing confidence today?

MR. BERLUTI: No.

THE COURT: I don't think I'm going to do that, but I'll think about it.

MR. BERLUTI: If you'd like proposed language on that, we have that.

THE COURT: Sure. Pass it up.

MR. SZAL: We object for the record.

MR. BERLUTI: Just doing my job, Judge.

THE COURT: There has to be a little levity when available. I'm going to start working on this. We'll get you guys a red-lined. We'll pass it down sometime this morning. You know I'm not here tomorrow so we have to get this to the Jury today. We don't need a verdict today. Judge Young will take the verdict if I'm not here.

That's where we are. How long do you think he's going to be on direct?

MR. SZAL: You never know with him. Maybe shortly after lunch, he'll be done.

THE COURT: With direct after lunch?

MR. SZAL: Yes.

THE COURT: That's really pushing it.
MR. SZAL: I'll tell him to hurry.
THE COURT: Did you see them applaud when I told them we were going to charge and close today?
MR. SZAL: No.
THE COURT: They did. They get it.
MR. SZAL: I'll tell him.
THE COURT: I have to get them charged today. How long are closings?
MR. SZAL: Similar to opening, maybe 20 minutes, 15.
MR. BERLUTI: I think similar to openings, I think it was more like 20 minutes, but, you know, in that area. We're not talking about an hour, Judge.
MR. SZAL: I said 20.
THE COURT: All right. If we're really pressed, I can charge them, and then you can do closings with Judge Young tomorrow, because he can't charge them but he can sit here and do closings, but I'd really rather not do that.
MR. SZAL: I think we should be fine today.
MR. BERLUTI: That would not be my preference, Judge. If we have to, we can.
THE COURT: Nor mine. It's an imposition. And I'd rather get this to them.
MR. SZAL: We'll get there.

THE COURT: They get what happened, okay? They get the factual scenario, okay?

MR. SZAL: Yes.

THE COURT: I'll see you all in ten minutes.

MR. SZAL: Thank you, Your Honor.

(Court recessed at 9:48 a.m.)

THE COURT: When the court reporter wasn't here, we had a brief discussion off the record where Mr. Berluti raised the fact that I had omitted the stray comment -- his requested stray comment instruction from the instructions. And I explained to him that that came up in the summary judgment context and that I didn't think it needed to be in the regular charge since the Jury could weigh that comment along with everything else.

Does that fairly capture our discussion?

MR. BERLUTI: I think it does, Judge. So my objection is clear, I'm relying on the case of Formosa versus Marshalls of Massachusetts, Inc., which is a United States District Court case in the Eastern District of New York. I think the request for an instruction was with respect to whether or not the comments that they claim were evidence of discrimination has to be placed in terms of time. So it's a temporal element and an element of the circumstances under which they were made versus the circumstances in which the job action that's complained of is made.

So I would request that there be an instruction along those lines. That's my objection.

MR. SZAL: We object to that. There's no evidence of stray comment. Stray comments typically in these cases are somebody makes an off-the-cuff, he's old or he's sick or whatever. The comments in this case are very pointed. Brought into a conference room, said, "If this happens again, this is what is going to happen." It's one-to-one conversation. And stray remarks are typically something that's overheard in the workplace, in the coffee room, something like that. So I don't think it's appropriate in this case and we object to the instruction.

THE COURT: I'm not going to give the instruction. They're getting an overall instruction on how to consider the evidence. I'm going to leave it at that without particularly highlighting one piece of evidence or another.

MR. BERLUTI: You certainly have no issue with us making an argument along those lines, right?

THE COURT: No, I do not have an issue with it. Yes, you may make the argument.

Do you want to see if they're here, Karen?

MR. DENNEHY: Your Honor, I was just curious in terms of how we time this. Do you typically like to charge before or after closings?

THE COURT: What I don't like to do is split up the

closings. I'm a little bit flexible about it. So, for example, if by some miracle of God, everybody rested before lunch and there wasn't time to do closings, I would do the first half of the charge to use the time.

MR. DENNEHY: I was trying to think if you're willing to do that, then I would try to accelerate the exam and see if we can get the evidence in before lunch, have lunch, and then have the closing statement.

THE COURT: That's fine. I'm happy to split it sort of between the preliminary charge and the case-specific charge, the elements of the offense. I typically give the final part of the charge after closings, but if by agreement you wanted me to do the entire charge before closings, I would do that too.

But I'm certainly amenable to splitting the jury charge. I actually think it's easier for the Jury to get it in two chunks, and I think it lets them focus more on the elements part of the charge. I'm flexible. I want to use the time as best we can, and I really don't want to split the closings before and after lunch.

MR. DENNEHY: I agree.

THE CLERK: All rise for the Jury.

(Jury enters the courtroom.)

THE COURT: Oddly enough, today I had no problem getting in. We're all pretty firmly committed to trying to

10:21:17 get you this case today, so I hope you'll bear with us if we shorten up lunch a little bit. We want to get this through today if we can.

You need to call your next witness, correct?

MR. DENNEHY: Thank you, Your Honor. We'll call Colin Reid to the stand.

THE CLERK: Can you please raise your right hand.

(Colin Reid duly sworn.)

THE CLERK: Can you please state your name and spell your last name for the record.

THE WITNESS: Colin Reid, R-E-I-D.

DIRECT EXAMINATION

BY MR. DENNEHY:

**Q**. Good morning, Mr. Reid. How are you?

**A**. Good morning.

**Q**. Just start off with a few basic questions here. You've worked for Cushman & Wakefield for over 27 years, correct?

**A**. Yes.

**Q**. And during that time, you were actually the one that hired Yury and you've been his supervisor that entire time, correct?

**A**. Correct.

**Q**. And a principal part of what you did was the AS/400 system, correct?

**A**. Yes.

**Q.** And you had a deposition in this case, did you not?
**A.** Yes.
**Q.** And in that deposition, you served as a corporate designee for Cushman & Wakefield. Do you recall that?
**A.** Correct.
**Q.** And during that deposition, you were involved with the document production, correct?
**A.** Yes.
**Q.** And do you recall testifying that this merger that you've heard about --
You've been in the court all week, correct?
**A.** Correct.
**Q.** And you've heard us talk about the merger. That merger had a heavy impact on the IT department, right?
**A.** Absolutely.
**Q.** And for the time that you worked with Yury, you felt that his work was great, right?
**A.** Yes, I did.
**Q.** And you trusted him, correct?
**A.** Yes, I did.
**Q.** And just to get one point down, you actually officially moved to Miami April 8; is that the date?
**A.** Well, I reported to the Miami office on April 8, but actually my last day in New York was March 27. Then I went on PTO and started working on April 8.

**Q.** Okay. And am I correct when you went to the Miami office, that you continued to supervise the unit in New York?
**A.** Yes.
**Q.** And when you went to the Miami office, you worked four days a week in the Miami office and typically one day a week at home?
**A.** Not every week. It's optional. It's at my discretion how many days I can work in the office or work at home. Some days I'm in the office -- some weeks I'm in the office five days, some four.
**Q.** Okay. As a general premise, you would like to work four days in the office, one day at home if the schedule was going well?
**A.** Yes.
**Q.** Okay.
MR. DENNEHY: Can you pull up Exhibit 3.
THE CLERK: Is this an exhibit?
MR. DENNEHY: It's an agreed-to exhibit. Okay. Can you scroll up a little bit. We'll start with the bottom.
BY MR. DENNEHY:
**Q.** Before we get to questions about the exhibit -- I've got it up here -- but just as a general premise, you had a company laptop, correct?
**A.** Yes, I did.
**Q.** In New York, you had a desktop as well?

**A.** Yes.
**Q.** This is an email dated from you to Andrew Hamilton, Monday, March 2, regarding space for Colin in Miami? Did I read that correctly?
**A.** Correct.
**Q.** And it says, "I would like a desktop PC with a monitor. Let me know if I should order it through Mike Loffredo. I will keep my laptop at home for remote support. There's an AS/400 printer already there which I will connect to."
Did I read that correctly?
**A.** Yes.
**Q.** You're looking for Andrew Hamilton to give you a desktop for the Miami office?
**A.** Correct.
**Q.** And then above it's from Andrew Hamilton to Colin Reid with a copy to Wanda Riley saying, "Re: Line Space for Colin in Miami. Wanda, I spoke with Colin about our conversation this morning. He'll bring his laptop but would like to set up a desktop machine. Unless you have any concerns, we can process the new equipment within IT directly."
Did I read that correctly?
**A.** Yes.
**Q.** Is he talking about getting you a new desktop here?
**A.** Yes.
**Q.** Okay. And was the situation going to be that you'd get a

new desktop in Miami and your old desktop would remain in New York?

**A.** Correct.

**Q.** Okay.

MR. DENNEHY: Then let's just scroll.

BY MR. DENNEHY:

**Q.** And Wanda just replies, "Okay with me."

And did that actually go forward, that you got the new desktop in Miami?

**A.** I did.

**Q.** You didn't have to fill out any forms --

Just to clarify, Andrew Hamilton is your direct manager, right?

**A.** Correct.

**Q.** You just had to reach out to him through an email and this all happened, correct?

**A.** Correct.

**Q.** The Workday system that you heard about while you've been in the courtroom, that Workday system was to be a new system that would impact the financial applications in the AS/400, correct?

**A.** Correct.

**Q.** And Yury Rinsky in your unit dealt with those financial applications, correct?

**A.** Yes, he did.

**Q**. This Workday program was going to have a major impact on how the computer system worked for collecting commissions, correct?
**A**. Yes.
**Q**. And was the idea that the Workday system would phase out the existing AS/400 for financial applications?
**A**. That was part of the phaseout. There were other applications on the AS/400 that are still there today that had nothing to do with Workday.
**Q**. Understood. So there's still part of AS/400 that's still going? It's an old beast that continues to roar, right?
**A**. Yes.
**Q**. But in terms of these financial applications and a lot of the stuff that Yury was doing, the Workday was changing that, correct?
**A**. Yes. But the Workday was actually replacing PeopleSoft, and PeopleSoft was not on the AS/400. PeopleSoft was on network servers supported by IBM -- Microsoft, sorry. Microsoft network servers.
**Q**. Okay. There was some level of phaseout of the AS/400 system in terms of the financial applications, though, correct?
**A**. Yes.
**Q**. Around this time, March-April 2015, you would describe that as a busy time for you, correct?

10:29:53 **A.** Absolutely.
10:29:54 **Q.** Major things were going on. Number one, you're moving, trying to relocate to Miami, correct?
10:29:59 **A.** Yes.
10:29:59 **Q.** Number two, there's some major systems development going on because of this merger, correct?
10:30:08 **A.** Correct.
10:30:09 **Q.** And to be fair so people know, when two companies come together, they have different systems that are incompatible, there's all this IT work that has to happen so that things can work smoothly, correct?
10:30:24 **A.** Correct.
10:30:28 **Q.** And around this time, you also had unfortunately a death in the family, correct?
10:30:33 **A.** Correct.
10:30:34 **Q.** And I think you testified at your deposition, when you asked to move to Miami, you went to Andrew Hamilton and said you'd like to relocate there, correct?
10:30:50 **A.** Correct.
10:30:51 **Q.** And I believe that you said that you didn't pressure them, it wasn't an immediate thing. So it came up, there were some discussions, and eventually this came to fruition, correct?
10:31:06 **A.** Yes. It took several months.
10:31:07 **Q.** It took several months. And isn't part of it you didn't

press the issue because there wasn't a pressing need to make the change, correct?
**A.** Correct. I did not press them.
**Q.** And you yourself didn't go to Leif or Craig to talk about this, you relied on discussions with Andrew Hamilton, correct?
**A.** Correct.
**Q.** And you yourself didn't process any forms to go through the process, correct?
**A.** No, I did not.
**Q.** To be clear, when you did the transfer from Miami -- from New York to Miami and you worked from home sometimes in Miami, sometimes at the office, when you made this change, wasn't part of the arrangement was that you would occasionally go to New York on an as-needed basis?
**A.** Yes, it was.
**Q.** And you were willing to do that, right?
**A.** Yes, I was.
**Q.** And you've been doing that for some period of time now, a couple of years?
**A.** Yes. A couple of years.
**Q.** And there's been no decrease in your ability to service that department, correct?
**A.** Correct.
**Q.** There's been some discussion during the trial about how

work gets done in your department. Isn't it true that for a big assignment, there's an intake form that's given out to the software engineers with an assignment if it's a big assignment that happens, big project?

**A.** I believe you're referring to the change request. Yes, it's a form that describes the business rules that have to be coded when the programs are written by the programmers.

**Q.** So the change request form is something that is processed, and then at some point it's given to the software engineer, and then they do the work, right?

**A.** Yes.

**Q.** And then some of the times they get their requests from users, wherever the users are, through an email, "I have this issue with my desktop," smaller problem, and they just respond to those requests, correct?

**A.** That's possible.

**Q.** From your experience --

You've been in business for over 30 now, correct?

**A.** Yes.

**Q.** And you're familiar with workflow models, correct?

**A.** Yes, I am.

**Q.** And isn't it fair to say that work productivity is increased when you have good workflow models in place?

**A.** I agree.

**Q.** Scheduling meetings through calendar invites is a more

better way to coordinate people's time and effort than just ad hoc meetings, correct?

**A.** Yes. It depends on the number of people that are going to be participating in a meeting. If it's just me and an IT person, then the meeting invite might not be necessary. I could just walk over or call that person. But if it involves people from the finance group, yes, normally we would do the meeting invites.

**Q.** But meeting invites and workflow-type things, they also deal with people's availability and resource management, right?

**A.** Absolutely.

**Q.** You agree you did have a conversation with Yury Rinsky, he came to you after your transfer was in place, and he said that he would like to move to Boston, correct?

**A.** Yes.

**Q.** And you agree that you responded to Yury that you were okay with him transferring, but that you would have to check with your manager, correct?

**A.** Yes. He actually told me that he was moving to Boston and he would like to live in Boston. And yes, he did tell me that. And I said I would have to check with my management and run it up the food chain. What that means is Andrew would have to take it up to his management, and ultimately it would have to be approved by the global CIO, who is the same

10:36:40 person who approved my transfer.
10:36:59 **Q.** You admit that either on April 30 or May 1, 2015, you did speak to Andrew Hamilton about Yury wanting to transfer, correct?
10:37:08 **A.** Correct.
10:37:08 **Q.** And that discussion took place before -- to your understanding, as you sit there today, that Yury actually departed the New York office on May 27, correct?
10:37:19 **A.** Correct.
10:37:20 **Q.** And so when you had this discussion with Andrew Hamilton, both of you were apprised of his desire to go to Boston before he left, correct?
10:37:30 **A.** Yes.
01:11:07 MR. DENNEHY: Go to Exhibit 11.
01:11:07 BY MR. DENNEHY:
10:37:31 **Q.** This is an email -- Exhibit 11, an agreed-to exhibit. It's from Colin Reid to Andrew Hamilton dated May 14, 2015. It says, "Subject: Accepted AS/400 Resourcing."
10:38:10 Did I read that correctly?
10:38:11 **A.** Yes.
10:38:12 **Q.** And it says, "Colin, let's discuss the situation Yury has put us in with his home purchase in Boston. On the flight up, could you think through the options and risks of replacing him (via contractor or permanent role) so we can evaluate all the pros and cons of keeping and replacing."

Did I read that correctly?
**A.** Yes.
**Q.** So May 14 is about two weeks after you first talked to Andrew Hamilton about Yury wanting to transfer, correct?
**A.** Correct.
**Q.** And it's about -- it's before Yury actually leaves, correct?
**A.** Correct.
**Q.** At this point in time, you're talking about risks of replacing him via contractor or permanent role, correct?
**A.** Yes. And also keeping him. Keeping and replacing.
**Q.** And then on May 19, you actually had a meeting with Andrew Hamilton about this issue, correct?
**A.** Correct.
**Q.** Just so we're clear because a lot of people testified, that meeting between you and Andrew Hamilton, was human resources present at that meeting on the 19th?
**A.** No.
**Q.** Let's go to Exhibit 20.
Before we get to this exhibit, just to comment on -- Exhibit 3 that we went over about your desktop in Atlanta, that was an email that you sent to Andrew Hamilton about desktop space. He responds. Wanda then weighs in.
A bunch of people communicate through that email, right?

10:40:31 **A.** Right.
10:40:32 **Q.** Okay. So Exhibit 20 is an email dated May 27 from Andrew Hamilton to Leif Maiorini, and he copies you. That's dated 5/27 and sent at 9 p.m. at night, correct?
10:40:55 **A.** Correct.
10:40:56 **Q.** And "Next Steps on AS/400 Support is" the subject line, correct?
10:41:01 **A.** Correct.
10:41:02 **Q.** And you were a 30(b)(6) deponent for the company in deposition and you produced documents, correct?
10:41:08 **A.** Correct.
10:41:12 **Q.** And we never got any documents in the case where anyone responded to this email. Did you actually search for responses to this email to see if any were sent?
10:41:29 **A.** I did, but I didn't find anything.
10:41:32 **Q.** Okay. A lot of emails about routine equipment get responses, but this email doesn't have any responses, correct, that you could find?
10:41:46 **A.** That I could find, right. I didn't find anything.
10:41:52 **Q.** And this email reflects that -- it's from Andrew and it says, "Colin and I reviewed our options with Kat today." "Kat" meaning Katrina Hicks, correct?
10:42:02 **A.** Correct.
10:42:03 **Q.** And you actually had an in-person meeting with Katrina Hicks?

**A.** Yes.
**Q.** And did she take notes during that meeting?
**A.** I don't remember.
**Q.** You don't recall any notes from that meeting being produced in this case, correct?
**A.** No.
**Q.** In your years of -- 30 years of business experience, typically when you have important meetings, reviews, don't you usually take meeting minutes and notes to record what's discussed in those meetings?
MR. BERLUTI: Objection, Your Honor.
THE COURT: Overruled.
**A.** I recall minutes being done for business meetings, absolutely, because it's going to end up in coding issues and IT-related problems. But as far as nonbusiness, I'm not able to say whether or not that was normal or standard.
BY MR. DENNEHY:
**Q.** In your experience in 30 years, have you ever had to reprimand an employee, pull him in a conference room and talk to him about something being late or whatever?
**A.** Yeah. And that would not have been put in minutes. The only time I would do something like that in writing is if I was putting someone on probation.
**Q.** So you wouldn't take notes of a meeting with an employee, then?

**A.** I worked with the same employees -- no.

**Q.** Okay. And this states -- Number 2, the second sentence -- "We believe we must retain Yury for about nine weeks to cover critical Workday and MK work."

Did I read that correctly?

**A.** Correct.

**Q.** Number 6, it says, "Work with Kat as KT unfolds on the official exit (mitigating litigation risks)."

Did I read that correctly?

**A.** Yes.

**Q.** Is it your experience that when you worked -- you typically worked, as Leif testified, with human resources to deal with mitigation of litigation risks?

**A.** Not typically. I've never had a situation like this before in the 30 years that I've been working at Cushman & Wakefield, so this was all new to me.

**Q.** And your understanding of mitigating litigation risks is potential litigation that could come from company action, correct?

MR. BERLUTI: Objection.

THE COURT: Overruled.

**A.** Correct.

BY MR. DENNEHY:

**Q.** And just to be clear, when Yury sent you an email on 5/17, you sent that right on to Andrew Hamilton, correct?

**A.** Yes, I did.
**Q.** Let's go to Exhibit 13. This is the email that you sent, correct? It says, "Andrew, I just saw this"; is that correct?
**A.** Correct.
**Q.** So you got this email -- you got it at 4 p.m., and around 8:30 or 8:25 p.m., you saw it in your inbox and sent it on to Andrew, correct?
**A.** Correct.
**Q.** And that is dated May 17, correct?
**A.** Correct.
**Q.** And if we go back to Exhibit 11, it's dated May 14, and that's where you talk about the options of risks of replacing him, correct?
**A.** Correct.
**Q.** And the May 14 email was prior to him sending his May 17 email, correct?
**A.** Correct.
**Q.** Prior to all this going down in March-April 2015, May 2015, in say February and for time before that, Yury was working three days a week from home in New Jersey and coming in the office two days a week for the most part, correct?
**A.** Correct.
**Q.** And then after this issue arose hand you started to think about options for Yury, you proposed that he had to come and

be in the New York office four days a week in person, correct?

**A.** Correct.

**Q.** And in reality, Yury had no direct reports? He was a technical guy, right?

**A.** Can you elaborate on the question? When you say "he had no direct report" --

**Q.** In terms of like you were a supervisor, you had three direct reports typically, correct?

**A.** Oh, yes.

**Q.** Meaning you were managing them, you do their evaluations, you're involved with the management of those people?

**A.** Correct.

**Q.** And if they want to take a PTO day or some type of thing that would need supervisor approval, they'd come to you, right?

**A.** Yes.

**Q.** Yury didn't have employees that reported to him?

**A.** No, he didn't.

**Q.** By "direct reports," I mean you're supervising some?

**A.** Okay.

**Q.** So he didn't have any direct reports, right?

**A.** No, he didn't.

**Q.** And you had a handful of direct reports, correct?

**A.** Correct.

10:49:02 **Q.** And you also have technical skills in your position, right?
10:49:08 **A.** Yes.
10:49:09 **Q.** You're not just somebody with a business management background, you have a technical background and knowledge, correct?
10:49:16 **A.** I do.
10:49:16 **Q.** And isn't it true that you testified during your deposition that Andrew Hamilton had zero technical background?
10:49:27 **A.** In terms of the AS/400?
10:49:33 **Q.** Yes.
10:49:34 **A.** Yes.
10:49:35 **Q.** But you were able to manage working from Miami and doing it quite well in terms of continuing to supervise your unit, correct?
10:49:48 **A.** Correct.
10:49:57 **Q.** Now, in the process of handling the different computer support needs, you would at times hire consultants, correct?
10:50:14 **A.** Correct.
10:50:14 **Q.** And it's true that consultants don't get paid benefits like medical insurance and that sort of thing, correct?
10:50:22 **A.** Correct.
10:50:23 **Q.** And they don't get paid bonuses, correct?
10:50:26 **A.** Correct.

**Q.** And they're subject to a term of contract, correct?
**A.** Correct.
**Q.** At the end of the contract, you don't have to renew it, correct?
**A.** No. We don't have to renew it, no.
**Q.** It's true that you knew that Yury Rinsky had some type of form of cancer, correct?
**A.** Correct. I did.
**Q.** And as you sit there today, you're not certain of whether you spoke about this with others in management, correct?
**A.** No, I said I didn't speak about it. He asked me subordinate to manager, co-worker to co-worker, "Please keep this private." I never discussed it anyone, I never put it in writing, and I tried to keep it quiet for the time that I have worked with Yury.
**Q.** So is it your testimony right now that you are certain that you didn't speak about it with anyone? Is that your testimony?
**A.** Yes.
**Q.** Okay. Why don't we look at your deposition. It's page 67, line 16. So line 13, the question was, "Do you ever recall communicating with anyone else at Cushman & Wakefield about Mr. Rinsky's cancer" -- oops.
THE CLERK: Is it an exhibit?
MR. DENNEHY: It's not an exhibit.

10:52:32 THE CLERK: Okay.
10:52:35 MR. DENNEHY: It's off my screen.
10:52:37 THE COURT: It's disappeared off mine too, in sort
10:52:45 of dramatic fashion, I have to say. It just went black.
10:53:10 It's still not up, Karen.
10:53:14 THE CLERK: How long is it? Is it on?
10:53:26 THE COURT: No. It happened the other day too. It
10:53:29 went black and Jarrett called down IT and then it came back
10:53:38 up. I don't have it, but just go ahead. You have it, right?
10:53:50 MR. DENNEHY: No.
10:53:52 THE COURT: You don't have it?
10:53:54 MR. BERLUTI: It's only at Counsel's.
10:53:56 THE COURT: Do you want to look at it from your
10:53:58 counsel table screen?
10:54:01 MR. DENNEHY: Does the witness have it?
10:54:03 THE WITNESS: No, I don't have it.
10:54:08 MR. SZAL: I've got a hard copy.
10:54:12 THE COURT: Nothing wrong with the old-fashioned
10:54:13 way.
10:54:36 MR. DENNEHY: Do you mind, I'll just approach?
10:54:38 THE COURT: Yes, that's fine.
10:54:46 BY MR. DENNEHY:
10:54:46 **Q.** So I'm reading the question that was asked at your
10:54:48 deposition. It's page 67 at line 13. And the question said,
10:54:56 "Do you ever recall communicating with anyone else about --

at Cushman & Wakefield about Mr. Rinsky's cancer that you knew about?"

"Answer: Communicating with anyone else directly? I don't remember. I can't say. You know, I never mentioned it to anyone else. I can't recall. It could have come up, but I can't say for sure."

Did I read that correctly?

**A.** Yes.

**Q.** As you sit there today you say that you're certain you don't remember it. But during your deposition, you weren't sure, correct?

**A.** Correct.

THE COURT: Go ahead. I just don't have a screen.

MR. DENNEHY: I don't either. I can try to dance -- move this around.

THE COURT: If you want to question from counsel table because you don't have the screen, that's fine.

Mr. Szal, your screen is working, right?

MR. DENNEHY: The witness' screen isn't working and theirs isn't working.

THE COURT: I'm not sure theirs isn't working. She didn't put this up because it's not an exhibit.

MR. DENNEHY: I understood that.

THE COURT: We can see if theirs is working. Can you pop something up, Karen. Let's see if theirs is working.

Okay. Mr. Dennehy, theirs is working.

MR. DENNEHY: All right. It's back.

THE COURT: Oh, mine's back too. What do you know, the good Lord works in strange and mysterious ways.

BY MR. DENNEHY:

**Q**. Mr. Reid, in preparing for your deposition and in preparing to produce documents and in preparing for this trial, you've become -- you've reviewed some documents, correct?

**A**. Correct.

**Q**. And you reviewed the document that was the certified response to Mr. Rinsky's claim at some point, didn't you?

**A**. Yes.

**Q**. And it was prepared by Craig Cuyar under oath, correct?

**A**. I believe so, but I would probably remember it better if I saw it.

**Q**. In that document, he states under oath that you didn't know about Mr. Rinsky's cancer. He denied that you knew that, correct?

**A**. He denied that I knew that?

**Q**. Yes.

**A**. I don't recall seeing that.

**Q**. Okay.

MR. DENNEHY: Why don't we pull up 73. I think it's on 57.

BY MR. DENNEHY:
**Q.** They found it on the page, and there's a little arrow there. Do you see the paragraph that says, "Reid also specifically denies knowing that Rinsky had lymphoma or telling Rinsky that C&W would not continue to employ him if he took more time off."
Did I read that correctly?
**A.** Yes.
**Q.** But, in fact, you knew that he had cancer, correct?
**A.** I knew that he had cancer, yes. I didn't know he had lymphoma, but I knew that he had cancer.
**Q.** At some point after this issue came up about Mr. Rinsky seeking a transfer, you actually sought to have him resign, correct?
**A.** Can you repeat the question?
**Q.** At some point after you had discussions with human resources and Mr. Hamilton about this transfer issue to Boston, you actually sought Mr. Rinsky to resign his position with the company, correct?
**A.** Resign, yes, or return to New York.
**Q.** Before you got to the "return to New York," didn't you just ask him to resign? Didn't you send him an email with some resignation -- proposed resignation letter language?
**A.** Yes. I did send him that letter.
**Q.** A number of these documents that you drafted in terms of

11:01:26 communications with Mr. Rinsky, you weren't the sole drafter of those documents, correct?
11:01:30 **A**. Correct.
11:01:31 **Q**. Are you familiar with a Steve Lipka?
11:01:54 **A**. Yes. I am familiar with Steve Lipka.
11:01:56 **Q**. Does he work in the IT department in New York?
11:01:59 **A**. Yes, he does.
11:02:00 **Q**. And does he live in Boston?
11:02:02 **A**. Yes, he does.
11:02:04 **Q**. And he's been doing that for how long?
11:02:13 **A**. At the time, I would say at least four years. At least four years at the time of the incident.
11:02:18 **Q**. Is he still working for Cushman today?
11:02:23 **A**. I believe so, but I can't tell say for certain.
11:02:28 **Q**. Okay. The other people in your group in New York continued to work, after this happened, three days a week remotely, this same schedule that they had had, correct?
11:02:51 **A**. Correct.
11:02:57 **Q**. And the consultant you hired, Edgardo Felix, he's still there, correct?
11:03:06 **A**. Correct.
11:03:06 **Q**. And he works three days from home?
11:03:08 **A**. No. He actually works two days from home now.
11:03:11 **Q**. Okay. And Anna, she was working, after this happened, still three days from home?

**A.** It varies between three and two from home.
**Q.** Okay. Let's go to your deposition at -- this is a nonagreed-to exhibit -- page 94, line 6. Up at Number 2, it says, "In 2015, was there ever a time where the policy in your department with respect to working remotely was changed?"
Answer: "In 2015, no."
At line 6, "So everybody continued to work remotely either two or three days a week, depending on who it was?
Answer at line 20: "Yes."
MR. BERLUTI: Objection. Objection. That's not the answer to that question.
THE COURT: Yeah. You have to ask that question differently.
MR. DENNEHY: I'll just strike the question. It was interrupted and there's no answer.
BY MR. DENNEHY:
**Q.** In 2015, Yury was the highest paid software technician in your group, correct?
**A.** Correct.
**Q.** And he received the highest bonus, correct?
**A.** Correct.
**Q.** Let's pull up Exhibit 4, which is an agreed-to exhibit. This is an email. It's from Andrew Hamilton to you, March 9, 2015. It's bonus/merit communication details. It has

attachments, final bonus and merit file. And it says, "Colin, here are the details for your team. Please remember that on Friday, the bonus will pay, and PeopleSoft will reflect the new salary in history. The average bonus attainment percentage across enterprise application is 85 percent. If you have any questions, please let me know. Andrew." And then there's an attachment.

Did I read all that correctly?

**A**. Yes.

MR. DENNEHY: And then can you scroll up.

BY MR. DENNEHY:

**Q**. Okay. So attached to this, you can see it has the names of three individuals. Your name in the direct manager role, their job code description. And then at the end, it's their annual salary. The first individual makes slightly over 57,000, Anna makes 104, and Yury comes in at 129.

Did I read that correctly?

**A**. Correct.

**Q**. And then the next -- roll up -- is the bonus. Same three people. The third line is Yury, correct?

**A**. Yes.

**Q**. And his bonus is $17,000, Anna comes in at 8, and the other individual is at 1,250, correct?

**A**. Correct.

**Q**. So there were a number of emails that have been gone over

11:07:25 during the trial. You would generally agree that there were
11:07:27 discussions in May 2015 about potentially replacing Yury,
11:07:35 correct?
11:07:35 **A.** Correct.
11:07:36 **Q.** And when he sent the email in May saying, "I'm going to
11:07:45 Boston," you didn't write back to him and say, "Whoa, this
11:07:50 transfer has not been approved yet," correct?
11:07:54 **A.** Correct.
11:07:54 **Q.** And you didn't call him and say, "Whoa, this transfer
11:07:59 hasn't been approved," correct?
11:08:01 **A.** Correct.
11:08:02 **Q.** And, in fact, you didn't tell him that -- you didn't tell
11:08:12 him that people were thinking of terminating him because
11:08:17 management wouldn't allow you to do so, correct?
11:08:19 **A.** Correct.
11:08:30 **Q.** During the time from May 30 to June 22, you had regular
11:09:01 Workday communications with Yury, correct?
11:09:05 **A.** Correct.
11:09:40 MR. DENNEHY: Can you put up Exhibit 26. This is
11:09:46 an agreed-to exhibit.
01:11:07 BY MR. DENNEHY:
11:09:48 **Q.** This is from the -- the bottom of it is from you to
11:09:52 Andrew Hamilton, June 1, 2015. It says, "Subject: SOW for
11:09:58 AS/400 Consultant." Is SOW scope of work?
11:10:04 **A.** Statement of Work.

**Q.** And it says, "Andrew, here is the signed SOW from the AS/400 consultant starting next Monday."

Did I read that correctly?

**A.** Yes.

**Q.** And this is Edgardo Felix?

**A.** Yes.

**Q.** And from Andrew Hamilton to Colin Reid. He says, "Boom! Nice work. How did testing go with Mark today (he explained the new protocols)."

Did I read that correctly?

**A.** "New process."

**Q.** "New process." Did I read it correctly now?

**A.** Yes.

**Q.** We can agree that "boom," exclamation point, Andrew's somewhat excited about bringing this consultant onboard, correct?

**A.** Correct.

**Q.** And Edgardo Felix's scope of work was similar to Yury Rinsky's role, correct?

**A.** Not initially.

**Q.** After Yury left, didn't his duties get divided up between you and Edgardo Felix?

**A.** Yes.

**Q.** And just to be clear, at no point did you ever tell Mr. Rinsky that his transfer had been denied, correct?

**A.** Correct.
**Q.** In fact, you were in court when Katrina Hicks testified and she stated that the issue that had come to her attention was that formal approval for his transfer hadn't happened. Did you remember hearing that?
**A.** I believe so.
**Q.** When you had your discussions with human resources, you did have at least some meetings with -- or discussions with Katrina Hicks and Andrew Hamilton about the situation, correct?
**A.** Correct.
**Q.** And did she use the term "formal approval" during those meetings?
**A.** I don't remember.
MR. DENNEHY: Let's go to Exhibit 23. Start at the bottom. Start with 2/26. That's it.
BY MR. DENNEHY:
**Q.** We're looking at the bottom part here. It says 2/26.
That was it, you had it. Do you see on the bottom of page 3 in front of you, it says -- in a message dated 2/26, it says, "Hi, Edgardo, nothing yet. If anything comes up, I will let you know."
Did I read that correctly?
**A.** Yes.
**Q.** And on 2/26, is this you replying to Edgardo, he's making

inquiry with you about whether you have any work for him, correct?
**A**. Correct.
MR. DENNEHY: Okay. Scroll up to the next one.
BY MR. DENNEHY:
**Q**. And then on Tuesday, April 14, Edgardo sends you another email, and he's inquiring about whether there's any more work, correct?
**A**. Correct.
MR. DENNEHY: Scroll up again.
BY MR. DENNEHY:
**Q**. And you reply on May 20th, "Edgardo, I hope you are keeping well. Something might be coming up soon. Are you still interested? Do you have any experience with the IFS feature on the AS/400? Regards."
That's your response, correct?
**A**. Correct.
**Q**. And did I read that correctly?
**A**. Yes.
MR. DENNEHY: Okay. Scroll up again. Go up a little more. Okay. One more.
BY MR. DENNEHY:
**Q**. And on May 20 Edgardo Felix writes to you and says, "Hi, sir. Thanks for this opportunity again. I am very interested in this position."

Did I read that correctly?
**A**. Yes.
**Q**. Fair to say around the end of May, you're looking to retain Edgardo Felix?
**A**. Correct.
**Q**. And let's go to Exhibit 29. Okay. This is Exhibit 29. Everyone's seen this a million times now. It's from Scott Sommer to Yury. It says, "Good afternoon. Your desktop is still in New York. Do you need it? "
Did I read that correctly?
**A**. Yes.
**Q**. And then it says -- Yury on June 2 replies, "Scott, I will need my desktop in a couple of weeks when I get a cubicle in Boston. Thanks."
That's Yury's response. Did I read that correctly?
**A**. Correct.
**Q**. And above that it says -- it's from you to Yury to Sommer, and you copy Andrew Hamilton, right?
**A**. Right.
**Q**. And that's June 2nd?
**A**. Right.
**Q**. And it says, "Scott, please wait until I am back in New York tomorrow. Yury might be getting new equipment for Boston since I have an AS/400 consultant sitting there next week. Andrew, please advise. Thanks."

Did I read that correctly?

**A.** Yes.

**Q.** And isn't the first exhibit that I started with, there was an email chain -- as Exhibit 3, an email chain about you getting your desktop set up in Miami? Do you remember that?

**A.** Yes.

**Q.** Isn't this email very similar to the one where you were getting your desktop situated?

**A.** I thought he said "objection."

MR. BERLUTI: No objection.

THE COURT: There was no objection.

THE WITNESS: He didn't.

THE COURT: No.

THE WITNESS: I'm sorry.

**A.** Yes, it is.

BY MR. DENNEHY:

**Q.** All right.

MR. DENNEHY: We have no more questions for this witness at this time.

MR. BERLUTI: Your Honor, may I just give him a copy?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. BERLUTI:

**Q.** Good morning, Mr. Reid.

**A.** Morning.

MR. DENNEHY: Your Honor, we object to the witness having a document in front of him while there's no question that's pending. If they want to put it off to the side.

THE COURT: Do you want to just turn it over.

Okay.

BY MR. BERLUTI:

**Q.** Mr. Reid, please describe your educational background?

**A.** I have a bachelor's in business and a master's in business management.

**Q.** And when did you first become employed at Cushman & Wakefield?

**A.** 1984.

**Q.** So you've been working there about 33 years?

**A.** Correct.

**Q.** How old are you, sir?

**A.** Sixty-three.

**Q.** Now, you were asked some questions, sir, about your getting a desktop in Miami. Do you recall seeing that, Exhibit 3, in an email exchange between you and Mr. Hamilton?

**A.** Yes.

**Q.** Did you send that email to Mr. Hamilton asking for a desktop after Mr. Cuyar had approved your transfer?

**A.** Yes.

**Q.** Now, you were asked some questions, sir -- strike that.

And when Mr. Rinsky sent the email exchange we just looked at with Mr. Sommer, had Mr. Cuyar approved Mr. Rinsky's transfer to Boston?

**A**. No. Up to this time, I still was not aware whether or not Yury was going to be approved or not approved.

**Q**. And your response to basically everybody in that email about requesting a desktop, you said, "Andrew, please advise." Do you recall that?

**A**. Yes.

**Q**. What did you mean by that, "Andrew, please advise"? What were you asking there?

**A**. Well, I wanted to know if Andrew would override my knowledge -- or update my knowledge, sorry, to let me know whether or not this was going to happen because I had no knowledge of whether or not it was a contingency plan that I was working on in case his relocation was approved.

**Q**. And you didn't know, as of June 2, 2015, whether or not his relocation request had been approved; is that correct?

**A**. Correct.

**Q**. By the way, in connection with your transfer to Miami, sir, did you have any agreement with Cushman & Wakefield as to how frequently you would come back to New York?

**A**. It was an open agreement that I would come back whenever necessary.

**Q**. And in 2015, how frequently did you have to come back to

New York?
**A.** I was back several times. I was back April, May, June, July, and then several more times after that.
**Q.** Did you own a home in New York before you moved to Miami?
**A.** I did. And I still do.
**Q.** I was going to ask you. You continue to own the home.
You were asked some questions, sir, about a May 27 email. It's Exhibit 20. We've seen it. It's the one from Andrew Hamilton to Leif Maiorini with a copy to you with a plan laid out, 1 through 6. Do you recall that email?
**A.** Yes, I did.
**Q.** By May 27, 2015, Mr. Rinsky was already in Boston at that time; is that correct?
**A.** Correct.
**Q.** His last day was actually five days before on May 22; isn't that right?
**A.** Yes.
**Q.** Between the time that you first learned -- between the time that Mr. Rinsky first asked you if he could transfer to Boston on April 30 until May 17 when he sent you the email to say, "I'm moving to Boston on May 27," you had raised that issue to Mr. Hamilton, correct?
**A.** Correct.
**Q.** But did you have any opportunity to actually meet with Mr. Hamilton and discuss what the plan would be in connection

with Mr. Rinsky's request to transfer?
**A**. No.
**Q**. There was a meeting request for May 19 with Mr. Hamilton. Do you recall that?
**A**. Right.
**Q**. Did that meeting actually take place on May 19?
**A**. I believe so.
**Q**. And at that time what was your understanding? Strike that.
When you first informed Mr. Hamilton about Mr. Rinsky's request, it was on either April 30 or May 1, correct?
**A**. Correct.
**Q**. It was almost immediately upon you learning about his request, you told Mr. Hamilton, right?
**A**. Correct.
**Q**. And on May 14, Mr. Hamilton emailed you and said, "On your flight up to New York, please think about what we should do with Yury about considering his request," and it said, "about his purchasing a home in Boston."
By May 14, sir, did you have any knowledge that Mr. Rinsky had made a firm decision to move to Boston?
**A**. Not on May 14, no.
**Q**. Now, you were asked some questions about the policy of the people reporting to you working remotely. Do you

remember those questions?
**A.** Yes.
**Q.** And you recall that you said that it was either three days in the office or two days in the office; is that correct?
**A.** Correct.
**Q.** Please explain that policy.
**A.** Well, the reason the policy came to be was because we were short of space and there were a lot of consultants coming in to work on different projects. So team members were asked to put together a plan as to how frequently you could have someone working remote.
And when I set up the schedule with Yury Rinsky and Anna Kleynshteyn, it was set up in an effort to try and have coverage in the office so that they wouldn't overlap, they wouldn't be both remote one day and then they would both be in the office the next day. It was a way to have coverage on-site at least four days a week in addition to my presence on-site.
**Q.** Now, you've already testified this was a very busy time for all the reasons that we've heard, including the implementation of the Workday deliverables; is that correct?
**A.** Correct.
**Q.** And do you recall, sir, that on May 13, because of the Workday deliverables, this privilege as it related to Anna

Kleynshteyn and Yury Rinsky had to change? Do you recall that?

**A.** Yes, I do.

**Q.** And it had to change for you too because you had to come -- although you had transferred to Miami, you had been called back to New York for at least two weeks, correct?

**A.** Correct.

**Q.** Could we see -- and what did you do as a result of these demands to make the Workday deliverables?

**A.** I had to restrict the remote working and have people come back to the office full-time.

MR. BERLUTI: Can we take a look at Exhibit 10, please.

BY MR. BERLUTI:

**Q.** So the second sentence in Exhibit 10, and this is an email from you to Yury Rinsky and to Anna Kleynshteyn, it says, "Working remotely is being revoked for both of you effective next week until Workday tasks are completed and approved by management."

Is that the email that you sent to Mr. Rinsky and to Ms. Kleynshteyn?

**A.** Yes, it is.

**Q.** And how long was it before the Workday tasks were completed and approved that you were referring to in Exhibit 10?

**A.** Well, Workday went into production in October of that year.

**Q.** So is it fair to say that from May of 2015 until October of 2015, Anna Kleynshteyn was required to report to work in the New York City office almost every day?

**A.** I don't think that we kept it until October.

**Q.** How long did you keep it?

**A.** We kept it a few months.

**Q.** So did it remain in effect certainly into July of 2015, then?

**A.** Around that time.

**Q.** And did your implementing this change and the privilege to work remotely have anything to do with Mr. Rinsky's request to transfer to Boston?

**A.** Absolutely not. This was a demand from the business management team that I return to New York. We were at a stalemate. We were falling behind in the project timetable. We had a timetable that we had to meet to go live for October 1. And this was just so that I could have a more grasp on the team and have them be able to work with the business team and other consultants. It was strictly regarding Workday. This had nothing to do with Yury.

**Q.** And you were asked some questions about Edgardo Felix. Do you recall that?

**A.** Yes.

**Q.** You said that when he was first retained at the beginning of June of 2015, that he was not initially retained to replace Yury Rinsky or words to that effect. Do you recall that?

**A.** Yes. Initially Yury and I had a discussion, before this Boston situation came up, that he needed help. And there were features that we needed for the interfaces between the AS/400 and Workday that Yury was not familiar with and I was not familiar with. That's the IFS feature. It stands for integrated file systems. And it's basically putting the data on a Microsoft server from the IBM AS/400.

Initially, Edgardo was brought in to do that and help with the workload, that Yury was spending too many hours working, and we didn't think we would be able to meet the September deadline.

**Q.** Now, the arrangement, financial arrangement with Mr. Felix, we saw yesterday, was that he would get paid at $65 an hour; is that correct?

**A.** Correct.

**Q.** And he worked 40 hours a week?

**A.** Correct.

**Q.** Were there times that he worked more than 40 hours a week?

**A.** A lot.

**Q.** And given the arrangement with him, if he worked more

than 40 hours a week, he worked based upon the number of hours he worked, correct?

**A.** Correct.

**Q.** And when Mr. Felix -- now, he worked from June until December of 2016 under the first contract, correct?

**A.** 2015.

**Q.** '15. Excuse me. Thank you.

Is that right?

**A.** Yes.

**Q.** And then his contract was renewed at the beginning of 2016, correct?

**A.** Correct.

**Q.** And his rate per hour was increased from $65 an hour to $75 an hour?

**A.** Correct.

**Q.** Do you recall being asked some questions about whether you spoke with anyone at Cushman & Wakefield about Mr. Rinsky's medical condition? Do you remember those questions?

**A.** Yes.

**Q.** And you were asked some questions about your deposition. Do you remember that?

**A.** Yes.

**Q.** Could you please turn over your deposition transcript that you have there. You were asked about page 67.

MR. DENNEHY: Objection, Your Honor. It's improper use of a deposition transcript. He's asking an examination. He's not trying to impeach the witness. The witness is here. He can testify.

THE COURT: I'm not sure what he's going to do. But if you showed him a chunk of a deposition, and he wants to show him more for context, I'm going to let him do that.

MR. DENNEHY: I don't think that's what he's doing.

MR. BERLUTI: That's exactly what I'm doing, Your Honor.

THE COURT: Let's see where it goes. You can stand up and object again.

BY MR. BERLUTI:

**Q**. You were asked on page 67 about a question at line 13 and then --

MR. DENNEHY: I struck that question, Your Honor.

MR. BERLUTI: That's not the one you struck.

THE COURT: Ask your question.

And then you can tell me, after he asks it, if it's the one you struck.

BY MR. BERLUTI:

**Q**. Do you recall that Counsel read in evidence page 67 at line 13, "Do you recall ever communicating with anybody else at Cushman & Wakefield about Mr. Rinsky's cancer that you knew about?"

And Counsel read your answer.

Do you recall that?

**A.** Yes.

**Q.** I'd now like to go to the next question at page 67 at line 21. "Any recollection of it -- of coming up with Mr. Hamilton?"

And what was your answer, sir?

**A.** "No recollection of it coming up with Mr. Hamilton."

**Q.** "Question: What about Leif?"

What was your answer?

**A.** "Or Leif."

**Q.** "Question: What about Craig?"

What was your answer?

**A.** "Or Craig."

**Q.** And the Leif being referred to there was Leif Maiorini, correct?

**A.** Correct.

**Q.** And the Craig being referenced there is Craig Cuyar, correct?

**A.** Correct.

**Q.** And that was the chain of command going up from you; is that right?

**A.** Correct.

**Q.** And in that email, Exhibit 24, with Mr. Felix in which on May 20 you said to him, "Something might be coming up," the

thing that was coming up was what you just described about, were these new inputs that had to be done for the Workday deliverables?

**A.** Correct.

**Q.** You were asked some questions about that you had never told Mr. Rinsky before June 22 of 2015 that his request for transfer had been denied. Do you recall those questions?

**A.** Yes.

**Q.** First of all, sir, whose decision was it -- who had to make the decision as to whether or not Mr. Rinsky's request to transfer would be allowed?

**A.** Mr. Cuyar.

**Q.** And at any time -- strike that.

And had you learned on June 2, when that email was going back and forth with Mr. Sommers, what Mr. Cuyar's decision was?

**A.** No.

**Q.** Now, when you met with Katrina Hicks and with Andrew Hamilton to discuss what to do in light of Yury's decision to move and at that point had actually moved, did his age ever come into the conversation?

**A.** No, it did not.

**Q.** Did his health ever come into the conversation in considering what to do in light of Yury's move to Boston?

**A.** No, it did not.

11:38:05 **Q**. Did you, sir, ever have a conversation at any time with Craig Cuyar about Mr. Rinsky's health?
11:38:12 **A**. Never.
11:38:14 **Q**. Did you, sir, ever have a conversation with Craig Cuyar about Mr. Rinsky's age?
11:38:20 **A**. Never.
11:38:31 MR. BERLUTI: Nothing further.
11:38:31 THE COURT: Redirect?
11:38:53 REDIRECT EXAMINATION
11:38:53 BY MR. DENNEHY:
11:39:13 **Q**. Just picking up on one of those last points, Mr. Reid, we can agree that no recollection of an event is different from being certain that it didn't happen, correct?
11:39:22 **A**. Correct.
11:39:28 MR. DENNEHY: And let's pull up Exhibit 10 again.
01:11:07 BY MR. DENNEHY:
11:39:44 **Q**. In this exhibit, you state that "Working remotely is being revoked for both of you effective next week." And that's dated May 13, 2015, correct?
11:40:05 **A**. Correct.
11:40:11 **Q**. And is it your testimony that Anna and Yury worked in the New York office five days a week for the whole next three months?
11:40:22 **A**. Yes.
11:40:42 **Q**. Okay. And then Exhibit 29, this is the exhibit that your

counsel sent to you -- questioned you about. And you state that it was your understanding you sent on this -- "Please advise to Andrew Hamilton to see if he might override the transfer," correct?

MR. BERLUTI: Objection.

THE COURT: What's the basis of the objection?

MR. BERLUTI: It's not what his testimony was. He can ask him the question. It's just not what his testimony was. Form of the question.

THE COURT: Ask him the question.

He'll correct it.

BY MR. DENNEHY:

**Q.** You sent this on to Andrew Hamilton in March to see if he was going to override this process that's being reflected in the email, correct?

**A.** I sent it to Andrew Hamilton because I didn't know whether or not -- what the decision was as far as Yury getting a work station and a cubicle.

**Q.** Okay. And you used the word "override," correct?

**A.** I believe I did.

**Q.** Okay. And it's fair to say that at no point in time -- is there a document in this case where Andrew Hamilton said, "Stop, put on the brakes, I'm overriding this decision," correct?

**A.** There's no document, correct.

**Q.** Thank you.

MR. DENNEHY: I've completed my examination.

THE COURT: Recross?

MR. BERLUTI: No, Your Honor.

THE COURT: Next witness?

MR. DENNEHY: At this time the plaintiff rests, Your Honor.

THE COURT: That means he's concluded his presentation. Their turn now.

MR. BERLUTI: We have something to hand up to Your Honor.

THE COURT: Okay. Let's deal with that during lunch break. Okay.

MR. BERLUTI: Okay. We rest, Your Honor.

THE COURT: Okay. All right. So that has concluded the presentation of the evidence. We're a little bit before our lunch break, so what I am going to the propose to do is do the first half --

The jury instructions that you're going to get generally comes in two parts. One of it is sort of a very general charge about how to consider evidence, witness credibility, and all those things. And the second half --

I'm sorry. You're excused unless you like it up here.

THE WITNESS: I can hear you better up here.

11:43:30 THE COURT: The second half is the more specific to the individual counts in this case. To use our time wisely, I'm going to give you the general part of the charge now.

11:43:43 Then we'll break for lunch, they'll give their closing arguments, and then I'll give you the second part of the charge. Let's use our time wisely, but it also gives us a break between the two parts of the charge. I'm going to give you have a written copy of the charge, but the quid pro quo on that is I have to read it, and it's very long. So it's nice to be able to break it up into two halves. It will certainly take less than 15 minutes.

11:44:07 So I'll give you the first part of the charge now. We've been working on the charge this morning. I've got red-lines for you all that I'm going to pass out now. Any changes that you want to the second half, we can discuss during lunch, and I'll just do the first half now. Okay?

11:44:27 Why don't up stand up and stretch, shake it off, and then I'll give you the first half of the charge.

11:45:30 On the first half of this, there's charges on two pages.

11:45:33 Does anyone have anything they want to talk about at side bar before I give this on those two pages?

11:45:41 MR. BERLUTI: No.

11:45:43 THE COURT: Plaintiff?

11:45:43 MR. SZAL: No, Your Honor.

CHARGE TO THE JURY

THE COURT: Okay. I'm going to begin my instructions on the law. As you deliberate, you will have a written copy of these instructions. Nonetheless, please listen very carefully to these instructions as I give them to you now.

In defining the duties of the Jury, let me first explain the general rules. It is your duty to find the facts from all of the evidence in the case. I will describe the law to you, and you must apply the law to the facts as you find them. You must follow the law as I describe it, whether or not you personally agree with the wisdom of the law.

This is a fundamental part of our system of government by law. It is your duty as jurors to decide the case fairly and impartially regardless of any personal likes or dislikes, opinions, prejudices, bias, sympathy for one party or another. You make the decision based solely on the evidence before you and according to the law.

In following my instructions, you must follow all of them and not single out some and ignore others. They are all equally important. The lawyers are allowed to comment both on the evidence and on the rules of law in their opening and closing statements, but if what they have said about the evidence differs from your memory, let your collective memory control.

If what they have said about the law seems to differ from any of my instructions, you must be guided only by my instructions. You must not read into these instructions or anything that I have said or done during the course of the trial any suggestion from me as to what verdict you should return. Whatever opinion I might have as to what your verdict should be is utterly irrelevant. The verdict is yours and yours alone to decide as the finders of the facts.

While I intend to be as helpful as I can in providing you with the knowledge of the law that you will require to render an intelligent and informed verdict, the law commits this case to your sole determination as the judges of the facts.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial as an individual person. The law treats corporations as persons, and all persons, including corporations, stand equal before the law and are to be dealt with as equals.

"Plaintiff," as you will recall, is the name we give to the person or entity who brings a lawsuit. The plaintiff in this case is Yury Rinsky. We refer to the party sued as the defendant. In this case, the defendant is Cushman & Wakefield, Inc.

The plaintiff bears the burden of proving his claims by what is called the preponderance of the evidence. To prove their claims, the plaintiff must prove certain "elements," which I will describe later in these instructions. Plaintiff must prove each element of a claim by preponderance of the evidence. If he fails to prove any element of a claim, you should find for the defendant as to that claim.

As I explained earlier in my preliminary instructions, "preponderance of the evidence" is a lower standard of approval than that of "approve beyond a reasonable doubt," the very high standard that we apply in a criminal trial.

The party bringing the claims in a civil case like this one does not need to prove his case to any degree of mathematical certainty. Rather, the party must produce evidence which, when considered in light of all of the facts and evidence in the case, leads you to believe that each element of his claims is more likely true than not.

To put it another way, if you were to put the plaintiff's evidence and the defendant's evidence on opposite sides of the scale, the plaintiff would have to make the scale tip in his direction for you to find in his favor on any claim. On the other hand, if you find that the credible evidence of a given issue is evenly divided between the

parties, that is, equally probable that one side is right as it is that the other side is right, then you must decide that issue against the party having the burden of proof, in this case, the plaintiff.

Your verdict must be based solely on the evidence and the applicable law. In reaching the decision as to whether the plaintiff has sustained his burden of proof, it would be improper for you to consider anything that is not in evidence.

You may not base your verdict on bias, prejudice, or sympathy. While you might sympathize with one party or the other, your verdict must not be based on that sympathy or influenced by it. Again, you must decide the case solely on the evidence and according to the law.

Before I turn to the applicable principles of the law, which I will do after lunch, I want to briefly review for you what is and is not evidence in a civil case.

Evidence was presented at this trial in two ways: First, through the sworn testimony of witnesses on both direct and cross-examination. Second, evidence was presented through exhibits such as documents, photographs -- actually, there were no photographs -- all documents that were identified by a witness or otherwise admitted during the trial.

The numbers assigned to the exhibits are for your

convenience in order to assure an orderly procedure. You should draw no inference from a fact that a particular exhibit was assigned a particular number or that there may be gaps in the number sequence.

Certain things are not evidence and should have no influence on your verdict. Arguments and statements by lawyers are not evidence. What the lawyers have said over the course of the trial, you might find helpful, even persuasive, but the facts are to be determined from your own evaluation of the testimony of the witnesses and exhibits and from any reasonable inferences that you choose to draw from the facts as you find them.

Questions by lawyers to the witness are not evidence and may only be considered to the extent that they give context or meaning to a witness' answer.

Objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe that a question is improper under the rules of evidence. You should not be influenced by the fact that such an objection was made. If I sustained the objection, you should ignore the lawyer's question and any assertion of fact that it might have contained. If I overruled the objection, you should treat the witness' answer like any other.

Testimony that I excluded, struck, or which I instructed you to disregard is not evidence. If you heard an

answer to a question before my ruling sustaining an objection, you are to disregard it. The answer is not evidence.

Over the course of the trial, I provided a limiting instruction to you, in one instance telling you that certain testimony should only be used for a certain purpose. You must abide by that instruction and not use that as evidence for any purpose that went beyond the scope of my limiting instruction.

You should also ignore any editorial comments made by the attorneys during their presentations, particularly those intended to characterize the testimony of witnesses. Whether or not a witness' testimony was believable at any particular point is a determination that only you can make. Notes, if you've kept them, are not evidence. They are a personal memory aid to be used to refresh your recollection of the evidence during the deliberations.

Finally, anything you may have seen or heard outside the courtroom during the course of the trial is not evidence. As I advised you at the beginning of the case, you should not have conducted your own research or have consulted with anyone else about the case. You must decide the case solely on the evident received at trial.

All right. There are two types of evidence, direct and circumstantial. Direct evidence is direct proof of a

fact, usually presented through the testimony of a person who claims to have been an eyewitness or participant -- an eyewitness to an event or participant in a conversation. When you evaluate direct testimony, your decision is fairly straightforward. Do you believe what the witness has told you is accurate?

Circumstantial evidence, on the other hand, is proof of a chain of circumstances or a set of facts from which you could infer or conclude that another fact is true, even though you have no direct evidence of that second fact. Although you may consider only the evidence presented in the case, you are not limited to the plain statement made by the witnesses or contained in the documents.

You are also permitted to draw reasonable inferences from the facts if you believe those inferences are justified in light of common sense and personal experience. An inference is simply a deduction or conclusion that may be drawn from the facts that have been established. Any inferences you draw must be reasonable and based on the facts as you find them. Inferences may not be based on speculation or conjecture.

You all have experience in your everyday affairs drawing inferences based on circumstantial evidence. For instance, if you woke up in the morning and saw it was a bright and clear day, but you also saw a puddle of water on

the street, you might draw the inference that it rained during the night, even though your sleep had been uninterrupted. In other words, the fact of rain is an inference that can be drawn from the presence of water on the street.

As I said, an inference may be drawn only if it is reasonable and logical and not speculation or based upon conjecture. If, for example, you observed puddles of water on your street but not on any other street in your neighborhood, then other facts such as a broken water main or a neighbor's malfunctioning sprinkler system might better explain the presence of the water on your street and therefor be a more logical inference. In deciding whether to draw an inference, you must look at and consider all of the facts in the case in light of reason, common sense, and your own life experience.

Neither type of evidence, direct or circumstantial, is considered superior or inferior to the other. Both types of evidence may be considered in reaching your verdict and may be given whatever weight you as the finders of fact deem that particular evidence to be worth.

Most evidence received at trial is offered, and in this case was offered through the testimony of witnesses. As the Jury, you are the sole judges of the credibility of these witnesses. If there are inconsistencies in the testimony, it

is your function to resolve any conflicts and to decide where the truth lies. You are not required to believe the testimony of any witness simply because that witness was under oath.

You may choose to believe everything that a witness said, only part of it, or none of it. If you do not believe a witness' testimony that something happened, that is not evidence that it did not happen. It simply means that you must put aside that testimony and look elsewhere for credible evidence before deciding where the truth lies.

Often it may not be what a witness says but how he or she says it that might influence whether or not to accept his or her version of an event as believable or credible. You may consider factors such as a witness' character, his or her demeanor on the witness stand, his or her frankness or lack of frankness in testifying, whether a witness was contradicted by anything that he or she may have said before the trial, whether his or her testimony is reasonable or unreasonable, probable or improbable in light of all of the other evidence in the case, how good an opportunity the witness had to observe the facts by which he testifies, and whether his or her memory seems accurate.

In deciding whether to believe a witness, you may specifically note any evidence of hostility or affection that the witness may have towards one of the parties. Likewise,

you may consider evidence of any other interest or motive that the witness may have in cooperating with a particular party, including an interest in the outcome of the case.

It is your duty to the consider whether the witness has permitted any such bias or interest to color his or her testimony. In short, if you find that a witness is biased, you should view that witness' testimony with caution, weigh it with care, and subject it to close and searching scrutiny. Keep in mind, however, it does not automatically follow that testimony given by an interested witness is to be disbelieved. There are many people who, no matter what their interest, no matter what their interest in the outcome of a case, would not testify falsely.

It is for you to decide, based on your own perceptions and common sense, to what extent, if any, a witness' interest has affected his or her testimony.

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things, get confused, or remember an event differently. Memory is not always reliable. When someone recounts a story twice, it will seldom be identical in every detail unless it is a memorized lie or the witness is possessed of extraordinary perception and recall. Even a truthful witness may be nervous and contradict himself.

In deciding how much significance to give to a

discrepancy in testimony, you should consider whether the discrepancy pertains to a fact of importance or only to a trivial detail. But a willful falsehood always is a matter of importance and should be considered seriously. It is for you to decide, based on your total impression of the witness, how to weigh any discrepancy in his or her testimony. You should as always use common sense and your own good judgment.

The weight of the evidence does not necessarily depend on the number of witnesses testifying for one side or the other. The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case or who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require any party to produce as exhibits all papers and things mentioned by the witnesses in this case.

You must determine the credibility of each witness who testified and reach a verdict based on all the believable evidence in the case. In considering the credibility of witnesses, you shall apply the same standards of evaluation to each witness. All persons stand equal before the law.

The testimony of a witness may be discredited or impeached by showing that he or she previously made statements that are inconsistent with his or her present testimony. If a witness has shown to give inconsistent statements concerning any material matter, you have the right

to distrust that witness' testimony in other respects. You may reject all of the testimony of that witness or give it such credibility as you think it deserves.

Sometimes, of course, people make innocent mistakes, particularly as to unimportant details. Not every contradiction or inconsistent statement is necessarily important. Again, you alone are the judges of the witness' credibility.

If you find that a witness has made inconsistent statements under oath on an earlier occasion such as in a deposition, you may also consider that earlier statement for its truth or falsity, the same as any other testimony at trial.

A number of documents have been received into evidence, some of which you saw and were discussed during trial and some of which weren't referenced. You will have all of them with you in the jury room available for your review. You decide the weight, if any, to give each document. That is, you may credit all of a document, a portion of a document, or none of a document.

In evaluating the believability of a statement or assertion in a document you should consider all of the surrounding circumstances. Among other factors, you may consider the author of the document, the believability of the author, when the document was created, the purpose or

purposes for which the document was created, whether the document was created in anticipation of litigation, whether the statements in the document are contradicted by anything else, and whether the statements in the document are reasonable or unreasonable, probable or improbable in light of all of other evidence in the case.

You've heard deposition testimony throughout the trial. A deposition is simply a procedure where prior to trial the lawyers from one side may question a witness or adverse party under oath before a court stenographer. This is part of a pretrial discovery, and each side is entitled to take depositions.

You may consider the testimony of a witness given at a deposition according to the same standard you would use to evaluate the testimony of a witness given at trial.

All right. That's the first half of the jury instructions. It's noon on the dot. Give me one minute.

Anyone want to talk about something I just said?

MR. BERLUTI: No, Your Honor.

THE COURT: Again, every time I speak to you, they have an opportunity to correct anything I may have not gotten quite right. So 45 minutes for lunch because I think we're on a good schedule, and we'll see you back at quarter to one.

THE CLERK: All rise for the Jury.

(Jury exits the courtroom.)

THE COURT: Do you want to take a break and come back at 12:30 unless you want to talk about the changes now?

MR. DENNEHY: Why don't we take a break and come back at 12:30.

MR. WHITESELL: Your Honor, I don't know how you want to do this in light of the ECF system, but we have a Rule 50 motion that we'd like to --

THE COURT: You can hand it up. I'll read it at lunch. It is my intention at this point to let this case go to the Jury, and then we'll see what happens afterwards, and you can do your motion. At this point, it's all in. But I'm happy to read the motion.

MR. WHITESELL: Just preserving our right.

THE COURT: That's fine. I understand. You're free to renew it after the verdict. Let's see what happened.

MR. WHITESELL: Thank you, Your Honor.

THE COURT: I have this red-lined version of the Jury instruction, which means I'm reading this tiny print.

MR. WHITESELL: Your Honor, I would also say, obviously, that was drafted before this morning's events, particularly with respect to the rule on our stray remarks. The primary motivating reason for the motion is causation. Obviously, getting from any discriminatory animus to termination, there's a wide gap there and there's really no connection. So that's really what we're saying here.

THE COURT: Okay. Again, it's my intention to at this point let the Jury have it, see what happens. Then you can take up the motion again afterwards.

MR. WHITESELL: Understood.

(Court recessed at 12:02 p.m.)

THE COURT: I have for you all -- do you need a copy, too, Sarah?

These are four copies. This is un-red-lined. The only difference between the red-lined which I was going to give you and the un-red-lined is that I found one place as I was going through it where I changed "handicapped" to "disabled." But here's the red-lined.

There's no other changes. I made some changes in the front half, but only to reflect what I said like -- just things like "his" or "her." So you'll see.

So who wants to start? Your prior objections are preserved. Although, Mr. Dennehy, since you weren't here, if you feel the need to make them again, I will understand.

MR. DENNEHY: Without spending too much time, Your Honor -- I guess you were waiting for me -- the only thing I'd say is that we stand by our position that there should be the common-law claims in the instruction. I understand you're not going to do that, but I want to keep that on the record that that's still our position. We object on that basis.

And then on the basis we feel that New York law and the punitive damages allows for them to consider the wealth of the company, and we feel like that should be part of that instruction.

THE COURT: And you?

MR. BERLUTI: So we -- I continue to press on page 11, Judge. At the bottom, "Evidence of pretexting alone may but need not support an inference of unlawful bias." That's fine.

"Therefore, if plaintiff has persuaded that the defendant's explanation for terminating the plaintiff is false, you may but are not required to infer that the defendant's covering up a discriminatory intent or motive or state of mind." I think we have to add a phrase to that: "However, they need to prove that the discriminatory animus was the reason for the employment decision," something along those lines. That burden of proof never leaves the plaintiff.

MR. DENNEHY: I think it's a short instruction, Your Honor. It includes the burden of proof, and so I don't think you need the redundancy in there.

THE COURT: What if I added to the end of that -- hold on, let me find the actual copy I'm going to give.

What if I just added to the end of that, comma, "although Plaintiff must still prove that the discrimination

was a substantial factor"?

MR. DENNEHY: The problem, Your Honor, is it's overly repetitive at this point. It's in the instruction. It's a short instruction. Then it's in the special verdict form. I don't think it's needed here. When they go to deliberate and fill out the form, it once again shows up.

THE COURT: I know. As long as it's not wrong, it can show up.

MR. DENNEHY: What's that?

THE COURT: As long as I'm not wrong, it can show up a lot of times. It's only the errors that I wish to have not repeat. I'm going to add that, comma, "although Plaintiff must still show that age or disability was a substantial factor."

MR. DENNEHY: I just want on the record that we object to the cumulative repetitive nature of that comment.

THE COURT: Okay.

MR. BERLUTI: Thank you, Your Honor. The other point, Your Honor, is under punitive damages. I note that you have not added anything in about the burden of proof on this, and we respectfully submit for the record -- I see what you've done -- that a punitive claim does have a separate burden of proof. That we've seen cases in New York in which punitive damages have actually been subjects of themselves for motions for summary judgment.

We believe that it is a separate burden of proof that must be met. And the burden of proof is higher than just a preponderance of the evidence, and we respectfully submit that that should be added. And we'd also request that it be added as a special verdict question on the special verdict form.

THE COURT: We did some research on this just to double-check myself. As I said this morning, I have not ever seen a jury instruction that sets a standard like that for damages or punitive damages, so we did the research on it to make sure. And I think that we are correct on how we have this.

The two cases that I'll refer you to are Johnson versus Strive East Harlem Employment Group, which is at 990 F.Supp.2d 435. And, let's see, and there's other cases that that cites. So here's the quote if you want. "Defendants next urge that Plaintiff did not prove punitive damages as a matter of law. In analyzing punitive damages, the same 'federal standard applies... under the [New York City Civil Rights Law]' as well as under federal law."

And it goes on to say, "Plaintiff's punitive damages award thus turns on whether the evidence supports an inference of 'intentional discrimination ... 'with malice or reckless indifference for the federally protected rights for the aggrieved individual.'"

So we're not charging on that.

MR. BERLUTI: Understood. Objection is made.

THE COURT: Yes. You quite correctly preserve it, both of you.

How about the verdict form? I understand your objection on the punitives. I'm not adding a special question on that.

MR. BERLUTI: I would note that -- I'm sorry.

MR. DENNEHY: I was going to say that's fine with us. Just as long as we have a continuing objection that we feel the common law claim should have been in here.

THE COURT: Yes.

MR. DENNEHY: As far as this goes, where it's at, this is fine.

MR. BERLUTI: I'm just going to note for the record, Your Honor, that I believe the requirement should be a but-for standard as opposed to substantial factor, but I've already made that objection.

THE COURT: Yes. And I note that I think substantial factor is the right standard. We charge but-for in the charge, and I think that they're substantially equivalent, significantly equivalent.

All right. I just need to make this one change to the charge.

THE CLERK: All rise for the Jury.

(Jury enters the courtroom.)

THE COURT: We're going to go right to closing arguments.

Plaintiff?

CLOSING ARGUMENT BY PLAINTIFF

MR. SZAL: Good afternoon, Ladies and Gentlemen of the Jury. First of all, we'd like to thank you for your service. It has not gone unnoticed that you have paid very close attention to this case, taken notes, listened to everything that went on here, and reviewed all of the documents that were shown to you.

A lot of this case has involved information technology, computer systems. And in that context you all know that we live in a sophisticated, technological world. In the context of discrimination, direct evidence is not often found. There's seldom an eyewitness to what an murderer's state of mind or mental process is. You rarely see a smoking gun email that says, "Fire the older disabled guy." And because of that, we let you as a Jury fill in the gaps. You get to infer what happened based on the documents that you've had and the documents that you haven't seen.

Now, you reviewed documents in this case. The majority of them came from the defendant, as you know. It's a sophisticated business entity that controls the flow of information. And a lot of what this case involves happened

in New York City, but regardless, you as a Jury are allowed to use your good old Boston common sense.

What happened in this case? On one side we have our story. Mr. Rinsky, a 27-year tenured employee, worked hard and diligently at the company. Worked hard, he earned his salary. Unfortunately, he got sick. In 2009, he had some cancer treatment, came back to work and was told, "Hey, it's fine, just don't let it happen again because we might not be able to employ you." The message was coming from management. He continued to do his job.

In 2013, unfortunately, his cancer returned. Same thing happened. Chemotherapy treatment. Came back to work and was told the same thing like it was a recording. "Don't get sick again because they might not be able to continue to employ you."

After 27 years, he was an employee that was 63 years old with a record of cancer and a history of it known to the company.

Then you have the defendant's side of the table. On the other side you have the explanation that Mr. Rinsky, after 27 years, up and moved to Boston. Didn't ask for approval. Just did it and was going to ask on the back end. Snuck out the door. Announced that he was transferring and eventually abandoned his job.

You know that's not the case.

Now, the Judge is going to instruct you more on the law with respect to specific claims in this case of discrimination. But in general we know that discrimination is when you treat somebody different because of something they can't control. We can't control how old we are. We get older every day. And mostly we can't control our health if something bad happens to us.

That's why the law protects you. In terms of disability, the focus is not just on what you feel about yourself, it's what others perceive about you, if they perceive you to be disabled because of your record. Do they think you're disabled because you've had cancer twice in the last six years? Just because you're able to work doesn't mean you're legally not disabled. Keep that in mind.

This is a case about different treatment. And how do we know that? Because we saw the documents. We have a clear example. We've looked at a lot of documents in this case, a lot of tedious emails and whatnot, and I'm not going to do that again.

I think this is an important email. This is June 4, 2015, right in the heart of the period that we're talking about.

There's two transfers on the table. There's Mr. Rinsky who is 63 years old with cancer twice in the last six years, and there's a guy named Jay Leiser. Mr. Rinsky

wants to go to Boston. Mr. Leiser wants to go to Florida. Craig Cuyar, who we've heard a lot about in this case, makes the decision. Jay, addresses compensation model. And we know that to mean, "See if he'll take less money if we let him move to Florida."

With Yury, his request is dead on arrival. Follow the same process, get rid of him. This right here shows the different treatment at the company.

So there's two stories we have here. We know what Mr. Rinsky knew and we know what the documents and the testimony of what was going on behind the scenes.

So let's first go to what Mr. Rinsky believed to be going on at the time. He learned that his manager was transferring to the Miami office. He decided to give the same thing a try. During the same time, a broker approached him about the sale of his house. He put it on the market. He received a great offer. Why was it great? Because it had no mortgage contingency and he didn't have to leave the house. It wasn't going to have any effect on his life whether this house sold.

He has conversations with Mr. Reid. The first conversation, Mr. Reid is too busy, but when Mr. Rinsky gets the offer, they sit down and talk. He says, "It's not just me, I need to talk to Andrew Hamilton, "after saying, "Thank you God your cancer hadn't returned."

Follow up communications ensued, and that was it. No other process or procedure necessary from what Mr. Rinsky understood. Colin is his manager for 27 years. If he needs anything, he goes to him. PTO time, computer equipment, whatever he needs, he calls Reid and he makes it happen.

Reid's response, you saw in the email. That was weeks after the actual response was given. He was told it was approved. Mr. Hamilton, Reid's manager, the only approval that Mr. Rinsky ever knew was necessary said, "I approve."

By the way, he was working three to four days at home anyway at this time. You heard testimony that Mr. Reid and Mr. Rinsky had a follow-up discussion on -- this is two days after the email. They discussed how he'd get a cubicle in Boston, how he had to get Internet set up. Mr. Reid, based on his own experience, was giving advice to Mr. Rinsky on what would happen after his transfer.

There was another meeting. It was the last day he was in the office on May 22nd. "Before you leave, let's go over your list for June." Nowhere in the testimony, nowhere in the documents did anyone say, "What do you mean, you're going to transfer to Boston? What do you mean? Your job's here. If you leave, we can't employ you."

They wanted him to leave. And why? They wanted the excuse. They knew he was sick. He had been sick twice.

He could get sick again. He manages IT for important commission systems. It's millions of dollars on the line. We heard Leif yesterday testify about what he does. He troubleshoots. He's dealing with commissions on million-dollar projects.

If something goes on, he has to be available. If he's out two days a week, that's a problem. If he's out for months, it's a bigger problem. This gave them the excuse.

So we also know from Mr. Rinsky's side of things that he finished out his work in New York. He packed his life up from New Jersey. He moved it up here to Boston. He had time off, but instead he said, "Colin, I have Internet, I want to start working again." He didn't use all the PTO time he took. He had daily interactions with Mr. Reid during this time. There was nothing unusual. It was business as usual.

Until he got an invitation to a conference call on June 22. He was excited. He thought, "I'm getting my cubicle in Boston." And by now, we all know what happened on that call. "Come back to New York five days a week or resign or be fired." Those were the options. That's what he knew.

But that was not all of what's going on. You have to ask yourselves why the secrecy? Why weeks, weeks of emails behind the scenes? "When are we going to do it? Who's going to do it? How are we going to do it?" There was no doubt they were going to terminate him. It's just who was

going to do it, how and when.

So here's the second story, the full story, the complete story, what was actually going on. On May 14, three days before even learning of the closing date for Mr. Rinsky's house, there's an email from Mr. Hamilton to call him. "Think about ways that we can decide whether we want to get rid of him or keep him." Three days. This issue was percolating long before that May 17 email.

"Evaluate the pros and cons of keeping and replacing." What were the pros? Well, he had a lot of experience. We know what the cons were. He could go out at any time and not be available to us.

May 19, there's a meeting with Hamilton and Reid to discuss what's going on. That's the same day that he met with Mr. Rinsky talking about the details of his transfer. On May 20, Mr. Reid emails the contractor, "I might have something coming up for you." Again, Mr. Rinsky hasn't even left the building. All they would have had to say was, "Your transfer is not approved," we wouldn't be here today. They didn't want him to stay.

May 22, there's a meeting with Mr. Reid and Mr. Rinsky to go over their task list before he left, same day he accepted a meeting request with Mr. Hamilton for the May 27 email that we looked at about.

Look at Exhibit 18. You've seen this a number of

times. There's no smoking gun in this case, but this one is pretty warm. "This is the plan. We're going to hire the contractor. We're going to take Mr. Rinsky's 27 years of knowledge" -- Exhibit 20. I'm sorry. Here's what I want. You remember this one, right? "We're going to hire the contractor. We're going to transfer his 27 years to the contractor. We're going to retain him for about nine weeks. We're going to process the transfer paperwork. We're going to work on the official exit," meaning his termination, "and we're going to mitigate litigation risks as always."

Mr. Rinsky never knew this was going on. This was never told to him. Daily interactions with people at the company, but this plan was never discussed. He didn't even know he was transferring his knowledge to this contractor. He didn't know his replacement had been hired, Edgardo Felix.

May 28, Mr. Rinsky starts work again from Boston. Two days later, they send a contract to the contractor to backfill his role. It gets signed, forwarded on to Andrew, who says, "Boom." They were very excited about that.

June 2, the contract is sent to Leif, and Mr. Hamilton again tells them they're backfilling Yury. Everybody knew what was going on here. There was no discussion about asking him to come back to New York.

On the same day in Boston, Mr. Reid is sending Mr. Rinsky an email, "You might be getting new computer

equipment." We already know they've hired his replacement, they're getting ready to fire him, they're going to keep him to cover critical work and then he's gone.

Leif tells Craig, the contractor, "I need to make this happen." Why? Why do you need to make that happen?

June 4, they swoop in and take Yury's old desk. Space is at a premium there. There's nowhere for him to even go back to if he went back to New York. He wouldn't have anywhere to sit three or four days a week.

June 4, there's more discussions about the termination.

June 5, Leif and Kat, they're planning on terminating him next week. No discussion of making an offer to him to come back.

June 15, "We need to terminate him ASAP." That's what Leif says. "Let's handle it like resign due to relocation."

June 16, they discuss terminating him on Friday. Instead, "Let's bring him in on Monday." That's the June 22 they were talking about.

At the same time, HR was trying to create a narrative that Mr. Rinsky relocated without notifying his manager. When that was told to Mr. Rinsky, he provided some emails. "I notified my manager, look at these emails."

Then the story changed. "Oh, we didn't notify your

manager, we meant approval. Notification, we meant approval." That's not what the documents say. You know that.

June 22, the call, Monday morning, business as usual, according to Mr. Rinsky, but it's intended to be an ambush. He thought that call was about his work space in Boston, but it was about his termination. "Be here tomorrow in New York City five days a week every day, resign, or be fired."

Mr. Rinsky is shocked. He's upset. Wouldn't you be if you worked for someone for 27 years and they told you you're going to be fired or have to resign?

He sends emails. He sends emails to Ms. Hicks, who we saw here. He sends emails to the president of the company. He sends emails to Reid. You've seen all the documents. His story has never changed. "I was approved. I got approval. I talked to Colin. I did what I thought I had to do. I thought I knew the process."

HR becomes involved. Then we get the edict from management. "No transfers for anyone at this point. We need to eliminate potential employment disputes and subsequent litigation."

There's always this risk of litigation, mitigating risks. This was the time that Jay Leiser's transfer was coming about. They wanted to handle or make it appear that

they were handling things consistently.

We know now that after the dust had settled, Jay Leiser is in Florida managing a team in India. Mr. Reid's in Miami. Ms. Hicks works in Washington D.C. Leif goes to Chicago to work. Everybody is transferring and working all over the country. But for some reason, Mr. Rinsky had to be at a desk in New York to perform his job.

And we know he didn't. We heard Leif testify yesterday. If there's something that needs to be done, if there's troubleshooting, they don't care where he is. "If he can fix the problem, if he can fix the commission system, if he can make sure that the millions of dollars continue to flow in, anywhere is fine with us."

HR starts drafting the termination for Mr. Rinsky. They draft it in a way that will mitigate litigation risks. It's full of inaccuracies, as Mr. Rinsky has testified, mostly because it wasn't written by Mr. Reid. Those weren't the people that were personally involved.

Then that letter was sent under Mr. Reid's name that we looked at earlier. That's how we got here today.

Now, at the beginning of this case, you were told some things. One of the things you were told was that Mr. Rinsky asked for forgiveness he didn't ask for permission. You were made a promise as to what the evidence was going to show in this case.

There was never an ask for forgiveness. He never asked. And the reason he didn't ask is he didn't do anything wrong. They told you that was the evidence. That's not the evidence. They're trying to trick you. You're not going to be tricked. We're not going to be tricked here in Boston by some company in New York.

He didn't ask for forgiveness, but he is asking for your help today. He's asking for your help to remedy a wrong. He should have been able to enjoy his retirement, complete his employment with the company, and should be employed there to this day. They prevented him from doing his work. They prevented him from earning his salary. They prevented him from getting his bonus and benefits. And in the process have caused him significant emotional harm.

He's asking you to find them responsible. He's asking you to make them pay with the salary that he should have earned, that he wanted to work for, that he still wants to work for. He's asking you to compensate him for the emotional distress. And he's also asking you to send a message to big corporate America. "This isn't how we treat older disabled people. This is wrong."

You can send a message to New York City. They'll remember Yury Rinsky. And the next time an older disabled worker makes a request, they won't use this as a pretext to terminate them legitimately.

Thank you for your attention, and we ask that you return a verdict in favor of the plaintiff. Thank you.

CLOSING ARGUMENT BY DEFENDANT

MR. BERLUTI: Ladies and gentlemen, I also would like to thank you for your attention, your time, and your efforts in this case. This is an age discrimination case. This is a disability discrimination case. The age discrimination laws protect older workers if they can do the job. Disability discrimination law protects disabled people if they are able to do the job.

You will receive no instruction and there is no law that says an older person or a disabled person can perform their job where they want to perform their job. There's nothing in these laws that say that an older worker or disabled worker can move if he wants to to another location and determine if it's best for him, because of family reasons, he should be able to move. That's not what these laws protect.

Cushman & Wakefield, the big bad New York employer, provided employment for Mr. Rinsky for 27 years, 24 of which was he was 40 years old or over. He was given raises almost every year. He was given bonuses almost every year. This company that had discriminatory animus in its mind and heart gave this gentleman a $17,000 raise in March of 2015 for the work that he did in 2014.

The evidence is it was the highest raise of the people in Colin Reid's department. They didn't care what his age was. They didn't care what his health condition was. They gave him the raise. It was the highest one -- the bonus, it was the highest one. And he got a raise. He was the highest paid employee.

Now, they tried to say at the beginning that, "Oh, gee, Cushman was trying to save money." They weren't trying to save money. They hired a consultant in which he was going to make even more money than Mr. Rinsky. The differential between 135,000 versus the $129,000 in salary that Mr. Rinsky was making was more than made up for any loss, the cost of any loss in benefits. Also, if Mr. Felix worked more than 40 hours, he got paid for that. So there's no evidence that cost savings had anything to do with this.

There was evidence from Mr. Reid today that they had put in motion hiring Mr. Felix as a consultant even before any decisions had been made about Mr. Rinsky. They were very busy. Let's look at the circumstances in 2015. You heard about the merger. You heard about the systems conversions. You heard about the Workday deliverables.

They were in a crunch time. They were working hard. They had consultants around. Everybody was running around like chickens with their head cut off. You saw the exhibit, the email from Mr. Reid saying, "I've been called

back to New York for two weeks." He'd just transferred to Miami. "I've been called back to New York for two weeks. Your ability to work remotely is revoked until these Workday deliverables are completed and approved by management." This was done on May 13, 2015.

Anna Kleynshteyn, who was employed for Cushman about the same time and was about his age, maybe four or five years younger, but there's no substantial difference there, Ms. Kleynshteyn is still employed. And when she was asked to come to the office every day, she did it for the months of May, June, and July.

This is not a case of discrimination in which a loyal, long-time productive worker -- there's no dispute about that -- had the rug taken out from under him by the employer. Nobody took Mr. Rinsky's deck. Nobody took Mr. Rinsky's computer. He gave it up. He surrendered it. He surrendered it because he wanted to come to Boston for family reasons.

That's fine. That's his prerogative, but -- but it's also the company's business judgment that they are permitted to exercise in this case. And you will get, as part of your instruction, that you may like or dislike the company's business judgment. You may agree or disagree with it, but that's not a basis for discrimination. You must find that but for a discriminatory animus, but for age

discrimination, but for disability discrimination, this decision would not have been made. And it's clear what the company's state of mind was.

Let's go through the facts. Mr. Rinsky began in 2014 to look for a home in Winchester, Massachusetts, close to his daughter who had been here for 20 years and was pregnant with her second child, their second grandchild. She gave birth to that second grandchild in January of 2015. Good for them.

They found a house that was a mile away in Winchester. They closed on it in December of 2014. At the time they closed on it, they were represented by counsel. And on the advice of counsel and with their understanding, they signed a Declaration of Homestead saying, "I intend to live here as my principal residence." And it's an exhibit in this case.

Immediately thereafter, what did they do? They began renovations, substantial renovations. Over $30,000, and it took several months. Mr. Rinsky testified those renovations weren't completed until the end of April or the beginning of May. They did everything, 100 percent new appliances, new hardwood floors. They changed the walls or the partitions. They painted the entire place.

You're not going to do that, ladies and gentlemen -- respectfully, that's not something that a person

does and then turn around and rent it out for a few years. That's only something that you're going to do if you plan to live there yourself.

So what does Mr. Rinsky say? He said, "Gee, in May, I decided to put the house on the market because a real estate broker approached me on it." We know that he signed a listing agreement. We know from the exhibits that the property was listed from March 29 and it closed on May 27. We know from his testimony that he received an offer. He saw it, he says, not later than April 2.

He immediately hired an attorney, James Burke, and he immediately proceeded to move forward with this purchase and signed the purchase and sale agreement. The final addendum, the change in the price, the inspection was done. The deal was done no later than April 28. Okay?

Does he tell Cushman & Wakefield this? Does he tell Cushman & Wakefield, his friend, Mr. Reid, that he's worked for that he bought a house? Does he tell him he's doing renovations? No. He keeps it to himself. He says that is -- when he learns that Mr. Reid transferred in the middle of March is when he says he learned about it. He thought about it. He said, "Gee, maybe I should do that too." That's what the story is.

Well, he waited -- Mr. Reid, you understand, now has moved to Florida. April 8, he's reporting to the Florida

office. He has to come back at the end of April because of bereavement, and he's back in the New York office on April 30. That's why Mr. Reid can say with certainty that April 30 is the first time that he met with Mr. Rinsky.

Mr. Rinsky didn't ask if he could put his house on the market. He didn't ask if he could move. He said, "I'm putting my house on the market." He informed Mr. Reid that. "And I plan to move to Boston." He didn't say it was already under agreement.

Seventeen or eighteen days later, on May 17, Mr. Reid gets an email saying, "Okay, I'm moving to Boston on May 27."

So there's some differences in their stories, in what Mr. Reid recollects and what Mr. Rinsky recollects. One of the things that Your Honor has instructed you on is inconsistent testimony or inconsistent statements.

One of the exhibits is Exhibit 77. It's an affidavit that was filed with the Massachusetts Commission Against Discrimination, and the date is important. It's August 24, 2015, so this is a matter of a few months after all of these events transpired.

In this document at paragraph 7, Mr. Rinsky says, "in the beginning of April 2015, I decided to inquire as to whether the company would allow me to work from the company's Boston office."

He then says in paragraph 9 that, "As a result of the company approving my request to work from Boston, I put my home in New Jersey on the market. On May 15, 2015, I received a cash offer for my New Jersey home."

Now, we know that that's all wrong. Now, this is not an innocent misstatement as Her Honor has instructed you, you tell the same story twice, it's never going to be the same. This was a statement that he filed under the penalties of perjury with the advice of counsel, with the opportunity to get all documents that he needed: A copy of his listing agreement, a copy of his purchase and sale agreement, and all of that.

There's no reason for these dates to be so far off. It's not just the dates. It's actually what happened that he says -- on May 15, he gets a cash offer.

He then says, "Two days later, I told Mr. Reid about the offer and that I intended to move to Boston at the end of May." Now, that's pretty close because on May 17, that was two days later, he emailed Mr. Reid and said, "I'm moving to Boston on May 27. And by the way, I need four days PTO." So that part is pretty close. But the timing of when he received the cash offer, he's trying to mislead what happened. He's trying to change the sequence of events.

He thought that because of how business at Cushman & Wakefield was, there was no way they wouldn't keep him on

to work remotely, even though he supported a user group that he sat right next door to. He made a calculation and it didn't work. He thought it was better to ask for forgiveness than to ask for permission.

When that didn't work and they told him, on June 22, that they couldn't put up with that, he had to come back, he had his job, he had to come back to where he'd been for 27 years or he could resign or he'd be terminated, now all of a sudden he changed facts. And this story that he said to the MCAD follows that changed fact. "I got approval and then they did certain things." That's not what happened. That's not what happened at all.

When he learned on June 22 about what the decision was, he writes to John Santora, the president of the company, who, by the way, is about the same age as Mr. Rinsky. He started at Cushman & Wakefield at about the same time. Mr. Rinsky testified today that.

And he said essentially the same type of thing in terms of sequence. "I asked for approval. I got approval. Then I put my house on the market and it sold." That's not what happened. We know that from the documents and from the evidence.

But there's a second important thing here. That is Mr. Rinsky is saying, "Well" -- by the way, in terms of age, Colin Reid is 63 years old. He's two years younger than

Mr. Rinsky. He made a request to transfer. He went through the proper channels. He took the time. It took more than six months. You heard Mr. Maiorini say it may take as much as a year just to get everything smoothed out to make sure they had confidence that he could do the work remotely.

Mr. Rinsky wanted to do it in a matter of a few weeks. It wasn't going to happen like that. It is a big company. There's a lot to consider. The decision-maker is Craig Cuyar, the global information technology chief, who especially at that time, given this big merger, was traveling all over the place. He's the one that ultimately had to approve it.

If Mr. Rinsky was treated differently, it's because he didn't want to go through the process. He didn't want to allow Cushman to fully consider his request.

So the other thing they now say in this case, "Oh, in addition to age, it's because of his health, disability discrimination." And they say that in 2009 -- and I read you the interrogatory on this. And he says, "Please list all the instances Mr. Rinsky experienced personal discriminatory animus based on his age and/or disability."

His response was, "I believe the termination of my employment was based on my age and/or health condition." The person that made the decision to terminate was Craig Cuyar. It wasn't Colin Reid. Colin Reid was several layers removed

from who made that decision. But there are two instances that I know of during which discriminatory animus was shown.

"In 2009, after my chemotherapy treatment, Mr. Reid called me into the conference room and said if I needed to take more time off from treatment, the company 'won't be able to keep you there.'" This is in 2009. He says the same thing happened again in 2013.

In this same affidavit to the MCAD, Exhibit 77, you need to take a look at paragraph 4 in which he talks about something that happens in 2009, but it has nothing to do with his health. It says, "In 2009, the company's information technology management was completely replaced, and during this time my position was changed to software engineer two." That's all he says about what happened in 2009.

He then says in paragraph 5, "I've experienced health issues recently that were known to the company. In 2013, I was hospitalized for two weeks with pneumonia and underwent treatment for recurrent lymphoma."

Paragraph 6 says, "Upon returning to work from my most recent lymphoma treatment, I was told by Mr. Reid that the company would not continue to employ me if I took more time off for something similar soon."

So this is very different. In this case, he's telling you there are two instances in which Mr. Reid said to him. In his affidavit in August of 2015, he says it only

happens once. It's up to you, ladies and gentlemen, to determine credibility of the witnesses.

Now, in this case he testified, and we have transcripts of that, that when he went out, he testified that it was 2012, not 2013. Now, that's an example, I submit to you, of where someone might be nervous and might make an innocent mistake. 2012, 2013, okay, that might happen.

When you have an opportunity to get medical records to correct data and to sit down and to make an affidavit and sign under the penalties of perjury, there's not by accident, ladies and gentlemen. That's not inadvertent. You have the advice of counsel with that.

Now, you were asked, "Why would Cushman & Wakefield want to not keep Mr. Rinsky?" The answer is there's no reason. They want to keep him. They were very busy and they struggled with this decision. The first email was, "Let's discuss the pros and cons of keeping him or separating."

Mr. Rinsky is the one that gave up his seat. He wanted to go to Boston. You heard Mr. Maiorini testify that it was very important that he be able to service his user group, the high-touch group that needed a lot of attention. Right?

And when Mr. Rinsky was there, people would come up to them and he would meet with them. He didn't want to testify to that in this case, ladies and gentlemen, but

that's what happened. There's a reason for it. You heard from Mr. Maiorini that Mr. Rinsky's expertise is -- there's overlap, but was different than Anna Kleynshteyn. They had fundamentally different jobs. And while they might cover each other for a short period of time like vacation, you couldn't replace one with the other. So it's not true that Mr. Rinsky could do everything remotely.

You can look at the -- you will look at the exhibits. And Exhibit 54, Mr. Reid is saying -- this is in June, this is weeks after things happened, that "When he told me" -- Mr. Rinsky told him he had already decided to relocate. He took a home equity loan. He purchased a home in Boston and put his own home up for sale.

He also says in an email, Exhibit 59 -- this is almost contemporaneous with these events, this is to Katrina -- there was no verbal confirmation. "When he informed me on April 30, I told him that this had to go through the IT process of Andrew, Leif, Craig, and reminded him that my relocation took several months to get approved. He asked me to do the best that I could."

Let's look at the same exhibit that we talked about in the opening, which is Exhibit No. 11 -- excuse me, I'm sorry, it's No. 12. This is the May 17 email in which Mr. Rinsky is informing Mr. Reid that he's leaving. In the second sentence, I submit to you, is a very important

sentence in the phraseology. "I am confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved."

Is that the phraseology, is that the statement made by someone that already has approval? That will be for you to determine and decide. I submit to you it does not. He does not know that he has approval. He knows that it hasn't gone through yet.

Now, ultimately you may agree or disagree that he should have stayed on for nine weeks, he should have been terminated as soon as he brought it up with Mr. Reid, but that's a business decision. That's solely in the province of the business people at Cushman & Wakefield. The person that made the decision was not Colin Reid, a person that Mr. Rinsky said had been very good to him for 27 years. That decision was made by Craig Cuyar.

What was in Craig Cuyar's mind? You can see that in Exhibit 33, an email dated June 4, that he was aware of the Jay Leiser request. He was not aware of the Yury Rinsky one. And that's why he had to treat it in a certain way as the other person that was relocating. It was basically dead on arrival because Mr. Rinsky made the request and left almost simultaneously.

You can also look at Exhibit 57 in which Mr. Cuyar

gives the exact reason for why he was maintaining the policy that he was maintaining. "I would like for our" --

First of all, he says, "These individuals were all hired with full knowledge that their roles were based in New York and accepted our offer of employment." He then says, "I would like our IT organization to maintain consistent policy for all employees so that we treat everyone fairly and provide them with the same employment opportunities."

There's nothing there about age discrimination. There's nothing there about health. Jay Leiser and Robert Maison were both younger than Mr. Rinsky. Mr. Reid was the same age. Age has nothing to do with this. Health has nothing to do with it.

Ladies and gentlemen, we have come to the end of a long road. The case is now going to be in your hands. We ask you to make a determination based upon the facts, based upon the law that Her Honor is going to instruct you on. Not based upon sympathies. Not based upon biases or prejudices.

What happened here was a business decision. Nobody pulled the rug out from under Mr. Rinsky. Somebody else was not given an opportunity to go to Boston, but Mr. Rinsky was not. There were no AS/400 engineers in Boston. There never had been. In 27 years of work, Mr. Rinsky never once went to Boston for business purposes.

This is a case in which Mr. Rinsky wanted to change the terms of his employment, and Cushman & Wakefield said no for business reasons, not because of age and not because of his health. Thank you for your service.

CONTINUATION OF JURY CHARGE

THE COURT: All right. Why don't you all stand up and move around for a minute. Then we'll finish the charge.

Now that you've heard the closing arguments, I want to turn to the principles of law that govern the specific claims and defenses made in this case. As an initial matter, a corporation like Cushman & Wakefield obviously can only act through its acts and employees. The law accordingly holds a corporation responsible for the acts done by its agents or employees that fall within the scope of their agency or employment.

In this case, Plaintiff Rinsky alleges that he was terminated from Cushman & Wakefield because of his age and/or disability. Accordingly, he has brought two legal claims against Defendant: One, a claim of age discrimination; and two, a claim of discrimination based on a disability.

Defendant asserts that he was terminated for job abandonment, a legitimate, nondiscriminatory business reason for the termination. Plaintiff responds this explanation is a pretext to conceal an improper discriminatory motive.

It is unlawful for an employer or its agents to

terminate an employee based on his age or because of a disability. In this case, in order for the plaintiff to recover, he must prove by a preponderance of the evidence that his age, a disability, or both was a determining or substantial factor in Defendant Cushman & Wakefield's decision to terminate him.

To establish a disability, Plaintiff must prove that he had any physical, medical, mental, or psychological impairment or a history or record of such impairment. The impairment can relate to any system of the body. Plaintiff need not prove that his age and/or disability was the only reason for the company's decision.

Age and/or disability are determining factors if Plaintiff would not have been terminated but for his age and/or disability. Plaintiff is not required to produce direct evidence that Defendant discriminated against him on the basis of age or disability. Discrimination is rarely admitted and may be inferred from the existence of other facts.

An at-will employee can be terminated by his employer at any time and for any reason so long as that reason wasn't unlawful. In deciding whether age or disability or both were a determining factor in Defendant's decision, why the defendant terminated the plaintiff is obviously important. It is unlawful to discharge a person

because of his age or disability. It is not unlawful to discharge a person for abandoning his job or for refusing to report to work or for any other lawful reason.

To decide this case, you will have to inquire into and determine the defendant's motive, intent, or state of mind. Sometimes motive, intent, or state of mind can be proved directly. Direct evidence is evidence that, if believed, would result in a highly probable inference that a forbidden bias was present in the workplace. Examples of direct evidence include facially discriminatory employment policies, statements of a defendant that suggest a discriminatory attitude toward older or disabled employees, testimony of a witness describing what their state of mind was or testimony of a witness about what a defendant said that would be reflective of their state of mind.

Motive, intent, or state of mind may also be proved indirectly or circumstantially. You may examine the defendant's actions and words and all of the surrounding circumstances to help you determine what the defendant's motive, intent, or state of mind was when it terminated the plaintiff.

Here Plaintiff has claimed discrimination and defendant has offered a different reason for its decision to terminate the plaintiff. Plaintiff asserts that this reason is pretext. When assessing pretext, you should differentiate

between discrimination and a business judgment. Discrimination based on age or disability is not permitted. A business decision is just that. Even if you believe that the business decision was a bad one, it is the defendant's decision to make so long as it is not a pretext for discrimination.

Evidence of pretext standing alone may but not need support an inference of unlawful bias. Therefore, if the plaintiff has persuaded you that the defendant's explanation for terminating the plaintiff is false, you may but are not required to infer that defendant is covering up a discriminatory intent, motive, or state of mind, although plaintiff must still show that age or disability was a substantial factor.

Next I'm going to instruct you on the law of damages. The fact that I charge you on the measurement of damages does not indicate that I have a view of what the verdict should be or whether any damages are due in this case. Instructions as to the measure of damages are given for your guidance and should only be considered in any event you find in favor of Plaintiff in accordance with the other instructions I've given you.

If the plaintiff has proven to you that the defendant unlawfully discriminated against him, then you must decide the amount of damages, if any, that will fairly

compensate the plaintiff. Except where I instruct you otherwise, the plaintiff bears the burden of proof on damages.

Although uncertainty in the amount of damages does not bar recovery and mathematical precision is not required, you must not speculate, conjecture, or guess in awarding damages. A damages award must be based on just and reasonable inferences from the evidence.

If you find that the defendant unlawfully discriminated against the plaintiff, then you may award damages in the following areas: Back pay, front pay, and emotional distress, which we also call compensatory damages, and punitive damages.

The purpose of compensatory damages, back pay, front pay, and compensation for emotional distress is to make the plaintiff whole for all the losses that he has suffered because of defendant's unlawful discrimination.

I'm going to discuss each of these individually beginning with back pay. The plaintiff is entitled to back pay, which is the amount of the plaintiff's lost earnings from the date of his termination until today. This includes all lost salary, bonuses, the value of employment benefits, and health insurance benefits that would have accumulated but for the defendant's discriminatory conduct. You should decrease this amount by any earnings and benefits received by

the plaintiff from another employer since the date of the adverse employment action.

The plaintiff is also entitled to front pay, which is the amount of damages resulting from the loss of future earnings and benefits that is attributable to the defendant's misconduct. You cannot speculate in awarding front pay. Rather, the determination of the amount of the award must be proven with reasonable certainty.

You should make estimates based on the evidence concerning the amount of future earnings that the plaintiff would have received but for the defendant's unlawful discrimination.

In determining front pay, you should consider and weigh the following factors: The amount of earnings, including salary, bonuses, and benefits that the plaintiff probably would have received between now and the plaintiff's projected retirement date or date of future employment; the plaintiff's probable date of retirement or date of future employment; the amount of earnings that the plaintiff probably will receive from another employer until his retirement; the availability of other employment opportunities; and the possibility of inflation and wage increases in the future.

In order to avoid overpaying the plaintiff, you must consider that the amount of money you give the plaintiff

today for future losses can be put in the bank where it can earn interest. So in making an award for future damages, you must determine the amount of money that, if invested today at a reasonable rate of interest, would in the future provide the plaintiff with the amount of money that you calculate he will lose in the future as a result of the defendant's conduct.

The plaintiff has a duty to limit or mitigate his damages by making reasonable efforts to find other comparable employment. It is the defendant's burden to prove to you that the plaintiff failed in his duty to mitigate damages by seeking other comparable employment and to show the extent to which such efforts would have diminished damages.

This can be done by showing that suitable work existed and that the plaintiff did not make reasonable efforts to obtain it. Comparable or suitable employment means that it is substantially equal to the plaintiff's prior job. The plaintiff is not required to go into a different line of work, accept a demotion, or take a lower ranking position.

If you find that the defendant has shown that the plaintiff failed to make any reasonable efforts to find other suitable employment, Plaintiff loses the right to claim back or front pay. It is up to you to decide if he made reasonable efforts or not and to what extent those efforts

mitigate damages.

If you find that the plaintiff has been discriminated against, you may also award him reasonable damages for his emotional distress. Emotional distress includes mental pain, discomfort, indignity, depression, fear, anxiety, or humiliation suffered as a result of the discrimination.

When considering emotional distress awards, some factors include but are not limited to the nature and character of the alleged harm, the severity of the harm, the length of time the plaintiff has suffered and reasonably expects to suffer, any physical manifestations of the mental harm, and whether the plaintiff has attempted to mitigate the harm, for example, by counseling or by taking medication.

In addition to awarding damages to compensate the plaintiff, you may but are not required to award plaintiff punitive damages if you find the acts of the defendant were wanton and reckless or malicious. The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant and thereby discourage the defendant and others from acting in a similar way in the future.

An act is malicious when it is done deliberately with knowledge of the plaintiff's rights and with intent to interfere fear with those rights. An act is wanton and reckless when it demonstrates conscious indifference and

utter disregard of its effect upon the health, safety, and rights of others.

If you find that the defendant's acts were not wanton or reckless or malicious, you may not award punitive damages. On the other hand, if you find the defendant's acts were wanton or reckless or malicious, you may award punitive damages.

In arriving at your decision as to the amount of punitive damage, you should consider the nature of what the defendant did, including the character of wrongdoing, whether the conduct was done with improper motive or vindictiveness, whether the act or acts constituted outrageous or oppressive intentional misconduct, defendant's awareness of the harm or potential harm caused by the conduct, how often the defendant engaged in similar conduct, and any effort to conceal or cover up the wrongdoing.

The amount of punitive damages that you award must be both reasonable and proportionate to the actual and potential harm suffered by plaintiff and to the compensatory damages you awarded Plaintiff. The nature of Defendant's conduct, including how offensive you find the conduct, is an important factor in deciding the amount of punitive damages.

I'm going to give you a break here and talk to them, so if you want to stand up and move around, please do.

Sidebar, please.

01:44:14 (WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

01:45:06 THE COURT: You first.

01:45:07 MR. DENNEHY: Aside from our running objections,
01:45:09 we're fine.

01:45:10 THE COURT: Okay.

01:45:11 MR. BERLUTI: Nothing other than what is already on
01:45:14 the record, Judge.

01:45:15 THE COURT: Okay. Excellent.

01:45:15 (The following is held in open court and in the
01:45:46 presence of the Jury.)

01:45:46 THE COURT: It is now time for you to start your
01:45:50 deliberations. Let me say a few words about those
01:45:53 deliberations. Each of you brings to your jury service, your
01:45:55 life experiences and knowledge. This serves only as a
01:45:56 background for your common sense and judgment.

01:45:57 In rendering your verdict, you must consider only
01:46:03 and decide the case solely upon the evidence in light of my
01:46:04 instructions. Each of you must decide the case for yourself,
01:46:07 but you should do so only after considering all of the
01:46:09 evidence and listening to the views of your fellow jurors.

01:46:12 Do not be afraid to change your opinion if you
01:46:14 decide you are or think you might be wrong after hearing the
01:46:17 opinions of your fellow jurors, but do not come to a decision
01:46:20 simply because other jurors insist that it is right, and do

not surrender an honest belief about the weight and effect of the evidence just to reach a verdict.

As you have seen, this case has taken time and effort to prepare and try. There is no reason to think that it could have been better tried or another jury would be better qualified than you to decide it. It is important, therefore, that you reach a verdict if you can do so conscientiously.

Your verdict must be unanimous as to each of the questions I am going to ask you to answer on the verdict form. I am going to ask Juror No. 4 -- right?

JUROR NO. 4: Yes.

THE COURT: I am going to ask Juror No. 4 to serve as the foreperson. The foreperson will have the same voice and the same vote as other deliberating jurors. The job does not come with extra pay. It does not come with extra prestige. The fact that one of you is the foreperson does not conduct special status or in your deliberations. You are all equal.

The foreperson will act to the extent helpful as the moderator of the discussion and will serve as the Jury spokesperson. The foreperson's most important obligation is to ensure that any juror who wishes to be heard on any material issue has a full and fair opportunity to be heard by his or her fellow jurors.

If you as a group decide to take a recess during your deliberations, you should stop discussing the case until the recess is over. Do not discuss the case during a recess when not all jurors are present. All of your discussions of the case should occur only when you are all together and your foreperson has indicated that deliberations may proceed.

If it becomes necessary during your deliberations to communicate with me, you may do so by sending a note through the court officer -- he's in back there -- who will be outside your room. No member of the Jury should ever attempt to communicate by me except by such a signed writing. If you do communicate with me, do not tell me in the note how you stand either numerically or otherwise on any issue before you until you have reached a verdict.

On matters touching simply on the arrangements for your meals, schedule and convenience, you are free to communicate with the court officer my courtroom clerk Karen orally rather than in writing. You are not to communicate with anyone but me about this case outside the Jury room, and then only in writing, other than the convenience issues that I just mentioned.

When you have reached your verdict, your answers will be recorded by the foreperson on what is called the verdict slip. This is simply the written notice of the decision you reach in this case. After you've reached

01:48:32 unanimous agreement on the verdict, your foreperson will fill in the form that I'm going to give to you, sign it and date it, and advise the court officer outside your door that you are ready to return to the courtroom.

After you return to the courtroom, your foreperson will deliver the completed verdict form as directed in open court.

You'll be getting six copies of the jury instructions to take out there with you. If you want more, let us know. There's one captioned a special verdict form. I'm going to send you out with a copy of that. There's instructions and questions on it. So you answer question one, you answer question two. Depending on your answer to questions one and two, you go on to three or you don't. You'll see those instructions are right on the verdict form. There you go.

It is my usual practice to bring everybody back at around 4:00 just to sort of see where you are, although you're free to communicate with me before then. And then at 4:00, we can decide if you want to stay, you want to go, you want to come back tomorrow, whatever you want to do.

But for now the case is yours. You'll be taken upstairs. You'll deliberate. You have the instructions.

How are the exhibits going up to them, electronically and or hard copy?

THE CLERK: Binder and electronically.

THE COURT: Okay. You're going to have a binder of the exhibits, and Karen will show you how to use -- there's an electronic system up there, So you can pull the exhibits up on a screen you've probably all been looking at for three days. All right. We will see you later.

THE CLERK: All rise for the Jury.

(Jury exits the courtroom.)

THE COURT: Do you want to get information? Are you all staying in the building or are you going?

MR. DENNEHY: We'll probably step outside. Can we give Mr. Szal's phone number?

THE CLERK: Yes.

Do both parties agree that these are the exhibits that will go back to the jury room?

MR. SZAL: Yes.

MR. BERLUTI: Defendant is content, yes.

[All exhibits listed in the Clerk's Exhibits Log have been admitted into evidence.]

(Court recessed at 1:52 p.m.)

(Jury enters the courtroom.)

THE CLERK: All rise for the jury. Court is back in session. Please be seated.

THE COURT: It's 4:00. I understand from Karen that you all want to go for the day, which is great. You

want to come back at 10 tomorrow, which is also great. Let's do that. We'll have lunch and snacks for you like we always do.

As it happens, I can't be here tomorrow because I have a family matter that I have to take care of. There will be another judge who will be here to answer any questions that you have and to preside over whatever needs presiding over tomorrow.

At the end of every trial, I normally go up and talk to the jury in sort of a more informal way. Because you're still a deliberating jury and I don't want to interfere with that in any way, I will say briefly thank you for all that you've done.

I don't want to thank you for coming out one way or the other because we don't know what that will be. I just want to thank you for being here every day and just for being a great jury in terms of how seriously you've taken this and the attention you've paid to it. I know we all appreciate that.

I'm going to let you go. If you need anything, Judge Young, he and I share a hallway, so you've probably seen him coming and going. Thank you all.

One more thing. Now, while you're deliberating, it's particularly important that you suspend thought about this for the night. You don't want to talk to anybody else

about it. No social media. It's sort of a suspended forum until you're back and you can engage in the group discussion that we rely on to get to a verdict. Thanks everyone.

(Jury exits the courtroom.)

THE COURT: So 10:00 tomorrow. Judge Young, if you need anything, Karen knows how to get in touch with him.

I normally talk to the attorneys also. Thank you. You all did a very nice job with us. I thought the closing arguments were very effective today.

I'm sure, Mr. Dennehy, I'll grow on you over time.

You, too, Mr. Berluti.

MR. BERLUTI: Thank you, Judge.

MR. DENNEHY: Thank you, Your Honor.

THE CLERK: Court is adjourned.

(Court adjourned at 4:06 p.m.)